UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA, | ) ) ) | **COMPLAINT** |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. _____ |
| DAVID S. FERRIERO, in his official capacity as Archivist of the United States, | ) ) ) ) | |
| Defendant. | ) ) | |

The United States Constitution now declares, once and for all, that equality of rights under the law shall not be denied or abridged on account of sex. For nearly 150 years, our Nation's foundational document did not acknowledge the existence of women. In 1920, the concept of equality among the sexes appeared in the Constitution for the first time, but was limited to the right to vote. Now—after 231 years and on the centennial of the 19th Amendment—the American people have committed to equality regardless of sex by adopting the Equal Rights Amendment as the 28th Amendment to the U.S. Constitution.

On January 27, 2020, the Commonwealth of Virginia became the 38th State to ratify the Equal Rights Amendment. At that moment, the process set forth in Article V of the U.S. Constitution was complete. Plaintiff States Nevada, Illinois, and Virginia—the three States to most recently ratify—ask this Court for an order: (1) directing the Archivist of the United States to perform his purely ministerial duty under 1 U.S.C. § 106b to "cause the amendment to be published, with his certificate, specifying . . . that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States," and (2) declaring that the Equal Rights Amendment has become the 28th Amendment to the U.S. Constitution.

1

After generations of effort, the women of this country are entitled to their rightful place in the Constitution. This Court should compel the Archivist to carry out his statutory duty of recognizing the complete and final adoption of the Equal Rights Amendment.

## PARTIES

1. Plaintiff Commonwealth of Virginia is a State of the United States of America.

2. Plaintiff State of Illinois is a State of the United States of America.

3. Plaintiff State of Nevada is a State of the United States of America.

4. Defendant David S. Ferriero is the Archivist of the United States. In that role, he oversees the operations of the National Archives and Records Administration. The Archivist is sued in his official capacity.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this suit arises under the Constitution and laws of the United States. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1361 because this is an "action in the nature of mandamus to compel" a federal officer "to perform a duty owed to the plaintiff."

6. Venue is proper under 28 U.S.C. § 1391(e) because the Archivist is sued in his official capacity and, for purposes of that capacity, the Archivist resides in this District.

## THE PROCESS FOR AMENDING THE CONSTITUTION

7. Article V of the United States Constitution establishes the process for adopting constitutional amendments. As relevant here, it provides:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by

>Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress.

8. The Constitution assigns particular tasks to Congress and the States in the amendment process that reflect a careful balance between state and federal power. Congress is given the powers to "propose Amendments to this Constitution" and to select between one of two "Mode[s] of Ratification"—ratification by state legislatures or via state "Conventions." States, in turn, are given the power to "ratif[y]" the amendments proposed by Congress. In the words of James Madison in *The Federalist* No. 39, the amendment process set forth in the Constitution is "neither wholly federal nor wholly national."

9. Article V was not merely an afterthought in the creation of the American constitutional scheme. To the contrary, the amendment process generated significant debate among the Framers and was carefully designed to balance the need for stability in our governing document with flexibility to adapt that document as needed. As James Madison explained in *The Federalist* No. 43, Article V's procedure for making "useful alterations" to the Constitution "guards equally against that extreme facility, which would render the Constitution too mutable; and that extreme difficulty, which might perpetuate its discovered faults."

## HISTORY OF THE EQUAL RIGHTS AMENDMENT

10. Women have been fighting for equality in the United States since the Founding generation. In 1776, Abigail Adams famously told her husband, John, to "Remember the Ladies" when drafting "the new Code of Laws."

11. The original text of the United States Constitution did not include—or even refer to—women. In fact, the only known use of the pronoun "she" in the Framers' deliberations appeared in an ultimately rejected clause referring to fugitive slaves.

12. The first women's rights convention was held in Seneca Falls, New York, in 1848.

13. It was not until 1868 that the first federal legislation was introduced proposing equal suffrage for men and women on the basis of citizenship. The resolution was not even debated.

14. After the Civil War, suffragists advocated for universal suffrage and hoped the Reconstruction Amendments would protect women and grant them the right to vote.

15. In March 1913, thousands of women marched in favor of women's suffrage in Washington, D.C., where they were met with bitter resistance and could proceed only with the assistance of the U.S. Army.

16. The House of Representatives eventually passed a resolution guaranteeing women the right to vote in 1918, and President Woodrow Wilson supported the amendment in a presidential address that he delivered on the Senate floor. The resolution, however, failed in the Senate twice. Finally, in 1919, the resolution passed both chambers of Congress, and the proposed women's suffrage amendment was sent to the States for ratification.

17. The 19th Amendment was formally adopted as part of the U.S. Constitution in 1920, upon ratification by the requisite number of States. Even so, some States ratified the amendment decades later. Virginia did not ratify until 1952. Alabama waited until 1953. Louisiana only ratified in 1970. And Mississippi did not ratify the 19th Amendment until 1984.

18. Over time, a patchwork of constitutional and statutory provisions has been found to prohibit discrimination on the basis of sex in certain circumstances. The relevant standards typically call for only intermediate scrutiny of sex-based distinctions. Many of the statutory provisions have been changed, undermined, and even repealed. Until the Equal Rights

Amendment was ratified in 2020, American law did not include a broad and definite prohibition on sex discrimination.

19. The first proposal for an equal rights amendment was drafted by Alice Paul and introduced in Congress in 1923. Initially known as the "Lucretia Mott Amendment," that proposal was introduced in the House by Representative Daniel Read Anthony of Kansas, a nephew of Susan B. Anthony.

20. Between 1923 and 1946, proposals to amend the Constitution to prohibit discrimination on the basis of sex were taken up by congressional committees more than 30 times.

21. In 1946, an equal rights amendment proposal came to the Senate floor for the first time. Although that proposed amendment received majority support, it failed to achieve the necessary two-thirds majority, by a vote of 39-35.

22. The Senate passed versions of a proposed equal rights amendment in 1950 and 1953, but the House took no action. Although equal rights amendment proposals continued to be introduced in every Congress, none of these proposals received floor consideration in either chamber for more than 15 years.

23. Support for an equal rights amendment was a bipartisan cause. For many years, it was endorsed by both major political parties. In September 1960, then-Vice-President Nixon issued a statement encouraging "widespread support for our [party's] platform declaration in behalf of an equal rights amendment to our Constitution which would add equality between the sexes to the freedoms and liberties guaranteed to all Americans."

24. Throughout this period, the precise terms of the proposed amendment continued to evolve. Changes were made to both the language prohibiting discrimination and the

enforcement provision, and amendments were introduced, debated, adopted, and removed as Congress considered different iterations of the proposed amendment.

25. The House first passed an equal rights amendment in 1970. In January 1969, Representative Martha Griffiths of Michigan introduced H.J. Res. 264. After that resolution was referred to the Judiciary Committee, Representative Griffiths filed a discharge petition to bring the proposed amendment to the House floor. On August 10, 1970, the House approved the motion to discharge, and proceeded to adopt the proposed amendment by a vote of 334-26.

26. Although the proposed equal rights amendment passed the House in 1970, the Senate did not follow suit. The amendment was considered on the Senate floor in the fall of 1970, but the Senate adjourned without voting on the resolution and failed to bring it to the floor in the following session.

A. **Congress Proposes the Equal Rights Amendment to the States in 1972**

27. When the 92nd Congress convened, Representative Griffiths began the constitutional amendment process again. In 1971, she introduced H.J. Res. 208, which would ultimately become the Equal Rights Amendment proposed by Congress. The full text of the resolution (as adopted) states:

JOINT RESOLUTION

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

> *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled* (*two-thirds of each House concurring therein*), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE —

"SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"SECTION 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"SECTION 3. This amendment shall take effect two years after the date of ratification."

28. Both the House and the Senate approved H.J. Res. 208 by far more than the required two-thirds majority. The House adopted the resolution in October 1971 by a vote of 354-24, and the Senate adopted the resolution in March 1972 by a vote of 84-8. In both chambers, the Equal Rights Amendment passed with strong bipartisan support.

29. While Congress was considering the Equal Rights Amendment, President Richard Nixon endorsed it, noting in a letter to Senate Republican leadership that he had co-sponsored the equal rights amendment as a Senator in 1951 and remained committed to its adoption.

30. Once approved by two-thirds of each chamber, the Equal Rights Amendment was formally proposed to the States as provided in Article V.

31. By the end of 1972, 22 States had ratified the Equal Rights Amendment: Hawaii, New Hampshire, Delaware, Iowa, Kansas, Idaho, Nebraska, Texas, Tennessee, Alaska, Rhode Island, New Jersey, Colorado, West Virginia, Wisconsin, New York, Michigan, Maryland, Massachusetts, Kentucky, Pennsylvania, and California. The total number of ratifications reached 35 by the end of 1977, as Wyoming, South Dakota, Oregon, Minnesota, New Mexico, Vermont, Connecticut, Washington, Maine, Montana, Ohio, North Dakota, and Indiana each ratified the amendment.

**B.    Recent Ratifications by Nevada, Illinois, and Virginia Bring the Total Number of Ratifying States to 38**

32. In recent years, three more States have ratified the Equal Rights Amendment.

7

### i. Nevada

33. Nevada ratified the Equal Rights Amendment in 2017.

34. The Equal Rights Amendment was introduced in the 79th Nevada legislature on February 13, 2017. The Nevada Senate's joint resolution stated that the Equal Rights Amendment "is meaningful and needed as part of the Constitution of the United States and that the present political, social and economic conditions demonstrate that constitutional equality for women and men continues to be a timely issue in the United States."

35. The Nevada Senate ratified the Equal Rights Amendment on March 1, 2017 with bipartisan support.

36. On March 20, 2017, the Nevada Assembly ratified the Equal Rights Amendment, after amending the joint resolution to specify delivery of the ratification to the Archivist of the United States in accordance with federal statute. Again, the Nevada Assembly did so with bipartisan support.

37. On March 22, 2017, the Nevada Senate completed the ratification process by passing the amended joint resolution in bipartisan fashion. As stated by then-Senator Ford on the Nevada Senate floor: "This is long overdue. The fact that we are still having this conversation is very perturbing. We should all be clapping about equality, and I am happy to be doing so now."

38. The joint resolution was subsequently enrolled and delivered to the Nevada Secretary of State, who transmitted the ratification to the Archivist in accordance with federal statute.

39. Nevada thus became the 36th State to ratify the Equal Rights Amendment.

40. The National Archives and Records Administration has recorded Nevada as ratifying the Equal Rights Amendment.

### ii. Illinois

41. Illinois ratified the Equal Rights Amendment in 2018.

42. The Equal Rights Amendment was introduced in the 100th Illinois General Assembly on February 7, 2017. The Illinois Senate's proposing resolution stated that "[c]onstitutional equality for women and men continues to be timely in the United States and worldwide, and a number of other nations have achieved constitutional equality for their women and men[.]" On April 11, 2018, the Senate ratified the Equal Rights Amendment by the three-fifths majority required under the Illinois Constitution and with bipartisan support.

43. The bill arrived in the Illinois House of Representatives that same day. On May 30, 2018, the Illinois House voted to ratify the Equal Rights Amendment by the required constitutional three-fifths majority and with bipartisan support. Recognizing the historic gravity of the issue, one representative observed: "I don't think that I will have debated a more important Bill than this Bill. This is about who we are as a people. This is about who we believe the State of Illinois is and should be going forward. But it's more than just the State of Illinois; it's about the United States of America[.]"

44. On May 30, 2018, the Illinois Secretary of the Senate recorded the Equal Rights Amendment as officially adopted in both chambers of the Illinois General Assembly. Ratification by the State of Illinois was complete.

45. On June 15, 2018, the Illinois Secretary of State certified in writing that the Equal Rights Amendment had been ratified by the State of Illinois and mailed official certification to the Archivist.

46. Illinois thus became the 37th State to ratify the Equal Rights Amendment.

47. The National Archives and Records Administration has recorded Illinois as ratifying the Equal Rights Amendment.

### iii. Virginia

48. Virginia ratified the Equal Rights Amendment in 2020.

49. Ratification of the Equal Rights Amendment was one of the first measures introduced in the 2020 Session of the Virginia General Assembly. The ratification resolutions, Senate Joint Resolution 1 and House Joint Resolution 1, noted that "over 80 percent of Virginians approve the ratification of the Equal Rights Amendment by the Virginia General Assembly." The resolutions also explained that the Equal Rights Amendment had already been "ratified by 37 state legislatures," acknowledging Virginia's role as "pivotal to incorporating fundamental rights into the Constitution of the United States" throughout American history—both today, as to the Equal Rights Amendment, as well as during the Founding era, when "Virginia's ratification of 10 amendments in 1791 established the Bill of Rights."

50. In floor remarks in support of House Joint Resolution 1, the chief patron in the Virginia House of Delegates acknowledged the significance of Virginia's action as the 38th State to ratify: "Very rarely the votes we take matter to people around the nation and the world, but I want to be unequivocally clear that this is a vote of a lifetime. Never again will you be able to affect the United States Constitution and solidify and enshrine women's equality into our founding document."

51. A chief patron of Senate Joint Resolution 1 has described why ratification is an important turning point for our nation, stating: "By adding the Equal Rights Amendment to the Constitution, we have taken an imperfect document and made it closer to perfect. We can tell our children that they are all equally represented in the Constitution and that we are one step closer

to achieving liberty and justice for all." Demonstrating the bipartisan support in favor of ratification, another supporter stated on the Senate floor that ratification of the Equal Rights Amendment "is an issue that we all agree on," and the "principle . . . that women and men are equal . . . is worthy of being elevated to a constitutional priority."

52. On January 27, 2020, the Virginia House of Delegates and the Senate of Virginia adopted the ratification resolutions. The House adopted the resolution by a vote of 58 to 40, and the Senate adopted the resolution by a vote of 27 to 12. In both chambers, the Equal Rights Amendment was ratified with bipartisan support.

53. Also on January 27, 2020, the Clerk of the Virginia House of Delegates and the Clerk of the Senate of Virginia transmitted certified copies of Virginia's ratification resolutions to the Archivist. Virginia's ratification of the Equal Rights Amendment was complete.

54. Virginia thus became the 38th State to ratify the Equal Rights Amendment.

\* \* \*

55. The recent ratifications by Nevada, Illinois, and Virginia bring the total number of ratifying States to 38, satisfying Article V's requirement of ratification by "three fourths" of all States.

56. Public support for the Equal Rights Amendment remains consistently strong. A survey conducted by CBS News in 1999 showed that 74% of respondents supported the Equal Rights Amendment, while only 10% were opposed. In recent years, support for the amendment has become nearly universal. A 2016 poll found that 94% of respondents were in favor of a constitutional amendment guaranteeing equal rights for men and women.[1]

---

[1] That same poll found that 80% of respondents mistakenly believed that men and women are *already* explicitly guaranteed equal rights in the U.S. Constitution.

## THE DUTIES OF THE ARCHIVIST

57. Under Article V, a proposed constitutional amendment automatically becomes "valid to all Intents and Purposes, as Part of th[e] Constitution" as soon as it is "ratified by the Legislatures of three fourths of the several States." For that reason, the Equal Rights Amendment became part of the U.S. Constitution immediately upon Virginia's ratification.

58. Congress has enacted legislation that imposes ministerial duties on the Archivist involving the publication of duly enacted constitutional amendments. That statute, 1 U.S.C. § 106b, reads:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

59. That statute does not grant the Archivist any discretion in deciding whether to publish and certify a newly adopted amendment. Instead, the duties imposed upon the Archivist are mandatory and purely ministerial.

60. In 1992, then-Archivist Don Wilson published and certified the 27th Amendment shortly after Michigan ratified the proposal. As Mr. Wilson noted, the votes by three-fourths of the States—not the Archivist's signature or any action by his office—formally added the amendment to the Constitution.

61. Virginia transmitted a certified copy of its ratification of the Equal Rights Amendment to the National Archives and Records Administration on January 27, 2020. Because the National Archives and Records Administration has received "official notice" that the Equal

Rights Amendment has been adopted pursuant to Article V, the Archivist is required to publish the amendment and certify its validity.

62. As of the date of this filing, the Archivist has neither published nor certified the Equal Rights Amendment. On January 8, 2020, the National Archives and Records Administration announced that the Archivist will refuse to do so "unless otherwise directed by a final court order." Following Virginia's ratification, the Archivist confirmed that he will take no action to certify the adoption of the Equal Rights Amendment. The Archivist has therefore failed to execute the obligations imposed on him by federal law.

## ARGUMENTS DISPUTING THE VALIDITY OF THE EQUAL RIGHTS AMENDMENT HAVE NO MERIT

### A. No Binding Ratification Deadline Has Lapsed

63. The preamble of H.J. Res. 208 (1972) states that the proposed amendment "shall be valid . . . as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of it submission by the Congress." This language did not strip the Plaintiff States of their power to ratify the Equal Rights Amendment.

64. *First*, the purported limitations period on the time for ratification was not part of the actual "Article" that was "proposed" to the States. The text of that article—which is set out in full above—neither includes a deadline for ratification nor provides consequences if ratification occurs after a particular time. Because no timeframe was part of the "amendment[]" that Congress "propose[d]" to the States for ratification under Article V, it does not limit a State's discretion about whether—or when—to ratify Congress's proposal.

65. *Second*, Article V does not empower Congress to dictate when a State may consider—much less ultimately ratify—a proposed amendment. The Constitution grants Congress two specific powers regarding amendment: (1) to "propose Amendments to this

Constitution"; and (2) to designate whether the "Mode of Ratification" will be through state legislatures or via conventions.

66. Because Article V carefully sets out the balance between Congress and the States in the amendment process, congressional authority to limit the States' role in ratification should not be presumed where the Constitution is silent. And given the Framers' concern for protecting state prerogatives against federal intrusion, any doubts about the scope of congressional authority should be resolved in favor of the States. Indeed, pursuant to the Tenth Amendment to the United States Constitution, any "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

**B.    There Is No Implied Time Limit on Ratification**

67. Under Article V, there is no time limit for how long Congress may deliberate before proposing an amendment to the States. The same is true of a State's decision about whether or when to ratify a proposed amendment.

68. Nothing in Article V suggests—much less clearly requires—that States take action on proposed constitutional amendments within any particular amount of time. Reading additional requirements into Article V that appear nowhere in its text would upset the important balance the Framers struck between congressional and state authority.

69. The ratification process for the 27th Amendment confirms the point. Congress originally proposed that amendment—which prohibits pay changes for members of Congress from taking effect until after the next set of congressional elections—along with the Bill of Rights in 1789. Ratification of the 27th Amendment stalled after 1792, and the requisite three-fourths of state legislatures did not ratify it until 1992. Despite the passage of *more than 200*

*years* between Congress's proposal and the final State's ratification, the Archivist published and certified the 27th Amendment in May 1992.

**C.     A State's Ratification Is a One-Time Event**

70.     The recent ratifications of the Equal Rights Amendment by Nevada, Illinois, and Virginia bring the total number of ratifying States to 38. Although a small number of States have, at various times and in various ways, purported to "rescind" their earlier ratifications, these efforts are constitutionally unauthorized and without legal effect.

71.     Article V grants States the authority to "ratif[y]" amendments proposed by Congress, and nothing in Article V suggests that a State may definitively reject a proposed amendment or rescind a previous ratification. To the contrary, Article V specifically provides that a proposed amendment "shall be valid . . . , as Part of this Constitution, when ratified by . . . three fourths of the several States" through whichever mode of ratification (state legislatures or convention) selected by Congress. According to that mandatory language, once a State has ratified a proposed amendment, that State has had its final say on the question.

72.     Any other interpretation would read additional state authority into Article V where none exists. Allowing States to offer a non-final, or conditional, ratification contradicts the clear language of Article V, which specifically provides that proposed amendments shall be finally adopted upon ratification by the requisite number of States—with no mention of a State's authority to withdraw or otherwise modify its ratification once given. It would also be contrary to the Framers' intent that constitutional provisions be adopted "*in toto*, and *for ever*," as described in a letter from James Madison to Alexander Hamilton on July 20, 1788.

73.     Historical practice confirms that States have no power to rescind prior ratifications. On the few occasions where States have attempted to withdraw ratification with

respect to other constitutional amendments, those purported rescissions had no effect. For example, the 14th Amendment was adopted despite two States' attempts to rescind their ratifications.

74. Because 38 States have performed the ratification role assigned to them by Article V, the Equal Rights Amendment has become the 28th Amendment to the United States Constitution.

## THE PLAINTIFF STATES ARE ENTITLED TO MANDAMUS RELIEF

75. The previous allegations are repeated and realleged herein.

76. Under 28 U.S.C. § 1361, this Court has jurisdiction over "any action in the nature of mandamus to compel an officer . . . of the United States or any agency thereof to perform a duty owed to the plaintiff."

77. The Archivist has a clear and indisputable duty to publish and certify the Equal Rights Amendment as part of the U.S. Constitution.

78. The Archivist has failed to execute those duties and has made clear that he will not publish and certify the Equal Rights Amendment unless ordered to do so by a court.

79. The Plaintiff States have no adequate alternative remedy. Under Article V, the Equal Rights Amendment has been added to the U.S. Constitution. The Plaintiff States have already fulfilled their constitutional role in the amendment process—ratifying an amendment that has been proposed by Congress. But the Archivist refuses to carry out the ministerial duties required by statute to publish and certify the amendment.

80. The duty is owed "to the [Plaintiff States]" within the meaning of 28 U.S.C. § 1361. As separate sovereigns, the States are full and necessary partners in the constitutional amendment process. The Plaintiff States have fulfilled their assigned role by ratifying an

amendment that has been proposed by Congress. The Archivist's failure to carry out his ministerial duties to acknowledge the adoption of the amendment harms the Plaintiff States by creating widespread confusion regarding the effect of their ratifications.

81.     The Plaintiff States also have a significant interest in this case because the Archivist's delay continues to thwart the will of the people, as expressed by the lawful and valid adoption of the Equal Rights Amendment. As States that have ratified the Equal Rights Amendment, the Plaintiff States have a particularly acute interest in ensuring that the amendment is properly recognized as the law of the land.

## DEMAND FOR RELIEF

The Plaintiff States request that the Court enter judgment against the Archivist and award the following relief:

a)    Declare that the Equal Rights Amendment is "valid" and "part of th[e] Constitution" within the meaning of Article V;

b)    Declare that the Archivist's refusal to publish and certify the Equal Rights Amendment violates federal constitutional and statutory law;

c)    Order the Archivist to execute his statutory duties under 1 U.S.C. § 106b as soon as practicable, by instructing him to "cause the [Equal Rights Amendment] to be published, with his certificate" stating that the Plaintiff States are among those that have ratified and that the amendment "has become valid, to all intents and purposes, as a part of the Constitution of the United States";

d)    Grant Plaintiffs reasonable costs and attorney fees, including those costs and fees allowable under 28 U.S.C. § 2412; and

e)    Grant additional relief at law and in equity as the interests of justice may require.

| | |
|---|---|
| Dated:  January 30, 2020 | Respectfully submitted, |

| | |
|---|---|
| *Mark R. Herring* (signature) | *KR* (signature) |
| MARK R. HERRING<br>*Attorney General of Virginia* | KWAME RAOUL<br>*Attorney General of Illinois* |
| By:  /s/ *Michelle S. Kallen*<br>MICHELLE S. KALLEN [1030497]<br>TOBY J. HEYTENS [490314]<br>MARTINE E. CICCONI [219373]<br>JESSICA MERRY SAMUELS [1552258]<br>ZACHARY R. GLUBIAK<br>Office of the Attorney General<br>202 North Ninth Street<br>Richmond, Virginia 23219<br>(804) 786-7240 – Telephone<br>(804) 371-0200 – Facsimile<br>mkallen@oag.state.va.us | By:  /s/ *Kathryn Hunt Muse*<br>KATHRYN HUNT MUSE<br>CHRISTOPHER WELLS<br>ELIZABETH ROBERSON-YOUNG<br>Office of the Attorney General<br>100 West Randolph Street<br>Chicago, Illinois 60601<br>(312) 814-3000 – Telephone<br>(312) 814-5024 – Facsimile<br>kmuse@atg.state.il.us<br>cwells@atg.state.il.us<br>erobersonyoung@atg.state.il.us |
| *Attorneys for Plaintiff*<br>*Commonwealth of Virginia* | *Attorneys for Plaintiff*<br>*State of Illinois* |

*CDH* (signature)

AARON D. FORD
*Attorney General of Nevada*

 By:  /s/ *Heidi Parry Stern*
HEIDI PARRY STERN
CRAIG A. NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov

*Attorneys for Plaintiff*
*State of Nevada*