**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VIRGINIA, ILLINOIS, and NEVADA,<br>*Plaintiffs*,<br><br>v.<br><br>DAVID S. FERRIERO, in his official capacity<br>as Archivist of the United States,<br>*Defendant*,<br><br>ALABAMA, LOUISIANA, NEBRASKA,<br>SOUTH DAKOTA, and TENNESSEE,<br>[*Proposed*] *Intervenor-Defendants*, | Case No. 1:20-cv-242-RC |

**PARTIALLY OPPOSED[*] MOTION TO INTERVENE AND
SUPPORTING STATEMENT OF POINTS AND AUTHORITIES**

Plaintiffs, three States who claim they ratified the Equal Rights Amendment decades after the deadline expired, brought this suit to force the Archivist to add the ERA to the Constitution. Movants, two States who rejected the ERA and three States who timely rescinded their ratifications, seek to intervene in this suit for equal and opposite reasons. If Plaintiffs prevail and the ERA is added to the Constitution, then Movants will be forced to spend substantial resources defending their duly enacted laws from this new line of constitutional attack. Many of those laws, from prohibitions on the public funding of abortion to support for women-only prisons and shelters, risk invalidation. For the Movants who rescinded their ratifications, moreover, Plaintiffs' suit would force the Archivist to wrongly count them among the ratifying States and to illegally convert their rescinded ratification papers into live legal documents. Because Movants have weighty interests at stake and satisfy all the requirements for intervention, this Court should let them intervene as defendants.

---

[*] Per LCvR 7(m), counsel for Movants, Plaintiffs, and the Archivist discussed this motion in good faith to determine everyone's position. Plaintiffs oppose intervention. The Archivist takes no position on intervention as of right and consents to permissive intervention.

1

**BACKGROUND**

I.     **The Rejection of the Original ERA**

In 1972, Congress enacted a joint resolution proposing the ERA as the next amendment to the Constitution. H.J. Res. 208. The operative provision of the ERA would have stated that "[e]quality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex." *Id.* Like the proposing resolutions for the Twenty-Third, Twenty-Fourth, Twenty-Fifth, and Twenty-Sixth Amendments, the proposing resolution for the ERA gave the States a deadline of "seven years" to ratify the amendment. *Id.*

When the seven-year deadline arrived in 1979, only 30 States had ratified the ERA: Alaska, California, Colorado, Connecticut, Delaware, Hawaii, Indiana, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, Texas, Vermont, Washington, West Virginia, Wisconsin, and Wyoming. Five States had ratified the ERA but rescinded their ratifications: Idaho, Kentucky, Nebraska, South Dakota, and Tennessee. *See, e.g.*, 126 Cong. Rec. 4,861-62 (Mar. 13, 1979) (reporting South Dakota's resolution "withdraw[ing] its ratification" of the ERA and rendering its earlier ratification "null and void" if the ERA was not ratified by the original 1979 deadline). And 15 States had rejected the ERA: Alabama, Arizona, Arkansas, Florida, Georgia, Illinois, Louisiana, Mississippi, Missouri, Nevada, North Carolina, Oklahoma, South Carolina, Utah, and Virginia. The ERA fell short of the 38 States (three-fourths of 50) needed for ratification. *See* U.S. Const., Art. V.

Congress thus passed a measure purporting to "extend" the ratification deadline four more years. H.J. Res. 638 (1978). Unlike the original ERA and its seven-year deadline—which were enacted by a two-thirds vote of Congress, as required by Article V of the Constitution—the extension bill was passed by bare majorities. The only court to consider its legality held that the extension was unconstitutional. *See Idaho v. Freeman,* 529 F. Supp. 1107 (D. Idaho 1981).

The Supreme Court agreed to review that decision but, before it could, the extended deadline expired in 1982. No additional States had ratified the ERA between the original deadline and the extended deadline. So the Supreme Court dismissed the case as moot. *See Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809, 809 (1982). Congress, the Executive Branch, the States, and the American public all understood that the ERA was dead. *See, e.g.*, *Supreme Court Declares ERA Issues Legally Dead*, Post-Dispatch (Oct. 4, 1982). As Justice Ginsburg put it, the ERA cannot be ratified unless it's "put back in the political hopper" and its proponents "start[] over again, collecting the necessary number of States." *Justice Ginsburg to Address New Georgetown Law Students*, Georgetown Law (Sept. 12, 2019), bit.ly/3bbokcd (remarks begin at 1:03:35).

## II.     The Three-State Strategy

In recent years, activists have devised a plan to revive the expired ERA. Dubbed the "three state strategy," these activists argue that the ERA can become law if only three more States ratify it. Three more States, the logic goes, would bring the total number of ratifiers to 38 (ignoring the rescissions in Idaho, Kentucky, Nebraska, South Dakota, and Tennessee)—supposedly crossing the three-fourths threshold specified in Article V. Plaintiffs are all adherents to this plan: Nevada purported to ratify the ERA in 2017, Illinois followed suit in 2018, and Virginia became the third and final State in January 2020.

Plaintiffs' three-state strategy relies on at least three legal assumptions. All are demonstrably false.

**First**, Plaintiffs assume that the seven-year deadline Congress included in the ERA is unenforceable. *See* Compl. (Doc. 1) 13-14. But the Constitution gives Congress authority over the "mode of ratification," U.S. Const., Art. V, including the "period for ratification." *Dillon v. Gloss*, 256 U.S. 368, 376 (1921). When "the congressional resolution proposing" the Eighteenth Amendment declared that the amendment "should be inoperative unless ratified within seven years," the Supreme

3

Court upheld this deadline, "entertain[ing] no doubt" about "the power of Congress, keeping within reasonable limits, to fix a definite period for the ratification." *Id.* at 370, 375-76. While Plaintiffs note that the ERA's deadline was not included in the text of the proposed amendment itself, that was also true of the deadlines imposed on the Twenty-Third, Twenty-Fourth, Twenty-Fifth, and Twenty-Sixth Amendments. Under Plaintiffs' logic, the Congresses that proposed those amendments all violated the Constitution (and no one said anything about it).

**Second**, even if Congress had not imposed a deadline in the ERA, Plaintiffs assume that the Constitution itself does not limit the time available for ratification. *See* Compl. 14-15. It does. The Supreme Court has drawn the "fair … implication from article V" that "the ratification" of a constitutional amendment "must be within some reasonable time after the proposal." *Dillon*, 256 U.S. at 375. Article V treats "proposal and ratification" not "as unrelated acts, but as succeeding steps in a single endeavor, the natural inference being that they are not to be widely separated in time." *Id.* at 374-75. Only "sufficiently contemporaneous" ratification ensures that the grave seriousness of amending the Constitution "reflect[s] the will of the people in all sections at relatively the same period, which of course ratification scattered through a long series of years would not do." *Id.* at 375. While Plaintiffs note that the Twenty-Seventh Amendment was ratified in 1992 (200 years after it was proposed), the legitimacy of that ratification is hotly contested, and an isolated episode from the 1990s says little about the original meaning of Article V. *See Printz v. United States*, 521 U.S. 898, 918 (1997).

**Third**, Plaintiffs assume that Idaho, Kentucky, Nebraska, South Dakota, and Tennessee did not validly rescind their ratifications; if they did, then Plaintiffs are still 5 States short of the 38 States they need for ratification. *See* Compl. 15-16. Yet the Constitution gives States the power to determine "when" they have "ratified" an amendment. U.S. Const., Art. V; *accord Freeman*, 529 F. Supp. at 1134; *Dyer v. Blair*, 390 F. Supp. 1291, 1307 (N.D. Ill. 1975) (Stevens, J.). If States cannot rescind their ratifications before the ratification period has expired, constitutional amendments could "be ratified

4

by a technicality … and not because there is really a considered consensus supporting [them]." *Freeman*, 529 F. Supp. at 1149. As Justice Ginsburg recently explained, "a number of States have withdrawn their ratification [of the ERA]," so "if you count a latecomer [like Virginia] on the plus side, how can you disregard States that said, 'We've changed our mind'?" *Searching for Equality: The 19th Amendment and Beyond*, Georgetown Law (Feb. 10, 2020), bit.ly/2tUgeUw (remarks begin at 43:55).

### III.   Litigation Over the Three-State Strategy

Correctly anticipating that Virginia would soon complete the three-state strategy, three of the Movants (Alabama, Louisiana, and South Dakota) sued the Archivist last December. *See Alabama v. Ferriero*, No. 7:19-cv-02032-LSC (N.D. Ala.). Their complaint sought, among other relief, a declaration that the ERA has expired, a declaration that the rescinding States have not ratified the ERA, and an injunction requiring the Archivist to return South Dakota's ratification documents.

Three weeks after Movants sued, the Justice Department's Office of Legal Counsel issued a formal opinion on the three-state strategy. *See Ratification of the Equal Rights Amendment*, __ O.L.C. Op. __ (Jan. 6, 2020), bit.ly/2UqCYWZ. OLC's opinion agrees with one, but not all, of the legal claims that Movants raised in their complaint. OLC agrees that the original ERA proposed in 1972 can never be ratified because the seven-year deadline has expired. *See id.* at 12-36. Yet OLC did not opine on whether the ERA has expired because, apart from the deadline imposed by Congress, *the Constitution* imposes its own deadline on ratification. *See id.* at 18 n.17. OLC's existing opinions reach the opposite conclusion. *See id.* (citing *Congressional Pay Amendment*, 16 Op. O.L.C. 85, 92-93 (1992)). OLC also did not opine on whether the rescissions by Idaho, Kentucky, Nebraska, South Dakota, and Tennessee are valid and enforceable. *See id.* at 36-37. Again, OLC's existing opinions reach the opposite conclusion. *See id.* at 37 (citing Memo. for Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Asst. Att'y Gen., OLC, *Re: Constitutionality of Extending the Time Period for Ratification of the*

5

*Proposed Equal Rights Amendment* 28-49 (Oct. 31, 1977); *Power of a State Legislature to Rescind its Ratification of a Constitutional Amendment*, 1 Op. O.L.C. 13, 15 (1977)).

Despite these continued disagreements, the Archivist now agrees with Movants that the original ERA can never be ratified. Compl. 13; *see Press Statement on the Equal Rights Amendment*, NARA (Jan. 8, 2020), bit.ly/39ejGIi ("[The Archivist] defers to DOJ on this issue and will abide by the OLC opinion, unless otherwise directed by a final court order."). Thus, although Movants do not concede that their lawsuit against the Archivist is moot, it is now clear that the parties in that case are not adversarial on one important legal question surrounding the viability of the ERA. Movants expect their case against the Archivist to reach a mutually agreeable resolution soon.

Meanwhile, the parties in this case *are* adversarial on the legal questions surrounding the ERA. If Plaintiffs obtain their requested relief, this Court's judgment will cause Movants the exact same injuries that prompted them to sue the Archivist in the first place. And because the Justice Department's existing opinions reject two of Movants' defenses—i.e., their claim that the Constitution itself imposes time limits on ratification and their claim that States can rescind prior ratifications—Movants have no reason to believe the Justice Department will advance these defenses or otherwise protect Movants' interests. Movants thus filed this motion to intervene.

## ARGUMENT

### I. Movants are entitled to intervene as of right.

This Court "must grant a timely motion to intervene that seeks to protect an interest that might be impaired by the action and that is not adequately represented by the parties." *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014). Specifically, under Rule 24(a)(2), this Court grants intervention as of right if:

1. The motion is timely;
2. Movants have "a legally protected interest" in this action;
3. This action "threaten[s] to impair that interest"; and
4. No existing party is "an adequate representative of [Movants'] interests."

6

*Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008). Any movant "who satisfies Rule 24(a) will also meet Article III's standing requirement." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003).

"[T]he D.C. Circuit has taken a liberal approach to intervention." *Wilderness Soc. v. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000); *see Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967) (emphasizing "the need for a liberal application [of Rule 24(a)] in favor of permitting intervention"). Under any standard, liberal or otherwise, Movants satisfy each requirement of Rule 24(a).

**A.      This motion is timely.**

Movants filed a "timely motion" to intervene. Fed. R. Civ. P. 24(a). Movants filed this motion as quickly as they could—three weeks after the complaint was filed, before the Archivist even entered an appearance, and months before the Archivist's answer is due. *E.g.*, *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (motion timely filed "less than two months after the plaintiffs filed their complaint and before the defendants filed an answer"); *Connecticut v. DOI*, 344 F. Supp. 3d 279, 304 (D.D.C. 2018) (Contreras, J.) (motion timely filed "within a month of when Plaintiffs filed the complaint, and before Federal Defendants entered an appearance"); *WildEarth Guardians v. Jewell*, 320 F.R.D. 1, 3 (D.D.C. 2017) (Contreras, J.) (motion timely filed "approximately sixteen weeks after the initial complaint was filed"). Regardless how many days it's been, courts "'do not require timeliness for its own sake'" but only to prevent harm to the court or the parties. *100Reporters LLC v. DOJ*, 307 F.R.D. 269, 274-75 (D.D.C. 2014) (Contreras, J.). Since "no substantive progress has occurred in this action," Movants' intervention could not "unduly disrupt the litigation or pose an unfair detriment to the existing parties." *Id.* at 275. This motion is timely.

**B.      Movants have a protected interest in this action.**

Movants also have a "legally protected interest in [this] action." *Karsner*, 532 F.3d at 885 (citing Fed. R. Civ. P. 24(a)(2)). This "interest" test is a "liberal" one. *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 105 F.R.D. 106, 109-10 (D.D.C. 1985). It is "primarily a practical guide to disposing of

7

lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse*, 385 F.2d at 700. The test is satisfied here.

Movants' interests in this action are, at a minimum, equal to Plaintiffs'. If Plaintiffs have standing to ensure their "yes" votes are counted and the ERA is added to the Constitution, then Movants have standing to ensure their "no" votes are counted and the ERA is not added to the Constitution. Every "State has an interest in securing observance of the terms under which it participates in the federal system." *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 607-08 (1982). Key among those terms are the "orderly" rules that Article V establishes for amending the Constitution. *Hawke v. Smith*, 253 U.S. 221, 226 (1920); *accord Freeman*, 529 F. Supp. at 1128 ("Within article V each of the participants are assigned certain powers which appear to be carefully balanced and approximately equally distributed."). "It is not the function of" Plaintiffs, the Archivist, or anyone else "to alter the method which [Article V of] the Constitution has fixed." *Hawke*, 253 U.S. at 227. Yet this suit asks the Court to do just that—i.e., to allow Plaintiffs to alter our fundamental charter without securing the timely, supermajority consent that Article V requires. If Plaintiffs' suit is successful, Movants will suffer "a continuing injury." *Freeman*, 529 F. Supp. at 1123.

The Movants who rescinded their ratifications of the ERA (Nebraska, South Dakota, and Tennessee) have an additional interest at stake. The Archivist still has possession of their ratification documents; those documents were never returned after Movants' rescinded their initial ratifications. According to the Archivist, he maintains these documents solely for historical purposes. He claims that his official records do not list Idaho, Kentucky, Nebraska, South Dakota, or Tennessee as having validly ratified the ERA. *See, e.g.*, *Equal Rights Amendment – Proposed March 22, 1972*, *List of State Ratification Actions*, Nat'l Archives, *available at*, bit.ly/31BdR5d (noting these States' "Purported Rescission[s]"). But if Plaintiffs prevail in this case, then the Archivist will be ordered to convert Movants' archival ratifications into live legal documents, to wrongfully treat those documents as votes

for ratification, and to falsely list Movants as having ratified the ERA. These injuries, which resemble common-law property and tort claims, independently support Movants' intervention. *See Freeman*, 529 F. Supp. at 1114 (granting intervention to state defendants who sought "a return of Washington's certificate of ratification"); *id.* at 1123 (finding a "conflict of the type proper for the courts to resolve" because "the defendant has refused to remove Idaho's name from the official lists of those who are considered as having ratified").

All Movants have still more interests at stake in this action—interests that are even stronger than Plaintiffs'. If the ERA stays out of the Constitution, Plaintiffs could always *voluntarily* comply with what they believe it dictates. But if the ERA is added to the Constitution, Movants cannot avoid the risk that their duly enacted laws will be challenged as unconstitutional. *See Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[States] clearly ha[ve] a legitimate interest in the continued enforceability of [their] own statutes."); *Alaska v. DOT*, 868 F.2d 441, 443 (D.C. Cir. 1989) ("States have an interest, as sovereigns, in exercising 'the power to create and enforce a legal code.'"). For example:

- Movants have laws that prohibit the expenditure of public funds on abortion. *E.g.*, Ala. Admin. Code r. 560-X-6-.09; Ala. Medicaid-Provider Billing Manual §§5.8, 28.6.7 (Oct. 2019); La. Stat. Ann. §§22:1014, 40:1061.6; Neb. Rev. Stat. §44-1615.01; 471 Neb. Admin. Code §10-005.09; S.D. Codified Laws §§28-6-4.5, 58-17-147; Tenn. Code Ann. §9-4-5116. Litigants will argue that these laws violate the ERA, as they successfully argued under several state ERAs. *E.g.*, *N.M. Right to Choose/NARAL v. Johnson*, 975 P.2d 841 (N.M. 1998); *Doe v. Maher*, 515 A.2d 134 (Conn. Super. Ct. 1986); *Moe v. Sec'y of Admin. & Fin.*, 417 N.E.2d 387 (Mass. 1981).

- Movants maintain regulations that protect women's health, *e.g.*, Ala. Admin. Code r. 420-5-1-.01; La. Stat. Ann. §§40:2175.3-.4; S.D. Codified Laws 34-23A-5, and that impose other reasonable regulations of abortion, *e.g.*, Ala. Code §26-23A-4; La. Stat. Ann. §§40:1061.9-10, 16-17; La. Admin. Code tit. 48, §4405; Neb. Rev. Stat. §§28-3,106, 28-327; S.D. Codified Laws §§34-23A-3-5; Tenn. Code Ann. §39-15-202. Litigants will argue that the ERA is "properly interpreted" to "negate" these "hundreds of laws" because abortion restrictions are a form of "sex discrimination," Nat'l Org. for Women, *Is the Equal Rights Amendment Relevant in the 21st Century?*, bit.ly/2UvXN3p—an argument they successfully made under New Mexico's ERA, *see N.M. Right to Choose/NARAL*, 975 P.2d 841.

- Movants fund and operate programs, such as school athletics, that are reserved exclusively for women. Activists will argue that these programs violate the ERA, which they claim requires stricter scrutiny than the "intermediate scrutiny" currently given to sex-based

laws. *See* Compl. 4; *e.g.*, *Att'y Gen. v. Mass. Interscholastic Athletic Ass'n, Inc.*, 393 N.E.2d 284, 296 (Mass. 1979) (holding that a state rule barring "boys from playing on girls' interscholastic teams" violates the Massachusetts ERA).

Movants do not concede that any of their laws would violate the ERA. But if a litigant convinces at least one judge to enjoin Movants' laws under a federal ERA—as many judges have done under state ERAs—Movants and their citizens will suffer serious injuries. Even if Movants can quickly stay any such decisions and ultimately defend all their laws, the ERA will force them to spend massive time and money doing so. *See United States v. Windsor*, 570 U.S. 744, 761 (2013). And as soon as the ERA is added to the Constitution, it will cast a pall of uncertainty over hundreds of Movants' laws and "impos[e] substantial pressure on them to change their laws." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015). Movants thus have many weighty interests at stake in this case.

### C. This action threatens to impair Movants' interests.

Movants are "so situated that disposing of [this] action may as a practical matter impair or impede [their] ability to protect [their] interest." Fed. R. Civ. P. 24(a)(2). This language in Rule 24 is "obviously designed to liberalize the right to intervene in federal actions." *Nuesse*, 385 F.2d at 701. When applying it, "courts in this circuit look to the practical consequences that the applicant may suffer if intervention is denied." *100Reporters*, 307 F.R.D. at 278. The practical consequences for Movants are immense.

If Plaintiffs' action succeeds, then the ERA will be added to the Constitution. *See* Compl. 17. That addition will irreparably harm Movants in all the ways mentioned above: They will be forced to spend substantial resources defending their laws from constitutional attack, many of their laws risk invalidation, and the rescinding States' ratification documents will be unlawfully given effect and their rescissions ignored. Movants cannot sit back and wait until *after* the ERA is added to the Constitution and litigants begin using it to challenge their laws. Movants will be barred from challenging the validity of the ratification process at that time, litigants will claim, because the Archivist's "certification of the adoption of the [ERA will be] conclusive." *United States v. Stahl*, 792 F.2d 1438, 1439-40 (9th Cir. 1986).

10

While Movants would resist that argument, litigating in such a defensive posture would certainly present "a sterner challenge than [Movants] would face as intervenors here." *Smuck v. Hobson*, 408 F.2d 175, 181 (D.C. Cir. 1969). Nothing more is required for intervention.

But no matter what happens in future cases interpreting the ERA, Movants "do not need to establish that their interests *will* be impaired," "only that the disposition of the action 'may' impair or impede their ability to protect their interests." *Brumfield v. Dodd*, 749 F.3d 339, 344-45 (5th Cir. 2014). It would be "a questionable rule that would require prospective intervenors to wait on the sidelines …. The very purpose of intervention is to allow interested parties to air their views so that a court may consider them before making potentially adverse decisions." *Id.*

It is also no answer to say that Movants could "fil[e] a separate suit" of their own against the Archivist. *Kaufman v. Societe Internationale Pour Participations Industrielles Et Commerciales, S.A.*, 343 U.S. 156, 161 (1952). "[T]he opportunity to raise the same issue in another forum" in "the hope of sparking a conflict between circuits, and possibly even Supreme Court resolution," is "no bar to intervention of right"; such a rule would encourage the very "fragmented approach to adjudication that [Rule 24] seek[s] to avoid." *Nuesse*, 385 F.2d at 702; *accord Kaufman*, 343 U.S. at 161 (approving intervention to avoid "a multiplicity of separate actions")*; NRDC v. Costle*, 561 F.2d 904, 911 (D.C. Cir. 1977) (approving intervention because the movants' "involvement may lessen the need for future litigation to protect their interests").

Nor is there any guarantee that, in a separate dispute between Movants and the Archivist, the court would even reach the critical constitutional issues at stake here, given the parties' lack of adversity on the viability of the ERA. *See Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("In our adversary system, … we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and … we normally decide only questions presented by the parties."). Even if the parties someday become adversarial again, Movants are still entitled to intervene here because the

"persuasive weight" of an adverse decision from this Court "'would make it more difficult for [Movants] to succeed on similar claims … in a separate lawsuit of [their] own.'" *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 320 (D.C. Cir. 2015); *accord U.S. House of Representatives v. Price*, 2017 WL 3271445, at *1 (D.C. Cir. Aug. 1, 2017); *Roane*, 741 F.3d at 151. The "best" course then—and the one that Rule 24 "implements"—is to give "all parties with a real stake in a controversy … an opportunity to be heard" in this suit. *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 130 (D.C. Cir. 1972).

### D. The existing parties do not adequately represent Movants' interests.

Finally, no existing party is "an adequate representative of [Movants'] interests." *Karsner*, 532 F.3d at 885 (citing Fed. R. Civ. P. 24(a)(2)). This inadequate-representation requirement is "not onerous" and "should be treated as minimal." *Dimond v. Dist. of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986); *100Reporters*, 307 F.R.D. at 279. It is satisfied when "the applicant shows that representation of his interest 'may be' inadequate"; "[t]he applicant need … not [show] that representation will in fact be inadequate." *100Reporters*, 307 F.R.D. at 279; *Dimond*, 792 F.2d at 192; *see Am. Tel.*, 642 F.2d at 1293 ("[Intervention is] ordinarily … allowed … unless it is clear that the party will provide adequate representation for the absentee."). Representation is inadequate when the existing parties have "a 'different' interest" from the movant, even if they have "'a shared general agreement,'" "'tactical similarity [in their] legal contentions,'" or "general alignment" on the correct outcome. *Fund for Animals*, 322 F.3d at 737; *Crossroads*, 788 F.3d at 321.

Plaintiffs clearly do not represent Movants' interests, and the Archivist does not adequately represent them either. Most obviously, the Archivist will not raise two of Movants' defenses—that the ERA has expired by force of the Constitution, and that five States (including three Movants) have validly rescinded their ERA ratifications. The Archivist "defers to DOJ" in this case, *Press Release*, *supra*, and the Justice Department's existing opinions expressly reject these two defenses. Thus, Movants

will make "real and legitimate additional or contrary arguments" to the Archivist, which "is sufficient to demonstrate that the representation may be inadequate." *Brumfield*, 749 F.3d at 346. At the very least, Movants will "serve as a vigorous and helpful supplement" to the Archivist, will "make a more vigorous presentation" than the Archivist, and "can reasonably be expected to contribute to the informed resolutions of these questions." *Costle*, 561 F.2d at 912-13; *accord 100Reporters*, 307 F.R.D. at 286 ("Though the Court agrees that the DOJ can represent capably many of the interests asserted by the [movant], the Court also has found that … the strength of the DOJ's position will be enhanced by the assistance of the [Movant]").

More broadly, the D.C. Circuit "look[s] skeptically on [federal] government entities serving as adequate advocates for private parties," *Crossroads*, 788 F.3d at 321—much less for separate *sovereigns* like Movants. *Fund for Animals*, 322 F.3d at 736. As a federal official, the Archivist has no interest in the validity of Movants' laws or what happens to their ratification documents. *Id.* at 736-37; *see also Nuesse*, 385 F.2d at 703 (explaining that the federal government does not adequately represent States because, unlike them, it usually tries to maximize federal power). In fact, the Archivist has no formal position on the wisdom of the ERA, disclaims any independent power to decide legal questions about its ratification, and describes his role in the ratification process as merely "ministerial." *Press Release*, *supra*. Because his only interest is following the procedures imposed on him by federal law, the Archivist "merely seeks to defend the present suit and would accept a procedural victory." *Wal–Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016). Movants, by contrast, want a definitive ruling that rejects the three-state strategy on the merits and binds future Archivists. *See, e.g., Crossroads*, 788 F.3d at 321 (finding the federal government an inadequate representative of the movant's interests because the government planned to raise a procedural standing argument).

Finally, the "burden is on those opposing intervention to show the adequacy of the existing representation." *Smuck*, 408 F.2d at 181 (cleaned up). Because the government "has taken no position

13

on the motion to intervene" as of right, its "'silence on any intent to defend [Movants'] special interests is deafening.'" *Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246, 1256 (10th Cir. 2001); *accord U.S. House*, 2017 WL 3271445, at *2. Further, the positions and personnel of the Executive Branch can change over the course of a single case, so it is "not realistic to assume" that the Archivist will forever defend Movants' position in this litigation. *Utah Ass'n*, 255 F.3d at 1256. Movants "should not need to rely on a doubtful friend to represent [their] interests, when [they] can represent [themselves]" as intervenor-defendants. *Crossroads*, 788 F.3d at 321.

## II. Alternatively, Movants are entitled to permissive intervention.

Even if Movants were not entitled to intervention as of right under Rule 24(a), this Court should grant them permissive intervention under Rule 24(b). Exercising broad judicial discretion, courts grant permissive intervention when the movant makes a "timely motion" and has "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Courts also consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Id.* "While permissive intervention may be denied in order to avoid the likelihood of undue delay," it should not be denied based on the natural burdens that always come with adding parties—the likely delay must be "undue." *Nuesse*, 385 F.2d at 704 & n.13. Courts in this Circuit are particularly "hospitable" to "governmental application[s]" for permissive intervention, like this one. *Id.* at 705.

The requirements of Rule 24(b) are all met here. As explained, Movants filed a timely motion. And Movants will raise defenses that share many common questions with the parties' claims and defenses—including whether Congress can impose deadlines on constitutional amendments, *see* Compl. 13-14; whether the Constitution imposes deadlines on constitutional amendments, *see* Compl. 14-15; and whether States can rescind their ratifications of constitutional amendments, *see* Compl. 15-

16. These "similarities between the issues presented by [the proposed intervenor-defendant] and those raised by the DOJ" and Plaintiffs warrant permissive intervention. *100Reporters*, 307 F.R.D. at 286.

Movants' intervention will not unduly delay this litigation. Movants swiftly moved to intervene while the case was "at … a nascent stage," *id.*, and their participation will add no delay beyond the norm for multiparty litigation. This is particularly true because Movants will voice their collective views in one consolidated brief (and one consolidated oral argument), and they will focus their briefs and arguments on their own unique defenses, rather than duplicating defenses and arguments that the Archivist raises himself. Although Movants will make two "additional and different legal arguments," Plaintiffs will not be prejudiced because they "will have a full opportunity, in their … brief[s], to counter any such legal arguments." *United States v. Philip Morris USA Inc.*, 2005 WL 1830815, at *5 (D.D.C. July 22, 2005). And this case will likely be resolved at the motion-to-dismiss stage anyway, requiring only one round of briefing. Nor would any prejudice be undue "[i]n a case of this magnitude," which implicates the very contents of our founding document. *Id.* at *6.

"The proper approach" to permissive intervention, this Court has explained, "is to allow all interested parties to present their arguments in a single case at the same time." *100Reporters*, 307 F.R.D. at 286. Movants are interested parties, they have important interests to represent, their unique arguments are essential to the accurate resolution of this case, and this Court will benefit from their involvement. Movants should be granted leave to intervene.

## CONCLUSION

The Court should grant this motion and allow Movants to intervene as defendants.

Dated: February 19, 2020

STEVE MARSHALL
*Attorney General of Alabama*

 /s/ *Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.
*Solicitor General*
James W. Davis
*Deputy Attorney General*
A. Barrett Bowdre
*Deputy Solicitor General*
Kelsey J. Curtis
*Assistant Solicitor General*
OFFICE OF THE ALABAMA ATTORNEY GENERAL
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
(334) 353-2196
edmund.lacour@AlabamaAG.gov
jim.davis@AlabamaAG.gov
barrett.bowdre@AlabamaAG.gov
kelsey.curtis@AlabamaAG.gov

JEFF LANDRY
*Attorney General of Louisiana*

 /s/ *Elizabeth B. Murrill*
Elizabeth B. Murrill
*Solicitor General of Louisiana*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 326-6766
MurrillE@ag.louisiana.gov

DOUGLAS J. PETERSON
*Attorney General of Nebraska*

 /s/ *James A. Campbell*
James A. Campbell
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov

Respectfully submitted,

 /s/ *Cameron T. Norris*
Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

Cameron T. Norris
Alexa R. Baltes
Tiffany H. Bates
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
lexi@consovoymccarthy.com
tiffany@consovoymccarthy.com

JASON RAVNSBORG
*Attorney General of South Dakota*

 /s/ *Paul S. Swedlund*
Paul S. Swedlund
*Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF SOUTH DAKOTA
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
605-773-3215
paul.swedlund@state.sd.us

HERBERT H. SLATERY III
*Attorney General and Reporter of Tennessee*

 /s/ *Andrée S. Blumstein*
Andrée S. Blumstein
*Solicitor General*
OFFICE OF THE TENNESSEE ATTORNEY GENERAL
P.O. Box 20207
Nashville, TN 37202
(615) 741-3492
andree.blumstein@ag.tn.gov

## **CERTIFICATE OF SERVICE**

I filed this motion and its attachments with the Court via ECF, which will notify Plaintiffs' counsel. I also emailed this motion and its attachments to the following counsel for Defendant:

> Vinita Andrapalliyal
> U.S. DEPARTMENT OF JUSTICE
> CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
> 1100 L Street
> Washington, D.C. 20005
> 202-305-0845
> vinita.b.andrapalliyal@usdoj.gov
>
> *Counsel for Defendant Archivist of the U.S.*

Dated: February 19, 2020                                     */s/ Cameron T. Norris*