THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMONWEALTH OF VIRGINIA, *et al.*,

        Plaintiffs,

   v.

DAVID S. FERRIERO, in his official capacity as
Archivist of the United States,

        Defendant.

Case No. 1:20-cv-00242 (RC)

## <u>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

**Background and Procedural History** ................................................................. 2

I.     Article V and the Modern History of Ratifications .......................................... 2

II.    The Equal Rights Amendment ....................................................................... 4

III.   Procedural Background .................................................................................. 6

**Legal Standards** .................................................................................................. 7

**Argument** ............................................................................................................ 8

I.     Plaintiffs lack Article III standing because they have not alleged a concrete injury in fact that is traceable to the actions of the Archivist. ............................................................... 8

II.    Whether States may validly rescind their ratifications is not ripe for review ................... 11

III.   Plaintiffs' claims and requested relief would require this Court to decide issues that are non-justiciable political questions .................................................................... 12

IV.   Plaintiffs do not meet the legal requirements for mandamus jurisdiction. ....................... 15

     A.    Plaintiffs have no clear right to relief and the Archivist has no clear duty to act. 16

     B.    Plaintiffs fail to establish the lack of other adequate remedies. ............................ 23

     C.    Even if plaintiffs satisfied the mandamus prerequisites, this Court should not exercise its discretion because the equities do not balance in favor of plaintiffs. 24

V.    The Complaint should be dismissed for failure to state a claim. ..................................... 25

**Conclusion** ........................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*13th Reg'l Corp. v. DOI*,
     654 F.2d 758 (D.C. Cir. 1980) ........................................................................... 16, 23

*Am. Hops. Ass'n v. Burwell*,
     812 F.3d 183 (D.C. Cir. 2016) ........................................................................... 15, 16

*Am. Tort Reform Ass'n v. OSHA*,
     738 F.3d 387 (D.C. Cir. 2013) ................................................................................. 12

*Baker v. Carr*,
     369 U.S. 186 (1962) .................................................................................................. 12

*Baptist Mem'l Hosp. v. Sebelius*,
     603 F.3d 57 (D.C. Cir. 2010) ................................................................................... 15

*Cheney v. U.S. Dist. Court for D.C.*,
     542 U.S. 367 (2004) .................................................................................................. 24

*Clapper v. Amnesty Int'l USA*,
     568 U.S. 398 (2013) .................................................................................................... 8

*\*Coleman v. Miller*,
     307 U.S. 433 (1939) ........................................................................................... *passim*

*\*Dillon v. Gloss*,
     256 U.S. 368 (1921) ........................................................................................... *passim*

*Freedom Watch v. McAleenan*,
     --- F. Supp. --- , 2020 WL 922909 (D.D.C. Feb. 26, 2020) ...................................... 8

*Gerber Products Co. v. Perdue*,
     254 F. Supp. 74 (D.D.C. 2017) .................................................................................. 9

*Gov't of Manitoba v. Bernhardt*,
     923 F.3d 173 (D.C. Cir. 2019) ................................................................................. 10

*Greer v. Bd. of Trustees of Univ. of D.C.*,
     113 F. Supp. 3d 297 (D.D.C. 2015) ......................................................................... 25

*Hollingsworth v. Perry*,
     570 U.S. 693 (2013) .................................................................................................. 10

*Humane Society of the U.S. v. Vilsack*,
   797 F.3d 4 (D.C. Cir. 2015) ...................................................................................... 8

*Idaho v. Freeman*,
   529 F. Supp. 1107 (D. Idaho 1981) .................................................................. 4, 21

*In re African-American Slave Descendants Litig.*,
   304 F. Supp. 2d 1027 (N.D. Ill. 2004) ...................................................................... 9

*In re Cheney*,
   406 F.3d 723 (D.C. Cir. 2005) ................................................................... 15, 16, 25

*In re City of Fall River, Mass.*,
   470 F.3d 30 (1st Cir. 2006) .................................................................................... 24

*In re Kellogg Brown & Root, Inc.*,
   796 F.3d 137 (D.C. Cir. 2015) ............................................................................... 24

*Kokkonen v. Guardian Life Ins Co. of Am.*,
   511 U.S. 375 (1994) ................................................................................................. 7

*Leser v. Garnett*,
   258 U.S. 130 (1922) ............................................................................................... 22

*\*Lovitky v. Trump*,
   949 F.3d 753 (D.C. Cir. 2020) ......................................................................... 15, 24

*Lujan v. Defs of Wildlife*,
   504 U.S 555 (1992) ....................................................................................... 8, 9, 10

*Marcum v. Salazar*,
   694 F.3d 123 (D.C. Cir. 2012) ............................................................................... 11

*Nat'l Org. for Women v. Idaho*,
   459 U.S. 809 (1982) .......................................................................................... 4, 21

*Nat'l Org. for Women, Inc. v. Idaho*,
   455 U.S. 918 (1982) .......................................................................................... 4, 21

*Neitzke v. Williams*,
   490 U.S. 319 (1989) ................................................................................................. 8

*New Eng. Power Generators Asn'n v. FERC*,
   707 F.3d 364 (D.C. Cir. 2013) ................................................................................. 9

*New York v. United States,*
    505 U.S. 144 (1992) .......................................................................................... 22

*Pennsylvania v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) ......................................................................... 9, 10

*Power v. Barnhart,*
    292 F.3d 781 (D.C. Cir. 2002) ............................................................................ 16

*Raines v. Byrd,*
    521 U.S. 811 (1997) .......................................................................................... 8, 10

*Republic of Venezuela v. Philip Morris Inc.,*
    287 F.3d 192 (D.C. Cir. 2002) ............................................................................ 23

*Rucho v. Common Cause,*
    139 S. Ct. 2484 (2019) .................................................................................... 12, 13

*Serrano v. U.S. Atty. Gen.,*
    655 F.3d 1260 (11th Cir. 2011) ......................................................................... 24

*Spokeo, Inc v. Robins,*
    136 S. Ct. 1540 (2016) ......................................................................................... 8

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ........................................................................... 15

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978) ........................................................................................ 24, 25

*Thorpe v. Housing Authority of City of Durham,*
    393 U.S. 268 (1969) ............................................................................................ 11

*Tressler v. Nat'l R.R. Passenger Corp.,*
    819 F.Supp.2d 1 (D.D.C. 2011) ......................................................................... 25

*Twin Rivers Paper Co. LLC v. SEC,*
    934 F.3d 607 (D.C. Cir. 2019) ............................................................................. 9

*U.S. Term Limits, Inc. v. Thornton,*
    514 U.S. 779 (1995) ............................................................................................ 22

*United States ex re. Widenmann v. Colby,*
    265 F. 998 (D.C. Cir. 1920) ............................................................................... 18

*United States v. Coombs*,
    37 U.S. (12 Pet.) 72 (1838) ...................................................................................... 23

*United States v. Munsingwear, Inc.*,
    340 U.S. 36 (1950) ................................................................................................. 21

*United States v. Sprague*,
    282 U.S. 716 (1931) ......................................................................................... 17, 22

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*,
    454 U.S. 464 (1982) ............................................................................................... 10

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................................. 8

*White v. Hart*,
    80 U.S. 646 (1871) ............................................................................................. 2, 15

**STATUTES**

1 U.S.C. § 106b ....................................................................................................... 5, 6

5 U.S.C. § 706 ...................................................................................................... 23, 24

28 U.S.C. § 1361 ....................................................................................... 6, 15, 16, 25

**RULES**

Fed. R. Civ. P. 12 ............................................................................................ 2, 7, 8, 25

**UNITED STATES CONSTITUTION**

Ill. Const. art. 1, § 18 ............................................................................................... 11

U.S. Const. amends. XVIII, § 3 ................................................................................... 3

U.S. Const. amends. XX, § 6 ................................................................................... 3, 19

U.S. Const. amends. XXI, § 3 .................................................................................. 3, 19

U.S. Const. amends. XXII, § 2 ................................................................................. 3, 19

U.S. Const. amend I to XII, 1 Stat. 97 (1789) ............................................................ 20

U.S. Const. art. V ............................................................................................. 2, 16, 17

Va. Const. art. 1, § 11 ........................................................................................... 11

**OTHER AUTHORITIES**

D. Dobbs, Remedies 52 (1973) ............................................................................... 24

1 Stat 97 (1789) ...................................................................................................... 22

1 Story § 627 ......................................................................................................... 22

10 Cong. Rec. 6628 (1955) ..................................................................................... 20

65 S.J. Res. 17, 40 Stat. 1050 (1917) ...................................................................... 19

4 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 177 (2d ed. 1836) .................................................................................. 17

39 Cong. Globe 2771 (May 23, 1866) ....................................................................... 3

74 Stat. 1057 (1960) (23rd amend.) ..................................................................... 3, 19

76 Stat. 1259 (1962) (24th amend.) ..................................................................... 3, 19

79 Stat. 1327 (1965) (25th amend.) ..................................................................... 3, 19

85 Stat. 825 (1971) (26th amend.) ...................................................................... 3, 19

86 Stat. 1523 (1972) (proposed ERA) ....................................................................... 3

92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment) ....................... 3

*Congressional Pay Amendment*, U.S. Dep't of Justice, Office of Legal Counsel, 16 Op. O.L.C. 85 (1992) ..................................................................................... 5, 6

H.J. Res. 208, 86 Stat. 1523 (1972) ................................................................ 4, 17, 20

H.R. Rep. No. 95-1405 (1978) ................................................................................. 14

H.R.J. Res. 638, 95th Cong., 2d Sess., 92. Stat. 3799 (1978) ....................................... 4

Letter from Gary M. Stern, General Counsel, Nat'l Archives and Records Admin., to Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, U.S. Dep't of Justice (Dec. 12, 2018), https://www.archives.gov/files/press/press-releases/2020/olc-letter-re-era-ratification-12-12-2018.pdf ................................................................................................. 5

Linda J. Wharton, *State Equal Rights Amendments Revisited: Evaluating Their Effectiveness in Advancing Prot. Against Sex Discrimination*, 36 Rutgers L.J. 1201 (2005) ........................... 10

NARA Press Statement on the Equal Rights Amendment (Jan. 8, 2020), https://www.archives.gov/press/press-releases-4 ...................................................................... 1

Pet. of Adm'r of Gen. Servs. for Writ of Cert. Before J., *Carmen v. Idaho*, No. 81-1313 (U.S. Jan. 22, 1982) ............................................................................ 21

Pet. for Writ of Cert. Before J., *Nat'l Org. for Women, Inc. v. Idaho*, No. 81-1283 (U.S. Jan. 8, 1982) ............................................................................................................... 21

*Ratification of the Equal Rights Amendment*, U.S. Dep't of Justice, Office of Legal Counsel, 44 Op. O.L.C.  (Jan. 6, 2020) ("*Ratification of the ERA*"), https://www.justice.gov/olc/opinions .............................................................. *passim*

Remarks of Justice Ruth Bader Ginsburg, Georgetown University Law Center (Sept. 12, 2019) ............................................. 23

Ruth Bader Ginsburg, *Ratification of the Equal Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919 (1979) .................................................................................. 3

S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. (Ill. 2018) ..................................... 5

S.J. Res. 2, 79th Leg. (Nev. 2017) ................................................................. 5

S.J. Res. 2, 54th Leg. (S.D. 1979) .................................................................. 20

*The Federalist* No. 432 (James Madison) (Jacob E. Cooke ed., 1961) ........................................ 17

## INTRODUCTION

Nearly one hundred years ago, the Supreme Court held that Congress may establish a deadline for the ratification of constitutional amendments so that "the expression of the approbation of the people" is "sufficiently contemporaneous" in the ratifying States "to reflect the will of the people in all sections at relatively the same period." *Dillon v. Gloss*, 256 U.S. 368, 375 (1921). And since Congress proposed the Twentieth Amendment in 1932, Congress has adhered to that practice, giving the States a deadline for ratification of each proposed amendment to ensure an orderly and contemporaneous process.

The Equal Rights Amendment ("ERA") followed this well-trod path. When it proposed the ERA, Congress included a ratification deadline of March 22, 1979, which it later extended by three years and three months. As the Department of Justice's ("DOJ") Office of Legal Counsel ("OLC") has explained, this deadline, like those for many other proposed amendments, precludes ratification of the ERA based upon votes that occurred after the deadline. The Archivist of the United States ("Archivist"), who is tasked by statute with certifying constitutional amendments, "defers to DOJ on this issue and will abide by the OLC opinion." NARA Press Statement on the Equal Rights Amendment (Jan. 8, 2020), https://www.archives.gov/press/press-releases-4 (last visited May 7, 2020).

Plaintiffs, three states whose legislatures purported to ratify the ERA decades after Congress's ratification deadline, ask this Court to invalidate the deadline and mandate that the Archivist certify the ERA. But that request is contrary to Supreme Court precedent prohibiting courts from second-guessing the legislature's inclusion of a deadline for ratification. *Coleman v. Miller*, 307 U.S. 433, 454 (1939) ("the question, what is a reasonable time" for ratification, is a nonjusticiable political question); *Dillon*, 256 U.S. at 375–76 (Congress may establish a reasonable

1

time for ratification in proposing constitutional amendments). And that request would require this Court to adjudicate the validity of five states' actions to rescind their ratifications, an additional question the Supreme Court has determined to be a nonjusticiable political question. *Coleman*, 307 U.S. at 450; *White v. Hart*, 80 U.S. 646, 649 (1871). Moreover, even if there were a role for a court to play in the ratification process, it would not be implicated here, in a case brought by States that have the independent authority to act (or have indeed already acted) to protect their residents against sex discrimination in the manner they believe the ERA requires.

In recognition of the limited role for the courts in this political dispute, this Court should dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1). Should this Court instead proceed to the merits of the purely legal challenges asserted by plaintiffs, it should dismiss the Complaint under Rule 12(b)(1) for failure to establish a basis for mandamus relief or under Rule 12(b)(6) for failure to state a claim in light of the Archivist's well-supported decision not to certify adoption of the ERA.

## BACKGROUND AND PROCEDURAL HISTORY

### I. Article V and the Modern History of Ratifications

Article V establishes "[t]he power to amend the Constitution and the mode of exerting it." *Dillon*, 256 U.S. at 371. This article permits Congress to propose amendments "whenever two thirds of both Houses shall deem it necessary" and declares an amendment to be "valid to all [i]ntents and [p]urposes, as part of this Constitution when ratified by" three-fourths of the States by state legislatures or state conventions, "as the one or the other mode of ratification may be proposed by the Congress." U.S. Const. art. V. As the Supreme Court has recognized, "[w]hether a definite period for ratification shall be fixed, so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which Congress

may determine as an incident of its power to designate the mode of ratification." *Dillon*, 256 U.S. at 376.

Congress has exercised its authority to impose a ratification deadline numerous times over more than one hundred years. Although it considered using a ratification deadline in 1866 for the Fourteenth Amendment, *see* 39 Cong. Globe 2771 (May 23, 1866) (remarks of Sen. Buckalew), Congress first imposed one in 1917, when it included a seven-year ratification deadline in the text of the Eighteenth Amendment. *See* U.S. Const. amend. XVIII, § 3. Since 1924, each amendment proposed by Congress has included a seven-year ratification deadline.

Before 1960, Congress included these deadlines in the text of the amendments themselves. *See* U.S. Const. amends. XVIII, § 3; XX, § 6; XXI, § 3; XXII, § 2. But since then, Congress has included the deadline in the resolution proposing the amendment. *See* 74 Stat. 1057 (1960) (23rd amend.); 76 Stat. 1259 (1962) (24th amend.); 79 Stat. 1327 (1965) (25th amend.); 85 Stat. 825 (1971) (26th amend.); 86 Stat. 1523 (1972) (proposed ERA); 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment).[1] This was "largely to avoid 'cluttering up' the Constitution with vestigial provisions serving no function once an amendment was ratified." Ruth Bader Ginsburg, *Ratification of the Equal Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919, 923 (1979) (citation omitted). *See also Ratification of the Equal Rights Amendment*, U.S. Dep't of Justice, Office of Legal Counsel, 44 Op. O.L.C. __, at *18–21 (Jan. 6, 2020) ("*Ratification of the ERA*"), available at https://www.justice.gov/olc/opinions.

---

[1] Congress placed the deadline for the proposed D.C. Congressional Representation Amendment in both the proposing clause and the proposed amendment's text of the resolution proposing the amendment. *See* 92 Stat. 3795.

## II.     The Equal Rights Amendment

On March 22, 1972, Congress approved the ERA by a supermajority of each House and submitted it for ratification to the State legislatures. 92 H.J. Res. 208, 86 Stat. 1523 (1972). Consistent with the seven previous amendments proposed before 1972, Congress conditioned ratification on a seven-year deadline. *Id*. At the end of the seven-year period, only thirty-five of the necessary thirty-eight State legislatures had ratified the ERA, though five of those legislatures has also passed resolutions seeking to rescind their prior ratifications. *Ratification of the Equal Rights Amendment*, 44 O.L.C. at *7 & n.8.

In 1978, Congress passed a joint resolution to extend the time for consideration of the amendment until 1982. H.R.J. Res. 638, 95th Cong., 2d Sess., 92. Stat. 3799 (1978). This action by a subsequent Congress to extend the time to vote on a constitutional amendment was novel and controversial, and it led to a lawsuit by two States. *See Idaho v. Freeman*, 529 F. Supp. 1107, 1146–50, 1111 (D. Idaho 1981), *vacated sub nom. Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982), and *vacated sub nom. Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982), and *vacated sub nom. Carmen v. Idaho*, 459 U.S. 809 (1982), and *vacated sub nom. Carmen v. Idaho*, 459 U.S. 809 (1982). Those States sought to prevent the ERA's ratification during the extended ratification period and, assuming the validity of the extension, to have the court recognize that one State had rescinded its prior ratification. *See id*. The district court held that the extension of time for the ratification of the amendment was unconstitutional, and that States may effectively rescind a ratification. *Id*. at 1146–54. The Supreme Court granted certiorari before judgment in the court of appeals and stayed the district court's judgment. *See Nat'l Org. for Women, Inc. v. Idaho*, 455 U.S. 918 (1982). But because the 1982 deadline expired without any further ratification actions before the Supreme Court could address the merits, the Court, at the federal government's request,

4

vacated the district court's judgment and remanded the case with instructions to dismiss the complaint as moot. *See Nat'l Org. for Women v. Idaho*, 459 U.S. 809 (1982).

Although the ERA was not ratified by either the original or extended deadlines established by Congress, the proposed amendment has recently reemerged as a political issue. This political attention culminated in the passage of resolutions by Nevada (2017) and Illinois (2018) purporting to ratify the ERA. *See* S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. (Ill. 2018); S.J. Res. 2, 79th Leg. (Nev. 2017). Because as many as thirty-seven States had purported to ratify the amendment by 2018—if one counts the five States that voted to rescind their ratifications—certain Members of Congress asked the Archivist "to inform them as to what actions he would take in the event that a 38th state ratifies" the ERA. Letter from Gary M. Stern, General Counsel, Nat'l Archives and Records Admin., to Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, U.S. Dep't of Justice (Dec. 12, 2018), https://www.archives.gov/files/press/press-releases/2020/olc-letter-re-era-ratification-12-12-2018.pdf (hereinafter "Letter") (last visited May 7, 2020).

The Archivist is tasked by statute with certifying the passage of constitutional amendments as follows:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

1 U.S.C. § 106b. "Section 106b and its antecedents have long been understood as imposing a ministerial, 'record-keeping' duty upon the executive branch." *Congressional Pay Amendment*, U.S. Dep't of Justice, Office of Legal Counsel, 16 Op. O.L.C. 85, 98 (1992). "The Archivist may

not refuse to certify a valid amendment." *Id.* "Nonetheless, section 106b clearly requires that, before performing this ministerial function, the Archivist must determine whether he has received 'official notice' that an amendment has been adopted 'according to the provisions of the Constitution.'" *Id*. at 99. "This is a question of law that the Archivist may properly submit to the Attorney General for resolution." *Id*.

On December 12, 2018, the Archivist requested a legal opinion from OLC on his obligations under 1 U.S.C. § 106b in the event a thirty-eighth State purported to ratify the ERA. Letter, *supra*. On January 6, 2020, OLC issued a memorandum opinion concluding "that the deadline in the proposing clause of the ERA Resolution was a valid and binding exercise of Congress's authority to set a deadline on ratification" and, "whether the effective deadline was in 1979 or 1982, that time has come and gone." *Ratification of the ERA*, 44 Op. O.L.C. at *12, *24. OLC therefore concluded that "the ERA's adoption could not be certified under 1 U.S.C. § 106b." *Id*. at *37. On January 8, 2020, the Archivist issued a statement explaining that he would "abide by the OLC opinion." NARA Press Statement, *supra*. Three weeks later, on January 27, 2020, the Virginia General Assembly passed a joint resolution purporting to ratify the ERA. Compl. ¶¶ 52–53.

### III.     Procedural Background

Plaintiffs—the States of Virginia, Illinois, and Nevada—filed the present Complaint seeking declaratory and mandamus relief against the Archivist. Compl., ECF No. 5. They allege a single cause of action, under the mandamus statute, 28 U.S.C. § 1361. Compl. ¶¶ 75–81. Plaintiffs argue that because "[t]he recent ratifications by Nevada, Illinois, and Virginia bring the total number of ratifying States to 38, satisfying Article V's requirement of ratification by 'three fourths' of all States," *id*. ¶ 55, "the Archivist's refusal to publish and certify the Equal Rights

Amendment violates federal constitutional and statutory law," *id*. at p. 17. According to plaintiffs, "Virginia became the 38th State to ratify the ERA" in January 2020. *Id*. ¶ 2. Specifically, they argue that "Article V does not empower Congress to dictate when a State may consider—much less ultimately ratify—a proposed amendment." *Id*. ¶ 65. At the same time, they contend, the attempts by several States to "'rescind' their earlier ratifications . . . are constitutionally unauthorized and without legal effect." *Id.* ¶ 70.

In addition to seeking an order that the Archivist "cause the Equal Rights Amendment to be published, with his certificate, stating that the plaintiff States are among those that have ratified," *id.* at p. 18 (internal citation and quotation marks omitted), plaintiffs also seek a declaration that the ERA "is 'valid' and 'part of the Constitution'" within the meaning of Article V" and "that the Archivist's refusal to publish and certify the [ERA] violates federal and statutory law," *id*. at p. 17.

After plaintiffs filed their Complaint, the States of Alabama, Louisiana, Nebraska, South Dakota, and Tennessee moved to intervene as defendants in this lawsuit. Mot. to Intervene, ECF No. 10. These States, two of which claim that they "rejected the ERA" (Alabama and Louisiana) and three of which claim that they "rescinded their ratifications" (Nebraska, South Dakota, and Tennessee), argue that they "have weighty interests at stake," including the fear that "[i]f Plaintiffs prevail and the ERA is added to the Constitution, then [they] will be forced to spend substantial resources defending their duly enacted laws from this new line of constitutional attack." *Id.* at 1. The intervention motion remains pending at this time.

## LEGAL STANDARDS

Defendant moves to dismiss the Complaint for lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6). "Federal courts are courts of limited jurisdiction,

and it is generally presumed that a cause lies outside this limited jurisdiction.'" *Freedom Watch v. McAleenan*, --- F. Supp. ---, 2020 WL 922909, at *2 (D.D.C. Feb. 26, 2020) (quoting *Kokkonen v. Guardian Life Ins Co. of Am.*, 511 U.S. 375, 377 (1994)). "On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction." *Id.* Meanwhile, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). "As compared to a Rule 12(b)(6) motion for failure to state a claim, a court is to apply closer scrutiny when resolving a Rule 12(b)(1) motion." *Freedom Watch*, 2020 WL 922909, at *2.

## ARGUMENT

### I.     Plaintiffs lack Article III standing because they have not alleged a concrete injury in fact that is traceable to the actions of the Archivist.

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "In keeping with the purpose of this doctrine, '[the] standing inquiry [is] especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.'" *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997)).

"To survive a motion to dismiss for lack of standing, a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Society of the U.S. v. Vilsack*, 797 F.3 4, 8 (D.C. Cir. 2015). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly allege facts demonstrating' each element[,]" i.e., (1) injury in fact, (2) causation, and

(3) redressability. *Spokeo, Inc v. Robins,* 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). The alleged injury must be "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs of Wildlife*, 504 U.S 555, 560 (1992)). "[A] party cannot rest on 'abstract'" or "'conclusory' assertions of injury, . . . but must point to 'specific, concrete facts demonstrating . . . harm.'" *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 612 (D.C. Cir. 2019) (citations omitted).

Plaintiffs' Complaint vaguely alleges a purported injury to their general interests as States, but their allegations fall short of what Article III requires. Plaintiffs primarily allege that the Archivist has "harm[ed] the Plaintiff States by creating widespread confusion regarding the effect of their ratifications." Compl. ¶ 80. But the Complaint is devoid of any allegations indicating how that general state of uncertainty and confusion actually harms the plaintiffs in any concrete way. *See New Eng. Power Generators Asn'n v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013) ("It would be a strange thing indeed if uncertainty were a sufficiently certain harm to constitute an injury in fact."); *see also Gerber Products Co. v. Perdue*, 254 F. Supp. 74, 81 (D.D.C. 2017) ("[U]ncertainties that arise from regulatory decisions are not the kind of concrete and particularized injuries to establish an injury in fact."); *In re African-American Slave Descendants Litig.*, 304 F. Supp. 2d 1027, 1050 (N.D. Ill. 2004) ("[A]lleging a general state of confusion . . . fail[s] to allege any injury-in-fact" without specific facts clearly demonstrating some injury "that has come about as a result of that confusion.").

In lieu of such concrete allegations, plaintiffs assert that they have a "significant interest in this case" because the Archivist's actions have "thwart[ed] the will of the people." Compl. ¶ 81. Of course, that allegation only reinforces the generalized nature of plaintiffs' allegations, as they have no more right to pursue that "interest" through litigation than does the individual taxpayer

who alleges an illegal use of his or her taxes. *Compare Pennsylvania v. Kleppe*, 533 F.2d 668, 673, 679–80 (D.C. Cir. 1976) (holding State had no standing "to sue as representative of its citizenry" in "the presence of a federal defendant" and comparing *parens patriae* suits to taxpayer suits), *with id.* at 682 (Lumbard, J., dissenting) (arguing State could sue "to vindicate the will of the people"). It is black-letter law that "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III injury." *Lujan*, 504 U.S. at 573–77; *see also Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 183 (D.C. Cir. 2019) (discussing "longstanding precedent that a State in general lacks *parens patriae* standing to sue the federal government.").

Plaintiffs further assert that their interest is "particularly acute" here because they voted to ratify the ERA. Compl. ¶ 81. But to establish standing, "it is not enough that the party invoking the power of the court have a keen interest in the issue." *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013); *see also Raines v. Byrd*, 521 U.S. 811, 814, 831 (1997) (acute interest expressed by voting is an insufficiently "concrete injury to . . . establish[] Article III standing"). "[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 486 (1982).

There is a good reason that plaintiffs struggle to identify a concrete injury. The plaintiff-States seek to compel the ERA's adoption and accordingly limit their own sovereign power. But it would turn Article III on its head for a court to find that a plaintiff is injured by the absence of a rule imposing limits on that plaintiff's power and discretion. Nothing prevents them right now from addressing sex discrimination under State law as they believe the ERA would require. A State could achieve that result legislatively, either through the adoption of laws or the amendment of its

own constitution, which is a path that many States chose both before and after the expiration of the ERA's deadline. *See* Linda J. Wharton, *State Equal Rights Amendments Revisited: Evaluating Their Effectiveness in Advancing Prot. Against Sex Discrimination*, 36 Rutgers L.J. 1201, 1201–02 (2005). Indeed, at least two of the plaintiffs—Illinois and Virginia—have already passed versions of the ERA as amendments to their own constitutions. Ill. Const. art. 1, § 18; Va. Const. art. 1, § 11, par. 1. And nothing in federal law prevents Nevada from acting similarly. While plaintiffs may desire to limit the sovereign power of *other* governments, they cannot use this Court to do so without, at a minimum, a concrete injury in fact.

## II.        Whether States may validly rescind their ratifications is not ripe for review.

Even if plaintiffs could establish standing, portions of the Complaint would still fail to satisfy Article III. Specifically, plaintiffs' argument that certain States' votes to rescind their prior ratifications "are constitutionally unauthorized and without legal effect," Compl. ¶ 70, is not only barred by the political question doctrine, *see infra* pt. III, but do not even present a case or controversy ripe for this Court's adjudication. Neither the Archivist nor OLC has taken a position on this issue in connection with the current controversy, as there was no reason for them to do so given that the ERA included an explicit and valid deadline. *See Ratification of the ERA*, 44 Op. O.L.C. at *18 n.17, *36–37.[2]

Although plaintiffs ask this court to decide this question in the first instance, courts are without jurisdiction to render such advisory opinions. *Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 284 (1969); *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 396 (D.C. Cir.

---

[2] Although OLC has previously expressed views bearing on this question, it expressly declined to take a definitive position on these issues in its latest opinion on the ERA in light of its explicit and valid deadline. *See Ratification of the ERA*, 44 Op. O.L.C. at *36–37.

2013); *see also Marcum v. Salazar*, 694 F.3d 123, 129 (D.C. Cir. 2012) ("The ripeness inquiry springs from the Article III case or controversy requirement that prohibits courts from issuing advisory opinions on speculative claims." (citation omitted)). Should this Court conclude that Congress's explicit ratification deadline is invalid, the Archivist, in consultation with OLC, should be permitted to decide this question in the first instance. His resolution of the question could obviate any need for plaintiffs' challenge or, at a minimum, "sharpen[] the presentation of issues" for this Court's review. *Baker v. Carr*, 369 U.S. 186, 204 (1962).

### III. Plaintiffs' claims and requested relief would require this Court to decide issues that are non-justiciable political questions.

Even if this Court were to find that plaintiffs have adequately alleged a basis for standing under Article III, this Court would still lack jurisdiction to decide the dispute. All of plaintiffs' claims derive from their assertion that the Archivist must certify the ERA as part of the Constitution. Compl. At pp. 17–18. Accordingly, plaintiffs ask this Court to find that a deadline established by a supermajority of Congress for the ratification of a constitutional amendment is invalid, and to mandate that the Archivist certify the amendment as valid notwithstanding that deadline and the objection of States that have sought to rescind their prior authorizations. *Id.* at pp. 17–18; *id.* ¶¶ 63–81. In fact, plaintiffs ask this Court to declare that the States are subject to no deadline whatsoever to ratify the ERA based on their assertion that a deadline "would upset the important balance the Framers struck between congressional and state authority." *Id.* ¶¶ 67–69. But all of these issues are for the political branches to resolve. *See Coleman*, 307 U.S. at 447–56; *see also Baker*, 369 U.S. at 214 (In *Coleman*, "this Court held that the questions of how long a proposed amendment to the Federal Constitution remained open to ratification, and what effect a prior rejection had on a subsequent ratification, were committed to congressional resolution."). Because plaintiffs' principal claim that the ERA is valid necessarily requires the Court to address

12

issues over which it lacks jurisdiction under *Coleman*, this case must be dismissed. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2494, 2508 (2019) (when a "claim is said to present a 'political question' and to be nonjusticiable" the claim is "beyond the courts' jurisdiction" and the court must "dismiss [the case] for lack of jurisdiction.").

   ***Time Interval for Ratification***. Plaintiffs claim that the deadlines Congress imposed for states to ratify the ERA in both 1972 and 1978 are invalid and the ERA is accordingly open to ratification indefinitely. Compl. ¶¶ 63–69. But the deadline represents Congress's explicit judgment as to how much time was necessary and appropriate to ratify the ERA, regardless of whether a ratification deadline is placed in a joint resolution's proposed amendment text, the joint resolution's proposing clause, or the joint resolution itself. And under *Coleman,* "the question, what is a reasonable time [for ratification of a constitutional amendment], lies within the congressional province." 307 U.S. at 454. The "decision by . . . Congress, . . . of the question whether the amendment had been adopted within a reasonable time [is] not subject to review by the courts." *Id*.

   To be sure, the precise question that the Court in *Coleman* held to be a political question was the appropriate time period for ratification "in the absence of a limitation by the Congress." *Id*. at 452. But whether the question is the appropriate time for ratification in the absence of a deadline set by Congress, or whether a deadline once set should be ignored due to the manner in which Congress structured the proposed amendment, the principles underlying *Coleman* remain the same. *See id*. at 454 ("If it be deemed that such a question is an open one when the limit has not been fixed in advance, we think that it should also be regarded as an open one for the consideration of the Congress when, in the presence of certified ratifications by three-fourths of the States, the time arrives for the promulgation of the adoption of the amendment."); *see also*

*Rucho*, 139 S. Ct. at 2494 (internal citations omitted) (political questions do not raise an issue "of a Judiciary Nature."). Indeed, plaintiffs here expressly invite this Court to weigh in on the appropriate time for ratification in the absence of a valid deadline, arguing that no deadline should be inferred in the absence of an explicit one set by Congress. Compl. ¶¶ 67–69.

Congress determined how much time was needed to ratify the ERA after considering "a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in a court of justice[.]" *Coleman*, 307 U.S. at 453; *see* H.R. Rep. No. 95-1405, at 11 (1978). "The questions [that setting a deadline] involve are essentially political and not justiciable." *Coleman*, 307 U.S. at 454. Were this Court to accept plaintiffs' invitation to hold Congress's undisputed deadline invalid due to its particular placement in the legislative action at issue and substitute in its place an indefinite period for ratification, it would give this Court a pivotal role in the Amendment process, which Article V places in the hands of Congress. *See id*. at 453. Indeed, to rule for plaintiffs, this Court would have to upend the last sixty years of constitutional amendments, during which time Congress has routinely placed deadlines for ratification in the proposing clause. *See supra* at 2.

***Effect of State Ratification Redeterminations***. In order to find that the ERA has been ratified by the required number of States, this Court not only would have to set aside the deadline for ratification imposed by Congress, but also find invalid the actions several States have taken over the years to rescind their prior ratifications. Plaintiffs claim that "[a]lthough a small number of States have, at various times and in various ways, purported to 'rescind' their earlier ratifications, these efforts are constitutionally unauthorized and without legal effect." Compl. ¶ 70. But even assuming the Court may properly proceed to this question when it has not even been addressed by the Archivist, *see supra* at 11–12, the Supreme Court has determined that this precise

question too is non-justiciable. As it explained, "in accordance with th[e] historic precedent" of the Fourteenth Amendment's ratification process, "the question of the efficacy of . . . attempted withdrawal [of a state's prior ratification], should be regarded as a political question pertaining to the political departments." *Coleman*, 307 U.S. at 450; *see also White v. Hart*, 80 U.S. at 649 (A State's "den[ial] of the validity of her ratification of [a] constitutional amendment[]" presents a case that is "clearly one in which the judicial is bound to follow the action of the political department of the government, and is concluded by it."). Thus, not only would this Court be required to invalidate the prior actions of Congress, the remedy requested by plaintiffs would necessarily invalidate the actions of States that have sought to rescind their prior ratifications. As the Supreme Court held in *Coleman*, this Court has no judicial basis to make such a decision, which should be left to the political branches to decide. *See Coleman*, 307 U.S. at 450.

## IV.     Plaintiffs do not meet the legal requirements for mandamus jurisdiction.

Plaintiffs allege that they are entitled to an order under the mandamus statute, 28 U.S.C. § 1361, requiring the Archivist to publish the ERA with his certificate stating that the ERA is part of the Constitution of the United States, Compl. at p. 18; *id.* ¶ 75–81, but they fail to identify a waiver of sovereign immunity, *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996), much less satisfy the demanding prerequisites for mandamus relief. "Mandamus is drastic; it is available only in 'extraordinary situations,'" and is "hardly ever granted." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc). "A court may grant mandamus relief only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to [the] plaintiff." *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) (quoting *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010)). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Id.*

(quoting *Am. Hops. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016)). "In other words, 'mandamus jurisdiction under § 1361 merges with the merits.'" *Id*. (quoting *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005)).

### A.   Plaintiffs have no clear right to relief and the Archivist has no clear duty to act.

Courts "discuss the first two jurisdictional elements for mandamus-type relief . . . concurrently." *Id*. at 760. "[T]he word 'duty' in § 1361 must be narrowly defined, and . . . a plaintiff's legal grounds supporting the government's duty to him must be 'clear and compelling.'" *In re Cheney*, 406 F.3 at 729 (quoting *13th Reg'l Corp. v. DOI*, 654 F.2d 758, 760 (D.C. Cir. 1980)). When a statute "is silent as to what" a federal officer "should do" in a particular scenario, the statute's "silence on the subject" means there is no "'clear duty' required to justify a grant of mandamus." *Power v. Barnhart*, 292 F.3d 781, 784–86 (D.C. Cir. 2002).

Plaintiffs claim that "[t]he Archivist has a clear and indisputable duty to publish and certify the [ERA] as part of the U.S. Constitution," Compl. ¶ 77, even though several of the ratifying States have purported to rescind their ratifications and three States have purported to ratify the ERA after Congress's deadline, *see id*. ¶¶ 37, 45, 53, 63, 70. Plaintiffs' request for mandamus relief seeks to erase Congress's deadline for the ERA's ratification and runs headlong into Supreme Court precedent upholding Congress's authority to impose such a deadline, *see Dillon*, 256 U.S. at 375–76, as well as an extended political history that is consistent with Congress's decision to include a deadline in the proposing clause of the ERA.

The Framers sought to ensure that amendments to the Constitution were no simple matter, and the ERA's own history demonstrates that they were successful. The Constitution requires supermajorities in Congress (or of the state legislatures) even to propose an amendment. U.S. Const. art. V. It raises the bar for ratification even higher by requiring three-fourths of the States—

acting through either their legislatures or through ratifying conventions—to approve the amendment. *See id.* The Framers favored broad consensus in designing the ratification process to "guard[] . . . against that extreme facility which would render the Constitution too mutable," while at the same time "avoiding that extreme difficulty which might perpetuate its discovered faults." *The Federalist* No. 432, at 296 (James Madison) (Jacob E. Cooke ed., 1961); *see also Ratification of the ERA*, 44 Op. O.L.C. at *12.

The Framers further granted Congress the authority to specify "one or the other Mode of Ratification" in the States, either by the state legislatures or by state conventions chosen for that purpose, "as the one or the other . . . may be proposed by the Congress." U.S. Const. art. V; *see also* 4 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 177 (2d ed. 1836) (statement of James Iredell) ("Any amendments which either Congress shall propose, or which shall be proposed by such general convention, are afterwards to be submitted to the legislatures of the different states or conventions called for that purpose, as Congress shall think proper[.]"). Congress therefore exercises discretion in determining not just the substance of the amendment, but which of the two modes of ratification is to be used. *See Ratification of the ERA*, 44 Op. O.L.C. at *14.

The Supreme Court has consistently recognized these principles by deferring to Congress's broad authority to determine the parameters for ratification. *See, e.g.*, *United States v. Sprague*, 282 U.S. 716, 732–33 (1931) ("the choice of mode rests solely in the discretion of Congress"). In *Dillon*, the Court considered the argument that the Eighteenth Amendment was invalid "because the congressional resolution proposing the Amendment declared that it should be inoperative unless ratified within seven years," 256 U.S. at 370–71 (citation omitted), the same time frame that Congress gave States in its ERA joint resolution, 86 Stat. 1523 (1972).

As to what an appropriate ratification deadline would be, the Court concluded that "[w]hether a definite period for ratification shall be fixed so that all may know what it is and speculation on what is a reasonable time may be avoided is . . . a matter of detail which Congress may determine" as "an incident of its power to designate the mode of ratification" under Article V. *Dillon*, 256 U.S. at 376. In light of *Dillon*'s express language and holding, OLC concluded that "the deadline in the proposing clause of the ERA Resolution was a valid and binding exercise of Congress's authority to set a deadline on ratification." *Ratification of the ERA*, 44 Op. O.L.C. at *24. And the Archivist sensibly decided to follow this opinion.[3] *See* NARA Press Statement, *supra*.

Plaintiffs do not even reference *Dillon* in their Complaint and instead argue that Congress lacks the authority to impose a deadline in the proposing clause of the joint resolution submitting the proposed amendment to the States, as opposed to the text of the proposed amendment itself.

---

[3] One year before *Dillon* was decided, the D.C. Circuit refused to invalidate the certification of the Eighteenth Amendment by the official of the Executive Branch—the Secretary of State—that was previously delegated this role by statute. *United States ex re. Widenmann v. Colby*, 265 F. 998, 999 (D.C. Cir. 1920), *aff'd sub nom. U S ex rel Widenmann v. Hughes*, 257 U.S. 619 (1921). In the course of that decision, the D.C. Circuit explained that the Secretary of State's role was "ministerial" and had no authority to "look behind the notices" issued by States to determine whether the officials of those states "should not have issued the notices." *Id.* at 359–60. In light of *Dillon* and its progeny, it is unclear what continuing force *Colby* has. But even assuming that it remains good law, the court in *Colby* did not the Archivist's role in the situation presented here, where a State's notice was received after a deadline set by Congress and, thus, the proposed amendment did not garner the requisite number of State ratifications in time. *See Colby*, 265 F. at 999 (noting that the parties agreed that the Secretary "receive[d] official notice from the requisite number of states").

In any event, *Colby* would still require dismissal of this case, as the court went further, holding that the petitioner lacked a judicially-cognizable interest that would be redressed by the grant of the petition against the Secretary, as the relevant action that made the amendment law was the vote of the States, not the certification by the Secretary. *Id.* at 360 ("The petitioner has no interest in the prayer of his petition, because, if granted, it would avail him nothing.").

Compl. ¶ 64. Unlike the Eighteenth Amendment at issue in *Dillon*, Congress placed the ratification deadline for the ERA Resolution in the proposing clause, rather than in the text of the proposed amendment. But that decision is entirely consistent with the *reasoning* of the Supreme Court's decision in *Dillon* that setting a deadline is incident to the power to select the mode of ratification, which has always been included in the proposing clause. *See* 256 U.S. at 370–71 (framing the issue as whether a deadline was invalid "because the congressional *resolution* (40 Stat. 1050) proposing the Amendment declared that it should be inoperative unless ratified within seven years"). Indeed, just like the plaintiffs' reasoning here, the government argued in *Dillon* that the deadline was valid because, as part of the Eighteenth Amendment's substantive text, the deadline was ratified as part of the amendment itself. *See* Brief for the United States at 5–6. But the Court declined to decide the case on that proffered ground, clearing the way for Congress to place a deadline in the proposing clause if it so desires. *See* 256 U.S. at 370–71.

Congress's decision to include the ERA's ratification deadline in the proposing clause is consistent with congressional practice. Congress included the deadline for ratification in the proposing clause of the last several constitutional amendments proposed to the States. *See* 74 Stat. at 1057 (the Twenty-Third Amendment's resolution, which proclaimed that "the following article is hereby proposed . . . which shall be valid to all intents and purposes as part of the Constitution only if ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by Congress"); 76 Stat. at 1259 (Twenty-Fourth Amendment); 79 Stat. at 1327 (Twenty-Fifth Amendment); 85 Stat. at 825 (Twenty-Sixth Amendment). It is true that Congress, in the prior three amendments, had placed the deadline in the text of the amendment itself. *See* U.S. Const. amends XX, § 6, XXI, § 3, XXII, § 2; *Ratification of the ERA*, 44 Op. O.L.C. at *19–20. But that difference is irrelevant to the constitutional question presented. Congress's

decision to place the ratification deadline in the proposing clause of the Twenty-Third Amendment merely reflects the sensible desire to declutter the text of an amendment by removing extraneous sections imposing conditions on ratification that had no prospective effect. *See* 10 Cong. Rec. 6628 (1955) (Sen. Kefauver) ("The general idea was that it was better not to make the 7-year provision a part of the proposed amendment itself. It was felt that it would clutter up the Constitution . . . So the intention of the preamble is that it must be ratified within 7 years . . . to be effective."); *see also Ratification of the ERA*, 44 Op. O.L.C. at *20–22.

Given that Congress has specified the mode of ratification in the proposing clause of every resolution proposing a constitutional amendment since the first, *see* 1 Stat. 97, it is clear that Congress may exercise its integrally related authority to set a deadline in precisely the same manner. The Supreme Court indicated as much when it observed that the Child Labor Amendment did not include a ratification deadline "either in the proposed amendment or in the resolution of submission" without any suggestion that the latter approach would have rendered the deadline invalid. *Coleman*, 307 U.S. at 452. Indeed, to reach a contrary conclusion would be to render a portion of the proposing clause meaningless, even though it was adopted by a supermajority of Congress. *See* 86 Stat. 1523 (1972); *Ratification of the ERA*, 44 Op. O.L.C. at *7–8.

Ignoring the deadline established by Congress for ratification would also disrupt the settled expectations of States that took action (or decided not to take action) before the deadline. The "fair implication" that ratification "must be sufficiently contemporaneous in that number of States to reflect the will of the people in all sections at relatively the same period," *Dillon*, 256 U.S. at 375, is only strengthened by the existence of an actual deadline, which was known and relied upon by States, advocates, litigants, and courts when deciding how to proceed before its expiration, *see, e.g.*, 86 Stat. 1523 (1972); *see also, e.g.*, S.J. Res. 2, 54th Leg. (S.D. 1979) (adopting a resolution

that South Dakota's prior ratification would be withdrawn if the requisite number of States failed to ratify the ERA within the seven-year period).

And if there remained any doubt about either of these questions, it was resolved by the Supreme Court in 1982 when the Court found that the legal controversy over whether Congress could extend the ERA's ratification deadline became moot when the (extended) deadline expired. After the district court in *Freeman* held that Congress could not extend the deadline, 529 F. Supp. at 1150–54, the federal government and others sought review in the Supreme Court. *See, e.g.*, Pet. of Adm'r of Gen. Servs. for Writ of Cert. Before J., *Carmen v. Idaho*, No. 81-1313 (U.S. Jan. 22, 1982); Pet. for Writ of Cert. Before J., *Nat'l Org. for Women, Inc. v. Idaho*, No. 81-1283 (U.S. Jan. 8, 1982). Although the Court accepted review, the June 1982 deadline expired before it could hear argument. The government then urged the Court to dismiss the case as moot because "the Amendment has failed of adoption no matter what the resolution of the legal issues presented." Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (U.S. July 9, 1982). In response, other parties advised the Court that "[e]ven an unexplained ruling that this case is moot would necessarily signal implicit acceptance of [the government's] position." Response of Nat'l Org. for Women, Inc., et al., to Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (U.S. July 23, 1982). Applying *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), the Court remanded with instructions "to dismiss the complaints as moot." *Nat'l Org. for Women*, 459 U.S. at 809. In so doing, the Court necessarily adopted the view that Congress had validly imposed a ratification deadline that expired. *See id*.

Against this wealth of precedent and historical practice, plaintiffs rely on the absence of any express statement about timelines in Article V. *See* Compl. ¶ 65. But even though the "article

says nothing about the time within which ratification may be had," *Dillon*, 256 U.S. at 371, there

is also nothing "in the Article which suggests that an amendment once proposed is to be open to

ratification for all time,"[4] *id.* at 374.

There is equally nothing in the Tenth Amendment that precludes Congress from

establishing a ratification deadline. *See* Compl. ¶ 65–66; *id.* ¶ 66 (arguing that "congressional

authority to limit the States' role in ratification should not be presumed where the Constitution is

silent" and quoting the Tenth Amendment). "As Justice Story recognized, 'the states can exercise

no powers whatsoever, which exclusively spring out of the existence of the national government,

which the constitution does not delegate to them. . . . No state can say, that it has reserved, what it

never possessed.'" *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 802 (1995) (quoting 1 Story

§ 627). *See New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to

Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that

power to the States[.]"). How to ratify a federal constitutional amendment necessarily "exclusively

springs[] out of the existence of the national government," 1 Story § 627, and the Supreme Court

has concluded that "[t]he Tenth Amendment . . . added nothing to the instrument as originally

ratified and has no limited and special operation . . . upon the people's delegation by [A]rticle 5 of

certain functions to the Congress." *Sprague*, 282 U.S. at 733–34; *cf. Leser v. Garnett*, 258 U.S.

130, 137 (1922) ("[T]he function of a state legislature in ratifying a proposed amendment to the

---

[4] Plaintiffs also assert that the ratification and certification of the Twenty-Seventh Amendment, which occurred more than two hundred years after first being proposed, demonstrates that "[n]othing in Article V suggests . . . that States take action on proposed constitutional amendments within any particular amount of time." Compl. ¶ 68; *see also id.* ¶ 69. But contrary to the express ratification deadline in the ERA, or the ratification deadline at issue in *Dillon*, Congress simply declined to impose a ratification deadline for the Twenty-Seventh Amendment. 1 Stat 97 (1789).

federal Constitution, like the function of Congress in proposing the amendment, is a federal function derived from the Federal Constitution; and it transcends any limitations sought to be imposed by the people of a State."). The Tenth Amendment thus has no bearing on the validity of Congress's ratification deadline here. At a minimum, plaintiffs have not shown that that Congress clearly and indisputably violated the Constitution on multiple occasions by imposing ratification deadlines, nor could they given the longstanding presumption that Congress does not act unconstitutionally. *13th Reg'l Corp.,* 654 F.2d at 760; *see, e.g.*, *United States v. Coombs*, 37 U.S. (12 Pet.) 72, 76 (1838) (Story, J.) ("[A] presumption never ought to be indulged, that congress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the Court by language altogether unambiguous.").

Congress's ratification deadline comports with Supreme Court precedent and longstanding practice. And the Archivist, following OLC's careful legal analysis, properly declined to certify the ERA as adopted following Virginia's belated ratification action. Accordingly, not only does the Archivist lack a clear duty to certify the ERA, the deadline forbids him from doing so. *See Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 199 (D.C. Cir. 2002) (Where "no precedent of this court or of the Supreme Court even suggest[ed]" that plaintiffs were entitled to mandamus relief, no "clear and indisputable" right to relief found;. *see also* Remarks of Justice Ruth Bader Ginsburg, Georgetown University Law Center (Sept. 12, 2019) ("[T]he ERA fell three States short of ratification. I hope someday it will be put back in the political hopper, starting over again, collecting the necessary number of States to ratify it.").

### B. *Plaintiffs fail to establish the lack of other adequate remedies.*

Plaintiffs recite that they "have no adequate alternative remedy," Compl. ¶ 79, but do not explain why they cannot, for example, seek relief under the Administrative Procedure Act, 5

U.S.C. § 706(1), for the Archivist's purported failure to act. *Id.* ("To the extent necessary and when presented, the reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed . . . ."). Because Plaintiffs fail to establish the unavailability of an adequate alternative remedy, their mandamus claim fails on this basis alone.[5] *See Serrano v. U.S. Atty. Gen.*, 655 F.3d 1260, 1263–1264 (11th Cir. 2011) ("Because Serrano has an adequate remedy available to him [under the APA], the district court properly dismissed his request for mandamus relief."); *In re City of Fall River*, 470 F.3d 30, 32–33 (1st Cir. 2006).

### C. Even if plaintiffs satisfied the mandamus prerequisites, this Court should not exercise its discretion because the equities do not balance in favor of plaintiffs.

But even if plaintiffs could satisfy the threshold requirements for mandamus jurisdiction, they would still fall short in demonstrating "compelling equitable grounds" warranting the extraordinary relief of mandamus. "Even when the legal requirements for mandamus jurisdiction have been satisfied . . . a court may grant relief only when it finds compelling equitable grounds." *Lovitky*, 949 F.3d at 759; *see also Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 381 (2004) ("[T]he issuing court, in the exercise of its discretion, must be satisfied that [mandamus] is appropriate under the circumstances.") (citation omitted); *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 150 (D.C. Cir. 2015).

---

[5] If plaintiffs were to bring an APA claim under 5 U.S.C. § 706(1), the claim would fail on the merits because the Archivist is not required to certify the ERA as adopted for the reasons set forth above. *See supra* at 16–24. However, whether plaintiffs' APA claim would ultimately succeed does not bear on whether there is an adequate remedy, for the inquiry turns on whether an alternate forum, statute, or administrative process exists to adjudicate the claim. *See, e.g.*, *Upton v. Birotte*, No. CIV.A.11-1332, 2011 WL 2938134, at *1 (D.D.C. July 21, 2011) (concluding that mandamus relief was foreclosed because "the federal appeals process provides an adequate remedy for petitioner").

Given that plaintiffs have not alleged an injury sufficient to establish standing, let alone a sufficient hardship that they would face absent mandamus relief, *see supra* at 8–11, plaintiffs fail to articulate why this Court should exercise its discretion to issue any such relief here. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 193, 195 (1978) (Since "all or almost all equitable remedies are discretionary, the balancing of equities and hardships is appropriate in almost any case as a guide to the chancellor's discretion." (quoting D. Dobbs, Remedies 52 (1973))). Even more critically, the substantial separation-of-powers concerns with the judiciary intervening in the process to propose, ratify, and certify a constitutional amendment, *see supra* at 12–15, are "too fundamental for [a court] to pre-empt congressional action by judicially decreeing what accords with 'common sense and the public weal.'" *Hill*, 437 U.S. at 195.

### V.     The Complaint should be dismissed for failure to state a claim.

Finally, plaintiffs' failure to establish any of the elements of mandamus jurisdiction, *see supra* at XX, also warrants dismissal of their Complaint for failure to state a claim under Rule 12(b)(6). *See In re Cheney*, 406 F.3d 723, 729 ("[M]andamus jurisdiction under § 1361 merges with the merits."); *see also, e.g.*, *Greer v. Bd. of Trustees of Univ. of D.C.*, 113 F. Supp. 3d 297, 310 (D.D.C. 2015) (To prevail against a motion to dismiss under Rule 12(b)(6), "Plaintiff must allege 'facts that, if true, would establish the elements of each claim.'" (quoting *Tressler v. Nat'l R.R. Passenger Corp.*, 819 F.Supp.2d 1, 5 (D.D.C. 2011))).

### CONCLUSION

For the foregoing reasons, this Court must dismiss the Complaint.

Dated: May 7, 2020                                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

25

DAVID M. MORRELL
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ERIC R. WOMACK
Assistant Branch Director
Civil Division

/s/ *Vinita B. Andrapalliyal*
VINITA B. ANDRAPALLIYAL
(*Admitted in New York*)
LIAM C. HOLLAND
(*Admitted in New York*)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-0845
Fax: (202) 616-8470
E-mail: Vinita.b.andrapalliyal@usdoj.gov

*Attorneys for Defendant*