**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA,

Plaintiffs,

v.

DAVID S. FERRIERO, in his official capacity as Archivist of the United States,

Defendant.

Case No. 1:20-cv-242-RC

BRIEF *AMICUS CURIAE* OF
EAGLE FORUM, EAGLE FORUM FOUNDATION,
PUBLIC ADVOCATE OF THE UNITED STATES,
CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND,
CALIFORNIA CONSTITUTIONAL RIGHTS FOUNDATION,
U.S. CONSTITUTIONAL RIGHTS LEGAL DEFENSE FUND,
CLARE BOOTHE LUCE CENTER FOR CONSERVATIVE WOMEN,
POLICY ANALYSIS CENTER,
RESTORING LIBERTY ACTION COMMITTEE,
VIRGINIA DELEGATE DAVID LAROCK, AND
FORMER VIRGINIA DELEGATE ROBERT G. MARSHALL
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Joseph W. Miller
Law Offices of
Joseph Miller, L.L.C.
P.O. Box 83440
Fairbanks, AK 99708
Co-Counsel for *Amici Curiae*
Restoring Liberty Action Committee

William J. Olson (D.C. Bar No. 233833)
Jeremiah L. Morgan (D.C. Bar No. 1012943)
Herbert W. Titus
Robert J. Olson (D.C. Bar No. 1029318)
William J. Olson, P.C.
370 Maple Ave. W., Ste. 4
Vienna, VA 22180-5615
(703) 356-5070
Counsel for *Amici Curiae*

Dated: May 14, 2020

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . ii

INTEREST OF THE *AMICI CURIAE* . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . 2

ARGUMENT

I. Plaintiffs Have Not Met Their Burden to Sufficiently Allege, and Certainly Have Not Demonstrated, Any of the Predicates Required to Have the Court Rule on the Merits of Their Claim . . . . . . . . . . 5

II. The Requirement that Constitutional Amendments with Deadlines for Ratification Be Proposed and Ratified in Contemporaneous Fashion Has Been Established by the U.S. Supreme Court . . . . . . . . . . 8

III. The Complaint Is Based on False Predicates . . . . . . . . . . 12

A. The False Factual Predicates . . . . . . . . . . 12

B. Article V: The Text Disregarded . . . . . . . . . . 14

IV. The Equal Rights Amendment Is neither Narrow nor Uncontested, Totally Unlike the Twenty-Seventh Amendment. . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . 21

## TABLE OF AUTHORITIES

Page

**HOLY BIBLE**

*Genesis* 5:1-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**CONSTITUTION**

Article V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

**CASES**

*Coleman v. Miller*, 307 U.S. 433 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
*Dillon v. Gloss*, 256 U.S. 368 (1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9, 10
*Dyett v. Turner,* 439 P.2d 266 (Utah 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
*Idaho v. Freeman*, 529 F. Supp. 1107, 1154 (D. Id. 1981), *vacated as moot*
459 U.S. 809 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**MISCELLANEOUS**

P. D'Arcy, "Why the US needs to pass the Equal Rights Amendment — finally,"
Ted.com (Oct. 5, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Declaration of Independence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14
T.J. DiLorenzo, "Truth About the 14th Amendment" . . . . . . . . . . . . . . . . . . . . . . . . . 8
Equal Rights Amendment Resolution, 92 H.J. Res. 208, 86 Stat. 1523 (1972) . . . . . 2, *passim*
ERA Coalition, "Why We Need the ERA" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
D. Forte, "The Heritage Guide to the Constitution" (2d ed., 2017) . . . . . . . . . . . . . . 14, 15
R. Francis, "The Equal Rights Amendment: Frequently Asked Questions,"
Alice Paul Institute (Feb. 15, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
C. Holcomb, "Elites Hate Phyllis Schlafly Because She Defeated Them from Home
with Six Kids in Tow," *The Federalist* (Apr. 13, 2020) . . . . . . . . . . . . . . . . . . . . . 3
M. Hunter, "Leaders Concede Loss on Equal Rights," *New York Times*
(June 25, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12
Illinois Constitution, Article I, Section 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
J.A. Jameson, *Constitutional Conventions* (4th ed.) . . . . . . . . . . . . . . . . . . . . . . . . . 10
D. Kurtzleben, "Virginia May Ratify the Equal Rights Amendment. What Would
Come Next Is Murky," NPR (Jan. 8, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
D. Lawrence, "There is No 'Fourteenth Amendment'" *U.S. News & World Report*
(Sept. 27, 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Robert G. Marshall, The Equal Rights Amendment: A Study in Deception
(manuscript) (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
P. McCormick, "June 30, 1982: The Day the ERA Dies," United Press
International (June 30, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
F. McDonald, "Was the Fourteenth Amendment Constitutionally Adopted?" *The
Abbeville Review* (Apr. 23, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Office of Legal Counsel Memorandum Opinion, Ratification of the Equal Rights
Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

M.M. Olohan, "Phyllis Schlafly's Daughter Calls Out 'Mrs America' For 'Fictionalized,' Agenda-Driven 'Slurs' Against Her Family," *Daily Caller* (Apr. 16, 2020) . . . . . . . 3
C. Ruse, "Justice Ginsburg Tells Abortion Activists the ERA is Dead: 'Start Over Again,'" *LifeNews.com* (Sept. 23, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . 16
J. Sarfati, "The Genesis Account" (Creation Book: 2015) . . . . . . . . . . . . . . . . . . . . . . 13
Virginia Constitution, Article I, Section 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
S. Zaretsky, "There are Now More Women in Law School Than Ever Before," Above the Law (Mar. 7, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## INTEREST OF THE *AMICI CURIAE*[1]

*Amici curiae* Eagle Forum (formerly known as STOP ERA, founded by Phyllis Schlafly) and Public Advocate of the United States are not-for-profit organizations which are exempt from federal income taxation under section 501(c)(4) of the Internal Revenue Code ("IRC"). *Amicus curiae* Eagle Forum Foundation, Conservative Legal Defense and Education Fund, California Constitutional Rights Foundation, U.S. Constitutional Rights Legal Defense Fund, Clare Boothe Luce Center for Conservative Women, and Policy Analysis Center are not-for-profit organizations which are exempt from federal income taxation under IRC section 501(c)(3). Restoring Liberty Action Committee is an educational organization. Each organization participates in the public policy process and has filed numerous *amicus curiae* briefs in federal and state courts.

Virginia Delegate David LaRock is a member of the Virginia House of Delegates, representing the 33rd House District (representing parts of Loudoun County, Clarke County, Frederick County, and the City of Winchester) since 2014. He voted in the House of Delegates in opposition to the resolution "ratifying" the Equal Rights Amendment, and is a businessman and a general contractor. Former Virginia Delegate Bob Marshall served in the Virginia House of Delegates for 26 years and is author of the forthcoming book "The Equal Rights Amendment: A Study in Deception."

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

## STATEMENT OF THE CASE

On March 22, 1972, Congress passed a Joint Resolution to send to the States a proposed amendment to the U.S. Constitution to add what was called the Equal Rights Amendment ("ERA"). The Joint Resolution read as follows:

> *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein),* That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution **when ratified by the legislatures of three-fourths of the several States within seven years** from the date of its submission by the Congress:
>
> "Article —
>
> "Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
> "Sec. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.
> "Sec. 3. This amendment shall take effect two years after the date of ratification." [92 H.J. Res. 208, 86 Stat. 1523 (1972) (emphasis added).]

In adopting this resolution, Congress employed two of the procedures set out in Article V of the United States Constitution for amending the Constitution — (i) proposal by Congress and (ii) ratification by state legislatures:

> The Congress, **whenever two thirds of both Houses shall deem it necessary**, **shall propose Amendments to this Constitution**, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, **when ratified by the Legislatures of three fourths of the several states**, or by Conventions in three fourths thereof, as the one or the other

> Mode of Ratification may be proposed by the Congress.... [Emphasis added.]

Moving quickly, by the end of 1972, twenty-two states had ratified the Equal Rights Amendment with eight more states added in 1973, leaving the proposed amendment eight states short of the three-fourths (38 states) needed for ratification. Soon the initial superficial appeal of the amendment wore thin, and, as the amendment was subjected to serious scrutiny, the ratification train derailed.

Leading that national effort was one woman — Phyllis Schlafly — the founder of STOP ERA, which was later folded into *amicus curiae* Eagle Forum.[2] The historic significance of Phyllis Schlafly's work against the ERA was inadvertently testified to by her fictionalized and inaccurate portrayal in the recently released miniseries "Mrs. America," sponsored by Hulu.[3] Gradually, state lawmakers came to understand that the ERA was not just about equal pay for equal work but also about a radical social agenda that was foreign to most Americans — most certainly in the 1970's during the period of ratification — and in large part continuing to this day.

Concerned women came to realize that the ERA likely would have adverse effects which would do everything but aid women and their lives, such as subjecting women to the military draft and front-line combat; abolishing all laws regulating or prohibiting abortion; requiring taxpayer-funded abortions; undermining the proposition that marriage was only

---

[2] *See, e.g.,* C. Holcomb, "Elites Hate Phyllis Schlafly Because She Defeated Them from Home with Six Kids in Tow," *The Federalist* (Apr. 13, 2020).

[3] *See* M.M. Olohan, "Phyllis Schlafly's Daughter Calls Out 'Mrs America' For 'Fictionalized,' Agenda-Driven 'Slurs' Against Her Family," *Daily Caller* (Apr. 16, 2020).

between a man and a woman; eliminating tax exemptions for churches with male-only clergy; ending single-sex schools and sports teams; establishing unisex prison cells, hospital and nursing home rooms, and school dormitories; and invalidating all legislation passed to protect women in the workplace — to name but a few.

ERA supporters subsequently realized in 1977 that they could never obtain ratification by the necessary 38 states within seven years. Those who had lost the battle in the state legislatures demanded Congress "extend" the ratification deadline by seven additional years, and then settled for a purported extension to June 30, 1982 (just over three years), which was approved by Congress in October 1978 before the original seven-year deadline had expired.

By the date of the expiration of the extended ratification deadline of June 30, 1982, the ERA was still three states short of the 38 states required for ratification. To remedy the loss suffered in failing to obtain ratification, the ERA was reintroduced into Congress in 1983 and has been reintroduced many times since. However, even the most ardent ERA supporters recognized that the original ERA had become null and void once ratification had failed decades ago.

Nevertheless, Congresswoman Jackie Speier (D-CA) introduced H. J. Res. 38 (2019) and H. J. Res 79 (2019) which purport to allow, by a simple majority vote, those states which did not previously ratify the ERA another chance to pass ratification resolutions. H. J. Res 79 was reported from the House Judiciary Committee on November 13, 2019, and was passed by the House of Representatives on February 13, 2020 by a vote of 232-183 (which constituted a 55 percent vote in favor, far less than the super-majority required by the Constitution for a constitutional amendment). With the Senate unlikely to pass that resolution, supporters of the

ERA are now hoping that the judiciary will act to impose the ERA on the nation through litigation, such as that brought by Virginia, *et al.* to this Court.

Plaintiffs Virginia, Illinois, and Nevada claim to be the 36th, 37th, and 38th states to ratify the expired ERA proposal, based on actions taken in 2019 and 2020. These three states brought this suit to require the National Archivist to certify the ERA as the Twenty-Eighth Amendment to the U.S. Constitution. Thereafter, five states, three of which had rescinded their previous ratifications of the ERA proposal, have filed a motion to intervene to oppose the plaintiff states' lawsuit.

Proponents contend these post-deadline "ratifications" can be legitimately added to the original 35 state ratification resolutions from the 1970s and early 1980s. This politically driven attempt to breathe life into the ERA corpse,[4] has no basis in law or Article V.

## ARGUMENT

### I. PLAINTIFFS HAVE NOT MET THEIR BURDEN TO SUFFICIENTLY ALLEGE, AND CERTAINLY HAVE NOT DEMONSTRATED, ANY OF THE PREDICATES REQUIRED TO HAVE THE COURT RULE ON THE MERITS OF THEIR CLAIM.

To set out a claim which this Court could address on the merits and potentially grant relief, plaintiffs must make numerous showings — none of which have been sufficiently asserted or established in their complaint. The first three issues set out below are well addressed by defendant, but this *amicus* brief addresses several of the remaining issues. The remaining issues identified below demonstrate that the complaint wholly disregards such U.S.

---

[4] One federal district court concluded the ERA died on March 22, 1979. *See Idaho v. Freeman*, 529 F. Supp. 1107, 1154 (D. Id. 1981), *vacated as moot* 459 U.S. 809 (1982).

Supreme Court authority as exists, and is little more than a political document, not supported by legal authority. *See* Section III, *infra*.

First, plaintiffs have not established that they have standing to bring this suit. *See* Defendant's Memorandum in Support of Motion to Dismiss ("Motion to Dismiss") at 8-11.

Second, plaintiffs have not demonstrated why this Court should resolve non-justiciable political questions. *See* Motion to Dismiss at 12-15.

Third, plaintiffs do not meet the legal requirements for an exercise of this Court's mandamus jurisdiction and thus, under Rule 12(b)(6), fail to state a claim. *See* Motion to Dismiss at 15-25.

Fourth, plaintiffs have made no showing as to why this district court can disregard the U.S. Supreme Court's decision in *Dillon v. Gloss*, 256 U.S. 368, 375 (1921). *See* Section II, *infra*.

Fifth, plaintiffs have made no showing as to why the long-established congressional practice of using fixed deadlines for state ratification of constitutional amendments should be overridden by this Court. *See* Defendant's Motion to Dismiss at 3.

Sixth, plaintiffs fail to provide authority for its argument imputing significance to the practice, adopted during the second half of the 20th century, whereby the deadline for ratification is placed in the first portion of the congressional resolution addressing the ratification procedure, rather than in the second portion containing the proposed text. *See* Section III, *infra*.

Seventh, plaintiffs claim without authority not only that the congressionally established seven-year period for ratification was invalid and must be disregarded or struck down by this

Court, but also provide no authority for this Court to read into the congressionally proposed ERA an unlimited period for ratification — or at least a 48-year period.[5]

Eighth, although the validity of Congress' action in extending the period for ratification is not directly implicated in its case (as ratification did not occur between March 22, 1979 and June 30, 1982), plaintiffs implicitly ask this Court to disregard the action of Congress in purporting to extend the deadline for ratification beyond the initial period for ratification. Indeed, adoption of plaintiffs' position requires this Court to assume, even if *sub silentio*, that the extended congressional deadline was a nullity, just as the original deadline was void and of no effect.

Ninth, plaintiffs simply assert that while a state may refuse to ratify an amendment any number of times without effect, a vote to ratify cannot be reconsidered and rescinded either before or after the period of ratification has expired. This argument would establish a type of "one-way rachet principle," where decisions of the state legislators with which plaintiffs politically agree are recognized, and decisions with which they politically disagree are disregarded. Thus, plaintiffs do not rely on a rule of law, but mislabel a practical political necessity as being a legal rule. Before January 27, 2020, the date on which plaintiffs assert that Virginia was the 38th state to ratify, five states had rescinded their ratification — Nebraska,

---

[5] The ERA was proposed March 22, 1972, and Congress established a seven-year period for ratification, which expired on March 22, 1979. Before that 1979 deadline occurred, Congress purported to extend the period of ratification by three years and three months, to June 30, 1982. It is uncontested that the required number of states did not ratify before *either* date set by Congress. The Virginia vote on ratification occurred long after — on January 27, 2020: (i) almost 48 years after ERA was proposed: (ii) almost 41 years after the Congressionally established deadline for ratification expired; and (iii) almost 38 years after the purported Congressional extension of the deadline expired.

Tennessee, Idaho, Kentucky, and South Dakota. Plaintiffs' theory would force this Court to completely disregard the action of these five state legislatures, simply asserting "these efforts are constitutionally unauthorized and without legal effect."[6] *See* Complaint, ¶ 70.

## II. THE REQUIREMENT THAT CONSTITUTIONAL AMENDMENTS WITH DEADLINES FOR RATIFICATION BE PROPOSED AND RATIFIED IN CONTEMPORANEOUS FASHION HAS BEEN ESTABLISHED BY THE U.S. SUPREME COURT.

To support its claim that the seven-year ratification period established by Congress (presumably including the three-year and three-month extension of the period made before those seven years expired) is invalid and should be disregarded, plaintiffs must overcome the U.S. Supreme Court's decision issued 99 years ago in *Dillon v. Gloss*. In that case, for the ratification of the Eighteenth Amendment, Congress established the same seven-year period for ratification as it did for the ERA:

> Congress … fixed **seven years** as the period for ratification. Whether this could be done was questioned at the time and debated at length, but the prevailing view in both houses was that some limitation was intended and that seven years was a reasonable period. [*Id*. at 373 (emphasis added).]

After reviewing the relevant constitutional provisions, the Court continued:

---

[6] Plaintiffs assert the existence of a "historical practice" that states may not rescind ratification, referring only to the ratification of the 14th Amendment. *See* Complaint, ¶ 73. The complaint fails to provide any detail, but merely provides reliance on the process by which the 14th Amendment was ratified, shall we say, opens a "can of worms." Historians of various philosophical stripes have demonstrated that the post-war process by which the 14th Amendment was ratified was fraught with irregularities, and the shortcuts taken at that time to re-establish the union during a time of Black Codes are scant authority for the establishment of what plaintiffs generously assert to be a "historical practice." *See generally Dyett v. Turner,* 439 P.2d 266, 269-273 (Utah 1968); F. McDonald, "Was the Fourteenth Amendment Constitutionally Adopted?" *The Abbeville Review* (Apr. 23, 2014); D. Lawrence, "There is No 'Fourteenth Amendment'" *U.S. News & World Report* (Sept. 27, 1957); and T.J. DiLorenzo, "Truth About the 14th Amendment."

> We do not find anything in [Article V] which suggests that an amendment once proposed is to be open to ratification **for all time**, or that ratification in some of the States may be separated from that in others by **many years** and yet be effective. We do find that which strongly suggests the contrary. [*Id.* at 374 (emphasis added).]

The Court then discussed three reasons that ratifications occurring after "many years" should not be considered to be effective. The first of these reasons is "proposal and ratification are not treated as unrelated acts but as succeeding steps in a single endeavor, the natural inference being that they are not to be widely separated in time." *Id.* at 374-75. Plaintiffs here are not clear if they are proposing that there can be no valid period of time set by Congress for ratification, or if the period could be fixed, but just not less than 48 years. By any standard, 48 years meets the definition of a period of "many years."

The Court's second reason was "it is only when there is deemed to be a necessity therefor that amendments are to be proposed, the reasonable implication being that when proposed they are to be considered and disposed of presently." *Id.* at 375. Although the three states bringing this challenge appear to believe that adoption of the ERA is a "necessity" in 2020, that view is now a half-century removed from when two-thirds of Congress embraced that view. Certainly disposing of the 1972 proposed amendment in 2020 is something other than "presently."

The last reason offered by the Court was "as ratification is but the expression of the approbation of the people and is to be effective when had in three-fourths of the States, there is a fair implication that it must be sufficiently contemporaneous in that number of States to reflect the will of the people in all sections at relatively the same period, which of course ratification scattered through a long series of years would not do." *Id.* Again, without

question, actions taken 48 years apart do not reflect the "contemporaneous" will of the people. Indeed, the 48-year period between Congress proposing the ERA and Virginia purporting to ratify it constitutes one-fifth of the entire existence of our nation as a constitutional republic.

In conclusion, the *Dillon* Court quoted favorably the following proposition from a treatise entitled *Constitutional Conventions* (4th ed. § 585) by John Alexander Jameson:

> that an alteration of the Constitution proposed today has relation to the sentiment and the felt needs of today, and that, if **not ratified early** while that sentiment may fairly be supposed to exist, it **ought to be regarded as waived**, and not again to be voted upon, unless a second time proposed by Congress. [*Id.* (emphasis added).]

This, Justice VanDevanter observed, "is the better conclusion." The opposite view, he views to be "quite untenable." He concluded:

> Of the power of Congress, keeping within reasonable limits, to fix a definite period for the ratification we entert[ain] no doubt.... Whether a definite period for ratification shall be fixed so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which Congress may determine.... [*Dillon* at 375-76.]

A review of *Dillon* yields but one shred of an argument which could be raised by plaintiffs. In its first sentence describing the Eighteenth Amendment, the Court mentions that it stated that "it should be inoperative unless ratified within seven years...." *Id.* at 371. The full section 3 of the Eighteenth Amendment states:

> This article shall be **inoperative unless it shall have been ratified** as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, **within seven years** from the date of the submission hereof to the States by the Congress. [Emphasis added.]

The comparable language in the ERA does not use the term inoperative, but rather states the matter in the affirmative:

> That the following article is proposed as an amendment to the Constitution of the United States, **which shall be valid** to all intents and purposes as part of the Constitution **when ratified** by the legislatures of three-fourths of the several States **within seven years** from the date of its submission by the Congress. [Emphasis added.]

For this reason, one could suppose, the plaintiffs might argue that, from the absence of the "shall be inoperative" language, Congress opened the door to ratification after seven years. However, that argument would require this Court to disregard the logical implication of the language in the ERA Resolution — that if it "shall be valid … when ratified … within seven years" — clearly implies the corollary of that proposition, that it "shall **not** be valid … if **not** ratified … within seven years." Moreover, the Court did not base its analysis on the "inoperative" provision.

After *Dillon*, the next U.S. Supreme Court case addressing the validity of state ratifications of a constitutional amendment was *Coleman v. Miller*, 307 U.S. 433 (1939). There, the Supreme Court concluded that the validity of state ratifications of a constitutional amendment raises a political question that was not within the competence of the judiciary. Clearly, *Coleman* provides no additional support for this effort by states to have the federal judiciary declare a constitutional amendment to have been properly ratified.

Quite unlike the apparent views of the Democrat governors of the plaintiff states, when the extended period for ratification expired in 1982, those who supported the Equal Rights Amendment understood that their fight for ratification was over, as reported in what some at the time viewed as the national newspaper of record, the *New York Times*:

> Leaders of the fight for an equal rights amendment officially conceded defeat today….

> "We've just begun to fight," said Eleanor Smeal, the president of the National Organization for Women, the group that spearheaded the Equal Rights Amendment Countdown Campaign, which has now ended in defeat....
>
> Phyllis Schlafly, a leader of a group called Stop-ERA, hailed the defeat of the amendment tonight, saying: "They realized E.R.A. is dead and I think that that is an admission they have lost the battle."...
>
> A bipartisan group of at least 38 senators, led by Bob Packwood[7] of Oregon, a Republican, and Paul E. Tsongas of Massachusetts, a Democrat, will introduce new legislation in Congress on July 14, calling again for a constitutional amendment that would have to be ratified by three-fourths of the state legislatures. [M. Hunter, "Leaders Concede Loss on Equal Rights," *New York Times* (June 25, 1982).[8]]

## III. THE COMPLAINT IS BASED ON FALSE PREDICATES.

### A. The False Factual Predicates.

Plaintiffs' Complaint repeatedly asserts that, on January 27, 2020, "Virginia became the 38th State to ratify the Equal Rights Amendment [for] [a]t that moment, the process set forth in Article V of the U.S. Constitution was complete," making it ready to be published by the National Archives. Complaint at 1. Plaintiffs' Complaint is grounded in two false predicates.

---

[7] ERA supporter and outspoken supporter of what are called "women's rights," Senator Bob Packwood was forced to resign from the U.S. Senate on September 7, 1995, following the unanimous recommendation from the Senate Ethics Committee that he be expelled from the Senate for sexual misconduct against women on his staff, including some incidents recorded in his diary, which he later altered and destroyed.

[8] *See also* P. McCormick, "June 30, 1982: The Day the ERA Dies," United Press International (June 30, 1982) ("The ERA officially dies at midnight, June 30, when it falls three states short[] of the required 38 for ratification. Death was sealed last week when Florida and then Illinois legislatures rejected ratification.... What will happen to Mrs. Schlafly's 'STOP ERA' organization, now that the ERA has been stopped? 'It will fold into the Eagle Forum,' she said. That Forum, 50,000 members, was set up to help crusades for strong families....")

First, Plaintiffs describe the recent efforts by three states to ratify the ERA as an act of "the people" (Complaint ¶ 81), and assert that ratification is now being demanded by the people, as demonstrated by various public opinion polls (Complaint ¶ 49, ¶ 56). However, Congress assigned the responsibility for ratification of the ERA to state legislatures — not to state conventions, and certainly not to the people directly. Such stump-style political arguments are repeatedly made by plaintiffs, as if repetition would transform them into principles of constitutional law — which they most assuredly are not. This claim is political at its core, as if this case is being argued in the court of public opinion, not in a court of law which must follow the law. Public opinion polls and purported political demands of "the people" should be irrelevant to the resolution of the constitutional question presented for resolution.

Second, the Complaint makes the baseless claim that "our Nation's foundational document did not acknowledge the existence of women." Complaint at 1. However, America's Charter, the Declaration of Independence, proclaims that "all men are created equal." The Bible affirms that in the day when our Creator God created man, he made him in His own likeness, male and female, and he blessed them, and named them "Man." *See Genesis* 5:1-2. *See also* J. Sarfati, "<u>The Genesis Account</u>" at 446 (Creation Book: 2015). Our nation's founders understood the meaning of the term "men" as being inclusive of all of humanity (*id.* at 334-35), entitling both sexes to their inalienable rights to life, liberty, and the

pursuit of happiness, as the Declaration of Independence makes no fewer than five references to our Creator and His relation to all humanity.[9]

**B. Article V: The Text Disregarded.**

All inquiries arising under the Constitution must begin with the text. By its clear language, Article V provides for two processes by which an amendment may be "proposed": (i) by a two-thirds vote of Congress, or (ii) by application of two-thirds of the legislatures of the several States. Next, the Article V provides two ways by which a proposed amendment may become a part of the Constitution: (i) by ratification by three-fourths of the State legislatures, or (ii) by convention of three-fourths of the States. Then, Article V vests in Congress authority to prescribe the specific "mode of ratification" to be followed respecting one of the other ratification proposals submitted by Congress, whether by the several state legislatures or by convention of the States. *See* D. Forte, "The Heritage Guide to the Constitution" (2d ed., 2017) at 372.

Although the Complaint quotes the relevant language of Article V by which to measure the validity of its claim — that on the 27th day of January 2020, Virginia "ratif[ied] the Equal Rights Amendment" (Complaint ¶ 48) — it makes no effort to allege the facts necessary to sustain plaintiffs' claim. Each of the three plaintiff states has failed to comply with the specific **mode** of ratification established by Congress. Since 1924, every constitutional amendment

---

[9] First, "the Laws of Nature and of Nature's God…." Second, "all men are created equal…." Third, "that they are endowed by their Creator with certain unalienable Rights…." Fourth, "appealing to the Supreme Judge of the world…." Fifth, "with a firm reliance on the protection of divine Providence."

proposed has included such a time certain,[10] and the proposed ERA was no different, establishing this procedure:

> the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States, **within seven years** from the date of its submission by the Congress.[11] [Emphasis added.]

The action taken by the Virginia General Assembly in adopting House Joint Resolution 1 on January 27, 2020 is characterized in the complaint as a "ratification resolution," but viewed from the perspective of the Constitution, that resolution could not be offered in response to any ERA proposal submitted by Congress. Hence, it was a nullity. At best, House Joint Resolution 1 constituted a request by the Virginia General Assembly to Congress that it re-propose the Equal Rights Amendment.

Plaintiffs would have this Court disregard the plain language of the 1972 congressionally proposed ERA, based on their novel theory that giving meaning to Congress' language would "strip the Plaintiff States of their power to ratify" the ERA. (Complaint ¶ 63.) Audaciously, plaintiffs belittle any congressionally established rules governing ratification in order to force open the door for setting a time certain for shutting down a movement that has

---

[10] *See* Heritage Guide at 372.

[11] In October 1978, Congress purported to extend this date for ratification by three years. *See* Office of Legal Counsel Memorandum Opinion for the General Counsel, National Archives and Records Administration, Ratification of the Equal Rights Amendment (Jan. 6, 2020) at 1.

run its course. As Justice Ruth Bader Ginsburg, a proponent of the ERA, advised just last year: let the ERA supporters begin again.[12]

## IV. THE EQUAL RIGHTS AMENDMENT IS NEITHER NARROW NOR UNCONTESTED, TOTALLY UNLIKE THE TWENTY-SEVENTH AMENDMENT.

Plaintiffs' Complaint and Defendant's Motion to Dismiss address many of the issues surrounding the process by which the proposed Equal Rights Amendment was proposed by Congress in 1972, and whereby the states declined to ratify the proposal in the ensuing decade. However, neither addresses the effect that the proposed ERA would have if it had become part of the Constitution. The nature of the amendment is significant in that it distinguishes itself from ratification process for the Twenty-Seventh Amendment to the U.S. Constitution, which prohibits any law that increases or decreases the salary of members of Congress until the next term for the House. That amendment was submitted for ratification on September 25, 1789, and then was deemed ratified on May 7, 1992 — over 202 years later. Distinguishing it from the ERA, that proposal contained no congressionally specified period for ratification. Moreover, on May 20, 1992, the House passed a concurrent resolution confirming the validity of the ratification by a vote of 414 to 3, and the Senate did the same unanimously, by a vote of 99-0. While the purpose of the Twenty-Seventh Amendment was narrow and largely uncontested, the same is not true of the ERA.

---

[12] *See* C. Ruse, "Justice Ginsburg Tells Abortion Activists the ERA is Dead: 'Start Over Again,'" *LifeNews.com* (Sept. 23, 2019). ("'I was a proponent of the equal rights amendment. I hope someday it will be put back in the political hopper and we'll be starting over again collecting the necessary states to ratify it,' said Ginsburg to a gathering at Georgetown University Law Center….")

As the Complaint alleges, the ERA would "declare[], once and for all, that equality of rights under the law shall not be denied or abridged on account of sex." Complaint at 1.

The two operative provisions of the proposed ERA state:

> "SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
> "SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."

The phrase "equality of rights under the law" is not defined, so inevitable court analysis of whether a particular action violates the ERA would unavoidably venture into interminable analysis of the intention of the drafters, and what was meant by "equality of rights."

Illustrative of the confusion that could ensue is the hotly contested litigation before the U.S. Supreme Court regarding the meaning of "because … of sex" in Title VII of the Civil Rights Act. *See* Bostock v. Clayton Co. (Supreme Court No. 17-1618) and R.G. & G.R. Harris Funeral Homes v. EEOC (Supreme Court No. 18-107) (both argued on Oct. 8, 2019). In addition to prohibiting laws that expressly discriminate by sex, the ERA could be used to invalidate laws that tend to have an incidental unequal impact, even if not unfair or are otherwise discriminatory.[13] With respect to Section 2 of the ERA, there also would be much litigation about the scope of the federal power and responsibility to enforce the ERA.[14] For

[13] The unintended effects of the ERA should be given some thought by proponents. Consider the fact that, in 2016, women outnumbered men in law school classrooms for the first time. S. Zaretsky, "There Are Now More Women in Law School Than Ever Before," Above the Law (Mar. 7, 2018). If ratified, would the ERA compel state law schools to increase the number of men and decrease the number of women, so that "equality of rights under the law" would be achieved?

[14] Two of the plaintiff states already prohibit sex discrimination in their state constitutions (*see* Virginia Constitution, Article I, Section 11, and Illinois Constitution, Article

example, there could be questions about whether or how the ERA and any implementing legislation could effect or even preempt state regulation of sex discrimination.

While some suggest that the ERA is merely symbolic — because there are many federal and state statutes and state constitutions that already prohibit sex-based discrimination — some proponents have described the sweeping significance the ERA could have:

> "The Supreme Court has ruled in the past that discrimination against pregnant women is really discrimination against pregnant people, and therefore it doesn't constitute sex discrimination," [Professor Martha Davis] said. "And I think the Equal Rights Amendment, through its legislative history, as well as its language, would clarify that discrimination on the basis of traits that are sex-specific would be violative of the ERA." In addition, proponents often argue that the ERA would help women get equal pay and that it would help victims of gender-based violence seek justice. [D. Kurtzleben, "Virginia May Ratify the Equal Rights Amendment. What Would Come Next Is Murky," NPR (Jan. 8, 2020).]
>
> The Equal Rights Amendment would provide a fundamental legal remedy against sex discrimination by guaranteeing that constitutional rights may not be denied or abridged on account of sex. For the first time, sex would be considered a suspect classification, as race, religion, and national origin currently are. Governmental actions that treat males or females differently as a class would be subject to strict judicial scrutiny and would have to meet the highest level of justification – a necessary relation to a compelling state interest – to be upheld as constitutional. [R. Francis, "The Equal Rights Amendment: Frequently Asked Questions," Alice Paul Institute (Feb. 15, 2020).]
>
> "The hope is, in passing the ERA, we could get everything from equal pay for women through to better protections by state law enforcement when gender violence occurs," Dunn says. [P. D'Arcy, "Why the US needs to pass the Equal Rights Amendment — finally," Ted.com (Oct. 5, 2018).]

---

I, Section 18), and Nevada has a state constitutional amendment pending on the ballot in the 2022 election. https://ballotpedia.org/Nevada_Equal_Rights_Amendment_(2022). Plaintiffs have not alleged that failure to certify ratification of the ERA will prevent them from prohibiting sex discrimination within those states.

The ERA Coalition, an organization promoting the ratification of the ERA, lists "a few areas in which the ERA can make a significant difference":

- "Pay Equity: An ERA will set a norm for equal pay and provide a basis for litigation and legislation to extend the same pay entitlements to women and men."

- "Violence Against Women: An ERA could require that states meet Constitutional sex equality standards in the enforcement of their laws against gender violence and expand the federal power to legislate against these crimes."

- "Pregnancy Discrimination: An ERA could protect women from being disadvantaged because they are women, of which discrimination against pregnant women is an instance. When it is only women who are harmed by a policy, the fundamental principle of equal rights on the basis of sex is violated."

- "Citizenship: Although the opportunity to pass on values and knowledge and identification relevant to citizenship does vary, it does not vary reliably by sex. Where the sexes are located in the same position relative to legislation, an ERA would likely require that they be treated the same."

- "Systemic Bias: An ERA could provide the possibility of recourse when women are clearly disadvantaged by unequal treatment, without having to prove the intent to discriminate."

- "Public Policy: An ERA would be meaningful and significant on the level of policy guidance as much for what it says as for what it does. As a statement and symbol of principle, it would provide a guiding star and beacon of hope for efforts toward social equality at all social levels."

- "International Leadership: An Equal Rights Amendment in the United States Constitution would show this country not only talking sex equality talk to other countries but walking the sex equality walk here at home." [http://www.eracoalition.org/wp-content/uploads/2019/09/Why-We-Need-the-ERA.pdf.]

Whereas the effect of the Twenty-Seventh Amendment was narrow and minor, the effect of the Equal Rights Amendment would alter the state of the law in hundreds, if not thousands of ways that could not now even be anticipated. Whereas the Twenty-Seventh

Amendment was largely noncontroversial,[15] the ratification of the ERA has been hotly disputed for nearly half a century, and any judicial decision that deemed it to be ratified, or ordering the Archivist of the United States to declare it to be ratified, would provoke a constitutional crisis of significant magnitude, to the detriment of the nation.

The Equal Rights Amendment provides that "Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex." On its face, that one sentence would seem to require a re-examination of every federal and state statute, regulation, policy and other legislative action, and every action by the President, every governor, and every agency of government, to ensure that something called "equality or rights" be ensured. Does anyone know what that means? But putting aside the issue of what changes would be required is the significant issue of — "who decides?" Who decides whether the tens of thousands of lawsuits that this Amendment would engender are well founded. It is reasonable to assume that in almost all cases it would be judges — primarily federal judges — who would decide. Thus, control of our government would shift from the political branches chosen by and accountable to the People, to lawyers wearing robes, destroying the Separation

---

[15] *See* Robert G. Marshall, The Equal Rights Amendment: A Study in Deception (manuscript) (2020) at 72 ("Congressman Don Edwards (D-CA) made it very clear in debate on H. Con. Res. 320, ('Madison Pay Amendment') which became the 27th Amendment to the Constitution, that its passage was an exception to the rule. Congressman Don Edwards, who had also chaired the House Judiciary Subcommittee which heard the ERA, stated: 'Mr. Speaker ... the pay amendment has overwhelming support both in Congress and among the States. ... And I will certainly support the resolution before us today. ... But there is another, broader issue here that must not be lost sight of, and that is the Constitution itself. The House may decide today to make an exception to the principle of contemporaneous consensus that has been a guiding constitutional principle for most of this century. But it should be clear that this is an exception, not a precedent.' Congressman Don Edwards, Congressional Record, 05/20/92, p. H 3397.") .

of Powers. And every action by a state government would be subject to federal review, in a way that would destroy principles of Federalism. It would federalize all of family law, which historically has been entrusted to the states. When government must meet the standard of "due process of law," at least the judges have the common law to draw from in understanding what that requires. But as to "equality of rights" there is no common law antecedent. And there is no context provided by the Amendment. Although proponents point to the simplicity of the language of the Amendment as a strength, the fact that it introduces a term with no historic or other demonstrated meaning into law, empowers federal judges to do whatsoever they think right. The temptation to acquire power is a natural one, but one that must be resisted. We urge this court to resist the siren song being sung by Plaintiffs, for it may be deceptively alluring, but would shipwreck our constitutional republic. That is why the ERA did not receive the support of the requisite number of state legislatures, and why it now must not be imposed by federal courts, which would be the primary recipient of its powers.

**CONCLUSION**

For the reasons set out above, the Government's Motion to Dismiss should be granted.

Respectfully submitted,

*/s William J. Olson*

William J. Olson (D.C. Bar No. 233833)
Jeremiah L. Morgan (D.C. Bar No. 1012943)
Herbert W. Titus
Robert J. Olson (D.C. Bar No. 1029318)
William J. Olson, P.C.
370 Maple Ave. W., Ste. 4
Vienna, VA 22180-5615
(703) 356-5070
Counsel for *Amici Curiae*

Joseph W. Miller
Law Offices of
Joseph Miller, L.L.C.
P.O. Box 83440
Fairbanks, AK 99708
Co-Counsel for *Amici Curiae*
Restoring Liberty Action Committee

Dated: May 14, 2020