UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-00242 |
| | ) | |
| DAVID S. FERRIERO, in his official capacity as Archivist of the United States, | ) | |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, and TENNESSEE, | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**PLAINTIFF STATES' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................... 2

    A.  The Article V Amendment Process ......................................................... 2

    B.  The Equal Rights Amendment.................................................................. 3

    C.  This Lawsuit ............................................................................................. 5

LEGAL STANDARDS ......................................................................................................... 6

ARGUMENT ........................................................................................................................ 6

I.     This Court has the power to review and rectify the Archivist's overreach ..................... 7

    A.  The Plaintiff States have standing as sovereigns and equal partners in the constitutional amendment process .................................................................. 7

    B.  The political question doctrine does not apply here ............................... 11

    C.  The Archivist's attempt to manufacture a new Executive Branch ripeness inquiry should be rejected ........................................................................ 16

II.    The purported deadline in the congressional resolution does not invalidate the Plaintiff States' ratifications of the Equal Rights Amendment .................................................. 18

    A.  The Archivist does not have the power to ignore State ratifications ...................... 18

    B.  There is no deadline for the States to ratify in the "Amendment[]" that Congress "propose[d]".................................................................................. 19

III.   The Plaintiff States have satisfied the other requirements for mandamus relief............ 26

    A.  There is no adequate alternative remedy ............................................... 26

    B.  The equities weigh in favor of the Plaintiff States................................. 27

CONCLUSION.................................................................................................................... 29

# TABLE OF AUTHORITIES

<u>Page</u>

## Cases

*Alden v. Maine*,
  527 U.S. 706 (1999) ............................................................................... 1, 7, 9

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
  458 U.S. 592 (1982) ................................................................................... 9, 11

*Al-Tamimi v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019) ............................................................................. 15

*American Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016) ..................................................................... 28, 29

*American Nat. Ins. Co. v. F.D.I.C.*,
  642 F.3d 1137 (D.C. Cir. 2011) ......................................................................... 6

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
  135 S. Ct. 2652 (2015) ...................................................................................... 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................ 6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 6

*Bostock v. Clayton Cty., Georgia*,
  No. 17-1618, 2020 WL 3146686 (U.S. June 15, 2020) ..................................... 19

*Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*,
  477 U.S. 41 (1986) ............................................................................................ 11

*California v. Trump*,
  No. CV 19-960 (RDM), 2020 WL 1643858 (D.D.C. Apr. 2, 2020) .................... 7

*Clinton v. City of New York*,
  524 U.S. 417 (1998) .......................................................................................... 22

*Coleman v. Miller*,
  307 U.S. 433 (1939) ................................................................................... passim

*Competitive Enter. Inst. v. U.S. Envtl. Prot. Agency*,
  67 F. Supp. 3d 23 (D.D.C. 2014) ...................................................................... 27

*Coyle v. Smith*,
  221 U.S. 559 (1911) ............................................................................................ 8

*Dillon v. Gloss*,
  256 U.S. 368 (1921) ................................................................... 19, 21, 23, 24

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .......................................................................................... 25

*Fornaro v. James,*
    416 F.3d 63 (D.C. Cir. 2005) ............................................................................... 28

*Gerber Prod. Co. v. Perdue,*
    254 F. Supp. 3d 74 (D.D.C. 2017) ........................................................................ 10

*\*Government of Manitoba v. Bernhardt,*
    923 F.3d 173 (D.C. Cir. 2019) ........................................................................ 10, 11

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) .............................................................................................. 22

*Hollingsworth v. Virginia,*
    3 U.S. 378 (1798) ................................................................................................. 17

*I.N.S. v. Chadha,*
    462 U.S. 919 (1983) ............................................................................................... 3

*Idaho v. Freeman,*
    529 F. Supp. 1107 (D. Idaho 1981) ........................................................................ 9

*In re African-Am. Slave Descendants Litig.,*
    304 F. Supp. 2d 1027 (N.D. Ill. 2004) ................................................................. 10

*In re Core Commc'ns, Inc.,*
    531 F.3d 849 (D.C. Cir. 2008) ............................................................................. 27

*In re Medicare Reimbursement Litig.,*
    414 F.3d 7 (D.C. Cir. 2005) ................................................................................. 28

*In re Pub. Employees for Envtl. Responsibility,*
    957 F.3d 267 (D.C. Cir. 2020) ............................................................................. 28

*Jacobson v. Commonwealth of Massachusetts,*
    197 U.S. 11 (1905) ............................................................................................... 25

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.,*
    219 F. Supp. 2d 20 (D.D.C. 2002) ....................................................................... 27

*Kaplan v. Cent. Bank of the Islamic Republic of Iran,*
    896 F.3d 501 (D.C. Cir. 2018) ............................................................................. 16

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.,*
    909 F.3d 446 (D.C. Cir. 2018) ............................................................................... 2

*Marbury v. Madison,*
    5 U.S. 137 (1803) ................................................................................................. 17

*\*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ....................................................................................... 7, 8, 9

*Nat'l Org. for Women, Inc. v. Idaho,*
    459 U.S. 809 (1982) ............................................................................................. 24

*New England Power Generators Ass'n, Inc. v. FERC,*
    707 F.3d 364 (D.C. Cir. 2013) ............................................................................. 10

*New York v. United States*,
  505 U.S. 144 (1992) ....................................................................................... 8, 23

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................................................. 27

*Rio Grande Pipeline Co. v. FERC*,
  178 F.3d 533 (D.C. Cir. 1999) .......................................................................... 16

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ............................................................................................. 17

*Sparrow v. United Air Lines, Inc.*,
  216 F.3d 1111 (D.C. Cir. 2000) ........................................................................... 6

*State of Idaho v. Freeman*,
  529 F. Supp. 1107 (D. Idaho 1981) .................................................................... 24

*Texas v. White*,
  74 U.S. 700 (1868) ............................................................................................... 7

*U.S. ex rel. Widenmann v. Colby*,
  265 F. 998 (D.C. Cir. 1920) ............................................................................... 19

*United States v. Chambers*,
  291 U.S. 217 (1934) ........................................................................................... 22

*United States v. Sprague*,
  282 U.S. 716 (1931) ................................................................................... 3, 21, 22

*Vietnam Veterans of Am. v. Shinseki*,
  599 F.3d 654 (D.C. Cir. 2010) ........................................................................... 27

*Waterkeeper All., Inc. v. Wheeler*,
  330 F.R.D. 1 (D.D.C. 2018) ............................................................................... 10

*Yazoo & M.V.R. Co. v. Thomas*,
  132 U.S. 174 (1889) ........................................................................................... 25

*Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) ........................................................................................... 15

**Constitutional Provisions**

U.S. Const. art. I, § 3, cl. 1 ................................................................................. 22, 26

U.S. Const. art. I, § 9, cl. 1 ....................................................................................... 26

*U.S. Const. art. V .......................................................................................... passim

U.S. Const. amend. XIV .......................................................................................... 11

U.S. Const. amend. XIX ........................................................................................... 11

U.S. Const. amend. XVIII .............................................................................. 21, 23, 26

U.S. Const. amend. XXI ..................................................................................... 18, 26

U.S. Const. amend. XXIV ......................................................................................... 11

*U.S. Const. amend. XXVII ............................................................... 12, 14, 24, 25

**Statutory and Legislative Authorities**

*1 U.S.C. § 106b.............................................................................................. passim

5 U.S.C. § 706(1) ................................................................................................ 27, 28

H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972)............................................. 4, 8, 20

H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978)........................................... 22, 25

H. Con. Res. 320, 102d Cong. (1992) ...................................................................... 13

S. Con. Res. 120, 102d Cong. (1992) ...................................................................... 13

**Other Authorities**

1 *Annals of Cong.* (1789) (Joseph Gales ed., 1834)............................................... 26

1 Stat. 97 (1789).......................................................................................................... 13

Archivist of the U.S., U.S. Constitution, Amendment 27, 57 Fed. Reg. 21,187
    (May 19, 1992)..................................................................................................... 13

Articles of Confederation of 1781, art. XIII ............................................................... 3

*Congressional Pay Amendment*, 16 Op. O.L.C. 87 (Nov. 2, 1992)..................... passim

Jessie Kratz, *The First Amendments to the U.S. Constitution*, Nat'l Archives and
    Records Admin. (Sept. 25, 2019) ......................................................................... 13

Jessie Kratz, *The National Archives' Role in Amending the Constitution*,
    Prologue: J. of the Nat'l Archives, Vol. 49, No. 1 (Spring 2017)....................... 13

Letter from Gary M. Stern to Steven A. Engel (Dec. 12, 2018).................................. 13

Nat'l Archives and Records Admin., *Equal Rights Amendment: List of State
    Ratification Actions* (Mar. 24, 2020).................................................................. 5, 26

*Power of a State Legislature to Rescind its Ratification of a Constitutional
    Amendment*, 1 Op. O.L.C. 13 (1977) .................................................................. 18

President George Washington, *Inaugural Address of 1789* (Apr. 30, 1789)................. 2

*The Federalist* No. 39 (James Madison)...................................................................... 2

*The Federalist* No. 78 (Alexander Hamilton).............................................................. 16

*The Federalist* No. 85 (Alexander Hamilton)................................................................ 3

*The Records of the Federal Convention of 1787*, (Max Farrand ed., 1911) ...... 3, 8, 12

Walter Dellinger, *The Legitimacy of Constitutional Change: Rethinking the
    Amendment Process*, 97 Harv. L. Rev. 386 (1983).............................................. 12

## INTRODUCTION

The United States Constitution is much more than our country's foundational document: it is an embodiment of the core values of American society and a reflection of how far we have come since the Nation's founding. Aware of their own shortcomings, the Framers did not purport to create a perfect document, but instead endeavored "to form a *more* perfect Union." In doing so, they acknowledged the need for the Constitution to evolve with American society and designed Article V to carefully balance separate roles assigned to Congress and the States.

Over time, the Constitution has been amended to declare that certain practices once common are wrong and out of step with who we are as a people, including slavery, denying suffrage based on race and sex, and sending young people to die in battle before they could vote. Earlier this year, government-sponsored sex discrimination was added to that list when the Commonwealth of Virginia became the 38th and final State needed to ratify the Equal Rights Amendment.

Despite a validly adopted amendment—and a constitutional process that provides no role for the Executive Branch—the Archivist of the United States refuses to credit ratifications by Virginia, the State of Illinois, and the State of Nevada (the Plaintiff States). In doing so, the Archivist is failing to perform the purely ministerial duty imposed on him by federal statute: to "cause the amendment to be published." 1 U.S.C. § 106b. No law gives the Archivist or any other Executive official the power to countermand the States' ratification of the Equal Rights Amendment, nor could it. Permitting the Archivist to exercise such a power would upend the careful balance our Founders constructed in Article V, disregard the States' special role in the constitutional amendment process, and ignore the respect and dignity due to the Plaintiff States as "residuary sovereigns and joint participants in the Nation's governance." *Alden v. Maine*, 527 U.S. 706, 709 (1999).

1

Accepting the Archivist's arguments, however, would do much more than simply allow an unelected Executive official to disregard his ministerial duty. It would tell the women of America that, after 231 years, they must wait even longer for equal treatment under the Constitution. And it would nullify the Plaintiff States' sovereign prerogative to ratify amendments that make our Union more perfect. The motion to dismiss should be denied.

## BACKGROUND

### A.    The Article V Amendment Process

Article V plays an important role in the foundation of our constitutional scheme. *See* Compl. ¶ 9. The amendment process inspired significant debate among the Framers and was carefully designed to balance State and Federal power. *Id.* As James Madison explained—and the Department of Justice has long acknowledged—the structure of Article V is "neither wholly federal nor wholly national." *Id.* ¶ 8 (quoting *The Federalist* No. 39 (James Madison)); accord *Congressional Pay Amendment*, 16 Op. O.L.C. 87, 103 (Nov. 2, 1992).[1] "[B]oth Congress and the states play[] important roles." *Id.* Congress may "propose Amendments" and choose from one of two specifically designated "Mode[s] of Ratification." U.S. Const. art. V. States, in turn, are empowered to decide whether to "ratif[y]" those proposals. *Id.* Nothing in Article V gives the federal Executive Branch any role in the amendment process.[2]

This balance between Congress and the States grew out of the Framers' deep concern that federal actors would have too much control over changes to the Constitution. *See* Compl. ¶¶ 8,

---

[1] On a motion to dismiss, the Court may take judicial notice of public records that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018).

[2] During his First Inaugural Address, George Washington confirmed that the President has no role under Article V, declining to make any "particular recommendations" about potential amendments because he had no "official opportunities" to weigh in. President George Washington, *Inaugural Address of 1789* (Apr. 30, 1789).

66. Indeed, an early proposal at the convention would have allowed States to directly amend the Constitution without requiring Congress (or any federal official) to participate at all. See 1 *The Records of the Federal Convention of 1787*, at 121 (Max Farrand ed., 1911) ("provision ought to be made for . . . amending the system now to be established, without requiring the assent of the Nat[ional] Legislature"). George Mason supported this proposal, arguing that "[i]t would be improper to require to consent of the Nat[ional] Legislature, because they may abuse their power, and refuse their consent on that very account." *Id.* at 203.

Although Article V ultimately included a role for Congress, the Framers designed the process to ensure that federal power had limits. See Compl. ¶¶ 8–9, 66. In urging support for the Constitution during the ratification debates, Alexander Hamilton explained that, under Article V's structure, "[w]e may safely rely on the disposition of the State legislatures to erect barriers against the encroachments of the national authority." *The Federalist* No. 85 (Alexander Hamilton); see also *I.N.S. v. Chadha*, 462 U.S. 919, 956 n.21 (1983) (describing Article V's requirement that amendments be approved by three-fourths of the States as a "check" on federal legislative authority).[3]

### B.     The Equal Rights Amendment

In 24 operative words, the Equal Rights Amendment declares: "Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex." Compl. ¶ 27; H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972) (H.J. Res. 208).

---

[3] Even Congress's proposing power is subject to override by the States, as two-thirds of State legislatures can force Congress to call a convention to propose new amendments. U.S. Const. art. V; see also *United States v. Sprague*, 282 U.S. 716, 730 (1931) ("[O]n the application of the legislatures of two-thirds of the States, [Congress] must call a [proposing] convention."). This was a marked change from the Articles of Confederation. See Articles of Confederation of 1781, art. XIII, para. 1 (any "alteration" must "be agreed to in a Congress of the United States").

The effort to add a constitutional amendment specifically recognizing sex equality began soon after the 19th Amendment finally guaranteed women's right to vote in 1920. See Compl. ¶ 19. The first proposal for an equal rights amendment was introduced in Congress in 1923. *Id.* Nearly 50 years later, Congress proposed the Equal Rights Amendment pursuant to Article V and submitted it to the States for consideration. *Id.* ¶¶ 28, 30.

As of 2016, 35 States had ratified the Equal Rights Amendment—three short of the 38 required for the proposed amendment to be adopted by three-fourths of the States. U.S. Const. art. V; Compl. ¶ 31. The count grew to 36 with Nevada's ratification in 2017, and then 37 when Illinois followed suit the next year. Compl. ¶¶ 33, 39, 41, 46. On January 27, 2020, Virginia became the 38th State to ratify. *Id.* ¶¶ 48, 52, 54. Legislators in all three States recognized the gravity of their ratification votes, as Nevada, Illinois, and Virginia became the final three States needed to add the Equal Rights Amendment to the Constitution. *Id.* ¶¶ 34, 37, 42, 43, 49–51.

With Virginia's ratification earlier this year, the Article V requirements were satisfied and the Equal Rights Amendment became "valid to all Intents and Purposes, as Part of th[e] Constitution." U.S. Const. art. V; Compl. ¶¶ 55, 74. Upon receiving "official notice" that the proposed amendment "ha[d] been adopted, according to the provisions of the Constitution," the Archivist of the United States was statutorily required to promptly "cause the amendment to be published" and "certif[y]" that the Equal Rights Amendment "has become valid, to all intents and purposes, as a part of the Constitution of the United States." 1 U.S.C. § 106b; Compl. ¶¶ 58–62. As the Archivist acknowledges, this provision imposes upon him a "ministerial, record-keeping duty" with respect to certifying constitutional amendments. Mem. in Supp. of Def.'s Mot. to Dismiss (Dkt. 29-1) (Mem.) 5–6 (citing *Congressional Pay Amendment*, 16 Op. O.L.C. at 98); see also Compl. ¶¶ 58–59. It does not give the Archivist discretion or power to prefer

some States' ratifications over others.

Since Virginia's ratification of the Equal Rights Amendment, the National Archives and Records Administration (NARA)—under the direction of the Archivist—has acknowledged receipt of official notice of "state ratification actions" by 38 States.[4] Despite his statutory duty to publish and certify amendments, the Archivist "declined to certify the ERA as adopted" and refuses to do so until ordered by a court. Mem. 23; Compl. ¶ 62 (referencing press statement that Archivist will refuse to certify the Equal Rights Amendment "unless otherwise directed by a final court order"); Mem. 1 (quoting and linking to same press statement); see also Joint Stipulation (Dkt. 23) ¶¶ 2–3, *Alabama v. Ferriero*, No. 7:19-cv-02032 (N.D. Ala. Feb. 27, 2020) (Archivist stipulating that "he will not certify the adoption of the Equal Rights Amendment" unless "directed by a final court order" or the Department of Justice changes its current position).

### C.    This Lawsuit

The Plaintiff States filed this lawsuit shortly after Virginia ratified in January 2020 to ensure their ratifications are respected and vindicate their sovereign prerogatives under Article V. Compl. ¶¶ 76–81. As the final three States to ratify the Equal Rights Amendment, the Plaintiff States have a significant interest in ensuring that their ratifications are given proper legal effect. *Id.* ¶ 81. Because the Archivist has expressly refused to carry out his statutory duty absent a court order, the Plaintiff States seek mandamus relief to compel the Archivist to "publish" and "certif[y]" that the Equal Rights Amendment is "valid" and "part of the Constitution of the United States." 1 U.S.C. § 106b; Compl. at 17 (Demand for Relief).

---

[4] Nat'l Archives and Records Admin., *Equal Rights Amendment: List of State Ratification Actions* (Mar. 24, 2020), https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf. See also Mem. in Supp. of Mot. to Dismiss (Dkt. 12) at 18, *Equal Means Equal v. Ferriero*, No. 1:20-cv-10015-DJC (D. Mass. Apr. 14, 2020) (Archivist noting that he and his predecessor "have recorded all previous State ratification actions" of the Equal Rights Amendment, including Virginia's recent ratification).

The Archivist moves to dismiss the complaint under Rule 12(b)(1) and Rule 12(b)(6). Mem. 2, 7–8.

## LEGAL STANDARDS

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), courts treat the complaint's factual allegations as true and grant plaintiffs the benefit of all inferences from the facts alleged. *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000); *American Nat. Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the pleaded facts "allow[] the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Id.*

## ARGUMENT

The Plaintiff States have adequately alleged that their sovereign interests are injured by the Archivist's failure to act, and none of the issues presented by the complaint are outside the scope of this Court's authority. To the contrary, the "purely legal" (Mem. 2) questions raised here are matters of statutory and constitutional interpretation that fall squarely within the province of the judiciary.

Nor has the Archivist shown that the Plaintiff States' claim for mandamus relief fails. The time limit Congress placed in the resolution accompanying the Equal Rights Amendment is not binding on the States because it was not part of the "Amendment[]" that Congress "propos[ed]" to the States for ratification, U.S. Const. art. V, and the Archivist's other defenses to mandamus likewise fail. Accordingly, the Plaintiff States' claim may proceed and the motion to dismiss should be denied.

I.    **This Court has the power to review and rectify the Archivist's overreach**

The Archivist's motion raises three challenges to the Court's authority to hear this suit: standing, the political question doctrine, and ripeness. None of those limitations defeat jurisdiction here. Most fundamentally, the Archivist's arguments all have a common flaw: asking this Court to treat the Plaintiff States like any other litigant and disregarding the special dignity due to them "as residuary sovereigns and joint participants in the Nation's governance." *Alden v. Maine*, 527 U.S. 706, 709 (1999).

A.    **The Plaintiff States have standing as sovereigns and equal partners in the constitutional amendment process**

The Archivist asserts that the Plaintiff States have not alleged "a concrete injury" that satisfies Article III's standing requirement. Mem. 10. That claim ignores the Plaintiff States' constitutionally prescribed role in the amendment process and the "special solicitude" to which States are "entitled" in the "standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).

1.    **Article V and the Plaintiff States' sovereign interests**

The Supreme Court has squarely held that "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts*, 549 U.S. at 518. Any Article III analysis applied to States must account for their "sweeping interests" "as separate sovereigns." *California v. Trump*, No. CV 19-960 (RDM), 2020 WL 1643858, at *7 (D.D.C. Apr. 2, 2020). This is particularly true when it comes to a constitutional provision that confers on States a specifically articulated and important sovereign role. See Compl. ¶¶ 7–9, 66, 68.

Because "[t]he Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States," *Texas v. White*, 74 U.S. 700, 725 (1868), Article V makes the States "full and necessary partners in the constitutional amendment process." Compl. ¶ 80; see *The Federalist* No. 39 (James Madison) (describing the process for amending the Constitution as

"neither wholly federal nor wholly national"). Acting through Congress, the Federal Government's role is to "propose Amendments," while the States' role is to consider those proposals and "ratif[y]" the ones with which they agree. U.S. Const. art. V. As relevant here, once a proposed amendment has been "ratified by the Legislatures of three fourths of the several States," it "*shall be* valid to all Intents and Purposes, as Part of th[e] Constitution." *Id.* (emphasis added); see Compl. ¶ 7.[5]

This specific arrangement is a critical piece of the constitutional design to which the States agreed when they ratified the Constitution and consented to be bound by its terms. It is also why the Archivist is wrong to insist that the Plaintiff States "have no more right" to bring this suit under Article III "than does the individual taxpayer." Mem. 9. "States are not mere political subdivisions of the United States," and "[s]tate governments are neither regional offices nor administrative agencies of the Federal Government." *New York v. United States*, 505 U.S. 144, 188 (1992). To be sure, the original States (including Virginia) "surrender[ed] certain sovereign prerogatives" when they entered the federal union, *Massachusetts*, 549 U.S. at 519. But every State—including States (like Illinois and Nevada) later admitted on "equal footing" with their sister States, *Coyle v. Smith*, 221 U.S. 559, 573 (1911)—possesses "a residuary and inviolable sovereignty" that the Federal Constitution both preserves and protects. *Alden*, 527 U.S. at 715; see also 1 *The Records of the Federal Convention of 1787*, at 159 (Max Farrand ed., 1911) ("We cannot abolish the States and consolidate them into one Gov[ernment] . . . . Let our Gov[ernment] be like that of the solar System; let the Gen[eral] Gov[ernment] be the Sun and the States the Planets repelled yet attracted, and the whole moving regularly and harmoniously in

---

[5] Article V also grants Congress the power to select the "Mode of Ratification" used by the States—either legislatures or conventions. Compl. ¶ 65; U.S. Const. art V. For the Equal Rights Amendment, Congress selected the State legislature mode of ratification. Compl. ¶¶ 27, 30; H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972).

their respective Orbits."). It is therefore "of considerable relevance" to the standing inquiry "that the party seeking review here is a sovereign State and not . . . a private individual." *Massachusetts*, 549 U.S. at 518.

Indeed, even *Coleman v. Miller*, 307 U.S. 433 (1939)—on which the Archivist heavily relies—recognized that "a right and privilege under the Constitution" related to ratifying amendments confers standing to sue. *Coleman*, 307 U.S. at 438. Although the Plaintiff States disagree with the Archivist's characterization of *Coleman* as to other aspects of justiciability, see *infra* at 12–15, the Supreme Court held as a threshold matter that the interest of state officials in the validity of the proposed Child Labor Amendment was "sufficient to give the Court jurisdiction." *Coleman*, 307 U.S. at 446; see also *Idaho v. Freeman*, 529 F. Supp. 1107, 1120 (D. Idaho 1981), *vacated*, 459 U.S. 809 (1982) (a party that is "specially empowered under article V to participate in the amendment process" may sue to "assert[] a judicially recognizable injury particular to themselves and not what might be termed a 'general grievance'").

By refusing to honor the Plaintiff States' ratification of the Equal Rights Amendment, the Archivist intrudes on the "inviolable sovereignty" of the States in one of their "respective spheres" and disregards an exercise of their sovereign power. *Alden*, 527 U.S. at 714–15; see Compl. ¶¶ 8, 79–81. As States, Plaintiffs have "an interest in securing observance of the terms under which [they] participate[] in the federal system," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607–08 (1982), including assuring that the process for amending the Constitution is respected. The injury inflicted on the Plaintiff States' sovereign interests is particularly significant here, as the Archivist would apparently read the States out of Article V entirely. See Mem. 14 (asserting that "the Amendment process . . . [is] in the hands of Congress"). This case thus constitutes precisely the sort of "direct injury lawsuit"—in which a

"State . . . sue[s] to redress its own injury"—that is fully consistent with Article III's standing requirements. *Government of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019).[6]

### 2. None of the Archivist's arguments deprive the Plaintiff States of standing

The Archivist questions the sufficiency of the Plaintiff States' allegations of harm by mischaracterizing the injury as mere concern about "widespread confusion" as to the status of the Equal Rights Amendment. Mem. 9. The Plaintiff States agree that such confusion alone would be insufficient to confer Article III standing, as would a "generally available grievance" or "every citizen's interest in proper application of the Constitution and laws." Mem. 10. But the Plaintiff States have much more at stake here, as is evident when viewing the complaint as a whole. Notably, *none* of the decisions on which the Archivist relies involved States as a party, Mem. 9–10,[7] and the complaint's discussions of "widespread confusion" and "the will of the people," see Compl. ¶¶ 80–81, are all made in connection with the States' sovereign interests.

Further, the fact that the Plaintiff States enjoy other "sovereign power" to adopt their own laws on any range of subjects—including, as the Archivist points out, sex discrimination, Mem. 10—in no way undermines or interferes with the authority specifically allocated to them under Article V. Nor does such power strip the Plaintiff States of standing to vindicate their distinct, sovereignty-based interests when an actor—like the Archivist—improperly interferes with the

---

[6] The Archivist's challenge to the Plaintiff States' standing is also inconsistent with his consent to permissive intervention by five other States in this action. See Dkt. 10 at 1. It is well established in this jurisdiction that all intervenors "must [] demonstrate Article III standing." *Waterkeeper All., Inc. v. Wheeler*, 330 F.R.D. 1, 6 (D.D.C. 2018).

[7] See *New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 368–70 (D.C. Cir. 2013) (evaluating standing of association); *Gerber Prod. Co. v. Perdue*, 254 F. Supp. 3d 74, 80–83 (D.D.C. 2017) (private corporation); *In re African-Am. Slave Descendants Litig.*, 304 F. Supp. 2d 1027, 1046–52 (N.D. Ill. 2004) (private individuals). Indeed, in one of those cases, an association was dismissed for lack of standing, but the Court proceeded to the merits on claims asserted by States. *New England Power Generators Ass'n*, 707 F.3d at 366, 370.

States' constitutional authority to amend the Federal Constitution. See *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 51 n.17 (1986) (emphasizing that a State has "a judicially cognizable interest in the preservation of its own sovereignty" and "a diminishment of that sovereignty" grants standing to sue).

Finally, whether the States choose to exercise their Article V authority in a way that "limit[s] their own sovereign power," as the Archivist suggests (Mem. 10), is neither here nor there. Many prior constitutional amendments were adopted to do just that, by prohibiting certain government conduct that the American people collectively decided to abolish. See U.S. Const. amend. XIV ("No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; not deny to any person within its jurisdiction the equal protection of the laws."); U.S. Const. amend. XIX ("The right of citizens of the United States to vote shall not be denied or abridged . . . by any state on account of sex."); U.S. Const. amend. XXIV ("The right of citizens of the United States to vote in [federal elections] shall not be denied or abridged by . . . any state by reason of failure to pay any poll tax or other tax.").[8]

## B.    The political question doctrine does not apply here

Despite looking to "a final court order" for direction, *supra* at 5, the Archivist asserts that this Court is powerless to hear this dispute because the Plaintiff States' claims are "for the political branches to resolve." Mem. 12. Relying exclusively on *Coleman v. Miller*—an 80-year-

---

[8] Although such a claim appears to be foreclosed by precedent that is binding on this Court, see *Gov't of Manitoba*, 923 F.3d at 183, the Plaintiff States also contend that they separately have *parens patriae* standing to bring this action to "secur[e] [their] residents from the harmful effects of discrimination." *Snapp*, 458 U.S. at 608–09. Because the question of when a State may bring a *parens patriae* suit against the Federal Government to challenge executive action remains an open question, the Plaintiff States preserve this argument for future proceedings in this case if needed. See, *e.g.*, *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 n.10 (2015) ("cases on the standing of states to sue the federal government" are "are hard to reconcile").

old decision that predates the entirety of the Supreme Court's modern political-question jurisprudence—the Archivist insists that all of the issues in this case are "non-justiciable political questions" and that the Plaintiff States' complaint must therefore be dismissed for lack of jurisdiction. *Id.* at 12–15. Those arguments fail.

### 1.    The Archivist overstates *Coleman*'s precedential value

Any suggestion that *Coleman* is properly read as requiring that proposed amendments return to Congress for "promulgation" is inconsistent with the constitutional text. 307 U.S. at 450. The language of Article V contains no hint of any such requirement. See U.S. Const. art. V; accord Walter Dellinger, *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 Harv. L. Rev. 386, 387 (1983) (interpreting constitutional amendment process to require congressional promulgation is "a disastrous rendering of article V").

Congressional promulgation also cannot be squared with how the Archivist dealt with the most recent change to the Constitution that preceded adoption of the Equal Rights Amendment: ratification of the 27th Amendment in 1992. See Compl. ¶¶ 60, 69. Although the Archivist now relegates that incident to a footnote, see Mem. 18 n.3, it is directly on point here because the Archivist certified *that* amendment without waiting for congressional approval.

In 1789, the First Congress proposed to the States an amendment to prohibit changes in pay for members of Congress from taking effect until after the next set of congressional elections. See 1 Stat. 97 (1789). In 1992—two hundred and three years later—the Archivist received notification that the amendment had been ratified by 38 States and asked the Department of Justice for advice about what to do.[9] Despite questions about the amendment's

---

[9] See Jessie Kratz, *The First Amendments to the U.S. Constitution*, Nat'l Archives and Records Admin. (Sept. 25, 2019), https://prologue.blogs.archives.gov/2019/09/25/the-first-amendments-to-the-u-s-constitution/; see also Letter from Gary M. Stern to Steven A. Engel

validity after so many years had passed, the Archivist certified its adoption a mere 11 days after receiving official notice that the requisite number of States had ratified, without waiting for any action by Congress.[10] And even though Congress passed resolutions within a few days agreeing that the amendment had been adopted,[11] that affirmation was—in the Archivist's view—"unnecessary" in light of "the votes by three-fourths of the states."[12]

The Department of Justice specifically endorsed the Archivist's approach and agreed that *Coleman* must be read narrowly. In an official opinion issued several months later, the Office of Legal Counsel (OLC) concluded that "the notion of congressional promulgation is inconsistent with both the text of Article V of the Constitution and with the bulk of past practice." *Congressional Pay Amendment*, 16 Op. O.L.C. 87, 102 (Nov. 2, 1992). "To give one branch of government ultimate control over the Constitution's very content," OLC explained, "would be to repudiate the American approach in favor of a return to parliamentary supremacy." *Id.* at 103. On the question of past practice, the Department summarized that a congressional promulgation requirement would mean "the executive branch [had] illegally certified every amendment except the Fourteenth." *Id.* at 105.[13]

More recently, and with respect to the Equal Rights Amendment in particular, the Archivist himself has explained that "a proposed Amendment becomes part of the Constitution

(Dec. 12, 2018) (noting that, in 1991, "NARA contacted OLC with respect to the Archivist's role under 1 U.S.C. § 106b" should "a 38th state . . . ratify the Congressional Pay Amendment").

[10] Archivist of the U.S., U.S. Constitution, Amendment 27, 57 Fed. Reg. 21,187, 21,187–88 (May 19, 1992).

[11] See S. Con. Res. 120, 102d Cong. (1992); H. Con. Res. 320, 102d Cong. (1992).

[12] Jessie Kratz, *The National Archives' Role in Amending the Constitution*, Prologue: J. of the Nat'l Archives, Vol. 49, No. 1 (Spring 2017), https://www.archives.gov/publications/prologue/2017/spring/historian-27-amendment.

[13] The fact that the 27th Amendment did not include a purported time limit has nothing to do with how its ratification history undermines any interpretation of *Coleman* as requiring congressional promulgation.

as soon as it is ratified by three-fourths of the states, indicating that Congressional action is not needed to certify that the Amendment has been added to the Constitution."[14] Both the Archivist and the Department of Justice have therefore acknowledged that *Coleman* cannot be read as the Archivist urges here—to require that Congress approve constitutional amendments after the requisite number of States have ratified.

### 2. *Coleman* is not on point

In any event, *Coleman*'s political question holding is also distinguishable on the facts presented here. The plaintiffs in *Coleman* brought suit (a) in state court (b) against state legislative officials (c) to stop them from certifying that Kansas had ratified the Child Labor Amendment. *Coleman*, 307 U.S. at 436. Here, the Plaintiff States seek to prevent a federal officer (the Archivist) from improperly carving out a role in the amendment process for the Executive Branch when none exists in Article V. Compl. ¶¶ 8, 62, 77–79; see also Mem. 12 (arguing that "the Archivist" and "OLC" should "decide" constitutional question of rescission "in the first instance"). Those differences in posture raise materially different questions of federalism, sovereignty, and separation of powers. Federal courts must be available to restrain a federal official from overstepping his authority in such a blatantly unconstitutional manner.

*Coleman* also made no binding holding about time limits. As OLC itself previously explained, *Coleman* is not "authoritative as to contemporaneity" because the "reasonable time" discussion "was simply not part of [the Court's] holding," given the concurring and dissenting opinions. *Congressional Pay Amendment*, 16 Op. O.L.C. at 93. And because *Coleman* involved a proposed amendment that everyone involved agreed had not yet been ratified by the required number of States, the Court was not presented with the fundamental questions raised here. For

---

[14] Letter from David S. Ferriero to Hon. Carolyn Maloney (Oct. 25, 2012), available at www.congress.gov/116/meeting/house/109330/documents/HHRG-116-JU10-20190430-SD007.pdf.

the same reason, the circumstances in *Coleman* did not leave ratifying States unable to vindicate their sovereign prerogatives to finally adopt a proposed amendment, as dismissal would do here. See *supra* at 7–10.[15]

These distinctions are significant. Since *Coleman*, the political question doctrine has been clarified to be "a narrow exception" to the general rule that "the Judiciary has a responsibility to decide cases properly before it." *Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012). That exception applies only where a particular controversy "revolve[s] around policy choices and value determinations" that the Constitution has committed to Congress or the Executive. *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019). The Plaintiff States' claim here presents no such policy decision or value choice for the Court. The American people have already made the determination that sex equality should be enshrined in the Constitution, and the Plaintiff States (along with 35 others) have ratified the Equal Rights Amendment that Congress proposed to do so. The issue before this Court is limited to whether the Archivist can prefer some State ratification actions over others and abandon his statutory obligation to publish and certify an amendment as Congress directed in 1 U.S.C. § 106b. The relevant questions of statutory and constitutional interpretation are well within judicial authority and not reserved to the political branches to decide. See generally *The Federalist* No. 78 (Alexander Hamilton) ("The interpretation of the laws is the proper and peculiar province of the courts."). "A court cannot avoid its responsibility to enforce a specific statutory right merely because the issues have political implications." *Al-Tamimi*, 916 F.3d at 8.

---

[15] Nor did *Coleman* issue any binding holding about purported "rescissions." The question raised there was whether a State could ratify an amendment after previously having declined to do so, not whether it could attempt to undo a ratification that had already been completed. See *Coleman*, 307 U.S. at 447–50.

### 3.    The Archivist conflates justiciability and the merits

"The point of the [political question] doctrine is to identify questions that courts should not resolve." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514 (D.C. Cir. 2018). Accordingly, where that doctrine applies, courts must avoid making any pronouncements on the merits. The Archivist's justiciability arguments blur this line by asking the Court to dismiss the case as a political question *because* the purported deadline in the Equal Rights Amendment is valid. See Mem. 13 ("the deadline represents Congress's explicit judgment as to how much time was necessary and appropriate to ratify the ERA"). In doing so, the Archivist requests that the Court decide in the Archivist's favor on the merits by endorsing a maximalist view of Congress's authority over the amendment process—at the expense of the States and the original intent of the Founders. *Id.* at 12 (citing *Coleman* for the view that ratification questions are "committed to congressional resolution"). Crediting this theory would contort the political-question doctrine beyond recognition and do violence to the specific amendment process articulated in Article V. The Court should decline that invitation.

### C.    The Archivist's attempt to manufacture a new Executive Branch ripeness inquiry should be rejected

Rather than asserting that purported rescissions defeat the Equal Rights Amendment, the Archivist contends that the question of whether States may validly rescind prior ratifications is not "ripe for this Court's adjudication" because "[n]either the Archivist nor OLC has taken a position" on that issue. Mem. 11. That is not how ripeness works.

Like other justiciability doctrines, ripeness involves the entire case or controversy rather than discrete legal questions that may be raised as part of it. "[A] case is ripe when it presents a concrete legal dispute [and] no further factual development is essential to clarify the issues." *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 540 (D.C. Cir. 1999). The Archivist does not

suggest that this case fails to satisfy those requirements, nor could he. The Plaintiff States have notified the Archivist of their ratifications, he has declined to recognize them, and the Plaintiff States assert that refusal is unlawful. Nothing more is required.

The Archivist cites no authority to support his view that an Article III court lacks the authority to consider a purely legal question (here, the validity of purported rescissions) until after a particular part of the Executive Branch (here, OLC) has opined on it "in the first instance." Mem. 12. This is not a suit in which the Archivist may invoke deference to an administrative determination, nor does it involve any "exercise of judgment in an area which Congress has entrusted to the agency." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); see also Mem. 5 (describing Archivist's duty as "ministerial" and one of "record-keeping"). This is a direct action in which three sovereign States assert that a particular federal official (the Archivist) is inflicting constitutional harm by refusing to comply with what that official concedes is a non-discretionary duty imposed by federal statute. The fact that the Archivist and his current counsel (the Department of Justice) prefer to avoid taking a position on a possible defense to the Plaintiff States' claims—the validity of certain purported "rescissions"—says nothing about the authority of this Court "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). And all of this is especially true where, as here, the Constitution specifically allocates the relevant power to Congress and the States, with no role whatsoever assigned to the Executive Branch. See U.S. Const. art. V; *Hollingsworth v. Virginia*, 3 U.S. 378, 379 (1798) (rejecting argument that proposed constitutional amendments must be "presented to the President").[16]

---

[16] In any event, OLC *has* previously addressed the question of rescissions, concluding that States *may not* rescind prior ratifications. Mem. 11 n.2; see also Mem. for Hon. Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Ass't Att'y Gen., Office of Legal Counsel, *Re: Constitutionality of Extending the Time Period for Ratification of the Proposed Equal Rights Amendment* 49 (Oct. 31, 1977) ("[T]he whole thrust of history is that Art. V, as interpreted, does not permit States to rescind or otherwise place conditions upon their

## II.    The purported deadline in the congressional resolution does not invalidate the Plaintiff States' ratifications of the Equal Rights Amendment

The Archivist asserts that he is authorized to disregard the Plaintiff States' ratifications because those ratifications occurred after a deadline that the 92nd Congress included in introductory language in the congressional resolution containing the proposed Equal Rights Amendment. See Mem. 16–23. That language has no effect on the Archivist's duty under Section 106b for two reasons. *First*, the Archivist does not have the power to prefer some State ratifications over others. *Second*, because that deadline neither involves Congress's choice between the two "Mode[s] of Ratification" specified in Article V, nor was contained in the "propose[d] Amendment[]" that was submitted to the States for ratification, U.S. Const. art. V, it cannot affect *when* States may exercise their own constitutional prerogative to consider and ratify the Equal Rights Amendment.

### A.    The Archivist does not have the power to ignore State ratifications

Neither Article V nor 1 U.S.C. § 106b grants the Archivist discretion to reject a State's action ratifying a constitutional amendment. Article V of the Constitution does not prescribe any role for the Federal Executive Branch in the amendment process. And Section 106b directs that when the Archivist receives "official notice" from State officials that a proposed amendment "has been adopted[] according to the provisions of the Constitution," he "*shall* forthwith cause the amendment to be published, with his certificate, specifying . . . that the [amendment] has become valid, to all intents and purposes, as a part of the Constitution of the United States." 1

---

ratifications."); *Power of a State Legislature to Rescind its Ratification of a Constitutional Amendment*, 1 Op. O.L.C. 13, 14–15 (1977). The fact that one office in the current Department of Justice (OLC) has elected to not "take a definitive position" on rescissions "in its latest opinion" on the topic, Mem. 11 n.2, has no bearing on this Court's jurisdiction. Nor should OLC's newfound reluctance cast doubt on the principle that ratification is a one-time event, Compl. ¶¶ 70–73, with repeal as the constitutional process available to States that wish to reverse the effect of their ratifications, see, *e.g.*, U.S. Const. amend. XXI (repealing Prohibition).

U.S.C. § 106b (emphasis added); see Compl. ¶ 58. As with its predecessor statute, the actions required by the Archivist under this provision are "purely ministerial," and "[n]o discretion [is] lodged in him" to decide which ratifications should be given legal effect and which should not. *U.S. ex rel. Widenmann v. Colby*, 265 F. 998, 999 (D.C. Cir. 1920), aff'd, 257 U.S. 619 (1921); see Compl. ¶ 59. As the Supreme Court recently explained, "our[] . . . society" is one "of written laws," and thus courts may not "overlook plain statutory commands" like the directive to the Archivist here. *Bostock v. Clayton Cty., Georgia*, No. 17-1618, 2020 WL 3146686, at *17–18 (U.S. June 15, 2020). For that reason, "[a]s soon as [the Archivist] received the notices from [the requisite number] of the states that the amendment had been adopted, he was obliged, under the statute, to put forth his proclamation." *Colby*, 265 F. at 999.[17]

## B.    There is no deadline for the States to ratify in the "Amendment[]" that Congress "propose[d]"

The Archivist asks this Court to hold—for the first time—that a purported deadline located outside of the "propose[d] Amendment[]" that Congress submitted to the States defeats an otherwise properly ratified amendment. Accepting that argument would upend the close and equal partnership that Article V established between Congress and the States. See *supra* at 2–3.

### 1.    The seven-year timeframe is not part of the operative text proposed by Congress

As the Archivist points out (Mem. 4), Congress stated, in extra-textual language accompanying the proposed Equal Rights Amendment, that the amendment "shall be valid . . . as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress." Compl. ¶ 63 (quoting H.J.

---

[17] The Archivist's attempt (Mem. 18 n.3) to undermine *Colby* is unpersuasive. The Archivist fails to explain how *Dillon* calls *Colby* into question, particularly given the questionable status of *Dillon* itself. See *infra* at 23–24. And the fact that a certification had been issued in *Colby* does not change the statutory standard for issuing that certification.

Res. 208). But that language was not contained in the "propose[d] Amendment[]" that Congress submitted to the States for possible ratification. See Compl. ¶ 64. The "Article" that was formally "proposed" for the States to ratify stated only:

> "SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
> "SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.
> "SEC. 3. This amendment shall take effect two years after the date of ratification."

Compl. ¶ 27 (quoting H.J. Res. 208). The "seven years" language appears elsewhere in the joint resolution, in the introduction along with standard formalities such as "Resolved by the Senate and the House of Representatives of the United States of America in Congress assembled." H.J. Res. 208.

The location of that purported "deadline" matters under Article V. Nothing in Article V specifically grants Congress authority to restrict the timeframe during which States can act. See Compl. ¶¶ 65–66. This Court need not decide today whether Congress may constitutionally impose an enforceable timeframe for ratifying legally operative amendments in some other way. But it is clear that a putative seven-year deadline falling outside the text of the proposed amendment did not bind the States in the exercise of their own constitutional prerogatives under Article V to ratify the Equal Rights Amendment.

The text of the Constitution grants Congress two specific powers with respect to the amendment process: (1) "propos[ing] Amendments to th[e] Constitution"; and (2) choosing between two specific "Mode[s] of Ratification" set out in the Constitution—that is, ratification by state legislatures or conventions. Compl. ¶ 65 (describing U.S. Const. art. V). As the Archivist recognizes, Congress's second power under Article V is to choose "which of *the two*

modes of ratification is to be used." Mem. 17 (emphasis added). The word "Mode" is not a grant of freestanding authority to Congress to alter the process of ratification itself.[18]

In contrast, Congress has considerably more flexibility when it comes to the first task of "propos[ing] Amendments" to the States. U.S. Const. art. V. Past practice suggests that Congress may, at least in effect, present States with a deadline for ratification by drafting the text of the proposed amendment to be inoperative if ratification does not occur within a specific time. See, *e.g.*, U.S. Const. amend. XVIII, § 3 ("This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress."). Indeed, Congress has adopted this approach on numerous prior occasions. See Mem. 19 (discussing the 20th, 21st, and 22nd Amendments).

Although textual deadlines are a relatively recent innovation in the constitutional amendment process, that approach does not expand Congress's powers beyond those stated in Article V and at least arguably respects the careful balance between Congress and the States. See *United States v. Chambers*, 291 U.S. 217, 224 (1934) (stating that, under Article V, "Congress . . . is powerless to expand or extend its constitutional authority"). For example, if a 38th State were to ratify the proposed District of Columbia Voting Rights Amendment, the ratification process would be complete for a provision that—by its own terms—"shall be inoperative, unless it shall have been ratified" by August 22, 1985. H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978). Like other currently inoperative provisions, see, *e.g.*, U.S. Const. art. I, § 3, cl. 1, the Archivist would publish the newly added text as part of the Constitution, but it would lack

_____

[18] To be sure, dicta in *Dillon v. Gloss* suggests that Congress's ability to set a deadline may be "incident of its power to designate the mode of ratification." 256 U.S. 368, 376 (1921). Ten years later, however, the Supreme Court clarified that the mode of ratification simply refers to "one or the other alternative mode of ratification." *Sprague*, 282 U.S. at 732.

substantive effect. And unlike the Equal Rights Amendment, the States would have ratified the deadline as part of the text of Congress's proposal.

That does not mean, however, that Congress should be understood to have additional authority over the ratification process that appears nowhere in Article V. To the contrary, given the careful and intentional balance that the Framers struck between Congress and the States, no further federal authority to limit the States' role in amending the Constitution should be presumed in the face of constitutional silence. See Compl. ¶¶ 8, 66; *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998) (given "finely wrought" constitutional procedure, "[t]here are powerful reasons for construing constitutional silence . . . as equivalent to an express prohibition"). "If the [F]ramers of [Article V] had any thought that" time limits outside of the amendment itself should be enforceable, "nothing would have been simpler than so to phrase [A]rticle 5 as to exclude implication or speculation." *Sprague*, 282 U.S. at 732.

To the extent this is a close question, any doubts should be resolved in favor of the States. Compl. ¶ 66. As well chronicled elsewhere, one of the Framers' overarching concerns was designing a constitutional system that would provide sufficient protection for State prerogatives against federal intrusion. See *supra* at 2–3.[19] Against this backdrop, interpreting Article V to implicitly grant authority to Congress—at the expense of the States—without a clear statement to that effect would be inconsistent with the Framers' intent.[20] See Compl. ¶ 66; *New York*, 505

---

[19] See also *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) (explaining Framers' intent to "create[] a Federal Government of limited powers," such that States "retain substantial sovereign authority").

[20] This is particularly true where a broader time-limit authority would be asymmetric, as Congress would be free to consider amendments for decades but then set a "shot clock" on States to ratify without including that deadline in the text of the proposed amendment itself. Notably, the first proposal for an equal rights amendment was introduced in Congress in 1923, and similar measures were debated and voted on by Congress more than 30 times before the Equal Rights Amendment was proposed to the States in 1972. See Compl. ¶¶ 19–28.

U.S. at 156 (quoting Justice Story's observation that, because the Constitution is "an instrument of limited and enumerated powers, it follows irresistibly, that what is not conferred, is withheld, and belongs to the state authorities").

> **2.    The purported deadline does not nullify ratification of the Equal Rights Amendment**

a.    No court—anywhere—has ever held that the lapse of an extra-textual deadline (as in the Equal Rights Amendment) nullified a constitutional amendment that had been ratified by the requisite three-quarters of States.

Contrary to the Archivist's claim, the Supreme Court's decision in *Dillon v. Gloss*, 256 U.S. 368 (1921), does not suggest—much less hold—that putative time limits located outside of a "propose[d] Amendment[]" limit a State's power to ratify. As the Archivist acknowledges (Mem. 19), *Dillon* involved the 18th Amendment (Prohibition), which contained a deadline within the text of the proposed amendment itself. See U.S. Const. amend. XVIII, § 3; see Mem. 19 (acknowledging textual differences). What is more, *Dillon* rejected the argument that the mere inclusion of a time limit within the proposed text invalidated an amendment that *had* been ratified by the required number of States within the specified time, *Dillon*, 256 U.S. at 370–71—a vastly different question than the one presented here.

In any event, the continued vitality of *Dillon*'s holding remains an open question. For one thing, the Supreme Court specifically disavowed some of *Dillon*'s broad language 18 years later. See *Coleman*, 307 U.S. at 453 ("[W]hat was there said [in *Dillon*] must be read in the light of the point decided."). And, as with *Coleman*, the subsequent ratification of the 27th Amendment casts serious doubt on *Dillon* and its reasoning. Although *Dillon* stated that "ratification must be within some reasonable time after the proposal," 256 U.S. at 375, the 27th Amendment was formally promulgated and has not been challenged for nearly three decades—even though it was

ratified more than *two hundred years* after it was proposed. See *supra* at 12–13. If *Dillon* controls, the 27th Amendment also is not part of the Constitution.

Nor does the litigation in Idaho from the late 1970s and early 1980s support the Archivist's claim. Although the district court there concluded that Congress could set a deadline for State ratifications in the prefatory language of the Equal Rights Amendment, see *State of Idaho v. Freeman*, 529 F. Supp. 1107, 1151–53 (D. Idaho 1981), that decision was later vacated by the Supreme Court, see *Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809, 809 (1982). It is true, as the Archivist notes, that the Supreme Court's vacatur order was based on mootness, but the one-sentence order gives no explanation for the Court's decision and thus can hardly be said to have "resolved" anything. Mem. 21. At the time of the Court's order, only 35 States had ratified the Equal Rights Amendment, so the Court's ruling could just have likely depended on an insufficient number of ratifications as on the purported time limit. See Compl. ¶ 31. Since then, Plaintiff States have ratified the proposed amendment, bringing the total number to 38.[21]

b.    The Archivist also insists that the deadline Congress purported to impose with respect to the Equal Rights Amendment must be binding because Congress included time limits for other amendments in the introductory language of the proposing resolution in the same way. Mem. 19–20. But that practice has never been tested in or approved by the courts. In *Coleman*, for example, Chief Justice Hughes referred to the "the resolution of submission" only in the context of describing the *lack* of any purported deadline in the proposed Child Labor Amendment. 307 U.S. at 452. What is more, Congress itself has recognized that deadlines in the text of an amendment differ from deadlines in the introductory language outside Congress's

---

[21] The Court's unexplained vacatur order likewise could have been based upon the (since rejected) notion that any constitutional amendment must be ratified contemporaneously with Congress's proposal because that order was issued a decade before ratification of the 27th Amendment.

"propos[al]" to the States under Article V. The only amendment that has been proposed since the Equal Rights Amendment—the D.C. Voting Rights Amendment—included time limits in both the introductory language and in the body of the proposal sent to the States. H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978); see also Mem. 3 n.1.[22]

  c.  Any argument that the Plaintiff States' understanding of Article V would risk "cluttering up" the Constitution is unfounded. Mem. 3. That concern seems far-fetched given how rare constitutional amendments are.[23] And, at any rate, the Constitution already contains a great deal of inoperative language, which is a direct result of the First Congress's decision to place amendments at the end of the document instead of revising the original text as changes are made.[24] Amendments to the Constitution do not erase the provisions that they change, see, *e.g.*, U.S. Const. art. I, § 3, cl. 1, nor are provisions that are rendered inoperative by the passage of time removed from the document itself, see, *e.g.*, U.S. Const. art. I, § 9, cl. 1. Indeed, even when one amendment specifically repeals another, the repealed text remains part of the Constitution itself. Compare amend. XVIII (Prohibition), with amend. XXI, § 1 (repealing Prohibition).

  For all of these reasons, the seven-year deadline in the prefatory language of Congress's

---

[22] This distinction between the text of a proposed amendment and introductory language in the proposing resolution is consistent with similar contexts where the Supreme Court has long made clear that "a prefatory clause does not limit or expand the scope of the operative clause." *District of Columbia v. Heller*, 554 U.S. 570, 578–79 (2008); *id.* at 578 n.3 ("[T]he key 18th-century English case on the effect of preambles . . . stated that 'the preamble could not be used to restrict the effect of the words used in the purview.'"); see also *Yazoo & M.V.R. Co. v. Thomas*, 132 U.S. 174, 188 (1889) ("[A]s the preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act."); *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 22 (1905) (preamble to the Constitution "has never been regarded as the source of any substantive power conferred on the government of the United States").

[23] The only such proposed amendment is the D.C. Voting Rights Amendment, which has currently been ratified by fewer than 20 States, with the last ratification occurring in 1984.

[24] See 1 *Annals of Cong.* 795 (1789) (Joseph Gales ed., 1834) (reflecting passage of motion to append amendments to the end of the original document rather than integrating throughout the text).

joint resolution does not deprive the Plaintiff States of their constitutionally conferred authority to "ratif[y]" a "propos[ed] Amendment[]." U.S. Const. art. V. Accordingly, that language does not relieve the Archivist of his ministerial duty to publish and certify the Equal Rights Amendment.

## III.    The Plaintiff States have satisfied the other requirements for mandamus relief

Contrary to the Archivist's claim (Mem. 23–25), neither the adequate-remedy nor balance-of-equities elements defeat the Plaintiff States' request for mandamus relief.

### A.  There is no adequate alternative remedy

The remedy that the Plaintiff States seek is for their ratifications to be given legal effect as required by Article V. See Compl. ¶¶ 77–81. Because federal statute provides the process by which ratified amendments are published and certified, no remedy would be adequate other than a court order compelling the Archivist to carry out his statutory duty of publishing and certifying the Equal Rights Amendment. *Id.* The National Archives and Records Administration has stated publicly that the Archivist will refuse to do so "unless otherwise directed by a final court order," acknowledging that the Plaintiff States have no remedy at all without this lawsuit. *Id.* ¶¶ 62, 78; *supra* at 5.[25]

The Archivist's argument that the Plaintiff States should "seek relief under the Administrative Procedure Act" (APA) is both wrong and a distinction without a difference. Mem. 23. As the Supreme Court has noted, Section 706(1) in the APA adopted the "traditional practice" of mandamus, which allows for "enforcement of a specific, unequivocal command" as

---

[25] Nor is the Archivist's *List of State Ratification Actions* reflecting NARA's receipt of the Plaintiff States' ratification documents an adequate remedy. *Supra* n.4. That document refuses to credit the Plaintiff States' ratifications, noting that they "occurred after Congress's deadline expired." The Plaintiff States also continue to be injured by the Archivist's ongoing failure to publish and certify the Equal Rights Amendment as required under federal law.

to "a precise, definite act about which an official ha[s] no discretion whatever." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004); see also *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010) (explaining that "the standards for obtaining relief" in the form of mandamus or under the APA "are essentially the same"). For this reason, courts often evaluate requests to compel agency action under the same rubric, regardless of the particular label used. See *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (applying agency delay standards under Section 706(1) to request for "writ of mandamus"). Courts likewise do not enforce the rigid rule suggested by the Archivist that mandamus claims must be dismissed in light of Section 706(1). See, *e.g.*, *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 44 (D.D.C. 2002) (allowing both APA and mandamus claims to proceed); *Competitive Enter. Inst. v. U.S. Envtl. Prot. Agency*, 67 F. Supp. 3d 23, 36 (D.D.C. 2014) (same). Because the two claims are effectively the same—and where the Archivist has already asserted that any separate APA claim would fail, see Mem. 24 n.5—Section 706(1) does not preclude the Plaintiff States' request for mandamus relief.[26]

## B.    The equities weigh in favor of the Plaintiff States

The Plaintiff States have also established that "compelling equitable grounds" exist to order mandamus relief. *American Hosp. Ass'n v. Burwell*, 812 F.3d 183, 192 (D.C. Cir. 2016). As outlined in the complaint, the Plaintiff States are sovereign States that have ratified the Equal Rights Amendment pursuant to the procedures set forth in Article V. See Compl. ¶¶ 27–55, 76–81. With the Plaintiff States' ratifications, the Archivist is required to publish and certify that amendment under 1 U.S.C. § 106b. The Archivist's refusal to do so deprives not only the States

---

[26] To the extent the Court is inclined to conclude that 5 U.S.C. § 706(1) precludes the mandamus claim here, the Plaintiff States respectfully request the opportunity to amend their complaint to add such an APA claim. There would no prejudice to the Archivist because, as described above, the governing standards are effectively the same.

of their sovereign prerogatives under Article V—just as the Framers feared and sought to guard against—but also thwarts the will of the people and continues to deny women their rightful place in the Constitution. See Compl. ¶¶ 79–81.

In arguing otherwise, the Archivist relies on the same standing and non-justiciability arguments that fail for the reasons outlined above. See *supra* at 7–15. The fact that the current Executive Branch prefers that the Archivist not carry out his ministerial statutory duty does not defeat the Plaintiff States' claim on the equities, much like "having to pay a sum one owes can hardly amount to an equitable reason for not requiring payment." *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 13 (D.C. Cir. 2005).[27]

\* \* \*

It is true that mandamus is extraordinary, but so is the Archivist's unprecedented intrusion on constitutional authority explicitly granted to the States. See Compl. ¶¶ 77–81. "[A]lthough courts must respect the political branches and hesitate to intrude on their resolution of conflicting priorities, [their] ultimate obligation is to enforce the law as Congress has written it." *American Hosp. Ass'n*, 812 F.3d at 193; see also *In re Pub. Employees for Envtl. Responsibility*, 957 F.3d 267, 273 (D.C. Cir. 2020) (granting mandamus relief where agencies "failed to comply with their statutory mandate"). Here, the Archivist's refusal to acknowledge a finally adopted constitutional amendment—and the Executive Branch's corresponding disregard for the States' sovereign power under Article V—are exactly the type of rare and unusual circumstances that warrant an extraordinary remedy.

---

[27] The Archivist argues that the Plaintiff States "fail to identify a waiver of sovereign immunity." Mem. 15. But "[n]o separate waiver of sovereign immunity is required to seek a writ of mandamus to compel an official to perform a duty required in his official capacity." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005).

**CONCLUSION**

The Archivist has failed to raise any arguments—procedural or otherwise—that defeat the Plaintiff States' claim to mandamus relief. This Court has authority to adjudicate the issues presented here, and nothing in the Archivist's motion shows why he is not statutorily obligated to publish and certify the Equal Rights Amendment as the 28th Amendment to the United States Constitution. The motion to dismiss should be denied.[28]

---

[28] The Plaintiff States respectfully request oral argument on the Archivist's motion in light of the significant constitutional interests at issue in this case.

Dated: June 29, 2020

Respectfully submitted,

COMMONWEALTH OF VIRGINIA, STATE OF
ILLINOIS, and STATE OF NEVADA

KWAME RAOUL
Attorney General of Illinois

By:  _/s/ Kathryn Hunt Muse_
KATHRYN HUNT MUSE
CHRISTOPHER WELLS
ELIZABETH ROBERSON-YOUNG
Office of the Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-3000 – Telephone
(312) 814-5024 – Facsimile
kmuse@atg.state.il.us
cwells@atg.state.il.us
erobersonyoung@atg.state.il.us

*Attorneys for Plaintiff*
*State of Illinois*

MARK R. HERRING
Attorney General of Virginia

By:  _/s/ Michelle S. Kallen_
MICHELLE S. KALLEN [1030497]
TOBY J. HEYTENS [490314]
MARTINE E. CICCONI [219373]
JESSICA MERRY SAMUELS [1552258]
ZACHARY R. GLUBIAK
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
mkallen@oag.state.va.us

*Attorneys for Plaintiff*
*Commonwealth of Virginia*

AARON D. FORD
Attorney General of Nevada

By:  _/s/ Heidi Parry Stern_
HEIDI PARRY STERN
CRAIG A. NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov

*Attorneys for Plaintiff*
*State of Nevada*

## **CERTIFICATE OF SERVICE**

Pursuant to Local Civil Rule 5.4(d), I hereby certify that on June 29, 2020 I will file this

document electronically through the Court's CM/ECF system, which will effect service on all

counsel who have appeared.


_____
*/s/ Michelle S. Kallen*
Michelle S. Kallen

*Counsel for Plaintiff*
*Commonwealth of Virginia*