**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA, | |
| Plaintiffs, | Civil Action No. 1:20-cv-00242-RC |
| v. | |
| DAVID S. FERRIERO, in his official capacity as Archivist of the United States, | |
| Defendant, | |
| and | |
| ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, and TENNESSEE. | |
| Defendant-Intervenors. | |

**BRIEF OF *AMICI CURIAE* CONSTITUTIONAL LAW PROFESSORS ERWIN CHEMERINSKY, NOAH FELDMAN, REVA SIEGEL, AND JULIE C. SUK, IN SUPPORT OF NEITHER PARTY**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................ii

INTEREST OF *AMICI CURIAE* ......................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 2

BACKGROUND ................................................................................................................... 3

ARGUMENT ......................................................................................................................... 6

    I.     THE POLITICAL QUESTION DOCTRINE AND LACK OF
         ANY CONCRETE INTERESTS AT STAKE CURRENTLY
         PRECLUDE JUDICIAL REVIEW OF THE VALIDITY OF THE
         ERA'S RATIFICATION .......................................................................................... 6

    II.    CONGRESS, NOT THIS COURT, IS CONSTITUTIONALLY
         AUTHORIZED TO RESOLVE WHETHER THE REQUISITE
         NUMBER OF STATES HAVE EFFECTIVELY RATIFIED A
         CONSTITUTIONAL AMENDMENT ................................................................... 10

    III.   THE CONSTITUTION ASSIGNS NO ROLE TO THE
         ARCHIVIST OR THE EXECUTIVE BRANCH IN MAKING
         CONSTITUTIONAL AMENDMENTS .............................................................. 16

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Allen v. Wright,*
468 U.S. 737 (1984), *abrogated on other grounds by Lexmark Int'l Inc. v.
Static Control Components, Inc.,* 572 U.S. 118 (2014)...............................6, 10

*Baker v. Carr,*
369 U.S. 186 (1962) ............................................................................. 6, 7

*\*Coleman v. Miller,*
307 U.S. 433 (1939) .......................................................................*passim*

*Craig v. Boren,*
429 U.S. 190 (1976) ................................................................................ 14

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006) ................................................................................ 10

*Dillon v. Gloss,*
256 U.S. 368 (1921) ................................................................................ 11

*Frontiero v. Richardson,*
411 U.S. 677 (1973) ................................................................................ 14

*Goesaert v. Cleary,*
335 U.S. 464 (1948) .................................................................................. 9

*Goldwater v. Carter,*
444 U.S. 996 (1979) .................................................................................. 7

*Hammer v. Dagenhart,*
247 U.S. 251 (1918) .................................................................................. 9

*Hawke v. Smith,*
253 U.S. 221 (1920) ...............................................................................9, 17

*Hollingsworth v. Virginia,*
3 U.S. 378 (1798) ...................................................................................9, 16

*Hoyt v. Florida,*
368 U.S. 57 (1961) ..................................................................................... 9

*Idaho v. Freeman,*
529 F. Supp. 1107 (D. Idaho 1981) .............................................................. 4

*INS v. Chadha,*
462 U.S. 919 (1983) .................................................................................. 9

\* Authorities upon which *Amici Curiae* chiefly rely are marked with an asterisk.

*Leser v. Garnett,*
    258 U.S. 130 (1922) ................................................................................................. 17

*Nixon v. United States,*
    506 U.S. 224 (1993) ................................................................................................... 9

*Reed v. Reed,*
    404 U.S. 71 (1971) ................................................................................................... 14

*Rhode Island v. Palmer,*
    253 U.S. 350 (1920) ................................................................................................. 14

*United States v. Sitka,*
    845 F.2d 43 (2d Cir. 1988) ..................................................................................... 17

*United States v. Windsor,*
    570 U.S. 744 (2013) ................................................................................................... 7

*United States ex rel. Widenmann v. Colby,*
    265 F. 998 (D.C. Cir. 1920), *aff'd*, 257 U.S. 619 (1921) ................................ 17

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
    566 U.S. 189 (2012) ................................................................................................... 7

**Constitutional Provisions:**

U.S. Const. amend. XVIII, § 3 (repealed 1933) .................................................... 12

U.S. Const. amend. XX, § 6 ...................................................................................... 12

U.S. Const. amend. XXI, § 3 ...................................................................................... 12

U.S. Const. amend. XXII, § 2 ..................................................................................... 12

*U.S. Const. art. V .............................................................................*passim*

**Statutes:**

1 U.S.C. § 106b ............................................................................................................ 17

15 Stat. 709 (1868) .................................................................................................... 11

**Legislative Materials:**

65 Cong. Rec. 10,092 (1924) ...................................................................................... 9

106 Cong. Rec. 12,571 (1960) ................................................................................... 13

108 Cong. Rec. 5,102 (1962) ..................................................................................... 13

116 Cong. Rec. 27,999-28,004 (1970) ....................................................................... 3

116 Cong. Rec. 36,450-51 (1970)............................................................... 3

117 Cong. Rec. 35,296 (1971)................................................................... 9

138 Cong. Rec. 11,869 (1992)................................................................. 11

138 Cong. Rec. 12,052 (1992)................................................................. 11

166 Cong. Rec. S2719 (2020).................................................................. 16

Cong. Globe, 40th Cong., 2d Sess. 4295-96 (1868) ............................... 11

Cong. Research Serv., R42979, *The Proposed Equal Rights Amendment: Contemporary Ratification Issues* (updated 2019) ....................... 3, 4

*Equal Rights Amendment Extension, Hearings on H.J. Res. 638 Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 95th Cong. 7 (1978) ......................................... 18

*Equal Rights Amendment Extension, Hearings on H.J. Res. 638 Before the Subcomm. on Civil and Constitutional Rights of the H. Comm.on the Judiciary*, 95th Cong. 64 (1978) ....................................... 15

*Equal Rights Amendment Extension, Hearings on S.J. Res. 134 Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 95th Cong. 262-64 (1978) .................................................15, 16

H.R.J. Res. 75, 68th Cong. (1923) ........................................................ 3

H.R.J. Res. 79, 116th Cong. (2020) ...................................................... 4

H.R.J. Res. 208, 92nd Cong. (1972) ...............................................3, 12, 13

H.R.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978)..............................4, 13

H.R. Rep. No. 116-378 (2020) ............................................................. 2

S.J. Res. 2, 79th Session (Nev. 2017) ................................................. 15

S.J. Res. 6, 116th Cong (2019) ............................................................. 5

**Other Authorities:**

Robert Black, *Could the Equal Rights Amendment Become a reality?*, Nat'l Const. Ctr. (Jan. 15, 2020), https://tinyurl.com/ydxzlv85 ................ 4

Jane Mansbridge, *Why We Lost the ERA* (1986) ................................... 4

*Ratification of the Equal Rights Amendment: Memorandum Opinion for the General Counsel of the National Archives and Records Administration*, Office of Legal Counsel (Jan. 6, 2020), https://tinyurl.com/yafonaqk .................6, 18

iv

Laurence H. Tribe, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role*, 97 Harv. L. Rev. 433 (1983) ..................................................... 9

John R. Vile, *Encyclopedia of Constitutional Amendments, Proposed Amendments, and Amending Issues, 1789-2015* (2d ed. 2003) ......................................... 3

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are scholars in constitutional law.[1]  They write to offer their perspective to the Court on the Constitution's amendment process generally and the important role it plays in the Constitution's separation of powers.

Erwin Chemerinsky is the Dean of Berkeley Law and an expert in constitutional law, federal jurisdiction, and civil rights.  He is the author of eleven books on those topics, including leading casebooks and treatises.  His most recent books are: *We the People:  A Progressive Reading of the Constitution for the Twenty-First Century*; *Closing the Courthouse Door:  How Your Constitutional Rights Became Unenforceable*; and *Free Speech on Campus*.

Noah Feldman is the Felix Frankfurter Professor of Law at Harvard Law School.  His research focuses on constitutional studies, with a particular emphasis on the relationship between law and religion, free speech, constitutional design, and the history of legal theory.  He has written eight books, including, most recently, *The Three Lives of James Madison: Genius, Partisan, President* and *The Arab Winter: A Tragedy*.  He frequently contributes analysis to publications such as the New York Times Magazine and Bloomberg News.  He is co-author, with Kathleen Sullivan, of the leading textbook, *Constitutional Law*, now in its twentieth edition.  Last year, he was called to testify before the House Judiciary Committee as part of the House impeachment hearings.

Reva Siegel is the Nicholas deB. Katzenbach Professor of Law at Yale Law School.  Her writing draws on legal history to explore questions of law and inequality and to analyze how courts interact with representative government and popular movements in interpreting

---

[1] No person other than *amici* and their counsel authored this brief or provided funding related to it.

1

the Constitution.  She has written extensively on race, gender, and LGBTQ equality law and its evolution through conflict.  Her work on the dynamics of constitutional change addresses Congress and the amendment process, most recently, the Nineteenth Amendment.  Her books include *Reproductive Rights and Justice Stories* (edited with Melissa Murray & Kate Shaw, 2019) and a leading constitutional law textbook, *Processes of Constitutional Decisionmaking* (with Paul Brest, Sanford Levinson, Jack M. Balkin, and Akhil Reed Amar, 2018).

Julie C. Suk is a Professor of Sociology and Political Science at The Graduate Center of the City University of New York, where she is also the Dean for master's programs.  From 2005-2018 she was a Professor of Law at Cardozo Law School, and, in Fall 2020, she will be a Visiting Professor at Yale Law School.  She is a scholar of comparative constitutional law whose recent work focuses on gender equality amendments in constitutions around the world. Her 2017 article, *An Equal Rights Amendment for the Twenty-First Century: Bringing Global Constitutionalism Home*, was cited in H.R. Rep. No. 116-378, at 5 n.29 (2020), the House Judiciary Committee's favorable report on removing the Equal Rights Amendment ratification deadline.  She is the author of a forthcoming book, *We the Women: The Unstoppable Mothers of the Equal Rights Amendment* (Aug. 2020).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The power to resolve a dispute about the ratification of a constitutional amendment lies with Congress, at least in the first instance.  Plaintiff and Intervenor States ask this Court to decide whether the Equal Rights Amendment is now ratified or expired.  The Defendant Archivist suggests that the Executive Branch should decide.  But the text of Article V, Supreme Court precedent, and history suggest that it is a political question for Congress. Congress is currently considering the issue, and there is no concrete controversy at present for this Court to resolve.  The separation of powers requires this Court to refrain from adjudicating the ERA's validity in this litigation.  Addressing the ratification issue on its

2

merits would prematurely entangle the Court in deciding abstract issues not necessary to resolve a concrete controversy. Congress—the democratically elected, federal-lawmaking branch of government—is best placed to resolve disagreements between states about the validity of a federal constitutional amendment.

## BACKGROUND

**The Equal Rights Amendment**. In 1923, a constitutional amendment guaranteeing equality of rights, not to be denied or abridged on account of sex, was first introduced in Congress. *See* H.R.J. Res. 75, 68th Cong. (1923). From 1923 through 1971, the judiciary committees of both houses of Congress held hearings on the Equal Rights Amendment. The Senate adopted it by a two-thirds vote in 1950 and 1953, but it was not until 1970 that the Equal Rights Amendment ("ERA") got its first debate and vote on the floor of the House of Representatives. John R. Vile, *Encyclopedia of Constitutional Amendments, Proposed Amendments, and Amending Issues, 1789-2015* 177 (2d ed. 2003). In 1970, Congresswoman Martha Griffiths led a discharge petition to get the ERA to the House floor over the objections of the House Judiciary Committee. *See* 116 Cong. Rec. 27,999-28,004 (1970). The House then voted 352 to 15 to adopt the ERA, but the Senate did not follow suit in that session. *See* Vile, *supra*, at 177. The Senate added a seven-year deadline to the ERA without voting on whether to adopt the constitutional amendment. *See* 116 Cong. Rec. 36,450-51. The next congressional session, in 1971-72, saw the successful reintroduction of the ERA. *See* Vile, *supra*, at 177. The resolution proposing the constitutional amendment included language that the amendment would be valid "when ratified . . . within seven years" of the date of submission. *See* H.R.J. Res. 208, 92nd Cong. (1972). Both houses adopted the ERA by over 90 percent of the vote in that session, and sent it out to the States for ratification on March 22, 1972. *See* Vile, *supra*, at 177; Cong. Research Serv., R42979, *The Proposed Equal Rights Amendment: Contemporary Ratification Issues* 16 (updated 2019).

Initially, States were quick to ratify the ERA. By the end of 1973, thirty state legislatures had ratified the ERA. *See, supra*, Cong. Research Serv., R42979 at 16. By 1977, thirty-five had ratified the ERA, three states short of the thirty-eight needed to constitute three-fourths of the states required by Article V. *See id.*; U.S. Const. art. V. In 1978, Congress adopted a resolution extending the time period for ratification by thirty-nine months. *See* H.R.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978). Meanwhile, from 1973 to 1978, four states—Nebraska, Tennessee, Idaho, and Kentucky—voted to rescind their ratifications of the ERA. *See Idaho v. Freeman*, 529 F. Supp. 1107, 1112 n.2 (D. Idaho 1981). A fifth state, South Dakota, passed a resolution stating that its prior ratification would cease to be valid on the date of the original 1979 time period of Congress, unless three-fourths of the states ratified by then. Robert Black, *Could the Equal Rights Amendment Become a reality?*, Nat'l Const. Ctr. (Jan. 15, 2020), https://tinyurl.com/ydxzlv85. No additional state ratified the ERA between March 22, 1979 (the date when the original time period lapsed) and June 30, 1982 (the date when the revised time period lapsed). *See* Jane Mansbridge, *Why We Lost the ERA* 13 (1986). Many assumed that the ERA was no longer viable.

**The Present Dispute Over Virginia, Illinois, and Nevada's Ratifications.** In March 2017, the Nevada legislature ratified the ERA, and, in May 2018, the Illinois legislature followed suit. Then, in January 2020, the Virginia legislature ratified the ERA, making it the thirty-eighth state to have done so. In February 2020, apparently prompted by Virginia's ratification vote and the possibility that 38 states had now ratified the ERA, the House of Representatives adopted a resolution eliminating the prior deadlines on ERA ratification. *See* H.R.J. Res. 79, 116th Cong. (2020). The resolution, which passed by a vote of 232 to 183, declared that the ERA would be part of the Constitution "whenever ratified" by three-fourths of the states. A bipartisan resolution to this effect has also been introduced in the Senate, *see* S.J. Res. 6, 116th Cong (2019), and is supported by 48 sponsors thus far.

4

In the meantime, Virginia, Illinois, and Nevada filed this suit against the Archivist of the United States seeking a judicial declaration that the ERA was now part of the Constitution and requiring that the Archivist perform his "purely ministerial duty" to publish the amendment.  *See* Compl. at 1, *Virginia v. Ferriero*, No. 1:20-cv-00242-RC (D.D.C. Jan. 30, 2020),[2] ECF No. 1 ("Compl.").  The Plaintiff States' position is that the ERA is validly ratified and currently part of the U.S. Constitution because: (1) no ratification deadline validly existed, *id.* at 13; (2) Congress lacks constitutional power to set a deadline for ratification, *id.* at 13-14; and (3) the Constitution does not permit States to rescind their ratifications, *id.* at 15-16.  The Intervenor States—who either have never ratified or have rescinded their prior ratifications—argue that: (1) the ERA expired due to a valid ratification deadline; (2) the Constitution implicitly limits the time available for state ratification and that tacit deadline has passed; and (3) the ERA lacks support due to rescissions of ratifications by five states.  *See* Mem. Op. at 2 (June 12, 2020), ECF No. 34.

The Archivist moved to dismiss the Complaint for lack of standing, based on the ratification deadline, as well as the political question doctrine, and argued that mandamus jurisdiction is lacking because Congress can set the parameters, such as time limits, for ratification.  *See* Mem. in Supp. of Def.'s Mot. to Dismiss at 8-16 (May 7, 2020), ECF No. 29-1 ("Mot. to Dismiss").  The Archivist expressed his intent to "defer to DOJ on [ERA issues] and [to] abide by the OLC opinion [on the subject]."  *Id.* at 1 (internal quotations omitted).  The Office of Legal Counsel concluded in January 2020 that "Congress had the constitutional authority to impose a deadline on the ratification of the ERA and, because that deadline has expired, the ERA Resolution is no longer pending before the States."  *Ratification of the Equal Rights Amendment: Memorandum Opinion for the General Counsel*

---

[2] Unless otherwise noted, all ECF citations refer to this matter.

*of the National Archives and Records Administration*, Office of Legal Counsel 2 (Jan. 6, 2020), https://tinyurl.com/yafonaqk ("2020 OLC Memo").

## ARGUMENT

**I.    THE POLITICAL QUESTION DOCTRINE AND LACK OF ANY CONCRETE INTERESTS AT STAKE CURRENTLY PRECLUDE JUDICIAL REVIEW OF THE VALIDITY OF THE ERA'S RATIFICATION.**

In its current posture, this case presents nonjusticiable questions that should be resolved by Congress—where they are pending—and not the courts.  Justiciability doctrines are fundamentally about the separation of powers and appropriate role of the federal courts in the system of separated powers.  *See Allen v. Wright*, 468 U.S. 737, 750 (1984), *abrogated on other grounds by Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). As Supreme Court case law indicates, courts should not rush to resolve difficult constitutional questions whose contours may be changed by the branch to whom the Constitution has entrusted responsibility for the amendment process and which is actively considering the matter.  Honoring these justiciability doctrines here is of real importance, because they are designed to protect the separation of powers and to prevent the inappropriate exercise of the judicial power—concerns that apply a fortiori to judicial review of the constitutional amendment process.  *See Coleman v. Miller*, 307 U.S. 433, 452-55 (1939).

The political question doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962).  Cases involving a political question include:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.*; *see also Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195, 197-98 (2012) (emphasizing as key whether an issue is textually committed to another branch, whether there are judicially manageable standards, and concluding that the constitutionality of the federal statute at issue was a question for the courts to decide). *Coleman v. Miller*, discussed further below, indicates that questions relating to the efficacy of ratification of an amendment over an extended time period are committed to Congress under Article V. *See* 307 U.S. at 452-53.

Moreover, "the political-question doctrine rests in part on prudential concerns calling for mutual respect among the three branches of Government." *Goldwater v. Carter*, 444 U.S. 996, 1000 (1979) (Powell, J. concurring in the judgment); *see also Zivotofsky*, 566 U.S. at 202-03 (Sotomayor, J., with Breyer, J., concurring in part and concurring in the judgment) (emphasizing the need to consider all of the *Baker v. Carr* factors and noting that prudential factors may call for judicial "abstention" from decision). Although the Court in *Zivotofksy* focused primarily on textual commitment and judicially manageable standards in deciding that the issue before it was justiciable, Justice Sotomayor's concurrence emphasized the continued importance of prudential factors. Even when a question is not entirely committed to another branch, judicial review may still be inappropriate. *See, e.g.*, *Goldwater*, 444 U.S. at 996 (Powell, J., concurring in the judgment) (explaining his view that the issue was not a political question, as four other Justices found, but was nevertheless "not ripe for judicial review"); *see also United States v. Windsor*, 570 U.S. 744, 757, 759 (2013) (noting that even when a "case presents a justiciable controversy under Article III," there are "[r]ules of prudential standing," which are "flexible," but are "designed to protect the courts from deciding abstract questions of wide public significance even when other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights" (internal quotation marks and alterations omitted)).

In *Coleman v. Miller*, the Supreme Court applied the political question doctrine in the amendment context, concluding that both "the question of the efficacy of ratifications by state legislatures, in the light of previous rejection or attempted withdrawal" and "what is a reasonable period within which ratification may be had," at least where Congress had specified no time limit, were "political questions," committed to congressional resolution. 307 U.S. at 450, 452, 454; *see also id.* at 459-60 (Black, J., concurring). In that context, the Court explained that the issue of a time period for ratification was a non-justiciable political question because resolving it involves:

> an appraisal of a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in a court of justice and as to which it would be an extravagant extension of judicial authority to assert judicial notice as the basis of deciding a controversy with respect to the validity of an amendment actually ratified.

*Id.* at 453-54. As such, the Court concluded, "these conditions are appropriate for the consideration of the political departments of the Government[,]" because "[t]he questions they involve are essentially political and not justiciable." *Id.* at 454.

In this case, unlike in *Coleman v. Miller*, the resolution proposing this amendment included a time period. However, as we explain in Part II below, the wording and location of this time period as well as the related history of congressional action, argue against judicial involvement in this case at this point.

*Coleman v. Miller*'s decision to refrain from reviewing the ratification process serves several important purposes. First, broad judicial review of the ratification process poses risks to the Constitution's system of checks and balances. After all, a constitutional amendment is not a form of ordinary legislation, governed by the bicameralism and presentment requirements of Article I, Section 7. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 955 & n.21 (1983); *Hawke v. Smith*, 253 U.S. 221, 230 (1920); *Hollingsworth v. Virginia*, 3 U.S. 378,

379-80 (1798).   Rather, amendment is one of the only checks on the Court's power to interpret the Constitution.   Indeed, Congress often proposes amendments to interpret the Constitution differently from courts.   For instance, the amendment at issue in *Coleman v. Miller*, was proposed by Congress to supersede the Supreme Court's interpretation of the Constitution in *Hammer v. Dagenhart*, 247 U.S. 251 (1918).   *See* 65 Cong. Rec. 10,092 (1924) (Remarks of Senator Shortridge).

So, too, with the ERA.   Congress proposed the ERA in 1972 because it judged the Supreme Court's protection against gender discrimination in cases like *Goesaert v. Cleary*, 335 U.S. 464 (1948) (upholding partial ban on female bartenders), and *Hoyt v. Florida*, 368 U.S. 57 (1961) (upholding women's exemption from jury service), to be inadequate.   *See* 117 Cong. Rec. 35,296 (1971) (floor speech by Congresswoman Martha Griffiths noting *Goesaert v. Cleary* and *Hoyt v. Florida* as evidence of the Supreme Court's reluctance to invalidate sex-discriminatory laws under the Equal Protection Clause).   As Professor Tribe has argued, "judicial supervision would significantly undercut the independence of article V from normal legal processes and erode its special role in the constitutional scheme," and ultimately involve the Supreme Court in "pass[ing] on the legitimacy of actions taken to correct perceived flaws in its own jurisprudence—a task with uncomfortable implications for the integrity of the judicial enterprise."   Laurence H. Tribe, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role*, 97 Harv. L. Rev. 433, 444 (1983); *cf. Nixon v. United States*, 506 U.S. 224, 234-35 (1993) (explaining that because impeachment is the only check that Congress has on judges, "judicial review would be inconsistent with the Framers' insistence that our system be one of checks and balances").

Second, a narrow judicial role in the review of amendments serves to protect the separation of powers.   As the Court explained in *Allen v. Wright*, justiciability doctrines, like the political question doctrine discussed in *Coleman v. Miller*, "define[] with respect to the

Judicial Branch the idea of separation of powers on which the Federal Government is founded" and "are founded in concern about the proper—and properly limited—role of the courts in a democratic society."  468 U.S. at 750 (internal quotation marks omitted).  Together with the related doctrines of standing, ripeness, and mootness, the political question doctrine plays an important role in sustaining the legitimacy of the courts and in maintaining the balance among the branches of government, so important to the health of our constitutional system of representative democracy.  *Cf. DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (explaining that these doctrines "originate in Article III's 'case' or 'controversy'" requirement).  Through these doctrines, courts protect Congress's constitutionally prescribed role—as the elected, national lawmaking body—in the amendment process.

Third, a narrow judicial role in the amendment process honors the design of Article V.  Article V assigns constitutional amendments to the judgments of our most representative bodies—Congress and state legislatures—and requires supermajority votes both in Congress and among the states before an amendment may be added to the constitution.  *See* U.S. Const. art. V.  Allowing broad judicial review of the ratification process would thus undermine Congress's textually prescribed role.

## II.  CONGRESS, NOT THIS COURT, IS CONSTITUTIONALLY AUTHORIZED TO RESOLVE WHETHER THE REQUISITE NUMBER OF STATES HAVE EFFECTIVELY RATIFIED A CONSTITUTIONAL AMENDMENT.

Congress is the only standing body of the national government with a textually prescribed role in amending the Constitution.  *See* U.S. Const. art. V.  As such, Congress should have the opportunity to decide whether the ERA has been effectively ratified in the first instance.  Congress's historic role in resolving disagreements about constitutional amendment ratification underscores the appropriateness of awaiting action by Congress—as does the intensely political nature of the question.

1.     History demonstrates Congress has authority to resolve disagreements on ratification.  Congress has exercised the authority to resolve disagreements among the States regarding ratification time limits and rescissions.  On two occasions, Congress has taken action to pass resolutions recognizing the validity of a constitutional amendment when uncertainty existed as to whether the amendment had been effectively ratified.  Indeed, the range of action taken by Congress throughout the amendment process indicates the wide discretion committed to Congress by the Constitution.

When the Fourteenth Amendment was awaiting ratification by two-thirds of the states, Ohio and New Jersey ratified the amendment, only to later vote to rescind their ratifications. *See* Cong. Globe, 40th Cong., 2d Sess. 4296 (1868).  Notwithstanding Ohio and New Jersey's purported rescission of their ratifications, Congress adopted a concurrent resolution stating that the required three-quarters of states had ratified the Fourteenth Amendment and it was thus adopted as part of the Constitution.  15 Stat. 709, 710 (1868).  And the resolution listed Ohio and New Jersey among the ratifying states.  *See id.*; *see also* Cong. Globe, 40th Cong., 2d Sess. 4295-96 (1868).

The Twenty-Seventh Amendment posed a different sort of uncertainty.  It was sent to the States for ratification in 1789, but languished 203 years—during which time the Supreme Court remarked that the amendment had in effect expired by passage of time.  *Dillon v. Gloss*, 256 U.S. 368, 375 (1921).  Yet in 1992, the amendment was ratified by a 38th State.  Despite the long lag between promulgation and the last state's ratification, both chambers of Congress passed resolutions affirming that the amendment was validly ratified, *see* 138 Cong. Rec. 11,869 (1992); 138 Cong. Rec. 12,052 (1992), and it was added to the Constitution.

This history confirms what the Supreme Court has said:  Article V commits wide latitude to Congress to resolve "the question of the efficacy of ratifications by state

legislatures," including whether constitutional amendments have been validly ratified by a sufficient number of States to become part of the Constitution.  *Coleman*, 307 U.S. at 450.

2.   The time period for ratification of the ERA was neither included in the text of the amendment nor expressed as a condition of ratification, thereby allowing room for congressional resolution.  The text of the ERA itself does not include a deadline by which it had to be ratified.  Instead, the deadline was part of the resolution proposing the constitutional amendment.  *See* H.R.J. Res. 208, 92nd Cong. (1972).  The resolution reads:

> [T]he following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution *when ratified* by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress.

*Id.* (emphasis added).  The language providing that the ERA becomes valid "when ratified" leaves open whether the ERA remains viable even if not ratified within seven years.

In contrast to this language, Congress has used explicitly conditional language in other proposed constitutional amendments.  For example, the text of the Eighteenth Amendment itself makes clear that the time limit is mandatory:  "This article shall be *inoperative unless* it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress."   U.S. Const. amend XVIII, § 3 (repealed 1933) (emphasis added).  Congress used identical language—making an amendment "inoperative unless . . . ratified . . . within seven years"—in the text of the Twentieth, Twenty-First, and Twenty-Second Amendments.  *See* U.S. Const. amend. XX, § 6; U.S. Const. amend. XXI, § 3; U.S. Const. amend. XXII, § 2.

In other instances, when Congress has included time limits outside of the text of an amendment itself, it has used language of limitation not found in the ERA.  The preambles to the Twenty-Third and Twenty-Fourth Amendments say "the following article is hereby

12

proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution *only if* ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission to Congress." 106 Cong. Rec. 12,571 (1960) (emphasis added); 108 Cong. Rec. 5,102 (1962). This conditional language more strongly implies that the time limits in those amendments were intended as conditions of ratification.

No such language appears in the text of the ERA. And the language that appears in the resolution proposing the ERA is more ambiguous. In fact, it uses no conditional language at all. Instead, the resolutions say that the amendment would be valid "*when ratified* by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress." *See* H.R.J. Res. 208, 92nd Cong. (1972). The "when ratified" phrasing is ambiguous; Congress might find that the ERA could remain viable if the seven-year period is extended. Indeed, Congress itself sanctioned this interpretation when, in 1978, it extended the deadline. *See* H.R.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978). In so doing, Congress acted consistently with *Coleman v. Miller*'s explanation that the determination as to "whether a reasonable time had elapsed" since the submission of the amendment for ratification is to be made by "the Congress with the full knowledge and appreciation ascribed to the national legislature of the political, social and economic conditions which have prevailed during the period since the submission of the amendment." 307 U.S. at 453-54.

3. Congress is best able to take into account the circumstances relevant to resolving disagreements on the vitality of the ERA. As *Coleman v. Miller* suggested, decisions about the relevant time period over which an amendment could be ratified involve "appraisal of a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in a court of justice." *Id.* at 453.

The years since the ERA passed Congress have seen both change and continuity in our country's understanding of sex equality.

Even as Congress contemplated the ERA, the Supreme Court began developing its sex equality jurisprudence. Between the House's vote to adopt the ERA in 1971 and the Senate's vote in 1972, the Court invalidated *de jure* gender discrimination for the first time in *Reed v. Reed*, 404 U.S. 71 (1971). After the ERA was put to the States for ratification, the Court held that heightened scrutiny applied to sex classifications and began invalidating statutes reflecting stereotyped distinctions between the sexes. *See Craig v. Boren*, 429 U.S. 190 (1976); *see also Frontiero v. Richardson*, 411 U.S. 677, 685, 687-88 (1973) (plurality op.). In *Frontiero* two members of the Court took note of the ERA's adoption by Congress and its pendency. 411 U.S. at 685, 687-88 (Brennan, J.); *id.* at 692 (Powell, J., concurring). The plurality even took the position that Congress's actions, as a "coequal branch of Government," to prohibit sex discrimination, was "not without significance" to the Court's interpretation of the Fifth Amendment—further evidencing judicial respect for the constitutional role of a coordinate branch of government. *Id.* at 687-88.

It is for Congress, not the courts in the first instance, to resolve whether this Amendment has been or can yet be ratified. States' deliberations over time may well have been influenced by the body of constitutional sex equality law, consisting of judicial interpretations of the Fifth and Fourteenth Amendments, that has developed in the decades since the ERA was passed by Congress. Resolving the question of efficacy of ratifications over this period of time requires judgments about whether the amendment remains "necessary," an unreviewable determination that Article V assigns to Congress as part of its authority to propose amendments. *Cf. Rhode Island v. Palmer*, 253 U.S. 350, 384-85 (1920) (concluding that Congress need not make an express declaration that they regarded an amendment as necessary). Such judgments are fundamentally political, and should be taken

14

up in the first instance by Congress—the branch most responsible for representing "the people" and the only branch of the federal government charged, under Article V, with a role in the amending process.

Nevada's ratification of the ERA in 2017 explicitly recognized the unique role Congress plays in evaluating these questions, observing that "Congress is in a unique position to judge the tenor of the nation, to be aware of the political, social, and economic factors affecting the nation, and to be aware of the importance to the nation of the proposed amendment."  S.J. Res. 2, 79th Session (Nev. 2017).  In ratifying decades after the time limit, Nevada assumed that "it is for Congress, under the principles of *Coleman v. Miller*, to determine the validity of the state ratifications occurring after a time limit in the resolving clause, but not in the amendment itself."  *Id.*

During the 1978 hearings on the ERA deadline extension, now-Justice Ruth Bader Ginsburg observed that "fundamental human rights guarantees" such as the ERA may take longer than seven years because they are "stated at a level of majestic generality," and therefore warrant sustained national debate about the "purpose and probable effects of the amendment."  *Equal Rights Amendment Extension, Hearings on S.J. Res. 134 Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 95th Cong. 262-64 (1978) (statement of Justice Ruth Bader Ginsburg, then professor at Columbia University) ("1978 S. Hr'g. Statement").  The need for time and sustained debate was also emphasized by Professor Thomas Emerson, of the Yale Law School.  *See Equal Rights Amendment Extension, Hearings on H.J. Res. 638 Before the Subcomm. on Civil and Constitutional Rights of the H. Comm.on the Judiciary*, 95th Cong. 64 (1978) (statement of Thomas I. Emerson, professor at Yale Law School) (Professor Emerson noted that women's suffrage was under consideration for at least three-quarters of a century before a constitutional amendment guaranteeing it was adopted in 1920, as "[h]istory has demonstrated that a long period of time is necessary for the

nation to make up its mind with respect to fundamental changes in the status of large groups in the population").

Ruth Bader Ginsburg further emphasized in her Senate testimony in 1978 that Congress had the responsibility to determine whether "the equal rights amendment has lost vitality," and whether the amendment had "received a full and fair hearing on the merits." 1978 S. Hr'g. Statement at 263.  These are precisely the questions that Congress is now contemplating.  *See, e.g.*, 166 Cong. Rec. S2719 (2020) (Remarks of Senator Lisa Murkowski on Women's Suffrage) ("I have introduced a resolution, S.J. Res. 6, which would remove the time limit from the joint resolution that passed the Congress in 1972.  I have asserted time and again . . . that you cannot put a time limit on women's equality.").

This Court should accordingly allow Congress to speak to the continuing need for the ERA.

## III.    THE CONSTITUTION ASSIGNS NO ROLE TO THE ARCHIVIST OR THE EXECUTIVE BRANCH IN MAKING CONSTITUTIONAL AMENDMENTS.

Nothing in the Constitution—in Article V or elsewhere—assigns either the Executive Branch or the Archivist a role in amending the Constitution.  The President "has nothing to do with the proposition, or adoption, of amendments to the U.S. Constitution."  *Hollingsworth*, 3 U.S. at 381 n.*.  The Archivist's actions or inactions have no effect on whether the ERA is part of the Constitution.  The absence of any designated role for the Executive Branch underscores why Congress, not the Executive Branch or this Court, should decide ratification issues in the first instance.

Article V states that an amendment becomes law after being proposed by the Congress and "ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof."  U.S. Const. art. V.  The Supreme Court has held that the States, in ratifying a proposed constitutional amendment, are exercising a *federal* power since a State's

ratification "derives its authority from the federal Constitution to which the state and its people have alike assented."  *Hawke*, 253 U.S. at 230; *see also Leser v. Garnett*, 258 U.S. 130, 136-37 (1922).

Because Article V assigns functions only to Congress and the States in amending the Constitution, whether a constitutional amendment has been ratified is not up to the Executive Branch.  The only role envisioned for the Archivist—publishing the amendment—is purely ministerial and does not augment or diminish its legal authority.  *See* 1 U.S.C. § 106b (requiring that "[w]henever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published").  *See also United States v. Sitka*, 845 F.2d 43, 47 (2d Cir. 1988) (explaining that "[t]he authority created [for the Executive] [i]s purely ministerial . . . [and] could not and did not affect the process of ratification itself, which is self-executing upon completion" (internal citations omitted)); *id.* ("Congress has not . . . delegated any of its lawmaking authority" in passing § 106b); *United States ex rel. Widenmann v. Colby*, 265 F. 998, 999 (D.C. Cir. 1920) (terming the Executive's power under the statute "purely ministerial"), *aff'd*, 257 U.S. 619 (1921).   Instead, Congress, as the lawmaking body, is the proper initial decisionmaker with regard to both the reasonableness of time for ratification and whether a state has ratified an amendment.

In fact, Plaintiff States and Defendant agree on these points: they both acknowledge the role played by the Archivist in adding amendments to the Constitution is purely ministerial, Compl. ¶ 59; Mot. to Dismiss at 5-6, and the parties further agree that publication of a constitutional amendment by the Archivist is not what makes it law.  Compl. ¶ 57; Mot. to Dismiss at 2.

Yet, the Archivist asked the Office of Legal Counsel for guidance in advance of Virginia's ratification vote on whether it should publish the ERA after Virginia's ratification, and its current refusal to publish the Amendment is premised on the OLC's legal opinion. *See* Mot. to Dismiss at 1. The January 2020 OLC Memorandum opined that Congress lacked power both in 1978, when an extension was voted, and at present, in effect, to extend the deadline and recognize recent ratifications. 2020 OLC Memo at 3. An earlier OLC opinion had taken a different view on the authority of Congress to extend a ratification deadline within the time period set by Congress, concluding that Congress had such constitutional power. *See Equal Rights Amendment Extension, Hearings on H.J. Res. 638 Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 95th Cong. 7 (1978) (statement of John M. Harmon, Assistant Att'y Gen., Office of Legal Counsel, Dep't of Justice). That the Executive Branch has taken different views at different moments on this question evidences the range of reasonable political judgments about the ERA's continued vitality. When such a range of reasonable political judgments exist, the proper decisionmaker is the national political branch explicitly charged with proposing constitutional amendments. Under Article V, that branch is Congress.

Respectfully submitted,

DATED: June 29, 2020

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth (D.C. Bar No. 484170)
Kaitlyn A. Golden (D.C. Bar No. 1034214)
Erin R. Chapman (D.C. Bar No. 1616622)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600

*Attorneys for Amici Constitutional Law Professors*

18

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 29, 2020, the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

.                                    /s/ Jessica L. Ellsworth