# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

COMMONWEALTH OF VIRGINIA, *et al.*,

*Plaintiffs*,

v.

DAVID S. FERRIERO, in his official capacity as the Archivist of the United States

*Defendant*.

_____

No. 1:20-cv-00242, Hon. Rudolph Contreras

_____

**BRIEF FOR EQUALITY NOW, THE WORLD POLICY ANALYSIS CENTER, THE LATIN AMERICAN AND CARIBBEAN COMMITTEE FOR THE DEFENSE OF WOMEN'S RIGHTS, THE EQUAL RIGHTS TRUST, THE EUROPEAN WOMEN'S LOBBY, FEMNET, THE ARAB WOMEN ORGANIZATION, INTERNATIONAL WOMEN'S RIGHTS ACTION WATCH ASIA PACIFIC AND THE SISTERHOOD IS GLOBAL INSTITUTE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS**

_____

STEFANI JOHNSON MYRICK (D.C. Bar 1032545)
*Counsel of record*
DAVIS POLK & WARDWELL LLP
901 Fifteenth Street, N.W.
Washington, DC 20005
(202) 962-7165
stefani.myrick@davispolk.com

ANTONIA KIRKLAND
DIVYA SRINIVASAN
EQUALITY NOW
125 Maiden Lane
9th Fl., Suite B
New York, New York 10038
(212) 586-0906
akirkland@equalitynow.org

AMELIA T.R. STARR
MARGARITA CLARENS
ALEXA B. LUTCHEN
AMANDA RAE SCHWARZENBART
BEN JERNIGAN
DAVIS POLK & WARDWELL LLP
450 Lexington Ave.
New York, New York 10017

*Counsel for Amici Curiae*

June 29, 2020

# TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE, AUTHORSHIP AND FINANCIAL
    CONTRIBUTION STATEMENTS....................................................................... i

TABLE OF AUTHORITIES ................................................................................ ii

INTEREST OF AMICI CURIAE ...........................................................................1

SUMMARY OF ARGUMENT ..............................................................................2

I.    THE VAST MAJORITY OF COUNTRIES AROUND THE WORLD
    RECOGNIZE THE PERVASIVE HARM ARISING FROM SEX
    INEQUALITY AND THE NEED FOR EXPRESS CONSTITUTIONAL
    GUARANTEES OF EQUALITY ON THE BASIS OF SEX ...............................4

    A.    The government's arguments regarding standing fail to recognize
        the international consensus that express constitutional provisions
        are necessary to address the significant harm to all caused by sex
        discrimination. ...........................................................................................4

    B.    Constitutional sex equality provisions around the world have
        facilitated both the elimination of discriminatory laws and the
        implementation of affirmative measures to prevent discrimination
        and violence against women and girls. ........................................................7

        i.    Elimination of discriminatory laws.................................................7

        ii.    Affirmative measures to prevent discrimination...........................10

        iii.    The ERA's potential impact in the United States .........................11

II.    THE UNITED STATES IS REQUIRED TO ADOPT THE ERA TO
    COMPLY WITH ITS TREATY COMMITMENTS.............................................14

    A.    The International Covenant on Civil and Political Rights is binding
        federal law and requires the United States to take all necessary
        measures, including passing a constitutional amendment to ensure
        sex equality. ............................................................................................14

    B.    The ERA is Necessary for the United States to Comply with its
        ICCPR Obligation to Take Further Measures to Prevent Sexual and
        Gender-based Violence and Discrimination. .............................................17

III.    THE UNITED STATES SHOULD ADOPT THE ERA TO COMPLY WITH
    INTERNATIONAL LAW AND HUMAN RIGHTS STANDARDS..................18

A. International law prohibits the United States from taking actions that would defeat the object and purpose of the Convention on the Elimination of All Forms of Discrimination against Women, a treaty which requires sex equality..............................................................18

B. International treaties, customary international law and decisions of international bodies consistently require sex equality. ..............................21

CONCLUSION.............................................................................................................25

APPENDIX................................................................................................................ A-1

## <u>CORPORATE DISCLOSURE, AUTHORSHIP AND FINANCIAL<br>CONTRIBUTION STATEMENTS</u>

Pursuant to United States District Court for the District of Columbia Rule LcvR 7(o)(5), *amici curiae* state that each party to this brief is a nonpartisan, nonprofit organization with no parent corporation and that no publicly held corporation owns 10% or more of its respective stock or other interest in the respective organizations.

Pursuant to LcvR 7(o)(5), *amici curiae* state that no counsel to a party in the matter before the Court authored this brief in whole or in part; that no party or party's counsel contributed money intended to fund preparing or submitting this brief; and that no person contributed money to *amici curiae* that was intended to fund preparing or submitting this brief.

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Abbott v. Abbott*,
   560 U.S. 1 (2010) ........................................................................................................19

*Abdulaziz, Cabales and Balkandali v. United Kingdom*,
   A94 Eur. Ct. H.R. at 83 (1985) ...................................................................................23

*Al-Bihani v. Obama*,
   619 F.3d 1 (D.C. Cir. 2010) .........................................................................................24

*Attorney General v. Unity Dow*,
   (1992) 103 I.L.R. 128 (Bots.) .......................................................................................8

*Benin Constitutional Court Decision*,
   DCC 14-172 (Sept. 16, 2014) .......................................................................................8

*Benner v. Canada (Sec'y of State)*,
   [1997] 1 S.C.R. 358 (Can.) ...........................................................................................8

*Bundesverfassungsgericht* (BverfG) (Federal Constitutional Court) May 21, 1974,
   37 Entscheidungen des Bundesverfassungsgerichts [BVerfGE] 217 (Ger.) ...............8

*Corte Costituzionale*,
   28 Gennaio 1983, Giur. it. 1983, I, 91 (It.) .................................................................8

*Lenahan v. United States*,
   Case 12.626, Inter-Am. Comm'n H. R., Report No. 80/11 ¶ 162 (2011)...................24

*María Isabel Véliz Franco et al.*,
   Case 12,578, Inter-Am. Comm'n H.R., Report No. 170/11, ¶ 83 (2011)...................24

*Meera Gurung v. Her Majesty's Gov't, Dep't of Central Immigration, Ministry of Home
   Affairs*, Dec'n No. 4858 2051 (S. Ct. 1994) (Nepal) .....................................................8

*Nguyen v. INS*,
   533 U.S. 53 (2001).........................................................................................................6

*Rattigan and Others v. Chief Immigration Officer*,
   1995(2) SA 182 (ZS) (Zim.) .........................................................................................8

*Rebeca Z. Gyumi v. Attorney General*,
   Miscellaneous Civil Cause No 5 of 2016 (HC) ............................................................8

*Reed v. Reed*,
   404 U.S. 71 (1971).........................................................................................................4

*Romein v. Adv. General for Scotland*,
    [2016] CSIH 24 (Scot.) ..................................................................................8

*Saikō Saibansho* [Sup. Ct.] June 6, 2008, Hei 6 (Gyo-Tsu) no. 135, 62 Saikō Saibansho
    Minji Hanreishū [Minshū] Majority § 2 (Japan) (translated at
    http://www.courts.go.jp/app/hanrei_en/detail?id=955) ................................8

*The Paquete Habana*,
    175 U.S. 677 (1900) ....................................................................................25

*United States v. Morrison*,
    529 U.S. 598 (2000) ............................................................................13, 18

*United States v. Nagarwala*,
    350 F. Supp. 3d 613 (E.D. Mich. 2018) ........................................7, 13, 18

*United States v. Virginia*,
    518 U.S. 515 (1996) ....................................................................................12

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ....................................................................................16

*Women Against Violence and Exploitation in Society (WAVES) & CWS-L v. Republic of
    Sierra Leone*,
    No. ECW/CCJ/JUD/37/19, Ct. of Just. of the Econ. Cmty. of West African States
    (2020) ..........................................................................................................24

CONSTITUTION

Tanzania's Const. art. 13 ........................................................................................8

U.S. Const. art. VI, cl. 2 .......................................................................................14

STATUTES & RULES

18 U.S.C. § 2243(c)(2) ..........................................................................................18

OTHER AUTHORITIES

African (Banjul) Charter on Human and Peoples' Rights, 1520 U.N.T.S. 217, arts. 18.3,
    19 (June 27, 1981) ......................................................................................23

American Convention on Human Rights, 1144 U.N.T.S. 143, art. 1(1)
    (Nov. 22, 1969) ..........................................................................................23

Beate Rudolf & Andrea Eriksson, *Women's Rights Under International Human Rights Treaties: Issues of Rape, Domestic Slavery, Abortion, and Domestic Violence*, 5 INT'L J. CONST. L. 507 (2007)....................................................................24

Beijing Declaration and Platform for Action, U.N. Doc. A/CONF.177/20, Ch. II, ¶ 10 (Sept. 15, 1995).....................................................................................................22

*Big Firms Required to Publish Gender Pay Gap in 2021*, SWISSINFO.CH (Aug. 21, 2019, 12:03 PM) .............................................................................................................11

Brief for the United States as Amicus Curiae Supporting Petitioner, *Abbott v. Abbott*, 560 U.S. 1 (2010) (No. 08-645)...............................................................................19

Catharine A. MacKinnon, *Creating International Law: Gender as Leading Edge*, 36 HARV. J. L. & GENDER 105 (2013)......................................................................24

Connie De La Vega & Jennifer Fiore, *The Supreme Court of the United States Has Been Called Upon to Determine the Legality of the Juvenile Death Penalty in Michael Domingues v. State of Nevada*, 21 WHITTIER L. REV. 215, 224 (1999).....................20

Convention on the Elimination of All Forms of Discrimination against Women art. 2, Dec. 18, 1979, 1249 U.N.T.S. 13..................................................................3, 19, 21

*Convention on the Elimination of All Forms of Discrimination against Women, Overview of the Convention*, United Nations..............................................................................18

*Convention on the Elimination of All Forms of Discrimination against Women*, United Nations Office of the High Commissioner for Human Rights ...................................19

*Convention on the Rights of the Child*, United Nations Office of the High Commissioner for Human Rights.................................................................................................22

Counter-Memorial of the United States of America (Mexico v. U.S.) 1 I.C.J. (Nov. 3, 2003) .....................................................................................................................25

Curtis A. Bradley, *Unratified Treaties, Domestic Politics, and the U.S. Constitution*, 48 Harv. Int'l L.J. 307 (2008) ......................................................................19, 20, 21

David Díaz, et al., *Royal Decree-Law 6/2019, of 1 March, on Urgent Measures to Guarantee Equal Treatment and Opportunities for Women and Men in Employment and Occupation*, BAKER MCKENZIE .......................................................................11

*Does the Constitution Explicitly Guarantee Equality or Non-Discrimination Across Sex and/or Gender?*, WORLD POLICY ANALYSIS CENTER ....................................................5

Eric Talbot Jensen, *Presidential Pronouncements of Customary International Law as an Alternative to the Senate's Advice and Consent*, 2015 B.Y.U. L. Rev. 1525 (2015)..............................................................................25

European Convention on Human Rights, 213 U.N.T.S. 221, art. 14 (Nov. 4, 1950) ........23

FGM Legislation by State, AHA Foundation ..................................................................14

General Assembly, Transforming Our World: The 2030 Agenda for Sustainable
    Development, G.A. Res. 70/1, Goal 5, U.N. Doc. A/Res/70/1 (Oct. 21, 2015) ..........23

Harmeet Kaur, *Bigamy is no longer a felony in Utah*, CNN (May 12, 2020, 5:03 PM) ...14

HUMAN RIGHTS COMMITTEE, CONCLUDING OBSERVATIONS OF THE HUMAN RIGHTS
    COMMITTEE, U.N. DOC. CCPR/C/USA/CO/3, ¶ 28 (Sept. 15, 2006) ..........................16

HUMAN RIGHTS COMMITTEE, GENERAL COMMENT NO. 28, EQUALITY OF RIGHTS
    BETWEEN MEN AND WOMEN (ARTICLE 3), U.N. DOC. CCPR/C/21/REV.1/ADD.10
    (MAR. 29, 2000) .............................................................................................15, 16, 17

HUMAN RIGHTS COUNCIL, REPORT OF THE WORKING GROUP ON THE ISSUE OF
    DISCRIMINATION AGAINST WOMEN IN LAW AND IN PRACTICE ON ITS MISSION TO THE
    UNITED STATES OF AMERICA ¶ 84 (2016) ...........................................................10, 16

International Covenant on Civil and Political Rights, art. 2, Mar. 23, 1976,  99 U.N.T.S.
    171 ......................................................................................................3, 15, 16, 17

Int'l Covenant on Civ. & Pol. Rts. art. 2(1) ...................................................................15

Int'l Covenant on Civ. & Pol. Rts. art. 3 ...........................................................3, 15, 17

Int'l Covenant on Civ. & Pol. Rts. art. 7 .......................................................................17

Int'l Covenant on Civ. & Pol. Rts. art. 24 .....................................................................17

Int'l Covenant on Civ. & Pol. Rts. art. 26 ...........................................................3, 15, 16, 17

ISABEL LATZ ET AL., EQUAL RIGHTS FOR WOMEN AND GIRLS IN THE WORLD'S
    CONSTITUTIONS, WORLD POLICY ANALYSIS CENTER 6-13 (2014) ..............................10

JODY HEYMANN, ALETA SPRAGUE & AMY RAUB,
    ADVANCING EQUALITY 49 (2020) ....................................................................... *passim*

Julie C. Suk, *An Equal Rights Amendment for the Twenty-First Century: Bringing Global
    Constitutionalism Home*, 28 YALE J.L. & FEMINISM 381 (2017) ..............6, 8, 9, 10, 11

Lee Epstein, Andrew D. Martin, Lisa Baldez & Tasina Nitzschke Nihiser, *Constitutional
    Sex Discrimination*, 1 TENN. J. L. & POL'Y 11 (2004) ..................................................12

*Legal Grounds; Reproductive and Sexual Rights in African Commonwealth Courts*,
    CENTER FOR REPRODUCTIVE RIGHTS & INTERNATIONAL PROGRAMME ON
    REPRODUCTIVE AND SEXUAL HEALTH LAW AT THE UNIVERSITY OF TORONTO 58
    (2005) ...........................................................................................................................9

Lindsey Sacher, *From Stereotypes to Solid Ground: Reframing the Equal Protection Intermediate Scrutiny Standard and Its Application to Gender-Based College Admissions Policies*, 61 CASE W. RES. L. REV. 1411 (2011) ................................12, 13

MAKING PROGRESS, BUT STILL FALLING SHORT: A REPORT ON THE MOVEMENT TO END CHILD MARRIAGE IN AMERICA, TAHIRIH JUSTICE CENTER (2020)..............................14

Protocol to the African Charter on Human and Peoples' Rights on the Rights of Women in Africa, art. 2.1(a) (July 1, 2003) ............................................................................23

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 102(2) (1987) ........................................................................................................24

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 111 Reporters' Note 1 (1987) ...............................................................................25

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 312(3) (1987) ........................................................................................................19

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 312 cmt. h(i) (1987) ...........................................................................................20

RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 306 Reporters' Note 1 (2018) ............................................................................25

Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267 (2007)...............12

S. Rep. No. 102-23, 102d Cong. (1992) ............................................................................14

S. Todd Rogers, *The Originalist*, Legally Speaking (Jan. 2011)........................................15

*Status of Treaties, Convention on the Elimination of All Forms of Forms of Discrimination Against Women*, UNITED NATIONS TREATY COLLECTION ..................19

Thomas Michael McDonnell, *Cluster Bombs over Kosovo: A Violation of International Law?*, 44 ARIZ. L. REV. 31 (2002) .....................................................................20, 21

Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/218 (Dec. 10, 1948) ..................................................................................................22

Vienna Convention on the Law of Treaties art. 18, May 23, 1969, 1155 U.N.T.S. 331......................................................................................4, 19

William J. Clinton, *Remarks by President Clinton at Press Conference on the Comprehensive Test Ban Treaty* (Oct. 14, 1999)........................................................20

## INTEREST OF AMICI CURIAE

**Equality Now** is an international human rights organization, with an office in New York City, as well as in London, Nairobi and Beirut, working for the protection and promotion of the rights of women and girls worldwide with a membership network of individuals and organizations around the world.  Founded in 1992, Equality Now has advocated for women and girls in the United States since its inception, and has a long history of working to achieve legal and systemic change, including constitutional reform, that addresses violence and discrimination against women and girls worldwide.  For nearly 30 years, with a team of lawyers and legal experts, Equality Now has focused on eliminating sex discriminatory laws around the globe. Equality Now is a lead organization of the national ERA Coalition, and has actively supported ratification of the Equal Rights Amendment at the state and national levels.

The following organizations, from every region of the world, all advocate for the rights of women and girls and join Equality Now in its submission of this *amici curiae* brief: the WORLD Policy Analysis Center, the Latin American and Caribbean Committee for the Defense of Women's Rights, the Equal Rights Trust, the European Women's Lobby, FEMNET, the Arab Women Organization, International Women's Rights Action Watch Asia Pacific and the Sisterhood is Global Institute.[1]

In light of the relevance of this lawsuit to the rights of women and girls and the important effects that this case may have on efforts to prevent discrimination and violence against women and girls in the United States, Equality Now and the other *amici* have a strong interest in the outcome of the case.  The United States' failure to certify and incorporate the Equal Rights Amendment specifically impedes the work and mission of *amici* because of the significant role

---

[1] Full descriptions of these *amici* appear in the Appendix to this brief.

of the United States as a global leader that can influence global gender policy, as well as jurisprudence around the world.

## SUMMARY OF ARGUMENT

The Equal Rights Amendment (the "ERA") adds express language to the United States Constitution (the "Constitution") guaranteeing equality on the basis of sex.  In the course of almost 30 years working to address sex inequality and violence around the world, Equality Now has seen the pervasive damage wrought by inequality, and conversely, the tremendous benefits gained by countries which have embraced sex equality in the law and in practice.  In this brief, *amici* seek to highlight the worldwide success of constitutional sex equality amendments, provisions required under international law, and to refute two aspects of the government's motion to dismiss.[2]  First, the government argues that the plaintiff states, suing on behalf of their citizens, have not suffered an injury sufficient to confer standing.  Second, the government suggests that a patchwork of state laws in some states (but not others) is sufficient to address sex inequality.  Equality Now's experience demonstrates that these assertions are not borne out by reality.  Like women and girls around the world, female citizens of the plaintiff states, and of the United States more broadly, suffer concrete injury from ongoing discrimination, lack of political and economic representation and inadequate protection from gender-based violence.  Moreover, the failure of the United States to provide constitutional protection for equality on the basis of sex undermines any efforts by individual states, including plaintiff states, to address this systemic issue.  Indeed, the international experience demonstrates that a patchwork of local

---

[2] While this submission focuses on these specific points, *amici* also disagree with each of the government's other positions in its motion to dismiss, which should be denied.  The plaintiffs' brief and other *amici* address these additional government arguments.

efforts cannot remedy these harms—only constitutional action on a nationwide basis can ensure the universal right to equality for all women and girls.

The United States' failure to expressly guarantee equality at the constitutional level is shocking.  The rest of the world has recognized the harms of discrimination on the basis of sex, including violence against women and girls, and that constitutional action is necessary to address them.  Eighty-five percent of U.N. member states have constitutions that explicitly guarantee equality for women and girls.[3]  These constitutional guarantees have enabled national legal reforms that eliminated discriminatory statutes and have facilitated laws that protect women and girls.

Additionally, the United States' failure to adopt the ERA violates its binding international legal obligations—obligations the government's motion to dismiss entirely ignores.  In 1992, the United States ratified the International Covenant on Civil and Political Rights ("ICCPR"), which *requires* it to take *all steps necessary* to put an end to sex discrimination and to ensure that the *law prohibits discrimination* on the basis of sex.[4]  Without the ERA, the current constitutional structure in the United States is inadequate to bring the United States into compliance with the ICCPR.  Similarly, the United States has signed the Convention on the Elimination of All Forms of Discrimination against Women ("CEDAW"), which has a core purpose of ending all forms of discrimination against women *without delay*.[5]  Under international law, the United States may

---

[3] The vast majority of U.N. member states have a single, written constitutional document. The remainder have a series of documents understood to have constitutional status, such as the Human Rights Act in the United Kingdom and the Basic Laws of Israel.

[4] *See* International Covenant on Civil and Political Rights, arts. 2, 3, 26, Mar. 23, 1976, 99 U.N.T.S. 171

[5] *See* Convention on the Elimination of All Forms of Discrimination Against Women, art. 2, Dec. 18, 1979, 1249 U.N.T.S. 13.

not defeat the object or purpose of a treaty it has signed[6]; yet, the government argues that the

Archivist properly ignored Virginia's lawful ratification of the ERA.  This is inconsistent with a

goal of ending discrimination against women *without delay*.  Furthermore, the guarantee of sex

equality has attained the status of customary international law, which the United States is

violating in failing to certify the ERA as part of the Constitution.  Immediate certification of the

ERA is a necessary step to remedy the failures of the United States to comply with its obligations

and duties under international law.

## ARGUMENT

I.     **THE VAST MAJORITY OF COUNTRIES AROUND THE WORLD
        RECOGNIZE THE PERVASIVE HARM ARISING FROM SEX INEQUALITY
        AND THE NEED FOR EXPRESS CONSTITUTIONAL GUARANTEES OF
        EQUALITY ON THE BASIS OF SEX**

   A.     **The government's arguments regarding standing fail to recognize the
           international consensus that express constitutional provisions are necessary
           to address the significant harm to all caused by sex discrimination.**

The United States lags behind the rest of the world in not expressly guaranteeing equality

on the basis of sex in the Constitution.  While the Equal Protection Clause of the Fourteenth

Amendment has been interpreted to apply to sex discrimination, it does not serve as a

constitutional *guarantee* of equality on the basis of sex.  The Equal Protection Clause simply

provides that no state may "deny to any person within its jurisdiction the equal protection of the

laws," without specifically calling out sex.  Indeed, courts did not interpret the Equal Protection

Clause to cover sex discrimination until the 1970s.[7]  Even now, courts analyzing a law

discriminating on the basis of sex apply only intermediate scrutiny, as opposed to strict scrutiny.

---

[6] *See* Vienna Convention on the Law of Treaties art. 18, May 23, 1969, 1155 U.N.T.S.
331.

[7] *See Reed v. Reed*, 404 U.S. 71, 75-77 (1971).

As discussed more fully below, this standard does not provide the same level of protection as an express constitutional provision guaranteeing equality for women and girls.  In contrast to the Fourteenth Amendment, the ERA would allow all women and girls to benefit from an express guarantee of equality, something the vast majority of nations already provide.

The United States' failure to include an express guarantee of equality on the basis of sex in its Constitution stands in contrast to the rest of the world.  Among the 193 U.N. member states, 85 percent explicitly guarantee equality or non-discrimination based on sex and/or gender in their constitutions.[8]  Only 16 other nations guarantee constitutional equality or non-discrimination to all citizens without expressly mentioning gender or sex.[9]

Indeed, recognizing the concrete harms caused by sex inequality, recently adopted constitutions worldwide have been nearly unanimous in guaranteeing equality on the basis of sex.[10]  Ninety-four percent of constitutions adopted since 1970 have included a constitutional guarantee of equality on the basis of sex, including all of those adopted since 2000.[11]  Many nations have also amended an older constitution and added guarantees of constitutional equality on the basis of sex, including France, Germany and Luxembourg.[12]

---

[8] JODY HEYMANN, ALETA SPRAGUE & AMY RAUB, ADVANCING EQUALITY 49 (2020).

[9] *Does the Constitution Explicitly Guarantee Equality or Non-Discrimination Across Sex and/or Gender?*, WORLD POLICY ANALYSIS CENTER, https://www.worldpolicycenter.org/data-tables/policy/does-the-constitution-explicitly-guarantee-equality-or-non-discrimination-across-sex-and-or-gender (last visited June 26, 2020).  These nations include: Belarus, Costa Rica, El Salvador, Indonesia, Ireland, Jordan, Latvia, Lebanon, Monaco, Norway, Seychelles, Singapore, Tonga, United Arab Emirates, Uruguay and Yemen.  *Id.*  In addition, certain nations have no constitutional guarantee of equality or non-discrimination, including: Australia, Bahamas, Barbados, Brunei, Denmark, Kiribati, Nauru and Saudi Arabia.  *Id.*

[10] *See* HEYMANN ET AL., *supra* note 8, at 50-51.

[11] *Id.*

[12] *Id.* at 58; Julie C. Suk, *An Equal Rights Amendment for the Twenty-First Century: Bringing Global Constitutionalism Home*, 28 YALE J.L. & FEMINISM 381, 385 (2017).

Perhaps recognizing that the United States' failure to adopt the ERA leaves its citizens[13] at a significant disadvantage, the government asserts in its motion to dismiss that it is sufficient that the states may address sex discrimination in their own constitutions.[14]  However, a patchwork of state-based action does not alter the reality that the United States is a global outlier. In most other countries in the world, a woman's rights do not depend on which part of the country she happens to reside in.  An American woman or girl should enjoy the same rights and protections whether she lives in Virginia or Illinois (which have passed state-level constitutional sex equality amendments) or Alabama, Louisiana, South Dakota, or Tennessee (which lack state-level constitutional sex equality guarantees and which have intervened in this lawsuit to block equal rights).  Moreover, given the pervasive nature of inequality, the failure of certain states to provide protections on the basis of sex undermines the efforts of states that do provide such protections.  For example, the failure of certain states to pass laws against female genital mutilation ("FGM") results in perpetrators of this harmful practice transporting girls from states

---

[13] The failure to adopt the ERA affects American men in addition to women.  For example, in *Nguyen v. INS*, 533 U.S. 53 (2001), the son of a United States citizen challenged federal law's requirement that an unwed father (but not an unwed mother) had to declare financial support in writing as a condition to giving citizenship to a child born abroad.  In November 2000, Equality Now and its partners around the world submitted an *amici curiae* brief asking the Court to consider international law, including the ICCPR, as well as customary international law and jurisprudence from other countries.  The Court held, however, that the law does not violate the equal protection guarantee of the United States Constitution.  *Id.* at 61-71.  In her dissenting opinion Justice O'Connor wrote "[i]ndeed, the majority's discussion may itself simply reflect the stereotype of male irresponsibility that is no more a basis for the validity of the classification than are stereotypes about the 'traditional' behavior patterns of women."  *Id.* at 94 (O'Connor, J. dissenting).  An explicit guarantee of equality in the Constitution would improve the United States' credibility as a defender of human rights, including nationality rights.

[14] *See* Def's Mot. Dismiss 10-11.

with protections to states that lack them.[15]  These harms are not theoretical. A constitutional mandate of equality, as recognized by the vast majority of countries around the world, is in fact an effective remedy to those harms. Simply put, based on the experience of the *amici*, the government's position that the existing patchwork of state-level protections demonstrates that plaintiffs have not suffered an injury is meritless.  Now that the ERA has been ratified, it is time for the United States to guarantee all its citizens the same rights on the basis of sex afforded to the majority of women and girls around the world.

> **B.     Constitutional sex equality provisions around the world have facilitated both the elimination of discriminatory laws and the implementation of affirmative measures to prevent discrimination and violence against women and girls.**

Constitutional guarantees of equality on the basis of sex have been effective in combating gender-based violence and discrimination.  These equality guarantees have eliminated many laws that discriminated against women and girls.  In addition, these provisions provide an avenue for the implementation of affirmative laws that prevent future discrimination and violence against women and girls.  While not providing a precise guide to how the ERA will impact United States law, these global examples provide insight into the types of protections that can be achieved through the ERA.

> *i.     Elimination of discriminatory laws*

Countries with constitutional guarantees of equality on the basis of sex have eliminated laws that historically discriminated against women and girls.  For example, constitutional sex equality provisions have helped identify and remove discriminatory provisions in marriage laws. The Court of Appeal in Tanzania recently upheld a decision finding the Law of Marriage Act,

---

[15] *See United States v. Nagarwala*, 350 F. Supp. 3d 613, 615-16 (E.D. Mich. 2018) (noting that victims subjected to FGM at a Michigan clinic had been brought from Minnesota and Illinois).

which allows girls of 15 to be married off with parental consent, while boys must be 18 years old, to be unconstitutional and in violation of Article 13 of Tanzania's Constitution, which guarantees equality on the basis of sex.[16]  Similarly, a marital rape exception to Nepal's criminal rape law was invalidated under Nepal's constitutional sex equality provision.[17]  And, over the past four decades, ten national supreme courts have relied on constitutional equality provisions to invalidate sex-based qualifications in national citizenship laws.[18]

In addition, constitutional guarantees of equality for women have enabled the elimination of laws that discriminated against pregnant women.  Germany's Constitutional Court relied on the country's gender equality provision to strike down laws that were insufficient to protect pregnant women from being fired.[19]  Also, the Court of Appeal in Botswana found that a regulation that required students to leave college if they became pregnant violated Botswana's constitutional provision prohibiting sex-based discrimination.[20]

---

[16] *Rebeca Z. Gyumi v. Attorney General*, Miscellaneous Civil Cause No. 5 of 2016 (HC), 1-2, 50-51, https://d3n8a8pro7vhmx.cloudfront.net/equalitynow/pages/1911/attachments/original /1571911712/20191023145222.pdf?1571911712.

[17] HEYMANN ET AL., *supra* note 8, at 48.

[18] *See Benner v. Canada (Sec'y of State)*, [1997] 1 S.C.R. 358, ¶ 10 (Can.); Saikō Saibansho [Sup. Ct.] June 6, 2008, Hei 6 (Gyo-Tsu) no. 135, 62 Saikō Saibansho Minji Hanreishū [Minshū] Majority § 2 (Japan) (translated at http://www.courts.go.jp/app/hanrei_en/ detail?id=955); Bundesverfassungsgericht (BverfG) (Federal Constitutional Court) May 21, 1974, 37 Entscheidungen des Bundesverfassungsgerichts [BVerfGE] 217 (Ger.); Corte Costituzionale, 28 Gennaio 1983, Giur. it. 1983, I, 91 (It.); Attorney General v. Unity Dow, (1992) 103 I.L.R. 128, 131 (Bots.); *Rattigan and Others v. Chief Immigration Officer*, 1995(2) SA 182 (ZS) (Zim.); *Meera Gurung v. Her Majesty's Gov't, Dep't of Central Immigration, Ministry of Home Affairs*, Dec'n No. 4858 2051, ¶ 14 (S. Ct. 1994) (Nepal); *Benin Constitutional Court Decision*, DCC 14-172 (Sept. 16, 2014); Romein v. Adv. General for Scotland, [2016] CSIH 24 (Scot.).

[19] Suk, *supra* note 12, at 410.

[20] LEGAL GROUNDS; REPRODUCTIVE AND SEXUAL RIGHTS IN AFRICAN COMMONWEALTH COURTS, CENTER FOR REPRODUCTIVE RIGHTS & INTERNATIONAL PROGRAMME ON REPRODUCTIVE AND SEXUAL HEALTH LAW AT THE UNIVERSITY OF TORONTO 58 (2005).

Nations have also been able to use constitutional provisions guaranteeing gender equality to strike down laws that reinforced unequal gender norms.  For instance, Germany used its constitutional provision to eliminate laws that promoted unequal familial roles, including a law permitting women, but not men, one paid holiday a month to do housework;[21] a provision that gave more weight to fathers in authority over children in the event of a disagreement with the mother;[22] and a law that treated the husband's name as the default name for a married couple.[23]

Countries' constitutional guarantees of equality for women have also allowed them to combat discrimination by private actors.  For example, the Constitutional Court in Colombia interpreted its constitutional provision to affirm a pilot's right to health coverage for her miscarriage.[24]

These examples demonstrate the positive impact that constitutional sex equality provisions have had in other countries.  The adoption of the ERA will have a similarly positive effect in the United States because, contrary to the government's curt dismissal of the idea that plaintiff states and their citizens have suffered harm, *see* Def's Mot. Dismiss 9-10, painful and systemic gender inequality exists in the United States.  A 2016 report by the United Nations Working Group on Discrimination against Women and Girls concluded that "women in the United States do not take their due place as citizens of the world's leading economy . . . . [W]omen are left behind in terms of international standards as regards their public and political

---

[21] HEYMANN ET AL., *supra* note 8, at 62.

[22] Suk, *supra* note 12, at 409.

[23] *Id.* at 410-11.

[24] HEYMANN ET AL., *supra* note 8, at 53.

representation, their economic and social rights and their health and safety protections."[25]  *Amici* reject the government's suggestion that a patchwork approach is sufficient to address this inequality.  Based on their experience and on the successes of constitutional sex equality provisions in countries such as Zimbabwe, Germany, Nepal and Botswana, *amici* submit that the ERA is necessary to rectify persisting gender inequality in the United States.

      ii.     *Affirmative measures to prevent discrimination*

Countries with constitutional guarantees of sex equality have used such guarantees not only to eliminate existing discriminatory laws, but also to implement laws that prevent future discrimination on the basis of sex.[26]  Constitutional authority to pass such laws is critical to ending sex discrimination and gender-based violence.

Germany and France have particularly strong track records of using their constitutional sex and/or gender equality provisions to advance new laws.  For instance, on the basis of Germany's constitutional gender equality provision, the German Constitutional Court upheld a new law providing "bonus" months of parental leave if a father took leave and creating entitlement to public daycare placement for any child older than 12 months, which it noted were measures designed to advance equal rights in practice.[27]  Similarly, France, relying on the "comprehensive gender equality statute" in its constitution, has implemented measures to reduce

---

[25] HUMAN RIGHTS COUNCIL, REPORT OF THE WORKING GROUP ON THE ISSUE OF DISCRIMINATION AGAINST WOMEN IN LAW AND IN PRACTICE ON ITS MISSION TO THE UNITED STATES OF AMERICA ¶ 84 (2016), https://www.refworld.org/docid/5800dd4a4.html [hereinafter HUMAN RIGHTS COUNCIL REPORT].  The report recommended that the United States adopt a constitutional sex equality amendment.  *Id.* ¶ 90(b).

[26] There are also countries that build explicit language into the constitutional amendment itself delineating specific protections.  *See* ISABEL LATZ ET AL., EQUAL RIGHTS FOR WOMEN AND GIRLS IN THE WORLD'S CONSTITUTIONS, WORLD POLICY ANALYSIS CENTER 6-13 (2014).

[27] Suk, *supra* note 12 at 416-17; HEYMANN ET AL., *supra* note 8, at 62-63.

the gender pay gap; reform parental leave to incentivize equal caregiving by fathers and mothers; provide aid to victims of violence against women; and institute gender balance rules in new institutional settings where they had not previously applied.[28]

Germany, France and other nations have used their constitutional gender equality provisions to advance legislation promoting equal access for men and women to public office and other positions of social and professional import.[29]  In addition, certain nations, including Spain[30] and Switzerland,[31] have used gender equality guarantees under the constitution to mandate wage equality requirements on employers.

    *iii.*    *The ERA's potential impact in the United States*

As demonstrated by the above examples, the ERA could provide women and girls in the United States with protections from discrimination that currently do not have a clear constitutional basis, including laws relating to child marriage, domestic violence, pregnancy discrimination and parental rights, among others.

Current provisions of the Constitution have been inadequate to protect these rights. Although the Equal Protection Clause applies to sex discrimination, the current constitutional review structure is insufficient to prevent sex discrimination.  Courts considering Equal Protection Clause challenges to laws alleged to discriminate on the basis of sex apply an

---

[28] Suk, *supra* note 12, at 429.

[29] *Id.* at 420-24, 429.

[30] David Díaz, et al., *Royal Decree-Law 6/2019, of 1 March, on Urgent Measures to Guarantee Equal Treatment and Opportunities for Women and Men in Employment and Occupation*, BAKER MCKENZIE https://f.datasrvr.com/fr1/619/23682/Igualdad_-_Alerta_-_PDF_Document_ENG.PDF (last visited June 27, 2020).

[31] *See Big Firms Required to Publish Gender Pay Gap in 2021*, SWISSINFO.CH (Aug. 21, 2019, 12:03 PM), https://www.swissinfo.ch/eng/gender-equality_firms-required-to-publish-gender-pay-gap-in-2021/45175268.

intermediate scrutiny standard, which requires the state defending the challenged law to show that the challenged discriminatory method is substantially related to important governmental objectives.[32]  By contrast, a state defending a classification based on categories such as race, religion and national origin must show that the classification is necessary or narrowly tailored to promote a compelling government interest in order to meet the strict scrutiny standard.[33]  The standard of review for laws that differentiate based on sex is more permissive, and less predictable, than the standard of review for laws that differentiate based on other traits.  One study found that the probability of success for a litigant alleging discrimination is only 47% under intermediate scrutiny; under strict scrutiny the probability of prevailing improves to 73%.  The study also highlighted the lack of predictability of the intermediate scrutiny standard (as opposed to the rational basis and strict scrutiny standards) and concluded that the indeterminacy of the intermediate scrutiny standard of review left considerable room for ideological impact.[34]  Moreover, courts applying intermediate scrutiny often analyze government interests in terms of whether the interest is in defense of an "archaic" gender stereotype about male versus female roles in society.[35]  "[I]t follows that present-day 'stereotypes' were once well-accepted truths that could be invoked to justify gender-based discrimination"; how those stereotypes are defined at any one time, or by any one person, can vary greatly.[36]  That intermediate scrutiny is both more permissive and more amorphous than strict scrutiny makes it easier for state and federal

---

[32] *United States v. Virginia*, 518 U.S. 515, 533 (1996).

[33] Richard H. Fallon, Jr., *Strict Judicial Scrutin*y, 54 UCLA L. REV. 1267, 1268 (2007).

[34]  Lee Epstein, Andrew D. Martin, Lisa Baldez & Tasina Nitzschke Nihiser, *Constitutional Sex Discrimination*, 1 TENN. J.L. & POL'Y 11, 49-50 (2004).

[35] *See* Lindsey Sacher, *From Stereotypes to Solid Ground: Reframing the Equal Protection Intermediate Scrutiny Standard and Its Application to Gender-Based College Admissions Policies*, 61 CASE W. RES. L. REV. 1411, 1421 (2011).

[36] *Id.*

governments to defend laws discriminating against women and girls, hindering the ability to achieve gender equality on a national basis.

Advocates have been forced to try to rely on other constitutional provisions, such as the Commerce Clause, to extend protections to women and girls against discrimination. However, current constitutional jurisprudence poses an obstacle to this approach. For example, the Eastern District of Michigan held that neither the Commerce Clause nor the Necessary and Proper Clause could support a federal law criminalizing FGM, ending the prosecution of a doctor for allegedly performing female genital mutilation on nine children.[37] The Supreme Court similarly invalidated the portion of the Violence Against Women Act of 1994 that provided a civil remedy for victims of gender-motivated violence on the basis that Congress lacked the authority to enact this provision under either the Commerce Clause or the Fourteenth Amendment.[38]

Tiers of scrutiny and commerce clause jurisprudence are not just legal concepts. They impact the day-to-day lives of women and girls in the United States. The limitations of intermediate scrutiny on laws that discriminate on the basis of sex has fostered continued human rights violations and has blocked Congress and the courts from taking crucial protective action. A young American girl should not have to fear FGM simply because she was born in one of the 12 states that have not yet criminalized this practice.[39] Nor should she be forced into child marriage in the 46 states that still allow marriage under the age of 18[40] in violation of

---

[37] *United States v. Nagarwala*, 350 F. Supp. 3d 613, 630-31 (E.D. Mich. 2018)

[38] *United States v. Morrison*, 529 U.S. 598, 617-18, 627 (2000).

[39] *See FGM Legislation by State*, AHA FOUNDATION, https://www.theahafoundation.org/female-genital-mutilation/fgm-legislation-by-state/ (last visited June 27, 2020).

[40] *See* MAKING PROGRESS, BUT STILL FALLING SHORT: A REPORT ON THE MOVEMENT TO END CHILD MARRIAGE IN AMERICA, TAHIRIH JUSTICE CENTER 1 (2020),
(….continued)

international law, or a polygamous marriage because her family happens to live in Utah, which recently downgraded bigamy from a felony to a mere infraction.[41] That the government's motion to dismiss instead insists that there is no injury in this case shows a complete disregard for the life-altering and detrimental sex-based discrimination, including violence, that too many people in the United States still face.

## II.   THE UNITED STATES IS REQUIRED TO ADOPT THE ERA TO COMPLY WITH ITS TREATY COMMITMENTS

### A.   The International Covenant on Civil and Political Rights is binding federal law and requires the United States to take all necessary measures, including passing a constitutional amendment to ensure sex equality.

On March 24, 1992, the United States Senate ratified the International Covenant on Civil and Political Rights ("ICCPR").[42] Thus, the ICCPR is "the supreme law of the land" in the United States.[43] Currently, the United States fails to comply with several key provisions of the ICCPR. These provisions require the United States to ensure equal enjoyment of civil and political rights and to take necessary steps to prevent sex discrimination and gender-based violence to ensure equal enjoyment of those rights. At a bare minimum, in order to comply with these commitments, which are binding under both international and federal law (and of which the government's motion to dismiss makes no mention), the United States must adopt a constitutional sex equality provision like the ERA.

---

(continued….)

https://www.tahirih.org/wp-content/uploads/2020/01/Reflection-Paper_Making-Progress-But-Still-Falling-Short_FINAL-with-map_May-13_2020.pdf.

[41] Harmeet Kaur, *Bigamy is no longer a felony in Utah*, CNN (May 12, 2020, 5:03 PM), https://www.cnn.com/2020/05/12/us/bigamy-decriminalized-utah-trnd/index.html.

[42] S.Rep No.102-23, 102d Cong., at 1 (1992).

[43] U.S. CONST. art. VI, cl. 2.

Article 2(1) of the ICCPR guarantees individuals a wide range of civil and political rights without discrimination on the basis of sex.[44]  Article 2 also states that, "[w]here not already provided for by existing legislative or other measures, each State Party to the [ICCPR] undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the [ICCPR], to adopt such laws or other measures as may be necessary to give effect to the rights recognized in the [ICCPR]."[45]  Article 3 of the ICCPR requires the United States to "ensure the equal right of men and women to the enjoyment of all civil and political rights set forth" in the treaty.[46]  Accordingly, the treaty requires the United States to "take all steps necessary, including the prohibition of discrimination on the ground of sex, to put an end to discriminatory actions."[47]  In addition to these two provisions, Article 26 of the ICCPR explicitly requires that "the law shall prohibit any discrimination" on the ground of sex.

Together, these provisions require the United States to adopt a constitutional sex equality amendment.  Sex equality is "not already provided for," in the United States Constitution.[48]  And as explained above in section I.B.iii, the intermediate scrutiny regime the United States currently uses to implement the Equal Protection Clause is woefully insufficient "to put an end to

---

[44] International Covenant on Civil and Political Rights, art. 2, Mar. 23, 1976,  99 U.N.T.S. 171. [hereinafter ICCPR].

[45] *Id.*

[46] *Id.* art. 3.

[47] *See* HUMAN RIGHTS COMMITTEE, GENERAL COMMENT NO. 28, EQUALITY OF RIGHTS BETWEEN MEN AND WOMEN (ARTICLE 3), U.N. DOC. CCPR/C/21/REV.1/ADD.10, ¶ 4 (Mar. 29, 2000).

[48] ICCPR, *supra* note 44, art. 2.  Indeed, Justice Scalia expressly stated that the Constitution does not prohibit discrimination on the basis of sex.  *See* S. Todd Rogers, *The Originalist*, Legally Speaking (Jan. 2011), https://podcast.uctv.tv/webdocuments/legally-speaking/11_01LegallySpeaking_Scalia.pdf (stating, in an interview, "Certainly the Constitution does not require discrimination on the basis of sex.  The only issue is whether it prohibits it.  It doesn't.  Nobody ever thought that that's what it meant.  Nobody ever voted for that.").

discriminatory actions."[49]  Nor do current statutes, such as Title VII, bring the United States into compliance with the ICCPR.  For example, in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011), the Supreme Court held that a group of female Wal-Mart employees alleging discrimination in pay and promotion practices in violation of Title VII could not proceed as a class, demonstrating the ineffectiveness of Title VII for addressing widespread gender discrimination.  Indeed, the Human Rights Committee, the United Nations treaty-monitoring body that oversees State party implementation of the ICCPR, has observed that "many [U.S.] federal laws which address sex-discrimination are limited in scope and restricted in implementation."[50]  The Committee thus recommended to the United States that it bring itself into compliance with the ICCPR by taking all steps "to ensure the equality of women before the law and equal protection of the law."  *Id.*  However, the United States' current constitutional doctrine is an obstacle to the passage of laws designed to rectify gender inequality.[51]

In its motion to dismiss, the government asserts that it is sufficient that states address sex discrimination in their own constitutions.  But a patchwork of state-level efforts does not satisfy the *United States'* obligations as a nation under the ICCPR, including the Article 26 requirement that the law shall guarantee to all persons equal and effective protection against discrimination.

---

[49] HUMAN RIGHTS COMMITTEE, GENERAL COMMENT NO. 28, EQUALITY OF RIGHTS BETWEEN MEN AND WOMEN (ARTICLE 3), U.N. DOC. CCPR/C/21/REV.1/ADD.10, ¶ 4 (Mar. 29, 2000).

[50] HUMAN RIGHTS COMMITTEE, CONCLUDING OBSERVATIONS OF THE HUMAN RIGHTS COMMITTEE, U.N. DOC. CCPR/C/USA/CO/3, ¶ 28 (Sept. 15, 2006).

[51] *See supra* Section I.B.iii.  In a recognition of these obstacles, the United Nations Working Group on Discrimination against Women and Girls recommended that the United States adopt a constitutional equal rights amendment.  *See* HUMAN RIGHTS COUNCIL REPORT, *supra* note 25, ¶¶ 23, 24 90(b).

Given the likelihood – indeed the established practice – of different levels of protection between states, reliance on state-level efforts cannot bring the United States into ICCPR compliance.

The United States must therefore address sex equality at a constitutional level by passing the ERA to comply with the requirements of the ICCPR.  A constitutional sex equality amendment that bolsters constitutional protection against sex discrimination and provides authorization for protective federal laws is a "necessary" step to eliminate sex discrimination and to ensure sex equality under the laws.[52]

**B.      The ERA is Necessary for the United States to Comply with its ICCPR Obligation to Take Further Measures to Prevent Sexual and Gender-based Violence and Discrimination.**

The ICCPR also guarantees citizens' rights to protection from sexual and gender-based violence ("SGBV") and discrimination.  Article 24 grants children the right to protections based on their minor status without discrimination as to sex.[53]  Article 7 bars "cruel, inhuman, or degrading treatment or punishment,"[54] a prohibition that encompasses violence against women and girls.[55]  Moreover, SGBV is a form of sex discrimination and implicates the anti-discrimination prohibitions of ICCPR Articles 2, 3 and 26.  ICCPR states that parties must take all "necessary steps" to eliminate gender-based violence.[56]

Together, these provisions require the United States to take measures to prevent gender-based violence, including, for example, FGM.  But current constitutional doctrine obstructs

---

[52] *See* ICCPR, *supra* note 44, art. 3.

[53] *Id.* art. 24.

[54] *Id.* art. 7.

[55] *See* Human Rights Committee, General Comment No. 28, Equality of Rights Between Men and Women (Article 3), U.N. Doc. CCPR/C/21/Rev.1/add.10, ¶ 11 (Mar. 29, 2000).

[56] ICCPR, *supra* note 44, art. 3.

Congress from taking such measures.[57]  Even existing federal statutes countenance harmful

practices—for example, the federal statutory rape law contains an exception for sexual acts

between married individuals, meaning that child marriage is a defense to statutory rape.[58]  A

constitutional amendment that would authorize strong statutory protections against gender-based

violence is necessary to remove obstacles to ICCPR compliance.  Without the ERA, the United

States fails to meet its ICCPR commitments.

III.   **THE UNITED STATES SHOULD ADOPT THE ERA TO COMPLY WITH INTERNATIONAL LAW AND HUMAN RIGHTS STANDARDS**

A.   **International law prohibits the United States from taking actions that would defeat the object and purpose of the Convention on the Elimination of All Forms of Discrimination against Women, a treaty which requires sex equality.**

The Convention on the Elimination of All Forms of Discrimination against Women

("CEDAW") is the chief global women's rights treaty.  Often termed "an international bill of

rights for women," CEDAW "defines what constitutes discrimination against women and sets up

an agenda for national action to end such discrimination."[59]  The U.N. General Assembly

adopted the treaty in 1979,[60] and it has come to represent the consensus of the international

community: 189 nations have ratified CEDAW.[61]  The United States is among only a small

---

[57] *See, e.g.*, *Morrison*, 529 U.S. at 602; *Nagarwala*, 350 F. Supp. 3d at 617-31.

[58] *See* 18 U.S.C. § 2243(c)(2).

[59] *Convention on the Elimination of All Forms of Discrimination against Women, Overview of the Convention*, United Nations, https://www.un.org/womenwatch/daw/cedaw/ (last updated Jan. 1, 2008).

[60] *Id.*

[61] *Convention on the Elimination of All Forms of Discrimination against Women*, United Nations Office of the High Commissioner for Human Rights, https://indicators.ohchr.org (last updated June 19, 2020).

handful of U.N. members and observers that have not ratified CEDAW (it is joined only by Iran, Niue, Palau, Somalia, Sudan, The Holy See and Tonga).[62]

Article 2 of CEDAW specifically calls for a gender equality provision in the Constitution.[63]  Although the Senate has yet to ratify CEDAW, President Jimmy Carter signed CEDAW on July 17, 1980.[64]  International law obliges States not to undermine the object or purpose of treaties they have signed, even if they have not yet ratified such treaties.[65]  Therefore, under international law, the United States has the obligation not to defeat the object and purpose of CEDAW. While international legal experts debate the precise scope of the object and purpose obligation, many commentators argue that the obligation requires signatories not to violate a

[62] *Id.*

[63] "States Parties condemn discrimination against women in all its forms, agree to pursue by all appropriate means and without delay a policy of eliminating discrimination against women and, to this end, undertake[ t]o embody the principle of the equality of men and women *in their national constitutions* or other appropriate legislation if not yet incorporated therein and to ensure, through law and other appropriate means, the practical realization of this principle." Convention on the Elimination of All Forms of Discrimination against Women art. 2(a), Dec. 18, 1979, 1249 U.N.T.S. 13 (emphasis added).

[64] *See Status of Treaties, Convention on the Elimination of All Forms of Discrimination Against Women*, UNITED NATIONS TREATY COLLECTION, https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-8&chapter=4&clang=_en (last modified June 28, 2020).

[65] *See* Vienna Convention on the Law of Treaties art. 18, May 23, 1969, 1155 U.N.T.S. 331 (Treaty signatories are "obliged to refrain from acts which would defeat the object and purpose" of the treaty.); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 312(3) (1987) ("Prior to the entry into force of an international agreement, a state that has signed the agreement or expressed its consent to be bound is obliged to refrain from acts that would defeat the object and purpose of the agreement.").  While the United States has not ratified the Vienna Convention, the United States has expressed the belief that it is nevertheless bound by the Convention because much of it, including Article 18, reflects customary international law. Curtis A. Bradley, *Unratified Treaties, Domestic Politics, and the U.S. Constitution*, 48 HARV. INT'L L.J. 307, 308, 314-15 (2008) (collecting sources).  The United States "recognizes the Convention as an authoritative guide to treaty interpretation."  Brief for the United States as Amicus Curiae Supporting Petitioner at 9 & n.6, *Abbott v. Abbott*, 560 U.S. 1 (2010) (No. 08-645).

treaty or its most important provisions.[66]  Reasoning that actions in violation of core treaty provisions are so inconsistent with a treaty that they defeat its object and purpose,[67] scholars and policymakers have maintained that the United States' former use of the death penalty for minors defeated the object and purpose of the signed but unratified Convention on the Rights of the Child as evidenced by that treaty's prohibition on the use of the death penalty for minors;[68] that testing nuclear weapons would violate the United States' object and purpose obligation under the signed but unratified Comprehensive Nuclear Test Ban Treaty;[69] and that any United States use of an indiscriminate weapon would defeat the object and purpose of the signed but unratified First Additional Protocol to the Geneva Conventions.[70]

The United States is not in compliance with CEDAW's core purpose, namely to foster a concerted, worldwide effort to "pursue by all appropriate means and without delay a policy of

---

[66] *See* Bradley, *supra* note 65, at 307-08, 315-16, 328-31.

[67] *See* Thomas Michael McDonnell, *Cluster Bombs over Kosovo: A Violation of International Law?*, 44 ARIZ. L. REV. 31, 107 (2002); *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 312 cmt. h(i) (1987) (suggesting that a weapons test with irreversible consequences would defeat the object and purpose of the Strategic Arms Limitation Treaty.).

[68] Connie De La Vega & Jennifer Fiore, *The Supreme Court of the United States Has Been Called Upon to Determine the Legality of the Juvenile Death Penalty in Michael Domingues v. State of Nevada*, 21 WHITTIER L. REV. 215, 224 (1999) ("[T]he United States is obligated to adhere to the object and purpose of the Convention on the Rights of the Child--the protection of youth, including the protection from the most severe harm that can come to them.").

[69] William J. Clinton, *Remarks by President Clinton at Press Conference on the Comprehensive Test Ban Treaty* (Oct. 14, 1999), http://www.fas.org/nuke/control/ctbt/text/101499clintonstatement.htm ("I signed that treaty, it still binds us unless I go, in effect, and erase our name -- unless the President does that and takes our name off, we are bound by it.").

[70] McDonnell, *supra* note 67, at 107 ("Using an indiscriminate weapon is arguably so inconsistent with the treaty as to defeat its object and purpose.").  *See* Bradley, *supra* note 65, at 315-16.

eliminating discrimination against women."[71]  Indeed, by failing to adopt the ERA, the United

States violates a core provision of CEDAW: the Article 2 directive to pursue the elimination of

discrimination by all means necessary including "undertak[ing]. . . [t]o embody the principle of

the equality of men and women *in their national constitutions* or other appropriate legislation if

not yet incorporated therein."[72]  The current legal regime in the United States, which reviews

laws that discriminate against women only under a permissive intermediate scrutiny standard and

imposes obstacles to the passage of legislation to protect women and girls from violence and

other forms of discrimination, is not sufficient to comply with Article 2 and undermines the core

CEDAW purpose of eliminating discrimination against women.  Contrary to the government's

assertions in its motion to dismiss, CEDAW's focus on nationwide action demonstrates the harm

of a patchwork, subnational approach: women and girls are left at the mercy of geography for

access to fundamental protections and rights.  Adoption of the ERA is necessary for the United

States to meet its obligation not to defeat the object and purpose of CEDAW.

> **B.     International treaties, customary international law and decisions of
>         international bodies consistently require sex equality.**

Adding to ICCPR's and CEDAW's clear expression of a global commitment to sex

equality, a broad array of other sources of international law including treaties, customary

international law and decisions of international tribunals evince a global recognition of sex

equality as a fundamental human right.

International agreements include the Universal Declaration of Human Rights, which was

adopted unanimously by all U.N. members including the United States in 1948 and provides that

---

[71] *See* Convention on the Elimination of All Forms of Discrimination against Women, art. 2, Dec. 18, 1979, 1249 U.N.T.S. 13.

[72] *Id.* (emphasis added).

"[e]veryone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind such as . . . sex."[73]  Similarly, the Convention on the Rights of the Child—which the United States has signed but not ratified, making it the only nation which has not ratified this Convention[74]—mandates that "States Parties shall respect and ensure the rights set forth in the present Convention to each child within their jurisdiction without discrimination of any kind, irrespective of the child's or his or her parent's or legal guardian's . . . sex."[75]  And the Beijing Declaration and Platform for Action from the Fourth World Conference on Women, which has been adopted by 189 member states including the United States, declared that "the eradication of all forms of discrimination on the grounds of sex are priority objectives of the international community."[76]  Most recently, in 2015, all governments, including the United States, adopted the Sustainable Development Goals, including Goal 5 (achieve gender equality and empower all women and girls) with a specific target of ending "all forms of discrimination against women and girls."[77]

Regional treaties, too, establish a commitment to sex equality.  The European Convention on Human Rights provides that "[t]he enjoyment of  . . . rights and freedoms . . . shall be secured without discrimination on any ground such as sex."[78]  The African Charter on Human and

---

[73] Universal Declaration of Human Rights, G.A. Res. 217A (III) at 71, U.N. Doc. A/218 (Dec. 10, 1948).

[74] *Convention on the Rights of the Child*, United Nations Office of the High Commissioner for Human Rights, https://indicators.ohchr.org (last updated June 19, 2020).

[75] Convention on the Rights of the Child, art. 2(1), Nov. 20, 1989, 1577 U.N.T.S. 3.

[76] Beijing Declaration and Platform for Action, U.N. Doc. A/CONF.177/20, Ch. II, ¶ 10 (Sept. 15, 1995).

[77] General Assembly, Transforming Our World: The 2030 Agenda for Sustainable Development, G.A. Res. 70/1, Goal 5, U.N. Doc. A/Res/70/1 (Oct. 21, 2015).

[78] European Convention on Human Rights, 213 U.N.T.S. 221, art. 14 (Nov. 4, 1950).

Peoples' Rights requires States to "ensure the elimination of every discrimination against women" and provides that "[a]ll people shall be equal; they shall enjoy the same respect and shall have the same rights."[79]  Likewise, the American Convention on Human Rights requires States parties to "undertake to . . . ensure to all persons subject to their jurisdiction the free and full exercise of those rights and freedoms, without any discrimination for reasons of . . . sex."[80]

Finally, international legal tribunals have echoed the consensus commitment to sex equality.  In *Abdulaziz, Cabales and Balkandali v. United Kingdom*, the European Court of Human Rights noted that "the advancement of the equality of the sexes is today a major goal."[81] In *María Isabel Véliz Franco et al.*, the Inter-American Commission on Human Rights relied on the statement of the United Nations Special Rapporteur on violence against women that customary international law obliges States to prevent and respond to acts of violence against women with due diligence.[82]  Additionally, in 2011, the Inter-American Commission on Human Rights found that the United States failed to protect Jessica Lenahan and her children—who, despite Lenahan's repeated requests that the police enforce a restraining order, were abducted and killed by Lenahan's abusive husband—in violation of the equality clause of the American

---

[79] African (Banjul) Charter on Human and Peoples' Rights, 1520 U.N.T.S. 217, arts. 18.3, 19 (June 27, 1981).  Additionally, the Protocol to the African Charter on Human and Peoples' Rights on the Rights of Women in Africa provides that, "States Parties shall combat all forms of discrimination against women through appropriate legislative… measures.  In this regard they shall . . . include in their national constitutions . . . . the principle of equality between women and men and ensure its effective application."  Protocol to the African Charter on Human and Peoples' Rights on the Rights of Women in Africa, art. 2.1(a) (July 1, 2003).

[80] American Convention on Human Rights, 1144 U.N.T.S. 143, art. 1(1) (Nov. 22, 1969).

[81] A94 Eur. Ct. H.R. at 83 (1985).

[82] Case 12,578, Inter-Am. Comm'n H.R., Report No. 170/11, ¶ 83 (2011).

Declaration of the Rights and Duties of Man.[83]  In yet another example, in *Women Against Violence and Exploitation in Society (WAVES) & CWS-L v. Republic of Sierra Leone*,[84] the Community Court of Justice of the Economic Community of West African States  found that Sierra Leone's ban on pregnant girls attending mainstream school was discriminatory and unlawful under the African Charter on Human and Peoples' Rights.

Given this overwhelming consensus of an international commitment to sex equality, sex and gender equality have attained the status of customary international law.[85]  Customary international law binds the United States.[86]  Adopting the ERA would be a significant step

---

[83] *Lenahan v. United States*, Case 12.626, Inter-Am. Comm'n H. R., Report No. 80/11 ¶ 162 (2011).

[84] No. ECW/CCJ/JUD/37/19, Court of Justice of the Economic Community of West African States (2020).

[85] *See* Catharine A. MacKinnon, *Creating International Law: Gender as Leading Edge*, 36 HARV. J. L. & GENDER 105, 118-19 n. 43 (2013) (noting a "building" "international consensus" that sex discrimination and gender crimes violate customary international law); Beate Rudolf & Andrea Eriksson, *Women's Rights Under International Human Rights Treaties: Issues of Rape, Domestic Slavery, Abortion, and Domestic Violence*, 5 INT'L J. CONST. L. 507, 524 (2007) (noting that states are bound to the principle of gender equality through customary international law); *see generally Al-Bihani v. Obama*, 619 F.3d 1, 13 n.2 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the denial of rehearing en banc) ("Customary international law is a kind of international common law; it is a body of rules and principles said to arise informally from the general and consistent practice of nations.") (citing RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 102(2) (1987)).

[86] *See The Paquete Habana*, 175 U.S. 677, 700 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction . . . ."); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 111 Reporters' Note 1 (1987) (referring to "[t]he President's authority and duty to take care that a principle of customary international be faithfully executed").  Accordingly, U.S. Presidents and executive branch officials have repeatedly proclaimed that certain rules, such as particular provisions of the United Nations Convention of the Law and the Sea, the Additional Protocol II to the 1949 Geneva Conventions, and the Vienna Convention on the Law of Treaties, reflect customary international law and bind the United States.  *See* Eric Talbot Jensen, *Presidential Pronouncements of Customary International Law as an Alternative to the Senate's Advice and Consent*, 2015 B.Y.U. L. REV. 1525, 1534-41 (2015); RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 306 Reporters' Note 1 (2018) (citing Counter-
(….continued)

toward aligning United States law with the overwhelming consensus of international law, which it has supported including through ratifying the ICCPR, signing CEDAW and adopting the Beijing Platform for Action and the Sustainable Development Goals.  The United States must no longer stand apart in failing its citizens by denying them the fundamental right to equality on the basis of sex in its Constitution.

## **CONCLUSION**

For the foregoing reasons, *amici* respectfully request that the Court deny the motion to dismiss and allow this case to proceed.

Respectfully submitted.

---

(continued….)

Memorial of the United States of America (Case Concerning Avena and Other Mexican Nationals) 67-68 & n.142 (Nov. 3, 2003)).

Dated:     June 29, 2020


/s/ Stefani Johnson Myrick                          Antonia Kirkland
Stefani Johnson Myrick (D.C. Bar 1032545)           Divya Srinivasan
*Counsel of record*                                 EQUALITY NOW
DAVIS POLK & WARDWELL LLP                            125 Maiden Lane
901 Fifteenth Street, N.W.                           9th Fl., Suite B
Washington, DC 20005                     New York, New York 10038
(202) 962-7165                                      (212) 586-0906
stefani.myrick@davispolk.com            akirkland@equalitynow.org


Amelia T.R. Starr
Margarita Clarens
Alexa B. Lutchen
Amanda Rae Schwarzenbart
Ben Jernigan
DAVIS POLK & WARDWELL LLP
450 Lexington Ave.
New York, New York 10017
(212) 450-4516
amelia.starr@davispolk.com

## APPENDIX

The **WORLD Policy Analysis Center** ("WORLD") is a non-partisan research institution based at the University of California, Los Angeles. WORLD analyzes globally comparative measures of constitutional rights, laws and policies in areas fundamental to equal opportunities, and uses this information to understand legal gaps, the impact of laws on outcomes and feasible approaches to strengthening protections. WORLD also examines whether countries have enacted laws to realize their commitments under the Universal Declaration of Human Rights, the Sustainable Development Goals, and a wide range of other UN, ILO and other global body treaties and agreements. WORLD has led a detailed analysis of equality provisions in the constitutions of all 193 UN Member States, which examines guarantees for equal rights not only on the basis of sex or gender, but also on the basis of pregnancy, marital and family status. In addition to constitutional protections, WORLD examines a wide range of laws and policies in all 193 countries in areas relevant to gender equality, equality of opportunity overall, work, health and education.

The **Latin American and Caribbean Committee for the Defense of Women's Rights** ("CLADEM"), founded in 1987, is a feminist regional network of individuals and non-governmental organizations based in Lima, Peru with affiliates in fifteen countries working for the full enjoyment of women's rights, based on principles of equality and non-discrimination, among others. CLADEM has had consultative status with the United Nations since 1995 and was authorized to take part in activities at the Organization of American States in 2002, and has had consultative status with UNESCO since 2009. CLADEM promotes the development and adoption of international and regional human rights instruments, and it holds governments accountable for the lack of implementation

of women's human rights standards by submitting reports as well as filing strategic litigation cases at the national and international levels. In March 2009, CLADEM was awarded the King of Spain Human Rights Prize and the Gruber Prize in 2010.

The **Equal Rights Trust** (the "Trust") is an independent international non-governmental organization, which exists to combat all forms of discrimination and ensure everyone can participate in society on an equal basis. The Trust works in partnership with civil society and lawyers to secure the adoption and implementation of equality laws. Members of the Trust's staff and board have extensive experience of engaging in litigation at the national, regional and international levels in relation to cases that raise important legal questions on equality or non-discrimination. In terms of the present case, the Trust has considerable expertise in the area of equality on the basis of sex, having acted as a third party intervenor or *amicus curiae* in relevant cases before the Committee on the Elimination of Discrimination against Women (see *Cretu v. Moldova*, No. 3564/11), the European Court of Human Rights (see among others, *Volodina v. Russia*, No. 41261/7) and the Inter-American Court of Human Rights (see *Gretel Artavia Murillo et al. ("In Vitro Fertilisation") v. Costa Rica*, Case No: 12.361).

The **European Women's Lobby ("EWL")**, founded in 1990, is the largest European umbrella network of women's associations representing a total of more than 2,000 organizations in the EU coming together to campaign for their common vision of a Feminist Europe. The EWL has members in 26 EU Member States, 3 Candidate Countries, the United Kingdom and Iceland, as well as 17 European-wide organizations representing the diversity of women and girls in Europe. Together with our members, we

aim to influence the general public and European Institutions in support of women's human rights and equality between women and men.

**FEMNET** - the African Women's Development and Communication Network - is a Pan-African, membership-based feminist network based in Nairobi with over 700 members across 46 African countries.  FEMNET envisions an African society where gender equality is achieved and women and girls enjoy all their rights and live in dignity. FEMNET exists to facilitate and coordinate the sharing of experiences, ideas, information and strategies for human rights promotion among African women's organizations through networking, communication, capacity-building and advocacy at the regional and international levels.

The **Arab Women Organization** ("AWO") is a women's rights organization working for promotion of the rights of women and girls with a membership network that includes 88 women's community based organizations (CBOs).  AWO has been working for gender equality and women's rights since 1970.

**International Women's Rights Action Watch Asia Pacific (IWRAW – Asia Pacific)** is an international non-governmental organization established in Kuala Lumpur, Malaysia, in 1993. IWRAW Asia Pacific works toward the progressive interpretation, implementation and realization of the human rights of women through the lens of the United Nations Convention on the Elimination Against All Forms of Discrimination Against Women (CEDAW Convention) and other international human rights treaties. IWRAW Asia Pacific promotes the domestic implementation of international human rights standards by building the capacity of women and human rights advocates to claim and realize women's human rights. The organization has worked consistently with the

CEDAW Convention and its Committee to support the recognition and enjoyment of women's human rights in national contexts, by facilitating the participation of women from national organizations in over 120 countries in the CEDAW review process.

The **Sisterhood is Global Institute** is an international feminist think-tank that was founded in 1984 by Robin Morgan, Simone de Beauvoir and women from 80 countries who pledged visionary yet pragmatic action in support of women's rights, freedoms and power. Among its many activities over the past 35 years, the Sisterhood is Global Institute pioneered the first Urgent Acton Alerts regarding women's rights; the first Global Campaign To Make Visible Women's Unpaid Labor In National Accounts; and the first Women's Rights Manuals For Muslim Societies. It currently hosts the Donor Direct Action Fund for Women, a project working to strengthen women's rights organizations around the world by increasing their access to financial resources, political leaders and public visibility. Donor Direct Action currently has 14 partner grantees around the world working in Afghanistan, the Democratic Republic of Congo, El Salvador, Kenya, Latvia, Libya, Nepal, Palestine, Peru, Somalia, Syria and South Africa.

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of June, 2020, I electronically filed the

foregoing document using the CM/ECF filing system.  Service was accomplished on the

CM/ECF system.

/s/ Stefani Johnson Myrick
DAVIS POLK & WARDWELL LLP
901 Fifteenth Street, N.W.
Washington, DC 20005
(202) 962-7165
stefani.myrick@davispolk.com

*Counsel for Equality Now, the
WORLD Policy Analysis Center, the
Latin American and Caribbean
Committee for the Defense of Women's
Rights, the Equal Rights Trust, the
European Women's Lobby, FEMNET,
the Arab Women Organization,
International Women's Rights Action
Watch Asia Pacific and the Sisterhood
is Global Institute*