IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMONWEALTH OF VIRGINIA, *et al.,*            )
                                               )
                        Plaintiffs,            )
                                               )
vs.                                            )        Case No. 1:20-cv-00242(RC)
                                               )
DAVID S. FERRIERO, in his official capacity as )
Archivist of the United States,                )
                                               )
                        Defendant,             )
                                               )
ALABAMA, *et al.*,                             )
                                               )
                        Intervenor Defendants. )
_____/

---

AMICUS BRIEF BY ORGANIZATIONS THAT ADVOCATED
ERA RATIFICATION IN VIRGINIA, ILLINOIS, & NEVADA
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

D. Patricia Wallace
D.C. Bar No. 888230375
The Wallace Law Firm PLC
2920 W. Broad Street #C13
Richmond, VA 23230
Tel: (804) 239-9160
E-Mail: wallace@twlawplc.com

Jon L. Mills, Stuart H. Singer, Vanessa
Tussey, & Ana Carolina Varela*
Fla. Bar Nos. 148286, 377325, 125147, &
0123069
Joshua D. Riley
D.C. Bar No. 1026900
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale Florida 33301
Tel: (954) 356-0011; Fax -0022
E-mail:ssinger, jmills, jriley, vtussey,
avarela, ftleserve@bsfllp.com
**Pro Hac Vice* Motions Pending

*Attorneys for Amici*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................... iv

INTRODUCTION ................................................................................................................ 1

INTEREST OF AMICI CURIAE ......................................................................................... 2

SUMMARY OF ARGUMENT ............................................................................................ 3

ARGUMENT ....................................................................................................................... 4

I. The Plaintiff States Have Article III Standing in their *Parens Patriae* Capacity to Compel the Archivist to Perform his Ministerial Duty to Publish the ERA as the Twenty-Eighth Amendment ....................................................................................................................... 4

    A. The Plaintiff States have Article III standing in their *Parens Patriae* capacity to secure observance of the Constitutional terms under which they participate in the federal system and to protect their residents' well-being. ..................................... 5

    B. The prudential standing concerns of the *Mellon* bar do not apply because the Plaintiff States are not usurping the Executive Branch's *Parens Patriae* role; the relief sought—saying what the law is—falls squarely to the judicial branch, and granting relief will not involve the court in the inner workings of a sister branch. 9

II. The Text of Article V Mandates Inclusion of the Twenty-Eighth Amendment in the U.S. Constitution ....................................................................................................................... 13

    A. Article V establishes the process to amend the Constitution and grants exclusive power to the States to ratify Amendments by stating that Amendments "shall be valid to All Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several states." ............................................... 14

    B. The Text of Article V contains no restrictions, conditions, or limitations on the authority of three-fourths of the several States to validate an Amendment that has been properly proposed ....................................................................................... 16

    C. The debates and stated intent of the Framers support and validate the States' power in the Amendment Process as written explicitly in the text of Article V .. 17

III. The Text of Article V Explicitly Grants Legislatures the Power to Ratify but Does Not Grant Authority to Rescind a Ratification ....................................................................... 18

    A. Past attempts to rescind ratifications have had no effect. ..................................... 18

B.    Allowing rescission of previous ratifications is not only contrary to the text of Article V but illogically creates a chaotic system that destabilizes the process for debate and evaluation by states that are considering ratification.......................... 19

CONCLUSION.................................................................................................................... 21

CERTIFICATE OF SERVICE ............................................................................................. 22

## **TABLE OF AUTHORITIES**

Page(s)

### **Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez,*
 458 U.S. 592 (1982) ............................................................................................... 5, 9

*Aziz v. Trump,*
 231 F. Supp. 3d 23 (E.D. Va. 2017) ........................................................................ 11

*Cohens v. Virginia,*
 19 U.S. 264 (1821) .................................................................................................. 11

*Commonwealth of Pennsylvania v. Kleppe,*
 533 F.2d 668 (D.C. Cir. 1976) .......................................................................... 12, 13

*Escoe v. Zerbst,*
 295 US 490 (1935) .................................................................................................. 14

*Gutierrez de Martinez v. Lamagno,*
 515 U.S. 417 (1995) ................................................................................................ 14

*Manitoba v. Bernhardt,*
 923 F.3d 173 (D.C. Cir. 2019) .................................................................... 9, 12, 13

*Marbury v. Madison,*
 5 U.S. 137 (1803) .................................................................................................... 11

*Martin v. Hunter's Lessee,*
 14 U.S. 304 (1816) .................................................................................................. 15

*Massachusetts v. Mellon,*
 262 U.S. 447 (1923) ..................................................................................... 9, 10, 11

*Md. People's Counsel v. FERC,*
 760 F.2d 318 (D.C. Cir. 1985) .............................................................................. 5, 9

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
 551 U.S. 644 (2007) ................................................................................................ 14

*State of Idaho v. Freeman,*
 529 F. Supp. 1107 (D. Idaho 1981) ......................................................................... 20

*United States v. Sprague,*
 282 U.S. 716 (1931) ................................................................................................ 13

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
    454 U.S. 464 (1982) ................................................................................................ 5

## Constitutional Provisions

U.S. Const., Art. V ................................................................................................ *passim*

## Statutes

1 U.S.C. 106b ........................................................................................................ 6

## Other Authorities

W.F. Dodd, *Amending the Federal Constitution*,
    30 YALE L.J. 321 (1921) .................................................................................. 19

Bryan Garner, *Shall We Abandon Shall?* YOUR VOICE ABA JOURNAL (Aug. 1, 2012) ................ 14

Leo Kanowitz & Marilyn Klinger, *Can a State Rescind Its Equal Rights Amendment
    Ratification: Who Decides and How*,
    28 HASTINGS L.J. 979 (1977) ............................................................................ 18

David Kyvig, *Explicit and Authentic Acts: Amending the U.S. Constitution, 1776-2015* ............ 19

The Federalist No. 39 (James Madison) .................................................................. 6, 20

The Federalist No. 85 (Alexander Hamilton) ................................................................ 15

Danaya C. Wright, *"Great Variety of Relevant Conditions, Political, Social and Economic": The
    Constitutionality of Congressional Deadlines on Amendment Proposals under Article V*,
    28 WM. & MARY BILL RTS. J. 45 (OCT. 2019) ...................................................... 18

The American Association of University Women (AAUW) of Greater Richmond, AAUW of Illinois, AAUW of Nevada, AAUW of Virginia, the Center for Common Ground, the Chicago Bar Association, the Chicago Foundation for Women, the Illinois State Bar Association, the Illinois Federation of Women's Business Clubs, Inc., Illinois NOW, the League of Women Voters of Virginia, The McIntosh Foundation, the National Women's Political Caucus of Virginia, Nevadans for the ERA, Nevada NOW, Rachel's Network, VAratifyERA, Virginia NOW, Virginia Poor People's Campaign, The Women's Bar Association of Illinois, Women Matter, and the YWCA Metropolitan Chicago (collectively, "Amici") oppose the Motion to Dismiss by Defendant David S. Ferriero (the "Archivist"), in his official capacity as the National Archivist, and state:

## **INTRODUCTION**

Every proposed amendment ratified by the legislatures of three-fourths of the States has been deemed "valid to all Intents and Purposes, as part of th[e U.S.] Constitution," notwithstanding attempts by some States to rescind their ratifications.  This historical and reliable amendment process was broken on January 27, 2020, when the National Archivist refused to publish the Twenty-Eighth Amendment, known as the Equal Rights Amendment, unless "directed by final court order." (D.E. 1 ¶ 62 (internal quotation marks and citation omitted)).

The Archivist now seeks to evade such final court order by arguing that Plaintiffs, the States of Virginia, Illinois, and Nevada (collectively, the "Plaintiff States"), have not suffered injury sufficient to confer Article III standing.  The Archivist's argument runs contrary to District of Columbia Circuit law, which recognizes that injury to a State's quasi-sovereign interest is sufficient to establish Article III standing.  Amici and their respective States have suffered and will continue to suffer actual injury unless the Plaintiff States vindicate their rights, on behalf of themselves and their residents, under the Constitution.

The Archivist must recognize the Equal Rights Amendment because the unambiguous text of Article V says that amendments "shall be valid to all Intents and Purposes, when ratified by the Legislatures of three fourths of the several States."

## INTEREST OF AMICI CURIAE

Amici curiae are non-partisan, non-governmental organizations that support inclusion of the Equal Rights Amendment in the Constitution.  Each endorsed or promoted ratification of the Equal Rights Amendment by the legislatures of the Plaintiff States, Virginia, Illinois, and Nevada. As such, Amici have a substantial interest in the Archivist's certification and publication of the Twenty-Eighth Amendment.  To summarize the longer descriptions of Amici as provided in their motion for leave to file an amicus brief:

Amici include the grassroots movements or umbrella organizations that brought together numerous organizations and individuals to advocate ratification of the Equal Rights Amendment and spent considerable time and effort in educating the public and legislators about the Amendment.  Included in this grouping are Nevadans for the ERA, the Illinois Federation of Business Women's Clubs, VAratifyERA, and Women Matter (of Virginia), all of whom were instrumental in achieving ratification by the legislatures of their respective states.

Several Amici are state or local affiliates or divisions of national organizations that have long advocated the Equal Rights Amendment.  The American Association of University Women (AAUW) of Nevada, Illinois, Virginia, and Greater Richmond view ratification as promoting their mission of advancing equity for women and girls and have spent considerable time and effort seeking ratification by their respective state legislatures.  Since its inception, NOW has focused on making the Equal Rights Amendment part of the Constitution, and NOW of Nevada, Illinois, and Virginia also spent considerable time and effort seeking ratification by their respective state

legislatures.  The <u>League of Women Voters of Virginia</u> likewise has advocated the Equal Rights Amendment since it was proposed, and its members devoted considerable time and effort to achieve ratification by the Virginia General Assembly.

Among Amici are local groups that support equal rights for women.  Members of the <u>Chicago Foundation for Women</u> and <u>YWCA Metropolitan Chicago</u> invested resources into seeking ratification of the Equal Rights Amendment by the Illinois legislature.  Members of the <u>National Women's Political Caucus of Virginia</u> donated significant time and energy toward Virginia's ratification.

Amici also include organizations that have long supported equal rights under the law and included advocacy for the Equal Rights Amendment as part of their larger missions over the last few years.  The <u>Illinois State Bar Association</u>, the <u>Chicago Bar Association</u>, and the <u>Women's Bar Association of Illinois</u> all invested time and effort in achieving ratification by that State.  The <u>Center for Common Ground</u> and the <u>Poor People's Campaign of Virginia</u>, both traditionally focused on protecting voters' rights, donated resources to achieving ratification in Virginia.

Among Amici, the largest financial donor has been the <u>McIntosh Foundation</u>, which awarded almost half a million dollars through its grant program to support ratification of the Equal Rights Amendment. More generally, <u>Rachel's Network</u> has supported ratification of the Equal Rights Amendment.

## <u>SUMMARY OF ARGUMENT</u>

The Plaintiff States have *parens patriae* standing to sue the Archivist.  Amici, whose members include residents of the States of Nevada, Illinois, and Virginia, support the role of the Plaintiff States as *parens patriae* in this matter.  Plaintiff States and their residents will suffer actual injury by the Archivist's failure to implement the clear textual mandate of Article V.  Where, as

here, a federal official's refusal to perform a ministerial function violates the States' authority under the Constitution, the States are entitled to vindicate their authority through the courts.

No amendment that has been ratified by the legislatures of three-fourths of the States has failed to become part of the Constitution.  The unambiguous text of Article V mandates that the Equal Rights Amendment, after ratification by the legislatures of three-fourths of the States, become the Twenty-Eighth Amendment to the United States Constitution.  Amici's straightforward interpretation of the text of Article V is that, upon final state action, an amendment automatically becomes part of the Constitution.  The language is clear that an amendment "shall be valid to all Intents and Purposes, when ratified by the Legislatures of three fourths of the several States."

An amendment has never been excluded from the Constitution because of a State's attempt to rescind its ratification.  The disavowal of New Jersey's and Ohio's efforts to rescind their ratifications of the Fourteenth Amendment in 1868 represents the rational and preponderant view of rescissions.  Allowing rescissions would upend the process, making it unpredictable and allowing one State to thwart the efforts of others to amend the Constitution.

## ARGUMENT

I.     **The Plaintiff States Have Article III Standing in their *Parens Patriae* Capacity to Compel the Archivist to Perform his Ministerial Duty to Publish the ERA as the Twenty-Eighth Amendment**

Comprised in large part of residents of the Plaintiff States, Amici are uniquely suited to show that the Plaintiff States have standing in their *parens patriae* capacity to secure observance of their rights within the federal system and protect the well-being of their residents.[1]  For the

---

[1] Amici believe that the Plaintiff States have suffered direct injury sufficient to confer Article III standing but defer to the States to make that argument.

following reasons and those provided in the Plaintiff States' briefs, the Court should find that the Plaintiff States have *parens patriae* standing.

> A.    *The Plaintiff States have Article III standing in their* Parens Patriae *capacity to secure observance of the Constitutional terms under which they participate in the federal system and to protect their residents' well-being.*

Contrary to the Archivist's arguments (DE 29-1 at pp. 8-11), the Plaintiff States have suffered and will continue to suffer actual, concrete injury sufficient to confer Article III standing. Of particular importance to Amici, the Plaintiff States are suffering these injuries in their *parens patriae* capacity, as representatives of their residents, including many members of Amici organizations.  Under District of Columbia Circuit precedent, injury to a state in its *parens patriae* capacity is sufficient to confer Article III standing.  *See Md. People's Counsel v. FERC*, 760 F.2d 318, 320 (D.C. Cir. 1985) (Scalia, J.) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982)) ("It is unquestionable that a state, in its *parens patriae* capacity, does qualify as 'personally . . . suffer[ing] some actual or threatened injury.'").  Because the Plaintiff States have been injured in their *parens patriae* capacity, they have Article III standing, and the Court should take jurisdiction.

To proceed as *parens patriae*, a state must assert an injury "to what has been characterized as a 'quasi-sovereign' interest."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 601 (1982).  Quasi-sovereign interests typically fall into one or both of two categories: (1) a State's interest in "securing observance of the terms under which it participates in the federal system" and (2) a State's interest in the general well-being of its residents.  *Id.* at 607-08.  When determining whether an interest is quasi-sovereign, courts should consider "whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers."  *Id.* at 607.  The Supreme Court has explicitly recognized that a State's interest "in securing residents from the harmful effects of discrimination" is quasi-sovereign.  *Id.* at 609.

Plaintiff States' interests here are clearly quasi-sovereign.  This action seeks to secure the terms under which the States participate in the federal system, specifically, the observance of the text of Article V of the Constitution.  As discussed further in Part II below, the text of Article V gives States the exclusive authority to determine whether an amendment becomes part of the Constitution.  It says: "Amendments . . . shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States[.]"  By operation of Article V, a proposed amendment automatically becomes part of the Constitution once ratified by the legislature of the last State necessary to reach the three-fourths threshold.  As the Archivist himself acknowledged in a letter to Congresswoman Carolyn Maloney, dated October 25, 2012, and attached as **Exhibit A**, the transition from proposed amendment to amendment is certain.  In that letter, the Archivist states: "Under the authority of [1 U.S.C. 106b], once [the National Archives and Records Administration] receives at least 38 state ratifications of a proposed Constitutional Amendment, NARA publishes the amendment along with a certification of the ratifications and it becomes part of the Constitution[.]"  The Federal Government has no Constitutional role in deciding whether an amendment should be ratified and, therefore, no part in deciding whether a proposed amendment is ultimately made part of the Constitution.  Further, the Executive Branch has no role whatsoever in the amendment process other than to publish the amendment along with a certification of the ratifications.  The Archivist's refusal to publish the Twenty-Eighth Amendment constitutes a breach of the States' authority under Article V.  His refusal constitutes an incursion into the quasi-sovereign powers of the States vis-à-vis the Federal Government and degrades the power of three-fourths of the States to bind the entire nation.[2]

---

[2] In Federalist No. 39, Madison described the amendment process as both national and federal. *See* Federalist No. 39 (James Madison), available at https://avalon.law.yale.edu/18th_century/fed39.asp.  According to Madison, the process is

Through this action, the Plaintiff States seek to remedy that breach and, by doing so, secure the terms under which they participate in the federal system.

The interests at stake here also fall in the second category of interests deemed quasi-sovereign: States' interest in their residents' well-being.  Not only the States but also their residents have an interest in securing observance of Article V of the Constitution.  Amici's work in achieving their States' ratification of the Twenty-Eighth Amendment perfectly illustrates this point.  Amici invested considerable time, energy, professional skills, or funds in the campaigns to ratify the Equal Rights Amendment.  The Archivist, by refusing to publish the Twenty-Eighth Amendment, has single-handedly destroyed the value of Amici's labor and the campaign work of other residents of Plaintiff States.  Prospectively, the Archivist's failure to perform his statutorily mandated ministerial duty effectively destroys the voice of citizens in the democratic process.  If he is allowed to pick and choose which amendments to publish, as he has done with the Twenty-Eighth Amendment, he eliminates the decision-making authority Article V assigns to the State legislatures and, consequently, renders nugatory the voices of the people who elect legislators.

Plaintiff States also have a quasi-sovereign interest in protecting their residents against the harmful effects of discrimination.  Plaintiff States ratified the Equal Rights Amendment as a national remedy against the harmful effects of sex discrimination.  Without the Twenty-Eighth Amendment, Plaintiff States' protections extend only to their borders.  Residents are not protected when they leave Plaintiff States or enter federal facilities, such as military bases within their States, and there is no affirmation in the United States' foundational document that discrimination on account of sex is illegal.  No number of state laws, state constitutional provisions, or even federal

---

national because three-fourths of the States could bind the entire nation.  Conversely, the process is federal because Article V designates a proportion of the States, not a proportion of citizens generally, needed to effect amendment.

laws can express the importance of equality to the United States in the way that an amendment to the Constitution does.  Where the Twenty-Eighth Amendment is treated as a valid part of the Constitution, it will be an effective tool against discrimination.  Where the Amendment's validity is doubted, however, States and the Federal Government may not begin to bring themselves into compliance with its mandate against sex discrimination.  These States and the Federal Government will use the Archivist's failure to publish the Twenty-Eighth Amendment as an excuse for not complying with the Twenty-Eighth Amendment.  By seeking to remove any doubt as to the status of the Twenty-Eighth Amendment, the Plaintiff States are vindicating their quasi-sovereign interest in ending the harmful effects of discrimination.

That the interests pursued by the Plaintiff States are quasi-sovereign is corroborated by the fact that the injury—the harmful effects of discrimination on account of sex—is one that the States would attempt to address through their sovereign lawmaking powers.  Plaintiff States, acting through their sovereign legislative powers, ratified the Equal Rights Amendment as one way to diminish the harmful effects of sex discrimination.  Through their sovereign powers, the Plaintiff States of Virginia and Illinois have added equal rights amendments to their constitutions, and Nevada could.  (D.E. 29-1 at pp.10-11).  The interests at stake here are quasi-sovereign because the injuries are ones that the Plaintiff States' legislatures have addressed or have the authority to address through their sovereign lawmaking powers.

For these reasons, the Court should hold that the Plaintiff States' injuries are sufficient to confer Article III standing.

B.    *The prudential standing concerns of the* Mellon *bar do not apply because the Plaintiff States are not usurping the Executive Branch's* Parens Patriae *role; the relief sought—saying what the law is—falls squarely to the judicial branch, and granting relief will not involve the court in the inner workings of a sister branch*

Although, as here, injury to a State's quasi-sovereign interests satisfies Article III, a State cannot ordinarily bring a *parens patriae* suit against the federal government to protect its residents from the operation of federal statutes. *See Massachusetts v. Mellon*, 262 U.S. 447, 485-86. (1923). This limitation "speaks to prudential, not Article III, standing." *Manitoba v. Bernhardt*, 923 F.3d 173, 180 (D.C. Cir. 2019); *see also Md. People's Counsel*, 760 F.2d at 321-22.  Its purpose is "to prevent a State from encroaching on the federal government's power." *Manitoba*, 923 F.3d at 180. Courts, including the District of Columbia Circuit, have derived from *Mellon* a general rule barring State *parens patriae* suits against the Federal Government.  *See id.*at 176 (quoting *Snapp*, 458 U.S. 592, 610 n.16).  This general rule, however, does not apply here because (1) the Plaintiff States are not usurping the Federal Government's *parens patriae* role, (2) the relief sought falls squarely within the province of the Judicial Branch, and (3) granting the requested relief will not involve the Court in the inner workings of the Executive Branch.

The chief concern of the *Mellon* Court was "protecting the powers of the federal government vis-à-vis the states," specifically, preventing States from usurping the Federal Government's *parens patriae* role.  *Md. People's Counsel*, 760 F.2d at 321.  In *Mellon*, the Commonwealth of Massachusetts, in its *parens patriae* capacity, sought to declare unconstitutional a federal statute called the Maternity Act.  Congress and the Senate, including the representatives from Massachusetts, and the President of the United States—all accountable to the citizens of Massachusetts—participated in making the Maternity Act a federal law.  If citizens of Massachusetts were unhappy with the Act, their remedy lay in the democratic processes of lobbying their representatives or voting them out of office.  Notwithstanding the availability of

this remedy, Massachusetts in its *parens patriae* capacity sued the Federal Government.  In other words, the State was attempting to use an Article III Court to usurp the power of Congress and the President in their capacities as representatives of all U.S. citizens, including those of Massachusetts.  By doing so, Massachusetts invaded the relationship between its citizens and the Federal Government and encroached on the Federal Government's powers.  The Supreme Court held that the Commonwealth of Massachusetts was prohibited from challenging an act of Congress.  *See Mellon*, 262 U.S. at 485.  The Court's reasoning was obvious: because citizens of a State are also citizens of the United States, "[i]t cannot be conceded that a State, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof." *Id.*

The Plaintiff States here are not attempting to usurp the *parens patriae* role of the Federal Government.  Unlike the circumstances before the Court in *Mellon*, the Plaintiff States are not challenging an action the Constitution assigns to the representative branches of the Federal Government.  The residents of the Plaintiff States have no remedy through the democratic processes of lobbying and voting their federal representatives out of office.  Here, their only remedy is the Plaintiff States' lawsuit on their behalf.  Moreover, the Federal Government has suffered no injury that would allow it to step in as *parens patriae* to vindicate the rights of its citizens under Article V.  Neither Congress nor the Executive Branch has a role in the ratification process.  Solely the States have the power to ratify a proposed amendment, and, therefore, solely the States have the power and duty to protect their residents in connection with the ratification process.  This lawsuit does not diminish federal power: there was no federal power in the ratification process that could be diminished.

The Plaintiff States' challenge to the Archivist's refusal to publish the Twenty-Eighth Amendment falls within the type of action the *Mellon* Court contemplated as falling outside the general proscription against States, in their *parens patriae* capacity, suing the Federal Government. In *Mellon*, the Court drew a distinction between challenging the constitutionality of a statute, like the suit before it, from challenging the enforcement of such a statute. *See id.* (observing that the Court "need not go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress"). Elsewhere in its decision, the Court noted that it was "not now speaking of the merely ministerial duties of officials." *Id.* at 488. This distinction makes sense and explains why the Eastern District of Virginia held that the State in its *parens patriae* capacity had standing to sue the President to challenge the Constitutionality of an Executive Order. *See Aziz v. Trump*, 231 F. Supp. 3d 23 (E.D. Va. 2017). The case for allowing the Plaintiff States to proceed *parens patriae* is even more compelling here than it was in *Aziz*. In *Aziz*, the plaintiff was challenging the constitutionality of an Executive Order promulgated by an elected official. Here, by contrast, the Plaintiff States seek an order directing an Executive Branch official to perform the ministerial task of publishing the Twenty-Eighth Amendment.

The Plaintiff States seek to have the Court declare what the law is, a function squarely within the province of the Judicial Branch. *See Marbury v. Madison*, 5 U.S. 137 (1803); *Cohens v. Virginia*, 19 U.S. 264, 404 (1821) (Marshall, J.) (observing, "[w]e have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given"). If the Court concludes that the Equal Rights Amendment is, in the words of Article V, "valid to all Intents and Purposes, as Part of th[e] Constitution," then the Archivist must perform his statutorily mandated duty of publishing the Twenty-Eighth Amendment. If the Court concludes that the Equal Rights

Amendment is not "valid to all Intents and Purposes, as Part of th[e] Constitution," then the Archivist has no duty to publish it.

By contrast, if the Court does not take jurisdiction, it is allowing the Executive Branch to usurp the Judicial Branch's role of saying what the law is. As the Archivist explains in his Memorandum, the Department of Justice Office of Legal Counsel issued its interpretation of Article V, and in reliance on that opinion, the Archivist refuses to perform the ministerial duty of publishing the Twenty-Eighth Amendment. (D.E. 29-1 at p.1). If this matter ends there, the Executive Branch will have not only intruded into the Constitutional amendment process, where it has no authority, but also invaded the province of the Courts.

The Court's granting the relief requested by the Plaintiff States will not involve it in the inner workings of the Executive Branch. The relief sought here, to declare what the law is and direct compliance with it, distinguishes this suit from the District of Columbia Circuit cases cited by the Archivist. *See Manitoba*, 923 F.3d 173; *Commonwealth of Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976). In *Manitoba*, Missouri sued the federal Bureau of Reclamation to challenge that agency's Environmental Impact Statements on the grounds that they "'did not properly account for cumulative effects of water withdrawal from the Missouri River.'" *Manitoba*, 923 F.3d at 177. If the Court took jurisdiction over Missouri's complaint, it would necessarily have involved itself in the discretionary decision-making of the Bureau of Reclamation. Similarly, had the Court in *Kleppe* accepted jurisdiction, it would have deeply involved itself in second-guessing a federal agency in its operation and risked substituting the Court's judgment for that of the Small Business Administration. In *Kleppe*, the Commonwealth of Pennsylvania challenged the SBA's classification of specific areas ravaged by Hurricane Agnes and sought to have the district court force the SBA into continuing its work. *Kleppe*, 533 F.2d at 679. The Circuit Court

affirmed dismissal in part because the state's claims "would take us very far into the internal workings of a federal agency." *Id.* at 680.  Unlike the situations before the court in *Manitoba* and *Kleppe*, which both involved the inner workings and decision-making of the defending federal agencies, the Plaintiff States here simply ask the Court to interpret Article V and issue an order, based on that interpretation, to direct the Archivist to publish the Twenty-Eighth Amendment.  The issues before the Court do not involve it in the inner workings of a sister branch.

For these reasons, the Court should hold that the prudential considerations of the *Mellon* bar do not apply to the Plaintiff States' claims.

## II.     The Text of Article V Mandates Inclusion of the Twenty-Eighth Amendment in the U.S. Constitution

Whenever a proposed amendment has been ratified by the legislatures of three-fourths of the States, in accordance with Article V of the Constitution, it has *always* become "valid to all Intents and Purposes, as Part of th[e] Constitution."  The Equal Rights Amendment should be treated no differently.

In *United States v. Sprague*, 282 U.S. 716, 730 (1931), the Court found Article V to be "clear in statement and in meaning" and without any ambiguity.  *Id.* at 730.  Accordingly, the Court must interpret Article V as it is "understood by the voters; [as] its words and phrases [are] used in their normal and ordinary as distinguished from technical meaning; where the intention is clear there is no room for construction and no excuse for interpolation or addition."  *Id.* at 731.  If we adhere to the instructions of *Sprague*, the Equal Rights Amendment became the Twenty-Eighth Amendment on January 27, 2020, when it was ratified by the last State necessary to achieve approval by the legislatures of three-fourths of the States.  The text of Article V mandates that a

proposed amendment automatically become valid as part of the Constitution once ratified by the requisite number of States.[3]

> A.  *Article V establishes the process to amend the Constitution and grants exclusive power to the States to ratify Amendments by stating that Amendments "*shall be valid *to All Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several states."*

Article V states that "Amendments . . . *shall* be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States." (emphasis added).  If we give the word "shall" its ordinary meaning, Article V guarantees that a proposed amendment becomes part of the Constitution automatically once ratified by the legislature of the last State necessary to reach the three-fourths threshold, currently 38 of the 50 States.  As commonly used today, "shall" expresses "what is mandatory."  *See Shall*, Merriam-Webster, available at <https://www.merriam-webster.com/dictionary/shall>.   Attorneys and courts likewise treat "shall" as expressing command.  For example, *Black's Law Dictionary*, ninth edition, offers five meanings for "shall," but only the mandatory sense of the word is what "drafters typically intend and . . . courts typically uphold."  Bryan Garner, *Shall We Abandon Shall?* YOUR VOICE ABA JOURNAL (Aug. 1, 2012).  No less a source than the Supreme Court confirms that "shall" typically expresses command.  *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661 (2007) (collecting cases and explaining, where statute used "shall," it was "by its terms . . . mandatory"); *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) (noting that "'shall' generally means 'must'"); *Escoe v. Zerbst*, 295 US 490, 493 (1935) (observing that

---

[3] Notably absent from Article V is any authorization to impose additional obstacles on the amendment process—including deadlines to ratification.  Anticipating that the Plaintiff States will thoroughly address the argument that Article V impliedly authorizes Congress to impose deadlines, Amici are limiting their focus here to the text of Article V and their understanding of its meaning.

"shall" is "language of command"); *Martin v. Hunter's Lessee*, 14 U.S. 304, 314 (1816) ("The word *shall*, is a sign of the future tense, and implies an imperative mandate, obligatory upon those to whom it is addressed.") (emphasis in original).

The Framers also understood that "shall" in Article V expressed command. Contending that "shall" was mandatory, Alexander Hamilton argued that a different clause in Article V required Congress to call a constitutional convention if so requested by the requisite number of States. Hamilton defined "shall" in Federalist No. 85:

> By the fifth article of the plan, the congress will be obliged . . . to call a convention for proposing amendments. . . . The words of this article are peremptory. The Congress "shall call a convention." Nothing in this particular is left to the discretion of that body. . . . We may safely rely on the disposition of the state legislatures to erect barriers against the encroachments of the national authority.

*The Federalist Papers No. 85*, The Avalon Project at Yale Law School, *available at* <https://avalon.law.yale.edu/18th_century/fed85.asp>.

Whether interpreted as we do today or as the Founders did in the late eighteenth century, the clause, "Amendments . . . *shall* be valid to all Intents and Purposes, as part of this Constitution, when ratified by the Legislatures of three fourths of the several States" leaves no room for discretion. Just as the Founders and the original ratifying States could "safely rely" on "shall" as obliging Congress to call a convention, Amici and others today should be able to "safely rely" on "shall" as mandating the addition of the Twenty-Eighth Amendment to the Constitution. Article V leaves nothing to the discretion of Congress or, for that matter, the Executive Branch, which is not even mentioned. Because "shall" means "shall," the Equal Rights Amendment, ratified by the legislatures of three-fourths of the States, is the Twenty-Eighth Amendment to the Constitution.

Case No. 1:20-CV-00242(RC)

B.   *The Text of Article V contains no restrictions, conditions, or limitations on the authority of three-fourths of the several States to validate an Amendment that has been properly proposed*

Any doubt that "shall" requires inclusion of the Twenty-Eighth Amendment to the Constitution is dispelled by recourse to the complete text of Article V.  Article V states in its entirety:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

This text makes clear that there are only two actors in the amendment process: Congress and the States.  The role of each is explicitly defined. Congress has the power to propose amendments, call a convention upon the application of the legislatures of two-thirds of the States, and propose the mode of ratification.  The States may require Congress to call a Convention, and only the States have the power to accept or reject any proposed amendment.  Article V speaks of no other powers.

It is so unambiguous that the powers it grants can be summarized in a short chart:

| Power | Congress | States | Executive Branch |
|---|---|---|---|
| Propose amendments | ✓ | ◯ | ◯ |
| Call a convention to propose amendments | ✓ | ◯ | ◯ |
| Apply for a convention | ◯ | ✓ | ◯ |
| Ratify a proposed amendment | ◯ | ✓ | ◯ |
| Propose the mode of ratification | ✓ | ◯ | ◯ |
| Any other power | ◯ | ◯ | ◯ |

The impact of the States' exercising these powers is certain: ratification by legislatures of three-fourths of the States requires that the Amendment "be valid to all Intents and Purposes, as part of this Constitution." State legislatures, not Congress and certainly not the Executive Branch, have the power to add or decline to add a proposed amendment to the Constitution. Because legislatures of three-fourths of the States have ratified the Equal Rights Amendment, it is the Twenty-Eighth Amendment to the Constitution.

> C.    *The debates and stated intent of the Framers support and validate the States'*
> *power in the Amendment Process as written explicitly in the text of Article V*

We do not need to go further than the plain language of Article V to know that an amendment, once ratified by the legislatures of three-fourths of the States, is valid as part of the Constitution. If we do look behind the text, though, we see that this reading comports with what we know of the Framers' intent and embodies one of the many compromises reached to secure ratification of the Constitution.

That Congress had any role in the amendment process came about by virtue of a compromise among the delegates to the Constitutional Convention, which began in Philadelphia on May 25, 1787. During the first week of the Convention, Edmund Randolph presented the Virginia Plan, which was drafted by fellow Virginian James Madison. After cataloging several defects of the Articles of Confederation, Randolph offered 15 resolutions, including the following regarding amendment:

> Resd. [Resolved] that provision ought to be made for the amendment of the Articles of Union whensoever it shall seem necessary, and that the assent of the National Legislature ought *not* to be required thereto.

*Madison Debates May 29*, The Avalon Project at Yale Law School, *available at* <hhttps://avalon.law.yale.edu/18th_century/debates_529.asp> (emphasis added). The Virginians did not want the national government to have any role in the amendment process. Virginia's Anti-

Federalists feared the national government would hoard or use its amendment power to maintain or increase its power at the expense of the States' sovereignty.  *See* Danaya C. Wright, *"Great Variety of Relevant Conditions, Political, Social and Economic": The Constitutionality of Congressional Deadlines on Amendment Proposals under Article V*, 28 WM. & MARY BILL RTS. J. 45, 60-61 (Oct. 2019).  Alexander Hamilton and other Federalists, by contrast, feared that the national government would perceive problems in the Constitution but not be able to convince States to propose the necessary changes.  A compromise was reached.  *See id.*  The power to propose amendments was given to Congress, but, as discussed above, the States retained the power to insist on a constitutional convention, and, most importantly for our purposes, the States retained the exclusive power to approve proposed amendments.

Undermining States' power to ratify by refusing to publish the Twenty-Eighth Amendment goes against the plain language of Article V, which makes such power absolute and irreversible. The Court should deny Defendant's Motion to Dismiss and direct him to comply with the Constitution and his statutory duties.

### III.     The Text of Article V Explicitly Grants Legislatures the Power to Ratify but Does Not Grant Authority to Rescind a Ratification

The Archivist seeks to avoid the issue of whether States have the power to rescind their ratifications of the Equal Rights Amendment.  The text of Article V gives States no such power, and States' prior attempts to retract a ratification have been summarily ignored.

###### A.      *Past attempts to rescind ratifications have had no effect.*

States' attempts to rescind their ratifications of the Fourteenth, Fifteenth, and Nineteenth Amendments had no force.  These amendments became valid as part of the Constitution upon ratification by the legislature of the last State necessary to reach the three-fourths threshold, counting all States that had ratified, even those that had attempted to rescind ratification.  *See* Leo

Kanowitz & Marilyn Klinger, *Can a State Rescind Its Equal Rights Amendment Ratification: Who Decides and How*, 28 HASTINGS L.J. 979, 999-1000 (1977).  When the Fourteenth Amendment was presented to the States in 1866, amendment required ratification by the legislatures of twenty-eight states.  By June 15, 1867, twenty-two of the needed States had ratified it, including Ohio and New Jersey.  Before any other State ratified the amendment, Ohio and New Jersey attempted to rescind their ratifications.  By July 9, 1868, six more States had ratified the Fourteenth Amendment, bringing the total number of ratifications, if Ohio and New Jersey were included, to the necessary twenty-eight.  Congress and the Secretary of State disregarded Ohio and New Jersey's attempts to rescind their approval and confirmed adoption of the amendment effective July 9, 1868.  *See* W. F. Dodd, *Amending the Federal Constitution*, 30 YALE L.J. 321, 346 (1921).[4]  Attempted rescissions of later proposed amendments met similar fates.  In 1869, New York attempted to rescind its ratification of the Fifteenth Amendment.  *See id.*  Nonetheless, it was deemed a ratifying state.  *See id*.  In 1920, Tennessee attempted to rescind the Nineteenth Amendment, but the Secretary of State promulgated it with no question directed to Congress.  *See* David Kyvig, *Explicit and Authentic Acts: Amending the U.S. Constitution, 1776-2015* at 182, 1000 (1996): 16 Stat. 1131 (1870).

> B.    *Allowing rescission of previous ratifications is not only contrary to the text of Article V but illogically creates a chaotic system that destabilizes the process for debate and evaluation by states that are considering ratification.*

As discussed above, Article V vests the States with the exclusive power to ratify proposed amendments, and once the legislatures of three-fourths of the States have ratified an amendment, it automatically becomes "valid to all Intents and Purposes, as Part of th[e] Constitution."  There

---

[4] Until 1950, the Secretary of State was responsible for certifying amendments.  *See* National Archives and Records Administration, *Constitutional Amendment Process*, available at <https://www.archives.gov/federal-register/constitution>.

is no room in this design for States to rescind.  Once a State legislative body has ratified an amendment pursuant to Article V, its constitutional role is complete.[5]

An implied power to rescind ratifications is simply unmanageable, and it would weaken the democratic process.  The mere possibility of rescission would discourage later ratifications altogether.  Legislators and citizens, like those who participated in Amici's ratification efforts, would not be able to rely on the finality of ratification.  Where legislators and citizens cannot rely on prior ratifications, they cannot calculate whether to invest time, capital, and good will into advocating ratification of an amendment.  If a State can rescind its ratification at any moment and upset the entire national process, there would be little point in working toward amending the Constitution.   Allowing rescissions would be at odds with the "national" nature of amendment[6] because an implied power of rescission would grant a few calculating States the power to exert tyrannical control over the entire amendment process by timing their ratifications and subsequent rescissions.

This does not leave States without recourse.  Should a State regret its approval of an amendment, its remedy is ratifying a subsequent, corrective amendment.  We saw this with the Prohibition Amendment.  On January 16, 1919, the final State necessary to complete the amendment process ratified the Prohibition Amendment, and it immediately became the Eighteenth Amendment.  Within less than five years, the United States and the States recognized

---

[5] Inconsistent with the unambiguous text of Article V and the Framers' design, an Idaho district court read Article V as implying that States had the power to rescind ratification if done prior to ratification by three-fourths of the states.  *See State of Idaho v. Freeman*, 529 F. Supp. 1107, 1150 (D. Idaho 1981) (vacated as moot and remanded for dismissal, 459 U.S. 809 (1982)).  This case is inconsistent with the text of Article V and the history of attempted rescissions of prior ratifications.

[6] *See* Federalist No. 39, discussed above at note 2.

their mistake.  On December 5, 1933, upon ratification by the legislatures of three-fourths of the States, the Twenty-First Amendment repealed the Prohibition Amendment.

To permit a single State to undermine its sister States' power to ratify violates the balance of power among the States and the Federal Government, and it denies States the benefit of the bargain they struck when joining the Union.  The Court should deny Defendant's Motion to Dismiss and direct him to comply with the Constitution and his statutory duties.

## **CONCLUSION**

For these reasons and those argued by the Plaintiff States, the Court should deny Defendant's Motion to Dismiss the Complaint.

Respectfully submitted,

<table>
<tr>
<td>

/s/ D. Patricia Wallace
D. Patricia Wallace
D.C. Bar No. 888230375
**The Wallace Law Firm PLC**
2920 W. Broad Street #C13
Richmond, VA 23230
Tel: (804) 239-9160
E-Mail: wallace@twlawplc.com

</td>
<td>

**BOIES SCHILLER FLEXNER LLP**
Jon L. Mills, Esq.*
(Florida Bar No. 148286)
Stuart H. Singer, Esq.*
(Florida Bar No. 377325)
Joshua D. Riley, Esq.
(DC Bar No. 1026900)
Vanessa Tussey*
(Florida Bar No. 125147)
Ana Carolina Varela*
(Florida Bar No. 0123069)
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com
Email: jmills@bsfllp.com
Email: jriley@bsfllp.com
Email: vtussey@bsfllp.com
Email: avarela@bsfllp.com
Email: ftleserve@bsfllp.com

</td>
</tr>
</table>

*Attorneys for Amici*

*\*Pro Hac Vice* Motions Pending

### **CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2020, I electronically filed a true and correct copy of the foregoing proposed Brief with the Clerk of Court by using the appellate CM/ECF system, which will send notice of such filing to all registered users of the  CM/ECF system who are parties to this case.


*/s/* D. Patricia Wallace

22



NATIONAL
ARCHIVES

ARCHIVIST *of the*
UNITED STATES

DAVID S. FERRIERO
T: 202.357.5900
F: 202.357.5901
david.ferriero@nara.gov

25 October 2012

The Honorable Carolyn Maloney
U.S. House of Representatives
Washington, DC 20515

Dear Ms. Maloney:

Thank you for your letter requesting information about the ratification status of the Equal Rights Amendment (ERA), and the role played by the National Archives and Records Administration (NARA) in certifying amendments to the Constitution.

You asked for a list of the states that ratified the ERA, and a list of states that either rejected the amendment, or rescinded an earlier ratification vote.  I have attached a chart showing this information.

You also asked for legal verification of statements on NARA's website page "The Constitutional Amendment Process" (www.archives.gov/federal-register/constition). This webpage states that a proposed Amendment becomes part of the Constitution as soon as it is ratified by three-fourths of the states, indicating that Congressional action is not needed to certify that the Amendment has been added to the Constitution.  It also states that my certification of the legal sufficiency of ratification documents is final and conclusive, and that a later rescission of a state's ratification is not accepted as valid.

These statements are derived from 1 U.S.C. 106b, which says that:  "Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become

NATIONAL ARCHIVES and
RECORDS ADMINISTRATION

700 PENNSYLVANIA AVENUE, NW
WASHINGTON, DC 20408-0001

www.archives.gov

EXHIBIT A

valid, to all intents and purposes, as a part of the Constitution of the United States."
Under the authority granted by this statute, once NARA receives at least 38 state
ratifications of a proposed Constitutional Amendment, NARA publishes the amendment
along with a certification of the ratifications and it becomes part of the Constitution
without further action by the Congress.  Once the process in 1 U.S.C. 106b is completed
the Amendment becomes part of the Constitution and cannot be rescinded.  Another
Constitutional Amendment would be needed to abolish the new Amendment.

I hope this information answers your question and is of use to you.  If you would like
more information or would like to discuss this issue further, please do not hesitate to
contact me again.

Sincerely,

DAVID S. FERRIERO
Archivist of the United States