# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA,

Plaintiffs,

v.

DAVID S. FERRIERO, in his official capacity as Archivist of the United States,

Defendant,

ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, and TENNESSEE,

Intervenor-Defendants.

Case No. 1:20-cv-242-RC

**BRIEF FOR THE STATES OF NEW YORK, COLORADO, CONNECTICUT, DELAWARE, HAWAI‘I, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON AND WISCONSIN, AND THE GOVERNOR OF KANSAS AND THE DISTRICT OF COLUMBIA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS**

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Amici Curiae
The Capitol
Albany, New York 12224
(518) 776-2043

*(Complete counsel listing appears on signature pages.)*

Dated: June 29, 2020

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF AMICI CURIAE ....................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.   CONGRESS LACKED AUTHORITY TO IMPOSE A SEVEN-YEAR RATIFICATION
     DEADLINE IN ITS JOINT RESOLUTION PROPOSING THE ERA ................................. 3

     A.   The Deadline Is Not Authorized by Article V's Text............................... 4

     B.   The Deadline Undermines the Framers' Deliberate Choice of an Amendment
          Process that Imposes No Time Constraints............................................ 5

     C.   The Deadline Disrupts Article V's Careful Balancing. ........................... 9

     D.   The Deadline Undermines the Original States' Understanding of Article V
          When They Ratified the Constitution.................................................... 12

     E.   The Deadline Is Inconsistent with Congressional Practice from the Founding
          in 1789 until 1960.................................................................................. 15

     F.   *Dillon v. Gloss* does not control.......................................................... 18

II.  THE ATTEMPTS OF FIVE STATES TO RESCIND THEIR RATIFICATIONS OF THE ERA ARE
     INEFFECTIVE............................................................................................ 20

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Coleman v. Miller*
    307 U.S. 433 (1939) ..................................................................................24

*Dillon v. Gloss,*
    256 U.S. 368 (1921) .............................................................................3, 17

*Dyer v. Blair,*
    390 F. Supp. 1291 (N.D. Ill. 1975) .....................................................10

*Hawke v. Smith,*
    253 U.S. 221 (1920) ..................................................................... *passim*

*Idaho v. Freeman,*
    529 F. Supp. 1107 (D. Idaho 1981),
    *vacated as moot*, 459 U.S. 809 (1982) ................................................17

*Leser v. Garnett,*
    258 U.S. 130 (1922) ...............................................................................23

*Marcum v. Salazar,*
    694 F.3d 123 (D.C. Cir. 2012) .............................................................20

*United States v. Sprague,*
    282 U.S. 716 (1931) ....................................................................... 4, 20-21

## UNITED STATES CONSTITUTION

Articles
    V ........................................................................................... *passim*
    VII .................................................................................................12

Amendments
    XVIII § 3 .................................................................................16, 18
    XX § 6 ..........................................................................................16
    XXI § 3 .........................................................................................16
    XXII § 2 .......................................................................................16

## FEDERAL STATUTES

1 U.S.C. § 106b ..................................................................................18, 23

1 Stat. 97 (1789) ..............................................................................15n, 16

1 Stat. 402 (1794) ..............................................................................15n

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL STATUTES (CONT'D)**                                                      **PAGE(S)**

2 Stat. 306 (1803)........................................................................15n

2 Stat. 613 (1810)........................................................................15n

12 Stat. 251 (1861) ......................................................................15n

13 Stat. 567 (1865) ......................................................................15n

14 Stat. 358 (1866) ...............................................................15n, 23n

15 Stat. 346 (1869) ......................................................................15n

15 Stat. 707 (1868) ......................................................................23n

15 Stat. 709-10 (1868) ...........................................................23 & n

16 Stat. 1131 (1870).....................................................................23

36 Stat. 184 (1909) ......................................................................15n

37 Stat. 646 (1912) ......................................................................15n

40 Stat. 1050 (1917) ..............................................................15n, 18

41 Stat. 362 (1919) ......................................................................15n

43 Stat. 670 (1924) ......................................................................15n

47 Stat. 745 (1932) ................................................................15n, 18

48 Stat. 1749 (1933) ..............................................................15n, 18

61 Stat. 959 (1947) ................................................................15n, 18

74 Stat. 1057 (1960) .....................................................................16

76 Stat. 1259 (1962) .....................................................................16

79 Stat. 1327 (1965) .....................................................................16

85 Stat. 829 (1971) ......................................................................16

86 Stat. 1523 (1972)..................................................................4, 16

## TABLE OF AUTHORITIES (Cont'd)

STATE CONSTITUTIONS       PAGE(S)

Delaware Constitution of 1776, art. 30.................................................................5n, 7

Georgia Constitution of 1777, art. LXIII............................................................5n, 7

Maryland Constitution of 1776, IV, XXIII, XXVIII, LIX..................................5n, 6, 8

Massachusetts Constitution of 1780, pt. 2, ch. 6, art. X. .................................5n, 7

New Hampshire Constitution of 1784, pt. 2 .......................................................5n, 7

Ohio Constitution..........................................................................................................12

Pennsylvania Constitution of 1776, § 20...........................................................5n, 6

South Carolina Constitution of 1778, XLIV........................................................5n, 7

Vermont Constitution of 1777, ch. 2, XLIV........................................................5n, 6

Vermont Constitution of 1786, ch. 2, XL............................................................5n, 6

CONGRESSIONAL DOCUMENTS

Cong. Globe, 40th Cong., 3d sess., 671 (1869) ...................................................11n

58 Cong. Rec. 25 (1919).............................................................................................11n

66 Cong. Rec. 2159 (1925).........................................................................................24

65 Cong. Rec. 4488 (1924)...........................................................................................8

65 Cong. Rec. 4492 (1924).........................................................................................24

66 Cong. Rec. 2152 (1925)...........................................................................................8

72 Cong. Rec. 9623 (1930).........................................................................................11n

75 Cong. Rec. 1167 (1932).........................................................................................11n

75 Cong. Rec. 3856 (1932).........................................................................................17

101 Cong. Rec. 6628 (1955).......................................................................................17

# TABLE OF AUTHORITIES (Cont'd)

CONGRESSIONAL DOCUMENTS (CONT'D)                                        PAGE(S)

H. J. Res. 69, 67th Cong., 1st Sess., 61 Cong. Rec. 575 (1921) .....................................8

H. J. Res. 638 (1978) ...........................................................................................19

S. 2307 § 15(a), 90th Cong., 1st Sess. (1967) ....................................................24n

S. 623 § 13(a), 91st Cong., 1st Sess. (1969) .......................................................24n

S. 215 § 13(a), 92d Cong., 1st Sess. (1971) ........................................................24n

S. 1272 § 13(a), 93d Cong., 1st Sess. (1973) ......................................................24n

S. 1710 § 13(a), 96th Cong., 1st Sess. (1979) .....................................................24n

S. J. Res. 4, 68th Cong., 1st Sess. (1924) ..............................................................8

SCHOLARLY PUBLICATIONS

Akhil Reed Amar, America's Constitution: A Biography 417-19 (2006) ....................................19

C. Burdick, The Law of the American Constitution (1922) ...........................................22

David K. Watson, The Constitution of the United States: Its History, Application
    and Construction (1910) ............................................................................21, 22

Fasteau & Fasteau, May a State Legislature Rescind Its Ratification of a Pending
    Constitutional Amendment?, 1 Harv. Women's L.J. 27 (1978) .............................22n

Greg Abbott, The Myths and Realities of Article V, 21 Tex. Rev. L. & Pol. (2016) .............13, 15

J. Jameson, A Treatise on Constitutional Conventions 631-32 (4th ed., 1887) ...........................22

J. William Heckman, Jr., Ratification of a Constitutional Amendment: Can a State
    Change Its Mind?, 6 Conn. L. Rev. 28 (1973) .......................................................22n

Joseph Story, Commentaries on the Constitution of the United States (1833) ............................12

Judith L. Elder, Article V, Justiciability, and the Equal Rights Amendment, 31
    Okla. L. Rev. 63 (1978) ...............................................................................22n

Kanowitz & Klinger, Can a State Rescind Its Equal Rights Amendment
    Ratification: Who Decides and How?, 28 Hastings L.J. 979 (1977) ......................22n

Lester B. Orfield, The Amending of the Federal Constitution (1942) ...................................6

# TABLE OF AUTHORITIES (Cont'd)

SCHOLARLY PUBLICATIONS (CONT'D)                                                    PAGE(S)

Michael Stokes Paulsen, A General Theory of Article V: The Constitutional
    Lessons of the Twenty- Seventh Amendment, 103 Yale L.J. 677 (1993)............................23n

Pauline Maier, Ratification: The People Debate the Constitution (2010) ....................................12

Ralph R. Martig, Amending the Constitution, 35 Mich. L. Rev. 1253 (1937)...............................6

Ruth Bader Ginsburg, Ratification of the Equal Rights Amendment: A Question
    of Time, 57 Tex. L. Rev. 919 (1979).......................................................................................24

The Documentary History of the Ratification of the Constitution (Jensen & Kaminski
    eds.)...........................................................................................................................13, 14, 21

The Records of the Federal Convention of 1787 (Max Farrand ed., 1937)....................................9

Walter Dellinger, The Legitimacy of Constitutional Change: Rethinking the
    Amendment Process, 97 Harv. L. Rev. 386 (1983)...............................................................11

Yvonne B. Burke, Validity of Attempts to Rescind Ratification of the Equal
    Rights Amendment, 8 U.W.L.A. L. Rev. 1 (1976)...............................................................22n

OTHER AUTHORITIES

Articles of Confederation of 1781, art. XIII, ¶ 1 ........................................................................10

Local Civil Rule 7(o)(1)....................................................................................................................1

Memorandum for Robert J. Lipshutz, Counsel to the President, from John M. Harmon,
    Assistant Attorney General, Office of Legal Counsel (June 27, 1978), reprinted in
    Equal Rights Amendment Extension: Hearings on S.J. Res. 134 Before the
    Subcomm. on the Constitution of the Senate Comm. on the Judiciary, 95th Cong.,
    2d Sess., 80-99 (1978) .........................................................................................................20n

The Federalist No. 39 (Madison) .....................................................................................................9

The Federalist No. 43 (Madison) ...............................................................................................10, 11

The Federalist No. 85 (Hamilton).................................................................................................14

**INTEREST OF AMICI CURIAE**

Amici are the States of New York, Colorado, Connecticut, Delaware, Hawaiʻi, Maine, Maryland, Massachusetts, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington and Wisconsin ("amici States"), as well as the Governor of Kansas and the District of Columbia. Amici submit this brief under Local Civil Rule 7(o)(1) to support the plaintiffs, the States of Virginia, Illinois and Nevada, in opposing the motion to dismiss filed by the defendant Archivist of the United States.

Amici have two distinct interests in this litigation. First, amici States have a strong interest in vindicating their role as sovereign participants in the constitutional amendment process. Article V of the U.S. Constitution confers on the States the plenary power to ratify proposed amendments to the Constitution. Like plaintiffs, seventeen of the amici States have exercised that power in voting to ratify the Equal Rights Amendment ("ERA"). And because a total of thirty-eight—or three-quarters—of the States have now ratified the ERA, Article V commands that it "shall be valid to all intents and purposes, as part of this Constitution." By refusing to perform his ministerial duty to certify the ERA as a valid amendment, the Archivist undermines the States' role in the constitutional amendment process. Amici States have a strong interest in vindicating that role and maintaining the effectiveness of their ratifications. Indeed, that strong interest, combined with the fact that plaintiffs cast the last three votes needed to ratify the ERA, is precisely what gives plaintiffs standing here.

Second, all amici here have an interest in ensuring that their residents receive the highest level of protection from discrimination on the basis of sex, both when they interact with the federal government and when they travel to other States. While many amici have passed their own laws and some amici States have passed their own constitutional amendments guaranteeing equality on

the basis of sex, the ERA would guarantee such equality on a nationwide basis. Moreover, amicus District of Columbia, which cannot independently provide constitutional protections to its residents, must rely entirely on the ERA to provide a constitutional guarantee of equality based on sex. Thus, all amici have a strong interest in ensuring that the ERA's guarantee of equality takes its rightful place in the Constitution.

## SUMMARY OF ARGUMENT

We rely on plaintiffs to address the Archivist's threshold arguments seeking to dismiss the complaint on standing, political question and ripeness grounds. But the Archivist also argues that plaintiffs failed to satisfy the requirements necessary to obtain mandamus relief. And as part of that argument, the Archivist contests plaintiffs' claim that the ERA is now a valid amendment to the U.S. Constitution. We thus write to address two points in support of plaintiffs' claim.

First, Congress lacks authority to diminish the States' ratification power by imposing a deadline in a joint resolution proposing an amendment, as it sought to do with the ERA. Congress's attempt to impose this type of external constraint on the States' right to ratify proposed amendments is not authorized by the text of Article V—which provides that amendments shall be valid "when ratified," without further qualification—and conflicts with the original understanding of Article V, as reflected in its structure and history. The Framers and the original States that ratified the Constitution understood Article V to confer on the States a plenary power of ratification with which the federal government could not interfere. Indeed, there is a question whether Congress may constrain the States' ratification power by imposing a deadline in the text of an amendment itself, but that question need not be addressed here.

Second, the attempts by five States to rescind their ratifications of the ERA are ineffective. The Court need not address this point, either. The Archivist does not argue otherwise; he argues only that any question regarding the validity of the purported rescissions is non-justiciable.

Because the intervenors and proposed amici supporting the Archivist seek to address the question on the merits, however, we address it here to give the Court a balanced perspective. As we explain, the States' power to ratify an amendment under Article V is just that—the power to ratify. Article V does not permit States to withdraw their ratifications once duly submitted. Here too, this conclusion is supported by the text of Article V, as well as its history and context. There is a longstanding consensus dating back to the Founding that ratifications are final and irrevocable. This consensus was critical not only to the ratification of the Constitution itself, when the States roundly rejected the view that a State could ratify the Constitution on a conditional basis, but also to the ratification of the Fourteenth Amendment, whose adoption turned on the rejection of two States' attempts to rescind their ratifications. Any other rule would undermine the finality and clarity of the ratification process such as the Framers envisioned it.

## ARGUMENT

### I. CONGRESS LACKED AUTHORITY TO IMPOSE A SEVEN-YEAR RATIFICATION DEADLINE IN ITS JOINT RESOLUTION PROPOSING THE ERA

Contrary to the Archivist's contention, Dkt. 29-1 at 18-23, Congress had no authority to impose a ratification deadline on the States in its joint resolution proposing the ERA. As we explain, that deadline is not authorized by the plain text of Article V. The deadline also conflicts with the original understanding of Article V, as reflected in its structure and history—specifically, the Framers' intentional decision to choose, among competing models of constitutional amendment, the model that imposed no time constraints; the careful balancing reflected in the Framers' design of Article V; and the original States' understanding of Article V when they ratified the Constitution—as well as congressional practice for the first two centuries of our nation's history. And the Supreme Court's decision in *Dillon v. Gloss*, 256 U.S. 368 (1921), does not compel a contrary outcome. That case addressed a fundamentally different type of

constitutional challenge and in any event involved a ratification deadline placed in the text of an amendment rather than in Congress's joint resolution proposing an amendment.

### A.  The Deadline Is Not Authorized by Article V's Text.

Article V of the U.S. Constitution sets forth a simple and unambiguous procedure for proposing and ratifying an amendment to the Constitution. Unlike certain other provisions of the Constitution, Article V is not couched in broad terms open to varying interpretations. On the contrary, it "is clear in statement and in meaning, contains no ambiguity, and calls for no resort to rules of construction." *United States v. Sprague*, 282 U.S. 716, 730 (1931).

Article V provides that a proposed amendment "shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the several states." U.S. Const., art. V. Article V thus unambiguously defines "when" a proposed amendment becomes part of the Constitution—"when ratified." This temporal language is open-ended and imposes no deadline on the state ratification process. And "[i]t is not the function of courts or legislative bodies, national or state, to alter the method which the Constitution has fixed" for ratifying an amendment. *Hawke v. Smith*, 253 U.S. 221, 227 (1920).

Yet that is precisely what Congress sought to do with the ERA. The joint resolution proposing the ERA quotes verbatim from Article V—in providing that the ERA "shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States"—but it also tacks on the restrictive clause "within seven years of its submission by the Congress." 86 Stat. 1523 (1972). By adding this clause, Congress imposed a restriction on the amendment process that is not authorized by Article V's text.

Indeed, it is beyond dispute that the phrase "when ratified," as used in Article V, differs in meaning from the phrase "when ratified . . . within seven years," as used in Congress's joint resolution proposing the ERA. The difference in meaning becomes critical under precisely the

circumstances presented here: when ratification does *not* occur within seven years. Under these circumstances, the temporal condition expressed by Article V's text is satisfied, while the temporal condition added by Congress in its joint resolution is not. Congress's joint resolution thus introduces a substantively different test for establishing when a constitutional amendment has become valid, thereby "alter[ing] the method which the Constitution has fixed." *Hawke*, 253 U.S. at 227. It is invalid for that reason alone.

The problem identified here is not implicated when Congress places a ratification deadline directly in the text of a proposed amendment. As explained more fully *infra* at 19-20, Article V gives Congress the authority to "propose amendments"; it may perhaps permit Congress to include effective date language in the text of an amendment, but it does not authorize Congress to enact separate provisions imposing conditions or time limits on the ratification process. The deadline that Congress placed in the joint resolution proposing the ERA purports to override the plain language of Article V by precluding the ERA from becoming "part of th[e] Constitution," even after it has garnered thirty-eight State ratifications.

### B.   The Deadline Undermines the Framers' Deliberate Choice of an Amendment Process that Imposes No Time Constraints.

The ERA's ratification deadline undermines the Framers' manifest intent to create an amendment process free of time constraints. That intent is reflected in a comparison of Article V with the alternative models of constitutional amendment that existed at the time of the founding.

When the Constitution was drafted in 1787, eight of the original thirteen States had amendment provisions in their state constitutions: Delaware, Pennsylvania, Maryland, Georgia,

Vermont, Massachusetts, New Hampshire and South Carolina.[1] These state constitutions were among the first written constitutions in the world to set forth the process for their own future amendment; they therefore provided prominent models for the Framers in drafting Article V. *See* Ralph R. Martig, Amending the Constitution, 35 Mich. L. Rev. 1253, 1253-55 & n.1 (1937); *see also* Lester B. Orfield, The Amending of the Federal Constitution 1-2 (1942). Of the eight state constitutions that contained such amendment provisions, all but two—Delaware and Georgia—imposed specific timelines on various aspects of the amendment processes set forth, including times for proposing amendments and adopting proposed amendments. The Framers nonetheless rejected these models, opting instead for an amendment provision that, like those of Delaware and Georgia, allowed the amendment process to unfold without any time constraints.

Three States—Pennsylvania, Vermont and Maryland—expressly constrained the length of time that could lapse between the proposal of an amendment and its ultimate adoption, as Congress sought to do in proposing the ERA. Under the Pennsylvania Constitution of 1776, the Council of Censors—a body that sat every seven years to review the constitutionality of state laws—could propose a constitutional amendment by calling a convention "within two years after their sitting." Penn. Const. of 1776, § 47. A proposed amendment could thus remain pending for at most two years. The Vermont Constitutions of 1777 and 1786 contained a nearly identical amendment provision. Vt. Const. of 1777, ch. 2, XLIV; Vt. Const. of 1786, ch. 2, XL. Under the Maryland Constitution of 1776, an amendment proposed by the bicameral legislature, the General Assembly,

---

[1] Del. Const. of 1776, art. 30; Penn. Const. of 1776, § 47; Md. Const. of 1776, LIX; Ga. Const. of 1777, art. LXIII; Vt. Const. of 1777, ch. 2, XLIV; Vt. Const. of 1786, ch. 2, XL; Mass. Const. of 1780, pt. 2, ch. 6, art. X; N.H. Const. of 1784, pt. 2; S.C. Const. of 1778, XLIV. While the original constitutions of the other five States had no formal amendment provisions, those States nonetheless convened conventions at which amendments were enacted, and they subsequently formalized amendment provisions in their constitutions.

would not be adopted unless confirmed by that body "after a new election of delegates, in the first session after such new election." Md. Const. of 1776, LIX. Because delegates were elected once a year in October and the General Assembly convened at least once a year in November, *id.* at IV, XXIII, a period of at most one year and one month—from one October to the following November—could lapse between the proposal of an amendment and its ultimate adoption.

Three additional States—New Hampshire, Massachusetts and South Carolina—imposed deadlines on other aspects of their constitutional amendment processes. New Hampshire and Massachusetts constrained the time for *proposing* amendments, while imposing no constraint on the time for *adopting* proposed amendments. The New Hampshire Constitution of 1784 thus required the general court of the State, seven years after the Constitution took effect, to issue precepts for the election of delegates to meet in convention for purposes of amending the Constitution. N.H. Const. of 1784, pt. 2. No amendment would be adopted, however, until "laid before the towns and unincorporated places, and approved by two-thirds of the qualified voters present"—with no apparent deadline for this approval process. *Id.* The Massachusetts Constitution of 1780 provided that a similar amendment process would commence in 1795—fifteen years after the Constitution was initially adopted. Mass. Const. of 1780, pt. 2, ch. 6, art. X. The South Carolina Constitution of 1778 imposed a deadline not on the time for proposing or adopting an amendment, but rather on the time that could lapse between an amendment's adoption and its effective date. It thus provided that amendments could be adopted, without any prior proposal process, by majority votes in both legislative chambers, but that such amendments would not take effect "without notice being previously given of ninety days." S.C. Const. of 1778, XLIV.

The two remaining States, Delaware and Georgia, imposed no timeline on any aspect of their amendment processes, including the proposal and adoption of amendments. The Delaware

Constitution of 1776 provided: "No other part of this constitution shall be altered, changed, or diminished without the consent of five parts in seven of the assembly, and seven members of the legislative council." Del. Const. of 1776, art. 30. The Georgia Constitution of 1773 provided that no alteration could be made unless petitions for a convention were presented by a majority of the counties and signed by a majority of the voters in each county. Ga. Const. of 1777, art. LXIII.

In crafting Article V, the Framers chose not to follow either of the state constitutional models that imposed a specific time limit on the proposal or adoption of amendments—or, indeed, to impose a time limit on any other aspect of the amendment process (with the exception of a now-obsolete provision that prohibited the adoption, prior to 1808, of an amendment that would interfere with the slave trade or impose direct taxes[2]). Instead, the Framers opted for an amendment provision that, like those of Delaware and Georgia, contemplated no specific time limit for either aspect of the amendment process. This deliberate choice reflects an intent not to impose any fixed time limit either on Congress in crafting a proposed amendment or on the States in deciding whether to ratify such an amendment.

That intent is additionally reflected in the numerous subsequent attempts by Congress, all unsuccessful, to amend Article V to include precisely such time constraints. One prominent proposal, known as the Wadsworth-Garrett Amendment, would have created an amendment process analogous in many respects to that specified in the Maryland Constitution of 1776 discussed above. It would have prevented a State's ratification until at least one branch of the state legislature had been elected since the amendment's submission by Congress to the States for ratification, and required that ratification occur within six years of the amendment's submission

---

[2] *See* U.S. Const., art. V (providing "no amendment which may be made prior to the year one thousand eight hundred and eight shall in any manner affect the first and fourth clauses in the ninth section of the first article").

by Congress, among other requirements. H. J. Res. 69, 67th Cong., 1st Sess., 61 Cong. Rec. 575 (1921); S. J. Res. 4, 68th Cong., 1st Sess. (1924); 65 Cong. Rec. 4488 (1924); 66 Cong. Rec. 2152 (1925). Congress considered but failed to advance many other proposals to modify Article V that would have imposed similar constraints on the timing and procedure of the State ratification process. *See* Martig, *supra*, at 1277-1283 (discussing these proposals in detail). The fact that Congress considered an amendment of Article V necessary to authorize Congress to impose constraints on the state ratification process reflects an understanding that Article V, as drafted by the Framers, precludes such constraints.

### C.   The Deadline Disrupts Article V's Careful Balancing.

The extraneous seven-year deadline that Congress purported to impose on the ERA's ratification disrupts the careful balance that the Framers struck in crafting Article V, in two important respects.

*First*, the deadline upsets the balance between state and federal power. As plaintiffs explain, Dkt. 1 at 3, the Framers sought to create an amendment process that would be "neither wholly federal nor wholly national." The Federalist No. 39 (Madison). The Framers thus gave Congress the powers to "propose amendments" and to choose "one or the other mode of ratification"—by state legislatures or state conventions—while they gave the States the powers to demand "a convention for proposing amendments" and to ratify amendments, whether proposed by Congress or a convention. U.S. Const., art. V. In assigning these coordinate roles, the Framers were sensitive to the concern that Congress, if given too much control over the amendment process, would "abuse their power, and refuse their consent" to necessary amendments. 1 The Records of the Federal Convention of 1787, at 202-03 (Max Farrand ed., 1937) ("Farrand") (George Mason). Indeed, earlier versions of Article V gave Congress no role in the amendment process at all, *see id.* at 121-22, 194; 2 Farrand at 148, 159, 174, an approach that had broad support until Gouverneur

Morris and Alexander Hamilton successfully advocated for a balanced approach to give Congress and the States co-equal roles. *Id.* at 467-68, 558-59.

The ERA's ratification deadline disrupts this careful balance of power by allowing Congress to curtail the right of ratification that Article V reserves to the States. This right includes the ability to decide the timing and other basic logistics of ratification. *See Dyer v. Blair*, 390 F. Supp. 1291, 1304 (N.D. Ill. 1975) (Stevens, J.) (holding that a State had the authority to decide whether ratification by its legislature required a simple majority or a supermajority). Allowing Congress to usurp the States' control over the ratification process would undermine the Framers' intent to create an amendment process that protects the States from an overreaching federal government.

*Second*, it would upset the equally careful balance that the Framers sought to achieve between "that extreme facility, which would render the Constitution too mutable; and that extreme difficulty, which might perpetuate its discovered faults." The Federalist No. 43 (Madison). This balance is embodied in Article V's supermajority provisions, which require that Congress (or the States) propose amendments by two-thirds supermajorities and that a three-quarters supermajority of the States ratify proposed amendments. U.S. Const., art V. These requirements "secur[e] deliberation and consideration before a change can be proposed" or ratified, *Hawke*, 253 U.S. at 226, without making the ratification process unduly difficult. The Framers were keen to avoid the major flaw of the Articles of Confederation, whose amendment clause required unanimous consent among the States, making amendments nearly impossible. *See* Articles of Confederation of 1781, art. XIII, ¶ 1. As Hamilton explained, "It had been wished by many and was much to have been desired that an easier mode for introducing amendments had been provided." 2 Farrand at 558.

The ERA's ratification deadline upsets the Framers' careful balance between ease and

difficulty of amendment by imposing an additional hurdle in the amendment process absent from Article V's precise framework. It is difficult enough to meet Article V's demanding supermajority requirements, which the Framers understood as a sufficient bulwark against the hasty adoption of constitutional amendments. Limiting the time in which those supermajorities must be achieved imposes an additional layer of difficulty that the Framers did not intend—nor could they have since, as a noted constitutional scholar has observed, "[a] ratification process involving fifty legislatures and requiring affirmative action by thirty-eight is more complex than anything foreseen by the framers in 1787." Walter Dellinger, The Legitimacy of Constitutional Change: Rethinking the Amendment Process, 97 Harv. L. Rev. 386, 421 (1983).

The history of the ERA demonstrates the importance of "deliberation and consideration" in this complex process. *Hawke*, 253 U.S. at 226. Congress deliberated for nearly five decades, from 1923 to 1972, before finally passing a joint resolution proposing the ERA. *See* Dkt. 1 at 5. It took almost an almost identical amount of time, from 1972 to 2020, for thirty-eight States to ratify the amendment. *See* Dkt. 1 at 7-11. By curtailing the period of deliberation that Article V affords the States, Congress not only usurps the States' ratification power; it also tips the scales toward that "extreme difficulty" in effectuating constitutional change that the Framers sought to avoid. The Federalist No. 43 (Madison).

Moreover, if Congress had the authority to impose such additional constraints on the state ratification process—untethered from the text and careful balancing of Article V—there would be no principled way to draw the line between permissible constraints and impermissible ones. Suppose, for example, that Congress passed a joint resolution providing that an amendment would become valid "when ratified by the legislatures of three-fourths of the several States *and then*

*confirmed by a popular vote in each ratifying State*."[3] Few would doubt that this additional requirement would be at odds with the ratification framework specified in Article V. The Supreme Court rejected a similar requirement in *Hawke*, 253 U.S. at 225-27, holding that a provision of the Ohio Constitution that gave the people the right to hold a referendum on their legislature's ratification of a proposed amendment was inconsistent with Article V's precise language and design. The seven-year ratification deadline at issue here suffers from the same basic defect: It imposes an additional constraint on the ratification process that is absent from and inconsistent with Article V. Further, unlike a deadline placed in the text of an amendment, which States can approve when exercising their ratification power, a deadline placed in a proposing resolution gives States no express constitutional authority to approve the deadline or not.

> **D.    The Deadline Undermines the Original States' Understanding of Article V When They Ratified the Constitution.**

Allowing Congress to unilaterally impose by resolution additional constraints on the constitutional amendment process would also undermine the understanding of Article V that prevailed among the States when they chose to ratify the federal Constitution and form our national government.

After the Framers drafted the Constitution at the Philadelphia Convention of 1787, the original thirteen States each convened a convention to decide whether to ratify the Constitution. Under Article VII of the Constitution—which is closely analogous to Article V—the Constitution would be established among the ratifying States if at least nine of the thirteen States ratified it at their respective conventions. U.S. Const., art. VII. The outcome of this ratification process was far from certain. In several States, an influential faction of Anti-Federalist delegates vehemently

---

[3] Congress has considered but rejected various proposals to amend Article V to require ratification by popular referendum. *See* Cong. Globe, 40th Cong., 3d sess., 671 (1869); 58 Cong. Rec. 25 (1919); 72 Cong. Rec. 9623, 10539 (1930); 75 Cong. Rec. 1167, 10973, 14744 (1932).

opposed the Constitution as it then existed, in particular because it lacked a bill of rights. *See generally* Pauline Maier, Ratification: The People Debate the Constitution (2010); 1 Joseph Story, Commentaries on the Constitution of the United States 191-205 (1833).

Many of these delegates were persuaded to support the Constitution only because Article V provided the States a clear mechanism for curing the Constitution's defects without undue interference from the national government. For example, in Massachusetts, where the Federalists' narrow victory lent critical momentum to the ratification process, a prominent Anti-Federalist named Dr. Charles Jarvis declared that Article V was the reason he had changed his mind and decided to support unconditional ratification of the Constitution. Jarvis explained that while he had deep reservations about other aspects of the Constitution, Article V "has been a resting place, on which I have reposed myself in the fullest security, whenever a doubt has occurred, in considering any other passage in the proposed Constitution." Article V, he explained, furnished "an adequate provision for all the purposes of political reformation," allowing the States to temper the federal government if it became "too severe" and to infuse it with new life if it became "too languid." 6 The Documentary History of the Ratification of the Constitution ("DHRC") 1374 (Jensen & Kaminski eds.).[4]

Many other delegates expressed a similar understanding of the States' plenary authority under Article V. Throughout the ratification debates, "[w]henever the Anti-Federalists criticized the [Constitution] and urged a vote against ratification, the Federalists relied on Article V as their trump card." Greg Abbott, The Myths and Realities of Article V, 21 Tex. Rev. L. & Pol. 1, 13 (2016). The Federalists emphasized that "states would play the primary role in the Article V

---

[4] The DHRC's collection of materials from the state ratification debates is available online at https://uwdc.library.wisc.edu/collections/history/constitution.

process—a particularly powerful retort given that the principal source of Anti-Federalists'
criticisms was that the Constitution did too little to protect states' rights." *Id.* For instance, a
delegate in Massachusetts relied on Article V to address the concern that "Congress will have it in
their power to make what laws they please, and what alterations they think proper in the
constitution, after the people have adopted it." 5 DHRC at 512. The delegate explained that "[t]he
Constitution expressly says, that any alteration in the constitution must be ratified by three fourths
of the States." *Id.* And after explaining that the States also had the authority to propose amendments
by calling for a constitutional convention, the delegate concluded: "If this article does not clearly
demonstrate that all power is in the hands of the people, then the language by which we convey
our ideas, is shockingly inadequate to its intended purpose." *Id.*

In response to an important Anti-Federalist essay titled the "Old Whig," Federalists
published an essay during the Massachusetts ratification debates that specifically underscored that
Article V imposes no "limitation of time" on the amendment process, thus giving the people a
greater "degree of liberty" than the amendment provision of their own state constitution: "For the
citizens of this Commonwealth are only permitted *at a given time* to revise their Constitution and
then only if two thirds are agreed; but in the other case, the citizens of the United States can do it,
*without any limitation of time*." 4 DHRC 182 (emphases added).

Similarly, to counter Anti-Federalist arguments in New York, a prominent Federalist from
Pennsylvania named Tench Coxe wrote a letter to the New York Convention explaining that "if
three fourths of the state legislatures or conventions approve such proposed amendments, they
become an actual and binding part of the constitution, *without any possible interference of
Congress*." 20 DHRC at 1143 (emphasis added). Hamilton made a similar point in addressing the
widespread concern among state delegates that "the persons delegated to the administration of the

national government will always be disinclined to yield up any portion of the authority of which they were once possessed." The Federalist No. 85 (Hamilton). Hamilton explained that under Article V, when two-thirds of the States demanded a convention for the proposal of constitutional amendments, this demand would be "peremptory": Article V requires that "the Congress 'shall call a convention,'" and "[n]othing in this particular is left to the discretion of that body." *Id.* (quoting Article V). The same logic applies to the ratification process. Article V provides that when three-quarters of the States ratify a proposed amendment, the amendment "shall be valid to all intents and purposes, as part of this Constitution." Nothing is left to the discretion of Congress, including the time frame for ratification.

The notion that Congress could unilaterally impose additional constraints on the States' ability to ratify an amendment, as Congress sought to do in its resolution proposing the ERA, is inconsistent with this foundational history. Ultimately, "it was Article V (and the states' primacy in the amendment process) that flipped the Anti-Federalists' votes in key states in favor of ratification." Abbott, *supra*, at 15. Had Article V permitted Congress to constrain the States' ratification power in the manner urged by the Archivist here, the States might never have ratified the Constitution.

### E.   The Deadline Is Inconsistent with Congressional Practice from the Founding in 1789 until 1960.

Congressional practice during the first two centuries of our nation's history confirms the foundational understanding that a congressional resolution may not impose a deadline on the state ratification process.

From the proposal of the Bill of Rights in 1789 to the proposal of the Twenty-Second Amendment in 1947, the joint resolutions by which Congress submitted each of its proposed amendments to the States contained almost identical language: Quoting the language of Article V

15

itself, the proposing clauses of these joint resolutions all provided, with only minor stylistic variations, that the amendments would become valid when ratified by three-quarters of the States.[5] Congress used the same language in the joint resolution proposing the Twenty-Seventh Amendment, which was submitted to the States in 1789—along with the ten amendments forming the Bill of Rights, 1 Stat. 97 (1789)—but was not ratified until more than two hundred years later, in 1992.

Congress first sought to impose deadlines on the States' authority to ratify amendments by including deadlines within the text of several proposed amendments, beginning with the Nineteenth Amendment, proposed in 1919. Four amendments contain such deadlines. U.S. Const., amends. XVIII § 3, XX § 6, XXI § 3, XXII § 2. Because those amendments were ratified by the States within the deadlines imposed, however, the validity of those deadlines was never tested. Moreover, when a deadline is contained within the text of the amendment, it is part of what the States either ratify or decline to ratify—it is not an external constraint imposed by Congress alone.

Congress chose for the first time in 1960, in connection with the Twenty-Third Amendment, to put a time limit not in the amendment itself but in the joint resolution proposing the amendment to the States. As noted above, all previous proposing resolutions had used virtually verbatim the language of Article V, which provides that a proposed amendment "shall be valid to

---

[5] 1 Stat. 97 (1789) (Bill of Rights); 1 Stat. 402 (1794) (Eleventh Amendment); 2 Stat. 306 (1803) (Twelfth Amendment); 2 Stat. 613 (1810) (amendment never ratified that would have prohibited American citizens from accepting foreign titles of nobility); 12 Stat. 251 (1861) (amendment never ratified that would have precluded Congress from passing laws interfering with slavery); 13 Stat. 567 (1865) (Thirteenth Amendment); 14 Stat. 358 (1866) (Fourteenth Amendment); 15 Stat. 346 (1869) (Fifteenth Amendment); 36 Stat. 184 (1909) (Sixteenth Amendment); 37 Stat. 646 (1912) (Seventeenth Amendment); 40 Stat. 1050 (1917) (Eighteenth Amendment); 41 Stat. 362 (1919) (Nineteenth Amendment); 43 Stat. 670 (1924) (amendment never ratified that would have allowed Congress to regulate the use of child labor); 47 Stat. 745 (1932) (Twentieth Amendment); 48 Stat. 1749 (1933) (Twenty-First Amendment); 61 Stat. 959 (1947) (Twenty-Second Amendment).

all intents and purposes, as part of this Constitution when ratified by the legislatures of three fourths of the several states." By contrast, the proposing clause for the Twenty-Third Amendment, unlike all previous proposing clauses, provided that the amendment "shall be valid to all intents and purposes as part of the Constitution *only if* ratified by the legislatures of three-fourths of the several States *within seven years from the date of its submission by Congress*." 74 Stat. 1057 (1960) (emphasis added). Congress used the same language in the joint resolutions proposing the next three amendments—the Twenty-Fourth through the Twenty-Sixth—as well as the ERA, except that it replaced "only if" with "when" for all but the Twenty-Fourth Amendment. 76 Stat. 1259 (1962) (Twenty-Fourth); 79 Stat. 1327 (1965) (Twenty-Fifth); 85 Stat. 829 (1971) (Twenty-Sixth); 86 Stat. 1523 (1972) (ERA).

In total, then, twenty-three of the twenty-seven amendments now part of our Constitution, other than the ERA, were submitted to the States with joint resolutions that mirrored Article V and included no ratification deadline. Only four amendments—proposed over a period of only eleven years—were submitted with joint resolutions that contained such a deadline. And none of those deadlines was ever challenged in court. While some members of Congress assumed that moving the deadline to a joint resolution would make no substantive difference, 101 Cong. Rec. 6628 (1955) (Sen. Kefauver), other members questioned that assumption, 75 Cong. Rec. 3856 (1932) (Rep. Jeffers). Indeed, Congress had earlier declined to place a deadline in a joint resolution to avoid this very issue. *Id.* (Rep. Ramseyer).

**F.**     ***Dillon v. Gloss* does not control.**

Contrary to the Archivist's contention, Dkt. 29-1 at 16-18, the Supreme Court's decision in *Dillon v. Gloss*, 256 U.S. 368 (1921), does not control the ratification issue presented here. [6]

*Dillon* held that a person convicted under the National Prohibition Act could not invalidate his conviction by challenging Congress's power to impose a ratification deadline in the text of the Eighteenth Amendment, which authorized the Act. 256 U.S. at 370-76. To begin, the decision in *Dillon* did not turn on the validity of the ratification deadline. Congress required the States to ratify the Eighteenth Amendment within seven years, but three-quarters of the States ratified the amendment in just over a single year—and thus well within Congress's deadline. *Id.* at 370. Unlike the ERA's ratification deadline, then, the deadline at issue in *Dillon* did not ultimately diminish the States' ratification authority. Thus, whatever the Court may have said in dictum concerning Congress's authority to decide what a reasonable period for ratification would be, the Court had no occasion to consider any of the arguments presented here concerning the impermissibility of congressional constraints on the States' ratification power.

Moreover, the ratification deadline at issue in *Dillon*, unlike the ERA's deadline, was placed directly in the text of the amendment. The Eighteenth Amendment contained a section providing that the amendment would "not be operative" unless ratified within seven years of its submission by Congress. U.S. Const., amend. XVIII § 3. An identical deadline was later included

---

[6] The Archivist also places undue reliance on the Supreme Court's one-sentence decision vacating as moot the district court judgment in *Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1981), *vacated as moot*, 459 U.S. 809 (1982). That case involved a challenge to Congress's joint resolution extending the ERA's ratification deadline by three years, from 1979 to 1982. The Supreme Court summarily dismissed the case as moot because, before the Court could hear oral argument, the extended deadline expired without yielding any additional ratifications. Contrary to the Archivist's contention, Dkt. 29-1 at 21, the Court's summary decision does not address whether Congress is authorized to impose a deadline and whether, if it is, Congress can extend a deadline. Rather, the decision merely reflects the fact that the validity of the since-expired three-year extension no longer presented a live controversy at the time.

in the text of the Twentieth through the Twenty-Second Amendments. *Id.* XX § 6, XXI § 3, XXII § 2. This type of ratification deadline is categorically distinct from the ERA deadline at issue here, for three reasons.

First, unlike the ERA deadline, the deadlines for these four amendments did not purport to preclude the amendments from becoming part of the Constitution when ratified by three-quarters of the States in accordance with Article V. On the contrary, the joint resolutions proposing these amendments all provided, consistent with Article V, that the amendments would "become valid as part of the Constitution when ratified by the legislatures of the several States as provided by the Constitution." 40 Stat. 1050 (1917); *see also* 47 Stat. 745 (1932); 48 Stat. 1749 (1933); 61 Stat. 959 (1947). But once ratified, the amendments provided by their own terms that they would be "inoperative" if the ratification process took more than seven years. The amendments would thus be validly adopted amendments to the Constitution—and would have to be certified as such under 1 U.S.C. § 106b—but would have no legal effect. *See* Akhil Reed Amar, America's Constitution: A Biography 417-19 (2006) (explaining this point). Indeed, the deadlines rendering the amendments inoperative would not themselves be valid unless and until the amendments were ratified. The deadline for the ERA, by contrast, purports to directly override Article V by precluding the ERA from ever becoming a valid amendment, even after it has been ratified by three-quarters of the States.

Second, Congress's power to impose a ratification deadline in the text of an amendment is "based, quite simply, upon the plenary authority of Congress to propose the texts of amendments." Dellinger, *supra*, 408 n.120. The authority that Article V confers on Congress to "propose amendments," U.S. Const., art. V, necessarily implies the authority to decide the content of a proposed amendment, which the States can in turn choose to ratify or not. But no such authority is

implicated where, as here, Congress has merely placed the deadline in the proposing clause of a joint resolution. Such a deadline constitutes a purely external constraint on the state ratification process that has no basis in the text of Article V.

Third, Congress cannot modify a deadline placed in the text of an amendment; once an amendment has been submitted to the States for ratification, Congress no longer has any ability to modify the text of that amendment. By contrast, if Congress places a ratification deadline in its joint resolution proposing an amendment, nothing prevents it from passing a subsequent joint resolution modifying or eliminating that deadline (assuming for the sake of argument that the deadline has any validity in the first place). Indeed, Congress has already done just that with respect to the ERA, passing a joint resolution extending the ratification deadline by three years and three months. H. J. Res. 638 (1978). While some dispute Congress's authority to pass such an extension resolution, the Court need not—and should not—resolve that question, because it is not presented here. What matters for present purposes is that there is a significant substantive difference between a ratification deadline placed in the text of an amendment, which no one could plausibly argue Congress can extend, and a deadline placed in a joint resolution, which a wealth of authority suggests Congress can extend.

For these reasons, the ratification deadline at issue in *Dillon*, because it was placed directly in the text of the Eighteenth Amendment, was fundamentally different from the ratification deadline at issue here.

## II.   THE ATTEMPTS OF FIVE STATES TO RESCIND THEIR RATIFICATIONS OF THE ERA ARE INEFFECTIVE

Preliminarily, amici agree with plaintiffs that judicial review is not precluded merely because the Office of Legal Counsel (OLC) has recently opted not to opine on the validity of the attempts by five States—Idaho, Kentucky, Nebraska, South Dakota and Tennessee—to rescind

their votes ratifying the ERA.[7] This is not a case in which judicial review would benefit from an administrative agency's expertise or further factual development, as required to defeat a claim for lack of ripeness. *See Marcum v. Salazar*, 694 F.3d 123, 129 (D.C. Cir. 2012). While the Archivist does not defend the validity of the purported rescissions, intervenors and proposed amici seek to do so. We write to explain why their arguments are mistaken.

First, the text of Article V gives States the right to "ratif[y]" proposed amendments; it does not grant the right to rescind a ratification once submitted. Had the Framers wished to give States that right, "nothing would have been simpler than so to phrase article 5 as to exclude implication or speculation." *Sprague*, 282 U.S. at 732. Given Article V's uniquely precise language, the fact that the Framers did not explicitly grant States a right of rescission is "persuasive evidence" that the Framers intended ratification as a one-time, irrevocable event. *Id.*

Second, the history of the Constitution's ratification confirms the Framers' intent to treat ratification as final and irrevocable. As discussed *supra* at 12-15, many of the delegates to the State ratification conventions had serious misgivings about the Constitution as it then existed because it lacked a bill of rights. The delegates understood, however, that a vote to ratify the Constitution would be final and could not be made conditional on the subsequent adoption of amendments. *See* Maier, *supra*, at 379-82, 385-96, 431. For example, when a conditional ratification was under consideration in New York, Alexander Hamilton, a delegate to the New York Convention, wrote a letter to James Madison to ask his advice. Madison replied that the Constitution "requires an

---

[7] The OLC did in fact opine on this issue in 1978, when Congress was contemplating extending the ERA's ratification deadline by three years. As explained below, OLC issued a formal memorandum opining that the five purported rescissions were invalid based on the text and history of Article V. *See* Memorandum for Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel (June 27, 1978), reprinted in Equal Rights Amendment Extension: Hearings on S.J. Res. 134 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary, 95th Cong., 2d Sess., 80-99 (1978) ("Harmon Memo").

adoption *in toto* and *for ever*" and that "any *condition* whatever must vitiate the ratification." Letter from James Madison to Alexander Hamilton (July 1788) (emphases in original), reprinted in 2 David K. Watson, The Constitution of the United States: Its History, Application and Construction 1314-17 (1910). Based on this view, New York and other States rejected proposals to ratify the Constitution that would have reserved the "right to recede and withdraw from the said Constitution." 23 DHRC at 2290-91.

Third, a longstanding consensus among scholars and commentators confirms the Framers' understanding of ratification as an irrevocable event. All of the major writers and scholars of the nineteenth and early twentieth centuries shared this understanding. As one scholar explained, Article V confers on the States "a special power" to ratify proposed amendments but that, "[w]hen exercised, as contemplated by the constitution, by ratifying, it ceases to be a power, and any attempt to exercise it again must be nullity." J. Jameson, A Treatise on Constitutional Conventions 631-32 (4th ed., 1887). Another scholar likewise explained that "the act of ratification is final in each case," reasoning that "any other doctrine would lead to great confusion in determining when an amendment has in fact been adopted." C. Burdick, The Law of the American Constitution 43-44 (1922); *see also* Orfield, *supra*, at 51-52 (explaining that "each affirmative step in the passage of an amendment is irrevocable"); 2 Watson, *supra*, at 1313-18.

Similarly, in the 1970s, when various States began considering the idea of rescinding their ratifications of the ERA, there developed a large body of scholarship opining that such rescissions

would be invalid based on, among other things, the text of Article V and historical precedent.[8] The Department of Justice's OLC adopted the same view in a careful analysis that then-Assistant Attorney General for the OLC John Harmon drafted in 1978. *See* Harmon Memo, *supra* 20 n.7. And the Attorneys General in numerous States issued formal opinions adopting the same view, including in the five States that ultimately purported to rescind their ratifications. As a result, "[e]very state legislature that passed a resolution rescinding a prior ratification of the ERA did so under the cloud of an express opinion that such an action would be a legal nullity." Dellinger, *supra*, at 423 & n.179; *see also* Fasteau & Fasteau, *supra*, at 39-42.

Fourth, historical precedent supports the same conclusion. The few instances when States have attempted to rescind their ratifications of a proposed amendment, their attempted rescissions have been rejected as invalid. The Fourteenth Amendment is the most prominent example. The adoption of that amendment turned on Congress's decision to reject the attempts by two States, Ohio and New Jersey, to rescind their earlier ratifications. At least one of the two States' ratifications was required to obtain the requisite ratification by three-quarters of the States. After learning of the States' purported rescissions, Congress nonetheless passed a joint resolution listing both States as having ratified the amendment and directing the Secretary of State to certify the

---

[8] *See, e.g.*, Fasteau & Fasteau, May a State Legislature Rescind Its Ratification of a Pending Constitutional Amendment?, 1 Harv. Women's L.J. 27 (1978); Kanowitz & Klinger, Can a State Rescind Its Equal Rights Amendment Ratification: Who Decides and How?, 28 Hastings L.J. 979 (1977); Yvonne B. Burke, Validity of Attempts to Rescind Ratification of the Equal Rights Amendment, 8 U.W.L.A. L. Rev. 1 (1976); J. William Heckman, Jr., Ratification of a Constitutional Amendment: Can a State Change Its Mind?, 6 Conn. L. Rev. 28 (1973); *but see* Judith L. Elder, Article V, Justiciability, and the Equal Rights Amendment, 31 Okla. L. Rev. 63 (1978) (rescission should be permitted).

amendment as validly adopted, which he did. 15 Stat. 709-10 (1868).[9] (The Secretary of State was then entrusted with the Archivist's current role under 1 U.S.C. § 106b to publish and certify adopted amendments.) Similarly, two years later, in certifying the adoption of the Fifteenth Amendment, the Secretary of the State listed New York among the ratifying States, even though New York had earlier passed a resolution purporting to rescind its ratification. 16 Stat. 1131 (1870). The Supreme Court has expressly approved this historical practice of treating rescissions as invalid, *Coleman v. Miller*, 307 U.S. 433, 448-50 (1939), and has dismissed the suggestion of proposed amici, Dkt. 31-1 at 8 n.6, that amendments from the Reconstruction Era are not valid precedents because they were adopted "practically as a war measure which has been validated by acquiescence." *Leser v. Garnett*, 258 U.S. 130, 136 (1922).

Fifth, the fact that Congress made several unsuccessful attempts to amend Article V to give States the right to rescind their ratifications of a proposed amendment suggests that States do not currently have that right under Article V. For example, the Wadsworth-Garrett Amendment discussed above would have given States the right to reconsider their ratifications at any time until three-fourths of the States had ratified the amendment or more than one-fourth had rejected it. *See supra* at 8. Both sponsors of the proposed amendment acknowledged that "under Article V, as now drawn, no State can change its vote from the affirmative to negative." 65 Cong. Rec. 4492 (1924)

---

[9] Congress proposed the Fourteenth amendment in 1866. 14 Stat. 358 (1866). By July 1868, the Legislatures in twenty-nine of the thirty-seven States then in the Union—one more than the requisite three-quarters—had ratified the amendment. Ohio and New Jersey, however, had a few months earlier passed resolutions purporting to rescind their ratifications. This prompted the Secretary of State to issue a conditional certification stating that if the ratifying resolutions of Ohio and New Jersey were still deemed valid, notwithstanding the attempted rescissions, then the Fourteenth Amendment was part of the Constitution. 15 Stat. 707 (1868). Congress then passed the joint resolution discussed above. 15 Stat. 709-10 (1868). For a detailed discussion of this history, *see* Michael Stokes Paulsen, A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment, 103 Yale L.J. 677, 709-11 (1993).

(Wadsworth); *see also* 66 Cong. Rec. 2159 (1925) (Garrett expressing same view). Similar legislation was introduced by Senator Ervin from 1967 to 1973,[10] and again by Senators Hatch and Helms in 1978.[11] None of these proposals passed either House, suggesting an acceptance of the prevailing view that ratifications are final and rescissions invalid.

Sixth, allowing States to rescind their ratifications would undermine the finality of the amendment process and "lead to great confusion in determining when an amendment has in fact been adopted." Burdick, *supra*, at 43-44. States could attempt to rescind their ratifications shortly before three-quarters of the States have submitted their ratifications, sowing doubt about whether and when ratification occurred. States could even seek to rescind their ratifications of an amendment *after* three-quarters of the States have ratified it, seeking to unwind amendments that have already gone into effect. Allowing States to rescind their ratifications would also undermine the seriousness and importance that state legislators accord to their vote to ratify a proposed amendment, because a vote to ratify could always be undone at a more politically expedient time. The ratification process could thereby become "'a poker game' in which states would be encouraged to treat their ratification lightly because the issue could be taken up 'again and again and again.'" Ruth Bader Ginsburg, Ratification of the Equal Rights Amendment: A Question of Time, 57 Tex. L. Rev. 919, 921 (1979) (citations omitted). Such an outcome would undermine the precise and straightforward amendment process the Framers designed in crafting Article V.

## CONCLUSION

The Court should deny defendant's motion to dismiss.

---

[10] S. 2307 § 15(a), 90th Cong., 1st Sess. (1967); S. 623 § 13(a), 91st Cong., 1st Sess. (1969); S. 215 § 13(a), 92d Cong., 1st Sess. (1971); S. 1272 § 13(a), 93d Cong., 1st Sess. (1973).

[11] S. 3 § 13(a), S. 1710 § 13(a), 96th Cong., 1st Sess. (1979).

Dated: Albany, New York
    June 29, 2020

         Respectfully submitted,

         LETITIA JAMES
          *Attorney General*
          *State of New York*
         BARBARA D. UNDERWOOD
          *Solicitor General*
         ANDREA OSER
          *Deputy Solicitor General*
         JOSEPH M. SPADOLA
          *Assistant Solicitor General*

    By: /s/_____
       Joseph M. Spadola
       Assistant Solicitor General

       The Capitol
       Albany, New York 12224
       (518) 776-2043

(Counsel listing continues on the next two pages.)

PHILIP J. WEISER
 *Attorney General*
 *State of Colorado*
1300 Broadway
Denver, CO 80203


WILLIAM TONG
 *Attorney General*
 *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106


KATHLEEN JENNINGS
 *Attorney General*
 *State of Delaware*
820 N. French Street
Wilmington, DE 19801


CLARE E. CONNORS
 *Attorney General*
 *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813


AARON M. FREY
 *Attorney General*
 *State of Maine*
6 State House Station
Augusta, ME 04333


BRIAN E. FROSH
 *Attorney General*
 *State of Maryland*
200 Saint Paul Place
Baltimore, Maryland 21202


MAURA HEALEY
 *Attorney General*
 *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
 *Attorney General*
 *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155


GURBIR S. GREWAL
 *Attorney General*
 *State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625


HECTOR BALDERAS
 *Attorney General*
 *State of New Mexico*
P.O. Drawer 1508
Santa Fe, New Mexico 87504


JOSHUA H. STEIN
 *Attorney General*
 *State of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603


ELLEN F. ROSENBLUM
 *Attorney General*
 *State of Oregon*
1162 Court Street NE
Salem, OR 97301


JOSH SHAPIRO
 *Attorney General*
 *Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120


PETER F. NERONHA
 *Attorney General*
 *State of Rhode Island*
150 S. Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, Vermont 05609

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
1125 Washington Street SE
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
  *Attorney General*
  *State of Wisconsin*
17 W. Main Street
P.O. Box 7857
Madison, WI 53707

LAURA KELLY
  *Governor*
  *State of Kansas*
Statehouse, 2nd Floor
300 SW 10th Avenue
Topeka, KS 66610

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
441 4th Street, NW, Suite 630 S.
Washington, DC 20001