UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA, ) ) ) | |
| Plaintiffs, ) ) | Case No. 1:20-cv-242-RC |
| v. ) ) | |
| DAVID S. FERRIERO, in his official capacity as Archivist of the United States, ) ) ) | |
| Defendant. ) ) | |

## BRIEF AMICI CURIAE OF THE ERA COALITION AND ADVOCATES IN THE WOMEN'S MOVEMENT IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Christopher Man
WINSTON & STRAWN LLP
1901 L Street NW
Washington, D.C. 20036
202-282-5000
202-282-5100 (fax)
cman@winston.com

Johanna Rae Hudgens
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
212-294-6700
212-294-4700 (fax)
jhudgens@winston.com

Linda T. Coberly
(pro hac vice pending)
Linda A. Greene
Courtney S. Block
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
312-558-5600
312-558-5700 (fax)
lcoberly@winston.com

## TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF INTEREST ............................................................ 1

ARGUMENT ..................................................................................................................... 5

I.      The fight for equality has been long and hard-fought, as advocates have struggled to
        correct the Framers' intentional exclusion of women.......................................................... 5

        A.      At the founding, our Constitution reflected the norms of its time, which
                deprived women of the most basic rights and powers under the law. ................... 5

        B.      The fight for the vote took more than a century, and even then, advocates
                recognized that suffrage was not sufficient to ensure equality. ............................ 7

        C.      Congress finally passed the ERA in 1972, placing a time limit only in the
                resolving clause of its joint resolution and extending it after concluding that
                such an important and fundamental amendment deserves more time. ................ 10

        D.      During and after the 1970s, the movement for equality proceeded, though its
                success has been incremental and incomplete. ..................................................... 13

        E.      Since 2016, the ERA has surged forward, with a new understanding of
                persistent inequality, sexual harassment, and sex-based violence. ...................... 16

II.     Women today face persistent inequality in nearly every sphere—inequality that
        reflects a continued and acute need for the Equal Rights Amendment. .......................... 18

        A.      Domestic and Sexual Violence ............................................................................ 19

        B.      Economic and Employment-Related Disparities .................................................. 22

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bradwell v. State of Illinois,*
    83 U.S. 130 (1873)......................................................................................................8

*Castle Rock v. Gonzales,*
    545 U.S. 748 (2005)..................................................................................................19

*Coleman v. Miller,*
    307 U.S. 433 (1939)..................................................................................................11

*Craig v. Boren,*
    429 U.S. 71 (1976)....................................................................................................15

*Dillon v. Gloss,*
    256 U.S. 368 (1921)..................................................................................2, 11, 12, 18

*Frontiero v. Richardson,*
    411 U.S. 677 (1973)................................................................................................5, 6

*Reed v. Reed,*
    404 U.S. 71 (1971)....................................................................................................15

*United States v. Morrison,*
    529 U.S. 598 (2000)..................................................................................................22

*United States v. Nagarwala,*
    350 F. Supp. 3d 613 (E.D. Mich. 2018)....................................................................22

*United States v. Virginia,*
    518 U.S. 515 (1996)..................................................................................................15

**Constitutional Provisions**

U.S. Const., art. V ....................................................................................................*passim*

U.S. Const., amend. V................................................................................................15

U.S. Const., amend. XIV ........................................................................................8, 15

U.S. Const., amend. XVIII....................................................................................2, 11, 18

U.S. Const., amend. XIX .......................................................................................9, 13

U.S. Const., amend. XXIII.........................................................................................12

U.S. Const., amend. XXVII ..................................................................................11, 14

**Statutes**

1 U.S.C. § 106b...................................................................................................2

Violence Against Women Act of 1994 (Pub. L. 103-322) ...........................................22

**Federal Legislative Materials**

H.J. Res. 208, 92d Cong. (1971)........................................................................10, 18

H.J. Res. 638, 95th Cong. (1978).............................................................................12

*Equal Rights Amendment Extension: Hearings on H.J. Res. 638 Before the
Subcomm. on Civil and Const. Rights of H. Comm. on Judiciary*, 95th Cong.
(1978) ...............................................................................................................13

H. Res. 432, 103d Cong. (1994) ...............................................................................14

H.J. Res 47, 112th Cong. (2011)...............................................................................14

S.J. Res. 39, 112th Cong. (2012) ..............................................................................14

H.J. Res. 79, 116th Cong (2019) (passed Feb. 13, 2020)..............................................17

S.J. Res. 6, 116th Cong. (2019) ...............................................................................18

H.R. Rep No. 116-378 (2020)........................................................................10, 12, 18

**State Legislative Materials**

H.J. Res. 97, 2020 Leg., Reg. Sess. (Ala.)..................................................................18

H. Con. Res. 2028, 54th Leg., 1st Reg. Sess. (Ariz. 2019)............................................13

S. Con. Res. 1001, 54th Leg., 2d Sess. (Ariz. 2020) ...................................................18

S.J. Res. 18, 92nd Gen. Assemb., Reg. Sess. (Ark. 2019).............................................18

S. Con. Res. 392, 2020 Leg. (Fla.)............................................................................18

S. Res. 66, 2019-2020 Leg., Reg. Sess. (Ga.).............................................................18

S. Con. Res. 2, 2019 Leg., Reg. Sess. (La.)................................................................18

H. Con. Res. 41, 2020 Leg., Reg. Sess. (Miss.)...........................................................18

H. Con. Res. 64, 100th Gen. Assemb., Reg. Sess. (Mo. 2020) ....................................18

S.J. Res. 25, 57th Leg., 2d Sess. (Okla. 2020)..............................................................18

H.J. Res. 3340, Gen. Assemb., 123rd Sess. (S.C. 2019)................................................18

H.J. Res. 7, 2020 Leg., Gen. Sess. (Utah)....................................................................18

**Other Authorities**

ABA 2020 Survey of Civil Literacy, at www.ambar.org/CivicSurvey ...........................2

Alice Paul Institute, *ERA Frequently Asked Questions* (2020), at
    www.equalrightsamendment.org/faq/.....................................................................14

Berlan, Meika & Harwood, Morgan, Nat'l Women's Law Center*, National
    Snapshot: Poverty Among Women and Families* (2018) .........................................23

Block, Sharon, *Rape and Sexual Power in Early America* (2006) ................................5

Calabresi, Steven G. & Rickert, Julia, *Originalism and Sex Discrimination*, 90
    Tex. L. Rev. 1 (2011).............................................................................................15

Campbell, Kelsey L., *Protecting Our Defenders: The Need to Ensure Due
    Process for Women in the Military before Amending the Selective Service Act,*
    45 Hastings Const. L. Q. 115 (2017) ......................................................................24

Campbell, Rebecca, et al., *Changing the Criminal Justice System Response to
    Sexual Assault*, Am. J. Community Psychol. (June 2020).......................................20

Chenoweth, Erica & Pressman, Jeremy, *This is what we learned by counting the
    women's marches*, Wash. Post, Feb. 7, 2017 ..........................................................16

de Witt, Karen, *100,000 Join March for Extension of Rights Amendment
    Deadline*, N.Y. Times, July 10, 1978 .....................................................................13

Defense Adv. Comm. on Women in the Service, *2018 Annual Report* (Dec. 11,
    2018) .......................................................................................................................25

Dismore, David, *July 9, 1978: Feminists Make History with Biggest-Ever March
    for the Equal Rights Amendment*, Feminist Daily Newswire, July 9, 2014............13

Downey, Renzo, *Bipartisan coalition calls for Equal Rights Amendment adoption*,
    Fla. Politics, Feb. 12, 2020 ....................................................................................18

DuBois, Ellen Carol, *Outgrowing the Compact of the Fathers: Equal Rights,
    Woman Suffrage, and the U.S. Constitution, 1820–1878*, J. Am. Hist. 836
    (Dec. 1987) ..............................................................................................................7

Editorial Board, *NC can make history – and Republicans can make amends – by ratifying the ERA*, Raleigh News & Observer, Aug. 30, 2019 ................................18

Editorial Board, *Utah should ratify the Equal Rights Amendment*, Salt Lake Trib., Dec. 7, 2019 ................................................................................................................18

Eldeib, Duaa, *Women plan march on Washington day after Trump's inauguration*, Chi. Trib., Nov. 28, 2016 ...........................................................16

ERA Coalition Press Release, June 17, 2016, at www.eracoalition.org..........................................2

*The Facts Behind the #MeToo Movement: A National Study on Sexual Harassment and Assault* (2018), at www.stopstreetharassment.org.......................................16

*Frederick Douglass on Women's Rights* (Philip S. Foner, ed., 1992)............................................7

Futures Without Violence, *American Indian Alaskan Native Violence Fact Sheet* (2012).............................................................................................................................20

Ginsburg, Ruth Bader, *Remarks on Women Becoming Part of the Constitution*, 6 Law & Ineq. 17 (1988).............................................................................................5

Graf, Nikki, et al., Pew Research Center, *The Narrowing, but Persistent, Gender Gap in Pay* (2018).................................................................................................23

Held, Allison L., et al., *The Equal Rights Amendment: Why the ERA Remains Legally Viable and Properly Before the States,* 3 Wm. & Mary J. Women & L. 113 (1997) ....................................................................................................................14

Hudson, Valerie M., et al., *The First World Order: How Sex Shapes Governance and National Security Worldwide* (2020) .................................................................19

Indian Law Res. Ctr., *Ending Violence Against Native Women*, at www.indianlaw.org/issue/ending-violence-against-native-women. ........................................20

James, S.E., et. al., National Center for Transgender Equality, *2015 U.S. Transgender Survey* (2016)..............................................................................................21

Kamarck, Kristy N., Cong. Research Serv., R42075, *Women in Combat: Issues for Congress* 6 (2016) ....................................................................................................24

Kantor, Jodi & Twohey, Megan, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times, Oct. 5, 2017 ..................................................17

Kilpatrick, Dean G., et al., Med. Univ. of South Carolina, *Drug-Facilitated, Incapacitated, and Forcible Rape: A National Study* (2007) ..................................20

Kitroeff, Natalie & Silver-Greenberg, Jessica, *Pregnancy Discrimination is Rampant Inside America's Biggest Companies*, N.Y. Times, Feb. 8, 2019 ...........................24

Krebs, Christopher P., et al., *The Campus Sexual Assault (CSA) Study: Final Report* (2007) .................................................................................20, 22

Law, Sylvia A., *The Founders on Families*, 39 U. Fla. L. Rev. 583 (1987) ..................................6

Legal Momentum, *Women and Poverty in America*, at www.legalmomentum.org/women-and-poverty-america.......................................................23

*Legally Speaking: The Originalist*, Cal. Lawy. (Jan. 2011) .........................................16

Levine, Beryl J., *Closing Comments*, 6 Law & Ineq. 41 (1988).......................................6

Martin, Jeffrey, *South Carolina Latest State to Move to Ratify Equal Rights Amendment With Bipartisan Effort*, Newsweek, June 7, 2020 ................................18

Model Penal Code § 213.1 (1962) ........................................................................5

Morabito, Melissa S., et al., U.S. Dept. of Justice, *Decision Making in Sexual Assault Cases, Replication Research on Sexual Violence Case Attrition in the U.S., III* (2019) ...............................................................................20

Nadler, Ben, *Georgia push for Equal Rights Amendment draws GOP support*, AP News, Jan. 30, 2019 .......................................................................18

Nat'l Center on Violence Against Women in the Black Community, *Black Women and Sexual Assault* (2018) ...........................................................20

Nat'l Comm'n on Military, Nat'l & Pub. Serv., *Inspired to Serve* (Mar. 2020) .........................25

Nat'l Council of Juvenile & Family Court Judges, *A Guide for Effective Issuance and Enforcement of Protection Orders*.............................................19

National Partnership for Women & Families, *America's Women and the Wage Gap: Fact Sheet* (Mar. 2020) ...............................................................23

Nat'l Sexual Violence Res. Ctr., *Immigrant Victims of Sexual Assault, SART Toolkit Section* 6.12, at www.nsvrc.org/sarts/toolkit/6-12 ...............................21

Neuwirth, Jessica, *Equal Means Equal* (2015).............................................9, 14, 17, 23

Norton, Mary Beth, *Liberty's Daughters: The Revolutionary Experience of American Women, 1750–1800* (1980) .........................................................5

Patil, Anushka, *How a March for Black Trans Lives Became a Huge Event*, N.Y. Times, June 15, 2020.......................................................................21

*Report of the Woman's Rights Convention* (1848) ....................................................7

*Rise Up!*, Ms. Magazine (Spring 2017) ................................................................16

Rollè, Luca, et. al., *Intimate Partner Violence Meets Same Sex Couples: A Review of Same Sex Intimate Partner Violence*, 9 Front. Psychol. 2 (2018) ......................................21

Routley, Nick, *Walmart Nation: Mapping America's Biggest Employers*, Visual Capitalist (Jan. 24, 2019) ......................................................................................................22

Saul, Stephanie & Taylor, Kate, *Betsy DeVos Reverses Obama-Era Policy on Campus Sexual Assault Investigations*, N.Y. Times, Sept. 22, 2017......................................21

Shaw, Elyse, et al., Inst. for Women's Policy Research, *Sexual Harassment and Assault at Work: Understanding the Costs* (Oct. 2018) ......................................24

Semega, Jessica, U.S. Census Bureau, *Payday, Poverty and Women* (Sept. 10, 2019) ................................................................................................................................24

Smith, Sharon G., et al., Nat'l Center for Injury Prevention & Control, Div. of Violence Prevention, *National Intimate Partner and Sexual Violence Survey: 2015 Data Brief* (2018)........................................................................................................19

Suk, Julie, *We the Women* (forthcoming 2020) ........................................................9, 10

Tetrault, Lisa, *The Myth of Seneca Falls: Memory and the Women's Suffrage Movement, 1848–1898* (2014) .......................................................................................7, 8

Toossi, Mitra, *A Century of Change: The U.S. Labor Force, 1950–2050*, Monthly Labor Rev. (May 2002)............................................................................................................9

U.S. Bureau of Labor Stat., Dept. of Labor, Report 1083, *Highlights of women's earnings in 2018* (Nov. 2019).....................................................................................23

U.S. Bureau of Labor Stat., Dept. of Labor, News Release, USDL-20-1140, *The Employment Situation – May 2020* ...........................................................................22

U.S. Office of Pers. Mgmt., DI-03326-10/2019, *Federal Equal Opportunity Recruitment Program Report FY 2017* (2019) .........................................................23

Wellman, Judith, *The Road to Seneca Falls* (1984) .....................................................7

Wharton, Linda J., *State Equal Rights Amendments Revisited: Evaluating their Effectiveness in Advancing Protection Against Sex Discrimination*, 36 Rutgers L.J. 1201 (2005).........................................................................................................14

Women & Families, *America's Women and the Wage Gap: Fact Sheet* (Mar. 2020) .......................................................................................................................23

Women's March, *Guiding Vision and Definition of Principles* (2017).........................16

Wriggins, Jennifer, *Rape, Racism, and the Law*, 6 Harv. Women's L.J. 118 (1983)......................5

Wright, Danaya C., *"Great Variety of Relevant Conditions, Political, Social and Economic": The Constitutionality of Congressional Deadlines on Amendment Proposals under Article V*, 28 Wm. & Mary Bill of Rights J. 1 (2019). ................................11

Youssef, Nancy A., *The Military Offers Women Pay Equity and Opportunity, but Few Still Make Top Ranks*, Wall Street J., Oct. 13, 2019 ........................................................24

## INTRODUCTION AND STATEMENT OF INTEREST[1]

Achieving equality for women is a long-term project, and progress has been painfully slow.  For the first 144 years of our Nation's existence, women were denied the most basic right of citizens in a democracy: the right to vote.  Women who otherwise met all criteria for voting were excluded from the polls simply because of their sex.  The absence of women's voices led to lawmaking and institutions that persistently discriminate against women.  Indeed, after women finally obtained the right to vote, it took decades more to secure statutory protection against overt discrimination in employment and education.

Despite the long history of discrimination, women today serve with tremendous distinction in the C-suite, on the floor of Congress, on the soccer field, on the presidential debate stage, and even in combat.  Women also make up the overwhelming majority of health-care workers on the front lines of the fight against COVID-19.  Yet women still face persistent inequality in nearly every sphere.  Women are consistently underrepresented in positions of power and overrepresented among those living in poverty.  Women are still paid only 81 cents on average—and far less than 81 cents for women of color—for every dollar paid to men, and women face an ongoing epidemic of domestic and sexual violence.  The persistent inequities are particularly acute for Black women, Latina women, indigenous and Native American women, immigrants, lesbians, trans women, women with disabilities, and single mothers.

These struggles continue to fuel the fight for the Equal Rights Amendment, which declares, "Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex."  Drafted by Alice Paul and other suffragists in the early 1920s, the ERA passed through Congress in 1972 with the support of both men and women,

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity (other than counsel for amici) contributed monetarily to the preparation or submission of this brief.

1

Republicans and Democrats.  After the number of state ratifications stalled at thirty-five in the late 1970s, the fight for equality continued to press forward, achieving steady progress on many fronts, including in public opinion.  Recent polls show that an overwhelming majority of Americans (again, both men and women, Republicans and Democrats) believe the ERA should be part of our Constitution.  *See*, *e.g.*, ERA Coalition Press Release, June 17, 2016, at www.eracoalition.org; ABA 2020 Survey of Civil Literacy, at www.ambar.org/CivicSurvey.  Three-quarters of the States have now voted to ratify the ERA, and there are active ratification efforts in every one of the unratified States.  Yet the current administration insists that it is too late and asks this Court to send the fight for women's constitutional equality back to square one.

This Court should reject that argument.  The painfully slow progress toward equality makes it particularly important in this context to respect the plain language of Article V, which establishes a process for amendment that does not contemplate time limits.  Under Article V, an amendment "shall be valid to all intents and purposes, as part of this Constitution, *when ratified by the legislatures of three fourths of the several States*."  U.S. Const. art. V (emphasis added).  The ERA satisfied this requirement in January 2020, when Virginia became the thirty-eighth State to ratify.  Now that the ERA "has been adopted, according to the provisions of the Constitution," federal law requires the Archivist to publish the amendment.  1 U.S.C. § 106b.

The seven-year time frame that Congress imposed in 1972 does not and cannot alter the provisions of the Constitution that govern amendment.  Unlike in some earlier amendments—for example, in the Prohibition Amendment, which the Supreme Court addressed in *Dillon v. Gloss*—Congress did not incorporate a time limit into the language of the ERA itself to be ratified by the States.  Instead, Congress inserted a time limit only in the resolving clause of its joint resolution.  At a minimum, this means that Congress can change the time limit at its

discretion in a subsequent joint resolution—as it did by a simple majority in 1978, when it

extended the time limit by just over three years.  After all, one Congress cannot bind future

Congresses.  But more fundamentally, the time limit's placement makes it ineffective to stop the

ERA, now that the constitutional requirements have been met.  As a matter of constitutional law,

the plain language of Article V dictates when the ERA becomes "valid to all intents and

purposes"—namely, "when ratified by the legislatures of three fourths of the several States."

Congress cannot change the Article V process on its own without asking the States to ratify the

change.  A time limit imposed unilaterally by Congress cannot stand in the way of the will of the

people in the thirty-eight States that ratified the ERA as provided in the Constitution.

Amici are a broad array of groups that strive for equality and opportunity for women and

work to eliminate sex-based discrimination and violence.  They include national organizations

that have fought for the ERA for decades, along with organizations in States that have ratified

the ERA, and organizations in States that have not.  A complete list follows:

> Alice Paul Institute (API)
> American Association of University Women (AAUW)
> Association of Flight Attendants-CWA (AFA-CWA)
> Arizona NOW
> Black Women's Roundtable
> Dolores Huerta Foundation
> Domestic Violence Legal Empowerment and Appeals Project (DV LEAP)
> Downtown Women for Change
> Equal Rights Amendment North Carolina Alliance (ERA-NC Alliance)
> Equality Utah
> ERA Coalition
> ERA Minnesota
> ERA Task Force AZ
> Feminist Majority Foundation
> Fund for Women's Equality (FFWE)
> Gender Justice
> General Federation of Women's Clubs (GFWC)
> Hadassah, the Women's Zionist Organization of America, Inc.
> Justice Revival
> League of Women Voters of the United States

Legal Momentum
Michigan Federation of Business and Professional Women's Clubs, Inc.
Michigan ERAmerica
Mormons for ERA
National Alliance to End Sexual Violence (NAESV)
National Association of Commissions for Women (NACW)
National Association of Social Workers (NASW)
National Association of Women Lawyers (NAWL)
National Congress of Black Women, Inc.
National Council of Jewish Women, Inc.
National Federation of Business and Professional Women's Clubs
National Immigrant Women's Advocacy Project, Inc. (NIWAP)
National Organization for Women (NOW)
National Women's Political Caucus (NWPC)
National Women's Political Caucus Foundation
Oklahoma Women's Coalition
Project 28 MO
Rethinking Eve LLC
Service Women's Action Network (SWAN)
Sisters of Loretto - Loretto Community
Sisters of St. Joseph of Carondelet Area
TIME'S UP Foundation
Union Theological Seminary in the City of New York
United 4 Equality, LLC
Utah ERA Coalition
Voto Latino
Women's Equality Coalition
Women's Health and Reproductive Rights
Women's Law Project (WLP)
Women Lawyers on Guard Inc. (WLG)
Women's Media Center
YWCA USA

Amici submit this brief to provide the Court with insight into the long and slow process of achieving equality under the law and to describe the persistent inequality that women continue to experience today.  Although the Framers did not themselves act to recognize and protect women's equality, they created a process for amending the Constitution—embodied in Article V—that could reflect changes in our society's understanding of human rights, even when those changes evolve over many years.  The ERA reflects such a change.

**ARGUMENT**

I.   **The fight for equality has been long and hard-fought, as advocates have struggled to correct the Framers' intentional exclusion of women.**

    A.   **At the founding, our Constitution reflected the norms of its time, which deprived women of the most basic rights and powers under the law.**

When our Nation declared its independence and confirmed in 1776 that "all men are created equal," women were not included.  A free married woman had no legal identity separate from her husband; she could not vote, make contracts, institute lawsuits, write a will, sell land, or keep her own wages.  *See* Mary Beth Norton, *Liberty's Daughters: The Revolutionary Experience of American Women, 1750–1800*, 46 (1980).

The legally subordinate position of women left them vulnerable to sexual coercion, which was rarely reported.  *See* Sharon Block, *Rape and Sexual Power in Early America* 94 (2006).  The rape of Black women was legal, regardless of the race of the perpetrator.  This was particularly true during slavery, when the rape of Black women by White men was commonplace and was used as a weapon to enforce White supremacy.  Jennifer Wriggins, *Rape, Racism, and the Law*, 6 Harv. Women's L.J. 118 (1983).  And married women of any race could not seek prosecution for rape by their husbands—which remained the case for centuries, until the laws began to change in the 1970s.  Norton, *supra*, at 47–48; *see, e.g.*, Model Penal Code § 213.1 (1962) (rape defined as forcible or coerced sex by a man "with a female not his wife").

The denial of rights for women was no coincidence.  Both law and culture at the time regarded women as inferior, weak, and in need of protection.  *See* Ruth Bader Ginsburg, *Remarks on Women Becoming Part of the Constitution*, 6 Law & Ineq. 17, 20 (1988); *see also Frontiero v. Richardson*, 411 U.S. 677, 684 (1973).  This same rationale supported denying women any political voice.  Theorists like Locke, Hobbes, and Rousseau all claimed that women

were inferior—and that this inferiority was a reason to restrict them to the domestic sphere.
Sylvia A. Law, *The Founders on Families*, 39 U. Fla. L. Rev. 583, 588–89, 589 n.20 (1987).

Against this backdrop, the Framers did *not* regard women as part of the Constitution's "We the People," despite their use of what is now understood as a gender-neutral term.[2]  The historical record is clear:  when Abigail Adams asked her husband John to "remember the ladies" in "the new Code of Law," he dismissed her request as a joke.  *Id.* at 587–88.  And Thomas Jefferson believed that "to prevent deprivation of morals and ambiguity of issue, [women] could not mix promiscuously in the public meetings of men."  Beryl J. Levine, *Closing Comments*, 6 Law & Ineq. 41, 41–42 (1988).

Further evidence comes from New Jersey's "little-known experiment" with women's suffrage.  Norton, *supra*, at 14.  The State's constitution originally defined voters as "all free inhabitants" who met certain property-ownership requirements, and many women seized the opportunity to cast ballots.  *Id.* at 13.  But the prevailing sentiment at the time was that women were not "fitted to perform this duty with credit to themselves, or advantage to the public."  *Id.* (quoting William Griffith, *Eumenes: Being a Collection of Papers* 33 (1799)).  The legislature acted swiftly to exclude women from the vote.  *Id.*  Lawmakers justified their action by saying that a woman's vote was more likely to be corrupted, reflecting the prevailing attitude that, "in practical effect, placed women, not on a pedestal, but in a cage."  *Frontiero*, 411 U.S. at 684.

---

[2] *Contrast* Amici Br. of Eagle Forum at 17 (relying on what is apparently a post-King-James translation of the Bible as evidence that the 1776 phrase "'all men are created equal'" was meant to recognize the inherent equality of "all of humanity," despite undeniable evidence that the drafters of that phrase did not regard or treat women, Native Americans, or Black people as "equal" to White men in any meaningful sense).

**B.     The fight for the vote took more than a century, and even then, advocates recognized that suffrage was not sufficient to ensure equality.**

The women's suffrage movement traces its history to the first Women's Rights Convention, held in 1848 in Seneca Falls, New York, though the suffragists' work began decades earlier. *See* Ellen Carol DuBois, *Outgrowing the Compact of the Fathers: Equal Rights, Woman Suffrage, and the U.S. Constitution, 1820–1878*, J. Am. Hist. 836, 840 (Dec. 1987); Lisa Tetrault, *The Myth of Seneca Falls: Memory and the Women's Suffrage Movement, 1848–1898,* 2, 120 (2014). The women who organized the 1848 gathering were abolitionists and veterans of the anti-slavery movement, which itself had become divided over the role of women. *Frederick Douglass on Women's Rights*, introduction, at 3–7 (Philip S. Foner, ed., 1992). Participants gathered for two days in Seneca Falls to "discuss the social, civil, and religious condition of woman." Judith Wellman, *The Road to Seneca Falls* 186 (1984). Elizabeth Cady Stanton unveiled the Declaration of Sentiments, which corrected the Founding Fathers' error and affirmed "that all men *and women* are created equal." *Report of the Woman's Rights Convention* (1848) (emphasis added). The Declaration of Sentiments also included several resolutions, including a demand for woman suffrage. Frederick Douglass—who had escaped from slavery just ten years earlier—attested powerfully in favor of this demand. *Frederick Douglass*, introduction, at 14–15.

In the years following, similar conventions were held throughout the United States, featuring activists and suffragists Sojourner Truth and Sarah Remond, among many others. By the Second Woman's Convention in 1851, however, the movement's focus had moved away from full equality and more narrowly toward suffrage as the "cornerstone of [its] enterprise," at least as a first step. *See* DuBois, *supra,* at 842.

After the Civil War, suffragists saw an opportunity to gain full citizenship in debates surrounding the Reconstruction Amendments.  The American Equal Rights Association—formed by former abolitionists and women's rights advocates—pushed for universal suffrage, but the simultaneous enfranchisement of Black men and all women was viewed as politically unrealistic by some and politically undesirable by others.  Tetrault, *supra*, at 17.  One author suggests that supporters of Black voting rights generally meant Black male suffrage, while White women who demanded women's voting rights were focused at the time on White female suffrage, leaving Black women "struggling for visibility and access," despite their fervent activism for both.  *Id*. at 21.  In the end, women's rights took a back seat.  The Fourteenth Amendment affirmed the citizenship of all persons born in the United States, but it guaranteed political representation only to "*male* citizens twenty-one years of age."  U.S. Const. amend. XIV, § 2 (emphasis added). This was the first time an explicit sex distinction appeared in the Constitution.

The Supreme Court interpreted the Fourteenth Amendment accordingly.  In 1873, the Court faced the question whether the Fourteenth Amendment's Privileges and Immunities Clause prevented a State from denying a law license to a woman based solely on her sex.  *Bradwell v. State of Illinois*, 83 U.S. 130 (1873).  The Court held that it did not, concluding that a State may regulate the granting of law licenses as it wished.  *Id*. at 139.  Three concurring justices, however, would have affirmed the state court's decision on the ground that women had no right "to engage in any and every profession, occupation, or employment in civil life."  *Id*. at 141 (Bradley, J.).  Their explanation reflects the status of women at the time:

> [T]he civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman.  Man is, or should be, woman's protector and defender.  The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. . . .  The harmony, not to say identity, of interest and views which belong, or should belong, to the family institution is repugnant to the idea of a

woman adopting a distinct and independent career from that of her husband.  So
firmly fixed was this sentiment in the founders of the common law that it became
a maxim of that system of jurisprudence that a woman had no legal existence
separate from her husband, who was regarded as her head and representative in
the social state; and, notwithstanding some recent modifications of this civil
status, many of the special rules of law flowing from and dependent upon this
cardinal principle still exist in full force in most States.  One of these is that a
married woman is incapable, without her husband's consent, of making contracts
which shall be binding on her or him . . . . [*Id.*]

Only after decades of continued advocacy—including picketing, hunger strikes, beatings,

arrests, and a World War—were women finally successful in securing the right to vote.  Jessica

Neuwirth, *Equal Means Equal* 2 (2015).  Even then, however, proponents of the Nineteenth

Amendment understood that the right to vote did not mean true equality.  After succeeding in her

long fight for suffrage, Alice Paul drafted the first Equal Rights Amendment to ensure that all

rights under law would be guaranteed equally to women and men.  *Id*.  The ERA was introduced

into Congress in 1923 by Representative Daniel Anthony of Kansas—a nephew of suffragist

leader Susan B. Anthony—but it never came to a congressional vote.  *Id.*

Support for the ERA grew slowly and steadily in the following decades.  The ERA

became part of the Republican Party's political platform in 1940 and the Democratic platform in

1944.  *Id.* at 3.  It reached the floor of the Senate in 1946, securing a majority vote but not the

two-thirds required in Article V of the Constitution.  *Id*.

At the same time, women were emerging as an important part of the work force.  When

American men went overseas to fight in World War II, women took their jobs on the home front

(though many were forced to relinquish their jobs to veterans at the end of the war).  Julie Suk,

*We the Women* 39 (forthcoming 2020).  Following World War II, a major expansion of the U.S.

economy increased the demand for labor.  Mitra Toossi, *A Century of Change: The U.S. Labor

Force, 1950–2050*, Monthly Labor Rev. (May 2002).  Fueled by both the civil rights movement

and the women's movement—as well as legislation promoting equal opportunity in

employment—more and more women began to work outside the home.  *Id.* at 18.  Between 1950 and 1970, the percentage of women participating in the paid workforce grew from 34% to 43%. *Id.*  These percentages exploded in the 1970s, growing by 20.5% for women aged 25–34 and by 14.4% for women aged 35–44.  *Id.*  An increase in participation rates of this magnitude in one decade is unprecedented by any other segment of the labor force.  *Id.*

Still, fundamental inequality persisted.  For decades after women's suffrage, state laws continued to exclude women from certain jobs, professions, colleges and universities, scholarships, and even jury service.  Suk, *supra*, at 53.  Some restrictions on married women's property rights limited women's access to credit and business opportunities.  *Id.*

### C.    Congress finally passed the ERA in 1972, placing a time limit only in the resolving clause of its joint resolution and extending it after concluding that such an important and fundamental amendment deserves more time.

In 1970, Congresswoman Martha Griffiths of Michigan filed a discharge petition in the House to bring the ERA to the floor.  *See* H.R. Rep. No. 116-378, at 2 (2020).  In the debate leading up to the House's historic vote, Democrats and Republicans alike testified in favor of the ERA's passage.  Suk, *supra,* at 55.  Ultimately, the House passed the ERA by a 354-to-24 margin.  The text of the proposed ERA contained three sections:

> Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

> Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

> Section 3. This amendment shall take effect two years after the date of ratification.

H.J. Res. 208, 92d Cong. (1971).  In 1972, the Senate passed the ERA by a vote of 84 to 8— again, with strong bipartisan support.  *See* H.R. Rep No. 116-378, at 12.

In the resolving clause of its joint resolution proposing the amendment, Congress purported to impose a seven-year time limit on the States' ratification.  H.J. Res. 208, 92d Cong.

(1971) (stating that the amendment would be valid "when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission to the Congress"). Such time limits are a modern creation. Congress injected a time limit for ratification for the first time in 1917, when it included a seven-year time limit in the Prohibition Amendment. Danaya C. Wright, *"Great Variety of Relevant Conditions, Political, Social and Economic": The Constitutionality of Congressional Deadlines on Amendment Proposals under Article V*, 28 Wm. & Mary Bill of Rights J. 1, 1 (2019). Before that amendment, there had never been a time limit on ratification. Indeed, our most recent amendment—the Twenty-Seventh, relating to congressional pay—was proposed by James Madison in 1789 and took 203 years to reach full ratification, becoming part of the Constitution in 1992. *Id*. at 19.

For the first half of the Twentieth Century, Congress placed these time limits in the text of the amendment itself, where they would be part of the language that the States would ratify. *Id*. at 20–25. It was this kind of time limit that the Supreme Court addressed in *Dillon*, which involved the Prohibition Amendment. *See also Coleman v. Miller*, 307 U.S. 433, 452 (1939) (discussing the time limit issue in dicta, in the context of *Dillon* and the Prohibition Amendment). Notably, neither *Dillon* nor any other Supreme Court case has considered whether a time limit is effective to stand in the way of an amendment once all constitutional requirements had been met. The States had ratified the Prohibition Amendment within seven years, so the time limit had no real impact on the ratification process; the argument in *Dillon* was that the mere presence of the time limit in the amendment's text rendered it invalid, allowing a bootlegger to avoid prosecution. *Id.* at 367–77. This was an "audacious" argument, and the Supreme Court unsurprisingly rejected it. Wright, *supra*, at 28.

Beginning with the Twenty-Third Amendment in the early 1960s, Congress changed its practice, moving the time limit to the "resolving" clause that introduced the amendment.  *Id*. at 25.  This had two important legal consequences.  By placing the time limit in the resolving clause of its joint resolution—which the States were not called upon to ratify—Congress preserved for itself the power to *change* the time limit later on.  As the Department of Justice later opined in connection with the ERA, a subsequent Congress may "act to extend the seven-year limitation clause."  H.R. Rep No. 116-378, at 9 (citing 1977 Opinion of the Office of Legal Counsel)).  More broadly, though, this change in location defeated any analogy to *Dillon*.  Even if the *Dillon* Court had addressed the *effectiveness* of a time limit—and as discussed above, it did not—the time limit it considered was fundamentally different from the time limit in the amendments proposed in the 1960s and early 1970s.  When a time limit does not appear in the text ratified by the States, it is merely a unilateral assertion by Congress, so it cannot change the process set forth in Article V.

At first, ratification of the ERA proceeded very quickly.  Within a year of Congress's adoption, the legislatures of thirty States voted to ratify.  H.R. Rep No. 116-378, at 3.  By the end of 1977, however, the number of ratifications had reached only thirty-five—three short of the required thirty-eight.  *Id.*  Rather than let the time limit expire, Congress extended the time limit by just over three years, into 1982.  H.J. Res. 638, 95th Cong. (1978).  By doing so, Congress affirmed that the previous time limit was not binding and could be altered, given that it appeared only in the resolving clause of the joint resolution and not in the text that the States would vote to ratify.  H.R. Rep. No. 116-378, at 7–9.

The extension of the time limit reflected Congress's understanding that a short deadline would not be appropriate for an amendment that concerned a matter of basic cultural change.

Testifying before Congress, Professor Thomas Emerson explained that "history has demonstrated that a long period of time is necessary for the nation to make up its mind with respect to fundamental changes in the status of large groups in the population." *Equal Rights Amendment Extension: Hearings on H.J. Res. 638 Before Subcomm. on Civil & Const. Rights of H. Comm. on Judiciary*, 95th Cong. 64 (1978) (statement of Thomas I. Emerson, Lines Prof. of L. Emeritus, Yale L. Sch.). He observed that women's suffrage had been under consideration for at least three-quarters of a century before ratification of the Nineteenth Amendment. *Id.* Both Professor Emerson and then-Professor Ruth Bader Ginsburg testified to the continued vitality of and need for the ERA, notwithstanding the time limit. *Id.* at 64 and 125 (statement of Ruth Bader Ginsburg, Prof. of L., Colum. L. Sch.).

The passage of the extension bill was the culmination of a massive and passionate grassroots effort by activists across the Nation. As more than 100,000 ERA supporters marched on the Capitol in Washington, D.C.—representing more than 325 delegations—activists around the country showered Congress with thousands of telegrams, demanding that it present the bill for a vote. *See* Karen de Witt, *100,000 Join March for Extension of Rights Amendment Deadline*, N.Y. Times, July 10, 1978, at A1; David Dismore, *July 9, 1978: Feminists Make History with Biggest-Ever March for the Equal Rights Amendment*, Feminist Daily Newswire (July 9, 2014); *see also* H. Con. Res. 2028, 54th Leg., 1st Reg. Sess. (Ariz. 2019) (stating that "thousands [] sent telegrams to Congress, shutting down Western Union").

### D.     During and after the 1970s, the movement for equality proceeded, though its success has been incremental and incomplete.

No additional states voted to ratify the ERA before the end of the extended time limit, but support for the ERA has continued to grow, and the push for ratification has never waned, attracting new generations of supporters. A new ERA has been introduced in Congress every

year since 1983.  Neuwirth, *supra*, at 101.  And after the Madison Amendment became law in

1992, 203 years after its passage by Congress—making clear that the passage of time is not a

barrier under Article V—advocates' attention also turned to completing the ratification of the

ERA proposed in 1972.  *E.g.*, Allison L. Held, et al., *The Equal Rights Amendment: Why the

ERA Remains Legally Viable and Properly Before the States*, 3 Wm. & Mary J. Women & L.

113 (1997).  A bill was introduced in the House in 1994 to recognize ratifications by three more

states, whenever they occurred.  *See* H. Res. 432, 103d Cong.  Then in 2011, the House saw the

first bill to eliminate the 1972 time limit altogether.  *See* H.J. Res 47, 112th Cong.  A similar bill

was introduced in the Senate in 2012.  *See* S.J. Res. 39, 112th Cong.  (As discussed below, the

House passed such a bill earlier this year, and a companion bill is pending in the Senate.)

Advocates also sought other protections for the rights of women, both in court and in

legislatures across the country.  Inspired by the federal ERA campaign, fourteen States added

equal rights protections to their own constitutions in the 1970s.  Linda J. Wharton, *State Equal

Rights Amendments Revisited: Evaluating their Effectiveness in Advancing Protection Against

Sex Discrimination*, 36 Rutgers L.J. 1201, 1201 (2005).  These provisions generally tracked the

proposed federal ERA, and "their legislative histories indicate a specific desire to provide more

comprehensive protection against sex discrimination than that available under the existing

Federal Constitution."  *Id.* at 1201–02.  Today, twenty-five state constitutions provide either

inclusive or partial guarantees of equal rights on the basis of sex.  *See* Alice Paul Institute, *ERA

Frequently Asked Questions* (2020), at www.equalrightsamendment.org/faq/.  Yet those state

constitutions have no impact on discrimination by agencies and officials in the federal

government.  And in the other twenty-five States, women remain without constitutional equality

protections at the federal *or* state level.

Another important area of advocacy for the advancement of women's rights was in court, under the Fourteenth Amendment.  The Supreme Court's century-old refusal to recognize sex discrimination under the Fourteenth Amendment ended in 1971, when the Court held that it was unconstitutional for a State to prefer men over women to administer a deceased's estate.  *Reed v. Reed*, 404 U.S. 71 (1971).  The Court held that a preference based on sex was "the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment."  *Id.* at 77.  This was the first victory of its kind for the then-Director of the ACLU Women's Rights Project, Ruth Bader Ginsburg.  She went on to lead a number of cases that succeeded in securing some measure of protection against sex discrimination under the Fifth and Fourteenth Amendments.  For example, in *Craig v. Boren*, 429 U.S. 71 (1976), the Court overturned an Oklahoma law allowing women to purchase beer at an earlier age than men— holding for the first time that laws that treated men and women differently should bear "intermediate scrutiny"—in other words, a substantial relationship to an important government objective.  Justice Ginsburg's influence continued after her confirmation to the Supreme Court— most notably with her opinion for the majority in *United States v. Virginia*, 518 U.S. 515 (1996), which held that Virginia Military Institute's male-only admissions process was unconstitutional.

Although this jurisprudence certainly reflects progress, the "intermediate scrutiny" for sex discrimination under the Fourteenth Amendment is both inadequate and insecure, particularly given the current administration's impact on the federal bench.  The late Justice Antonin Scalia and most other originalists have concluded that "the Fourteenth Amendment does not ban sex discrimination."  Steven G. Calabresi & Julia Rickert, *Originalism and Sex Discrimination*, 90 Tex. L. Rev. 1, 2 (2011).  Justice Scalia explained his views this way: "Certainly the Constitution does not require discrimination on the basis of sex.  The only issue is

whether it prohibits it.  It doesn't.  Nobody ever thought that that's what it meant.  Nobody ever

voted for that." *Legally Speaking: The Originalist*, Cal. Lawy. (Jan. 2011).

> **E.      Since 2016, the ERA has surged forward, with a new understanding of
> persistent inequality, sexual harassment, and sex-based violence.**

In recent years, the ongoing push to ratify the ERA has gained significant strength from a

new generation of activists, spurred on by the Women's March and the "Me Too" movement.

The Women's March sprang out of a post on Facebook after the 2016 presidential election,

quickly growing as women and their allies mobilized to create a global movement.  Although it

was initially a response to the U.S. election results, it aimed to draw attention to women's rights

and collective power.  Duaa Eldeib, *Women plan march on Washington day after Trump's

inauguration*, Chi. Trib., Nov. 28, 2016.  Women and men of all ages took to the streets on

January 21, 2017, in a global movement of staggering proportion—drawing an estimated 5.6

million protestors in nearly a thousand separate marches worldwide, spanning more than 90

countries on all seven continents.  *Rise Up!*, Ms. Magazine (Spring 2017).  It was the largest

single-day protest in U.S. history, drawing an estimated 4.1 million people in the United States

alone.  Erica Chenoweth & Jeremy Pressman, *This is what we learned by counting the women's

marches*, Wash. Post, Feb. 7, 2017.  The Unity Principles distributed by the organizers of the

Women's March called for, among other things, passage of an Equal Rights Amendment to the

U.S. Constitution.  Women's March, *Guiding Vision and Definition of Principles* 4 (2017).

At the same time, the "Me Too" movement drew attention to the continued problem of

sexual harassment and assault against women in the workplace.  Tarana Burke created the "Me

Too" movement in 2007 to help victims of sexual harassment and assault.  *See The Facts Behind

the #MeToo Movement: A National Study on Sexual Harassment and Assault* at 9 (2018), at

www.stopstreetharassment.org.  In October 2017, actress and ERA advocate Alyssa Milano

helped popularize the term on Twitter by inviting people to use a #MeToo hashtag to demonstrate how widespread sexual harassment and assault are in the United States.  *Id*.  Within days, more than a million people had used the hashtag.  *Id.*  Around the same time, many women in Hollywood were coming forward with sexual abuse allegations against the now-convicted film producer Harvey Weinstein.  Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times, Oct. 5, 2017.  In the ensuing months, dozens of high-profile men in entertainment, the arts, politics, sports, and business were fired or resigned after women and men had come forward with credible allegations of abuse.  Within the entertainment industry, this movement led to the formation of TIME'S UP!—an organization dedicated to eliminating sexual assault, harassment, and inequality in the workplace.

The renewed public attention to these important issues added fuel to the continuing drive for the ERA.  Ratification efforts had been ongoing for many years, with sustained advocacy both in state legislatures and in Congress.  Neuwirth, *supra*, at 99.  The new voices and attention after the Women's March combined with these sustained efforts to push the ERA forward.  In March 2017—on the forty-fifth anniversary of the ERA's passage through Congress—the Nevada legislature voted to ratify the ERA.  The Illinois General Assembly followed suit in May 2018, followed by the Virginia General Assembly in January 2020.  Three-quarters of the States have now voted to ratify the ERA, satisfying the requirements of Article V.

Immediately following Virginia's ratification, the U.S. House of Representatives voted on a bipartisan basis to remove the time limit in the joint resolution, to eliminate any doubt that the effectiveness of the ERA depends solely on Article V.  H.J. Res. 79, 116th Cong. (2019) (passed Feb. 13, 2020).  Indeed, the language of this resolution largely tracks the language of Article V, providing that "notwithstanding any time limit contained in House Joint Resolution

208, 92nd Congress, as agreed to in the Senate on March 22, 1972, the article of amendment

proposed to the States in that joint resolution shall be valid to all intents and purposes as part of

the United States Constitution whenever ratified by the legislatures of three-fourths of the several

States." *Id*.  The House's approval of this resolution reflects not only its judgment that the time

limit is not immutable but also its recognition that for a "broad and fundamental principle" like

the one reflected in the ERA, no time limit is appropriate:

> Unlike the Eighteenth Amendment at issue in *Dillon*, which related to the
> particular and narrow social policy of prohibition, the ERA stands for a broad and
> fundamental principle:  namely, government institutions may not discriminate on
> the basis of sex.  The Committee finds no less need to affirm that principle today
> than in 1972 or 1978—and it finds no reason to believe that such a principle will
> lose its vitality in the years to come.

H.R. Rep. No. 116-378, at 7–8.  A similar bill is pending in the Senate, with bipartisan

sponsorship.  *See* S.J. Res. 6, 116th Cong. (2019).  At the same time, active ratification efforts

continue in all of the as-yet-unratified States; ratification bills have been introduced within the

last fourteen months in all twelve state legislatures, many with bipartisan sponsorship.[3]

## II.    Women today face persistent inequality in nearly every sphere—inequality that reflects a continued and acute need for the Equal Rights Amendment.

Even as women have emerged as a powerful force in our economy and the electorate,

they continue to face persistent inequality.  These problems are particularly acute for women of

---

[3] *See, e.g.*, Jeffrey Martin, *South Carolina Latest State to Move to Ratify ERA With Bipartisan Effort*, Newsweek, June 7, 2020; Renzo Downey, *Bipartisan coalition calls for ERA adoption*, Fla. Politics, Feb. 12, 2020; Ben Nadler, *Georgia push for ERA draws GOP support*, AP News, Jan. 30, 2019; Editorial Board, *Utah should ratify the ERA*, Salt Lake Trib., Dec. 7, 2019; Editorial Board, *NC can make history – and Republicans can make amends – by ratifying the ERA*, Raleigh News & Observer, Aug. 30, 2019; *see also* H.J. Res. 97, 2020 Leg., Reg. Sess. (Ala.); S. Con. Res. 1001, 54th Leg., 2d Sess. (Ariz. 2020); S.J. Res. 18, 92nd Gen. Assemb., Reg. Sess. (Ark. 2019); S. Con. Res. 392, 2020 Leg. (Fla.); S. Res. 66, 2019-2020 Leg., Reg. Sess. (Ga.); S. Con. Res. 2, 2019 Leg., Reg. Sess. (La.); H. Con. Res. 41, 2020 Leg., Reg. Sess. (Miss.); H. Con. Res. 64, 100th Gen. Assemb., Reg. Sess. (Mo. 2020); H.B. 271, Gen. Assemb., 2019 Sess. (N.C.); S.J. Res. 25, 57th Leg., 2d Sess. (Okla. 2020); H.J. Res. 3340, Gen. Assemb., 123rd Sess. (S.C. 2019); H.J. Res. 7, 2020 Leg., Gen. Sess. (Utah).

color, immigrants, indigenous and Native American women, lesbians, trans women, women with disabilities, single mothers, and victims of sexual and domestic violence.  This continued inequality is the legacy of the historical exclusion of women's voices from our government, legal system, and other institutions.  It also holds our society back more broadly, as the subjugation of women produces a society that has more conflict, less peace, less stability, and less prosperity than one that recognizes and reinforces women's fundamental equality.  *See generally* Valerie M. Hudson, et al., *The First World Order: How Sex Shapes Governance and National Security Worldwide* (2020).  Below, we provide information about the disparities women continue to experience in two particularly critical areas: violence and employment.  Passing the ERA would be a critical step forward toward eliminating these disparities.

### A.      Domestic and Sexual Violence

Between one-third and one-half of U.S. women will be subjected to domestic violence at some point in their lives.  Nat'l Council of Juvenile & Family Court Judges, *A Guide for Effective Issuance and Enforcement of Protection Orders* (citation omitted).  Although state law generally provides for orders of protection, they are often unenforced.  *Id.*  Almost one-half of petitioners were abused again by their abusers within two years of obtaining a restraining order. *Id.* at 3.  The Supreme Court held in 2005 that a police department and municipality could not be sued for failing to enforce a restraining order against a woman's abusive husband—a failure that led to his murder of her three daughters.  *Castle Rock v. Gonzales*, 545 U.S. 748 (2005).

At the same time, more than 40% of American women are subjected to sexual violence, and only a fraction of these assaults are ever prosecuted.  Sharon G. Smith, et al., Nat'l Center for Injury Prevention & Control, Div. of Violence Prevention, *National Intimate Partner and Sexual Violence Survey: 2015 Data Brief* (2018).  For every 100 rapes or attempted rapes reported to police, only 19 cases lead to arrest, 5 end in a plea deal, and 1 ends in a guilty verdict

through trial.  Melissa S. Morabito, et al., U.S. Dept. of Justice, *Decision Making in Sexual Assault Cases, Replication Research on Sexual Violence Case Attrition in the U.S., III,* 1, 16 (2019).  Between 200,000 and 400,000 untested rape kits are sitting today in police departments across the United States.  Rebecca Campbell, et al., *Changing the Criminal Justice System Response to Sexual Assault*, Am. J. Community Psychol., at 1, 2 (June 2020).  The persistent failure of law enforcement to take sexual violence seriously is no doubt a significant factor in why so few rapes are reported.  One study found that only 15.8% of rapes are reported to law enforcement.  *See* Dean G. Kilpatrick et al., Med. Univ. of South Carolina, *Drug-Facilitated, Incapacitated, and Forcible Rape: A National Study* 44 (2007).  And on college campuses, the numbers are even worse:  less than 5% of completed and/or attempted rapes are reported. Christopher P. Krebs, et al., *The Campus Sexual Assault (CSA) Study: Final Report* (2007).

The intersection between sex and race intensifies the epidemic of violence.  Black women are subjected to rape and sexual assault at a higher rate than White, Asian, and Latina women; 40–60% of Black women have been subjected to coercive sexual contact by the age of 18.  Nat'l Ctr. on Violence against Women in the Black Community, *Black Women and Sexual Assault* 1 (2018).  And "violence against indigenous women has reached unprecedented levels on tribal lands and in Alaska Native Villages;" more than half are victims of sexual violence.  Indian Law Res. Ctr., *Ending Violence Against Native Women*, at www.indianlaw.org/issue/ending-violence-against-native-women.  Studies show that American Indian women are subjected to sexual violence at much higher rates than other U.S. women.  Futures Without Violence, *American Indian Alaskan Native Violence Fact Sheet* 2 (2012).

LGBTQ+ women are also disproportionately affected by gender-based violence.  For example, 43.8% of lesbians and 61.1% of bisexual women have been subjected to intimate

partner violence at some point in their lives.  Luca Rollè et. al., *Intimate Partner Violence Meets Same Sex Couples: A Review of Same Sex Intimate Partner Violence*, 9 Front. Psychol. 2 (2018). In addition, 33% of trans women have been subjected to bias-driven assaults.  S.E. James et. al., National Center for Transgender Equality, *2015 U.S. Transgender Survey* 133 (2016).  The recent murders of Black transgender women and the "Brooklyn Liberation" march for Black trans people have drawn public attention to the particular epidemic of violence affecting Black trans women.  Anushka Patil, *How a March for Black Trans Lives Became a Huge Event*, N.Y. Times, June 15, 2020.

Sexual violence and domestic violence are also acutely problematic for immigrant women.  Nat'l Sexual Violence Res. Ctr., *Immigrant Victims of Sexual Assault, SART Toolkit Section* 6.12, at www.nsvrc.org/sarts/toolkit/6-12.  Immigrants are also more susceptible to sexual assault in the workplace.  *Id.*  Immigrant victims of sexual violence confront not only the trauma of sexual violence but also the legal, economic, community, and other significant pressures arising from their immigrant status.  *Id.*  They may be unfamiliar with the U.S. legal system, lack access to service providers, and face language barriers.  They may hesitate to report their abuse for fear that seeking justice could lead to deportation.  *Id.*  Perpetrators of sexual assault often target undocumented women because they can be isolated due to language and cultural barriers and are less likely to know their rights.  *Id.*

Where legislation has been enacted to protect against these kinds of violence, enforcement fluctuates based on the political climate.  For example, Title IX prohibits discrimination on the basis of sex in federally funded programs, but regulations implementing those protections in the context of campus sexual assault are currently being rolled back. Stephanie Saul & Kate Taylor, *Betsy DeVos Reverses Obama-Era Policy on Campus Sexual*

*Assault Investigations*, N.Y. Times, Sept. 22, 2017.  This is despite the fact that one in five women will be the victim of a completed or attempted sexual assault in college.  Krebs, *supra*.

More broadly, federal efforts to legislate against gender-based violence have run into difficulty because of political controversy and a perceived lack of congressional power.  The Violence Against Women Act of 1994 (Pub. L. 103-322) passed in Congress with broad bipartisan support but was struck down in part as exceeding the power of Congress under the Commerce Clause.  *United States v. Morrison*, 529 U.S. 598 (2000).  The Act's other provisions were reauthorized by Congress in 2000, 2005, and 2013, but the current reauthorization has stalled because of political controversy over the protections it would grant to Native Americans, LGBTQ+ individuals, and immigrants, as well as proposed restrictions on gun ownership that would include domestic abusers who are not legally married to their victims.  Relatedly, a federal court in 2018 struck down a federal statute that criminalized female genital mutilation, holding that it too exceeded the power of Congress under the Commerce Clause.  *United States. v. Nagarwala*, 350 F. Supp. 3d 613 (E.D. Mich. 2018).  The second clause of the ERA—which confers power on Congress to enact legislation to protect the rights embodied in the first clause—could provide an alternative basis for congressional action in these and other respects*.

B.      **Economic and Employment-Related Disparities**

Women continue to suffer from significant economic disparities, and legislative efforts have not succeeded in leveling the playing field.  The ERA could drive change in this area, whether or not it applies against private sector employers directly.  The federal government is by far the Nation's largest single employer, and federal and state governments together employ more than 15% of the active workforce.  *See* U.S. Bureau of Labor Stat., Dept. of Labor, News Release, USDL-20-1140, *The Employment Situation – May 2020*, at 2 & tbl. B-1; Nick Routley, *Walmart Nation: Mapping America's Biggest Employers*, Visual Capitalist (Jan. 24, 2019).  And

women of color—who face multiple, intersecting axes of discrimination—make up a

disproportionate share of government workers.  *See* U.S. Office of Pers. Mgmt., DI-03326-

10/2019, *Federal Equal Opportunity Recruitment Program Report FY 2017*, at 73 (2019).

In 2018, the median gender wage gap was 19 cents—meaning that a woman who worked

full time earned only 81% of what a man earned.  U.S. Bureau of Labor Stat., Dept. of Labor,

Report 1083, *Highlights of women's earnings in 2018*, at 1 (Nov. 2019).  This ratio has remained

largely unchanged for more than a decade.  *Id.*  A woman in the United States can expect to

make anywhere from $700,000 to $2 million less than a male colleague over her lifetime,

depending on education level.  Neuwirth, *supra*, at 15 (citing the WAGE Project).  Even in the

same job, 25% of women report earning less than their male counterparts.  Nikki Graf, et al.,

Pew Research Center, *The Narrowing, but Persistent, Gender Gap in Pay* (2018).  Not

surprisingly, these disparities are far more pronounced for women of color.  Black women are

typically paid 62 cents, Native American women 57 cents, and Latinas 54 cents for every dollar

paid to White, non-Hispanic men.  National Partnership for Women & Families, *America's

Women and the Wage Gap: Fact Sheet* 1 (Mar. 2020).

These disparities—coupled with many other problems, including a lack of affordable,

high-quality childcare—make it inevitable that women are dramatically overrepresented among

Americans in poverty.  Women are 35% more likely than men to be poor, with single mothers at

particularly high risk.  *See* Legal Momentum, *Women and Poverty in America*, at

www.legalmomentum.org/women-and-poverty-america; *see also* Meika Berlan & Morgan

Harwood, Nat'l Women's L. Ctr*., Nat'l Snapshot: Poverty Among Women and Families* (2018).

In 2018, the poverty rate for families with a female head of household was 24.9%, far higher

than for married-couple families (4.7%) and for families with a male head of household (12.7%).

Jessica Semega, U.S. Census Bureau, *Payday, Poverty and Women* (Sept. 10, 2019).

Studies estimate that anywhere from a quarter to four-fifths of women will be subjected to workplace sexual harassment in their lifetimes.  Elyse Shaw, et al., Inst. for Women's Policy Research, *Sexual Harassment and Assault at Work: Understanding the Costs* 1 (Oct. 2018).  In addition to the damage to a woman's mental and physical health, workplace sexual harassment can result in lost opportunities for on-the-job learning and advancement, or lead to a forced job change, unemployment, and the abandonment of a well-paying career.  *Id.* at 4–5.  Pregnancy discrimination remains widespread, both in blue-collar jobs and in corporate office towers.  Natalie Kitroeff & Jessica Silver-Greenberg, *Pregnancy Discrimination is Rampant Inside America's Biggest Companies*, N.Y. Times, Feb. 8, 2019.

These problems pervade the public sector as well as private industry.  In the military, for example, women face persistent inequality despite serving with great distinction at all levels.  Although Congress repealed the combat exclusion in 1993, Department of Defense policy continued to exclude women from direct ground combat for another 20 years.  Kristy N. Kamarck, Cong. Research Serv., R42075, *Women in Combat: Issues for Congress* 6, 13 (2016).  Women were only recently given the opportunity to serve in all military occupations, including special forces billets that were previously reserved for men only.  *Id.* at 14.  Yet female officers continue to face adversity in promotion, in part because of their underrepresentation at service colleges and their difficulty in obtaining combat experience.  Nancy A. Youssef, *The Military Offers Women Pay Equity and Opportunity, but Few Still Make Top Ranks*, Wall Street J., Oct. 13, 2019.  At the same time, military sexual harassment and assault remain prevalent.  Kelsey L. Campbell, *Protecting Our Defenders: The Need to Ensure Due Process for Women in the*

24

*Military before Amending the Selective Service Act*¸ 45 Hastings Const. L. Q. 115, 129 (2017). Servicewomen are 16% more likely to be sexually assaulted than women in the general population (*id.* at 126), and one in four active-duty women are subjected to sexual harassment or some form of gender discrimination (*id.* at 120 n.31).

This is a problem not only for the servicewomen themselves but also for our Nation's military readiness. The recruitment of women is essential to maintain an all-volunteer force. *See* Defense Adv. Comm. on Women in the Service, *2018 Annual Report* 6 (Dec. 11, 2018). In its March 2020 report to Congress, a national commission recommended that the draft be extended to women as well as men. Nat. Comm'n on Military, Nat'l & Pub. Serv., *Inspired to Serve* 111–23 (Mar. 2020). The potential inclusion of women in the draft further supports the notion that it is time for men and women to be recognized as equal citizens of this country.

## CONCLUSION

The ERA remains as critical today as it was in 1923—when it was first introduced—and in 1972, when a bipartisan supermajority in Congress passed it and sent it to the States. And in the years since then, the already powerful public consensus in favor of the ERA has only continued to grow. The slow progress of the fight for equality demonstrates that civil rights movements do not happen in a moment in time; they span generations. The fundamental nature of constitutional equality makes it all the more important to respect the plain language of Article V, which sets out a process for amending our Constitution that imposes no time limits. We ask that the Court hold that a time limit in the resolving clause of a congressional joint resolution cannot stand in the way of an amendment that meets the constitutional requirements in Article V. There can be no time limit on equality.

Dated:  June 30, 2020                    Respectfully submitted,


                                         /s/ Christopher Man

                                         Linda T. Coberly
                                         (pro hac vice pending)
                                         Linda A. Greene
                                         Courtney S. Block
                                         WINSTON & STRAWN LLP
                                         35 West Wacker Drive
                                         Chicago, Illinois 60601
                                         312-558-5600
                                         312-558-5700 (fax)
                                         lcoberly@winston.com

                                         Johanna Rae Hudgens
                                         WINSTON & STRAWN LLP
                                         200 Park Avenue
                                         New York, New York 10166
                                         212-294-6700
                                         212-294-4700 (fax)
                                         jhudgens@winston.com

                                         Christopher Man (Bar No. 453553)
                                         WINSTON & STRAWN LLP
                                         1901 L Street NW
                                         Washington, D.C. 20036
                                         202-282-5000
                                         202-282-5100 (fax)
                                         cman@winston.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2020, a true and correct copy of the foregoing was served via ECF to all counsel of record.

/s/ Christopher Man
Christopher Man

27