**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMONWEALTH OF VIRGINIA, STATE
OF ILLINOIS, and STATE OF NEVADA,

               Plaintiffs,

v.

DAVID S. FERRIERO, in his official capacity
as Archivist of the United States,

               Defendant.

Case No. 1:20-cv-242-RC

**BRIEF *AMICUS CURIAE* OF
VOTEERA.ORG AND LEANNE LITTRELL DILORENZO
IN SUPPORT OF PLAINTIFF STATES**

John DiLorenzo, Jr., Bar No. 455749
Charles M. English, Jr., Bar No. 386572
Michael E. Kellermann
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006
(202) 973-4200
(202) 973-4499 (fax)
johndilorenzo@dwt.com
chipenglish@dwt.com
michaelkellermann@dwt.com

*Attorneys for Amici Curiae VoteERA.org and
Leanne Littrell DiLorenzo*

Dated: July 6, 2020

## TABLE OF CONTENTS

*Page(s)*

I.    INTEREST OF THE *AMICI CURIAE* VOTEERA.ORG AND LEANNE LITTRELL DILORENZO ................................................................1

II.   STATEMENT OF THE CASE................................................................2

III.  ARGUMENT................................................................4

    A.   The Supreme Court's Prior Commentary on Congress's Power to Impose Time Limitations on the Ratification of Constitutional Amendments is *Dicta*, and Not Binding Precedent ..........................................5

    B.   Contemporaneous Sources Suggest That the Framers Chose Not to Allow Congressionally-Imposed Time Limits on Constitutional Amendments................8

    C.   Nineteenth Century Congressional Action Supports a Textualist Reading of Article V ..........................................11

    D.   The Plain Text of Article V Fails to Provide Congress with the Power to Propose Limitations on Amendments, States with the Power to Rescind, and Ratification Contingent Upon Additional Events ...........................................13

IV.  CONCLUSION................................................................15

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bostock v. Clayton Cnty.*,
  2020 U.S. LEXIS 3252 (U.S. June 15, 2020) ..........................................................................7

*Coleman v. Miller*,
  307 U.S. 433 (1939) ................................................................................................................8

*Dillon v. Gloss*,
  256 U.S. 368 (1921) ........................................................................................................5, 7, 11

*Murray Energy Corp. v. Envtl. Prot. Agency*,
  936 F.3d 597 (D.C. Cir. 2019) ..............................................................................................6

*Winslow v. FERC*,
  587 F.3d 1133 (D.C. Cir. 2009) ............................................................................................7

**Constitutional Provisions**

U.S. Const. amend XVIII (repealed 1933) ........................................................................5, 6, 7

U.S. Const. art. I ....................................................................................................................9, 12

U.S. Const. art. V ............................................................................................................... *passim*

Or. Const. art. I, § 46 ..................................................................................................................1

**Legislative Materials**

14 Gales & Seaton, Register of Debates in Congress (1837) ................................................12, 13

6 Congressional Globe 56 (1838) ................................................................................................12

55 Cong. Rec. 5650 (1917) ............................................................................................................7

H.J. Res. 208 ..............................................................................................................................2, 4

**Other Authorities**

*The Federalist* No. 39 ...........................................................................................................10, 15

*The Federalist* No. 85 ............................................................................................................8, 10

*The Anti-Federalist* No. 49 .................................................................................................11

*Congressional Pay Amendment*,
    16 Op. O.L.C. 85 (1992) ..........................................................................................10

*Ratification of the Equal Rights Amendment: Memorandum Opinion for the
    General Counsel of the National Archives and Records Administration*, Office
    of Legal Counsel 37 (Jan. 6, 2020)…………………………..............................................4

BLACK'S LAW DICTIONARY 1102 (Byan A. Garner ed., 8th ed. 2004) ...........................6

*Dicta Definition*, MERRIAM-WEBSTER, https://www.merriam-
    webster.com/dictionary/dicta (last visited July 4, 2019) ...........................................6

Valerie C. Brannon, CONG. RESEARCH SERV., R45153 VERSION 2, STATUTORY
    INTERPRETATION: THEORIES, TOOLS, AND TRENDS 54 (2018) ..................................9

Ruth Bader Ginsburg, *Ratification of the Equal Rights Amendment: A Question of
    Time*, 57 TEX. L. REV. 919, 924 n. 26 (1979) ...........................................................6

Michael Stokes Paulsen, *A General Theory of Article V: The Constitutional
    Lessons of the Twenty-seventh Amendment*, 103 Yale L.J. 677, 694 n. 54
    (1993) ........................................................................................................................9

Joseph Story, Commentaries on the Constitution of the United States, Book III,
    Chapter 41 § 1824 (1823) ........................................................................................14

John Vlahoplus, *Ratification of the Equal Rights Amendment: Lessons from
    Special Elections to The House of Representatives in 1837*, 95 IND. L.J. SUPP.
    79 (2020) ..................................................................................................................13

Lori Walsh, *Equal Rights Amendment & South Dakota Explained*, South Dakota
    Public Broadcasting (Jan. 20, 2020) ........................................................................14

I.     **INTEREST OF THE** *AMICI CURIAE* **VOTEERA.ORG AND LEANNE LITTRELL DILORENZO[1]**

*Amicus curiae* VoteERA.org is a 501(c)(4) not for profit corporation formed for the purpose of advocating for adoption of the Federal Equal Rights Amendment and the placement of Equal Rights Amendment language in state Constitutions.  VoteERA.org and its political committees facilitated the collection of approximately 175,000 signatures to place the Equal Rights Amendment on the 2014 general election ballot in Oregon by popular initiative.  The initiative measure, Ballot Measure 89, received 925,892 votes out of a total of 1,440,799 cast (64%) and became Article I § 46 of the Oregon Constitution.  Article I § 46 now states:

> Article I, Section 46. Prohibition on denial or abridgment of rights on account of sex.

> (1) Equality of rights under the law shall not be denied or abridged by the State of Oregon or by any political subdivision in this state on account of sex.

> (2) The Legislative Assembly shall have the power to enforce, by appropriate legislation, the provisions of this section.

> (3) Nothing in this section shall diminish a right otherwise available to persons under section 20 of this Article or any other provision of this Constitution. [Created through initiative petition filed Oct. 24, 2013, and adopted by the people Nov. 4, 2014]

VoteERA.org is active in other women's rights issues, including exploring a proposed initiative measure to remove Oregon's statutes of limitations for criminal sexual assault claims and assisting other state organizations to further ratification of the Federal Equal Rights Amendment.  *Amicus curiae* Leanne Littrell DiLorenzo ("DiLorenzo") is the Founder and

---

[1] Consistent with Federal Rule of Appellate Procedure 29(a)(4), no party's counsel authored this brief in whole or in part.  No party or party's counsel contributed any money that was intended to fund the preparation or submittal of this brief.  No other person, other than these *amici curiae*, their members, or their counsel, contributed money that was intended to fund the preparation or submittal of this brief.

President of VoteERA.org.  She was a Chief Petitioner for Oregon 2014 Ballot Measure 89, is active in pursuing the addition of the Equal Rights Amendment to state constitutions, and is active in the effort to ratify the Federal Equal Rights Amendment.

*Amicus curiae* DiLorenzo has a personal interest in whether the Equal Rights Amendment becomes a part of the U.S. Constitution.  Her personal interest in the Equal Rights Amendment becoming part of the Constitution includes, but is not limited to, the following reasons:

a)      Equality in healthcare;

b)      Equality in protection against gender discrimination  and violence;

c)      Equality in education; and

d)      Equality in employment opportunities and compensation.

All parties have consented to the filing of this brief *amicus curiae*.

## II.    STATEMENT OF THE CASE

In 1971, H.J. Res. 208 was introduced to the 92nd Congress proposing what would ultimately become the Equal Rights Amendment as proposed by Congress.  The full text of the Resolution was as follows:

JOINT RESOLUTION

Proposing an amendment to the Constitution of the United

States relative to equal rights for men and women.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein),* That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE —

2

"SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"SECTION 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

The House of Representatives adopted the Resolution in October 1971 by a vote of 354 to 24, and the Senate adopted the Resolution in March 1972 by a vote of 84 to 8. The Resolution was adopted by Congress with strong bipartisan support. Once approved by two-thirds of each chamber, the Equal Rights Amendment was formally proposed to the states.

By the end of 1972, twenty-two (22) states had ratified the Equal Rights Amendment: Hawaii, New Hampshire, Delaware, Iowa, Kansas, Idaho, Nebraska, Texas, Tennessee, Alaska, Rhode Island, New Jersey, Colorado, West Virginia, Wisconsin, New York, Michigan, Maryland, Massachusetts, Kentucky, Pennsylvania and California. The total number of ratifications reached 35 by the end of 1977 when Wyoming, South Dakota, Oregon, Minnesota, New Mexico, Vermont, Connecticut, Washington, Maine, Montana, Ohio, North Dakota, and Indiana each ratified the Equal Rights Amendment.

In 2017, following the expiration of the purported ratification deadline, the State of Nevada became the 36th state to ratify the Equal Rights Amendment. The Archivist recorded Nevada as so ratifying. The State of Illinois ratified the Amendment in 2018 becoming the 37th state to ratify. The Archivist, once again, recorded that state's ratification of the Equal Rights Amendment. On January 27, 2020, the Commonwealth of Virginia became the 38th state to ratify the Equal Rights Amendment.

However, when it became apparent that he would be presented with Virginia's ratification, the Archivist sought an opinion from the U.S. Department of Justice.   On January 6, 2020, Steven A. Engle, Assistant Attorney General for the Office of Legal Counsel, in

3

anticipation of Virginia's action, advised that "when Congress uses a proposing clause to impose a deadline on the State's ratification of a proposed constitutional amendment, that deadline is binding and Congress may not revive the proposal after the deadline's expiration." *Ratification of the Equal Rights Amendment: Memorandum Opinion for the General Counsel of the National Archives and Records Administration*, Office of Legal Counsel 37 (Jan. 6, 2020).  The Archivist subsequently announced that he would no longer publish or certify the Equal Rights Amendment unless ordered to do so by a court.  He also published a "List of state ratification actions," acknowledging Virginia's action. A copy of that list is attached as Appendix 1.  See https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf

Subsequently, the Commonwealth of Virginia, the State of Illinois, and the State of Nevada brought this action against the Archivist, requesting that the Court order the Archivist to publish the Equal Rights Amendment, specifying that it is now part of the Constitution, and declaring that the Equal Rights Amendment is now the Twenty-Eighth Amendment to the Constitution.  *Amici curiae* agree with Plaintiffs that the recent ratifications by Nevada, Illinois and Virginia bring the total number of ratifying states to thirty-eight (38), thus satisfying Article V's requirement of ratification by "three-fourths" of all the states.

## III.   ARGUMENT

This Court should take notice that 38 states have now ratified the amendment originally proposed in 1971 by H.J. Res. 208, order the Archivist to publish the Equal Rights Amendment as part of the Constitution, and declare it as the Twenty-Eighth Amendment to the Constitution. The text alone of Article V, not *dicta* from an almost 100-year old decision, is central to the outcome of this case.  To the extent this Court looks to prior commentary, the Framers of the Constitution could hardly have envisioned circumstances where Congress would place any limitations on Congress' right to propose and state legislatures' right to debate and ratify an

amendment.  Moreover, prior Congressional action during the nineteenth century supports the view that Constitutional time limitations are not implied and must be explicit in the text of the Constitution to have any effect.  To conclude otherwise would lead to alternative interpretations whereby Congress or states could impose any number of contingencies on the ratification of Constitutional amendments, a result that the Framers surely did not intend.

    **A.**    **The Supreme Court's Prior Commentary on Congress's Power to Impose Time Limitations on the Ratification of Constitutional Amendments is *Dicta*, and Not Binding Precedent**

The Supreme Court previously addressed Congress's ability to impose time limitations by which state legislatures must ratify Constitutional amendments.  However, the pronouncements seized upon by the Defendants amount to *dicta*, and this Court should treat them as such.  Instead, this Court should look no further than the text of Article V.  Article V states in full:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

U.S. Const. art. V.

In *Dillon v. Gloss*, 256 U.S. 368 (1921), the petitioner argued that his conviction under the Volstead Act was invalid because Congress included in the Eighteenth Amendment (which prohibited the sale of alcohol) a provision requiring that the amendment be ratified within seven years.  *Id* at 370.  The argument was as follows: the Eighteenth Amendment violated Article V because the proposed amendment declared it would be inoperative unless state legislatures

ratified it within seven years.  *Id*.  Enforcement of the Eighteenth Amendment, through the Volstead Act, therefore stood on unconstitutional grounds.  *See id*.  The Supreme Court ultimately determined that the Eighteenth Amendment was constitutional, but also noted that Congress implicitly possessed the power to require ratification of an amendment within a reasonable amount of time.  *See id*. at 375-76; 377.

The Supreme Court did not need to expound on the purported timing powers of Congress in that case.  As future Justice Ginsburg noted, "The [E]ighteenth [A]mendment had in fact been ratified within some thirteen months of the time Congress proposed it."  Ruth Bader Ginsburg, *Ratification of the Equal Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919, 924 n. 26 (1979).  Because the amendment had passed well within the purported seven-year time limit, the Eighteenth Amendment remained valid.  Petitioner's "reed was slim" in relying on this argument, *id*., and the Supreme Court's discussion on reasonable time limitations on Constitutional amendments was gratuitous.  The opinion's discussion constituted comments "made during the course of delivering a judicial opinion, but . . . that [are] unnecessary to the decision in the case and therefore not precedential[,]" the very definition of "obiter dictum."  *See* Black's Law Dictionary 1102, (Bryan A. Garner ed., 8th ed. 2004); *see also Dicta Definition*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dicta (last visited July 4, 2019) (defining *dicta* as "a judge's expression of opinion on a point other than the precise issue involved in determining a case").  In keeping with a recent pronouncement by the Court of Appeals for the District of Columbia Circuit, "[d]icta is never binding on any court, nor is it persuasive here, because it is fundamentally incorrect."  *Murray Energy Corp. v. Envtl. Prot.*

*Agency*, 936 F.3d 597, 627 (D.C. Cir. 2019) (citing *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 235 (1959)).[2]

One need not look to *dicta* or venture beyond Article V's text to determine whether Congress (or states, for that matter) could impose time limitations on a Constitutional amendment. During the debate of the Eighteenth Amendment and its purported time limitation, Senator Frank Bosworth Brandegee (Connecticut) noted:

> The Constitution itself, therefore, provides that an amendment shall be ratified when approved by the legislatures of three-fourths of the States; and I think there is no question that that word 'when' always has been interpreted, and is correctly interpreted, as though it were 'whenever.' That has been the practice of the States in connection with all constitutional amendments which have been adopted.

55 Cong. Rec. 5650 (1917).

Article V's text is clear, and up until the debate of the Eighteenth Amendment, that "had been the practice of the States in connection with all constitutional amendments which have been adopted." *Id*. Nothing should be read into Article V beyond that which is within the article's plain text. As the Supreme Court has recently opined: "When the express terms of a statute give us one answer and the extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cnty.*, 2020 U.S. LEXIS 3252, at *10 (U.S. June 15, 2020) This Court should approach its analysis of

---

[2] *Amici curiae* acknowledge that Supreme Court *dicta* may have an enhanced authoritative value versus *dicta* from other courts, but this only occurs when that *dicta* is "carefully considered." *See, e.g.*, *Winslow v. FERC*, 587 F.3d 1133, 1135 (D.C. Cir. 2009). It is abundantly clear that the *dicta* in *Dillon v. Gloss* could not have been "carefully considered," especially where the Supreme Court acknowledged a dearth of any discussion of time limits during the adoption process, *Dillon* at 271, and, instead relied on an "implication" based on the absence of any textual evidence. *Id*.

Article V in a similar fashion.  Only the express terms laid out in Article V should be reviewed, and *dicta* suggesting otherwise need not be followed.[3]

### B.    Contemporaneous Sources Suggest That the Framers Chose Not to Allow Congressionally-Imposed Time Limits on Constitutional Amendments

A review of the pertinent "legislative history" surrounding the adoption of Article V reveals the absence of any discussion regarding time limits.  Had the Framers wished, they could have conferred upon Congress the ability to require state legislatures to ratify an amendment within a specified timeframe.  But their silence on the matter speaks volumes.  The Framers made it abundantly clear that they intended for the ratification process to be aligned to their overarching goals of separation of powers and striking a solid balance between federal and state authority. An implied additional power granted to Congress to restrict state authority to ratify amendments would hardly treat the federal and state governments as co-equals and would be contrary to those goals.  Furthermore, in *The Federalist* No. 85 "Conclusion", Alexander Hamilton reinforced the words of Article V as "peremptory", suggesting that no implied powers existed in Article V where the framers were silent.  Addressing the consequence of an application from two-thirds of the states, Hamilton said "[b]y the fifth article of the plan, the Congress will be obliged . . . to call a convention for proposing amendments. . . . The words of this article are *peremptory*.  The Congress 'shall call a convention.'  Nothing in this particular is left to the discretion of that body."  *The Federalist* No. 85 (Alexander Hamilton), available at https://guides.loc.gov/federalist-papers/full-text (emphasis added).

---

[3] *Amici curiae* do not address *Coleman v. Miller*, 307 U.S. 433 (1939) here because other participants have sufficiently briefed on that case.  *See, e.g.*, Plaintiff States' Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss at 11-16, ECF No. 37.

The text of Article V shows that the Framers knew how to insert conditions to the amendment power if they wanted to as evidenced by the language which prohibited amendments related to the slave trade before 1808. "When the Framers wanted a time limitation to govern certain activity, they knew how to say so. . . . [N]o amendment affecting slave importation was permitted 'prior to the Year One thousand eight hundred and eight.'" Michael Stokes Paulsen, *A General Theory of Article V: The Constitutional Lessons of the Twenty-seventh Amendment*, 103 Yale L.J. 677, 694 n.54 (1993). Paulsen further notes other examples where the Framers added time limitations to the certain sections of the constitution, including that representatives must be elected every second year (art. I, § 2), a census be taken every ten years, following the first census (art. I, § 2), and that the President may veto a bill or sign a bill into law in ten days, excluding Sundays (art. I, § 7). *Id.*[4]

It follows that if those who debated and drafted the Constitution intended Congress to have the power to limit the time periods for the passage of amendments, they would have expressly stated so. In keeping with *expressio unius est exclusio alterius* (the expression of one thing implies the exclusion of others), the Framers' silence underscores their views on Congressional powers and Constitutional amendments—such power was intended to be limited to that provided in the text of the Constitution. *See, e.g.*, Valerie C. Brannon, Cong. Research Serv., R45153 version 2, Statutory Interpretation: Theories, Tools, and Trends 54 (2018) (defining *expressio unius est exclusio alterius*).

---

[4] *Amicus curiae* New York and numerous states also point out that when the constitution was drafted in 1787, eight of the original thirteen states already had provisions relating to amendments provided in their constitutions and all but two imposed time limits on various aspects of the amendment process. Brief of New York, *et al.* as *Amici Curiae* in Support of Plaintiffs at 5-6, ECF No. 67.

Context surrounding the inclusion of Article V in the Constitution is also illuminating. The Framers feared the prospect of providing Congress with too much authority in amending the Constitution. This anxiety was on display in an early outline of the Constitution, which provided for amendments without the assent of the national legislature. *See Congressional Pay Amendment*, 16 Op. O.L.C. 85, 103 (1992) (citing 1 *Records Federal Convention of 1787* 121 (Max Farrand, ed., revised ed. 1966)).

James Madison noted in the Federalist Papers that the amendment process is "neither wholly NATIONAL nor wholly FEDERAL." *The Federalist* No. 39 (James Madison) (emphasis in original), available at https://guides.loc.gov/federalist-papers/full-text. A paradigm where Congress could debate and reintroduce failed amendments year after year, decade after decade, while simultaneously forcing state legislatures to ratify amendments under a prescribed time period suggests that Congress would hold more power than state legislatures in the amendment process. This would stand in stark contrast to the federal-state balance that the Framers envisioned.

Moreover, Hamilton recognized the importance of state legislatures in the amendment process: "We may safely rely on the disposition of the State legislatures to erect barriers against the encroachments of the national authority." *The Federalist* No. 85 (Alexander Hamilton), available at https://guides.loc.gov/federalist-papers/full-text. Those who supported the passage of the Constitution clearly did want to grant Congress more authority than was absolutely necessary in the amendment process.

Notably, at least one opponent to the Constitution believed that the amendment process was so difficult that he could not imagine circumstances where the Constitution would ever be amended. An *Anti-Federalist Papers*' author argued, "no alteration shall ever be made; so that

10

whether it is a good constitution or a bad constitution, it will remain forever unamended." *The Anti-Federalist* No. 49, available at http://resources.utulsa.edu/law/classes/rice/Constitutional/ Anti-Federalist/49.htm.  The author, writing under the pen name "An Old Whig," continued: "[T]he proposed constitution holds out a prospect of being changed if it be found necessary or convenient to change it; but the conditions upon which an alteration can take place, are such as in all probability will never exist." *Id*.

This Anti-Federalist was ultimately proven wrong, as the Constitution has been successfully amended over two dozen times.  But the fact that the Anti-Federalists believed that process was too onerous makes one wonder as to why an "implied" congressional power to impose time limits would not have been seized upon and included in these Anti-Federalist arguments.  The answer is apparent.  A power to impose time limitations was not referenced in the opposition's arguments because no such power was expressed or implied in the proposed Constitution.

*Amici curiae* research has failed to turn up any substantial discussion on the timing of amendments during the consideration of the Constitution.  This is not surprising in light of the Supreme Courts observation that, "[n]either the debates in the federal convention which framed the Constitution nor those in the state conventions which ratified it shed any light on the question [relating to time upon which ratification must occur]." *Dillon* at 371.

### C.   Nineteenth Century Congressional Action Supports a Textualist Reading of Article V

Further support for a textualist reading of Article V can be found in prior Congressional action from the early nineteenth century.  In 1837, the governors of Mississippi and Arkansas issued writs of special election for vacancies during a special session of Congress, requiring that the winners of the House of Representatives elections serve until the winners of the next

November election succeeded them.  *See* 14 Gales & Seaton, Register of Debates in Congress App. 168 (1837) (Representative Buchanan), available at https://memory.loc.gov/cgi-bin/ampage?collId=llrd&fileName=029/llrd029.db&recNum=459 ("Register"); *see also* 6 Congressional Globe 56 (1838) (Representative Bell), available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=005/llcg005.db&recNum=28 ("Globe").

Article II, section 2 reads in relevant part "When vacancies happen in the Representation from any state, the executive authority thereof shall issue writs of election to fill such vacancies." U.S. Const. art. I, § 2.  Notably, section 2 contains no provision for a governor to limit in any way the writs of election (*i.e.*, by permitting those elected by special election to serve until a certain date).

When the seating of the newly elected Mississippi Members was challenged,[5] the House Committee of Elections agreed that the time limit the governor of Mississippi imposed was *ultra vires*.  *See* Register at App. 168, available at https://memory.loc.gov/cgi-bin/ampage?collId=llrd&fileName=029/llrd029.db&recNum=459.  The full House subsequently found that the Mississippi governor's time limit on the terms of the specially-elected Members of the House of Representatives violated the Constitution.  *See* Register at 1176, available at https://memory.loc.gov/cgi-bin/ampage?collId=llrd&fileName=029/llrd029.db&recNum=7 (Representative Buchanan noted that this "seems to be the understanding of every member who has spoken on the subject."  Ultimately, the House of Representatives voted 118-101 to seat the Mississippi

---

[5] The challenge appears to be directed specifically to the specially-elected Mississippi Members, but ultimately could have affected whether the elected member from Arkansas would be seated in the House.  *See* Globe at 57, available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=005/llcg005.db&recNum=84 (Representative Pope recalling the vote on the Mississippi Members, and suggesting that the vote essentially included the Arkansas Member.).

representatives for the full term of the Twenty-Fifth Congress, which exceeded the time limit

that the Mississippi Governor prescribed.[6]  *See* Register at 1216-17, available at

https://memory.loc.gov/cgi-bin/ampage?collId=llrd&fileName=029/llrd029.db&recNum=27.

As one commentator recently remarked: if one reviews Article V consistent with Article

I, "the Constitution's text gives Congress only the power to propose amendments, without any

limitation or conditions." VLAHOPLUS at 82.  Such lessons from a past Congress should apply to

this case.  It logically follows that if state executives cannot limit their duties under the

Constitution by imposing time limitations, then nothing permits Congress to limit the time in

which states may debate, consider, and pass a proposed Constitutional amendment under Article

V.  *See id*.  These historical events highlight a determination made by one political branch of

government, but this interpretation of Article I is relevant to an Article V analysis here.  Time

limitations on state's powers to ratify Constitutional amendments go beyond any power that the

Constitution's text provides.

**D.**  **The Plain Text of Article V Fails to Provide Congress with the Power to Propose Limitations on Amendments, States with the Power to Rescind, and Ratification Contingent Upon Additional Events**

As noted above, the text of Article V provides no implicit powers beyond what it states.

Supreme Court Justice Joseph Story concluded after a review of Article V that "[t]ime is thus

allowed, and ample time, for deliberation, both in proposing and ratifying amendments. . . .

---

[6] The specially-elected Members of the House from Mississippi relied on the full House's decision, and chose not to run in the upcoming general election.  The winners of that election demanded to be seated in the House of Representatives.  Due to "conflicting views and doubts by vocal members, the House decided to throw the seats back to the voters of Mississippi by expelling [the specially-elected Members] without seating [those elected in the general election]."  John Vlahoplus, *Ratification of the Equal Rights Amendment: Lessons from Special Elections to The House of Representatives in 1837*, 95 IND. L.J. SUPPLEMENT 79, 84-85 (2020) (VLAHOPLUS).

Indeed, years may elapse before a deliberate judgment may be passed upon them, unless some pressing emergency calls for instant action."  Joseph Story, Commentaries on the Constitution of the United States, Book III, Chapter 41 § 1824 (1823), available at https://lonang.com/library/reference/story-commentaries-us-constitution/.  Such a reading is consistent with a textual interpretation of Article V.

One can imagine that if it were accepted that Article V implies a Congressional power to set time limitations, a series of other "implied powers" could be advanced.  For example, Congress could have the implied power to propose an amendment to the Constitution which suspends presidential term limits, but would permit state ratification only while the current occupant remains in office.  Such an example would be directly tied to the President at the time Congress passed the amendment, and it stands to reason that no such limitation should exist.  It would similarly seem strange for Congress to pass an amendment whose effectiveness was dependent on the political party of the next elected President.  Under this hypothetical, the Archivist would only declare a proposed amendment to be a Constitutional amendment if upon the 38th state's ratification, a Republican (or Democrat) sat in the White House.

Moreover, if this Court accepted that Congress should have additional implied powers relating to the amendment of the Constitution, it would necessarily follow that states would similarly possess implied Constitutional ratification powers.  If this notion were accepted, nothing could prevent a state from conditioning its ratification of a proposed amendment on whether 37 other states also ratify the amendment within a certain number of years.[7]  It is not

---

[7] South Dakota has attempted to rescind its ratification of the Equal Rights Amendment . The circumstances surrounding South Dakota's purported rescission differ slightly from this hypothetical in that South Dakota's legislature passed a resolution that declared that its original ratification would "sunset" if the ERA did not meet the 38-state threshold before the Congressionally-extended deadline of June 30, 1982.  *See* Lori Walsh, *Equal Rights Amendment*

difficult to imagine how challenging it would be to have 38 different states with 38 different timing contingencies (State A conditioning its ratification on 37 other state legislatures passing the amendment in 1 year, State B requiring 37 other states to ratify the amendment within 10 years, State C conditioning ratification on whether 37 other states ratify an amendment in 11 years, *etc*.). Similarly, nothing would prevent a state from specifically reserving its right to rescind its ratification if certain events occurred—perhaps a formal declaration of war, or a federal income tax hike.[8]

Such examples remain possibilities if Congress has an implicit power to impose time limitations on the ratification of Constitutional amendments. As explained above, the Framers believed in the balance of the amendment system between the states and the federal government. The Constitutional amendment process is "neither wholly NATIONAL nor wholly FEDERAL." *The Federalist* No. 39 (James Madison) (emphasis in original) . Giving Congress (or states) the power to impose certain limitations on the proposal or ratification processes for Constitutional amendments fails to honor the federal-state balance that the Framers envisioned.

## IV.   CONCLUSION

For the reasons set forth in this brief *amicus curiae*, the Court should deny the Defendant's motion to dismiss and, pursuant to Article V of the Constitution, take notice that 38 states have now ratified the amendment originally proposed in 1971 by H.J. Res. 208, order the

---

*& South Dakota Explained*, South Dakota Public Broadcasting (Jan. 20, 2020), https://www.sdpb.org/blogs/margins/equal-rights-amendment-south-dakota-explained/.

[8] *Amicus Curiae* New York, *et al.* envision other troubling extensions of this theory. Brief of New York, *et al.* as *Amici Curiae* in Support of Plaintiffs at 11, 12, ECF No. 67.

Archivist to publish the Equal Rights Amendment as part of the Constitution, and declare it as the Twenty-Eighth Amendment to the Constitution.

Respectfully submitted,


   /s/ *Charles M. English, Jr.*
John DiLorenzo, Jr., Bar No. 455749
Charles M. English, Jr., Bar No. 386572
Michael E. Kellermann
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006
(202) 973-4200
(202) 973-4499 (fax)
chipenglish@dwt.com
johndilorenzo@dwt.com
michaelkellermann@dwt.com

*Attorneys for Amici Curiae VoteERA.org and*
*Leanne Littrell DiLorenzo*

Dated:  July 6, 2020

# EQUAL RIGHTS AMENDMENT - PROPOSED MARCH 22, 1972
## LIST OF STATE RATIFICATION ACTIONS

The following dates reflect the date of the state legislature's passage, the date of filing with the Governor or Secretary of State, or the date of certification by the Governor or Secretary of State, whichever is the earliest date included in the official documents sent to the NARA, Office of the Federal Register. (Updated as of: 03/24/2020)

| STATE | RATIFICATION | STATE | RATIFICATION |
|---|---|---|---|
| Alabama | not ratified | Montana | Jan. 25, 1974 |
| Alaska | April 5, 1972 | Nebraska* | March 29, 1972 |
| Arizona | not ratified | Nevada** | March 22, 2017 |
| Arkansas | not ratified | New Hampshire | March 23, 1972 |
| California | Nov. 13, 1972 | New Jersey | April 17, 1972 |
| Colorado | April 21, 1972 | New Mexico | Feb. 28, 1973 |
| Connecticut | March 15, 1973 | New York | May 18, 1972 |
| Delaware | March 23, 1972 | North Carolina | not ratified |
| Florida | not ratified | North Dakota | Feb. 3, 1975 |
| Georgia | not ratified | Ohio | Feb. 7, 1974 |
| Hawaii | March 22, 1972 | Oklahoma | not ratified |
| Idaho* | March 24, 1972 | Oregon | Feb. 8, 1973 |
| Illinois** | May 30, 2018 | Pennsylvania | Sept. 26, 1972 |
| Indiana | Jan. 24, 1977 | Rhode Island | April 14, 1972 |
| Iowa | March 24, 1972 | South Carolina | not ratified |
| Kansas | March 28, 1972 | South Dakota* | Feb. 5, 1973 |
| Kentucky* | June 27, 1972 | Tennessee* | April 4, 1972 |
| Louisiana | not ratified | Texas | March 30, 1972 |
| Maine | Jan 18, 1974 | Utah | not ratified |
| Maryland | May 26, 1972 | Vermont | March 1, 1973 |
| Massachusetts | June 21, 1972 | Virginia** | January 27, 2020 |
| Michigan | May 22, 1972 | Washington | March 22, 1973 |
| Minnesota | Feb. 8, 1973 | West Virginia | April 22, 1972 |
| Mississippi | not ratified | Wisconsin | April 26, 1972 |
| Missouri | not ratified | Wyoming | Jan. 26, 1973 |

* Purported Rescission

| | |
|---|---|
| Nebraska | March 15, 1973 |
| Tennessee | April 23, 1974 |
| Idaho | Feb. 8, 1977 |
| Kentucky | March 20, 1978 |
| South Dakota | March 5, 1979 |

** Ratification actions occurred after Congress's deadline expired. *See* U.S. Dep't of Justice, Office of Legal Counsel, *Ratification of the Equal Rights Amendment*, 44 Op. O.L.C. __, Slip Op. (Jan. 6, 2020).

APPENDIX 1

**CERTIFICATE OF SERVICE**

Pursuant to Local Civil Rule 5.4(d), I hereby certify that on this 6th day of July, 2020, I caused the document to be served electronically via the court's CM/ECF system, which will effect service on all counsel who have appeared.

*/s/ Charles M. English, Jr.*
Charles M. English, Jr., Bar No. 386572