## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VIRGINIA, ILLINOIS, and NEVADA,

*Plaintiffs*,

v.

DAVID S. FERRIERO, in his official capacity
as Archivist of the United States,

*Defendant*,

ALABAMA, LOUISIANA, NEBRASKA,
SOUTH DAKOTA, and TENNESSEE,

*Intervenor-Defendants*.

Case No. 1:20-cv-242-RC

**ORAL HEARING REQUESTED**

## INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND
## SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................. iii

Introduction ........................................................................................................................... 8

Background ............................................................................................................................. 9

Argument ................................................................................................................................ 13

    I.       Plaintiffs' ratifications of the ERA were ineffective because the congressional deadline had expired .................................................................................................... 14

    II.     Plaintiffs' ratifications of the ERA were ineffective because a constitutionally reasonable time for ratification had expired. ........................................................... 16

    III.   Even if they were effective, Plaintiffs' ratifications of the ERA are insufficient because five States validly rescinded their ratifications. ......................................... 23

    IV.   The Court should resolve this case on the merits. .................................................. 26

           A.      Plaintiffs cannot win this case if their ratifications are invalid .............................. 26

           B.      The validity of Plaintiffs' ratifications is not a political question. ......................... 27

Conclusion ............................................................................................................................. 32

Certificate of Service ............................................................................................................ 34

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. Ferriero,*
  No. 7:19-cv-2032-LSC (N.D. Ala.) ............................................................................................ 27

*Alaska Airlines, Inc. v. Brock,*
  480 U.S. 678 (1987) .................................................................................................................... 15

*Ayotte v. Planned Parenthood of N. New England,*
  546 U.S. 320 (2006) .................................................................................................................... 14

*Bostock v. Clayton Cty.,*
  2020 WL 3146686 (U.S. June 15, 2020) ...................................................................................... 8

*Chiafalo v. Washington,*
  591 U.S. ___ (July 6, 2020) ........................................................................................................ 22

*Coleman v. Miller,*
  307 U.S. 433 (1939) ..................................................................................................... 29, 30, 31, 32

*Cutler v. Hayes,*
  818 F.2d 879 (D.C. Cir. 1987) .................................................................................................... 30

*\*Dillon v. Gloss,*
  256 U.S. 368 (1921) ....................................................................... 8, 16, 17, 22, 23, 24, 28, 29, 30

*Dyer v. Blair,*
  390 F. Supp. 1291 (N.D. Ill. 1975) ........................................................................... 25, 28, 29, 31

*Eisner v. Macomber,*
  252 U.S. 189 (1920) .................................................................................................................... 18

*Epic Sys. Corp. v. Lewis,*
  138 S. Ct. 1612 (2018) .................................................................................................................. 8

*Free Enter. Fund v. PCAOB,*
  561 U.S. 477 (2010) .................................................................................................................... 16

*Gabbs Expl. Co. v. Udall,*
  315 F.2d 37 (D.C. Cir. 1963) ...................................................................................................... 18

*Hawke v. Smith,*
  253 U.S. 221 (1920) .............................................................................................................. 28, 31

*Hollingsworth v. Virginia,*
  3 U.S. (3 Dall.) 378 (1798) ........................................................................................................ 28

*\*Idaho v. Freeman,*
  529 F. Supp. 1107 (D. Idaho 1981) ....................................................... 9, 10, 23, 24, 25, 26, 28, 31, 32

*In re Aggrenox Antitrust Litig.,*
  2016 WL 4204478 (D. Conn. Aug. 9, 2016) ............................................................................. 32

*Chief authority

*Leser v. Garnett,*
258 U.S. 130 (1922) ................................................................................................ 28

*Lynch v. Donnelly,*
465 U.S. 668 (1984) ................................................................................................ 21

*Marshall Cty. Health Care Auth. v. Shalala,*
988 F.2d 1221 (D.C. Cir. 1993) ............................................................................ 13

*Mass. Lobstermen's Ass'n v. Ross,*
945 F.3d 535 (D.C. Cir. 2019) .............................................................................. 18

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
526 U.S. 172 (1999) ................................................................................................ 14

*Murphy v. NCAA,*
138 S. Ct. 1461 (2018) ........................................................................................... 14

*Nat'l Ass'n for Fixed Annuities v. Perez,*
217 F. Supp. 3d 1 (D.D.C. 2016) ......................................................................... 29

*Nat'l Org. for Women, Inc. v. Idaho,*
455 U.S. 918 (1982) ................................................................................................ 10

*Nat'l Org. for Women, Inc. v. Idaho,*
459 U.S. 809 (1982) ............................................................................................ 9, 11

*NLRB v. Noel Canning,*
573 U.S. 513 (2014) ................................................................................................ 30

*NLRB v. SW Gen., Inc.,*
137 S. Ct. 929 (2017) ............................................................................................. 22

*NRDC v. NRC,*
216 F.3d 1180 (D.C. Cir. 2000) ............................................................................ 18

*Parker v. Hoglander,*
2016 WL 3527014 (D.D.C. June 23, 2016) ......................................................... 13

*Patterson v. City of Toledo,*
2012 WL 1458115 (N.D. Ohio Apr. 26, 2012) .................................................... 32

*Prade v. City of Akron,*
2015 WL 2169975 (N.D. Ohio May 8, 2015) ...................................................... 13

*Printz v. United States,*
521 U.S. 898 (1997) ................................................................................................ 22

*Sampson v. United States,*
832 F.3d 37 (1st Cir. 2016) .................................................................................... 32

*Seminole Tribe of Fla. v. Florida,*
517 U.S. 44 (1996) .................................................................................................. 18

*Sierra Club v. EPA,*
322 F.3d 718 (D.C. Cir. 2003) .............................................................................. 18

*The National Prohibition Cases*,
253 U.S. 350 (1920) ................................................................ 28

*Trailmobile Co. v. Whirls*,
331 U.S. 40 (1947) .................................................................. 19

*U.S. ex rel. Widenmann v. Colby*,
265 F. 998 (D.C. Cir. 1920) .................................................... 27

*United States v. Booker*,
543 U.S. 220 (2005) ................................................................ 14

*United States v. Jones*,
565 U.S. 400 (2012) ................................................................ 21

*United States v. Morrison*,
529 U.S. 598 (2000) ................................................................ 22

*United States v. Nixon*,
418 U.S. 683 (1974) ................................................................ 31

*United States v. Philip Morris USA, Inc.*,
327 F. Supp. 2d 13 (D.D.C. 2004) ......................................... 13

*United States v. Sprague*,
282 U.S. 716 (1931) ............................................... 18, 23, 28, 29

*Virginia v. Ferriero*,
2020 WL 3128948 (D.D.C. June 12, 2020) ......................... 8, 21

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
566 U.S. 189 (2012) .................................................... 28, 29, 31

## Statutes

1 U.S.C. §106b ........................................................................ 12, 27

12 Stat. 251 (1861) ...................................................................... 20

5 U.S.C. §3331 ............................................................................ 27

H.R.J. Res. 1, 101st Cong. (1989) ............................................. 11

H.R.J. Res. 1, 98th Cong. (1983) ............................................... 11

H.R.J. Res. 208, 92d Cong., 2d Sess., 86 Stat. 1523 (1972) ...... 9

H.R.J. Res. 41, 106th Cong. (1999) ........................................... 11

H.R.J. Res. 638, 95th Cong., 2d Sess., 92 Stat. 3799 (1978) .... 10

H.R.J. Res. 69, 112th Cong. (2011) ........................................... 11

Nev. S.J. Res. 10, 79th Sess. (2017) .......................................... 25

S.D. S.J. Res. 2 (Mar. 5, 1979) .................................................. 10

S.J. Res. 1, 101st Cong. (1989) .................................................. 11

S.J. Res. 40, 103d Cong. (1993) ................................................. 11

S.J. Res. 6, 115th Cong. (2017) ...................................................................................... 12

S.J. Res. 7, 109th Cong. (2005) ...................................................................................... 11

**Other Authorities**

116 Cong. Rec. 28,012 (1970) ....................................................................................... 15

116 Cong. Rec. 36,302 (1970) ....................................................................................... 15

117 Cong. Rec. 35,814 (1971) ....................................................................................... 15

118 Cong. Rec. 9551 (1972) .......................................................................................... 15

118 Cong. Rec. 9552 (1972) .......................................................................................... 15

128 Cong. Rec. 14,925 (1982) ....................................................................................... 11

128 Cong. Rec. 16,106 (1982) ....................................................................................... 11

17A Am. Jur. 2d Contracts §57 ..................................................................................... 30

*Congressional Pay Amendment,*
    16 OLC Op. 85 (Nov. 2, 1992) ....................................................................... 22, 27, 32

*Extending the Ratification Period for the Proposed Equal Rights Amendment: Hearing on H.J. Res. 638
    Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary,*
    95th Cong. 1 (1978) ........................................................................................... 10, 18

Fed. R. Civ. P. 24(c) ...................................................................................................... 13

Fed. R. Civ. P. 56(a) ...................................................................................................... 13

Fed. R. Civ. P. 56(b) ...................................................................................................... 13

Ginsburg, *Ratification of the Equal Rights Amendment: A Question of Time,*
    57 Tex. L. Rev. 919 (1979) ......................................................................... 15, 21, 28

H.R. Rep. 95-1405 (1978) .............................................................................................. 15

Hatch, *The Equal Rights Amendment Extension: A Critical Analysis,*
    2 Harv. J.L. & Pub. Pol'y 19 (1979) ...................................................................... 15

*Hearings on H.R.J. Res. 208 Before the House Comm. on the Judiciary,*
    92d Cong., 1st Sess. 41 (1971) ............................................................................... 15

Huckabee, *Ratification of Amendments to the U.S. Constitution,*
    CRS Report 97-922 (Sept. 30, 1997), bit.ly/3g81Jin ....................................... 19, 20

Jameson, *A Treatise on Constitutional Conventions:
    Its History, Powers, and Modes of Proceeding* (4th ed. 1887) ................................ 17

*Justice Ginsburg to Address New Georgetown Law Students,*
    Georgetown Law (Sept. 12, 2019), bit.ly/3bbokcd ................................................ 8

*Memo. from John M. Harmon, Assistant Att'y Gen., OLC, DOJ,
    to Robert J. Lipshutz, Counsel to the President* (Oct. 31, 1977) ........... 10, 18, 22, 30, 31

Paulsen, *A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment,*
    103 Yale L.J. 677 (1993) ................................................................... 10, 24, 25, 26

*Prakash, *Of Synchronicity and Supreme Law*,
132 Harv. L. Rev. 1220 (2019)...................................................................................16, 18, 19, 20, 22, 29

*Ratification of the Equal Rights Amendment*,
44 Op. OLC ___ (slip op. 1) (Jan. 6, 2020) ......................................................... 12, 26, 28, 30, 32

Snyder, *Under-the-Radar Resolution Means Nevada Backs Off from Growing Constitutional Convention Movement*, Nev. Indep. (June 13, 2017), bit.ly/3dOMauh..................................................................25

*The Federalist No. 22* (Hamilton) ...............................................................................................19

*The Federalist No. 39* (Madison) ................................................................................................23

*The Federalist No. 43* (Madison) ................................................................................................23

*The Federalist No. 85* (Hamilton) ..........................................................................................19, 24

Witter, *Extending Ratification Time for the Equal Rights Amendment: Constitutionality of Time Limitations in the Federal Amending Process*, 4 Women's Rts. L. Rep. 209 (1978) ....................................................15

**Constitutional Provisions**

U.S. Const. art. III, §1, cl. 1 ......................................................................................................18

*U.S. Const., art. V ..................................................................................................................23, 24

**INTRODUCTION**

Based on the briefing in this case, one thing is clear: Plaintiffs and their amici think the Equal Rights Amendment is a good idea and want to see it added to the Constitution. In fact, of the eight amicus briefs filed on Plaintiffs' side, six spend their *entire* brief making policy arguments about why the United States ought to have an ERA. *See* Businesses Br. (Doc. 40-1); Mayors Br. (Doc. 51-1); Equality Now Br. (Doc. 61-1); Gen. Ratify Br. (Doc. 64-2); ERA Coalition Br. (Doc. 68-1); Mich. Br. (Doc. 71).

But "this case," the Court has already explained, is not about "the content and potential impact of" the ERA. *Virginia v. Ferriero*, 2020 WL 3128948, at *3 (D.D.C. June 12, 2020). It is about whether one particular ERA proposal from 1972 made it through the rigorous amendment process that the founders codified in Article V. That question must be answered by "applying the law's demands," not by indulging "naked policy appeals" or by bending the rules to "address unwanted consequences." *Bostock v. Clayton Cty.*, 2020 WL 3146686, at *17 (U.S. June 15, 2020). If the ERA is a worthy cause with broad support, then its proponents shouldn't need ratification gimmicks to enact it. They should "put [it] back in the political hopper" and "start[] over again, collecting the necessary number of States." *Justice Ginsburg to Address New Georgetown Law Students*, Georgetown Law (Sept. 12, 2019), bit.ly/3bbokcd (remarks begin at 1:03:35).

Plaintiffs' assertion that the ERA is already our Twenty-Eighth Amendment requires the constitutional equivalent of an "interpretative triple bank shot." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626 (2018). It requires this Court to hold that the ERA's statutory ratification deadline is unconstitutional (and severable)—even though a unanimous Supreme Court has held that these kinds of deadlines are valid and enforceable. *Dillon v. Gloss*, 256 U.S. 368 (1921). Plaintiffs' theory requires this Court to hold that Article V does not require amendments to be ratified within a "reasonable time"—even though that same unanimous Supreme Court held that it does. *See id.* And Plaintiffs'

theory requires this Court to hold that the Constitution forbids States from timely rescinding their ratifications—even though the only court to consider that question persuasively concluded otherwise. *See Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1981), *vacated due to subsequent mootness*, 459 U.S. 809 (1982).

Each premise of Plaintiffs' outcome-driven theory is flawed as a matter of law. The ERA that Congress proposed in 1972 failed of adoption in 1979 and can no longer be ratified. Accordingly, this Court should enter summary judgment against Plaintiffs.

## BACKGROUND

The ERA has been proposed many times and worded in several different ways. This case is about one particular iteration of the ERA—the only one to pass Congress with the necessary two-thirds support. On March 22, 1972, Congress approved House Joint Resolution 208. SMF ¶1. That resolution sent the ERA to the States to be ratified by three-fourths of their legislatures by March 22, 1979:

> That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:
>
> "ARTICLE —
>
> "SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
> "SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.
> "SEC. 3. This amendment shall take effect two years after the date of ratification."

H.R.J. Res. 208, 92d Cong., 2d Sess., 86 Stat. 1523 (1972).

Yet, as the deadline approached, it became clear that the ERA would not cross the three-fourths threshold in time. Three-fourths of fifty is thirty-eight, but only thirty-five States had purported to ratify the ERA before the seven-year deadline. SMF ¶¶12-13. And five of those States

had rescinded their prior ratifications, including Idaho, Kentucky, and Intervenors Nebraska, South Dakota, and Tennessee. SMF ¶13.[1]

So Congress tried to extend the deadline. Various witnesses—including then-Professor Ruth Bader Ginsburg of Columbia Law School—offered testimony on the legality of an extension. *See generally Extending the Ratification Period for the Proposed Equal Rights Amendment: Hearing on H.J. Res. 638 Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary*, 95th Cong. 1 (1978) (*House Extension Hearings*). And the Justice Department gave the extension its blessing. *Memo. from John M. Harmon, Assistant Att'y Gen., OLC, DOJ, to Robert J. Lipshutz, Counsel to the President* (Oct. 31, 1977) (*1977 OLC*). Ultimately, Congress approved House Resolution 638, which purported to extend the ERA's ratification deadline to June 30, 1982. H.R.J. Res. 638, 95th Cong., 2d Sess., 92 Stat. 3799 (1978). But the extension was approved by simple majorities of the House and Senate—not the "two thirds of both houses" contemplated by Article V. SMF ¶16.

A federal district court considered the extension's constitutionality (and several other questions surrounding the ERA's ratification, including the legality of rescissions) in *Idaho v. Freeman*. In December 1981, the *Freeman* court declared the extension "null and void" because its "promulgation … was in violation of the constitutional requirement that Congress act by two-thirds of both Houses when exercising its article V powers." 529 F. Supp. at 1155, 1153. The U.S. Supreme Court stayed the district court's judgment and agreed to review its decision (though it refused to expedite its consideration of the merits). *See Nat'l Org. for Women, Inc. v. Idaho*, 455 U.S. 918 (1982).

---

[1] Instead of an immediate rescission, South Dakota tied its rescission to the ERA's seven-year ratification deadline. South Dakota's joint resolution stated that, "[i]n the event that the [ERA] is not ratified … on or before March 22, 1979, the Legislature of South Dakota hereby withdraws its ratification …, which action renders any previous ratification null and void and without any force or effect whatsoever." S.D. S.J. Res. 2 (Mar. 5, 1979). This "sunset" resolution is a valid way to rescind a prior ratification. *See* Paulsen, *A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment*, 103 Yale L.J. 677, 731 (1993).

Before the Supreme Court resolved the *Freeman* litigation, however, the extended deadline of June 30, 1982 came and went. No additional States had ratified the ERA. SMF ¶20. The Acting Solicitor General submitted a memorandum suggesting mootness, asking the Court to vacate and remand for an order of dismissal because the ERA "has failed of adoption." SMF ¶21. Other parties objected, stressing that a mootness ruling "would effectively decide the 'antecedent' issue of whether Congress has plenary power and control over the amending process under Article V and thereby determine many of the other issues and policies presented by this case." SMF ¶22. After weighing these arguments, the Supreme Court ordered the district court "to dismiss the complaints as moot." *Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)).

All camps—ERA supporters, ERA opponents, and neutral bystanders alike—assumed that the ERA had been defeated. SMF ¶¶24-27, 29. As far as Intervenors are aware, there is no evidence that *anyone* in the 1980s thought the original ERA was still alive and open for ratification. That's unsurprising. The ERA's initial seven-year deadline and its three-year extension were sources of substantial debate, negotiations, and hearings in Congress. None of that focus would have made sense unless congressional ratification deadlines are binding and enforceable. Nor did ERA proponents try to assuage their supporters, after the extended deadline expired, by arguing that they only needed three more States to ratify.

Like everyone else, ERA proponents assumed they needed to "reintroduce it fresh and begin from square 1 … go[ing] through the different legislatures all over again." 128 Cong. Rec. 14,925 (1982) (Rep. Schroeder). So they immediately reintroduced the ERA in Congress (and in many Congresses thereafter). *See* 128 Cong. Rec. 16,106 (1982); *e.g.*, H.R.J. Res. 1, 98th Cong. (1983); H.R.J. Res. 1, 101st Cong. (1989); S.J. Res. 1, 101st Cong. (1989); S.J. Res. 40, 103d Cong. (1993); H.R.J. Res. 41, 106th Cong. (1999); S.J. Res. 7, 109th Cong. (2005); H.R.J. Res. 69, 112th Cong. (2011); S.J. Res.

6, 115th Cong. (2017). But Congress never again passed the ERA with the requisite two-thirds support. SMF ¶28.

Plaintiffs' theory, commonly known as the "three-state strategy," did not emerge until the 1990s. ¶30. Relying heavily on the Archivist's decision to certify the Twenty-Seventh Amendment, proponents of the three-state strategy argued that Congress's original ERA proposal was still open for ratification. ¶¶30-31. That proposal could become law if only three more States ratified it, they contended, because congressional deadlines can be ignored (or changed), the Constitution has no deadline for ratification, and the five rescinding States are stuck with their initial ratifications. Adopting this logic, Nevada purported to ratify the ERA in 2017, Illinois purported to ratify the ERA in 2018, and Virginia purported to ratify the ERA in 2020. ¶¶32-37.

The Archivist has rejected the three-state strategy. Exercising his discretionary authority to determine whether he has received "official notice" that a constitutional amendment "has been adopted, according to the provisions of the Constitution," 1 U.S.C. §106b, the Archivist sought legal advice from the Justice Department in December 2019. SMF ¶41. The Office of Legal Counsel responded with a formal opinion, concluding that the ERA could not be ratified unless it is "propose[d] … anew" via "the same procedures required to propose an amendment in the first instance." *Ratification of the Equal Rights Amendment*, 44 Op. OLC ___ (slip op. 1) (Jan. 6, 2020) (2020 OLC). The Archivist agreed to abide by the Justice Department's opinion and, should it ever change, give Intervenors at least 45 days' notice before he certifies the ERA. SMF ¶¶43-44.

Plaintiffs filed this lawsuit in January. Doc. 1. Intervenors quickly moved to intervene, attaching a proposed answer to their motion, and this Court granted intervention on June 12. *See* Doc. 10; Doc. 10-1; Doc. 34. The Archivist has not yet filed an answer, but he filed a motion to dismiss on May 7. Doc. 29. The Archivist's reply in support of his motion to dismiss is due August 10. *See* Minute Order (May 22, 2020). Because this motion and the Archivist's motion are on similar briefing

schedules and turn on similar questions of law, Intervenors respectfully ask the Court to hear and decide the two motions together.

## ARGUMENT

Parties can seek summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). A summary-judgment motion "can thus be too late, but not too early; 'at any time' does in fact mean 'at any time.'" *Parker v. Hoglander*, 2016 WL 3527014, at *3 (D.D.C. June 23, 2016). While the non-moving party can say it still needs discovery, *see* Fed. R. Civ. P. 56(d), that argument fails when the case turns on "purely legal questions." *United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 13, 17 (D.D.C. 2004). Here, the parties agree that this case raises "'purely legal' questions … of statutory and constitutional interpretation." MTD Opp. 6 (quoting MTD 2). So "there is no real distinction" in this case between "a 12(b)(6) motion and a motion for summary judgment." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).[2]

This Court should enter "judgment as a matter of law" against Plaintiffs, Fed. R. Civ. P. 56(a), for three independent reasons. First, Plaintiffs could not ratify the ERA because its seven-year ratification deadline expired four decades earlier. Congress had the power to establish that deadline, as the Supreme Court unanimously held in *Dillon v. Gloss*, and that deadline was a crucial part of the compromise that secured the ERA. Second, Plaintiffs could not ratify the ERA because, under Article V of the Constitution, an amendment's proposal and ratification must be reasonably close in time. The forty-five-year gap between the ERA's proposal and Plaintiffs' ratifications is not reasonable,

_____

[2] If it makes a difference, this motion should be construed as a motion to dismiss under Rule 12(b)(6). Intervenors filed an answer with their motion to intervene, *see* Fed. R. Civ. P. 24(c), so they lost their chance to file a motion to dismiss. And because the Archivist has not yet filed an answer, Intervenors could not file a Rule 12(c) motion for judgment on the pleadings either. This motion for summary judgment was Intervenors' only vehicle to raise their purely legal defenses. Recognizing this predicament, some courts have allowed parties to file post-answer motions to dismiss under Rule 12(b)(6). *See, e.g.*, *Prade v. City of Akron*, 2015 WL 2169975, at *1-2 (N.D. Ohio May 8, 2015). This Court could do the same.

under any metric. Third, the ERA has not crossed the three-fourths threshold for ratification because, while its ratification was still open, five States validly rescinded their ratifications. These questions are all justiciable, they should be resolved on their merits, and they require a final judgment against Plaintiffs.

## I.     Plaintiffs' ratifications of the ERA were ineffective because the congressional deadline had expired.

The Archivist is correct: Congress gave the States seven years to ratify the ERA, the States failed to meet that deadline, and Congress's deadline was valid and enforceable. *See* MTD (Doc. 29-1) 16-23. Intervenors adopt the Archivist's arguments on this point.

Intervenors would add one point. Under Plaintiffs' theory, Article V does not allow Congress to limit the time that States have to ratify constitutional amendments. *See* Compl. (Doc. 5) ¶¶65-66; MTD Opp. (Doc. 37) 22. In other words, Plaintiffs think the seven-year deadline in the congressional resolution proposing the ERA is *unconstitutional.* But when an act is partially unconstitutional, courts do not stop there; they conduct a severability analysis, evaluating whether the unconstitutional provision "dooms the remainder of the Act." *Murphy v. NCAA*, 138 S. Ct. 1461, 1482 (2018). Courts "must" ask: "Would the legislature have preferred what is left of its statute to no statute at all?" *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006); *accord United States v. Booker*, 543 U.S. 220, 246 (2005) ("Would Congress still have passed the valid sections had it known about the constitutional invalidity of the other portions?" (cleaned up)).

The "touchstone" of severability is "legislative intent." *Ayotte*, 546 U.S. at 330. Even if severing the unconstitutional provision would leave the act "'fully operative as a law,'" the whole act must be invalidated if "'it is evident that the legislature would not have enacted'" it without the unconstitutional part. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999). Courts make this determination by "evaluat[ing] the importance of the [unconstitutional provision] in the original

legislative bargain." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987); *see id.* at 691-96 (reviewing the "legislative history").

The ERA's seven-year ratification deadline was a crucial part of the legislative bargain; without it, the amendment would not have secured the necessary two-thirds support in Congress. The ERA's proponents opposed including a ratification deadline. *See* 118 Cong. Rec. 9551-52 (1972) (Sen. Hartke); 117 Cong. Rec. 35,814 (1971) (Rep. Griffiths); Ginsburg, *Ratification of the Equal Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919, 921 (1979) (Ginsburg); Witter, *Extending Ratification Time for the Equal Rights Amendment: Constitutionality of Time Limitations in the Federal Amending Process*, 4 Women's Rts. L. Rep. 209, 216-17 (1978) (Witter). Contrary to Plaintiffs' current theory, ERA proponents recognized that, if the deadline passed before enough States had ratified the ERA, "we must begin the entire process once again." 118 Cong. Rec. 9552 (1972) (Sen. Hartke). But "several influential Members of both Houses objected to its absence." H.R. Rep. 95-1405, at 4 (1978). They worried that the ERA "could roam around State legislatures for 50 years," 116 Cong. Rec. 28,012 (1970) (Rep. Celler), and they warned that allowing it to "float around in space" was "very unwise," *id.* at 36,302 (Sen. Ervin).

In fact, when the House passed a version of the ERA without the seven-year deadline, the measure died in Congress. *See* Witter 215-16. The bill was reintroduced in the next Congress, with the seven-year deadline included "to gain united support for the amendment." Hatch, *The Equal Rights Amendment Extension: A Critical Analysis*, 2 Harv. J.L. & Pub. Pol'y 19, 35 n.70 (1979) (citing *Hearings on H.R.J. Res. 208 Before the House Comm. on the Judiciary*, 92d Cong., 1st Sess. 41 (1971) (Rep. Griffiths)); *see also* 117 Cong. Rec. 35,814 (Rep Griffiths: explaining that the deadline's absence was "one of the objections last year" and that its inclusion should "weed out" some of the opposition). This version of the ERA, with the seven-year deadline included, finally garnered the support of two-thirds of Congress—where all other attempts to pass the ERA had failed. *See* Compl. ¶¶19-28.

While divining congressional intent "can sometimes be elusive, the answer here seems clear": the ERA's "historical context makes it evident" that more than one-third of Congress "would have preferred no [ERA] at all" to an ERA that had no deadline for ratification. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 509 (2010). So if Plaintiffs are right that the seven-year deadline in the ERA's proposing resolution is unconstitutional, then the *entire* resolution must fall. The deadline's nonseverability would be yet another reason why Plaintiffs' ratifications—indeed, *all* States' ratifications—of the ERA are ineffective. Notably, at least thirty States expressly referenced the seven-year deadline in their ratification documents. SMF ¶9. If that condition on their ratification was in fact illegal, then their ratification votes should no longer be counted either. *See* Prakash, *Of Synchronicity and Supreme Law*, 132 Harv. L. Rev. 1220, 1289-90 (2019) (Prakash). Plaintiffs' challenge to the ERA's seven-year deadline is, thus, self-defeating.

## II. Plaintiffs' ratifications of the ERA were ineffective because a constitutionally reasonable time for ratification had expired.

Even if Congress's seven-year deadline were invalid or nonbinding, the Constitution contains its own ratification deadline: a "reasonable time" after the amendment's proposal. *Dillon*, 256 U.S. at 375. Plaintiffs' attempt to ratify the ERA more than four decades after its proposal falls well outside the zone of reasonableness.

Under Article V, a constitutional amendment must be ratified within a "reasonable time" after it is proposed. *Id.* That's what a unanimous Supreme Court held in *Dillon v. Gloss*. While *Dillon* acknowledged that Article V "contains no express provision" limiting the time for ratification, the Court deemed that omission "not … controlling" because constitutional rules can also be "reasonably implied." *Id.* at 373. One rule that can be reasonably "impli[ed] from article 5," the Court explained, is that amendments must be ratified within a "reasonable time" after they are proposed. *Id.* at 374-75. The Court reached that conclusion for four reasons:

1. The text of Article V treats the acts of proposal and ratification "not … as unrelated acts, but as succeeding steps in a single endeavor." *Id.* The "natural inference" from this coupling is that proposal and ratification "are not to be widely separated in time." *Id.* at 375.

2. The text of Article V allows Congress to propose amendments "only when there is deemed to be a necessity therefor." *Id.* The "reasonable implication" of that language is that, once proposed, amendments "are to be considered and disposed of presently." *Id.*

3. By requiring a supermajority of "three-fourths of the states," ratification is meant to reflect "the expression of the approbation of the people." *Id.* Ratification must be "sufficiently contemporaneous" with proposal to "reflect the will of the people in all sections at relatively the same period"—something "ratification scattered through a long series of years would not do." *Id.*

4. The opposite view—that amendments never expire and can be ratified forever—would have "untenable" results. *Id.* It would allow proponents to combine votes from "the present" with totally unrelated votes from "generations now largely forgotten." *Id.* And it would mean that "amendments proposed long ago—two in 1789, one in 1810 and one in 1861—are still pending." *Id.* That latter amendment would allow States *to reinstitute slavery. See id.* at 372 (discussing the Corwin Amendment).

For these four reasons, the *Dillon* Court rejected the notion "that an amendment once proposed is to be open to ratification for all time, or that ratification in some of the states may be separated from that in others by many years and yet be effective." *Id.* at 374. It endorsed the conclusion in Judge Jameson's treatise: "an alteration of the Constitution proposed to-day has relation to the sentiment and the felt needs of to-day, and that, if not ratified early while that sentiment may fairly be supposed to exist, it ought to be regarded as waived." *Id.* at 375 (quoting Jameson, *A Treatise on Constitutional Conventions: Its History, Powers, and Modes of Proceeding* §585 (4th ed. 1887)).

*Dillon*'s conclusion that Article V limits the time for ratification is not dicta. True, the precise question in *Dillon* was whether the seven-year ratification deadline that Congress put in the Eighteenth Amendment was constitutional. *Id.* at 370-71. And the Court held that Congress has the power to impose such deadlines. *Id.* at 376. But the *reason* Congress has that power, according to the Court, is because the Constitution *itself* requires ratification to occur within a reasonable time. *See id.* at 374-76.

"When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which [courts] are bound." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996); *accord Gabbs Expl. Co. v. Udall*, 315 F.2d 37, 39 (D.C. Cir. 1963) (language that is "material to the decision" is not dicta); *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535, 541 (D.C. Cir. 2019) ("a necessary part of [the court's] reasoning" is not dicta); *Eisner v. Macomber*, 252 U.S. 189, 205 (1920) (reasoning that "furnishe[s] the entire basis for the conclusion reached" is not dicta). For that reason, *Dillon*'s analysis of Article V's limit on the time for ratification—which "took up the vast majority of the *Dillon* opinion" and was "a necessary building block for its ultimate conclusion"—binds this Court. Prakash 1281.

Even if *Dillon*'s analysis were dicta, it was "carefully considered" dicta of the Supreme Court—which binds this Court all the same. *Mass. Lobstermen's*, 945 F.3d at 541. As the Supreme Court has explained, "article 5 was carefully examined" in *Dillon*, and "[*Dillon*'s] statements" about the meaning of Article V "were not idly or lightly made." *United States v. Sprague*, 282 U.S. 716, 732-33 (1931). The argument that *Dillon*'s discussion can be "dismiss[ed]" as dicta "carries no weight" for "this 'inferior Court,'" since "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003) (cleaned up; quoting U.S. Const. art. III, §1, cl. 1); *accord NRDC v. NRC*, 216 F.3d 1180, 1189 (D.C. Cir. 2000).

Binding or not, this Court *should* follow *Dillon*'s interpretation of Article V because it is correct as an original matter. To quote then-Professor Ruth Bader Ginsburg, "[i]mplicit in Article V is the requirement that ratification of a proposed constitutional amendment occur within some reasonable time." *House Extension Hearings* 122. The Justice Department, too, once deemed this principle "no longer open to question." 1977 OLC 19. Though the text of Article V does not spell out a particular timeframe for ratification, "the usual rule of construction where time is not expressly prescribed" is

that "duration for a reasonable period is the term accepted by the law." *Trailmobile Co. v. Whirls*, 331 U.S. 40, 54-55 (1947) (citing *Dillon*, 256 U.S. at 375).

Indeed, the text of Article V expressly contemplates a reasonably contemporaneous ratification period. Article V requires Congress to "deem [an amendment] necessary"—a judgment that can be made only in light of current circumstances. *See* Prakash 1269. Article V also requires amendments to be approved by a supermajority democratic vote: "two thirds of both Houses" and "the Legislatures of three fourths" of the States. "One crucial element of majority rule"—let alone supermajority rule—"is the requirement that those in favor of some … constitutional amendment … actually constitute a majority at a *given moment in time.*" Prakash 1224. As Hamilton put it, the Constitution rests on "the consent of the people," *The Federalist No. 22*, so it can change only when the people are "*united* in the desire of a particular amendment," *The Federalist No. 85* (emphasis added). No such unity exists when different generations approve amendments in different circumstances over different decades. *See* Prakash 1272.

"Historical practice" further confirms that "the amendment process must occur over a reasonable, and therefore limited, period." Prakash 1274. Until our most recent amendment, no amendment took longer than four years to ratify. Huckabee, *Ratification of Amendments to the U.S. Constitution* 1, CRS Report 97-922 (Sept. 30, 1997), bit.ly/3g81Jin. The average time for ratification was one year, eight months, and seven days. *Id.*

| Amendment | Time to Ratify |
|---|---|
| I-X | 2 years, 2 months, 20 days |
| XI | 11 months, 3 days |
| XII | 6 months, 6 days |
| XIII | 10 months, 6 days |
| XIV | 2 years, 26 days |
| XV | 11 months, 8 days |
| XVI | 3 years, 6 months, 22 days |
| XVII | 10 months, 26 days |
| XVIII | 1 year, 29 days |
| XIX | 1 year, 2 months, 14 days |
| XX | 10 months, 21 days |
| XXI | 9 months, 15 days |
| XXII | 3 years, 11 months, 6 days |
| XXIII | 9 months, 12 days |
| XXIV | 1 year, 4 months, 27 days |
| XXV | 1 year, 7 months, 4 days |
| XXVI | 3 months, 8 days |

*See id.* at 4. The founding generation's debate over what is now the Twenty-Seventh Amendment is also telling. That amendment was first proposed in 1789, but it failed to secure the necessary three-fourths approval. When popular opinion shifted toward the amendment again in 1816, no one argued that the original amendment was still pending. The founding generation rightly assumed that the amendment would have to start over again, with a new proposal from Congress and a new round of voting from the States. *See* Prakash 1274-75.

Accepting Plaintiffs' view that *Dillon* is wrong would wreak havoc on our constitutional system. Plaintiffs' argument that every failed amendment is still pending before the States would reach even the Corwin Amendment—a despicable amendment that would forever enshrine slavery in the Constitution. *See* 12 Stat. 251 (1861) ("No amendment shall be made to the Constitution which will authorize or give to Congress the power to abolish or interfere, within any State, with the domestic institutions thereof, including that of persons held to labor or service by the laws of said State."). Plaintiffs' argument also necessarily means that the ratification process can be stretched out over decades (or even centuries). That regime would make it impossible to conduct the most basic task of

constitutional interpretation: divining an amendment's "contemporaneous understanding" or "original meaning." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984); *United States v. Jones*, 565 U.S. 400, 407 n.3 (2012). And it would allow an amendment to be ratified by accretion even though, at any given time, a supermajority of States *oppose* it. *See* Prakash 1272. The Supreme Court rightly rejected these absurdities in *Dillon*, and this Court should do the same.

In response to all this, Plaintiffs hang their hats on the Twenty-Seventh Amendment—an amendment that the Archivist deemed ratified in 1992, more than 200 years after Congress proposed it. *See* Compl. ¶69; MTD Opp. 23-24. It's unclear what role the Twenty-Seventh Amendment plays in Plaintiffs' argument. Perhaps Plaintiffs are making a practical point: this Court *should not* hold that Article V limits the time for ratification because doing so would undermine the Twenty-Seventh Amendment. *See* MTD Opp. 24. Or perhaps Plaintiffs are making a legal point: this Court *cannot* hold that Article V limits the time for ratification because the Twenty-Seventh Amendment effectively rejects that argument. *See* MTD Opp. 23. Either way, Plaintiffs' point fails.

Practically speaking, this Court can hold that Plaintiffs' ratifications of the ERA were too late without undermining the Twenty-Seventh Amendment. Unlike the ERA, the Archivist has already certified the Twenty-Seventh Amendment as ratified. That distinction is practically important because, as this Court has noted, "it is unclear whether [litigants are] able to bring a subsequent lawsuit to 'un-publish' or 'de-ratify' [a constitutional] amendment." *Ferriero*, 2020 WL 3128948, at *4. Also unlike the ERA, Congress did not include any ratification deadline in the Twenty-Seventh Amendment. When determining what constitutes a "reasonable time" under Article V, courts might distinguish cases where two-thirds of Congress expressed a view from cases where Congress was silent. *Cf.* Ginsburg 944-45 & nn.159-60.

Legally speaking, the Twenty-Seventh Amendment means nothing for this case. No court has ever considered the legality of its ratification. And this Court must follow *Dillon*, a unanimous

interpretation of the Constitution by the U.S. Supreme Court—even if the political branches disagree with that decision. *See United States v. Morrison*, 529 U.S. 598, 616 n.7 (2000). Nor is the Archivist's certification of an amendment *in the 1990s* the sort of "historical practice" that helps courts determine the meaning of the Constitution. *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017); *see Printz v. United States*, 521 U.S. 898, 917-18 (1997) (explaining that examples from "the past few decades" are "of such recent vintage that they are no more probative than the statute before us of a constitutional tradition that lends meaning to the text"). The political branches have not been consistent in their views either. Before the Justice Department described *Dillon*'s interpretation of Article V as "dicta," it insisted that *Dillon*'s interpretation was "no longer open to question." *Compare Congressional Pay Amendment*, 16 OLC Op. 85, 90 (Nov. 2, 1992) (1992 OLC), *with* 1977 OLC 19. And up until the Twenty-Seventh Amendment, Congress consistently acted as though unratified amendments expire. *See* Prakash 1274-79. The Twenty-Seventh Amendment does not trump this much longer historical practice, let alone the holding of *Dillon* or the text of Article V. *See Chiafalo v. Washington*, 591 U.S. ___, ____ (July 6, 2020) ("[Parties] cannot rest a claim of historical tradition on one [example] in over 200 years.").

Because Article V requires amendments to be ratified within a "reasonable time," *Dillon*, 256 U.S. at 375, Plaintiffs' purported ratifications of the ERA were ineffective. A reasonable ratification period for the ERA is probably seven years. Seven years is the period that Congress chose for the ERA, and it's the period that Congress chose for nearly every amendment proposed in the last century. SMF ¶7. But wherever Article V draws the line exactly, the forty-five year gap between the ERA's proposal and Plaintiffs' ratifications is plainly unreasonable. "[C]onsidering the periods within which prior amendments were ratified," *Dillon*, 256 U.S. at 376, the ERA's ratification would have taken *four decades* longer than any amendment ratified in our first 200 years. SMF ¶¶5-6. Over that same timeframe, the country grew by 100 million people, had seven different Presidents, and saw near-complete turnover in its national and state "representatives." *Dillon*, 256 U.S. at 375; *see* SMF ¶38. The

politics of the late 2010s are, to put it mildly, quite different from the politics of the late 1970s. And more than half of Americans alive today were not alive then. SMF ¶39. Article V does not allow "the present … generation" to reach back in this manner and "supplement[]" the work of "representatives of generations now largely forgotten." *Dillon*, 256 U.S. at 375.

In short, even if Congress could not set a time limit on ratification, the States' votes on the ERA were not "sufficiently contemporaneous … to reflect the will of the people in all sections at relatively the same period." *Id.* Article V does not allow an amendment to be ratified by a cluster of States, lay dormant for nearly half a century, and then be resurrected by a small minority of States. Because that is precisely what the Supreme Court held in *Dillon*, Plaintiffs' claims fail as a matter of law.

## III. Even if they were effective, Plaintiffs' ratifications of the ERA are insufficient because five States validly rescinded their ratifications.

To reach the magic number of thirty-eight, Plaintiffs need to count the ratifications of Idaho, Kentucky, Nebraska, South Dakota, and Tennessee—even though those States expressly rescinded their prior ratifications of the ERA. Plaintiffs know that, but they insist that all five rescissions were unconstitutional. *See* Compl. ¶¶70-74. Plaintiffs are wrong, for largely the same reasons that the *Freeman* court gave when it considered this question. *See* 529 F. Supp. at 1146-50.

The text of Article V "equally enables" Congress and the States. *The Federalist No. 43* (Madison). This was by design, as it makes the amendment process "neither wholly federal nor wholly national." *The Federalist No. 39* (Madison). Article V accomplishes this balance by giving Congress and the States "carefully balanced and approximately equally distributed" powers. *Freeman*, 529 F. Supp. at 1128.

Congress has the power to control the "mode of ratification." U.S. Const., art. V; *see Sprague*, 282 U.S. at 732 ("This Court has repeatedly and consistently declared that the choice of mode rests

solely in the discretion of Congress."). That power is why Congress can set deadlines on ratification, as explained above. *See Dillon*, 256 U.S. at 376.

As for the States, they have the power to determine "when" they have "ratified" an amendment. U.S. Const., art. V; *see Freeman*, 529 F. Supp. at 1134 (explaining that Article V gives the States "exclusive control over the actual process of ratification, or determination of actual consensus"). This, too, was by design. In response to the Anti-Federalists' fears about Congress's role in the amendment process, the Federalists pointed to the States' exclusive power over ratification. Given this power, they explained, "[w]e may safely rely on the disposition of the State legislatures to erect barriers against the encroachments of the national authority." *The Federalist No. 85* (Hamilton).

The States' power over ratification includes the power to rescind a prior ratification, at least when the rescission occurs before the ratification period ends. "[T]he drafters of the Constitution considered it important" that constitutional amendments "draw on that same power which is the source of the original authority of the Constitution—'the consent of the people.'" *Freeman*, 529 F. Supp. at 1148. That consent is missing when a State timely rescinds its ratification. "To allow a situation where … the first act of a state is irrevocable … would permit an amendment to be ratified by a technicality … and not because there is really a considered consensus supporting the amendment." *Id.* at 1149. Counting the rescission would "giv[e] a truer picture of the people's will as of the time." *Id.* at 1148.

While Article V does not expressly mention the power to rescind, it didn't need to. The "general rule" under our system of law is that, until an enactment acquires independent legal significance, it "is repealable by the same authority that produced it." Paulsen 725. Under Article V, state ratifications have "technical significance … at only one time—when three-fourths of the states have acted to ratify." *Freeman*, 529 F. Supp. at 1150. Until that three-fourths threshold is reached, there is "nothing in the nature of … state ratification legislation that creates vested legal interests"; each

State "can repeal its contribution toward the creation of a whole until the whole has been finally created." Paulsen 726. Indeed, several States have rescinded ratifications in the past (including amici New York and New Jersey). *Freeman*, 529 F. Supp. at 1143-44. Instead of dismissing these rescissions as illegal, the political branches "dignified" them by "waiting and collecting additional ratifications" until the rescinding States were no longer necessary to cross the three-fourths threshold. *Id.* at 1149.[3]

"To the extent this is a close question," as Plaintiffs elsewhere argue, "any doubts should be resolved in favor of the States." MTD Opp. 22. Unlike the mode and timing of ratification, which the Constitution entrusts to Congress, Article V puts States in charge of the method for ratifying constitutional amendments. As then-Judge Stevens explained, Article V's "failure to prescribe any particular ratification procedure" reflects the Framers' "understanding that state legislatures should have the power and the discretion to determine for themselves how they should discharge the responsibilities committed to them by the federal government." *Dyer v. Blair*, 390 F. Supp. 1291, 1307 (N.D. Ill. 1975). Nothing in the constitutional text, history, or precedent suggests that rescissions are somehow beyond this power and discretion. To quote Plaintiffs' again, because "one of the Framers' overarching concerns was … protecti[ng] State prerogatives against federal intrusion," no "limit [on] the States' role in amending the Constitution should be presumed in the face of constitutional silence." MTD Opp. 22. Indeed, "refus[ing] to recognize a state's rescission … would destroy the balance created in article V and remove the state's power to create a barrier to encroachment by the national government." *Freeman*, 529 F. Supp. at 1146.

For all these reasons, the "better reading" of Article V is that the "power to rescind" is "fairly implicit" in the power to ratify. *See* Paulsen 724-28. Depriving the States of rescissions is all the more

---

[3] Relatedly, Plaintiff Nevada has voted to rescind its prior calls for a constitutional convention on, among other topics, a balanced-budget amendment. *See* Nev. S.J. Res. 10, 79th Sess. (2017), bit.ly/3dMfhhR; Snyder, *Under-the-Radar Resolution Means Nevada Backs Off from Growing Constitutional Convention Movement*, Nev. Indep. (June 13, 2017), bit.ly/3dOMauh.

inappropriate if, as Plaintiffs contend, proposed constitutional amendments never expire and can be ratified by future generations over the course of centuries. *See* 2020 OLC 26 n.21. It is "strange to say that a proposed amendment never dies but, 'Terminator'-like, lives on until it has completed its mission, no matter how many times it appears to have been 'killed' by the states, and that only an overtaking amendment ('Terminator II'?) retracting the prior amendment could stop the original proposal." Paulsen 724. The Court should not read the Constitution to require this bizarre one-way ratchet.

## IV. The Court should resolve this case on the merits.

The other parties identify merits questions that they think this Court cannot resolve. Plaintiffs argue that this Court cannot consider the validity of their ratifications because, valid or not, the Archivist simply *must* accept them. *See* MTD Opp. 18-19. The Archivist argues that the three issues raised here—the congressional deadline, the constitutional deadline, and state rescissions—are nonjusticiable political questions. *See* MTD 12-15. Both sides are mistaken.

### A. Plaintiffs cannot win this case if their ratifications are invalid.

Strangely, Plaintiffs argue that the Archivist cannot make any substantive determinations about their ratification documents; even if an amendment's ratification is plainly deficient, they say, the Archivist *must* add the amendment to the Constitution. Plaintiffs' argument proves too much. It "would be true whether the state is exercising its affirmative power of ratification or the negative function of rescission," so it would require the Archivist to honor the five States who rescinded their ERA ratifications too. *Freeman*, 529 F. Supp. at 1150. Plaintiffs' argument also proves too little. *Someone* has to decide whether the ERA was validly ratified. If it's not the Archivist, *see* MTD Opp. 18-19, and it's not Congress, *see* MTD Opp. 12-14, then it must be the judiciary. This Court, then, can resolve the validity of Plaintiffs' ratifications and instruct the Archivist what to do.

Plaintiffs' argument is also wrong. The relevant statute requires the Archivist to "cause [an] amendment to be published" only after he receives "official notice" that an amendment "has been

adopted, *according to the provisions of the Constitution*." 1 U.S.C. §106b (emphasis added). That's

unsurprising since, like other federal officials, the Archivist takes an oath to follow the Constitution.

5 U.S.C. §3331. True, the Archivist's duty to certify amendments is largely "ministerial": he "may not

refuse to certify a *valid* amendment." 1992 OLC 98 (emphasis added). "Nonetheless, section 106b

clearly requires that, before performing this ministerial function, the Archivist must determine whether

he has received 'official notice' that an amendment has been adopted 'according to the provisions of

the Constitution.' This is a question of law that the Archivist may properly submit to the Attorney

General for resolution." 1992 OLC 99; *cf. U.S. ex rel. Widenmann v. Colby*, 265 F. 998, 999 (D.C. Cir.

1920) (describing the duties of one of the Archivist's predecessors as "purely ministerial" where there

was "no allegation … that [he] did not receive official notice from the requisite number of states"),

*aff'd on other grounds*, 257 U.S. 619 (1921). With the Attorney General's assistance, the Archivist made

that critical legal determination about the ERA, like he has done for other amendments. *See* SMF ¶¶41-

45; 1992 OLC 99 & n.20. His legal judgment is subject to judicial review.[4]

**B.    The validity of Plaintiffs' ratifications is not a political question.**

The Archivist agrees that he can make legal determinations about ratifications, but disagrees

that this Court can do the same. He believes the questions in this case are nonjusticiable

determinations for the political branches to make. *See* MTD 12-15. His argument for avoiding the

merits of this case is just as wrong as Plaintiffs'.

As then-Judge Stevens explained, the notion that legal disputes about constitutional

amendments present nonjusticiable political questions "is not one which a District Court is free to

---

[4] Intervenors take no position on whether mandamus is the proper vehicle to challenge the Archivist's decision. Intervenors agree with Plaintiffs, though, that States have at least one mechanism to challenge the Archivist's actions regarding constitutional amendments. *See* MTD Opp. 27 n.26. When three of the Intervenors sued the Archivist last year, they brought an equitable action for injunctive and declaratory relief. *See* Doc. 1 at 23, *Alabama v. Ferriero*, No. 7:19-cv-2032-LSC (N.D. Ala. Dec. 16, 2019).

accept." *Dyer*, 390 F. Supp. at 1300. The Supreme Court "has on several occasions decided questions arising under article V, even in the face of 'political question' contentions." *Id.* at 1300 & n.21. To quote now-Justice Ginsburg, the Supreme Court has "entertained and resolved on the merits a variety of questions relating to the process of proposing and ratifying constitutional amendments." Ginsburg 943; *see, e.g.*, *Sprague*, 282 U.S. 716; *Leser v. Garnett*, 258 U.S. 130 (1922); *Dillon*, 256 U.S. 368; *The National Prohibition Cases*, 253 U.S. 350 (1920); *Hawke v. Smith*, 253 U.S. 221 (1920). In fact, one of the Supreme Court's earliest decisions resolved a question about the ratification process—and did so on the merits. *See Hollingsworth v. Virginia*, 3 U.S. (3 Dall.) 378 (1798).

The questions in this case do not satisfy either prong of the political-question doctrine. There is no "'textually demonstrable constitutional commitment of the issue to a coordinate political department.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012). The executive branch is not even *mentioned* in Article V. Congress is mentioned, but Plaintiffs and the Justice Department both agree that nothing "in the text of Article V, historical practice, or other Supreme Court precedent" gives Congress the power "to determine the validity of a constitutional amendment after the States have submitted their ratifications." 2020 OLC 32; *accord* MTD Opp. 12-14. Granting "plenary power to Congress to control the amendment process" would "run[] completely counter to the intentions of the founding fathers." *Freeman*, 529 F. Supp. at 1126. Because Article V "split[s]" the amending power "between Congress and the states," "it is evident … that the framers did not intend either of those two parties to be the final arbiter of the process"; rather, "the courts, as a neutral third party … [would] decide … questions raised under article V." *Id.* at 1135.

Nor do the questions in this case lack "'judicially discoverable and manageable standards for resolving [them].'" *Zivotofsky*, 566 U.S. at 195. Consider them in turn.

**Congressional Deadline**: The question whether Congress can limit the States' time for ratification is not only justiciable—the Supreme Court has already decided it. The *Dillon* Court held,

squarely and unanimously, that Congress can "fix a definite period for the ratification" of constitutional amendments. 256 U.S. at 375-76. Congress's power to set deadlines is "incident of its power to designate the mode of ratification" and, thus, binds the States. *Id.* at 376. This holding from *Dillon* remains good law. In *Sprague*, the Court reaffirmed *Dillon*'s "statements with respect to the power of Congress in proposing the mode of ratification." 282 U.S. at 732. And in *Coleman v. Miller*, the lead opinion described *Dillon*'s analysis as "cogent" and confirmed that *Dillon* "*held* that the Congress in proposing an amendment may fix a reasonable time for ratification." 307 U.S. 433, 452 (1939) (emphasis added). While four Justices in *Coleman* "disapprov[ed] of the conclusion arrived at in *Dillon*," *id.* at 458 (Black, J., concurring), the other five Justices did not. *See Dyer*, 390 F. Supp. at 1299-300; Prakash 1277-78.[5]

To conclude that Congress has the power to set ratification deadlines, the *Dillon* Court examined the text, structure, and history of the Constitution—evidence and arguments that are right in the judiciary's wheelhouse. Here, too, the Archivist eloquently explains why Congress has the power to set ratification deadlines. *See* MTD 16-23. "Recitation of [his] arguments—which sound in familiar principles of constitutional interpretation—is enough to establish that this case does not 'turn on standards that defy judicial application.'" *Zivotofsky*, 566 U.S. at 201.

**Constitutional Deadline**: Courts can similarly determine what Article V deems a "reasonable time" for ratifying constitutional amendments. As a general matter, courts have no trouble deciding whether an amount of time is "reasonable"—a concept that is "ubiquitous in the law." *Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 41-42 (D.D.C. 2016); *see, e.g.*, 5 U.S.C. §555 ("reasonable

---

[5] Plaintiffs' suggestion that *Sprague* and *Coleman* somehow undermine *Dillon*, MTD Opp. 21 n.18, 23, is thus a poor reading of those decisions. But even if Plaintiffs were reading the tea leaves correctly, this Court cannot hold that the Supreme Court's "more recent cases have, by implication, overruled an earlier precedent"; it must "leav[e] to [the Supreme] Court the prerogative of overruling its own decisions.'" *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989)).

time"); *Cutler v. Hayes*, 818 F.2d 879, 896 (D.C. Cir. 1987) ("unreasonable delay"); 17A Am. Jur. 2d Contracts §57 ("[a]n offer [to contract] lapses after the expiration of a reasonable time"). If the Supreme Court can determine that "more than 3 days but less than 10 days" is not a "substantially lengthy" recess, *NLRB v. Noel Canning*, 573 U.S. 513, 527, 537-38 (2014), then courts can determine what constitutes a "reasonable time" to ratify constitutional amendments.

True, in *Coleman*, some Justices thought that, "in the absence of a limitation by the Congress" "either in the proposed amendment or in the resolution of submission," courts cannot determine what constitutes a reasonable ratification period under Article V. 307 U.S. at 452-53. But Congress did "fix a reasonable time" for ratifying the ERA "in the resolution of submission," *id.* at 452, so *Coleman*'s reasoning doesn't apply here. *Coleman* did not overrule *Dillon*, where a unanimous Court evaluated Congress's seven-year deadline for the Eighteenth Amendment and concluded that it was reasonable. *Dillon*, 256 U.S. at 376; *see also id.* at 375 (explaining that a sixty-year gap would not be reasonable). The *Dillon* Court made that determination by looking to "the periods within which prior amendments were ratified"—the kind of historical inquiry that is within the judiciary's competence. *Id.* at 376; *see, e.g.*, *Noel Canning*, 573 U.S. at 537-38 (calculating the length of prior recesses to determine how short a recess can be).[6]

**State Rescissions**: Like Congress's power to impose ratification deadlines, the States' power to rescind their prior ratifications is an ordinary, justiciable question of constitutional law. It "demands

---

[6] *Coleman*'s discussion of whether courts can determine, with no guidance from Congress, what constitutes a "reasonable time" under Article V was not even an opinion of the Court. *See* 1977 OLC 50 ("There was … no clear majority in *Coleman* … for the position that courts could never review the question of reasonableness."). The two Justices in dissent thought that courts were perfectly capable of deciding what constitutes a "reasonable time" under Article V, even when Congress is silent. *See* 307 U.S. at 470-73 (Butler, J., dissenting). As for the other seven Justices, four would not have reached that question because they thought the plaintiffs lacked Article III standing. *See id.* at 460-70 (op. of Frankfurter, J.). The remaining three reaffirmed *Dillon*, but thought that courts should not determine what constitutes a "reasonable time" under Article V when Congress is silent. *See id.* at 452-56. Because *Coleman* was so "fractured," 2020 OLC 29, this Court should be hesitant to read it broadly or to extend it to new contexts.

careful examination of the textual, structural, and historical evidence put forward by the parties ….
This is what courts do." *Zivotofsky*, 566 U.S. at 201. The *Freeman* court, for example, consulted these
traditional sources of evidence to reach a well-informed conclusion about the constitutionality of state
rescissions. *See* 529 F. Supp. at 1146-50. The Justice Department and nineteen state amici have also
consulted this evidence and drawn a firm (albeit incorrect) conclusion. *See* 1977 OLC 29-49; States
Amicus Br. (Doc. 67) 20-25. This Court can do the same. Whether States have the power to rescind
turns largely on the meaning of "the word 'ratification'" in Article V—a provision that "must be
interpreted with the kind of consistency that is characteristic of judicial, as opposed to political,
decision making." *Dyer*, 390 F. Supp. at 1303; *Freeman*, 529 F. Supp. at 1137. The States' "power to
ratify a proposed amendment to the federal Constitution has its source in the federal Constitution,"
*Hawke*, 253 U.S. at 230, and the Supreme Court "has consistently exercised the power to construe and
delineate claims arising under express powers" and implied "powers alleged to derive from
enumerated powers," *United States v. Nixon*, 418 U.S. 683, 704 (1974).

True, the lead opinion in *Coleman* contains a stray passage suggesting that the validity of state
rescissions is a political question: "We think … the question of the efficacy of ratifications by state
legislatures, in the light of previous rejection *or attempted withdrawal*, should be regarded as a political
question … with the ultimate authority in the Congress in the exercise of its control over the
promulgation of the adoption of the amendment." 307 U.S. at 450 (emphasis added). But the italicized
language about rescissions was "clearly … dicta." *Freeman*, 529 F. Supp. at 1142. The *Coleman* litigation
arose because Kansas purported to ratify the Child Labor Amendment after previously voting to reject
it. 307 U.S. at 435-36. No State tried to rescind its ratification of the Child Labor Amendment, let
alone Kansas, so "the effect of a rescission … was not before the court." *Freeman*, 529 F. Supp. at
1142. As the lead opinion in *Coleman* explains, "[t]he precise question" that *Coleman* attempted to

decide was whether a State could be "restrain[ed] … from certifying [its] ratification" of an amendment "because of an earlier rejection." 307 U.S. at 450.

Nor is *Coleman*'s discussion of rescissions the kind of "considered dicta" that binds this Court. *See Freeman*, 529 F. Supp. at 1142 (explaining that *Coleman*'s drive-by discussion of rescissions is, at most, "persua[sive]" authority). As explained, *Coleman* was a badly fractured opinion with no opinion representing a majority of the Court. *See supra* n.6. "[D]icta from a Supreme Court plurality opinion" is simply "non-precedential." *Sampson v. United States*, 832 F.3d 37, 45 (1st Cir. 2016); *accord In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *6 (D. Conn. Aug. 9, 2016) (distinguishing "*Marks*-doctrine dicta" from a "*Marks*-doctrine holding"); *cf. Patterson v. City of Toledo*, 2012 WL 1458115, at *6 (N.D. Ohio Apr. 26, 2012) (explaining that "plurality dicta" that "was not even applied by the plurality in that case … cannot be … [the] law"). Like the *Freeman* court, this Court must draw its own conclusions about the justiciability and merits of state rescissions. And as far as persuasive authority goes, all agree that *Coleman* has little to say for itself. *See* MTD Opp. 12-14; 2020 OLC 29-32; 1992 OLC 102-05.

## CONCLUSION

The Court should enter judgment against Plaintiffs.

Dated: July 6, 2020

Respectfully submitted,

STEVE MARSHALL
*Attorney General of Alabama*

  /s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Solicitor General*
James W. Davis
*Deputy Attorney General*
A. Barrett Bowdre
*Deputy Solicitor General*
OFFICE OF THE ALABAMA ATTORNEY GENERAL
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
(334) 353-2196
edmund.lacour@AlabamaAG.gov
jim.davis@AlabamaAG.gov
barrett.bowdre@AlabamaAG.gov

  /s/ Cameron T. Norris
Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

Cameron T. Norris
Alexa R. Baltes
Tiffany H. Bates
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
lexi@consovoymccarthy.com
tiffany@consovoymccarthy.com

JEFF LANDRY
*Attorney General of Louisiana*

  /s/ Elizabeth B. Murrill
Elizabeth B. Murrill
*Solicitor General of Louisiana*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 326-6766
MurrillE@ag.louisiana.gov

JASON RAVNSBORG
*Attorney General of South Dakota*

  /s/ Paul S. Swedlund
Paul S. Swedlund
*Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF SOUTH DAKOTA
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
605-773-3215
paul.swedlund@state.sd.us

DOUGLAS J. PETERSON
*Attorney General of Nebraska*

  /s/ James A. Campbell
James A. Campbell
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF
NEBRASKA
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov

HERBERT H. SLATERY III
*Attorney General and Reporter of Tennessee*

  /s/ Andrée S. Blumstein
Andrée S. Blumstein
*Solicitor General*
OFFICE OF THE TENNESSEE ATTORNEY
GENERAL
P.O. Box 20207
Nashville, TN 37202
(615) 741-3492
andree.blumstein@ag.tn.gov

**CERTIFICATE OF SERVICE**

I filed this document with the Court via ECF, which will electronically notify all counsel of record.

Dated: July 6, 2020                                    */s/ Cameron T. Norris*