UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-00242 |
| | ) | |
| DAVID S. FERRIERO, in his official capacity as Archivist of the United States, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, and TENNESSEE, | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**PLAINTIFF STATES' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

LEGAL STANDARD ................................................................................................................. 1

BACKGROUND ........................................................................................................................ 3

ARGUMENT .............................................................................................................................. 6

    I.    Intervenors misconstrue Plaintiff States' argument that an extra-textual deadline cannot invalidate States' ratifications .......................................................................................... 7

    II.    There is no hidden contemporaneity requirement in Article V ......................................... 9

        A.    Finding an implied contemporaneity requirement in Article V would invalidate the only constitutional amendment in nearly half a century ............................................ 9

        B.    Sex equality is not outdated ..................................................................................... 13

    III.    Prior "rescissions" have never been given effect and should not here ........................... 16

        A.    The text of Article V only authorizes States to ratify proposed amendments ......... 16

        B.    Historical practice confirms that "rescissions" are without effect .......................... 18

        C.    In no event would Intervenors be entitled to summary judgment .......................... 24

CONCLUSION ......................................................................................................................... 27

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................................ 2

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................ 2

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................ 2

*Coleman v. Miller,*
  307 U.S. 433 (1939) ................................................................................ 10, 16, 18

*Dillon v. Gloss,*
  256 U.S. 368 (1921) ....................................................................................... passim

*eBay, Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) .............................................................................................. 18

*Grimes v. District of Columbia,*
  794 F.3d 83 (D.C. Cir. 2015) ................................................................................. 2

*Hawke v. Smith,*
  253 U.S. 221 (1920) ............................................................................. 16, 17, 18, 23

*Hollingsworth v. Virginia,*
  3 U.S. 378 (1798) ................................................................................................. 23

*Leser v. Garnett,*
  258 U.S. 130 (1922) ....................................................................................... 12, 17

*McCulloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819) ............................................................................. 17

*Murray Energy Corp. v. EPA,*
  936 F.3d 597 (D.C. Cir. 2019) ............................................................................. 10

*National Org. for Women, Inc. v. Idaho,*
  459 U.S. 809 (1982) .............................................................................................. 23

*New York Trust Co v. Eisner,*
  256 U.S. 345 (1921) .............................................................................................. 18

*Scott v. Harris,*
  550 U.S. 372 (2007) ................................................................................................ 2

*Sparrow v. United Air Lines, Inc.,*
  216 F.3d 1111 (D.C. Cir. 2000) ............................................................................. 2

*State of Idaho v. Freeman,*
  529 F. Supp. 1107 (D. Idaho 1981) ................................................................ 23

*United States v. Sprague,*
  282 U.S. 716 (1931) ........................................................................................ 10

*Wise v. Chandler,*
  108 S.W.2d 1024 (Ky. 1937) ..................................................................... 5, 25

**Statutes**

U.S. Const. amend. XIV ............................................................................ 18, 19, 27

U.S. Const. amend. XIX ............................................................................ 12, 20, 27

U.S. Const. amend. XV ............................................................................. 12, 18, 27

U.S. Const. amend. XVII ...................................................................... 11, 12, 13, 27

U.S. Const. amend. XVIII ......................................................................... 8, 9, 10, 14

U.S. Const. amend. XVIII, § 3 ............................................................................... 8

U.S. Const. amend. XX ........................................................................................... 9

U.S. Const. amend. XX, § 6 .................................................................................... 9

U.S. Const. amend. XXI .......................................................................................... 9

U.S. Const. amend. XXI, § 3 ................................................................................... 9

U.S. Const. amend. XXII ......................................................................................... 9

U.S. Const. amend. XXII, § 2 .................................................................................. 9

U.S. Const. amend. XXVIII .............................................................................. 13, 23

U.S. Const. art. V ......................................................................................... passim

**Other Authorities**

1 U.S.C. § 106b ..................................................................................................... 21

15 Stat. 706 (1868) ............................................................................................... 19

16 Stat. 1131 (1870) ............................................................................................. 20

3 Stat. 439 (Apr. 20, 1818) ................................................................................... 21

**Rules**

Fed. R. Civ. P.  24(c) .............................................................................................. 2

Fed. R. Civ. P. 12 .................................................................................................... 2

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 2

Fed. R. Civ. P. 56 .................................................................................................... 2

Fed. R. Civ. P. 56(a) ........................................................................................... 1, 2

Fed. R. Civ. P. 56(c) ............................................................................................... 2

**Treatises**

H. Con. Res. 10, 44th Leg. (Idaho 1977) ................................................................... 6

H.J. Res. 2, 1972 1st Extra. Sess. Gen. Assemb. (Ky. 1972) ....................................... 5

H.J. Res. 20, 1978 Sess. Gen. Assemb. (Ky. 1978) ............................................... 5, 24

H.J. Res. 371, 87th Gen. Assemb. (Tenn. 1972) ......................................................... 4

H.J.R. No. 1, 58th Gen. Assemb. (Ohio 1868) ......................................................... 19

H.R. Rep. No. 116-378, at 8 (2020) ........................................................................... 14

H.R.J. Res. 79, 116th Cong. (2020) .......................................................................... 24

J. Res. No. 4, 98th Leg. (N.J. 1868) ......................................................................... 19

Legis. Res. 83, 82d Leg. (Neb. 1972) ......................................................................... 4

Legis. Res. 9, 83d Leg. (Neb. 1973) ........................................................................... 4

S.J. Res. 133, 41st Leg. (Idaho 1972) ......................................................................... 5

S.J. Res. 2, 54th Leg. (S.D. 1979) .............................................................................. 6

S.J. Res. 29, 88th Gen. Assemb. (Tenn. 1974) ........................................................... 5

**Constitutional Provisions**

*A Century of Lawmaking for a New Nation: U.S. Congressional Documents and
    Debates, 1774–1875*, Library of Congress ............................................................ 19

AAUW, *Gender Pay Gap by State* .......................................................................... 14

Around the Nation, *Acting Governor Vetoes Kentucky Rights Reversal*, N.Y.
    Times (Mar. 21, 1978) ........................................................................................ 5, 25

Around the Nation, *Kentucky House Rescinds Equal Rights Bill Approval*, N.Y.
    Times (Mar. 17, 1978) ............................................................................................ 24

Around the Nation, *South Dakota Rescinds Vote on Rights Amendment*, N.Y.
    Times (Mar. 2, 1979) ........................................................................................... 6, 26

Bainbridge Colby, *Amendment to the* Constitution*, 1920* ..................................... 20

Bill McAllister, *Revolutionary Idea Haunts Hill: 39 States Back Pay Curb, But
    Was 202 Years of Debate Enough?*, Wash. Post (May 8, 1992) ............................ 11

Cong. Globe, 40th Cong., 2d Sess. 2226 (1868) ...................................................... 19

Cong. Globe, 40th Cong., 2d Sess. 876 (1868) ........................................................ 19

Cong. Globe, 40th Cong., 2d Sess. 877 (1868) ........................................................ 19

*Equal Rights Amendment Extension: Hearing Before the Subcomm. on Civil and
    Constitutional Rights of the Comm. on the Judiciary, House of Representatives*,
    95th Cong. 37 (1977) ............................................................................... 18, 20, 22

Founders Online, *Amendments to the Constitution, [8 June] 1789*, National
    Archives ................................................................................................................ 17

Founders Online, *To Alexander Hamilton from James Madison, [20 July 1788]*, National Archives ............................................................................................................ 27

George Stewart Brown, *The "New Bill of Rights" Amendment*, 9 Va. L. Rev. 14 (1922). ...................................................................................................................... 20

JoAnne Young, *It Took Awhile, But Add Nebraska's Name to the List*, Lincoln J. Star (Apr. 1, 2016) ......................................................................................................... 11

John Jameson, *A Treatise on Constitutional Conventions: Its History, Powers, and Modes of Proceeding* (4th ed. 1887) ...................................................................... 13

*Kentucky Ratifies Rights Amendment*, Chi. Tribune (June 16, 1972) ........................................... 24

Ky. Atty. Gen. Op., 1978 WL 26349 ...................................................................................... 5

Letter from Assistant Atty. Gen. Robert H. Roberts to State Representative Rep. Victor H. Ashe (Mar. 13, 1973) .............................................................................. 5

Letter from David S. Ferriero, Archivist of the United States, to the Hon. Carolyn Maloney (Oct. 25, 2012) ......................................................................................... 22

Letter from J. William Heckman to State Sen. Shirley Marsh, Senate Subcomm. on Const. Amends. (Feb. 20, 1973) ........................................................................... 4

Memorandum for Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Atty. General, Office of Legal Counsel, *Re: Constitutionality of Extending the Time Period for Ratification of the Proposed Equal Rights Amendment* (Oct. 31, 1977) .................................................................. 25

Mich. Atty. Gen. Op. No. 4779 at 39 (1973) ................................................................... 4

Michael Stokes Paulsen, *A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment*, 103 Yale L.J. 677 (1993) ..................... 13, 17

National Coal. Against Domestic Violence, *Domestic Violence in Nebraska* .......................... 15

National Coal. Against Domestic Violence, *Domestic Violence in Tennessee* .......................... 15

Pooja Jain-Link et al., *Ending Harassment at Work Requires an Intersectional Approach*, Harv. Bus. Rev. (Apr. 23, 2019) ........................................................... 15

S.D. Atty. Gen. Op. No. 75-33 (Feb. 21, 1975) .............................................................. 6

Saikrishna Bangalore Prakash, *Of Synchronicity and Supreme Law*, 132 Harv. L. Rev. 1220 (2019) ................................................................................................. 12

Samuel Freedman & Pamela Naughton, *ERA: May a State Change Its Vote?* (1978) ................................................................................................................ 5, 6

Scott Bomboy, *How a College Term Paper Led to a Constitutional Amendment*, National Const. Ctr. (May 7, 2020) ........................................................................ 11

Susan Milligan, *States with Largest and Smallest Gender Pay Gap*, US News & World Rep. (Apr. 2, 2019) ...................................................................................... 14

*Tennessee Is 10th to Ratify Equal Rights Amendment*, N.Y. Times (Apr. 5, 1972) ..................... 4

The Federalist No. 39 (Madison) ................................................................................ 17

Times Wires Services, *Kentucky Official Vetoes ERA Vote*, L.A. Times, (Mar. 21, 1978) ......................................................................................................................... 25

Walter Dellinger, *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 Harv. L. Rev. 386, 423 (1983) .............................................. 4

Women Lawyers on Guard, *Still Broken: Sexual Harassment and Misconduct in the Legal Profession, A National Study* (2020) ........................................................ 15

## INTRODUCTION

Intervenors ask this Court to adopt a theory of Article V that is contradicted by four constitutional amendments and inconsistent with the plain language of Article V.

Contrary to Intervenors' argument, neither the Supreme Court nor any other court has ever addressed whether language in a congressional resolution can invalidate States' ratifications of a constitutional amendment. The timeframe on which Intervenors rely does not invalidate Plaintiff States' ratification of the Equal Rights Amendment because Congress—in a departure from four prior amendments—already chose to sever *these* words from the "Amendment[]" that it "propose[d]" to the States. Nor are Plaintiff States' ratifications nullified by an amorphous contemporaneity requirement that cannot be found anywhere in Article V's text, particularly when reading such a requirement into Article V would invalidate the only other constitutional amendment adopted in the past four decades.

Finally, Article V provides no textual basis for rescission, and nearly two centuries of historical precedent dating back to the original drafters of the Constitution underscores that State ratification is a one-time event. Intervenors' insistence that States need not stand by their decision to ratify a constitutional amendment would call into question ratification of no fewer than three constitutional amendments and generate constitutional chaos.

For the reasons Plaintiff States explained in their complaint, the Equal Rights Amendment has been adopted and the Constitution finally has joined the rest of the industrialized world in recognizing that equality regardless of sex is the law of the land. Intervenors' motion for summary judgment should be denied.

## LEGAL STANDARD

Intervenors have filed a Motion for Summary Judgment under Rule 56(a). See Intervenors' Mot. for Summ. J. and Supporting Mem (Dkt. 74) (Intervenors Br.), at 13. In a

footnote, however, Intervenors ask the Court to construe the motion "as a motion to dismiss under Rule 12(b)(6)." *Id.* at 13 n.2. Intervenors suggest that they "lost their chance to file a motion to dismiss" under Rule 24(c), and that a motion for judgment on the pleadings would be premature absent the Archivist's answer. *Id.* Intervenors wrongly suggest that the procedural vehicle they have selected will not make a difference to the governing legal standard. *Id.*

Construing the motion under Rule 12 would require treating the complaint's factual allegations as true and granting Plaintiff States the benefit of all inferences from the facts alleged. See *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

If the Court proceeds under Rule 56, then summary judgment is only proper if Intervenors have "show[n] that there is no genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the outcome of the litigation, see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is "genuine" if there is enough evidence for a reasonable finder of fact to decide in favor of the non-movant, see *Scott v. Harris*, 550 U.S. 372, 380 (2007). Under Federal Rule of Civil Procedure 56, a party moving for summary judgment "must support [its] assertion[s] by" citing "materials in the record." Fed. R. Civ. P. 56(c). Because the movant bears this burden, "[i]t is not enough to move for summary judgment without supporting the motion in any way." *Grimes v. District of Columbia*, 794 F.3d 83, 93 (D.C. Cir. 2015) (quotation marks and citation omitted).

Under either standard, Plaintiff States' claim survives and Intervenors' motion should be denied.

## BACKGROUND

Plaintiff States have already presented thorough background on the Article V amendment process, the Equal Rights Amendment, and their request for relief in their brief opposing the Archivist's pending motion to dismiss. See Compl. (Dkt. 1, 5); Pls. Mem. in Opp. to Def.'s Mot. to Dismiss (Dkt. 37) (Pls.' MTD Opp.), at 1–6. Rather than repeat that discussion, Plaintiff States add the following points:

*Intervenors oversimplify the history of the Equal Rights Amendment.* Intervenors insist that after 1982, "[a]ll camps—ERA supporters, ERA opponents, and neutral bystanders alike—assumed that the ERA had been defeated." Intervenors Br. 11. That claim has no bearing on the legal issues presented here. It is also false.

Even after the expiration of the putative deadline, activists continued the fight for the Equal Rights Amendment through the 1980s to today. During the 1980s, advocates in Virginia waved banners proclaiming "ERA Is Not Dead." See Pls. Resp. to Intervenors' Statement of Material Facts (attached) (Pls.' Resp.), at ¶ 25 n.1. Laura Callow, dubbed the "Susan B. Anthony of Michigan," continued to give monthly commentaries on various aspects of the Equal Rights Amendment through the middle of the 1980s, well after 1982. *Id.* And ratification campaigns also continued throughout the country, resulting in the final three ratifications necessary to add the Equal Rights Amendment to the Constitution.

Despite the hard work of generations of activists, both before and after Congress's approval of the Equal Rights Amendment, meaningful sex equality has not been achieved. According to an article published by the National Academy of Sciences, "there has been

dramatic progress in movement toward gender equality, but, in recent decades, change has slowed and on some indicators stalled entirely." Pls.' Resp. ¶ 25.

*History of purported State rescissions*. Between 1973 and 1979 five States purported to rescind their prior ratifications of the Equal Rights Amendment. Because purported rescissions of constitutional amendments have never before been recognized, in attempting to do so, all of these States acted "under the cloud" that their efforts "would be a legal nullity."[1]

1.    *Nebraska*. In 1972, Nebraska was one of the first States to ratify the Equal Rights Amendment. Legis. Res. 83, 82d Leg. (Neb. 1972). The following year, however, the Nebraska legislature voted to have its ratification of the Equal Rights Amendment "withdrawn." Legis. Res. 9, 83d Leg. (Neb. 1973). When Nebraska's unicameral legislature was considering rescission, a state senator requested a legal opinion from the United States Senate Judiciary Subcommittee on Constitutional Amendments. The opinion advised that any attempt to rescind Nebraska's ratification would be "null and void."[2] On March 15, 1973, however, the Nebraska legislature adopted a resolution purporting to "rescind" its ratification.

2.    *Tennessee*. Tennessee was the tenth state to ratify the Equal Right Amendments and did so with overwhelming support in the state legislature. H.J. Res. 371, 87th Gen. Assemb. (Tenn. 1972). The State House unanimously approved ratification, and only five of 30 State Senators voted against the resolution.[3] In 1973, Tennessee's highest legal officer issued an opinion that the State was not permitted to rescind its ratification of the Equal Rights

---

[1] Walter Dellinger, *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 Harv. L. Rev. 386, 423 (1983).

[2] Letter from J. William Heckman to State Sen. Shirley Marsh, Senate Subcomm. on Const. Amends. (Feb. 20, 1973), reprinted in Mich. Atty. Gen. Op. No. 4779 at 39 (1973).

[3] See *Tennessee Is 10th to Ratify Equal Rights Amendment*, N.Y. Times (Apr. 5, 1972).

Amendment.[4] One year later, on April 23, 1974, the Tennessee legislature voted to "rescind" its ratification of the Equal Rights Amendment despite a formal legal opinion to the contrary. S.J. Res. 29, 88th Gen. Assemb. (Tenn. 1974). The then-Tennessee Secretary of State appeared to recognize the futility of the rescission measure as the Congressional Record does not include any indication that official copies of the resolution were ever transmitted.

 3. *Kentucky*. In 1972, Kentucky ratified the Equal Rights Amendment and sent the necessary ratification papers to the Archivist. H.J. Res. 2, 1972 1st Extra. Sess. Gen. Assemb. (Ky. 1972). Despite a 1937 decision from the Commonwealth's highest court specifically stating that all action once taken on an amendment to the federal Constitution was final,[5] six years after ratification, Kentucky's General Assembly attempted to disavow the State's prior approval. H.J. Res. 20, 1978 Sess. Gen. Assemb. (Ky. 1978). The resolution was sent to the Governor's desk and promptly vetoed by the acting Governor.[6] The State's highest legal officer did not acknowledge the resolution as undoing the State's ratification. See, *e.g.*, Ky. Atty. Gen. Op., 1978 WL 26349 (referring, in an opinion postdating the "rescission" actions, to "the 1972 ratification of the Equal Rights Amendment in Kentucky").

 4. *Idaho*. Idaho had been among the first States to ratify in 1972. S.J. Res. 133, 41st Leg. (Idaho 1972). In 1973, the Idaho Attorney General opined that the State lacked jurisdiction to rescind its ratification of the Equal Rights Amendment. Idaho Atty. Gen. Op. No. 73-116 (Jan.

---

[4] See Samuel Freedman & Pamela Naughton, *ERA: May a State Change Its Vote?* 36 (1978) (citing Letter from Assistant Atty. Gen. Robert H. Roberts to State Representative Rep. Victor H. Ashe (Mar. 13, 1973)).

[5] See *Wise v. Chandler*, 108 S.W.2d 1024, 1033 (Ky. 1937).

[6] Around the Nation, *Acting Governor Vetoes Kentucky Rights Reversal*, N.Y. Times (Mar. 21, 1978) (Kallen Decl. Ex. 8).

24, 1973).[7] In 1977, state legislators voted to "rescind" Idaho's prior ratification of the Equal Rights Amendment. H. Con. Res. 10, 44th Leg. (Idaho 1977).

      5.    *South Dakota*. After ratifying the Equal Rights Amendment in 1973, South Dakota became the last State to purportedly rescind a prior ratification—in a different (and less direct) way.[8] In 1979, the South Dakota legislature passed a resolution that attempted to add a sunset provision to its earlier ratification by purporting to rescind the State's ratification *if* 37 other States had not ratified by March 22, 1979. S.J. Res. 2, 54th Leg. (S.D. 1979). The legislature adopted this resolution notwithstanding an official opinion from the State's Attorney General that "this Legislature or any future Legislature is without authority to withdraw the previous ratification of the Equal Rights Amendment." S.D. Atty. Gen. Op. No. 75-33 (Feb. 21, 1975), https://atg.sd.gov/OfficialOpinions/Official%20Opinion%2075-33.pdf.

## ARGUMENT

      Intervenors advance three arguments, all of which fail as a matter of law. *First*, Intervenors' "severability analysis" (at 14–16) takes aim at an argument not advanced here. *Second*, Intervenors' insistence (at 16–23) that Article V includes a hidden contemporaneity requirement finds no support in constitutional text, binding case law, or historical practice. *Third*, the purported rescissions of prior ratifications on which Intervenors rely (at 23–26) are not authorized under Article V and thus have no effect on the adoption of the Equal Rights Amendment upon ratification by three-fourths of the States. Accordingly, Intervenors are not

---

      [7] This opinion predates the period of time for which Idaho Attorney General opinions are available online. It is discussed in secondary sources. *E.g.*, Freedman & Naughton, note 4, *supra*. If this Court were to decide that States' actions subsequent to ratification are relevant to this case, then Plaintiff States will seek this document, among others, in discovery.

      [8] Around the Nation, *South Dakota Rescinds Vote on Rights Amendment*, N.Y. Times (Mar. 2, 1979).

entitled to summary judgment, and their motion should be denied.[9]

## I.    Intervenors misconstrue Plaintiff States' argument that an extra-textual deadline cannot invalidate States' ratifications

Intervenors "add one point" to the Archivist's arguments regarding the congressional resolution accompanying the amendment that Congress proposed to the States. Intervenors Br. 14. According to Intervenors, "Plaintiffs think the seven-year deadline in the congressional resolution proposing the ERA is *unconstitutional*." *Id*. And because the "deadline" cannot be severed from the amendment, Intervenors contend, "the entire resolution must fall." *Id*. at 14, 16. In so arguing, Intervenors attempt to refute an argument Plaintiff States do not make.

1.    The complaint does not require holding that language Congress included in their resolution is "unconstitutional," as Intervenors claim. Congress already chose to sever the seven-years language from the "Amendment[]" that Congress "propose[d]" to the States by placing it separate and apart from the actual text of the Amendment. U.S. Const. art. V. The timeframe does not restrict the States and, therefore, does not nullify subsequent ratifications.[10]

For this same reason, the question of "severability" is not at issue, and there is no need for this Court to "divin[e] congressional intent" as Intervenors suggest. Intervenors Br. 14, 16. Here, Congress has *already* severed the seven-years clause by departing from its prior practice of

---

[9] Because Plaintiff States' request for relief involves purely legal questions, Plaintiff States are simultaneously moving for summary judgment in their favor. To the extent, however, that this Court may agree with Intervenors that Article V requires consideration of States' actions after the State has sent official notice of its ratification, genuine issues of material fact would exist as to whether the rescissions on which Intervenors rely are, as Intervenors assert, "valid." See Section III(C), *infra*.

[10] See Pls.' MTD Opp. 20 ("it is clear that a putative seven-year deadline falling outside the text of the proposed amendment *did not bind the States* in the exercise of their own constitutional prerogatives under Article V to ratify the Equal Rights Amendment" (emphasis added)).

incorporating deadlines into the text of the proposed amendments. It makes little sense to argue that a provision cannot be severed from an amendment of which it was never a part.[11]

2.    Intervenors also insist that "a unanimous Supreme Court has held that *these kinds of deadlines* are valid and enforceable." Intervenors Br. 8 (citing *Dillon v. Gloss*, 256 U.S. 368 (1921)) (emphasis added). As Plaintiff States have already explained, that simply isn't so. The Supreme Court has *never addressed* the "kind[] of deadline" at issue here—an extra-textual timeframe in a congressional resolution that is not "propose[d]" to the States for ratification under Article V—*much less* whether any such deadline limits States' ability to ratify. Instead, the case on which Intervenors rely—*Dillon v. Gloss*—involved a different kind of deadline: one that was submitted to (and therefore ratified by) the States in the text of the amendment itself.

In the 18th Amendment (at issue in *Dillon*), Congress proposed to the States the following language: "This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress." U.S. Const. amend. XVIII, § 3. When States ratified the 18th Amendment they also ratified the language in Section 3, and it was only by virtue of the requisite number of States ratifying the proposed amendment that this "deadline" would have force. Had the final State necessary for ratification voted to do so after the seven-year time period had expired, the amendment still would have been added to the Constitution but, according to Section 3's own

---

[11] Intervenors' analogy to an unconstitutional provision of a statute is problematic for yet another reason. As explained below, see Section III(A), *infra*, a constitutional amendment is fundamentally different than normal legislation. Intervenors' reliance on cases involving statutory interpretation says little about the constitutional amendment process. Intervenors Br. 14 (citing cases involving statutes).

terms, it would have been "inoperative." *Id.*[12] By contrast, the timeframe on which Intervenors rely was never part of the "propose[d] Amendment[]" that Congress submitted to the States for ratification. U.S. Const. art. V. Thus, unlike the 18th Amendment at issue in *Dillon* (and the 20th, 21st, and 22nd Amendments),[13] the deadline in the congressional resolution outside the text of the Equal Rights Amendment did not bind the States in the exercise of their own constitutional prerogatives under Article V.

## II.    There is no hidden contemporaneity requirement in Article V

Intervenors next argue that, congressional resolution deadline aside, the Equal Rights Amendment fails a contemporaneity test that is implied but never stated in the text of Article V. That argument fails as a matter of history, law, and logic.

### A.    Finding an implied contemporaneity requirement in Article V would invalidate the only constitutional amendment in nearly half a century

Intervenors acknowledge that the text of Article V contains no contemporaneity requirement. Intervenors Br. 16.[14] Intervenors rely exclusively on *Dillon*—a nearly century-old

---

[12] This did not happen, however, because the Eighteenth Amendment was ratified within the seven-year timeframe. See Section II(A), *infra*.

[13] See U.S. Const. amend. XX, § 6 ("This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the several States within seven years from the date of its submission."); U.S. Const. amend. XXI, § 3 ("This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by conventions in the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress."); U.S. Const. amend. XXII, § 2 ("This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the several States within seven years from the date of its submission to the States by the Congress.").

[14] As amici States explain, when the Framers drafted Article V, six State Constitutions imposed specific timelines on aspects of the amendment process, including times for proposing amendments and adopting proposed amendments. Amicus Br. of New York et al. (Dkt. 67), at 5–9. Notwithstanding the presence of time constraints in six State Constitutions, the Framers chose to follow the model set forth in the Delaware and Georgia Constitutions, which allowed the amendment process to unfold without any time constraints. *Id.* at 6. The lack of time restrictions in Article V was, therefore, a choice, not an accident.

decision that itself recognized that Article V "says nothing about the time within which ratification may be had," 256 U.S. at 371—to argue that Article V implies amendments must be ratified within some unspecified time. But the text of Article V "is clear in statement and in meaning, contains no ambiguity, and calls for no resort to rules of construction." *United States v. Sprague*, 282 U.S. 716, 730 (1931).

1. The Court's holding in *Dillon* did not turn on any implicit contemporaneity requirement in Article V. In *Dillon*, a person who had been convicted of violating the National Prohibition Act challenged his conviction by arguing the *mere existence* of the deadline in Section 3 of the 18th Amendment invalidated the entire amendment even though that amendment *had* been ratified well within the timeframe set forth by the text of the amendment. *Dillon*, 256 U.S. at 370–71. Nor did anyone argue in *Dillon* that the time it took to complete ratification for the 18th Amendment—there, one year and 29 days[15]—was not sufficiently close in time. Because the issue of contemporaneity simply was not before the Court in *Dillon*, the Court's language implying a contemporaneity requirement in Article V is dicta.[16]

2. Events after *Dillon* confirm there is no implied contemporaneity requirement in Article V.[17] In 1992—70 years after *Dillon*, and 203 years after being formally proposed to the

---

[15] Intervenors Br. 20 (chart).

[16] In a recent opinion, the D.C. Circuit was clear that "[d]icta is never binding on any court." *Murray Energy Corp. v. EPA*, 936 F.3d 597, 627 (D.C. Cir. 2019).

[17] Plaintiff States agree with Intervenors that *Coleman v. Miller* should not be read broadly, see Intervenors Br. 30 n.6, but the Supreme Court's repudiation of *Dillon* in *Coleman* may not be ignored. In *Coleman*, and notwithstanding *Dillon*, the Court was "unable to agree with th[e] contention" that "in the absence of a limitation by the Congress, the Court can and should decide what is a reasonable period within which ratification may be had." *Coleman v. Miller*, 307 U.S. 433, 452 (1939). The Court was clear that the question of whether "the Court should take upon itself the responsibility of deciding what constitutes a reasonable time [when Congress has not exercised that power] and determine accordingly the validity of ratifications" "was not involved in *Dillon v. Gloss* . . . and, in accordance with familiar principle, what was

States—the 27th Amendment was published as part of the Constitution. Intervenors' argument that a contemporaneity requirement must now be read into Article V to preclude the Equal Rights Amendment cannot be squared with adoption of the 27th Amendment.

Indeed, despite their current request that this Court create a contemporaneity requirement, *all five of the intervening States* played crucial roles in the 27th Amendment's long-delayed ratification. In 1985—196 years after the amendment was proposed to the States—Intervenors South Dakota and Tennessee ratified the 27th Amendment. Intervenor Louisiana ratified in 1988, 199 years after the 27th Amendment was proposed to the States. On May 5, 1992, Intervenor Alabama became the 38th and final State necessary for ratification—*203 years* after the 27th Amendment was proposed to the States.[18] Even though such a vote was unnecessary, Intervenor Nebraska ratified the 27th Amendment in 2016—more than 220 years after its proposal to the States.[19] In short, any concern Intervenors may have about the contemporaneity of ratifications is either new or specific to the Equal Rights Amendment.

The subsequent ratification of the 27th Amendment also cautions against overreading *Dillon*. In *Dillon*, the Court stated that, absent a contemporaneity requirement, "amendments proposed long ago—two in 1789, one in 1810 and one in 1861—[would] still [be] pending." 256 U.S. at 375; *id.* (stating that this lack of contemporaneity would be an "untenable result"). One of those "amendments proposed long ago" to which *Dillon* specifically referred was the provision that became the 27th Amendment. Notwithstanding *Dillon*, 32 States (including Intervenors)

_____

there said must be read in the light of the point decided." *Id.* at 452–53; see also Pls.' MTD Opp. 23.

[18] Bill McAllister, *Revolutionary Idea Haunts Hill: 39 States Back Pay Curb, But Was 202 Years of Debate Enough?*, Wash. Post (May 8, 1992); Scott Bomboy, *How a College Term Paper Led to a Constitutional Amendment*, National Const. Ctr. (May 7, 2020).

[19] JoAnne Young, *It Took Awhile, But Add Nebraska's Name to the List*, Lincoln J. Star (Apr. 1, 2016).

subscribed to the view that the amendment was still pending when they ratified between 1978 and 1992, and (also notwithstanding *Dillon*) the Archivist certified and published that amendment as validly added to the Constitution. Kallen Decl., Ex. 7.

There is simply no way for this Court to accept Intervenors' contemporaneity requirement against the Equal Rights Amendment without fatally undermining the validity of the long-settled and uncontroversial 27th Amendment. Indeed, the scholar on whom Intervenors principally rely to advance their theory of a hidden contemporaneity requirement[20] forthrightly admits that accepting his view would mean that "the Twenty-Seventh Amendment is no amendment at all." Saikrishna Bangalore Prakash, *Of Synchronicity and Supreme Law*, 132 Harv. L. Rev. 1220, 1283 (2019).

The Supreme Court has specifically declined an invitation to call prior amendments into question when evaluating a challenge to a subsequent amendment. In *Leser v. Garnett*, 258 U.S. 130 (1922), a group of Maryland voters sued to have two names purged from the list of qualified voters. The only ground for disqualification was that the voters were women. 258 U.S. at 135. Plaintiffs there argued that the two women were not qualified to vote because the 19th Amendment had not been validly ratified and Maryland's Constitution limited suffrage to men. *Id.* at 136. The Supreme Court observed that the 19th Amendment was similar to the 15th Amendment, and it specifically refused to adopt a theory of the 19th Amendment that would undermine the 15th Amendment. *Id.* Here, as in *Leser*, questions about the validity of two amendments—the 27th and 28th—are inextricably intertwined. Under Intervenors' contemporaneity theory, "[o]ne cannot be valid and the other invalid. That the [27th] is valid . . . has been recognized and acted on for [over a quarter of] a century." *Id.* Century-old dicta from *Dillon*, that has been subsequently undermined by both the Supreme Court and later

---

[20] See Intervenors Br. 16, 18–22, 29 (citing this source 10 times).

12

unchallenged practice, does not compel this Court to invalidate both the 27th and 28th Amendments.

Finally, even if there were an inherent reasonable time requirement in Article V, it would be met here. Congress and the States each have important roles in amending the constitution under Article V. Congress took 49 years to consider the Equal Rights Amendment, Compl. ¶¶ 19–28 (1923 to 1972); the three-fourths of the States ratified it in 48 years, Compl. ¶¶ 31, 33, 41, 48 (1972 to 2020).

### B.    Sex equality is not outdated

To the extent a contemporaneity requirement is relevant to Article V (and it is not), such a requirement would not defeat the justification or need for the Equal Rights Amendment.[21] According to Intervenors, *Dillon* held that proposed amendments must be "ratified" while the same "sentiment may fairly be supposed to exist." Intervenors Br. 17 (quoting *Dillon*, 256 U.S. at 375 and John Jameson, *A Treatise on Constitutional Conventions: Its History, Powers, and Modes of Proceeding* § 585 (4th ed. 1887)). Even under that test, the Equal Rights Amendment is necessary and valid.

As one of the scholars on whom Intervenors rely has explained, "the perceived need for an amendment" may not necessarily dissipate as years pass, but instead "might even *increase* over time as a problem becomes more and more acute." Michael Stokes Paulsen, *A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment*, 103 Yale L.J. 677, 690 (1993). That is precisely the case here. Neither Intervenors nor the Archivist denies

---

[21] Intervenors are wrong in their assertion that "Plaintiffs' theory requires this Court to hold that Article V does not require amendments to be ratified within a 'reasonable time.'" Intervenors Br. 8 (quoting *Dillon v. Gloss*, 256 U.S. 368 (1921)). If the Court were to conclude a "reasonable time" requirement exists, we simply argue that ratification of the specific amendment here—prohibiting the United States or any State from denying or abridging equality of rights on account of sex—met any "reasonable time" requirement.

that "[e]quality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex"—as provided in the Equal Rights Amendment—reflects the will of the American people. And for good reason.

Although some aspects of "[t]he politics of the late 2010s" may be "quite different from the politics of the late 1970s," Intervenors Br. 22–23, sex inequality persists. As the House of Representatives Committee on the Judiciary recently explained,

> Unlike the Eighteenth Amendment at issue in *Dillon*, which related to the particular and narrow social policy of prohibition, the ERA stands for a broad and fundamental principle: namely, government institutions may not discriminate on the basis of sex. The Committee finds no less need to affirm that principle today than in 1972 or 1978—and it finds no reason to believe that such a principle will lose its vitality in the years to come.

H.R. Rep. No. 116-378, at 8 (2020). Some of the numerous examples of sex inequality today include:

*Wage gap*. The median wage gap in 2018 was 19 cents, which means that women who worked full time earned about 82% as much as men. See Amicus Br. of ERA Coalition (Dkt. 68-1), at 23 (citing the United States Bureau of Labor Statistics); see also Amicus Br. of Generation Ratify (Dkt. 44-1), at 21–23; Amicus Br. of United Conference of Mayors (Dkt. 51-1), at 15–16. This gap is even greater for women of color: Latinas earn 54 cents for every dollar paid to white, non-Hispanic men, and this number is 57 cents on the dollar for Native American women, and 62 cents to the dollar for Black women. Amicus Br. of Generation Ratify (Dkt. 44-1), at 21.[22]

---

[22] The gender pay gap in Intervenor States is even more pronounced than the average in the country. With a gender pay ratio of 70%, Louisiana ranked 51st in a study of States (and Puerto Rico) by the American Association of University Women examining the gender pay gap by state. AAUW, *Gender Pay Gap by State*, https://www.aauw.org/resources/article/gender-pay-gap-by-state/ (last visited August 19, 2020). South Dakota's pay ratio by gender was 78%, and Nebraska and Tennessee had a gender pay ratio of 80%. *Id.* In Alabama, women make less than 74 cents for every dollar earned by a man. Susan Milligan, *States with Largest and Smallest Gender Pay Gap*, US News & World Rep. (Apr. 2, 2019), https://www.usnews.com/news/best-states/articles/2019-04-02/states-with-largest-and-smallest-gender-pay-gap.

*Sexual harassment*. More than one-third of women have been subjected to workplace sexual harassment in their lifetimes.[23] In fact, a recent study examining sexual harassment in the legal profession recently found that 75% of women lawyers, including judges and law partners, experienced sexual harassment.[24]

*Domestic violence*. Domestic violence is disproportionately experienced by women (and women of color in particular), along with lack of enforcement of laws intended to provide protection.[25] This is no less true in the Intervening States. In Nebraska, for example, 38.5% of women (and only 26.1% of men) experience intimate partner physical violence, intimate partner sexual violence, and/or intimate partner stalking in their lifetimes[26] while that number in Tennessee is 40% for women (as compared to 32.5% of men).[27]

The Equal Rights Amendment has not become irrelevant or outdated. Equality does not expire.

---

[23] Pooja Jain-Link et al., *Ending Harassment at Work Requires an Intersectional Approach*, Harv. Bus. Rev. (Apr. 23, 2019), https://hbr.org/2019/04/ending-harassment-at-work-requires-an-intersectional-approach; see also Amicus Br. of ERA Coalition (Dkt. 68-1), at 24.

[24] Women Lawyers on Guard, *Still Broken: Sexual Harassment and Misconduct in the Legal Profession, A National Study*, at 4 (2020) (survey finding that among respondents 75% of women lawyers had direct experience with sexual harassment whereas only 22% of men had direct experience).

[25] See ERA Coalition Amicus Br. of ERA Coalition (Dkt. 68-1), at 19 ("Between one-third and one-half of U.S. women will be subjected to domestic violence at some point in their lives" and although "more than 40% of American women are subjected to sexual violence, [] only a fraction of these assaults are ever prosecuted."); *id.* at 20 (describing data about domestic violence experienced by Black and American Indian women); see also Amicus Br. of Business and Corporate Entities (Dkt. 40-1), at 14 (one in six women has been the victim of an attempted or completed rape over a lifetime).

[26] See National Coal. Against Domestic Violence, *Domestic Violence in Nebraska*, https://assets.speakcdn.com/assets/2497/nebraska_2019.pdf (last visited Aug. 19, 2020).

[27] See National Coal. Against Domestic Violence, *Domestic Violence in Tennessee*, https://assets.speakcdn.com/assets/2497/tennessee.pdf (last visited Aug. 19, 2020).

### III.    Prior "rescissions" have never been given effect and should not here

Intervenors' final argument assumes the question it asks by positing that five States "validly rescinded their ratifications" of the Equal Rights Amendment. Intervenors Br. 14. As the text of Article V and the history of prior amendments confirm, there is no such thing as a legally "valid" rescission of a State's ratification of a constitutional amendment. And even accepting the (incorrect) proposition that States may rescind, Intervenors fail to offer any evidence and have therefore failed to carry their burden of proving that any of the rescissions on which they rely were validly adopted and endorsed by the necessary State officials.

#### A.    The text of Article V only authorizes States to ratify proposed amendments

Article V addresses the ratification of proposed amendments in exclusively positive terms. See U.S. Const. art. V ("*when* ratified by legislature of three fourths of the several states, or by convention in three fourth thereof" (emphasis added)). Nowhere does the constitutional text provide that a State may void its ratification. Thus, under the plain language of Article V, when a State has ratified a proposed amendment, the State's constitutional authority is exhausted and its role in the ratification process has come to an end.[28]

1.    Because "the power to ratify a proposed amendment to the federal Constitution has its source in the federal Constitution," *Hawke v. Smith*, 253 U.S. 221, 230 (1920), constitutional ratification has been considered a special sovereign prerogative throughout American history. Intervenors premise their rescission argument on the "'general rule'" that "until an enactment acquires independent legal significance, it 'is repealable by the same

---

[28] This is why a State may approve an amendment that it formerly rejected but may not reject an amendment that it has already approved. See *Coleman*, 307 U.S. 433. When a State legislature votes not to approve an amendment, nothing has happened in a constitutional sense. The proposed amendment remains with the State and may be reconsidered at the State legislature's leisure. But, when an amendment has been ratified by the State, the State has completed its part of the federal constitution's amendment process.

authority that produced it.'" Intervenors Br. 24 (quoting Michael Stokes Paulsen, *A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment*, 103 Yale L.J. 677, 725 (1993)). But the Supreme Court has been clear that a State's ratification of a constitutional amendment is not merely "an act of legislation within the proper sense of the word." *Hawke*, 253 U.S. at 229. Instead, "[t]he act of ratification by the [S]tate derives its authority from the federal Constitution to which the [S]tate and its people have alike assented." *Id.* at 230. "[T]he function of a state Legislature in ratifying a proposed amendment to the federal Constitution" therefore "transcends any limitations sought to be imposed by the people of a state." *Leser*, 258 U.S. at 137. Accordingly, the "general rule" of repeal that applies to legislation—on which Intervenors rely here—does not apply to constitutional ratification. Cf. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819) ("we must never forget that it is a *constitution* we are expounding").

       2.     The text of Article V speaks of an amendment becoming "valid . . . when ratified"; nowhere does the Constitution state that actions subsequent to ratification must also be considered. When proposing what became the Bill of Rights in the First Congress, James Madison argued that amendments were necessary "to satisfy the public mind that their liberties will be perpetual."[29] Like the original provisions of the Constitution, constitutional amendments were intended to last forever—or until changed by subsequent amendment. In a change from the Articles of Confederation, the constitutional amendment process is "neither wholly national nor wholly federal." The Federalist No. 39 (Madison). Cognizant of the pitfalls of investing either with too much power, the Founders crafted a balance between the powers of the States and Congress, carefully defining and restricting the powers of each. As the Supreme Court

---

[29] Founders Online, *Amendments to the Constitution, [8 June] 1789*, National Archives, https://founders.archives.gov/documents/Madison/01-12-02-0126.

recognized, "[t]he language of [Article V] is plain, and admits of no doubt in its interpretation. It is not the function of courts or legislative bodies, national or state, to alter the method which the Constitution has fixed." *Hawke*, 253 U.S. at 227. Just as States could not withdraw their original ratification of the Constitution, they cannot withdraw their ratification of amendments. To conclude otherwise would be to read procedures into Article V that are not evident from the constitutional text.

### B. Historical practice confirms that "rescissions" are without effect

The question of "rescission" is not new. To the contrary, it has been repeatedly considered and rejected throughout our Nation's history. And, as the Office of Legal Counsel has previously noted, the "consistent interpretation" since "James Madison" has been that "ratification by the State must be unconditional, unqualified, and irrevocable." *Equal Rights Amendment Extension: Hearing Before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary, House of Representatives*, 95th Cong. 37 (1977) (testimony of John M. Harmon) (ERA Extension Report). "[I]n this area as others, 'a page of history is worth a volume logic.'" *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006) (Roberts, C.J., concurring) (quoting *New York Trust Co v. Eisner*, 256 U.S. 345, 349 (1921) (Holmes, J.)).[30]

1.    The ratifications of the 14th, 15th, and 19th Amendments confirm that Article V does not permit rescissions.

*The 14th Amendment*. Congress specifically considered and rejected State attempts to rescind their ratifications the 14th Amendment. On January 31, 1868, Ohio's General Assembly passed a joint resolution attempting to rescind its ratification of the 14th Amendment. H.J.R. No.

---

[30] The Supreme Court's reasoning in *Coleman* also highlights the importance of past practice when it comes to rescissions. The Court looked to "historic precedent" to conclude that Congress has "the ultimate authority" to determine "the efficacy of ratifications by state legislatures, in light of previous rejection or attempted withdrawal." *Coleman*, 307 U.S. at 450.

1, 58th Gen. Assemb. (Ohio 1868), reprinted in Cong. Globe, 40th Cong., 2d Sess. 876 (1868). Senator Charles Sumner of Massachusetts dismissed Ohio's attempt, stating: "[t]he assent of the State once given is final. A State, I do not hesitate to say, can no more withdraw such assent than it can withdraw from the Union; and on the latter proposition I believe there is now universal accord." Cong. Globe, 40th Cong., 2d Sess. 877 (1868).[31] Senator Sumner elaborated that "this resolution of the Legislature of Ohio is *brutum fulmen*—impotent as words without force." *Id.* Two months later, New Jersey also attempted to rescind its earlier ratification of the 14th Amendment. J. Res. No. 4, 98th Leg. (N.J. 1868). In response, the House of Representatives passed a resolution calling New Jersey's resolution "disrespectful to the House and scandalous in character." Cong. Globe, 40th Cong., 2d Sess. 2226 (1868). Congress passed a joint resolution listing 29 states, including Ohio and New Jersey, that had ratified the amendment and directing the Secretary to proclaim its adoption. *Id.* at 4295 ("Whereas the Legislatures of the States of . . . New Jersey . . . Ohio . . . have ratified the fourteenth article of amendment to the Constitution of the United States . . . said fourteenth article is hereby declared to be a part of the Constitution."). On July 28, 1868, the Secretary of State issued a proclamation declaring the 14th Amendment adopted, including New Jersey and Ohio as ratifying States. 15 Stat. 706 (1868).[32]

*The 15th Amendment*. A purported rescission was rejected again, two years later, in connection with the 15th Amendment. After ratifying the 15th Amendment New York passed a

---

[31] For a searchable database of this source, see *A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774–1875*, Library of Congress, https://memory.loc.gov/ammem/amlaw/lwcglink.html#anchor40 (last visited August 19, 2020).

[32] To be sure, Congress received other ratifications pushing the number of States above the requisite number even without the inclusion of New Jersey and Ohio. As the language makes clear, when Congress passed the resolution declaring the 14th Amendment ratified as part of the Constitution it considered Ohio and New Jersey's ratifications proper and counted them towards the total number of required ratifications—rejecting the notion that a State is permitted to claw back a prior ratification.

resolution purporting to rescind; the Secretary of State nevertheless listed New York among the ratifying States. See 16 Stat. 1131 (1870).

*The 19th Amendment*. Rejection of rescission arose again in the context of the 19th Amendment. After ratifying the 19th Amendment, Tennessee attempted to rescind its ratification, but this rescission has not been recognized (and the Secretary of State published the amendment including Tennessee among the ratifying States).[33]

2.      Congress has specifically considered—but failed to propose—a constitutional amendment that would permit States to rescind prior ratifications. After the 19th Amendment was ratified, a bill was proposed that would amend the Constitution to explicitly allow rescissions of prior ratifications.[34] As Senator James Wolcott Wadsworth Jr., one of the senators after whom the proposed amendment was named, explained in 1924:

> It is apparent that under Article V, as now drawn, no State can change its vote from the affirmative to the negative in the matter of a constitutional amendment. Once ratified by a State, that State can not change, even though it does so before a sufficient number of States have ratified so as to insert the amendment in the Constitution itself. Tennessee tried to change. It cannot be done under Article V.

ERA Extension Report at 23. The proposed amendment languished in committee and never made it to the floor of either chamber. *Id.* at 37.

---

[33] Bainbridge Colby, *Amendment to the* Constitution*, 1920*, https://www.loc.gov/rr//program/bib/ourdocs/images/41stat1823.pdf; see also ERA Extension Report at 22–23 (prepared testimony of John M. Harmon).

[34] ERA Extension Report at 23. The Wadsworth-Garrett Amendment would have added the following language to Article V:

> *Provided*, That the members of at least one house in each of the legislatures which may ratify shall be elected after such amendments have been proposed; that any State may require that ratification by its legislature be subject to confirmation by popular vote; and that, until three- fourths of the States have ratified or more than one-fourth of the States have rejected or defeated a proposed amendment, any State may change its vote . . .

George Stewart Brown, *The "New Bill of Rights" Amendment*, 9 Va. L. Rev. 14, 14 (1922).

3.      It is also telling that Congress has set up no framework for the Archivist to receive notice of or take action on purported rescissions. In 1818, the predecessor statute to 1 U.S.C. § 106b was enacted, requiring the Secretary of State, "whenever official notice shall have been received, at the Department of State, that any amendment . . . proposed to the constitution of the United States, has been adopted," "to cause the said amendment to be published." An Act to Provide for the Publication of the Laws of the United States, and for Other Purposes, ch. 80, 3 Stat. 439 (Apr. 20, 1818). More recently, in 1 U.S.C. § 106b, Congress directed the Archivist to "cause the amendment to be published" "[w]henever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution." Neither statute included a provision for notification of a State's failure to ratify, nor is there any provision for rescinding a prior, filed ratification.

4.      Counsel for both the legislative and executive branches have similarly concluded that States lack authority to rescind prior ratification.

While the views of the federal legislative and executive officials are not conclusive as to the States' constitutional powers, the Court may find their reasoning persuasive. In 1973, J. William Heckman, Counsel for the Senate Subcommittee on Constitutional Amendments, specifically rejected the notion that a state may rescind its ratification of a constitutional amendment. See Heckman, note 2, *supra*. He explained that "the judicial opinions and, more importantly, the precedents established by the Congress itself make it clear that once a state has ratified an amendment, it has exhausted the only power conferred on it by Article V of the Constitution, and may not, therefore, validly rescind such action." *Id.* at 36.

With this clear and consistent historical record, it is not surprising that, in 1977, the Department of Justice officially took the position "that Congress cannot give to the States a right of rescind by any means short of amending Article V of the Constitution."[35] When Congress extended the deadline in the congressional resolution accompanying the proposed Equal Rights Amendment, it did so with the understanding that States likely would not be able to rescind their earlier ratifications. As another of the witnesses, a law professor, testified in 1977, he believed that Congress had been "correct" in "consistently accept[ing] the view . . . that a State may not rescind." *Id.* at 65 (prepared testimony of Professor Thomas I. Emerson). He continued, "recission is a conditional ratification . . . I think the constitutional amendment process as has been clear from James Madison on, does not contemplate a conditional ratification." *Id.* at 67.

As recently as 2012, the current Archivist (David S. Ferriero) himself wrote in a letter to Representative Carolyn Maloney affirming that "my certification of the legal sufficiency of ratification documents is final and conclusive, and that a later rescission of a state's ratification is not accepted as valid."[36]

5.    The consistent refusal to consider rescissions makes sense. Permitting States to withdraw prior ratifications would cause confusion and uncertainty, such that amendments would be debated endlessly across legislative sessions in various States. In a world where States could rescind ratifications, Intervenors' concern that proposed amendments "could roam around State legislatures for 50 years" and "float around in space" would come true. Intervenors Br. 15 (quotation marks and citations omitted). Subjecting every proposed amendment to multiple rounds of ratification and rescission in each State would yield just the constitutional chaos that

---

[35] ERA Extension Report at 6–7 (statement of John M. Harmon).

[36] Letter from David S. Ferriero, Archivist of the United States, to the Hon. Carolyn Maloney (Oct. 25, 2012), available at www.congress.gov/116/meeting/house/109330/documents/HHRG-116-JU10-20190430-SD007.pdf.

Intervenors claim they seek to avoid.[37] See *Hawke*, 253 U.S. at 230 (viewing a State's ratification as not final "might lead to endless confusion in the manner of ratification of federal amendments").

Accepting Intervenors' view of rescissions, like the interpretation of the constitutional amendment process put forth by the Archivist, would improperly create additional steps and assign new roles not contemplated by Article V. Under Intervenors' argument, federal courts would be required to review and rule on the effects of potentially unlimited subsequent actions by State legislatures, constantly putting the content of the U.S. Constitution in doubt. Under the Archivist's view, after Congress and three-fourths of the States have satisfied the text of Article V, executive officials would need to approve those actions before the Constitution is amended (apparently without any deadline for such review, and despite the executive branch having no constitutional role in amendments). See Pls.' MTD Opp. 12; see also *Hollingsworth v. Virginia*, 3 U.S. (3 Dall.) 378, 379 (1798) (rejecting argument that proposed constitutional amendments must be "presented to the President"). Any suggestion that a new Congress should have to pass a resolution approving an amendment after the States have ratified (without any apparent timeline to act) is not set forth in Article V.[38] None of these are rules that the judiciary should create.

---

[37] To support the counter-textual and counter-historical theory that Article V permits States to withdraw their ratification, Intervenors rely almost exclusively on a case that is no longer good law: *State of Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1981). See Intervenors Br. 9, 10, 23, 24, 25, 26, 28, 31, 32 (citing *Freeman* 19 times). That decision was later vacated by the Supreme Court and therefore should not weigh as persuasive authority. See *National Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982).

[38] A similar theory wherein Congress must resolve disagreement among Congress and the States sets forth an amorphous standard that appoints Congress as referee for its own dispute and would upend the equal balance set forth in Article V. Plaintiff States note that even though Plaintiff States ratified the Equal Rights Amendment in 2017, 2018, and 2020, and initiated this action over six months ago to compel the Archivist to publish the Twenty-Eighth Amendment, at no time have both chambers of Congress passed a joint resolution adopting the unified position that the Equal Rights Amendment is no longer pending, that any of the 38 States' ratifications

Until the Constitution is amended otherwise, amendments proposed by Congress to the States become valid when ratified by three-fourths of the States. The Equal Rights Amendment became valid on January 27, 2020. Compl. ¶¶ 52–53.

### C.    In no event would Intervenors be entitled to summary judgment

Even if the Court was to conclude—contrary to history and the plain text of Article V—that States *could* rescind prior ratifications, Intervenors still would not have carried their burden as the moving party to prove that any of the purported rescissions on which they rely were "valid[]." Intervenors Br. 14, 23. Despite seeking judgment as a matter of law on an issue for which they would bear the burden of proof, Intervenors have provided the Court with *no* evidence about *any* of the rescissions that they ask to be recognized as preventing the Equal Rights Amendment from having satisfied Article V's three-fourths requirement. Intervenors did not do so presumably because they would have to explain how each State legally authorized its legislature to rescind a prior ratification of a federal amendment and how those procedures were satisfied with regard to that State's ratification of the Equal Rights Amendment.

1.    For example, Intervenors include Kentucky on their list of States that rescinded their ratification. But the narrative is not that simple. In June 1972, Kentucky became the nineteenth state to ratify the Equal Rights Amendment.[39] Six years later, the Kentucky House purported to rescind its ratification. H.J. Res. 20, 1978 Sess. Gen. Assemb. (Ky. 1978).[40] Once

---

have been invalid, or that the Archivist should not certify and publish the amendment. To the contrary, one chamber passed a bill on February 13, 2020 to *remove* uncertainty about the validity of the Equal Rights Amendment. See H.R.J. Res. 79, 116th Cong. (2020).

[39] *Kentucky Ratifies Rights Amendment*, Chi. Tribune (June 16, 1972).

[40] Representative Dolly McNutt remarked, "It is a sad day when the Commonwealth of Kentucky sends forth the word that the Commonwealth of Kentucky no longer considers its women equal." Around the Nation, *Kentucky House Rescinds Equal Rights Bill Approval*, N.Y. Times (Mar. 17, 1978).

the Senate also voted to rescind, the resolution was sent to the Governor, but Governor Julian Carroll was away on vacation out of state.[41] Instead of waiting for his return, Kentucky's Lieutenant Governor Thelma Stovall (the State's first female Lieutenant Governor),[42] who was constitutionally permitted to exercise all the powers of the Governor while the Governor was away, vetoed the resolution.[43] Calling the measure "legislative folly," Stovall reminded the General Assembly "[t]he highest court of Kentucky has held that a state can act but once upon a proposed amendment to the federal Constitution." *Id.*[44] Should this Court accept the (incorrect) proposition that rescissions are valid in principle, determining whether Kentucky's rescission was "valid" would require untangling issues of fact and nuances of Kentucky state law and procedure—nuances that the State's Governor, Lieutenant Governor, high court, and General Assembly disagreed on at the time.[45]

2.       South Dakota's purported "rescission" is similarly unsettled. In 1973, South Dakota ratified the Equal Rights Amendment. In 1979, the state legislature changed its mind and

---

[41] Times Wires Services, *Kentucky Official Vetoes ERA Vote*, L.A. Times, (Mar. 21, 1978); see also *Acting Governor Vetoes Kentucky Rights Reversal* note 6, *supra*.

[42] *Secretary of State Thelma Loyace Hawkins Stovall*, Kentucky Sec'y of State, http://apps.sos.ky.gov/secdesk/sosinfo/default.aspx?id=64#:~:text=First%20woman%20to%20be%20elected,Addie%20Mae%20(Goodman)%20Hawkins (last visited August 19, 2020).

[43] *Kentucky Official Vetoes ERA Vote*, note 41, *supra*.

[44] In a case concerning the Child Labor amendment, the Kentucky Court of Appeals (then the State's highest court) held "[w]e think the conclusion is inescapable that a State can act but once . . . upon a proposed amendment." *Wise*, 108 S.W.2d at 1033.

[45] During the debate over the Thirteenth Amendment, the Kentucky Governor also believed that rescission was unconstitutional. He told the state legislature, "Nothing but ratification forecloses the right of action. When ratified all power is expended." Memorandum for Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Atty. General, Office of Legal Counsel, *Re: Constitutionality of Extending the Time Period for Ratification of the Proposed Equal Rights Amendment*, at 33 (Oct. 31, 1977) (quotation marks and citation omitted).

voted to revoke its ratification,[46] despite an official legal opinion from the State's Attorney General explaining that such legislative action would have no effect:

> in light of the fact that certified copies of Chapter 1, SL 1973 [South Dakota's resolution in favor of ratification] have been forwarded to the Secretary of State of the United States, to the presiding officers of both Houses of Congress of the United States, and to the administrator of the United States General Services Administration, it is my opinion that this Legislature or any future Legislature is without authority to withdraw the previous ratification of the Equal Rights Amendment.

S.D. Atty. Gen. Op. No. 75-33 (Feb. 21, 1975).

South Dakota's attempted rescission is even more odd because, rather than outright rescission, the legislature inserted a purported "sunset" condition. The resolution reads:

> In the event that the amendment . . . is not ratified by the constitutionally required three-fourths of the several states under the terms and conditions [as set forth by Congress when it first proposed the amendment] . . . on or before March 22, 1979, the Legislature of South Dakota hereby withdraws its ratification of such proposed constitutional amendment as of March 23, 1979, which action renders any previous ratification null and void and without any force or effect whatsoever without further resolution or act of the Legislature of the state of South Dakota.

S.J. Res. 2, 54th Leg. (S.D. 1979). In this way, South Dakota sought not just to withdraw its prior ratification of the Equal Rights Amendment, but to make its rescission conditional on what may or may not happen in the future.

Citing a single law review article, Intervenors assert that South Dakota's "'sunset' resolution is a valid way to rescind a prior ratification." Intervenors Br. 10 n.1. Historical evidence, however, demonstrates that the Founders would not have looked kindly on conditional State actions in connection with constitutional ratification. Writing to Alexander Hamilton during the ratification debates, James Madison expressed his disgust with the concept of

---

[46] *South Dakota Rescinds Vote On Rights Amendment*, note 8, *supra*.

"adoption [of the Constitution] for a limited time."[47] Madison explained that Virginia had considered adopting the Constitution while "reserving right to withdraw" but determined that this was "worse than a rejection." *Id.* A sunset rescission like South Dakota's—in effect a ratification of an amendment for only a limited period of time—is exactly the type of conditional ratification that Madison so despised as against the very nature of the Constitution. As Madison explained, "[t]he Constitution requires an adoption *in toto*, and *for ever*." *Id.*

As a practical matter, should the Court conclude that States have constitutional authority to rescind their prior ratifications as Intervenors argue, the amendment process under Article V would become dominated by questions about the validity of purported rescissions and when, if ever, State ratifications are final and effective (questions steeped in complicated nuances of State law). For the purposes of this litigation, Intervenors have offered no evidence in support of their motion for summary judgment and have failed to establish the absence of any disputed material facts as to purported rescissions of the Equal Rights Amendment.

*        *        *

To accept Intervenors' arguments about deadlines, contemporaneity, and rescission not only would create additional requirements not found in Article V, but also would unnecessarily call into question the 14th, 15th, 19th, and 27th Amendments. This Court should decline Intervenors' request to rewrite the U.S. Constitution.

## CONCLUSION

Intervenors' motion for summary judgment should be denied.[48]

---

[47] See Founders Online, *To Alexander Hamilton from James Madison, [20 July 1788]*, National Archives, https://founders.archives.gov/documents/Hamilton/01-05-02-0012-0086.

[48] Given the significant constitutional interests at issue in this case, Plaintiff States respectfully request oral argument on Intervenors' motion.

Dated: August 19, 2020

Respectfully submitted,

COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA

KWAME RAOUL
Attorney General of Illinois

By: _/s/ Kathryn Hunt Muse_
KATHRYN HUNT MUSE
CHRISTOPHER WELLS
ELIZABETH ROBERSON-YOUNG
Office of the Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-3000 – Telephone
(312) 814-5024 – Facsimile
kmuse@atg.state.il.us
cwells@atg.state.il.us
erobersonyoung@atg.state.il.us

*Attorneys for Plaintiff*
*State of Illinois*

MARK R. HERRING
Attorney General of Virginia

By: _/s/ Michelle S. Kallen_
MICHELLE S. KALLEN [1030497]
TOBY J. HEYTENS [490314]
MARTINE E. CICCONI [219373]
JESSICA MERRY SAMUELS [1552258]
ZACHARY R. GLUBIAK
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
mkallen@oag.state.va.us

*Attorneys for Plaintiff*
*Commonwealth of Virginia*

AARON D. FORD
Attorney General of Nevada

By: _/s/ Heidi Parry Stern_
HEIDI PARRY STERN
CRAIG A. NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov

*Attorneys for Plaintiff*
*State of Nevada*

28

## CERTIFICATE OF SERVICE

Pursuant to Local Civil Rule 5.4(d), I hereby certify that on August 19, 2020 I will file this document electronically through the Court's CM/ECF system, which will effect service on all counsel who have appeared.


/s/ Michelle S. Kallen
Michelle S. Kallen

*Counsel for Plaintiff*
*Commonwealth of Virginia*