# Exhibit 1

H. J. Res. 208



# Ninety-second Congress of the United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Tuesday, the eighteenth day of January,*
*one thousand nine hundred and seventy-two*

## Joint Resolution

Proposing an amendment to the Constitution of the United States relative to
equal rights for men and women.

*Resolved by the Senate and House of Representatives of the United*
*States of America in Congress assembled (two-thirds of each House*
*concurring therein),* That the following article is proposed as an
amendment to the Constitution of the United States, which shall be
valid to all intents and purposes as part of the Constitution when rati-
fied by the legislatures of three-fourths of the several States within
seven years from the date of its submission by the Congress:

"ARTICLE —

"SECTION 1. Equality of rights under the law shall not be denied or
abridged by the United States or by any State on account of sex.
"SEC. 2. The Congress shall have the power to enforce, by appropri-
ate legislation, the provisions of this article.
"SEC. 3. This amendment shall take effect two years after the date
of ratification."

*Carl Albert*

*Speaker of the House of Representatives.*

*Vice President of the United States and*
*President of the Senate pro Tempore.*

I certify that this Joint Resolution originated in the House of Representatives.

W. Pat Jennings
*Clerk.*

By W. Raymond Colley

# Exhibit 2



# Nevada State Senate

March 22, 2017

David S. Ferriero
Archivist of the United States of America
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Ferriero:

Pursuant to Article V of the Constitution of the United States of America and the laws of the United States enacted thereto, 1 U.S.C. §§ 106b and 112, I have enclosed a certified and duly authenticated copy of Senate Joint Resolution No. 2 of the 79th Session of the Legislature of the State of Nevada, which serves as official notice that the Legislature of the State of Nevada, lawfully convened in its 79th Session which commenced on February 6, 2017, pursuant to Article 4, Section 2 of the Constitution of the State of Nevada, and acting through its Senate and Assembly, ratified the proposed amendment to the Constitution of the United States of America which was proposed by both houses of the 92nd Congress of the United States of America, by a constitutional majority of two-thirds, House Joint Resolution No. 208, 92d Cong., 2d Sess., 86 Stat. 1523 (1972), and which is more commonly known as the federal Equal Rights Amendment.

Sincerely,

Claire J. Clift
Secretary of the Senate of the
Legislature of the State of Nevada

Encl.
Senate Joint Resolution No. 2 of the 79th Session of the
Legislature of the State of Nevada

**LEGISLATIVE COUNSEL BUREAU
RESEARCH LIBRARY**

As the designated custodian of various records of the Nevada Legislature, I hereby certify that this is a true and correct copy of the document maintained in the Research Library.

Dated this ___ day of _____, 20__

TERESA WILT, Legislative Librarian

By. _____

File Number _____

## SENATE JOINT RESOLUTION NO. 2

_____

*President of the Senate*

_____

*Secretary of the Senate*

_____

*Speaker of the Assembly*

_____

*Chief Clerk of the Assembly*

STATE OF NEVADA

*OFFICE OF SECRETARY OF STATE*

————————

## RECEIVED AND FILED

Date _____

Hour _____

_____

*Secretary of State*

By _____

*Receiving Clerk*

(NSPO ι 09)

Senate Joint Resolution No. 2–Senators Spearman, Cancela, Cannizzaro, Ratti, Woodhouse; Atkinson, Denis, Farley, Ford, Manendo, Parks and Segerblom

Joint Sponsors: Assemblymen Araujo, Bilbray-Axelrod, Brooks, Bustamante Adams, Carlton, Carrillo, Cohen, Diaz, Frierson, Jauregui, Joiner, Miller, Monroe-Moreno, Ohrenschall, Spiegel, Sprinkle and Yeager

FILE NUMBER..........

SENATE JOINT RESOLUTION—Ratifying the proposed amendment to the Constitution of the United States providing that equality of rights under the law shall not be denied or abridged by the United States or by any state on account of sex.

**Legislative Counsel's Digest:**
Under Article V of the United States Constitution, Congress has the power to propose an amendment to the federal Constitution and to determine the mode of ratification. (U.S Const. Art. V) In 1972, Congress passed the Equal Rights Amendment and sent it to the states for ratification, imposing a 7-year time limit for ratification in the resolving clause of the Amendment, but later extended this time limit to June 30, 1982 The Equal Rights Amendment was ratified by 35 states before the deadline Under *Coleman v. Miller*, 307 U.S 433, 450, 456 (1939), the United States Supreme Court held that, as a political question, Congress may determine whether an amendment is valid because ratifications of the amendment are made within a reasonable period of time, even after the deadline. This resolution ratifies the Equal Rights Amendment, which provides for equality of rights under the law regardless of sex.

WHEREAS, Both houses of the 92nd Congress of the United States of America, by a constitutional majority of two-thirds, adopted the following resolution proposing to amend the United States Constitution:

RESOLVED BY THE SENATE AND HOUSE OF REPRESENTATIVES OF THE UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED (TWO-THIRDS OF EACH HOUSE CONCURRING THEREIN), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:



79th Session (2017)

– 2 –

ARTICLE.......

Section 1.   Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

Section 2.   The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

Section 3.   This amendment shall take effect two years after the date of ratification; and

WHEREAS, The 95th Congress of the United States amended the resolution of the 92nd Congress to extend the time for ratification to June 30, 1982, thereby indicating its continued support of the amendment; and

WHEREAS, The Congress of the United States adopted the 27th Amendment to the Constitution of the United States, which was proposed in 1789 by our First Congress but not ratified by three-fourths of the States until May 7, 1992, and, on May 18, 1992, certified as the 27th Amendment; and

WHEREAS, The restricting time limit for ratification of the Equal Rights Amendment is in the resolving clause and is not part of the amendment which was proposed by Congress and which has already been ratified by 35 states; and

WHEREAS, Having passed a time extension for the Equal Rights Amendment on October 20, 1978, Congress demonstrated that a time limit in a resolving clause may be disregarded if it is not part of the proposed amendment; and

WHEREAS, The United States Supreme Court in *Coleman v. Miller*, 307 U.S. 433 (1939), recognized that Congress is in a unique position to judge the tenor of the nation, to be aware of the political, social and economic factors affecting the nation and to be aware of the importance to the nation of the proposed amendment; and

WHEREAS, If an amendment to the Constitution of the United States has been proposed by two-thirds of both houses of Congress and ratified by three-fourths of the state legislatures, it is for Congress, under the principles of *Coleman v. Miller*, to determine the validity of the state ratifications occurring after a time limit in the resolving clause, but not in the amendment itself; and

WHEREAS, The Legislature of the State of Nevada finds that the proposed amendment is meaningful and needed as part of the Constitution of the United States and that the present political, social and economic conditions demonstrate that constitutional equality for



79th Session (2017)

– 3 –

women and men continues to be a timely issue in the United States; now, therefore, be it

RESOLVED BY THE SENATE AND ASSEMBLY OF THE STATE OF NEVADA, JOINTLY, That the proposed amendment to the Constitution of the United States of America is hereby ratified by the Legislature of the State of Nevada; and be it further

RESOLVED, That the Secretary of the Senate shall prepare and transmit a copy of this resolution to the Secretary of State who shall keep it as a true record of the official acts of the Legislative Department of the State Government pursuant to Section 20 of Article 5 of the Nevada Constitution; and be it further

RESOLVED, That the Secretary of the Senate shall prepare and transmit a certified copy of this resolution, duly authenticated, to the Archivist of the United States at the National Archives and Records Administration pursuant to 1 U.S.C. §§ 106b and 112, which shall serve as official notice that the proposed amendment to the Constitution of the United States of America is hereby ratified by the Legislature of the State of Nevada; and be it further

RESOLVED, That the Secretary of the Senate shall prepare and transmit a copy of this resolution to the Vice President of the United States as the presiding officer of the United States Senate, the Speaker of the House of Representatives and each member of the Nevada Congressional Delegation; and be it further

RESOLVED, That this resolution becomes effective upon passage.

20  17



79th Session (2017)

# Exhibit 3



# OFFICE OF THE SECRETARY OF STATE

**JESSE WHITE** • Secretary of State

June 15, 2018

David S. Ferriero
Archivist of the United States
National Archives and Records Administration
8601 Adelphi Road
College Park, MD  20740-6001

Dear Mr. Ferriero:

    This office is forwarding herewith a copy of the **Senate Joint Resolution Constitutional Amendment No.** 4, which was passed by the Illinois General Assembly on May 30, 2018.  Said Amendment represents ratification by the State of Illinois of the Equal Rights Amendment as passed by both houses of the 92nd Congress of the United States of America at its Second Session.

Yours truly,

JESSE WHITE
Secretary of State



**State of Illinois**
**Executive Department**

# CERTIFICATE

## To All To Whom These Presents Shall Come, Greeting:

I, JESSE WHITE, Secretary of State of the State of Illinois, do hereby certify that the attached is a true copy of **Senate Joint Resolution Constitutional Amendment No. 4**, which was passed by the Illinois General Assembly on May 30, 2018. Said amendment represents ratification by the State of Illinois of the Equal Rights Amendment as passed by both houses of the 92nd Congress of the United States of America at its Second Session.

IN TESTIMONY WHEREOF, I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois. Done at the City of Springfield, **June 15, 2018.**





SECRETARY OF STATE

10000SC0004ENR                          LRB100 08663 HEP 18798 e

*STATE OF ILLINOIS*
*ONE HUNDREDTH GENERAL ASSEMBLY*
*SENATE*

*Senate Joint Resolution*
*Constitutional Amendment No. 4*

*Offered by Senators Steans, Martinez, Bennett, Lightford,*
*Biss, Murphy, Castro, Bush, Manar, Holmes, Hutchinson,*
*Morrison and Harmon; Senator J. Cullerton, President of the*
*Senate; and Senators Van Pelt, Aquino, Raoul, Collins,*
*Bertino-Tarrant, T. Cullerton, Koehler, Harris, Hunter, Sims,*
*Landek, Stadelman, Sandoval, Hastings and Muñoz*

WHEREAS, The Ninety-second Congress of the United States of America, at its Second Session, in both houses, by a constitutional majority of two-thirds, adopted the following proposition to amend the Constitution of the United States of America:

"JOINT RESOLUTION

RESOLVED BY THE HOUSE OF REPRESENTATIVES AND SENATE OF THE UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED (TWO-THIRDS OF EACH HOUSE CONCURRING THEREIN), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as a part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE _____

10000SC0004ENR          -2-          LRB100 08663 HEP 18798 e

Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

Section 3. This amendment shall take effect two years after the date of ratification.""; and


WHEREAS, A Joint Resolution is a resolution adopted by both houses of the General Assembly and does not require the signature of the Governor; a Joint Resolution is sufficient for Illinois' ratification of an amendment to the United States Constitution; and


WHEREAS, The United States Congress has recently adopted the 27th Amendment to the Constitution of the United States, the so-called Madison Amendment, relating to Compensation of Members of Congress; this amendment was proposed 203 years earlier by our First Congress and only recently ratified by three-fourths of the States; the United States Archivist certified the 27th Amendment on May 18, 1992; and


WHEREAS, The founders of our nation, James Madison included, did not favor further restrictions to Article V of the Constitution of the United States, the amending procedure; the United States Constitution is harder to amend than any other constitution in history; and


WHEREAS, The restricting time limit for the Equal Rights Amendment ratification is in the resolving clause and is not a part of the amendment proposed by Congress and already ratified by 35 states; and

10000SC0004ENR             -3-          LRB100 08663 HEP 18798 e

WHEREAS, Having passed a time extension for the Equal Rights Amendment on October 20, 1978, Congress has demonstrated that a time limit in a resolving clause can be disregarded if it is not a part of the proposed amendment; and

WHEREAS, The United States Supreme Court in Coleman v. Miller, 307 U.S. 433, at 456 (1939), recognized that Congress is in a unique position to judge the tenor of the nation, to be aware of the political, social, and economic factors affecting the nation, and to be aware of the importance to the nation of the proposed amendment; and

WHEREAS, If an amendment to the Constitution of the United States has been proposed by two-thirds of both houses of Congress and ratified by three-fourths of the state legislatures, it is for Congress under the principles of Coleman v. Miller to determine the validity of the state ratifications occurring after a time limit in the resolving clause, but not in the amendment itself; and

WHEREAS, Constitutional equality for women and men continues to be timely in the United States and worldwide, and a number of other nations have achieved constitutional equality for their women and men; therefore, be it

RESOLVED, BY THE SENATE OF THE ONE HUNDREDTH GENERAL ASSEMBLY OF THE STATE OF ILLINOIS, THE HOUSE OF REPRESENTATIVES CONCURRING HEREIN, that the proposed amendment to the Constitution of the United States of America set forth in this resolution is ratified; and be it further

RESOLVED, That a certified copy of this resolution be forwarded to the Archivist of the United States, the President

10000SC0004ENR           -4-           LRB100 08663 HEP 18798 e

pro tempore of the Senate and the Speaker of the House of Representatives of the Congress of the United States, and each member of the Illinois congressional delegation.

   Adopted by the Senate, April 11, 2018.


_John J. Cullerton_
President of the Senate


_Th_
Secretary of the Senate


   Concurred in by the House of Representatives, May 30, 2018.


_Michael J. Madigan_
Speaker of the House of Representatives


_Bradley J. Bolin_
Assistant Clerk of the
House of Representatives

FILED
INDEX DEPARTMENT
JUN 1 4 2018
IN THE OFFICE OF
SECRETARY OF STATE

MH0719

A message from the House by
Mr. Mapes, Clerk:
Mr. President  --  I am directed to inform the Senate that
the House of Representatives has concurred with the Senate in the
adoption of the following joint resolution constitutional
amendment, to-wit:

SENATE JOINT RESOLUTION
CONSTITUTIONAL AMENDMENT 4


10000SC0004 Engrossed

WHEREAS, The Ninety-second Congress of the United States of America,
at its Second Session, in both houses, by a constitutional majority of
two-thirds, adopted the following proposition to amend the Constitution of
the United States of America:

"JOINT RESOLUTION
    RESOLVED BY THE HOUSE OF REPRESENTATIVES AND SENATE OF THE UNITED
STATES OF AMERICA IN CONGRESS ASSEMBLED (TWO-THIRDS OF EACH HOUSE
CONCURRING THEREIN), That the following article is proposed as an
amendment to the Constitution of the United States, which shall be valid
to all intents and purposes as a part of the Constitution when ratified by
the legislatures of three-fourths of the several States within seven years
from the date of its submission by the Congress:

"ARTICLE _____
    Section 1. Equality of rights under the law shall not be denied or
abridged by the United States or by any State on account of sex.
    Section 2. The Congress shall have the power to enforce, by
appropriate legislation, the provisions of this article.
    Section 3. This amendment shall take effect two years after the date
of ratification.""; and

    WHEREAS, A Joint Resolution is a resolution adopted by both houses of
the General Assembly and does not require the signature of the Governor; a
Joint Resolution is sufficient for Illinois' ratification of an amendment
to the United States Constitution; and

    WHEREAS, The United States Congress has recently adopted the 27th
Amendment to the Constitution of the United States, the so-called Madison
Amendment, relating to Compensation of Members of Congress; this amendment
was proposed 203 years earlier by our First Congress and only recently
ratified by three-fourths of the States; the United States Archivist
certified the 27th Amendment on May 18, 1992; and

    WHEREAS, The founders of our nation, James Madison included, did not
favor further restrictions to Article V of the Constitution of the United
States, the amending procedure; the United States Constitution is harder
to amend than any other constitution in history; and

WHEREAS, The restricting time limit for the Equal Rights Amendment ratification is in the resolving clause and is not a part of the amendment proposed by Congress and already ratified by 35 states; and

WHEREAS, Having passed a time extension for the Equal Rights Amendment on October 20, 1978, Congress has demonstrated that a time limit in a resolving clause can be disregarded if it is not a part of the proposed amendment; and

WHEREAS, The United States Supreme Court in Coleman v. Miller, 307 U.S. 433, at 456 (1939), recognized that Congress is in a unique position to judge the tenor of the nation, to be aware of the political, social, and economic factors affecting the nation, and to be aware of the importance to the nation of the proposed amendment; and

WHEREAS, If an amendment to the Constitution of the United States has been proposed by two-thirds of both houses of Congress and ratified by three-fourths of the state legislatures, it is for Congress under the principles of Coleman v. Miller to determine the validity of the state ratifications occurring after a time limit in the resolving clause, but not in the amendment itself; and

WHEREAS, Constitutional equality for women and men continues to be timely in the United States and worldwide, and a number of other nations have achieved constitutional equality for their women and men; therefore, be it

RESOLVED, BY THE SENATE OF THE ONE HUNDREDTH GENERAL ASSEMBLY OF THE STATE OF ILLINOIS, THE HOUSE OF REPRESENTATIVES CONCURRING HEREIN, that the proposed amendment to the Constitution of the United States of America set forth in this resolution is ratified; and be it further

RESOLVED, That a certified copy of this resolution be forwarded to the Archivist of the United States, the President pro tempore of the Senate and the Speaker of the House of Representatives of the Congress of the United States, and each member of the Illinois congressional delegation.

Concurred in by the House, May 30, 2018.

TIMOTHY D. MAPES, Clerk of the House

10000SC0004ENR                          LRB100 08663 HEP 18798 e

STATE OF ILLINOIS
ONE HUNDREDTH GENERAL ASSEMBLY
SENATE

Senate Joint Resolution
Constitutional Amendment No. 4

Offered by Senators Steans, Martinez, Bennett, Lightford,
Biss, Murphy, Castro, Bush, Manar, Holmes, Hutchinson,
Morrison and Harmon; Senator J. Cullerton, President of the
Senate; and Senators Van Pelt, Aquino, Raoul, Collins,
Bertino-Tarrant, T. Cullerton, Koehler, Harris, Hunter, Sims,
Landek, Stadelman, Sandoval, Hastings and Muñoz


WHEREAS, The Ninety-second Congress of the United States of
America, at its Second Session, in both houses, by a
constitutional majority of two-thirds, adopted the following
proposition to amend the Constitution of the United States of
America:

"JOINT RESOLUTION

RESOLVED BY THE HOUSE OF REPRESENTATIVES AND SENATE OF THE
UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED (TWO-THIRDS OF
EACH HOUSE CONCURRING THEREIN), That the following article is
proposed as an amendment to the Constitution of the United
States, which shall be valid to all intents and purposes as a
part of the Constitution when ratified by the legislatures of
three-fourths of the several States within seven years from the
date of its submission by the Congress:

"ARTICLE _____

10000SC0004ENR          -2-          LRB100 08663 HEP 18798 e

Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

Section 3. This amendment shall take effect two years after the date of ratification.""; and

WHEREAS, A Joint Resolution is a resolution adopted by both houses of the General Assembly and does not require the signature of the Governor; a Joint Resolution is sufficient for Illinois' ratification of an amendment to the United States Constitution; and

WHEREAS, The United States Congress has recently adopted the 27th Amendment to the Constitution of the United States, the so-called Madison Amendment, relating to Compensation of Members of Congress; this amendment was proposed 203 years earlier by our First Congress and only recently ratified by three-fourths of the States; the United States Archivist certified the 27th Amendment on May 18, 1992; and

WHEREAS, The founders of our nation, James Madison included, did not favor further restrictions to Article V of the Constitution of the United States, the amending procedure; the United States Constitution is harder to amend than any other constitution in history; and

WHEREAS, The restricting time limit for the Equal Rights Amendment ratification is in the resolving clause and is not a part of the amendment proposed by Congress and already ratified by 35 states; and

*10000SC0004ENR*       *-3-*       *LRB100 08663 HEP 18798 e*

*WHEREAS, Having passed a time extension for the Equal Rights Amendment on October 20, 1978, Congress has demonstrated that a time limit in a resolving clause can be disregarded if it is not a part of the proposed amendment; and*

*WHEREAS, The United States Supreme Court in <u>Coleman v. Miller</u>, 307 U.S. 433, at 456 (1939), recognized that Congress is in a unique position to judge the tenor of the nation, to be aware of the political, social, and economic factors affecting the nation, and to be aware of the importance to the nation of the proposed amendment; and*

*WHEREAS, If an amendment to the Constitution of the United States has been proposed by two-thirds of both houses of Congress and ratified by three-fourths of the state legislatures, it is for Congress under the principles of <u>Coleman v. Miller</u> to determine the validity of the state ratifications occurring after a time limit in the resolving clause, but not in the amendment itself; and*

*WHEREAS, Constitutional equality for women and men continues to be timely in the United States and worldwide, and a number of other nations have achieved constitutional equality for their women and men; therefore, be it*

*RESOLVED, BY THE SENATE OF THE ONE HUNDREDTH GENERAL ASSEMBLY OF THE STATE OF ILLINOIS, THE HOUSE OF REPRESENTATIVES CONCURRING HEREIN, that the proposed amendment to the Constitution of the United States of America set forth in this resolution is ratified; and be it further*

*RESOLVED, That a certified copy of this resolution be forwarded to the Archivist of the United States, the President*

10000SC0004ENR          -4-          LRB100 08663 HEP 18798 e

pro tempore of the Senate and the Speaker of the House of
Representatives of the Congress of the United States, and each
member of the Illinois congressional delegation.

Adopted by the Senate, April 11, 2018.


President of the Senate


Secretary of the Senate


Concurred in by the House of Representatives, May 30,
2018.


Speaker of the House of
Representatives


Assistant Clerk of the
House of Representatives

MS0461

A message from the Senate by
Mr. Anderson, Secretary:
Mr. Speaker   --   I am directed to inform the House of
Representatives that the Senate has adopted the following Senate
Joint Resolution Constitutional Amendment, in the adoption of
which I am instructed to ask the concurrence of the House of
Representatives, to-wit:

SENATE JOINT RESOLUTION CONSTITUTIONAL AMENDMENT 4

Adopted by the Senate, April 11, 2018, by a three-fifths vote.

Tim Anderson, Secretary of the Senate

# Exhibit 4



# Commonwealth of Virginia

## GENERAL ASSEMBLY

### RICHMOND

January 27, 2020

David Ferriero
National Archivist
3301 Metzerott Road
College Park, Maryland  20740-6001

Dear Mr. Ferriero:

On January 27, 2020, the Virginia General Assembly passed both House Joint Resolution No. 1 and Senate Joint Resolution No. 1.  Both HJR 1 and SJR 1 are Virginia's ratification of the Equal Rights Amendment to the Constitution of the United States.

Pursuant to this legislation, we have been directed to transmit a copy of HJR No. 1 and SJR No. 1 to the President of the United States, the Speaker of the United States House of Representatives, the President of the United States Senate, the members of the Virginia Congressional Delegation, and the Archivist of the United States at the National Archives and Records Administration of the United States.

So you may take note of this recent legislative action, we have included for your convenience a copy of HJR No. 1 and SJR No. 1.  We also are asking that you share this information with others who you believe may benefit from knowing the action of the General Assembly on this matter.

Sincerely,

Susan Clarke Schaar
Clerk, Senate of Virginia

Suzette Denslow
Clerk, Virginia House of Delegates



# SENATE OF VIRGINIA

*SENATE JOINT RESOLUTION NO. 1*

*Ratifying the Equal Rights Amendment to the Constitution of the United States.*

*Patrons—McClellan, Locke, Hanger, Howell, Surovell, Saslaw, Barker, Bell, Boysko, Deeds, Ebbin, Edwards, Favola, Hashmi, Lewis, Lucas, Marsden, Mason, McPike, Morrissey, Petersen and Spruill; Delegate: Samirah*

*Agreed to by the Senate, January 15, 2020*
*Agreed to by the House of Delegates, January 27, 2020*

*WHEREAS, a concurrent or joint resolution is a resolution adopted by both houses of a bicameral legislature, which does not require the signature of the chief executive, and a concurrent or joint resolution is sufficient for a state's ratification of an amendment to the Constitution of the United States; and*

*WHEREAS, Article V of the Constitution of the United States provides that amendments "shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the several states"; and*

*WHEREAS, over 80 percent of Virginians approve the ratification of the Equal Rights Amendment by the Virginia General Assembly; and*

*WHEREAS, Virginia has been pivotal to incorporating fundamental rights into the Constitution of the United States, as when Virginia's ratification of 10 amendments in 1791 established the Bill of Rights; now, therefore, be it*

*RESOLVED by the Senate, the House of Delegates concurring, That the General Assembly of the Commonwealth of Virginia hereby ratify and affirm the Equal Rights Amendment to the Constitution of the United States proposed by the United States Congress on March 22, 1972, and ratified by 37 state legislatures. The complete text of House Joint Resolution 208 proposing the Equal Rights Amendment follows:*

*HOUSE JOINT RESOLUTION 208*

*Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.*

*RESOLVED by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:*

*"Article—*

*"Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.*

*"Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.*

*"Section 3. This amendment shall take effect two years after the date of ratification."; and, be it*

*RESOLVED FURTHER, That the Clerk of the Senate transmit certified copies of this joint resolution to the President of the United States, the Speaker of the United States House of Representatives, the President of the United States Senate, the members of the Virginia Congressional Delegation, and the Archivist of the United States at the National Archives and Records Administration of the United States.*

*A True Copy, Teste:*

*Susan Clarke Schaar*
*Clerk of the Senate*

*L. Louise Lucas*
*President Pro Tempore of the Senate*

*Eileen Filler-Corn*
*Speaker of the House of Delegates*



# COMMONWEALTH OF VIRGINIA
# GENERAL ASSEMBLY

HOUSE JOINT RESOLUTION NO. 1

## Ratifying the Equal Rights Amendment to the Constitution of the United States.

Agreed to by the House of Delegates, January 15, 2020
Agreed to by the Senate, January 27, 2020

WHEREAS, a concurrent or joint resolution is a resolution adopted by both houses of a bicameral legislature, which does not require the signature of the chief executive, and a concurrent or joint resolution is sufficient for a state's ratification of an amendment to the Constitution of the United States; and

WHEREAS, Article V of the Constitution of the United States provides that amendments "shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the several states"; and

WHEREAS, over 80 percent of Virginians approve the ratification of the Equal Rights Amendment by the Virginia General Assembly; and

WHEREAS, Virginia has been pivotal to incorporating fundamental rights into the Constitution of the United States, as when Virginia's ratification of 10 amendments in 1791 established the Bill of Rights; now, therefore, be it

RESOLVED by the House of Delegates, the Senate concurring, That the General Assembly of the Commonwealth of Virginia hereby ratify and affirm the Equal Rights Amendment to the Constitution of the United States proposed by the United States Congress on March 22, 1972, and ratified by 37 state legislatures. The complete text of House Joint Resolution 208 proposing the Equal Rights Amendment follows:

### HOUSE JOINT RESOLUTION 208

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"Article—

"Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"Section 3. This amendment shall take effect two years after the date of ratification."; and, be it

RESOLVED FURTHER, That the Clerk of the House of Delegates transmit certified copies of this joint resolution to the President of the United States, the Speaker of the United States House of Representatives, the President of the United States Senate, the members of the Virginia Congressional Delegation, and the Archivist of the United States at the National Archives and Records Administration of the United States.

House Patrons: Carroll Foy, Ayala, Ward, Kory, Watts, Roem, Herring, Adams, D.M., Aird, Askew, Bagby, Bourne, Bulova, Carr, Carter, Cole, J.G., Convirs-Fowler, Delaney, Filler-Corn, Gooditis, Guy, Guzman, Hayes, Helmer, Heretick, Hope, Hudson, Hurst, Jenkins, Jones, Keam, Krizek, Levine, Lindsey, Lopez, McQuinn, Mugler, Mullin, Murphy, Plum, Price, Rasoul, Reid, Samirah, Scott, Sickles, Simon, Simonds, Subramanyam, Sullivan, Torian, Tran, Tyler, VanValkenburg and Willett

A True Copy, Teste:

*Suzette Denslow*
Clerk of the House of Delegates
And
Keeper of the Rolls of the Commonwealth

*Eileen Filler-Corn*
Eileen Filler-Corn
Speaker of the House of Delegates

*L. Louise Lucas*
L. Louise Lucas
President Pro Tempore of the Senate

# Exhibit 5

# EQUAL RIGHTS AMENDMENT - PROPOSED MARCH 22, 1972
## LIST OF STATE RATIFICATION ACTIONS

The following dates reflect the date of the state legislature's passage, the date of filing with the Governor or Secretary of State, or the date of certification by the Governor or Secretary of State, whichever is the earliest date included in the official documents sent to the NARA, Office of the Federal Register. (Updated as of: 03/24/2020)

| STATE | RATIFICATION | STATE | RATIFICATION |
|---|---|---|---|
| Alabama | not ratified | Montana | Jan. 25, 1974 |
| Alaska | April 5, 1972 | Nebraska* | March 29, 1972 |
| Arizona | not ratified | Nevada** | March 22, 2017 |
| Arkansas | not ratified | New Hampshire | March 23, 1972 |
| California | Nov. 13, 1972 | New Jersey | April 17, 1972 |
| Colorado | April 21, 1972 | New Mexico | Feb. 28, 1973 |
| Connecticut | March 15, 1973 | New York | May 18, 1972 |
| Delaware | March 23, 1972 | North Carolina | not ratified |
| Florida | not ratified | North Dakota | Feb. 3, 1975 |
| Georgia | not ratified | Ohio | Feb. 7, 1974 |
| Hawaii | March 22, 1972 | Oklahoma | not ratified |
| Idaho* | March 24, 1972 | Oregon | Feb. 8, 1973 |
| Illinois** | May 30, 2018 | Pennsylvania | Sept. 26, 1972 |
| Indiana | Jan. 24, 1977 | Rhode Island | April 14, 1972 |
| Iowa | March 24, 1972 | South Carolina | not ratified |
| Kansas | March 28, 1972 | South Dakota* | Feb. 5, 1973 |
| Kentucky* | June 27, 1972 | Tennessee* | April 4, 1972 |
| Louisiana | not ratified | Texas | March 30, 1972 |
| Maine | Jan 18, 1974 | Utah | not ratified |
| Maryland | May 26, 1972 | Vermont | March 1, 1973 |
| Massachusetts | June 21, 1972 | Virginia** | January 27, 2020 |
| Michigan | May 22, 1972 | Washington | March 22, 1973 |
| Minnesota | Feb. 8, 1973 | West Virginia | April 22, 1972 |
| Mississippi | not ratified | Wisconsin | April 26, 1972 |
| Missouri | not ratified | Wyoming | Jan. 26, 1973 |

* Purported Rescission

| | |
|---|---|
| Nebraska | March 15, 1973 |
| Tennessee | April 23, 1974 |
| Idaho | Feb. 8, 1977 |
| Kentucky | March 20, 1978 |
| South Dakota | March 5, 1979 |

** Ratification actions occurred after Congress's deadline expired. *See* U.S. Dep't of Justice, Office of Legal Counsel, *Ratification of the Equal Rights Amendment*, 44 Op. O.L.C. __, Slip Op. (Jan. 6, 2020).

# Exhibit 6



# NARA Press Statement on the Equal Rights Amendment

Press Release ·
Wednesday, January 8, 2020

**Washington, DC**

At the request of the National Archives and Records Administration    (NARA), the Department of Justice (DOJ) has issued an <u>opinion on the Ratification of the Equal Rights Amendment</u> (ERA) and the statutory role of the Archivist of the United States.

Under 1 U.S.C. § 106b, the Archivist performs a ministerial role with respect to certifying the ratification of amendments to the U.S. Constitution, as follows:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

In its January 6, 2020, opinion, the Office of Legal Counsel (OLC) has concluded "that Congress had the constitutional authority to impose a deadline on the ratification of the ERA and, because that deadline has expired, the ERA Resolution is no longer pending before the States." (OLC Opinion, at p.2.) Accordingly, the OLC opinion goes on to state that "the ERA's adoption could not be certified under 1 U.S.C. § 106b." (OLC Opinion, at p.37.)

These issues are currently presented in two federal lawsuits against the Archivist of the United States, one filed in the U.S. District Court for the Northern District of Alabama    by the states of Alabama, Louisiana, and South Dakota and the other filed in the U.S. District Court for the District of Massachusetts    by Equal Means Equal, The Yellow Roses, and Katherine Weitbrecht.

NARA defers to DOJ on this issue and will abide by the OLC opinion, unless otherwise directed by a final court order.

# # #

For press information contact the National Archives Public and Media Communications Staff at 202-357-5300.

Connect with the National Archives on:
- **Twitter:** @USNatArchives
- **Facebook:** USNationalArchives
- **Tumblr:** usnatarchives
- **Instagram:** usnatarchives

**The U.S. National Archives and Records Administration**
1-86-NARA-NARA or 1-866-272-6272

# Exhibit 7

## ARCHIVIST OF THE UNITED STATES
## UNITED STATES OF AMERICA

*TO ALL TO WHOM THESE PRESENTS SHALL COME,*

*GREETING:*

*KNOW YE, That the first Congress of the United States, at its first session, held in New York, New York, on the twenty–fifth day of September, in the year one thousand seven hundred and eighty–nine, passed the following resolution to amend the Constitution of the United States of America, in the following words and figures in part, to wit:*

*The Conventions of a number of the States having at the time of their adopting the Constitution, expressed a desire, in order to prevent misconstruction or abuse of its powers, that further declaratory and restrictive clauses should be added:  And as extending the ground of public confidence in the Government will best ensure the benificent ends of its institution;*

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, two thirds of both Houses concurring, that the following Articles be proposed to the Legislatures of the several States, as Amendments to the Constitution of the United States, all or any of which Articles, when ratified by three fourths of the said Legislatures, to be valid to all intents and purposes, as part of the said Constitution, viz.:*

*Articles in addition to, and amendment of, the Constitution of the United States of America, proposed by Congress and ratified by the Legislatures of the several States, pursuant to the fifth Article of the original Constitution.*

\*   \*   \*   \*   \*   \*   \*

*Article the Second...No law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened.*

\*   \*   \*   \*   \*   \*   \*

*And, further, that Section 106b, Title 1 of the United States Code provides that whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.*

*And, further, that it appears from official documents on file in the National Archives of the United States that the Amendment to the Constitution of the United States proposed as aforesaid has been ratified by the Legislatures of the States of Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming.*

*And, further, that the States whose Legislatures have so ratified the said proposed Amendment constitute the requisite three fourths of the whole number of States in the United States.*

*NOW, Therefore, be it known that I, Don W. Wilson, Archivist of the United States, by virtue and in pursuance of Section 106b, Title 1 of the United States Code, do hereby certify that the aforesaid Amendment has been valid, to all intents and purposes, as a part of the Constitution of the United States.*

*IN TESTIMONY WHEREOF,*
*I have hereunto set my hand and caused the seal of the National Archives and Records Administration to be affixed.*

*DONE at the City of Washington this 18th day of May in the year of our Lord one thousand nine hundred and ninety-two.*

DON W. WILSON

*foregoing was signed in my presence on this 18 day of No , 1992.*

Martha L.

# Exhibit 8



# Around the Nation

## Acting Governor Vetoes Kentucky Rights Reversal

FRANKFORT, Ky., March 20 (AP)—Lieut. Gov. Thelma Stovall of Kentucky today vetoed a resolution rescinding the State Legislature's ratification in 1972 of the proposed equal rights amendment.

Mrs. Stovall was serving as Acting Governor in the absence from the state of Gov. Julian Carroll, who was on vacation in South Carolina.

Mrs. Stovall, a strong backer of the proposed amendment to the Constitution that would ban discrimination because of sex, fought the rescission move in the legislative session that ended early yesterday.

The General Assembly, she said this morning, "wasted valuable time and energy in using many tactics, within or without the boundaries of the rules adopted by the Legislature, to pass a measure which in itself amounts to legislative folly."

Last week, Kentucky became the fourth state to vote to reverse its vote on the proposal. The amendment is three short of the 38 states needed for ratification by next year. Four states have voted to rescind their approval, but the legality of such a move is not clear.

## Ex-Mississippi Governor Seeks Eastland's Seat

Special to The New York Times

JACKSON, Miss., March 20—William L. Waller, the former Governor of Mississippi who is regarded as a strong racial moderate, announced today that he would oppose Senator James O. Eastland for the Democratic senatorial nomination in June.

The move by the 51-year-old Mr. Waller, now a practicing attorney here, to unseat the 73-year-old Senator is considered a major political surprise because of supposed political ties between the two in the past.

It would mark the first time in 24 years that Senator Eastland has faced a strong Democratic challenger. Six years ago the senior Mississippi Senator had turned back a formidable challenge from Gil Carmichael, a Republican.

## Stressful Events Found To Precede Acts of Crime

CHICAGO, March 20 (UPI)—A study of prison inmates shows that a significant number underwent major events that changed their lives in the year before they were imprisoned.

The events included the death of a spouse, loss of a job, breakup of a marriage, trouble on the job, financial difficulties, arguments within the family, personal injuries and illness.

The researchers questioned 176 male inmates of McNeil Island Federal prison in Washington and a state penitentiary at Walla Walla, Wash., about events that occurred in the year before they were jailed.

They concluded that too many stressful life events could drive a person to crime.

The study, published in the current edition of Archives of General Psychiatry, found that prisoners were less stable and more mobile than a control group.

## Possible Ford Flaw Hinted In 6 Deaths, 39 Injuries

DETROIT, March 20 (AP)—The Federal Government said today that it was investigating a possible transmission defect that might have caused the deaths of six persons and injuries to 39 others.

The investigation by the National Highway Traffic Safety Administration indicates that some 1973 to 1978 Ford Motor Company vehicles have defects that cause the automatic transmissions to slip from park into reverse.

Such transmission failures have resulted in cars running over their owners, crushing them against buildings or dragging them along the pavement as a person tries to stop the runaway vehicle, the agency said.

Ford had no comment except that it was cooperating with the investigation. The auto maker said that it had no specific advice to motorists as no defect has yet been identified.

The inquiry involves Ford Torinos, Elites, LTD II's, and Thunderbirds; Mercury Montegos, Cougars and Lincolns; and F-100, F-150, F-250, F-350, Econoline and Bronco light trucks.

The New York Times
Published: March 21, 1978
Copyright © The New York Times

# Exhibit 9



NATIONAL
ARCHIVES

December 12, 2018

Steven A. Engel
Assistant Attorney General
Office of Legal Counsel
United States Department of Justice
Washington, DC  20530
BY EMAIL

Dear Mr. Engel:

The Archivist of the United States has been asked by Members of Congress to inform them as to what actions he would take in the event that a 38th state ratifies the Equal Rights Amendment to the United States Constitution (ERA).  The Archivist indicated that under 1 U.S.C. § 106b, he would be expected to publish the amendment to the Constitution when the requisite number of states have ratified it, but noted that he would first need to seek counsel from the Office of Legal Counsel (OLC).

The ERA was approved by Congress for ratification in 1972, with a seven-year deadline for ratification.  In 1978, Congress extended the deadline to 1982.  By 1973, 35 states had ratified the ERA.  Between 1973 and 1979, five of those states purported to rescind their ratifications.  In 2017, a 36th state ratified the ERA, and in May 2018, a 37th state did so (see attached list of state actions).  It is our understanding that several other states are considering ratification of the ERA, which could lead to 38 or more states having ratified it.  (See attached June 18, 2018, Congressional Research Service Report on "The Proposed Equal Rights Amendment: Contemporary Ratification Issues.")

Section 106b of Title I, United States Code, establishes certain responsibilities of the Archivist of the United States with respect to the publication and certification of amendments to the Constitution, as follows:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

NATIONAL ARCHIVES *and*
RECORDS ADMINISTRATION

8601 ADELPHI ROAD
COLLEGE PARK, MD 20740-6001
*www.archives.gov*

GARY M. STERN
GENERAL COUNSEL
Suite 3110
t. 301.837.3026
*garym.stern@nara.gov*

In 1991, when it appeared that a 38th state could ratify the Congressional Pay Amendment, NARA contacted OLC with respect to the Archivist's role under 1 U.S.C. § 106b, and in 1992, the Office of Legal Counsel issued an opinion on what became the 27th Amendment to the Constitution.  We now request that OLC provide the Archivist with guidance on his role under 1 U.S.C. § 106b in the event that 38 or more states ratify the Equal Rights Amendment.

Please feel free to contact me to discuss further.

.
Sincerely,

GARY M. STERN
General Counsel

Enc.

2

# EQUAL RIGHTS AMENDMENT - PROPOSED MARCH 22, 1972
## LIST OF STATE RATIFICATION ACTIONS

The following dates reflect the date of the state legislature's passage, the date of filing with the Governor or Secretary of State, or the date of certification by the Governor or Secretary of State, whichever is the earliest date included in the official documents sent to the NARA, Office of the Federal Register.

| STATE | RATIFICATION | STATE | RATIFICATION |
|---|---|---|---|
| Alabama | not ratified | Montana | Jan. 25, 1974 |
| Alaska | April 5, 1972 | Nebraska* | March 29, 1972 |
| Arizona | not ratified | Nevada | March 22, 2017 |
| Arkansas | not ratified | New Hampshire | March 23, 1972 |
| California | Nov. 13, 1972 | New Jersey | April 17, 1972 |
| Colorado | April 21, 1972 | New Mexico | Feb. 28, 1973 |
| Connecticut | March 15, 1973 | New York | May 18, 1972 |
| Delaware | March 23, 1972 | North Carolina | not ratified |
| Florida | not ratified | North Dakota | Feb. 3, 1975 |
| Georgia | not ratified | Ohio | Feb. 7, 1974 |
| Hawaii | March 22, 1972 | Oklahoma | not ratified |
| Idaho* | March 24, 1972 | Oregon | Feb. 8, 1973 |
| Illinois | May 30, 2018 | Pennsylvania | Sept. 26, 1972 |
| Indiana | Jan. 24, 1977 | Rhode Island | April 14, 1972 |
| Iowa | March 24, 1972 | South Carolina | not ratified |
| Kansas | March 28, 1972 | South Dakota* | Feb. 5, 1973 |
| Kentucky* | June 27, 1972 | Tennessee* | April 4, 1972 |
| Louisiana | not ratified | Texas | March 30, 1972 |
| Maine | Jan 18, 1974 | Utah | not ratified |
| Maryland | May 26, 1972 | Vermont | March 1, 1973 |
| Massachusetts | June 21, 1972 | Virginia | not ratified |
| Michigan | May 22, 1972 | Washington | March 22, 1973 |
| Minnesota | Feb. 8, 1973 | West Virginia | April 22, 1972 |
| Mississippi | not ratified | Wisconsin | April 26, 1972 |
| Missouri | not ratified | Wyoming | Jan. 26, 1973 |

* Purported Rescission

| | |
|---|---|
| Nebraska | March 15, 1973 |
| Tennessee | April 23, 1974 |
| Idaho | Feb. 8, 1977 |
| Kentucky | March 20, 1978 |
| South Dakota | March 5, 1979 |



# The Proposed Equal Rights Amendment: Contemporary Ratification Issues

**Thomas H. Neale**
Specialist in American National Government

July 18, 2018

**Congressional Research Service**

7-5700

www.crs.gov

R42979

# Summary

The proposed Equal Rights Amendment to the U.S. Constitution (ERA), which declares that "equality of rights under the law shall not be denied or abridged by the United States or any State on account of sex," was approved by Congress for ratification by the states in 1972. The proposal included a seven-year deadline for ratification. Between 1972 and 1977, 35 state legislatures, of the 38 required by the Constitution, voted to ratify the ERA. Despite a congressional extension of the deadline from 1979 to 1982, no additional states approved the amendment during the extended period, at which time the amendment was widely considered to have expired.

Since 1982, Senators and Representatives who support the amendment have continued to introduce new versions of the ERA, generally referred to as "fresh start" amendments. In addition, some Members of Congress have also introduced resolutions designed to reopen ratification for the ERA as proposed in 1972, restarting the process where it ended in 1982. This was known as the "three-state strategy," for the number of additional ratifications then needed to complete the process, until Nevada and Illinois ratified the amendment in March 2017 and May 2018, respectively, becoming the 36th and 37th states to do so. The ERA supporters' intention here is to repeal or remove the deadlines set for the proposed ERA, reactivate support for the amendment, and complete the ratification process by gaining approval from the one additional state needed to meet the constitutional requirement, assuming the Nevada and Illinois ratifications are valid.

As the 115th Congress convened, resolutions were introduced in the House of Representatives and the Senate that embraced both approaches. H.J.Res. 33, introduced by Representative Carolyn Maloney, and S.J.Res. 6, introduced by Senator Robert Menendez, propose "fresh start" equal rights amendments. H.J.Res. 53, introduced by Representative Jackie Speier, and S.J.Res. 5, introduced by Senator Benjamin Cardin, would remove the deadline for ratification of the ERA proposed by Congress in 1972.

First introduced in Congress in 1923, the ERA proposed to the states in 1972 by the 92nd Congress included the customary seven-year ratification time limit. Although through 1977 the ERA was approved by 35 states, various controversies brought the ratification process to a halt as the deadline approached. In 1978, Congress extended the deadline through 1982. Opponents claimed this violated the spirit, if not the letter of the amendment process; supporters insisted the amendment needed more time for state consideration. Further, they justified extension because the deadline was placed not in the amendment, but in its preamble. Despite the extension, no further states ratified during the extension period, and the amendment was presumed to have expired in 1982. During this period, the ratification question was further complicated when five state legislatures passed resolutions rescinding their earlier ratifications. The Supreme Court agreed to hear cases on the rescission question, but the ERA's ratification time limit expired before they could be argued, and the Court dismissed the cases as moot.

Many ERA proponents claim that because the amendment did not include a ratification deadline *within the amendment text*, it remains potentially viable and eligible for ratification indefinitely. They maintain that Congress possesses the authority both to repeal the original 1979 ratification deadline and its 1982 extension, and to restart the ratification clock at the current 37-state level—including the Nevada and Illinois ratifications—with or without a future ratification deadline. In support, they assert that Article V of the Constitution gives Congress broad authority over the amendment process. They further cite the Supreme Court's decisions in *Dillon v. Gloss* and *Coleman v. Miller* in support of their position. They also note the precedent of the Twenty-Seventh "Madison" Amendment, which was ratified in 1992, 203 years after Congress proposed it to the states.

Opponents of reopening the amendment process may argue that attempting to revive the ERA would be politically divisive, and that providing it with a "third bite of the apple" would be contrary to the spirit and perhaps the letter of Article V and Congress's earlier intentions. They might also reject the example of the Twenty-Seventh Amendment, which, unlike the proposed ERA, never had a ratification time limit. Further, they might claim that efforts to revive the ERA ignore the possibility that state ratifications may have expired with the 1982 deadline, and that amendment proponents fail to consider the issue of state rescission, which has never been specifically decided in any U.S. court.

The "fresh start" approach provides an alternative means to revive the ERA. It consists of starting over by introducing a new amendment, similar or identical to, but distinct from, the original. A fresh start would avoid potential controversies associated with reopening the ratification process, but would face the stringent constitutional requirements of two-thirds support in both chambers of Congress and ratification by three-fourths of the states.

# Contents

Introduction ................................................................................................................................... 1

Most Recent Developments............................................................................................................. 2

   115th Congress Proposals ......................................................................................................... 2

      Fresh Start Proposals ........................................................................................................ 2

      Discussion ........................................................................................................................ 3

      Removing the ERA Ratification Deadline: The "Three-State Strategy" ........................... 4

      Discussion ........................................................................................................................ 5

   Recent Activity in the State Legislatures: Nevada and Illinois ................................................. 5

   Contemporary Public Attitudes toward the Equal Rights Amendment ...................................... 6

An Equal Rights Amendment: Legislative and Ratification History, 1923-1972............................ 7

   Five Decades of Effort: Building Support for an Equal Rights Amendment in
      Congress, 1923-1970 ....................................................................................................... 7

   Congress Approves and Proposes the Equal Rights Amendment, 1970-1972 ...................... 10

      First Vote in the House, 91st Congress—1970 ................................................................ 11

      Passage and Proposal by Congress, 92nd Congress—1971-1972..................................... 12

      Congress Sets a Seven-Year Ratification Deadline.......................................................... 13

   Ratification Efforts in the States .......................................................................................... 14

   Ratification Is Extended in 1978, but Expires in 1982. ......................................................... 15

   Rescission: A Legal Challenge to the Ratification Process ................................................... 16

Renewed Legislative and Constitutional Proposals, 1982 to the Present ...................................... 16

   "Fresh Start" Proposals ........................................................................................................ 17

   "Three-State" Proposals ....................................................................................................... 17

Contemporary Viability of the Equal Rights Amendment ........................................................... 18

   Article V: Congressional Authority over the Amendment Process ........................................ 18

   The Madison Amendment (the Twenty-Seventh Amendment): A Dormant Proposal
      Revived and Ratified....................................................................................................... 20

   Ratification of the Madison Amendment: A Model for the Proposed Equal Rights
      Amendment? ................................................................................................................... 22

   The Role of the Supreme Court Decisions in *Dillon v. Gloss* and *Coleman v. Miller* ........... 24

   Ancillary Issues .................................................................................................................. 26

      Origins of the Seven-Year Ratification Deadline............................................................. 26

      Rescission ...................................................................................................................... 26

      Congressional Promulgation of Amendments.................................................................. 27

      The Proposed District of Columbia Voting Rights (Congressional Representation)
         Amendment—Congress Places a Ratification Deadline in the Body of the
         Amendment................................................................................................................ 28

Concluding Observations .............................................................................................................. 30

# Contacts

Author Contact Information ........................................................................................................... 31

# Introduction

On July 20, 1923, the National Woman's Party (NWP) met in Seneca Falls, New York, to commemorate the 75th anniversary of the historic Seneca Falls Convention and celebrate the 1920 ratification of the Nineteenth Amendment, by which women won the right to vote. At the meeting, NWP leader Alice Paul announced her next project would be to develop and promote a new constitutional amendment, guaranteeing equal rights and equality under the law in the United States to women and men. Paul, a prominent suffragist, noted the recent ratification of the Nineteenth Amendment, which established the right of women to vote. She characterized an "equal rights" amendment as the next logical step for the women's movement.[1] The proposed amendment was first introduced six months later, in December 1923, in the 68th Congress.[2] Originally named "the Lucretia Mott Amendment," in honor of the prominent 19th century abolitionist, women's rights activist, and social reformer, the draft amendment stated that, "men and women shall have equal rights throughout the United States and every place subject to its jurisdiction."

Nearly half a century passed before the Mott Amendment, as amended and ultimately renamed the Alice Paul Amendment, was approved by Congress and proposed to the states for ratification in 1972.[3] In common with the Eighteenth and Twentieth through Twenty-Sixth Amendments, the proposed ERA included a seven-year deadline for ratification; in this case the deadline was included in the proposing clause, or preamble, that preceded the text of the amendment. After considerable early progress in the states, ratifications slowed, and the process ultimately stalled at 35 states in 1977, 3 short of the 38 approvals (three-fourths of the states) required by the Constitution. As the 1979 deadline approached, however, ERA supporters capitalized on the fact that the seven-year time limit was incorporated in the amendment's proposing clause, rather than in the body of the amendment. Concluding that the amendment itself was, therefore, not time-limited, Congress extended the ratification period by 38 months, through 1982. No further states added their approval during the extension, however, and the proposed ERA appeared to expire in 1982.

Since the proposed ERA's extended ratification period expired in 1982, Senators and Representatives have continued to introduce new versions of the amendment, beginning in the 97th Congress.[4] More recently, new analyses emerged that led ERA supporters to assert that the amendment remains viable, and that the period for its ratification could be extended indefinitely by congressional action. Resolutions embracing this thesis have been introduced beginning in the 112th Congress.[5] Their stated purpose is that of "[r]emoving the deadline for ratification of the Equal Rights Amendment." If enacted, these measures would eliminate the 1979 and 1982 deadlines; reopen the proposed ERA for state ratification at the present count of 37 states;[6] and extend the period for state ratification indefinitely.

This report examines the legislative history of the various proposals that ultimately emerged as the proposed Equal Rights Amendment. It identifies and provides an analysis of current

---

[1] "Alice Paul, Feminist, Suffragist, and Political Strategist," The Alice Paul Institute, at http://www.alicepaul.org/alicepaul.htm.

[2] S.J. Res 21 and H.J. Res. 75, 68th Congress, 1st session.

[3] The amendment is referred to hereinafter as "the proposed Equal Rights Amendment," or "the proposed ERA."

[4] See H.J. Res. 192 et al. and S.J. Res. 213, 92nd Congress.

[5] See H.J.Res. 47 and S.J.Res. 39, 112th Congress.

[6] Nevada became the 36th state to ratify the ERA when its legislature voted to ratify the amendment on March 22, 2017, and Illinois became the 37th, when its legislature ratified on May 30, 2018.

legislative proposals and reviews contemporary factors that may bear on its present and future viability.

# Most Recent Developments

## 115th Congress Proposals

As the 115th Congress convened, resolutions were introduced in both the House and Senate that embraced two approaches to the Equal Rights Amendment. These include "fresh start" proposals that proposed a new constitutional amendment, separate from the amendment proposed by Congress in 1972 (H.J. Res. 208, 92nd Congress), and proposals designed to reopen the ratification process by removing the deadline included in the resolution proposing the original ERA.

### Fresh Start Proposals

Perhaps the most basic means of restarting an equal rights amendment would be by introduction of a new joint resolution, a "fresh start." In 1982, even as the extended ratification deadline for the proposed ERA approached, resolutions proposing a new equal rights amendment were introduced in the 97th Congress. New versions of the ERA have continued to be introduced in the House and Senate in each succeeding Congress. All have shared language identical or similar to the original proposed by Congress in 1982. Two fresh start amendments have been introduced to date in the 115th Congress, as detailed below.

#### *S.J.Res. 6*

The first fresh start ERA proposal to be offered in the 115th Congress was S.J.Res. 6, introduced by Senator Bob Menendez of New Jersey on January 20, 2017. To date, Senator Menendez has been joined by 15 cosponsors.[7] Senator Menendez's proposal incorporates the language of the original ERA, as proposed in the 92nd Congress:

> Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

> Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

> Section 3. This article shall take effect 2 years after the date of ratification.

S.J.Res. 6 has been referred to the Senate Committee on the Judiciary.

#### *H.J.Res. 33*

H.J.Res. 33 was introduced in the House of Representatives by Representative Carolyn Maloney of New York on January 24, 2017. To date, Representative Maloney has been joined by 169 cosponsors.[8] This measure is also a fresh start resolution, proposing a new ERA:

---

[7] A list of cosponsors for S.J. Res. 6 is available from Congress.gov at https://www.congress.gov/bill/115th-congress/senate-joint-resolution/6/cosponsors?r=1.

[8] A list of cosponsors for H.J. Res. 33 is available from Congress.gov at https://www.congress.gov/bill/115th-congress/house-joint-resolution/33/cosponsors?r=1.

Section 1. Women shall have equal rights in the United States and every place subject to its jurisdiction. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

Section 2. Congress and the several States shall have the power to enforce, by appropriate legislation, the provisions of this article.

Section 3. This amendment shall take effect two years after the date of ratification.

This version of the amendment includes Section 1 language that differs from the version of the ERA proposed by Congress in 1972. The new wording appeared initially in H.J.Res. 56 in the 113th Congress. Specifically, Section 1 was amended by the addition of the following clause at its beginning: "Women shall have equal rights in the United States and every place subject to its jurisdiction." In a press release issued at the time, Representative Maloney described this as a

> ... new and improved Equal Rights Amendment.... Today's ERA would prohibit gender discrimination and for the first time, would explicitly mandate equal rights for women.... This ERA is different ... it's designed for the 21st Century. This ERA expressly puts women in the Constitution for the first time.[9]

It may also be noted that this language recalls the wording of the first version of the ERA, as drafted by suffragist Alice Paul in 1923 and introduced in the 68th Congress in 1923:

> Men and women shall have equal rights throughout the United States and every place subject to its jurisdiction.
>
> Congress shall have power to enforce this article by appropriate legislation.[10]

Further, the resolution expands enforcement authority for the amendment "by appropriate legislation," extending it from Congress to include "the several States."

H.J.Res. 33 has been referred to the Subcommittee on the Constitution and Civil Justice of the House Committee on the Judiciary.

## Discussion

As joint resolutions proposing an amendment to the Constitution, S.J.Res. 6 and H.J.Res. 33 would require approval in identical form by two-thirds of the Members present and voting in both chambers of Congress. Unlike a standard joint resolution that has the force of law, the President's approval is not necessary for joint resolutions that propose amendments.[11] Both resolutions prescribe that the proposed amendment would be submitted to the legislatures of the states for ratification.[12]

Neither S.J.Res. 6 nor H.J.Res. 33 includes a time limit for ratification, either in their preambles, or in the body of the amendment. While a ratification deadline has been included in either the

---

[9] Rep. Carolyn B. Maloney, Press Release, "Rep. Maloney, Speaker Quinn, and Council Members Lappin, Brewer, James, and Chin Join Women Leaders to Announce New, Improved Equal Rights Amendment," August 13, 2013, at https://maloney.house.gov/media-center/press-releases/rep-maloney-speaker-quinn-and-council-members-lappin-brewer-james-and-chin-join-women.

[10] S.J. Res. 21, 68th Congress, 1st session, introduced on December 10, 1923, by Senator Charles Curtis of Kansas, and H.J. Res. 75, introduced on December 13 by Representative Daniel Read Anthony, also of Kansas. Representative Anthony was a nephew of women's rights pioneer Susan B. Anthony.

[11] U.S. Senate website, "Legislation, Laws, and Acts," at https://www.senate.gov/legislative/common/briefing/leg_laws_acts.htm#2

[12] Article V of the Constitution authorizes Congress to choose the mode of ratification, by either the legislatures of the several states, or by conventions called for the purpose of considering the proposed amendment.

preamble or the text of the 18th and 20th through 26th Amendments, it is a tradition dating to the early 20th century, rather than a constitutional requirement. If Congress were to propose either of these resolutions to the states as a constitutional amendment, they would arguably be eligible for ratification indefinitely. In not setting a ratification deadline, these measures thus avoid the expiration issues associated with the original proposed Equal Rights Amendment. They also arguably embrace the assumption under which the 27th Amendment was ratified in 1992, some 203 years after Congress sent it to the states for approval: proposed amendments remain constitutionally valid and eligible for ratification unless a deadline is specifically prescribed when the amendment is proposed.[13] Opponents, however, might argue that the seven-year ratification deadline first included in the 18th Amendment should not be lightly discarded. The inclusion of a "sunset" provision on proposed amendments, they might argue, is necessary to ensure that a contemporaneous majority of the people, and through them the state legislatures, favors the measure. This issue is examined at greater length later in this report.

### Removing the ERA Ratification Deadline: The "Three-State Strategy"

Two resolutions introduced in the 115th Congress, one each in the House and Senate, are designed to reopen the ratification process for H.J. Res. 208, the Equal Rights Amendment proposed by the 92nd Congress in 1972, and extend it indefinitely by removing the deadline set in the preamble to the proposed ERA. Both these measures are based on the "three-state" argument[14] that (1) Congress has the constitutional authority to propose, alter, or terminate any limits on the ratification of amendments pending before the states; (2) all existing ratifications remain in effect and viable; and (3) rescissions of ratification passed by some states are invalid. The three-state argument is examined in detail later in this report.[15]

### *S.J.Res. 5*

This resolution, designed to reopen the ERA ratification process, was introduced by Senator Ben Cardin of Maryland on January 17, 2017. To date, Senator Cardin has been joined by 36 cosponsors.[16] The purpose of the resolution, as stated in its title is "[r]emoving the deadline for ratification of the equal rights amendment." The text of the resolution states:

> [t]hat notwithstanding any time limit contained in House Joint Resolution 208, 92d Congress, as agreed to in the Senate on March 22, 1972, the article of amendment proposed to the States in that joint resolution shall be valid to all intents and purposes as part of the Constitution whenever ratified by the legislatures of three-fourths of the several States.

S.J.Res. 5 has been referred to the Senate Judiciary Committee.

---

[13] The 27th Amendment (the Madison Amendment) is examined later in this report.

[14] Although the Equal Rights Amendment has now been ratified by 37 states, this report will generally refer to proposals to repeal the ERA ratification deadline by its original name, the "three state" process or solution.

[15] See under "Three-State Proposals."

[16] A list of cosponsors for S.J.Res. 5 is available at Congress.gov at https://www.congress.gov/bill/115th-congress/senate-joint-resolution/5/cosponsors?r=1.

*H.J.Res. 53*

This resolution was introduced by Representative Jackie Speier of California on January 31, 2017. To date, Representative Speier has been joined by 166 co-sponsors.[17] The text of H.J.Res. 53 is identical to that of S.J.Res. 5.

H.J.Res. 53 has been referred to the Subcommittee on the Constitution and Civil Justice of the House Committee on the Judiciary.

## Discussion

Many ERA proponents claim that because the amendment as originally proposed by Congress in 1972 did not include a ratification deadline *within the amendment text*, it remains potentially viable and eligible for ratification indefinitely. They maintain that Congress possesses the authority both to remove the original 1979 ratification deadline and its 1982 extension, and to restart the ratification clock at the then-current 36-state level, with or without a future ratification deadline. In support, they assert that Article V of the Constitution gives Congress uniquely broad authority over the amendment process. They further cite the Supreme Court's decisions in *Dillon v. Gloss* and *Coleman v. Miller* in support of their position. They also note the precedent of the Twenty-Seventh "Madison" Amendment, which was ratified in 1992, 203 years after Congress proposed it to the states. These issues are examined more fully later in this report.

# Recent Activity in the State Legislatures: Nevada and Illinois

Although the ratification deadline for the proposed ERA expired in 1982, its proponents have continued to press for action in the legislatures of states that either failed to ratify it, or had previously rejected the amendment. Recent notable developments in the states include action by Nevada in 2017 and Illinois in 2018 to ratify the amendment. Also in 2018, however, proposals to ratify the ERA failed to reach the floor of state legislatures in both Arizona[18] and Virginia,[19] although supporters in the North Carolina Legislature assert the amendment may come to a vote in that state's legislature during the current session.[20]

## Nevada and Illinois Ratify the Equal Rights Amendment

The most widely-publicized recent ERA developments in the states occurred in March 2017, and May 2018, when Nevada and Illinois ratified the proposed amendment. Their actions raised the number of state ratifications to 37.

On March 22, 2017, the Nevada Legislature completed action on a resolution approving the ERA as proposed by H.J.Res. 208 in the 92nd Congress. With this action, Nevada became the 36th state to ratify the ERA, and the first state to do so since 1977. The ratification measure, introduced on

---

[17] A list of cosponsors for H.J.Res. 53 is available at Congress.gov at https://www.congress.gov/bill/115th-congress/house-joint-resolution/53/cosponsors?r=1.

[18] Dustin Gardiner, "On Equal Pay Day Arizona Republicans Block Vote on Equal Rights Amendment," *The Republic/AZCentral.com*, April 10, 2018, at https://www.azcentral.com/story/news/politics/arizona/2018/04/10/equal-rights-amendment-vote-fails-arizona-legislature/504763002/.

[19] Patricia Sullivan, "Virginia's Hopes of ERA Ratification Go Down in Flames This Year," *Washington Post*, February 9, 2018, at https://www.washingtonpost.com/local/virginia-politics/virginias-hopes-of-era-ratification-go-down-in-flames-this-year/2018/02/09/7acfbf80-0dab-11e8-8890-372e2047c935_story.html?utm_term=.c4e112eebca7.

[20] "NC Could Be Deciding State in Push for Constitutional Amendment," WETC6 Wilmington, June 6, 2018, at http://m.wect.com/story/38362420/nc-could-be-deciding-state-in-push-for-constitutional-amendment.

February 17 as Senate Joint Resolution 2, (SJR2), passed the Nevada Senate on March 1 and the Nevada House of Representatives on March 20. The Senate's concurrence with a House amendment on March 22 completed the ratification process.[21] The choice of dates had historical significance: H.J.Res. 208 was proposed by Congress on March 22, 1972, exactly 45 years earlier.[22] Press accounts of the action noted that the ratification marked a reversal of earlier actions in Nevada. Efforts to secure ERA ratification in the legislature failed three times in the 1970s and failed once when placed on the ballot as an advisory ballot issue in 1978.[23] With Nevada's ratification, the three-state strategy arguably changed to a "two-state strategy," and the legislature's action was reported as "being read by [ERA] supporters as an encouraging sign,"[24] while the Eagle Forum, an advocacy group historically opposed to ERA,[25] restated its criticism of the amendment, noting the deadline for ratification had been passed in 1982.[26]

On May 30, 2018, the Illinois legislature completed action on a resolution approving the ERA as proposed by H.J.Res. 208 in the 92nd Congress. With this action Illinois became the 37th state to ratify the amendment. The ratification measure, introduced as SJRCA (Senate Joint Resolution Constitutional Amendment 0004) on February 7, 2018, was adopted by the Senate as originally introduced on April 11 and in its final form by the Senate and House of Representatives on May 30.[27] The governor's approval was not required.[28]

## Contemporary Public Attitudes toward the Equal Rights Amendment

Public opinion polls showed support through the 1990s for an equal rights amendment. The first recorded survey on support for the proposal was a CBS News telephone poll conducted in September 1970, in which 56% of respondents approved of an equal rights amendment.[29] Favorable attitudes remained steady in the 1970s and throughout the subsequent ratification period, during which time levels of support as reported by the Gallup Poll never dropped below

---

[21] Nevada Legislature website, SJR 2, at https://www.leg.state.nv.us/Session/79th2017/Reports/history.cfm?ID=319. The governor's approval is not required for ratification of a constitutional amendment. The vote in favor of ratification was 13-8 in the Senate and 28-14 in the Assembly, at https://www.leg.state.nv.us/Session/79th2017/Reports/history.cfm?DocumentType=8&BillNo=2.

[22] Sandra Cherb, "Nevada Ratifies Equal Rights Amendment on 45th Anniversary of Passage by Congress," *Las Vegas Review Journal*, March 22, 2017, at https://www.reviewjournal.com/news/politics-and-government/nevada/nevada-ratifies-equal-rights-amendment-on-45th-anniversary-of-passage-by-congress//.

[23] Ibid.

[24] "Pumping Life into the Equal Rights Amendment," *New York Times*, March 25, 2017, at https://www.nytimes.com/2017/03/25/opinion/sunday/pumping-life-into-the-equal-rights-amendment.html?_r=0.

[25] The Eagle Forum was an early opponent of ERA. Its self-described mission is "to enable conservative and pro-family men and women to participate in the process of self-government and public policy making...." Eagle Forum, "Our Mission," at http://eagleforum.org/misc/descript.html.

[26] "Nevada's Assembly Passed the So-Called Equal Rights Amendment for Final Passage Today," Eagle Forum, March 20, 2017, at http://eagleforum.org/state-news/nevada/nevada-passed-era.html.

[27] Illinois General Assembly website, 100th General Assembly, Bill Status of SJRCA0004, http://www.ilga.gov/legislation/billstatus.asp?DocNum=4&GAID=14&GA=100&DocTypeID=SJRCA&LegID=99262&SessionID=91.

[28] Rick Pearson and Bill Lukitch, "Illinois Approves Equal Rights Amendment 36 Years after Deadline," *Chicago Tribune*, May 31, 2018, at http://www.chicagotribune.com/news/local/politics/ct-met-equal-rights-amendment-illinois-20180530-story.html.

[29] *CBS News Survey*, September 8-10, 1970. Source: Jane J. Mansbridge, *Why We Lost the ERA* (Chicago: U. of Chicago Press, 1986), pp. 206-209.

57%. A later ERA-specific survey conducted by CBS News in 1999 reported that 74% of respondents supported the proposed ERA, while 10% were opposed.[30]

The ERA's expiration as a pending constitutional amendment was eventually followed by corresponding fall-off in related polling; there is little evidence of related activity by major survey research organizations after 1999, a development that is arguably due to the fact that the ERA was presumed to be a closed issue.

More recently, in 2017, the Harris Survey conducted a poll on women's status in American society. While it did not include a specific question concerning the ERA, the Harris Survey included the following query: "There has been much talk recently about changing women's status in society today. On the whole, do you favor or oppose most of the efforts to strengthen and change women's status in society?" Sixty-six percent of respondents favored strengthening and changing women's status in society, 7% were opposed, and 27% were not sure.[31]

# An Equal Rights Amendment: Legislative and Ratification History, 1923-1972

Despite the efforts of women's rights advocates in every Congress, nearly 50 years passed between the time when the Mott Amendment was first introduced in 1923 and the Equal Rights Amendment was approved by Congress and proposed to the states in 1972.

## Five Decades of Effort: Building Support for an Equal Rights Amendment in Congress, 1923-1970

The first proposal for an equal rights amendment, drafted by Alice Paul, was introduced in the 68th Congress in 1923.[32] In its original form, the text of the amendment read as follows:

> Men and women shall have equal rights throughout the United States and every place subject to its jurisdiction.
>
> Congress shall have power to enforce this article by appropriate legislation.[33]

Although Alice Paul characterized the then-Lucretia Mott Amendment as a logical and necessary next step in the campaign for women's rights following the Nineteenth Amendment, the proposal made little progress in Congress over the course of more than two decades. During the years

---

[30] Major survey research firms regularly conducted surveys of public attitudes toward the Equal Rights Amendment between the 1970s and the 1990s. Their findings reflected consistent support for the proposed amendment throughout the ratification period. For instance, an early Gallup Poll, conducted in March 1975, showed 58% of respondents favored the proposed ERA, while 24% opposed it, and 18% expressed no opinion. These levels of support changed little during the when the ERA was pending before the states, never dropping below a 57% approval rate. Source: *The Gallup Poll, Public Opinion, 1982* (Wilmington, DE: Scholarly Resources Inc., 1982), p. 140. In ensuing years, public support rose. One later survey, conducted by the CBS News Poll in 1999, reported that 74% of respondents supported the proposed ERA, while 10% were opposed. Source: *CBS News Poll*, "Slow Progress for Women," conducted December 13-16, 1999, at http://www.cbsnews.com/news/poll-slow-progress-for-women/.

[31] "Two in Three Americans Favor Enhancing Women's Status in Society," The Harris Survey, March 10, 2017, at http://www.theharrispoll.com/politics/enhancing-womens-status-society.html.

[32] S.J. Res. 21, 68th Congress, 1st session, introduced on December 10, 1923, by Senator Charles Curtis of Kansas, and H.J. Res. 75, introduced on December 13 by Representative Daniel Read Anthony, also of Kansas. Representative Anthony was a nephew of women's rights pioneer Susan B. Anthony.

[33] Ibid.

following its first introduction, an equal rights amendment was the subject of hearings in either the House or Senate in almost every Congress. According to one study, the proposal was the subject of committee action, primarily hearings, on 32 occasions between 1923 and 1946, but it came to the floor for the first time—in the Senate—only in the latter year.[34] During this period, however, the proposal continued to evolve. In 1943, for instance, the Senate Judiciary Committee reported a version of an equal rights amendment incorporating revised language that remained unchanged until 1971:

> Equality of rights under the law shall be denied or abridged by the United States or by any State on account of sex.

> Congress and the several states shall have power, within their respective jurisdictions, to enforce this article by appropriate legislation.[35]

Throughout this period, amendment proponents faced opposition from traditionalists, organized labor, and some leaders of the women's movement. According to one study of the amendment's long pendency in Congress, "[t]he most persistent and most compelling trouble that crippled prospects for an ERA from its introduction in 1923 until a year after Congress initially passed it on to the states was opposition from most of organized labor during a period of ascending labor strength."[36] A principal objection raised by organized labor and women's organizations that opposed the amendment was concern that the ERA might lead to the loss of protective legislation for women, particularly with respect to wages, hours, and working conditions.[37] One historian notes that:

> Through the years of the New Deal and the Truman administration, however, protective legislation for women held a firm place in organized labor's list of policy favorites. Since an ERA threatened protective laws, it and its supporters qualified as the enemy.[38]

The nature of opposition from women's groups was illustrated by a 1946 statement issued by 10 prominent figures, including former Secretary of Labor Frances Perkins and former First Lady Eleanor Roosevelt, which asserted that an equal rights amendment would "make it possible to wipe out the legislation which has been enacted in many states for the special needs of women in industry."[39]

These attitudes toward the proposal persisted, even as women in great numbers entered the civilian workforce and the uniformed services during the four years of U.S. involvement in World War II (1941-1945), taking jobs in government, industry, and the service sector that had previously been filled largely by men. Congressional support for an equal rights amendment grew slowly in the late 1940s, but a proposal eventually came to the Senate floor, where it was the subject of debate and a vote in July 1946. Although the 39-35 vote to approve fell short of the

---

[34] Amelia Fry, "Alice Paul and the ERA," in Joan Hoff Wilson, ed., *Rights of Passage, The Past and Future of the ERA* (Bloomington, IN: Indiana U. Press, 1986), pp. 13-16.

[35] S.J. Res. 25, 78th Congress, introduced by Senator Guy Gillette of Iowa.

[36] Gilbert Y. Steiner, *Constitutional Inequality: The Political Fortunes of the Equal Rights Amendment* (Washington, DC: Brookings Institution, 1985), p. 7.

[37] Kathryn Kish Sklar, "Why Were Most Politically Active Women Opposed to the ERA in the 1920s?" in *Rights of Passage*, pp. 25-28. Opponents included the League of Women Voters and the General Federation of Women's Clubs. Steiner, *Constitutional Inequality*, pp. 7-10.

[38] Steiner, *Constitutional Inequality*, p 10

[39] Ibid., p. 52.

two-thirds of Senators present and voting required by the Constitution, it was a symbolic first step.[40]

The so-called Hayden rider, named for its author, Senator Carl Hayden of Arizona, was perhaps emblematic of the arguments ERA advocates faced during the early post-war era. First introduced during the Senate's 1950 debate, this proposal stated that:

> The provisions of this article shall not be construed to impair any rights, benefits, or exemptions conferred by law upon persons of the female sex.[41]

Although the rider's ostensible purpose was to safeguard protective legislation, one source suggested an ulterior motive: "Hayden deliberately added the riders in order to divide the amendment's supporters, and these tactics delayed serious consideration of the unamended version of the Equal Rights Amendment."[42] Whatever the rider's intent, it was not welcomed by ERA supporters,[43] and was opposed on the floor by Senator Margaret Chase Smith of Maine, at that time the only woman Senator.[44]

The Senate ultimately passed an equal rights amendment resolution that included the Hayden rider twice in the 1950s. In the 81st Congress, S.J. Res. 25, introduced by Senator Guy Gillette of Iowa and numerous co-sponsors, was approved by a vote of 63-19 on January 25, 1950, a margin that comfortably surpassed the two-thirds of Members present and voting required by the Constitution.[45] An amendment came before the Senate again in the 83rd Congress, when Senator John M. Butler of Maryland and co-sponsors introduced S.J. Res. 49. The resolution, as amended by the Hayden rider, passed by a vote of 73-11 on July 16, 1953.[46] Over the next 16 years, the Senate considered various equal rights amendment resolutions in committee in almost every session, but no proposal was considered on the floor during this period. By 1964, however, the Hayden rider had lost support in the Senate as perceptions of the equal rights amendment concept continued to evolve. In the 88th Congress, the Senate Judiciary Committee effectively removed it from future consideration when it stated in its report:

> Your committee has considered carefully the amendment which was added to this proposal on the floor of the Senate.... Its effect was to preserve "rights, benefits, or exemptions" conferred by law upon persons of the female sex. This qualification is not acceptable to women who want equal rights under the law. It is under the guise of so-called "rights" or

---

[40] "Equal Rights Amendment," *Congressional Quarterly Almanac, 81st Congress, Second Session, 1950*, vol. V (Washington, DC: Congressional Quarterly News Features, 1951), p. 419.

[41] See S.J. Res. 25, as amended, 81st Congress.

[42] Mary Frances Berry, *Why ERA Failed, Politics, Women's Rights, and the Amending Process of the Constitution* (Bloomington, IN: Indiana U. Press, 1986), p. 60.

[43] In oral history interviews conducted between November 1972 and March 1973, Alice Paul recalled that Senator Hayden's intentions in introducing the rider were sincere, and that he was dismayed when she told him it made the amendment unacceptable to many ERA activists. See "Conversations with Alice Paul: Women's Suffrage and the Equal Rights Amendment," Suffragists Oral History Project, U. of California, Calisphere, c. 1976, at http://content.cdlib.org/view?docId=kt6f59n89c&brand=calisphere&doc.view=entire_text.

[44] While she voted against the rider, Senator Smith voted yes on final passage of the resolution as amended, which included the rider. Senate debate, *Congressional Record*, vol. 96, pt. 1 (January 25, 1950), p. 870. See also, *Congressional Quarterly Almanac, 1950*, p. 420.

[45] Senate debate, *Congressional Record*, vol. 96, pt. 1 (January 25, 1950), pp. 870-873. For an analysis of the vote, see *Congressional Quarterly Almanac, 1950*, pp. 419-422.

[46] As with her vote in 1950, Senator Smith opposed the rider, but voted yes on final passage of the resolution in 1953. Senate debate, *Congressional Record*, vol. 99, pt. 7 (July 16, 1953), p. 8974.

> "benefits" that women have been treated unequally and denied opportunities which are available to men.[47]

Between 1948 and 1970, however, the House of Representatives took no action on an equal rights amendment. Throughout this period, Representative Emanuel Celler of New York had blocked consideration of the amendment in the Judiciary Committee, which he chaired from 1949 to 1953 and again from 1955 to 1973. A Member of the House since 1923, Chairman Celler had been a champion of New Deal social legislation, immigration reform, civil rights legislation, and related measures throughout his career, but his strong connections with organized labor, which, as noted earlier, opposed an equal rights amendment during this period, may have influenced his attitudes toward the proposal.[48]

## Congress Approves and Proposes the Equal Rights Amendment, 1970-1972

Although proposals for an equal rights constitutional amendment continued to be introduced in every Congress, there was no floor consideration of any proposal by either chamber for almost two decades following the Senate's 1953 action. By the early 1970s, however, the concept had gained increasing visibility as one of the signature issues of the emerging women's movement in the United States. As one eyewitness participant later recounted:

> The 1960s brought a revival of the women's rights movement and more insistence on changed social and legal rights and responsibilities. The fact of women's involvement in the civil rights movement and the anti-war movement and their changed role in the economy created a social context in which many women became active supporters of enhanced legislation for themselves.[49]

By the time the concept of an equal rights amendment emerged as a national issue, it had also won popular support, as measured by public opinion polling. As noted earlier in this report, the first recorded survey on support for the proposal was a CBS News telephone poll conducted in September 1970, in which 56% of respondents favored an equal rights amendment.[50] Favorable attitudes remained consistent during the 1970s and throughout the subsequent ratification period.[51] Labor opposition also began to fade, and in April 1970, one of the nation's largest and most influential unions, the United Auto Workers, voted to endorse the concept of an equal rights amendment.[52]

In actions that perhaps reflected changing public attitudes, Congress had also moved during the 1960s on several related fronts to address women's equality issues. The Equal Pay Act of 1963 "prohibited discrimination on account of sex in payment of wages,"[53] while the Civil Rights Act of 1964 banned discrimination in employment on the basis of race, color, religion, *sex*, or national

---

[47] U.S. Congress, Senate, Committee on the Judiciary, *Equal Rights for Men and Women*, report to accompany S.J. Res. 45, S. Rept. 1558, 88th Congress, 2nd session (Washington, DC: GPO, 1964), p. 2.

[48] Steiner, *Constitutional Inequality*, pp. 14-15.

[49] Berry, *Why ERA Failed, Politics, Women's Rights, and the Amending Process of the Constitution*, p. 60.

[50] *CBS News Survey*, September 8-10, 1970. Source: Jane J. Mansbridge, *Why We Lost the ERA* (Chicago: U. of Chicago Press, 1986), pp. 206-209.

[51] See above at footnote 30.

[52] Mansbridge, *Why We Lost the ERA*, p. 12.

[53] Equal Pay Act of 1963, 77 Stat. 56.

origin [emphasis added].[54] Although it remained pending, but unacted upon in Congress, proposals for an equal rights amendment had gained support in other areas. The Republican Party had endorsed an earlier version of the amendment in its presidential platform as early as 1940, followed by the Democratic Party in 1944.[55] Both parties continued to include endorsements in their subsequent quadrennial platforms, and, by 1970, Presidents Eisenhower, Kennedy, Lyndon Johnson, and Nixon were all on record as having endorsed an equal rights amendment.[56]

### First Vote in the House, 91st Congress—1970

Representative Martha Griffiths of Michigan is widely credited with breaking the legislative stalemate that had blocked congressional action on a series of equal rights amendment proposals for more than two decades.[57] Against the background of incremental change outside Congress, Representative Griffiths moved to end the impasse in House consideration of the amendment. On January 16, 1969, she introduced H.J. Res. 264, proposing an equal rights amendment, in the House of Representatives. The resolution was referred to the Judiciary Committee where, as had been expected, no further action was taken.[58] On June 11, 1970, however, Representative Griffiths took the unusual step of filing a discharge petition to bring the proposed amendment to the floor. A discharge petition "allows a measure to come to the floor for consideration, even if the committee of referral does not report it and the leadership does not schedule it."[59] In order for a House committee to be discharged from further consideration of a measure, a majority of Representatives (218, if there are no vacancies) must sign the petition. As reported at the time, the use of the discharge petition had seldom been invoked successfully, having gained the necessary support only 24 times since the procedure had been established by the House of Representatives in 1910, and Representative Griffiths' filing in 1970.[60] By June 20, Representative Griffiths announced that she had obtained the necessary 218 Member signatures for the petition.[61] Although the Judiciary Committee had neither scheduled hearings nor issued a report, the resolution was brought to the House floor on August 10. The House approved the motion to discharge by a vote of 332 to 22, and approved the amendment itself by a vote of 334 to 26.[62]

The Senate had begun to act on a resolution proposing an equal rights amendment in the 91st Congress in 1970, before the amendment came to the House floor. In May, the Judiciary Committee's Subcommittee on Constitutional Amendments held hearings on S.J.Res. 61, the Senate version of an amendment. These hearings were followed by hearings in the full committee in September, and consideration on the Senate floor in early October. Floor debate was dominated by consideration and adoption of two amendments that would have (1) exempted women from

---

[54] Title VII, Civil Rights Act of 1964, 78 Stat. 241.

[55] Donald Bruce Johnson, comp., *National Party Platforms*, vol. I, 1840-1956 (Urbana, IL: U. of Illinois Press, 1978), pp. 393, 403.

[56] U.S. President's Task Force on Women's Rights and Responsibilities, *A Matter of Simple Justice* (Washington, DC: GPO, 1970), p. 5.

[57] "Martha Griffiths and the Equal Rights Amendment," National Archives, Center for Legislative Archives, at http://www.archives.gov/legislative/features/griffiths.

[58] *Congressional Record*, vol. 115, pt. 1 (January 16, 1969), p. 1144.

[59] CRS Report 97-552, *The Discharge Rule in the House: Principal Features and Uses*, by Richard S. Beth, p. 3.

[60] "Equal Rights for Women Dropped in Senate," *Congressional Quarterly Almanac, 91st Congress, 2nd Session—1970, vol. XXVI* (26) (Washington, DC: Congressional Quarterly, Inc., 1970), p. 707.

[61] Ibid.

[62] For debate and vote on the amendment, see *Congressional Record*, vol. 116, pt. 21 (August 10, 1970), pp. 28004-28037.

compulsory military service, and (2) permitted non-denominational prayer in public schools; and a final amendment that provided alternative language for the resolution. Thus encumbered, the Senate resolution was unacceptable to ERA supporters, but, in any event, the Senate adjourned on October 14 without a vote on the resolution as amended, and failed to bring it to the floor for final action in the subsequent lame-duck session.[63]

## Passage and Proposal by Congress, 92nd Congress—1971-1972

In the 92nd Congress, Representative Griffiths began the process anew in the House of Representatives when she introduced H.J.Res. 208, proposing an equal rights amendment. Chairman Celler continued to oppose it, but no longer blocked committee action. After subcommittee and full committee hearings, the House Judiciary Committee reported an amendment on July 14, but the resolution as reported included amendments concerning citizenship, labor standards, and the exemption of women from selective service that were unacceptable to ERA supporters. When H.J.Res. 208 came to the floor in early October, however, the House stripped out the committee amendments, and, on October 12, it approved the resolution by a bipartisan vote of 354 to 24.[64]

The Senate took up the House-passed amendment during the second session of the 92nd Congress, in March 1972. On March 14, the Judiciary Committee reported a clean version of H.J. Res. 208 after rejecting several amendments, including one adopted by the Subcommittee on the Constitution, and several others offered in the full committee. The resolution was called up on March 15, and immediately set aside. The Senate began debate on the amendment on March 17, with Senator Birch Bayh of Indiana, a longtime ERA supporter, as floor manager. On the same day, President Richard Nixon released a letter to Senate Republican Leader Hugh Scott of Pennsylvania reaffirming his endorsement of the Equal Rights Amendment.[65] After two days in which the Members debated the proposal, Senator Sam Ervin of North Carolina offered a series of amendments that, among other things, would have exempted women from compulsory military service and service in combat units in the U.S. Armed Forces, and preserved existing gender-specific state and federal legislation that extended special exemptions or protections to women. Over the course of two days, Senator Ervin's amendments were serially considered and rejected, generally by wide margins. On March 22, the Senate approved the House version of the amendment, H.J. Res. 208, by a vote of 84 to 8, with strong bipartisan support.[66]

The text of H.J. Res. 208—the Equal Rights Amendment as proposed by the 92nd Congress—follows:

House Joint Resolution 208

---

[63] "Equal Rights for Women Dropped in Senate," *Congressional Quarterly Almanac, 1970*, pp. 708-709.

[64] The vote in the House was 217 Democrats and 137 Republicans in favor, 12 Democrats and 12 Republicans opposed. *Congressional Record*, vol. 117, pt. 27 (October 12, 1971), p. 35815. See also "House Passes Equal Rights Constitutional Amendment," *Congressional Quarterly Almanac, 92nd Congress, 1st Session, 1971, vol. XXVII* (27) (Washington, DC: Congressional Quarterly Inc. 1972), pp. 656-658.

[65] In his letter, President Nixon noted that he had co-sponsored the ERA as a freshman Senator in 1951, and that he remained committed to the amendment. "Letter to the Senate Minority Leader About the Proposed Constitutional Amendment on Equal Rights for Men and Women," U.S. President, *Public Papers of the Presidents of the United States, Richard Nixon, 1972* (Washington, DC: GPO, 1972), p. 444.

[66] The Senate vote was 47 Democrats and 37 Republicans in favor; two Democrats and six Republicans opposed. *Congressional Record*, vol. 118, pt. 8 (March 22, 1972), p. 9598. See also "Equal Rights: Amendment Passed over Ervin Opposition," *Congressional Quarterly Almanac, 92nd Congress, 2nd session, 1972, vol. XVIII* (18) (Washington, DC: Congressional Quarterly Inc. 1973), pp. 199-204.

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each house concurring therein), That

The following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years of its submission by the Congress:

"Section 1. Equality of rights under the law shall not be denied or abridged by the United States or any State on account of sex.

"Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"Section 3. This amendment shall take effect two years after the date of ratification."

The action of the two chambers in approving H.J. Res. 208 by two-thirds majorities of Members present and voting (91.3% in the Senate and 93.4% in the House) had the effect of formally proposing the amendment to the states for ratification.

## Congress Sets a Seven-Year Ratification Deadline

When it proposed the Equal Rights Amendment, Congress stipulated in the preamble of the joint resolution that the ERA was to be ratified by the constitutionally requisite number of state legislatures (38 then as now) within seven years of the time it was proposed, in order to become a valid part of the Constitution. A time limit for ratification was first instituted with the Eighteenth Amendment,[67] proposed in 1917, and, with the exception of the Nineteenth Amendment and the Child Labor Amendment, all subsequent proposed amendments have included a ratification deadline of seven years.

With respect to the Child Labor Amendment, Congress did not incorporate a ratification deadline when it proposed the amendment in 1924. It was ultimately ratified by 28 states through 1937, 8 short of the 36 required by the Constitution at that time, the Union then comprising 48 states. Although the amendment arguably remains technically viable because it lacked a deadline when proposed, the Supreme Court in 1941 upheld federal authority to regulate child labor as incorporated in the Fair Labor Standards Act of 1938 (52 Stat. 1060) in the case of *United States v. Darby Lumber Company* (312 U.S. 100 (1941)). In this case, the Court reversed its earlier decision in *Hammer v. Dagenhart* (24 U.S. 251 (1918)), which ruled that the Keating-Owen Child Labor Act of 1916 (39 Stat. 675) was unconstitutional. The amendment is thus widely regarded as having been rendered moot by the Court's 1941 decision.[68]

In the case of the Eighteenth, Twentieth, Twenty-First, and Twenty-Second Amendments, the "sunset" ratification provision was incorporated *in the body of the amendment itself*. For subsequent amendments, however, Congress determined that inclusion of the time limit within its body "cluttered up" the proposal. Consequently, all but one of the subsequently proposed amendments[69]—the Twenty-Third, Twenty-Fourth, Twenty-Fifth and Twenty-Sixth, and the

---

[67] The origins of and rationale for the seven-year ratification deadline are examined in greater detail later in this report.

[68] John R. Vile, "Child Labor Amendment," in *Encyclopedia of Constitutional Amendments, Proposed Amendments, and Amending Issues, 1789-2010*, 3rd edition (Santa Barbara, CA: ABC-CLIO, 2010), vol. 2, p. 65.

[69] Only the proposed District of Columbia Voting Rights (Congressional Representation) Amendment included a ratification deadline within the body of the amendment. This exception is examined later in this report.

ERA—placed the limit *in the preamble or authorizing resolution, rather than in the body of the amendment itself.*[70] This decision, seemingly uncontroversial at the time, was later to have profound implications for the question of extending the ratification window for the ERA.

## Ratification Efforts in the States

States initially responded quickly once Congress proposed the Equal Rights Amendment for their consideration. Hawaii was the first state to ratify, on March 22, 1972, the same day the Senate completed action on H.J. Res. 208. By the end of 1972, 22 states had ratified the amendment, and it seemed well on its way to adoption. Opposition to the amendment, however, began to coalesce around organizations like "STOP ERA," which revived many of the arguments addressed during congressional debate.[71] Opponents also broadly asserted that ratification of the amendment would set aside existing state and local laws providing workplace and other protections for women and would lead to other, unanticipated negative social and economic effects.[72] In 1976, ERA supporters established a counter-organization, "ERAmerica," as an umbrella association to coordinate the efforts of pro-amendment groups and serve as a high-profile national advocate for the amendment.[73]

Opposition to the proposed Equal Rights Amendment continued to gain strength, although, as noted earlier in this report, public approval of the amendment never dropped below 54% during the ratification period.[74] Following the first 22 state approvals, 8 additional states ratified in 1973, 3 more in 1974, and 1 each in 1975 and 1977, for an ultimate total of 35, 3 short of the constitutional requirement of 38 state ratifications.[75] At the same time, however, ERA opponents in the states promoted measures in a number of legislatures to repeal or rescind their previous ratifications. Although the constitutionality of such actions has long been questioned, by 1979, five states had passed rescission measures.[76] The question of rescission will be addressed in detail later in this report.

---

[70] U.S. Congress, *The Constitution of the United States of America, Analysis and Interpretation*, "Article V, Mode of Amendment," online edition available to Members of Congress and their staff at http://www.crs.gov/conan/default.aspx?doc=Article05.xml&mode=topic&t=1|2|3; hereinafter, *The Constitution Annotated*.

[71] Founded by political activist Phyllis Schlafly, STOP ERA, which was renamed "Eagle Forum" in 1975, continues, among other issues, to oppose the ERA in 2017. See Douglas Martin, "Phyllis Schlafly, 'First Lady' of a March to the Political Right, Dies at 92," *New York Times*, September 5, 2016, at https://www.nytimes.com/2016/09/06/obituaries/phyllis-schlafly-conservative-leader-and-foe-of-era-dies-at-92.html.

[72] David E. Kyvig, *Explicit and Authentic Acts: Amending the U.S. Constitution, 1776-1995* (Lawrence, KS: University of Kansas Press, 1996), pp. 409-412.

[73] Ibid., pp. 412-413. Berry, *Why ERA Failed*, p. 69. ERAmerica drew support from such organizations as the League of Women Voters, American Association of University Women, Federation of Business and Professional Women's Clubs, and other pro-ERA organizations.

[74] Mansbridge, *Why We Lost the ERA*, pp. 206-209.

[75] Ratifications by year and order of approval: 1972: Hawaii, New Hampshire, Delaware, Iowa, Kansas, Idaho, Nebraska, Texas, Tennessee, Alaska, Rhode Island, New Jersey, Colorado, West Virginia, Wisconsin, New York, Michigan, Maryland, Massachusetts, Kentucky, Pennsylvania, and California; 1973: Wyoming, South Dakota, Oregon, Minnesota, New Mexico, Vermont, Connecticut, and Washington; 1974: Maine, Montana, and Ohio; 1975: North Dakota; 1977: Indiana. (The Equal Rights Amendment/equalrightsamendment.org), "State Ratifications of the ERA," at http://www.equalrightsamendment.org/ratification.htm. This list has not been updated to include Nevada and Illinois.

[76] State rescissions by year: 1973: Nebraska; 1974: Tennessee; 1977: Idaho; 1978: Kentucky; 1979: South Dakota. Source, Congressional Research Service Memorandum, *Questions Pertaining to the Equal Rights Amendment*, by David C. Huckabee, August 19, 2004, p. 2. Available to Members of Congress and staff from CRS.

## Ratification Is Extended in 1978, but Expires in 1982

By the late 1970s, the ratification process had clearly stalled, and the deadline for ratification as specified in the preamble to H.J. Res. 208 was approaching. Reacting to the impending "sunset" date of March 22, 1979, ERA supporters developed a novel strategy to extend the deadline by congressional resolution. The vehicle chosen by congressional supporters was a House joint resolution, H.J.Res. 638, introduced in the 95th Congress on October 26, 1977, by Representative Elizabeth Holtzman[77] of New York and others. In its original form, the resolution proposed to extend the deadline an additional seven years, thus doubling the original ratification period.

During hearings in the House Judiciary Committee's Subcommittee on Civil and Constitutional Rights, legal scholars debated questions on the authority of Congress to extend the deadline; whether an extension vote should be by a simple majority or a supermajority of two-thirds of the Members present and voting; and if state rescissions of their ratifications were lawful. The full Judiciary Committee also addressed these issues during its deliberations in 1978.[78] Continuing controversy in the committee and opposition to extending the ratification period a full seven years led to a compromise amendment to the resolution that reduced the proposed extension to three years, three months, and eight days. ERA supporters accepted the shorter period as necessary to assure committee approval of the extension. Two other changes, one that would have recognized the right of states to rescind their ratifications, and a second requiring passage of the extension in the full House by a two-thirds super majority, were both rejected by the committee when it reported the resolution to the House on July 30.[79]

The full House debated the resolution during summer 1978, rejecting an amendment that proposed to recognize states' efforts to rescind their instruments of ratification. Another amendment rejected on the floor would have required votes on the ERA deadline extension to pass by the same two-thirds vote necessary for original actions proposing constitutional amendments. The House adopted the resolution by a vote of 233 to 189 on August 15, 1978.[80] The Senate took up H.J.Res. 638 in October; during its deliberations it rejected amendments similar to those offered in the House and joined the House in adopting the resolution, in this case by a vote of 60 to 36 on October 6.[81] In an unusual expression of support, President Jimmy Carter signed the joint resolution on October 20, even though the procedure of proposing an amendment to the states is solely a congressional prerogative under the Constitution.[82]

During the extended ratification period, ERA supporters sought unsuccessfully to secure the three necessary ratifications for the amendment, while opponents pursued rescission in the states with similarly unsuccessful results. A Gallup Poll reported in August 1981 that 63% of respondents supported the amendment, a higher percentage than in any previous survey, but, as one observer noted, "The positive poll results were really negative, because additional ratifications needed to

---

[77] Representative Holtzman had defeated Representative Emanuel Celler (q.v.) for renomination in the Democratic primary in 1992.

[78] "ERA Deadline Extended," *Congressional Quarterly Almanac, 95th Congress, 2nd Session, 1978, vol. XXIV* (34) (Washington, DC: Congressional Quarterly Inc., 1979), pp. 773-775.

[79] Ibid.

[80] Ibid., pp. 775-776.

[81] Ibid., p. 773.

[82] "ERA Deadline Extension," *Congress and the Nation, vol. V, 1977-1980* (Washington, DC: Congressional Quarterly Inc., 1981), pp. 798-800. For President Carter's explanation of his signing of the extension joint resolution, see "Equal Rights Amendment, Remarks on Signing H.J.Res. 638," in U.S. President, *Public Papers of the Presidents of the United States, Jimmy Carter, 1978* (Washington, DC: GPO, 1979), pp. 1800-1801.

come from the states in which support was identified as weakest."[83] On June 30, 1982, the Equal Rights Amendment deadline expired with the number of state ratifications at 35, not counting rescissions.

## Rescission: A Legal Challenge to the Ratification Process

As noted earlier, while ratification of the proposed Equal Rights Amendment was pending, a number of states passed resolutions that sought to rescind their earlier ratifications. By the time the amendment's extended ratification deadline passed in 1982, the legislatures of more than 17 states had considered rescission, and 5 passed these resolutions.[84] Throughout the period, however, legal opinion as to the constitutionality of rescission remained divided.

On May 9, 1979, the state of Idaho, joined by the state of Arizona and individual members of the Washington legislature, brought legal action in the U.S. District Court for the District of Idaho, asserting that states did have the right to rescind their instruments of ratification.[85] The plaintiffs further asked that the extension enacted by Congress be declared null and void.[86]

On December 23, 1981, District Court Judge Marion Callister ruled (1) that Congress had exceeded its power by extending the deadline from March 22, 1979, to June 30, 1982; and (2) that states had the authority to rescind their instruments of ratification, provided they took this action *before* an amendment was declared to be an operative part of the Constitution.[87] The National Organization for Women (NOW), the largest ERA advocacy organization, and the General Services Administration (GSA)[88] appealed this decision directly to the Supreme Court, which, on January 25, 1982, consolidated four appeals and agreed to hear the cases. In its order, the High Court also stayed the judgment of the Idaho District Court. On June 30, as noted earlier, the extended ratification deadline expired, so that when the Supreme Court convened for its term on October 4, it dismissed the appeals as moot, and vacated the district court decision.[89]

# Renewed Legislative and Constitutional Proposals, 1982 to the Present

Interest in the proposed Equal Rights Amendment did not end when its extended ratification deadline expired on June 30, 1982. Since that time, there have been regular efforts to introduce the concept as a "fresh start" in Congress, while additional approaches have emerged that would revive H.J. Res. 208, the amendment as originally proposed by the 92nd Congress.

---

[83] Berry, *Why ERA Failed*, p. 79.

[84] Kyvig, *Explicit and Authentic Acts*, p. 415. For state rescissions, see above at footnote 75.

[85] However, neither the Idaho nor the Arizona legislature had passed a resolution of rescission.

[86] *State of Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho, 1981).

[87] John F. Carroll, "Constitutional Law: Constitutional Amendment, Rescission of Ratification, Extension of Ratification Period, State of Idaho v. Freeman," *Akron Law Review*, vol. 16, no. 1 (summer 1982), pp. 151-161.

[88] GSA became involved in 1982 because it was at that time the parent agency of the National Archives and Records Service, now the National Archives and Records Administration, which, then, as now, received and recorded state ratifications for proposed constitutional amendments.

[89] *Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho, 1981), *prob. juris. noted*, 455 U.S. 918 (1982), *vacated and remanded to dismiss*, 459 U.S. 809 (1982).

## "Fresh Start" Proposals

One potential means of restarting an equal rights amendment would be by introduction of a new joint resolution, a "fresh start." Even as the June 30, 1982, extended ratification deadline approached, resolutions proposing an equal rights amendment were introduced in the 97th Congress. New versions of an ERA have continued to be introduced in the House and Senate in each succeeding Congress. For many years, Senator Edward Kennedy of Massachusetts customarily introduced an equal rights amendment early in the first session of a newly convened Congress; since the 111th Congress, Senator Robert Menendez of New Jersey has introduced Senate fresh start proposals. In the House of Representatives, Representative Carolyn Maloney of New York introduced a fresh start equal rights amendment in the 105th and all succeeding Congresses. Fresh start amendments introduced in the 115th Congress, S.J.Res. 6 and H.J.Res. 33, were discussed earlier in this report, under "Most Recent Developments."

## "Three-State" Proposals

In addition to "fresh start" proposals, alternative approaches to the ratification question have also emerged over the years. In 1994, Representative Robert E. Andrews of New Jersey introduced H.Res. 432 in the 103rd Congress. His proposal sought to require the House of Representatives to "take any legislative action necessary to verify the ratification of the Equal Rights Amendment as part of the Constitution when the legislatures of an additional 3 states ratify the Equal Rights Amendment." This resolution was a response to the three-state strategy[90] proposed by a pro-ERA volunteer organization "ERA Summit" in the 1990s,[91] which was called following adoption of the Twenty-Seventh Amendment, the Madison Amendment, in 1992. The rationale for H.Res. 432, and a succession of identical resolutions offered by Representative Andrews in subsequent Congresses,[92] was that, following the precedent of the Madison Amendment, the ERA remained a valid proposal and the ratification process was still open. Representative Andrews further asserted that the action of Congress in extending the ERA deadline in 1978 provided a precedent by which "subsequent sessions of Congress may adjust time limits placed in proposing clauses by their predecessors. These adjustments may include extensions of time, reductions, or elimination of the deadline altogether."[93] The influence of the Madison Amendment is examined at greater length later in this report.

The year 2012 marked the 30th anniversary of the expiration of the proposed Equal Rights Amendment's extended ratification deadline. During that period, new analyses emerged that examined the question of whether the amendment proposed in 1972 remains constitutionally viable. As noted later in this report, one of the most influential developments opening new lines of analysis occurred when the Twenty-Seventh Amendment, originally proposed in 1789 as part of a package that included the Bill of Rights, was taken up in the states after more than two centuries and ultimately ratified in 1992. This action, and Congress's subsequent

---

[90] As noted elsewhere in this report, the "three-state" argument maintains that (1) Congress has the constitutional authority to propose, alter, or terminate any limits on the ratification of amendments pending before the states; (2) all existing ratifications remain in effect and viable; and (3) rescissions of ratification passed by some states are invalid.

[91] The Equal Rights Amendment website, a project of the Alice Paul Institute, in collaboration with the ERA Task Force of the National Council of Women's Organizations, at http://www.equalrightsamendment.org.

[92] Most recently, H.Res. 794 in the 112th Congress.

[93] Rep. Robert E. Andrews, "Applauding the Recent Actions Taken by the Illinois State Legislature Regarding the Equal Rights Amendment," Extension of Remarks in the House, *Congressional Record*, vol. 149, pt. 10 (June 5, 2003), pp. 14039-14040.

acknowledgment of the amendment's viability, bear directly on the issue of the current status of the proposed Equal Rights Amendment, and are examined later in this report.

In the 112th Congress, for the first time since the proposed ERA's deadline expired, resolutions were introduced in both the House and Senate[94] that sought specifically to (1) repeal, or eliminate entirely, the deadlines set in 1972 and 1978; (2) reopen the proposed ERA for state ratification at the then-current count of 35 states; and (3) extend the period for state ratification indefinitely. Current legislation proposing the three state/two state strategy in the 115th Congress, S.J.Res. 5 and H.J.Res. 53 were discussed earlier in this report, under "Most Recent Developments."

# Contemporary Viability of the Equal Rights Amendment

Supporters of the ERA, and particularly the three-state strategy—now, arguably, the one-state strategy, assuming the validity of ratifications by Nevada and Illinois—identify a number of sources that they claim support their contention that the proposed Equal Rights Amendment remains constitutionally viable. Other scholars and observers, however, have raised concerns about, or objections to, these assertions.

## Article V: Congressional Authority over the Amendment Process

Proponents of the proposed Equal Rights Amendment cite the exceptionally broad authority over the constitutional amendment process granted to Congress by Article V of the Constitution as a principal argument for their case. The article's language states that "[t]he Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution ... which ... shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States or by Conventions in three fourths thereof...." While the Constitution is economical with words when spelling out the authority extended to the three branches of the federal government, it does speak specifically when it places limits on these powers. In this instance, the founders placed no time limits or other conditions on congressional authority to propose amendments, so long as they are approved by the requisite two-thirds majority of Senators and Representatives present and voting.

In a 1992 opinion for the Counsel to the President concerning ratification of the Twenty-Seventh Amendment, Acting Assistant Attorney General Timothy Flanigan took note of the absence of time limits in Article V, and drew a comparison with their presence in other parts of the Constitution:

> ... [t]he rest of the Constitution strengthens the presumption that when time periods are part of a constitutional rule, they are specified. For example, Representatives are elected every second year ... and a census must be taken within every ten year period following the first census, which was required to be taken within three years of the first meeting of Congress..... Neither House of Congress may adjourn for more than three days without the consent of the other ... and the President has ten days (Sundays excepted) within which to sign or veto a bill that has been presented to him.... The Twentieth Amendment refers to certain specific dates, January 3rd and 20th. Again, if the Framers had intended there to be

---

[94] H.J.Res. 47, Representative Baldwin and others; S.J.Res. 38l, Senator Cardin and others. Aside from routine committee referral, no action was taken on these resolutions.

a time limit for the ratification process, we would expect that they would have so provided in Article V.[95]

Further, Article V empowers Congress to specify either of two modes of ratification: by the state legislatures, or by ad hoc state conventions. Neither the President nor the federal judiciary is allocated any obvious constitutional role in the amendment process. To those who might suggest the Constitutional Convention did not intend to grant such wide authority to Congress, ERA supporters can counter by noting that the founders provided a second mode of amendment, through a convention summoned by Congress at the request of the legislatures of two-thirds of the states.[96] The suggestion here is that the founders deliberately provided Congress with plenary authority over the amendment process, while simultaneously checking it through the super-majority requirement, and balancing it with the Article V Convention alternative.[97] In the case of the proposed Equal Rights Amendment, it has been inferred by ERA supporters that since neither ratification deadlines nor contemporaneity requirements for amendments appear anywhere in Article V, Congress is free to propose, alter, or terminate such ratification provisions at its discretion.[98]

Advocates of congressional authority over the amendment process might also note the fact that Congress has acted on several occasions in the course of, or after, the ratification process by the states to assert its preeminent authority under Article V in determining ratification procedures.[99] For instance, on July 21, 1868, Congress passed a resolution that declared the Fourteenth Amendment to have been duly ratified and directed Secretary of State William Seward to promulgate it as such. Congress had previously received a message from the Secretary reporting that 28 of 37 states then in the Union had ratified the amendment, but that 2 of the 28 ratifying states had subsequently passed resolutions purporting to rescind their ratifications, and the legislatures of 3 others had approved the amendment only after previously rejecting earlier ratification resolutions. Congress considered these issues but proceeded to declare the ratification

---

[95] U.S. Department of Justice, Office of Legal Counsel, *Congressional Pay Amendment, Memorandum Opinion for the Counsel to the President*, by Timothy E. Flanigan, Acting Assistant Attorney General, Washington, November 2, 1992, Medical and Public Health Law Site, LSU Law Center, Louisiana State University, at https://biotech.law.lsu.edu/blaw/olc/congress.17.htm.

[96] The founders were concerned that Congress might resist the proposal of necessary amendments. As a result, they included the Article V Convention process as an alternative to congressional proposal of amendments. Alexander Hamilton explained the origins of the Article V Convention process in *The Federalist*: "The intrinsic difficulty of governing thirteen states ... will, in my opinion, constantly impose on the national rulers the necessity of a spirit of accommodation to the reasonable expectations of their constituents. But there is yet a further consideration.... It is this, that the national rulers, whenever nine States concur, will have no option on the subject. By the first article of the plan, the Congress will be obliged to call a convention for proposing amendments.... The words of this article are peremptory. The Congress 'shall call a convention.' Nothing in this particular is left to the discretion of that body." See Alexander Hamilton, "Conclusion," in *The Federalist*, Number 85 (Cambridge, MA: The Belknap Press of the Harvard University Press, 1961), p. 546.

[97] For further information on the "Article V Convention" alternative method for the proposal of constitutional amendments, see CRS Report R42589, *The Article V Convention to Propose Constitutional Amendments: Contemporary Issues for Congress*, by Thomas H. Neale; and CRS Report R42592, *The Article V Convention for Proposing Constitutional Amendments: Historical Perspectives for Congress*, by Thomas H. Neale.

[98] Mason Kalfus, "Why Time Limits on the Ratification of Constitutional Amendments Violate Article V," *University of Chicago Law Review*, vol. 66, no. 2 (spring, 1999), pp. 451-453.

[99] While these are precedents that Congress could follow, or at least look to for guidance, it should be recalled that one Congress may not bind succeeding Congresses in expression of their decision making. See, for example, William Holmes Brown, Charles W. Johnson, and John V. Sullivan, *House Practice: A Guide to the Rules, Precedents, and Procedures of the House* (Washington, DC: GPO, 2011), p. 158: "The Constitution gives each House the power to determine the rules of its proceedings.... This power cannot be restricted by the rules or statutory enactments of a preceding House."

process complete.[100] Congress similarly exercised its authority over the process less than two years later when it confirmed the ratification of the Fifteenth Amendment by resolution passed on March 30, 1870.[101] Congress exercised its authority over the amendment process again in 1992 when it declared the Twenty-Seventh Amendment, the so-called "Madison Amendment," to have been ratified, an event examined in the next section of this report.

Opponents of ERA extension, while not questioning the plenary authority of Congress over the amending process, raise questions on general grounds of constitutional restraint and fair play. Some reject it on fundamental principle; Grover Rees III, writing in *The Texas Law Review*, asserted that

> ... extension is unconstitutional insofar as it rests on the unsubstantiated assumption that states which ratified the ERA with a seven-year time limit also would have ratified with a longer time limit, and insofar as it attempts to force those states into an artificial consensus regardless of their actual intentions.[102]

ERA supporter Mary Frances Berry noted a similar argument raised by the amendment's opponents:

> ... some scholars pointed out that legally an offer and agreed-upon terms is required before any contract is valid. ERA ratification, according to this view, was a contract. Therefore, states could not be regarded as contracting not in the agreed upon terms. The agreed upon terms included a seven-year time limit. When seven years passed, all pre-existing ratifications expired.[103]

Writing in *Constitutional Commentary*, authors Brannon P. Denning and John R. Vile offered additional criticisms of efforts to revive the proposed Equal Rights Amendment, noting that ample time had been provided for ratification between 1972 and 1982. They further suggested that elimination of ratification deadlines would reopen the question of purported state rescissions of acts of ratification; that progress in women's equality in law and society may have "seemed to render ERA superfluous"; and that allowing the proposed amendment "a third bite at the apple would suggest that no amendment to the U.S. Constitution ever proposed ... could ever be regarded as rejected."[104]

## The Madison Amendment (the Twenty-Seventh Amendment): A Dormant Proposal Revived and Ratified

Supporters of the proposed Equal Rights Amendment cite another source in support of their argument for the proposed amendment's viability: the Twenty-Seventh Amendment to the Constitution, also known as the Madison Amendment, which originated during the first year of government under the Constitution, but fell into obscurity, and became the object of renewed

---

[100] 15 Stat. 709. The reconstructed legislatures of North Carolina, South Carolina, and Georgia reversed rejections by earlier unreconstructed state legislatures. Ohio and New Jersey had passed resolutions purporting to rescind their earlier ratifications of the amendment. For further information, see *The Constitution Annotated*, "Article V, Ratification."

[101] 16 Stat. 1131. Here again, Congress refused to acknowledge the act of the New York legislature purporting to rescind its previous instrument of ratification.

[102] Grover Rees III, "Throwing Away the Key: The Unconstitutionality of the Equal Rights Amendment Extension," *Texas Law Review*, vol. 58, no. 5, (May 1980), p. 930.

[103] Berry, *Why ERA Failed*, p. 71.

[104] Brannon P. Denning and John R. Vile, "Necromancing the Equal Rights Amendment," *Constitutional Commentary* (University of Minnesota), vol. 17, winter, 2000, issue 3, p. 598. See also the discussion of the unique circumstances of the 27th Amendment in *The Constitution Annotated*, "Article V, Ratification."

public interest only in the late 20th century. In 1789, Congress proposed a group of 12 amendments to the states for ratification. Articles III through XII of the proposals became the Bill of Rights, the first 10 amendments to the Constitution. They were ratified quickly, and were declared adopted on December 15, 1791. Articles I and II, however, were not ratified along with the Bill of Rights; Article II, which required that no change in Members' pay could take effect until after an election for the House of Representatives had taken place, was ratified by six states between 1789 and 1791 (the ratification threshold was 10 states in 1789), after which it was largely forgotten.[105]

After nearly two centuries, the Madison Amendment was rediscovered in 1978, when the Wyoming legislature was informed that as no deadline for ratification had been established, the measure was arguably still viable. Seizing on the opportunity to signal its disapproval of a March 3, 1978, vote by Congress to increase compensation for Representatives and Senators, the legislature passed a resolution approving the proposed amendment. In its resolution of ratification, the legislature cited the congressional vote to increase Member compensation, noting that:

> ... the percentage increase in direct compensation and benefits [to Members of Congress] was at such a high level, as to set a bad example to the general population at a time when there is a prospect of a renewal of double-digit inflation; and ... increases in compensation and benefits to most citizens of the United States are far behind these increases to their elected Representatives.... "[106]

The Wyoming legislature's action went almost unreported, however, until 1983, when Gregory D. Watson, a University of Texas undergraduate student, studied the amendment and concluded that it was still viable and eligible for ratification. Watson began a one-person campaign, circulating letters that drew attention to the proposal to state legislatures across the country.[107] This grassroots effort developed into a nationwide movement, leading ultimately to 31 additional state ratifications of the amendment between 1983 and 1992.

In 1991, as the number of state ratifications of the Madison Amendment neared the requisite threshold of 38, Representative John Boehner of Ohio introduced H.Con.Res. 194 in the 102nd Congress. The resolution noted that, "this amendment to the Constitution was proposed without a deadline for ratification and is therefore still pending before the States." The resolution went on to state "the sense of the Congress that at least 3 of the remaining 15 States should ratify the proposed 2nd amendment to the Constitution, which would delay the effect of any law which varies the compensation of Members of Congress until after the next election of Representatives."[108] Although no further action was taken on the resolution, its findings anticipated Congress's response to the amendment.

On May 7, 1992, the Michigan and New Jersey legislatures both voted to ratify the "Madison Amendment," becoming the 38th and 39th states to approve it. As required by law,[109] the Archivist

---

[105] In 1873, Ohio provided the only additional ratification to the pay amendment. For the record, Article I proposed regulating the size of the House of Representatives so that it eventually would include "not less than two hundred Representatives, nor more than one Representative for every fifty thousand persons."

[106] Wyoming legislature, H.J. Res. 6 (March 3, 1978), quoted in Richard B. Bernstein, "The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment," *Fordham Law Review*, vol. 61, issue 3, (December 1992), p. 537.

[107] Ibid.; Kyvig, *Explicit and Authentic Acts*, p. 465.

[108] H.Con.Res. 194, 102nd Congress, introduced August 1, 1991.

[109] 1 U.S.C. §106.

of the United States certified the ratification on May 18, and the following day an announcement that the amendment had become part of the Constitution was published in the *Federal Register*.[110] Although the Archivist was specifically authorized by the U.S. Code to publish the act of adoption and issue a certificate declaring the amendment to be adopted, many in Congress believed that, in light of the unusual circumstances surrounding the ratification, positive action by both houses was necessary to confirm the Madison Amendment's legitimacy.[111] In response, the House adopted H.Con.Res. 320[112] on May 20, and the Senate adopted S.Con.Res. 120[113] and S.Res. 298[114] on the same day. All three resolutions declared the amendment to be duly ratified and part of the Constitution.[115]

By providing a recent example of a proposed amendment that had been inactive for more than a century, the Twenty-Seventh Amendment suggests to ERA supporters an attainable model for renewed consideration of the proposed Equal Rights Amendment.

## Ratification of the Madison Amendment: A Model for the Proposed Equal Rights Amendment?

The example of the Madison Amendment contributed to the emergence of a body of advocacy scholarship that asserts the proposed Equal Rights Amendment has never lost its constitutional viability. One of the earliest expressions of this viewpoint was offered in an article that appeared in the *William and Mary Journal of Women and the Law* in 1997. The authors reasoned that adoption of the Twenty-Seventh Amendment challenged many of the assumptions about ratification generated during the 20th century. Acceptance of the Madison Amendment by the Archivist and the Administrator of General Services, as advised by the Justice Department[116] and ultimately validated by Congress, was said to confirm that there is no requirement that ratifications of proposed amendments *must* be roughly contemporaneous.[117] The authors went on to examine the history of the seven-year time limit, concluding after a review of legal scholarship on the subject that this device was a matter of procedure, rather than of substance (i.e., part of the body of the amendment itself). As such it was "separate from the amendment itself, and therefore,

[110] Archivist of the U.S., "U.S. Constitution, Amendment 27," *Federal Register*, vol. 567, no. 97, (May 19, 1992), pp. 21187-21188.

[111] "Madison Amendment," *Congress and the Nation, vol. VII, 1989-1992* (Washington, DC: Congressional Quarterly Inc., 1993), p. 972. For additional examination of the role and authority of the Archivist, see Bernstein, "The Sleeper Awakes: The History and Legacy of the Twenty-Seventh Amendment," pp. 540-542.

[112] H.Con.Res. 320, 102nd Congress, sponsored by Representative Jack Brooks.

[113] S.Con.Res. 120, 102nd Congress, sponsored by Senator Robert Byrd and others.

[114] S.Res. 298, 102nd Congress, sponsored by Senator Robert Byrd and others.

[115] S.Con.Res. 120 and S.Res. 298, *Congressional Record*, vol. 138, pt. 9 (May 20, 1992), p. 11869; H.Con.Res. 320, *Congressional Record*, vol. 138, pt. 9 (May 20, 1992), p. 12051. Senator Robert Byrd of West Virginia also introduced S.Con.Res. 121 on May 19, 1992, to declare that the ratification periods for four other pending amendments had lapsed, and that they were no longer viable. He did not, however, include the Equal Rights Amendment among them. The resolution was referred to the Senate Judiciary Committee, but no further action was taken.

[116] Office of Legal Counsel, U.S. Department of Justice, "Congressional Pay Amendment," *Memorandum Opinion for the Counsel to the President*, May 13, 1992, and November 2, 1992, at http://justice.gov/olc/congress/17.htm. See also Michael Stokes Paulsen, "A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment," *Yale Law Journal*, vol. 103, no. 3 (December 1992), p. 680, at footnote 7.

[117] Allison L. Held, Sheryl L. Herndon, and Danielle M. Stager, "The Equal Rights Amendment: Why the ERA Remains Legally Viable and Properly Before the States," *William and Mary Journal of Women and the Law*, vol. 3, (no issue number), 1997, p. 121.

it can be treated as flexible." By extending the original ERA deadline, Congress based its action on the broad authority over the amendment process conferred on it by Article V.[118]

Finally, the authors asserted, relying on the precedent of the Twenty-Seventh Amendment, that "even if the seven-year limit was a reasonable legislative procedure, a ratification after the time limit expired can still be reviewed and accepted by the current Congress.... "[119] In their view, even if one Congress failed to extend or remove the ratification deadline, states could still ratify, and a later Congress could ultimately validate their ratifications.[120]

Other observers question the value of the Madison Amendment as precedent. Writing in *Constitutional Commentary*, Denning and Vile asserted that the Twenty-Seventh Amendment presented a poor model for ERA supporters. Examining the amendment's origins, they suggested that "the courts and most members of Congress have tended to treat the 27th as a 'demi-amendment,' lacking the full authority of the 26 that preceded it."[121] Reviewing what they characterized as unfavorable interpretations of the Madison Amendment in various legal cases, the authors asked whether what they referred to as the "jury rigged ratification of the ERA might result in its similar evisceration by the judiciary that will be called upon to interpret it."[122] Similarly, a commentary in *National Law Journal* asserted that, by blocking its own cost of living salary increases, Congress itself has also persistently failed to observe the Madison Amendment's requirements that "[n]o law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened."[123]

On the other hand, supporters of the proposed ERA might claim that such criticism of the Twenty-Seventh Amendment refers more to what they might characterize as the flawed application of the amendment, rather than the intrinsic integrity of the amendment itself.

Constitutional scholar Michael Stokes Paulsen further questioned use of the Twenty-Seventh Amendment as an example in the case of the proposed Equal Rights Amendment. He returned to the contemporaneity issue, suggesting that the amending process

> ... should be *occasions*, not long, drawn-out processes. To permit ratification over a period of two centuries is to erode, if not erase the ideal of overwhelming popular agreement.... There is no assurance that the Twenty-seventh Amendment ever commanded, at *any one time*, popular assent corresponding to the support of two-thirds of the members of both houses of Congress and three-fourths of the state legislatures.[124] (Emphases in the original.)

It could be further argued by opponents of proposed Equal Rights Amendment extension that, whatever the precedent set by Congress in declaring the Twenty-Seventh Amendment to have been regularly adopted, there is no precedent for Congress promulgating an amendment based on state ratifications adopted after two ratification deadlines have expired.

---

[118] Ibid., pp. 129-130.

[119] Ibid., p. 131.

[120] This would arguably apply to Nevada's 2017 ratification of ERA.

[121] Denning and Vile, "Necromancing the Equal Rights Amendment," p. 598. See also the discussion of the unique circumstances of the 27th Amendment in *The Constitution Annotated*, "Article V, Amendment."

[122] Ibid., p. 599.

[123] Eric Fish and Daniel Hemel, "Congress's Unconstitutional Pay Freeze," *National Law Journal*, January 30, 2012, at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202540170443&slreturn=1.

[124] Paulsen, "A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment," p. 692.

# The Role of the Supreme Court Decisions in *Dillon v. Gloss* and *Coleman v. Miller*

By some measures, the action of the Archivist of the United States in announcing ratification of the Twenty-Seventh Amendment, followed by congressional confirmation of its viability, superseded a body of constitutional principle that had prevailed since the 1920s and 1930s. This body of theory and political consideration arguably originated with the Supreme Court's 1921 decision in *Dillon v. Gloss*, the case in which the Court first enunciated the principle that conditions of ratification for proposed constitutional amendments could be determined by Congress, and that the conditions should be roughly contemporaneous.[125] The Court concluded that, relying on the broad grant of authority contained in Article V, Congress had the power, "keeping within reasonable limits, to fix a definite period for the ratification.... "[126]

At the same time, the Court noted that nothing in the nation's founding documents touched on the question of time limits for ratification of a duly proposed constitutional amendment, and asked whether ratification would be valid at any time

> ... within a few years, a century or even a longer period, or that it must be had within some reasonable period which Congress is left free to define? Neither the debates in the federal convention which framed the Constitution nor those in the state conventions which ratified it shed any light on the questions.[127]

Ultimately, however, the Court concluded that proposal of an amendment by Congress and ratification in the states are both steps in a single process, and that amendments

> ... are to be considered and disposed of presently.... [A] ratification is but the expression of the approbation of the people and is to be effective when had in three-fourths of the states, there is a fair implication that it must be sufficiently contemporaneous in that number of states to reflect the will of the people in all sections at relatively the same period, which of course ratification scattered through a long series of years would not do.[128]

The need for contemporaneity was also discussed by the Court with regard to the congressional apportionment amendment and the Madison Amendment, both of which were pending in 1921. The Court maintained that the ratification of these amendments so long after they were first proposed would be "untenable."[129] Some scholars dispute the Court's position in *Dillon*, however; Mason Kalfus, writing in *The University of Chicago Law Review*, claimed that

---

[125] *Dillon v. Gloss*, 256 U.S. 368 (1921). Dillon, arrested on a violation of the Volstead Act, asserted, among other things, that the 18th Amendment was unconstitutional because Congress had included a ratification deadline in the body of the amendment, an action for which no authority appeared in the Constitution.

[126] Ibid.

[127] Ibid.

[128] Ibid.

[129] Ibid. Justice Van Devanter, delivering the majority opinion, asserted: "That this is the better conclusion [constitutional amendments lacking contemporaneousness ought to be considered waived] becomes even more manifest when what is comprehended in the other view is considered; for, according to it, four amendments proposed long ago—two in 1789, one in 1810 and one in 1861—are still pending and in a situation where their ratification in some of the States many years since by representatives of generations now largely forgotten may be effectively supplemented in enough more States to make three-fourths by representatives of the present or some future generation. To that view few would be able to subscribe, and in our opinion it is quite untenable."

reference to the contemporaneity doctrine is to be found neither in the text of Article V nor in the deliberations of the Philadelphia Convention.[130]

In *Coleman v. Miller*,[131] the Supreme Court explicitly held that Congress had the sole power to determine whether an amendment is sufficiently contemporaneous, and thus valid, or whether, "the amendment ha[s] lost its vitality through the lapse of time."[132] In *Coleman*, the High Court refined its holdings in *Dillon*, ruling that when it proposes a constitutional amendment:

- Congress may fix a reasonable time for ratification;

- there was no provision in Article V that suggested a proposed amendment would be open for ratification forever;

- since constitutional amendments were deemed to be prompted by some type of necessity, they should be dealt with "presently";

- it could be reasonably implied that ratification by the states under Article V should be sufficiently contemporaneous so as to reflect a nationwide consensus of public approval in relatively the same period of time; and

- ratification of a proposed amendment must occur within some reasonable time after proposal.[133]

The Court additionally ruled, however, that if Congress were not to specify a reasonable time period for ratification of a proposed amendment, it would not be the responsibility of the Court to decide what constitutes such a period. The Court viewed such questions as essentially political and, hence, nonjusticiable, believing that the questions were committed to, and must be decided by, Congress in exercise of its constitutional authority to propose an amendment or to specify the ratification procedures for an amendment.[134]

This "political question" interpretation of the contemporaneity issue is arguably an additional element supporting the fundamental constitutional doctrine of continued viability claimed by ERA advocates.

Another observer suggests, however, that the constitutional foundation of the Supreme Court's ruling in *Coleman v. Miller*, and hence the political question doctrine, may have been affected by the contemporary political situation. According to this theory, the Court in 1939 may have been influenced by, and overreacted to, the negative opinion generated by its political struggles with President Franklin Roosevelt over the constitutionality of New Deal legislation: "A later court, bruised by its politically unpopular New Deal rulings, retreated somewhat from a dogmatic defense of ratification time limits (as enunciated in *Dillon v. Gloss*)."[135] Michael Stokes Paulsen also questioned the Supreme Court's decision in *Coleman v. Miller*, suggesting that the "political

---

[130] Kalfus, "Why Time Limits on the Ratification of Constitutional Amendments Violate Article V," pp. 451-453.

[131] *Coleman v. Miller*, 307 U.S. 433 (1939). This case concerned the Child Labor Amendment, and arose from a dispute in the Kansas Senate over ratification procedure. This amendment was examined at greater length earlier in this report, under "Congress Sets a Seven-Year Ratification Deadline."

[132] Ibid.

[133] Ibid.

[134] Ibid. Note, however, that in advising the Archivist on certifying ratification of the 27th Amendment, the Office of Legal Counsel took the view that there was no role for Congress in promulgation of an amendment. See "Congressional Pay Amendment," *Memorandum Opinion for the Counsel to the President.*

[135] Kyvig, *Explicit and Authentic Acts*, p. 468.

question" doctrine could be interpreted to assert a degree of unchecked congressional authority over the ratification process that is arguably anti-constitutional.[136]

# Ancillary Issues

A range of subsidiary issues could also come under Congress's purview should it consider revival of the proposed Equal Rights Amendment or a signal to the states that it would consider additional ratifications beyond the expired ratification deadline in the congressional resolutions.

## Origins of the Seven-Year Ratification Deadline

One historical issue related to consideration of the proposed Equal Rights Amendment concerns the background of the seven-year deadline for ratification that originated with the Eighteenth Amendment (Prohibition). The amendment was proposed in 1917, proceeded rapidly through the state ratification process, and was declared to be adopted in 1919. During Senate consideration of the proposal, Senator and, later, President Warren Harding of Ohio is claimed to have originated the idea of a ratification deadline for the amendment as a political expedient, one that would "permit him and others to vote for the amendment, thus avoiding the wrath of the 'Drys' (prohibition advocates), yet ensure that it would fail of ratification."[137] As it happened, the law of unintended consequences intervened, as "[s]tate ratification proceeded at a pace that surprised even the Anti-Saloon League, not to mention the calculating Warren Harding."[138] Proposed on December 18, 1917, the amendment was declared to have been adopted just 13 months later, on January 29, 1919.

ERA supporters might cite this explanation of the origins of the seven-year ratification deadline in addition to their central assertions of the amendment's viability. They could claim that, far from being an immutable historical element in the amendment process, bearing with it the wisdom of the founders, the ratification time limit is actually the product of a failed political maneuver, and is, moreover, of comparatively recent origin.

Opponents of extension might argue, however, that, whatever its origins, the seven-year ratification deadline has become a standard element of nearly all subsequent proposed amendments.[139] They might further note that if ratification deadlines were purely political, Congress would not have continued to incorporate them in nine subsequent proposed amendments.[140] In their judgment, these time limits not only ensure that proposed constitutional amendments enjoy both broad and contemporaneous support in the states, but they also arguably constitute an important element in the checks and balances attendant to the amendment process.

## Rescission

In addition to this question, the constitutional issue of rescission would almost certainly recur in a contemporary revival of the proposed Equal Rights Amendment. As noted earlier in this report,

---

[136] Paulsen, "A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment," pp. 706-707, 718-721. See also the discussion of congressional authority in *The Constitution Annotated*, Article V.

[137] Kyvig, *Explicit and Authentic Acts*, p. 225.

[138] Ibid., p. 224.

[139] The 19th Amendment, providing for women's suffrage, and the unratified Child Labor Amendment, were the last to be proposed by Congress without a ratification deadline.

[140] The nine proposals are the 20th, 21st, 22nd, 23rd, 24th, 25th, and 26th Amendments, and the proposed Equal Rights and District of Columbia Voting Rights (Congressional Representation) Amendments.

five states enacted resolutions purporting to rescind their previously adopted ratifications of the proposed amendment. The U.S. District Court for the District of Idaho ruled in 1981 that states had the option to rescind their instruments of ratification any time in the process *prior to* the promulgation or certification of the proposed amendment, a decision that was controversial at the time.[141] The Supreme Court agreed to hear appeals from the decision, but after the extended ERA ratification deadline expired on June 30, 1982, the High Court in its autumn term vacated the lower court decision and remanded the decision to the District Court with instructions to dismiss the case.[142]

It may be noted by ERA supporters, however, that since the Supreme Court ruled in *Coleman v. Miller* that Congress has plenary power in providing for the ratification process, it may be inferred from this holding that Congress also possesses dispositive authority over the question as to the validity of rescission. Moreover, they might also note that its 1868 action directing Secretary of State William Seward to declare the Fourteenth Amendment to be ratified, notwithstanding two state rescissions, further confirms Congress's broad authority over the amendment process.[143]

Speculation on potential future court action on this question is beyond the scope of this report, but rescission arguably remains a potentially viable constitutional issue that could arise in response to a revival of the proposed Equal Rights Amendment.

## Congressional Promulgation of Amendments

Some observers have noted that, while Congress passed resolutions declaring the Fourteenth, Fifteenth, and Twenty-Seventh Amendments to be valid, congressional promulgation of amendments that have been duly ratified is not necessary, and has no specific constitutional foundation. In his 1992 Memorandum for the Counsel to the President concerning the Twenty-Seventh Amendment, Acting Assistant Attorney General Timothy Flanigan, wrote that

> Article V clearly delimits Congress's role in the amendment process. It authorizes Congress to propose amendments and specify their mode of ratification, and requires Congress, on the application of the legislatures of two-thirds of the States, to call a convention for the proposing of amendments. Nothing in Article V suggests that Congress has any further role. Indeed, the language of Article V strongly suggests the opposite: it provides that, once proposed, amendments "<u>shall be valid</u> to all Intents and Purposes, as Part of this Constitution, when ratified by" three-fourths of the States.[144] (Emphasis original in the memorandum, but not in Article V.)

The same viewpoint has been advanced by constitutional scholar Walter Dellinger. Addressing the question shortly after the Twenty-Seventh Amendment was declared to have been ratified, he noted

> An amendment is valid when ratified. There is no further step. The text requires no additional action by Congress or anyone else after ratification by the final state. The

---

[141] Kyvig, *Explicit and Authentic* Acts, pp. 451-416.

[142] *Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho, 1981), *prob. juris. noted*, 455 U.S. 918 (1982), *vacated and remanded to dismiss*, 459 U.S. 809 (1982). See also "ERA Dies Three States Short of Ratification," *Congressional Quarterly Almanac, 97th Congress, 2nd Session, 1992*, pp. 377-378.

[143] See earlier in this report under "Article V: Congressional Authority over the Amendment Process."

[144] "Congressional Pay Amendment," *Memorandum Opinion for the Counsel to the President*, November 2, 1992, p.102, at https://www.justice.gov/file/20561/download.

creation of a "third step"—promulgation by Congress—has no foundation in the text of the Constitution.[145]

Supporters of the proposed Equal Rights Amendment, however, might refer again to the Supreme Court's ruling in *Coleman v. Miller*. If plenary authority over the amendment process rests with Congress, advocates might ask, does it also presumably extend to other issues that arise, including provision for such routine procedures as promulgation of an amendment?

## The Proposed District of Columbia Voting Rights (Congressional Representation) Amendment—Congress Places a Ratification Deadline in the Body of the Amendment

Congress has proposed one constitutional amendment to the states since the proposed Equal Rights Amendment began the ratification process in 1972, the District of Columbia Voting Rights (Congressional Representation) Amendment. For this amendment, Congress returned to the earlier practice of placing a deadline for ratification directly in the body of the proposal itself. According to contemporary accounts, this decision was influenced by the nearly concurrent congressional debate over the ERA deadline extension.[146]

The District of Columbia is a unique jurisdiction, part of the Union, but not a state, and subject to "exclusive Legislation in all Cases whatsoever ... by Congress."[147] Congress has exercised its authority over the nation's capital with varying degrees of attention and control, and through a succession of different governing bodies, beginning in 1800. By the 1950s, the long-disenfranchised citizens of Washington, DC, began to acquire certain rights. The Twenty-Third Amendment, ratified in 1961, established their right to vote in presidential elections. In 1967, President Lyndon Johnson used his reorganization authority to establish an appointed mayor and a city council, also presidentially appointed.[148] In 1970, Congress provided by law for a non-voting District of Columbia Delegate to Congress, who was seated in the House of Representatives.[149] In 1973, President Richard Nixon signed legislation that established an elected mayor and council, while reserving ultimate authority over legislation to Congress.[150]

After more than a decade of change, proponents asserted that voting representation in Congress proportionate to that of a state would be an important step in the progress toward full self-government by the District of Columbia. In 1977, Representative Don Edwards of California, chairman of the House Judiciary Committee's Subcommittee on Civil and Constitutional Rights, introduced H.J.Res. 554 (95th Congress). The resolution, as introduced, comprised the following text:

> Resolved by the Senate and the House of Representatives of the United States of America in Congress assembled (two thirds of each House concurring therein), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the

---

[145] Walter Dellinger, "Legitimacy of Constitutional Change: Rethinking the Amendment Process," *Harvard Law Review*, vol. 97, issue 2 (December 1983), p. 398.

[146] Orrin G. Hatch, "Should the Capital Vote in Congress? A Critical Analysis of the Proposed D.C. Congressional Representation Amendment," *Fordham Urban Law Journal,* vol. 7 (issue 3), 1978, p. 483.

[147] U.S. Constitution, Article I, Section 8, clause 17.

[148] U.S. President, Lyndon B. Johnson, Reorganization Plan Number 3 of 1967, 81 Stat. 948.

[149] The District of Columbia Delegate Act, 84 Stat. 845.

[150] The District of Columbia Self Government and Government Reorganization Act, 87 Stat. 774.

legislatures of three fourths of the several states within seven years of the date of its submission by the Congress:

Article—

Section 1. For purpose of representation in the Congress, election of the President, and Article V of this Constitution, the District constituting the seat of government of the United States shall be treated as though it were a state.

Section 2. The exercise of the rights and powers conferred under this article shall be by the people of the District constituting the seat of government, and as shall be provided by the Congress.

Section 3. The twenty-third article of amendment to the Constitution of the United States is hereby repealed.

Extensive hearings were held in the subcommittee in 1977, and on February 15, 1978, the full Judiciary Committee reported the measure to the House. The committee, however, adopted an amendment offered by Representative M. Caldwell Butler of Virginia that incorporated the seven-year ratification deadline directly in the body of the resolution, rather than in the preamble. *Congressional Quarterly* reported that this provision

... was intended to ensure that the deadline could not be extended by a simple majority vote of Congress. The Justice Department has said in the case of the Equal Rights Amendment that Congress could extend the deadline for ratification by a simple majority vote because the time limit was contained in the resolving clause rather than in the body of that amendment.[151]

Similarly, writing in *Fordham Urban Law Journal* during the same period, Senator Orrin Hatch of Utah noted that:

Section 4 of the D.C. Amendment requires that ratification of the necessary three-fourths of the states must occur within seven years of the date of its submission to the states. The inclusion of this provision within the body of the resolution will avoid a similar controversy to that which has arisen with respect to the time limit for ratification of the proposed "Equal Rights Amendment."[152]

During consideration of H.J.Res. 554 in the full House, language setting the ratification deadline was deleted from the authorizing resolution, and the Butler amendment was incorporated in the body of the proposal by voice vote as a new section:

Section 4. This article shall be inoperative, unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the States within seven years from the date of its submission.[153]

The amendment passed the House on March 2, 1978, by a margin of 289 to 127, 11 votes more than the two-thirds constitutional requirement.[154] The Senate took up the House-passed resolution on August 16, 1978. During four days of debate, it rejected a wide range of amendments, voting

---

[151] "D.C. Representation," *Congressional Quarterly Almanac, 95th Congress, 2nd Session, 1978, vol. XXXIV* (34) (Washington: Congressional Quarterly Inc., 1979), p. 793.

[152] Hatch, "Should the Capital Vote in Congress? A Critical Analysis of the Proposed D.C. Congressional Representation Amendment," p. 483.

[153] "District of Columbia Representation in Congress," *Congressional Record*, vol. 124, part 4 (March 2, 1978), p. 5263.

[154] Ibid., pp. 5272-5273.

to adopt H.J.Res. 554 on August 22 by a margin of 67 to 32, one vote more than the constitutional requirement.[155]

The District of Columbia Congressional Representation Amendment expired on August 2, 1985, seven years after it was proposed by Congress. It was ultimately ratified by 16 states,[156] 22 short of the constitutionally mandated requirement that it be approved by three-fourths, or 38, of the states.

# Concluding Observations

The arguments and constitutional principles relied on by ERA supporters to justify the revival of the proposed Equal Rights Amendment include, but may not be limited to, the following:

- Article V, they assert, grants exceptionally broad discretion and authority over the constitutional amendment process to Congress.

- In their interpretation, the example of the Twenty-Seventh Amendment suggests that there is no requirement of contemporaneity in the ratification process for proposed constitutional changes.

- ERA proponents claim that the Supreme Court's decision in *Coleman v. Miller* gives Congress wide discretion in setting conditions for the ratification process.

- Far from being sacrosanct and an element in the founders' "original intent," the seven-year deadline for amendments has its origins in a political maneuver by opponents of the Eighteenth Amendment authorizing Prohibition.

- The decision of one Congress in setting a deadline for ratification of an amendment does not constrain a later Congress from rescinding the deadline and reviving or acceding to the ratification of a proposed amendment.

Against these statements of support may be weighed the cautions of other observers who may argue as follows:

- The Twenty-Seventh Amendment is a questionable model for efforts to revive the proposed Equal Rights Amendment; unlike the proposed amendment, it was not encumbered by two expired ratification deadlines. Moreover, it is argued that Congress has generally ignored its provisions since ratification.[157]

- Even though the proposed Equal Rights Amendment received an extension, supporters were unable to gain approval by three-fourths of the states. Opponents suggest that a "third bite of the apple" is arguably unfair and, if not unconstitutional, at least contrary to the founders' intentions.

- Revivification opponents caution ERA supporters against an overly broad interpretation of *Coleman v. Miller*, which, they argue, may have been be a politically influenced decision.

---

[155] "District of Columbia Representation in Congress," *Congressional Record*, vol. 124, part 20 (August 22, 1978), p. 27260.

[156] Ratifications by year: 1978: Michigan, New Jersey, Ohio; 1979: Connecticut, Massachusetts, Minnesota, Wisconsin; 1980: Hawaii, Maryland; 1989: Maine, Oregon, Rhode Island, West Virginia; 1984: Delaware, Louisiana, Iowa.

[157] Eric Fish and Daniel Hemel, "Congress' Unconstitutional Pay Freeze," *National Law Journal*/law.com, January 30, 2012, at https://www.law.com/nationallawjournal/almID/1202540170443&Congress_unconstitutional_pay_freeze&slreturn=20130022145518/?slreturn=20180602182349.

- Congress implicitly recognized its misjudgment on the ratification deadline for the proposed Equal Rights Amendment when it incorporated such a requirement in the text of the proposed District of Columbia Voting Rights (Congressional Representation) Amendment.

- The rescission issue was not conclusively decided in the 1980s and remains potentially open to congressional or judicial action if the proposed Equal Rights Amendment is reopened for further ratifications.

Congress could revisit the contending points raised by different analysts if it gives active consideration to legislation that would seek specifically to revive the proposed Equal Rights Amendment, or to accept the additional state ratifications.

In recent years, some supporters of the proposed ERA have embraced the three-state strategy, which maintains that Congress has the authority to effectively repeal the ratification deadlines provided in H.J. Res. 208, 92nd Congress and H.J.Res. 638, 95th Congress. In the 115th Congress, S.J.Res. 5 and H.J.Res. 53 incorporate this approach, which could be more accurately described as a "one-state strategy" following ratification by Nevada in 2017 and Illinois in 2018. Alternatively, Congress could propose a "fresh start" equal rights amendment; such proposals have been introduced regularly since the original ERA time limit expired in 1982. This approach might avoid the controversies that have been associated with repeal of the deadlines for the 1972 ERA, but starting over would present a fresh constitutional amendment with the stringent requirements provided in Article V: approval by two-thirds majorities in both houses of Congress, and ratification by three-fourths of the states. It would, however, be possible to draft the proposal without a time limit, as is the case with S.J.Res. 6 and H.J.Res. 33 in the 115th Congress. If approved by Congress in this form, the proposed amendment would, as was the case with the Madison Amendment, remain current, viable, and thus eligible for ratification, for an indefinite period.

## Author Contact Information

Thomas H. Neale
Specialist in American National Government
tneale@crs.loc.gov, 7-7883