UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMONWEALTH OF VIRGINIA, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:20-cv-00242 (RC) |
| DAVID S. FERRIERO, in his official capacity as the Archivist of the United States, | ) ) ) ) ) | |
| Defendant. | | |

**<u>DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

    I.   Plaintiffs fail to demonstrate a concrete injury that would satisfy the requirements of Article III. ....................................................................................................................... 2

    II.  Whether certain States validly rescinded their prior ratifications of the ERA is not ripe for review........................................................................................................................... 4

    III. Plaintiffs ask this Court to decide questions that the Supreme Court has identified as inherently political, inviting the Judiciary into a dispute that the Legislative and Executive Branches are entrusted to solve........................................................................ 6

    IV. Plaintiffs fail to satisfy the required elements to seek the extraordinary remedy of mandamus relief.............................................................................................................. 14

        A.     The Archivist must determine whether he has received "official notice" of an amendment's adoption and whether he can "certif[y]" that the proposed amendment is part of the Constitution. ................................................................................................. 15

        B.     Plaintiffs have no clear right to relief. ................................................................... 18

        C.     Plaintiffs fail to satisfy the remaining requirements for mandamus jurisdiction.... 22

CONCLUSION................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Action All. of Senior Citizens v. Leavitt,*
    483 F.3d 852 (D.C. Cir. 2007) ............................................................................ 23

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) ............................................................................................. 2

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015) ......................................................................................... 3, 6

*Baird v. Norton,*
    266 F.3d 408 (6th Cir. 2001) .............................................................................. 4

*Baker v. Carr,*
    369 U.S. 186 (1962) ............................................................................................ 7

*Blumenthal v. Trump,*
    949 F.3d 14 (D.C. Cir. 2020) ............................................................................. 3

*Carey v. Fed. Election Comm'n,*
    791 F. Supp. 2d 121 (D.D.C. 2011) .................................................................. 19

*Cheney v. U.S. Dist. Court for D.C.,*
    542 U.S. 367 (2004) ..................................................................................... 22, 23

*Chiafalo v. Washington,*
    140 S. Ct. 2316 (2020) ...................................................................................... 22

*Clapper v. Amnesty Int'l, USA,*
    568 U.S. 398 (2013) .......................................................................................... 12

*Coleman v. Miller,*
    307 U.S. 433 (1939) .................................................................................... *passim*

*Dillon v. Gloss,*
    256 U.S. 368 (1921) ............................................................................ 1, 8, 20, 21

*Goldwater v. Carter,*
    444 U.S. 996 (1979) ............................................................................................ 7

*Hamandi v. Chertoff,*
    550 F. Supp. 2d 46 (D.D.C. 2008) .................................................................... 23

*Hollingsworth v. State of Virginia,*
   3 U.S. (Dall.) 378 (1798) ............................................................................................. 21

*Idaho v. Freeman,*
   529 F. Supp. 1107 (D. Idaho 1981) ............................................................................... 5

*In re al-Nashiri,*
   791 F.3d 71 (D.C. Cir. 2015) ....................................................................................... 23

*In re Stone,*
   940 F.3d 1332 (D.C. Cir. 2019) ................................................................................... 22

*Kaplan v. Cent. Bank of the Islamic Republic of Iran,*
   896 F.3d 501 (D.C. Cir. 2018) ....................................................................................... 9

*Kirwa v. United States Dep't of Def.,*
   285 F. Supp. 3d 257 (D.D.C. 2018) ............................................................................. 23

*Lawyers United Inc. v. United States,*
   No. 1:19-CV-3222-RCL, 2020 WL 3498693 (D.D.C. June 29, 2020) .................................. 18

*Leser v. Garnett,*
   258 U.S. 130 (1922) ....................................................................................................... 2

*Lovitky v. Trump,*
   949 F.3d 753 (D.D.C. 2020) ......................................................................................... 24

*Marks v. United States,*
   430 U.S. 188 (1977) ....................................................................................................... 7

*Nat'l Treas. Emps. Union v. United States,*
   101 F.3d 1423 (D.C. Cir. 1996) .................................................................................. 4, 5

*Navajo Nation v. Azar,*
   302 F. Supp. 3d 429 (D.D.C. 2018) ............................................................................. 23

*NOW v. Idaho,*
   459 U.S. 809 (1982) ................................................................................................. 1, 20

*Pocket Veto Case,*
   279 U.S. 655 (1929) ..................................................................................................... 22

*Raines v. Byrd,*
    521 U.S. 811 (1997)...................................................................................................... 3, 4

*Reg'l Corp. v. U.S. Dep't of Interior,*
    654 F.2d 758 (D.C. Cir. 1980) ........................................................................................ 23

*Rucho v. Common Cause,*
    139 S. Ct. 2484 (2019) ..................................................................................................... 6

*Seminole Tribe of Florida v. Florida,*
    517 U.S. 44 (1996) ..................................................................................................... 13, 14

*Sierra Club v. EPA,*
    322 F.3d 718 (D.C. Cir. 2003) ........................................................................................ 13

*State Nat'l Bank of Big Spring v. Lew,*
    795 F.3d 48 (D.C. Cir. 2015) ............................................................................................ 5

*Texas v. United States,*
    523 U.S. 296 (1998) ........................................................................................................... 5

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ..................................................................................................... 12

*United States ex rel. Widenmann v. Colby,*
    265 F. 998 (D.C. Cir. 1920) ............................................................................................ 18

*United States v. Sprague,*
    282 U.S. 716 (1931) ......................................................................................................... 19

*Va. House of Delegates v. Bethune-Hill,*
    139 S. Ct. 1945 (2019) ....................................................................................................... 3

*Virginia v. Ferriero,*
    --- F.Supp.3d ---- No. 20-242, 2020 WL 3128948 (D.D.C. June 12, 2020) ..................... 2

*White v. Hart,*
    80 U.S. 646 (1871) ............................................................................................................. 9

*Zivotofsky v. Clinton,*
    566 U.S. 189 (2012) ........................................................................................................... 6

**Statutes**

1 U.S.C. § 106b ............................................................................................... 12, 15, 17

5 U.S.C. § 706(1) ..................................................................................................... 23

**Other Authorities**

4 Documentary History of the First Federal Congress of the United States of America 35–45,
    Charlene Bangs Bickford & Helen E. Veit eds., 1986,............................................ 21

Certification of Amendment to the Constitution of the United States Relating to Compensation
    of Members of Congress,
    57 Fed. Reg. 21 ................................................................................................ 16

Certification by Bainbridge Colby, Secretary of State, Act of Aug. 26, 1920,
    41 Stat. 1823 (1920)........................................................................................ 16

Certification by Bernard L. Boutin, Administrator of General Services,
    29 Fed. Reg. 1715 (Feb. 5, 1964) .................................................................... 16

Certification by Frank L. Polk, Acting Secretary of State, Act of Jan. 28, 1919,
    40 Stat., (1919)................................................................................................ 16

Certification of Hamilton Fish, Secretary of State,
    16 Stat. 1131 (1870)........................................................................................ 16

Certification by Henry L. Stimson, Secretary of State, Act of Feb. 6, 1933,
    47 Stat. 2569 (1933)........................................................................................ 16

Certification by Jess Larson, Administrator of General Services,
    16 Fed. Reg. 2019 (Mar. 3, 1951).................................................................... 16

Certification by John L. Moore, Administrator of General Services,
    26 Fed. Reg. 2808 (Apr. 4, 1961) .................................................................... 16

Certification by Lawson B. Knott, Administrator of General Services,
    32 Fed. Reg. 3287 (Feb. 24, 1967) .................................................................. 16

Certification by Philander C. Knox, Secretary of State, Act of Feb. 25, 1913,
    37 Stat. 1785 (1913)........................................................................................ 16

Certification by Robert L. Kunzig, Administrator of General Services,
    36 Fed Reg. 12 ................................................................................................ 16

Certification by William H. Seward, Secretary of State,

13 Stat. 774 (1865) ................................................................................................ 16

Certification by William Jennings Bryan, Secretary of State, Act of May 31, 1913,
38 Stat. 2049 (1913) ......................................................................................... 16

Certification by William Phillips, Acting Secretary of State, Act of Dec. 5, 1933,
48 Stat. 1749 (1933) ......................................................................................... 16

*Congressional Pay Amendment*, U.S. Dep't of Justice, Office of Legal Counsel,
16 Op. O.L.C. .......................................................................................... 9, 10, 16

*Equal Rights Amendment Extension: Hearings on S.J. Res. 134 Before the Subcomm. On the
Constitution of the S. Comm. on the Judiciary*, 95th Cong. 131 (1979) ............................. 8, 17

*H.J. Res., 638 Before the Subcomm. On Civil & Constitutional Rights of the H. Comm. on the
Judiciary*, 95th Cong. 137 (1978) ........................................................................ 8, 16

Laurence H. Tribe, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role*,
97 Harv. L. Rev. 433 (1983) ............................................................................. 11, 22

Ratification of the Equal Rights Amendment,
44 Op. O.L.C. Slip Op. (Jan. 6, 2020) ....................................................................... 5

Ruth Bader Ginsburg, *Ratification of the Equal Rights Amendment: A Question of Time*,
57 Tex. L. Rev. 919 (1979) ................................................................................. 6, 22

U.S. Bill of Rights, 1 Stat. 97 (1789) .......................................................................... 21

## INTRODUCTION

As the Supreme Court held decades ago, "[w]hether a definite period for ratification shall be fixed, so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which Congress may determine as an incident of its power to designate the mode of ratification." *Dillon v. Gloss*, 256 U.S. 368, 376 (1921). In proposing the Equal Rights Amendment, Congress did exactly that, including a deadline for ratification. Congress later sought to extend that deadline to provide States with additional time to ratify. When that extension lapsed without the required number of States ratifying the amendment, the Supreme Court recognized that a dispute over whether the extension was valid was moot. *See NOW v. Idaho*, 459 U.S. 809 (1982). More than thirty years later, there still can be no question that the ERA was not ratified by a sufficient number of States in the time allowed.

Plaintiffs' opposition makes clear that they disagree with the multiple pronouncements of the Supreme Court on the very issue that they now seek to litigate, including those that emphasize the inherently political, and thus unreviewable, nature of Congress's ratification deadline. But Plaintiffs provide no basis for this Court to ignore or overturn these high-court pronouncements. Such a result would be inappropriate in any case, but particularly so here, where Plaintiffs seek to do so based on amorphous sovereignty interests as opposed to a concrete injury from the Archivist's January 8, 2020 decision not to certify ratification of the amendment. Plaintiffs may have an interest in this issue, but they have alleged no injury that would satisfy the requirements of Article III.

**ARGUMENT**

**I.      Plaintiffs fail to demonstrate a concrete injury that would satisfy the requirements of Article III.**

The focus of Plaintiff States' Opposition is not on a concrete or particularized injury they have suffered as sovereigns due to the Archivist's actions, but rather on general principles of State sovereignty that are implicated by the amendment process. Pl. States' Mem. of P. & A. in Opp. to Def.'s Mot. to Dismiss ("Pls.' Mem.") 7–11, ECF No. 37. Plaintiffs still have not specified how precisely these sovereign interests are harmed. As this Court has recognized, *certification* of the ERA may injure Intervenor States' "interest[s] in their [sovereign] regulatory powers not being constrained or preempted," as those States would be unable to issue laws that are inconsistent with the ERA. *Virginia v. Ferriero*, --- F.Supp.3d ----, No. 20-242, 2020 WL 3128948, at *3 (D.D.C. June 12, 2020). But Plaintiff States are in the precise opposite position—seeking the passage of a federal law that would constrain their legislative powers as States.

Plaintiffs argue that "the Archivist intrudes on the 'inviolable sovereignty' of the States in one of their 'respective spheres' and disregards an exercise of their sovereign power" by refusing to "honor" their ratifications of the ERA. Pls. Mem. at 9. But the Archivist's decision not to certify the ERA in light of Plaintiffs' late votes is untethered to their sovereign interests. Instead, "the function of a state Legislature in ratifying a proposed amendment to the federal Constitution, like the function of Congress in proposing the amendment, is a federal function derived from the federal Constitution." *Leser v. Garnett*, 258 U.S. 130, 137 (1922). Each state legislature provides just one individual federal vote of the fifty possible and thirty-eight necessary for ratification. So the "terms under which [States] participate in the federal system" in this context, *see* Pls.' Mem. 9 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607–08 (1982)), might be analogized to the terms under which a member of Congress participates in the federal system. Although Plaintiff

2

States indicate their agreement that legislator standing might be a better lens through which to view their interest here, *see* Pls.' Mem.  (invoking *Coleman v. Miller*, 307 U.S. 433 (1939)), the Supreme Court has recognized that the right of a handful of members of a voting body to exercise their constitutionally-assigned role to vote does not confer a "sufficient 'personal stake' in [a] dispute . . . to have established Article III standing." *Raines v. Byrd*, 521 U.S. 811, 830 (1997). Here, of course, Plaintiffs had the opportunity to exercise that vote and did not ratify the ERA before the deadline. The three Plaintiff state legislatures "were not singled out" by the Archivist's application of a nondiscriminatory deadline because "their alleged injury"—diminution of the time period to consider ratifying the ERA—"is shared by the [47 state legislatures that] did not join the lawsuit—and their claim is based entirely on the loss of political power" after the conclusion of the deadline. *Blumenthal v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020) *docketed for appeal*, No. 20-5 (U.S. Jul. 9, 2020).

Indeed, precisely because institutional injuries affect each voting member equally, legislator standing typically requires an institutional plaintiff to represent institutional injuries; that institutional agent has actual authority to represent the injured group as a whole. *See Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1954 (2019); *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 801–03 (2015); *Raines*, 576 U.S. at 823–24; *Blumenthal*, 949 F.3d at 20 n.3. The only possible exception, "to the extent it survives," *Blumenthal*, 949 F.3d at 20 n.3, would require enough voting members "whose votes would have been sufficient to defeat (or enact) a specific" measure, *Bethune-Hill*, 139 S. Ct. at 1954 (quoting *Raines*, 521 U.S. at 823), "suing as a bloc," *see Raines*, 521 U.S. at 822. But even assuming that individual States, in this context, could be viewed as members of one institution (a questionable proposition), Plaintiffs would be thirty-five States short of establishing standing even under this possible "narrow

exception." *See Baird v. Norton*, 266 F.3d 408, 412–13 (6th Cir. 2001) (one legislator lacked standing but if her "lawsuit had been joined by other members of the Michigan House of Representatives whose total votes (and non-votes) would have been sufficient to defeat the necessary legislation, then this group of lawmakers, like the twenty state senators in *Coleman*, would have had standing as legislators based on vote nullification"). This "especially rigorous" requirement ensures that courts "exercise power only in the last resort, and as a necessity" to resolve only clear controversies in this sensitive area. *See Raines*, 521 U.S. at 819 (citation and internal quotation marks omitted).

### II.      Whether certain States validly rescinded their prior ratifications of the ERA is not ripe for review.

As Defendant has explained, Plaintiffs' request for relief necessarily demands that this Court decide whether certain States validly rescinded their prior ratifications of the ERA, an unripe question. Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem.") 11–12, ECF No. 29. Plaintiffs argue, without support, that because the validity of the rescissions is subsumed within the question of whether the ERA should be certified as adopted, the ripeness of the subsidiary question is immaterial. *See* Pls.' Mem. 16. But Plaintiffs put the cart before the horse by intertwining the issues of timeliness of the purported ratifications and of the validity of the five States' rescissions, when the OLC opinion on which the Archivist relied was based only on the fact that the recent State actions were untimely. *See Ratification of the ERA* at *36–37. In so doing, they ignore "the usually unspoken element of the rationale underlying the ripeness doctrine: If we do not decide it now, we may never need to. Not only does this rationale protect the expenditure of judicial resources, but it comports with our theoretical role as the governmental branch of last resort." *Nat'l Treas. Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996). Had Plaintiffs successfully sought narrower relief on the sole issue of the timeliness of their purported ratification

actions, the question of whether the five States' rescissions were valid may then be decided. At that point, there may or may not be a controversy for a court to resolve (setting aside the political-question issues discussed *supra*). *Texas v. United States*, 523 U.S. 296, 302 (1998) (dismissing as unripe a claim where it is "too speculative whether the problem [the plaintiff] presents will ever need solving").

Plaintiffs further argue that the ripeness doctrine is inapplicable because in adjudicating their challenge, no deference is due to the Archivist's decision. *See* Pls.' Mem. at 17. But, even assuming that this suggestion is correct (which it is not, see *infra* Sec. III), whether a claim is unripe does not depend on whether an agency is afforded deference. Constitutional challenges to government action, for example, are routinely dismissed as unripe, even if no deference is necessarily owed to the government. *See, e.g.*, *Nat'l Treas. Emps. Union*, 101 F.3d at 1432 (concluding that claim was unripe where "Appellants' suit seeks a declaration that the Line Item Veto Act is unconstitutional and an injunction against its enforcement"); *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 56 (D.C. Cir. 2015) (claim challenging constitutionality of an aspect of the Dodd-Frank Act was unripe).

Finally, contrary to Plaintiffs' contention, Pls.' Mem. at 17 n.16, OLC's previously expressed views bearing on the validity of rescissions, *see* Def.'s Mem.  at 11 n.2, do not counsel in favor of immediate adjudication of this issue. In its most recent opinion, OLC noted its prior opinion on this issue but explained that, notwithstanding that opinion, the issue "has not been resolved," Ratification of the Equal Rights Amendment, 44 Op. O.L.C. Slip Op. at 37 (Jan. 6, 2020) ("*Ratification of the ERA*"), in light of continuing scholarly debate and a district court opinion that disagreed with OLC's prior conclusion. *See Idaho v. Freeman*, 529 F. Supp. 1107, 1146–50 (D. Idaho 1981), *judgment vacated by Carmen v. Idaho*, 459 U.S. 809 (1982).  "[G]iven

the gray zone of constitutional interpretation involved," Ruth Bader Ginsburg, *Ratification of the Equal Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919, 941 (1979), this Court should defer review of this question until it is posed in a more concrete setting.

Should this Court proceed to decide this question as part of its review of Plaintiffs' claims, however, it should hold that the issue is not justiciable, for the reasons explained below.

> ### III.   Plaintiffs ask this Court to decide questions that the Supreme Court has identified as inherently political, inviting the Judiciary into a dispute that the Legislative and Executive Branches are entrusted to solve.

As Defendant has explained, Plaintiffs' requests for relief are contrary to *Coleman*, 307 U.S. 433, which prohibits judicial second-guessing of two issues that Plaintiffs ask this Court to decide: the time interval for ratification and the effect of state ratification redeterminations. Def.'s Mem. at 12–15. Plaintiffs disagree but provide little substantive justification to ignore the Supreme Court's pronouncements on these issues.

Plaintiff States assert that "the political question doctrine has been clarified to be 'a narrow exception,'" effectively attacking the doctrine writ large. Pls.' Mem. at 16 (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012)); *but see, e.g., Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). Similarly, Intervenors appear to request that this Court evaluate anew how the political question doctrine applies more broadly. *See* Intervenor's Mot. for Summ. J. & Supporting Mem. of P. & A. ("Intvs.' Mem.") 27–28, ECF No. 74. But this Court need not establish new jurisprudence on the political question doctrine in order for it to decide that the questions presented by Plaintiffs' Complaint are not justiciable. It need only give effect to the Supreme Court's prior decision in *Coleman*. *See* Def.'s Mem. at 12–15.[1]

---

[1] Intervenor States suggest that Chief Justice Hughes's opinion in *Coleman* is not the opinion of the Court. Intvs.' Mem. at 30 n.6. But they "overlook[] that Chief Justice Hughes' opinion, announced by Justice Stone, was styled 'Opinion of the Court.'" *Ariz. State Legislature v. Ariz.*

Plaintiffs misconstrue Defendant's argument as "asking the Court to dismiss the case as a political question *because* the purported deadline in the [ERA] is valid." Pls.' Mem. at 16. To be sure, Defendant believes that the merits of the validity of the deadline are clear. *See* Def.'s Mem. at 16-23; *infra* Sec. IV B. But this Court need not resolve that question in order to decide whether it is one that the political question doctrine allows the Judiciary to decide. After all, Plaintiffs cannot dispute that, whether binding on the States as a ratification deadline, Congress placed a deadline in the proposing clause of the ERA. Compl. ¶¶ 27, 28, 63. And that deadline represents "Congress's explicit judgment as to how much time was necessary and appropriate to ratify the ERA," even if Plaintiffs contend that this judgment is not binding on them. Def.'s Mem. at 13.

Indeed, implicit in Plaintiffs' acknowledgement that their "ratifications occurred after a deadline that the 92nd Congress included in introductory language in the congressional resolution containing the proposed [ERA]," Pls.' Mem. at 18, is the recognition that Congress made a

---

*Indep. Redistricting Comm'n*, 576 U.S. 787, 804 n.13 (2015) (quoting *Coleman v. Miller,* 307 U.S. 433, 435 (1939)). And it was so styled for good reason. Although Chief Justice Hughes' opinion—written for three justices—concludes only that the time period for ratification and effectiveness of state ratification redeterminations are political questions, *Coleman,* 307 U.S. at 454, the concurring opinion—authored by Justice Black and joined by Justices Frankfurter, Douglas, and Roberts—stated that all congressional power in this area is beyond judicial review:

> Since Congress has sole and complete control over the amending process, subject to no judicial review, the views of any court upon this process cannot be binding upon Congress . . .

*Id.* at 459. So seven justices found the issues in this case to be nonjusticiable political questions. Intervenors' footnote focuses only on Justice Frankfurter's concurring opinion—supported by the same four justices—that the *Coleman* plaintiffs lacked Article III standing. *See* Intv. Mem. at 30 n.6. But Justice Black's opinion was written separately "[u]nder the compulsion of [the standing] ruling." *Coleman*, 307 U.S. at 456. Accordingly, Chief Justice Hughes' opinion is the "holding of the Court" because it is the "position taken by those Members who concurred in the judgments on the narrowest grounds," *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation and internal quotation marks omitted), as a majority of the Supreme Court has recognized, *see, e.g., Goldwater v. Carter*, 444 U.S. 996, 1002-05 (1979) (opinion of Rehnquist, J.); *id.* at 1001 n.2 (opinion of Powell, J.); *Baker v. Carr*, 369 U.S. 186, 214 (1962).

decision about how much time was appropriate for the ERA's ratification. Congress, States, and the public have all long understood that Congress voted for a deadline restricting the time for ratification. And Plaintiffs cannot dispute that Congress viewed the deadline as binding, holding congressional hearings and passing an additional resolution in a controversial effort to extend that deadline. *See* 92 Stat. 3799 (1978); *see generally Equal Rights Amendment Extension: Hearings on H.J. Res. 638 Before the Subcomm. On Civil & Constitutional Rights of the H. Comm. on the Judiciary*, 95th Cong. 137 (1978); *Equal Rights Amendment Extension: Hearings on S.J. Res. 134 Before the Subcomm. On the Constitution of the S. Comm. on the Judiciary*, 95th Cong. 131 (1979). It is therefore clear, without considering the merits of Plaintiffs' claims, that accepting them would upset the "decision by the Congress, in its control of the action of the [Archivist]," of "what is a reasonable time" for ratification. *Coleman*, 307 U.S. at 452–56.

To be sure, "[t]he question whether Congress can limit the States' time for ratification is not only justiciable—the Supreme Court has already decided it." Intvs.' Mem. at 28 (citing *Dillon*, 256 U.S. at 375-76). But Plaintiffs do not challenge Congress' power to make that decision. Instead, they challenge the *format* by which Congress established that deadline. *See* Pls.' Mem. at 19–26. Although both *Dillon and Coleman* leave no doubt as to Congress's authority to establish such a deadline, *see* Def.'s Mem. at 17, 20; *infra* Sec. IV B., Plaintiffs cannot seek to undermine the process by which Congress acted without running headlong into *Coleman*.

Indeed, Plaintiffs devote several pages of argument to contesting a "suggestion" that Defendant never made: "that *Coleman* is properly read as *requiring* that proposed amendments return to Congress for 'promulgation.'" Pls.' Mem. at 12 (emphasis added). *See also id*. at 12–14. But OLC has recognized, and Defendant does not dispute, that the Archivist has a role to play in the Amendment process pursuant to section 106b. *See Congressional Pay Amendment*, 16 Op.

O.L.C. 87, 99 (Nov. 2, 1992).  And whether the Executive Branch has a role to play in the amendment process does not explain whether the same should be said of the Judicial Branch. Indeed, as Plaintiff States later recognize, "[t]he point of the political question doctrine is to identify questions that courts should not resolve." Pls.' Mem. at 16 (alteration in original) (quoting *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514 (D.C. Cir. 2018)). *Coleman* explains that the two subjects at issue here—timeliness and the effect of state ratification redeterminations—are appropriately subject to the final determination by the political departments instead of the courts. *See Coleman*, 307 U.S. at 450–56.

Plaintiffs try to distinguish *Coleman* by arguing that the *Coleman* plaintiffs "brought suit (a) in state court (b) against state legislative officials (c) to stop them from certifying that Kansas had" ratified an amendment and that it "involved a proposed amendment that everyone involved agreed had not yet been ratified by the required number of States." Pls.' Mem. at 14.  But these distinctions have no bearing on the Court's conclusions as to the justiciability of the issues presented by those plaintiffs. Namely, that "the question, what is a reasonable time [for ratification of a constitutional amendment], lies within the congressional province" and is not "subject to review by the courts." *Coleman*, 307 U.S. at 454. And "the question of the efficacy of . . . attempted withdrawal [of a state's prior ratification], should be regarded as a political question pertaining to the political departments." *Id.* at 450; *see also White v. Hart*, 80 U.S. 646, 649 (1871) (A State's "den[ial of] the validity of her ratification of [a] constitutional amendment[]" presents a case that is "clearly one in which the judicial is bound to follow the action of the political department of the government, and is concluded by it.").

Similarly, Plaintiff States err in suggesting that OLC has concluded that "*Coleman* also made no binding holding about time limits." Pls.' Mem. at 14. Plaintiffs say that OLC explained

"*Coleman* is not 'authoritative as to contemporaneity' because the 'reasonable time' discussion 'was simply not part of the Court's holding.'" *Id*. (alteration in original) (quoting 16 Op. O.L.C. at 93). But the language they quote—in context—explains that neither *Dillon* nor *Coleman* are "authoritative on the issue whether Article V *requires* contemporaneous ratification," 16 Op. O.L.C. at 92 (emphasis added)—an issue separate from the Court's "decision that the Congress *has the power* under Article V to fix a reasonable limit of time for ratification," *Coleman*, 307 U.S. at 454 (emphasis added) (describing *Dillon*). What is more, OLC did not go further and determine that the Court held the issue to be inherently justiciable. 16 Op. O.L.C. at 92. To the contrary, as OLC instead explained, "Chief Justice Hughes's opinion is . . . best understood as resting on a political question rationale: courts will not attempt to resolve certain questions concerning the validity of states' ratifications of constitutional amendments." *Id*. at 101. In other words, the political departments need not consider "the political, social and economic conditions which have prevailed during the period since the submission of the amendment," *Coleman*, 307 U.S. at 454, in deciding to certify a long-pending amendment, because as long as the political branches act reasonably, their decision is not justiciable.

Unable to distinguish *Coleman*, Plaintiffs turn to policy arguments that miss the mark. First they argue that "[f]ederal courts must be available to restrain a federal official from overstepping his authority" in "a blatantly unconstitutional manner," Pls.' Mem. at 14. But nothing in *Coleman* prevents courts from doing just that. Defendant has never argued that all Article V issues present nonjusticiable political questions. The view that the political departments have "complete control over the amending process subject to no judicial review" was the opinion of only four Justices in *Coleman*. 307 U.S. at 459 (Black, J., concurring). Defendant simply relies upon the *Coleman* Court's recognition that where Article V's silence can be read several reasonable ways, it is

appropriate to accept the political departments' construction of the Article. *See id.* at 447, 450 (where "Article V says nothing of rejection but speaks only of ratification . . . in accordance with . . . historical precedent" a rejection "should be regarded as a political question"); *id*. at 452 (that "nothing was found in Article V which suggested that an amendment once proposed was to be open to ratification for all time . . . [was a] cogent reason[] . . . that the Congress had the power to fix a reasonable time for ratification").

"But to recognize a role for the federal judiciary in policing the outer boundaries of the amendment process . . . is not to say *where* [Article V sets] those limits." Laurence H. Tribe, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role*, 97 Harv. L. Rev. 433, 434 (1983). There is little doubt that many actions may fall outside Article V's limits. The political question doctrine may not be used as a tool for the political branches to ignore the clear mandates of the Constitution. For example, if Congress promulgated an amendment that only twenty of the necessary thirty-eight States have ratified in any way, or if the Archivist purported to certify an amendment as part of the Constitution with a resolution of submission adopted by only one of the two chambers of Congress, nothing in *Coleman* would prohibit courts from remedying those blatantly unconstitutional actions.

But, in this case, this Court need not define the outer boundaries of the "range of reasonable political judgments" that Article V leaves to the political branches. *See* Amici Curiae Constitutional Law Professors Erwin Chemerinsky, *et al*.,in Support of Neither Party ("Law Prof. Mem.") 18, ECF No. 48-1. That is because the questions here have already been addressed by *Coleman*: timeliness and the effect of a state's ratification redetermination. *See* Def.'s Mem. at 12–15.

Determinations as to whether an amendment has "become valid, to all intents and purposes, as part of the Constitutional of the United States," 1 U.S.C. § 106b, cannot be both within a "range of reasonable political judgments," Law Prof. Mem. at 18, and "blatantly unconstitutional," Pls.' Mem. at 14. Plaintiffs' straw man reasoning to the contrary substitutes Justice Black's concurring opinion in *Coleman* for the opinion of the Court. *Compare*, Pls.' Mem. at 14, *with*, 307 U.S. at 459 (Black, J., concurring). Here, the Archivist has reasonably explained why he has no "clear duty to act" to certify the ERA under § 106b. *See* Def.'s Mem. at 16–23; *infra* Sec. IV B. If anything, because Congress long ago decided the appropriate amount of time for ratifying the ERA, he is compelled by that valid deadline not to certify the amendment. *Id.* Plaintiffs' theory that Congress's judgment on timeliness has no effect because of its location in the resolution of submission hardly makes the Archivist's decision not to certify the ERA in accordance with Congress's judgment "blatantly unconstitutional."[2]

Plaintiffs' second policy reason for ignoring *Coleman* is their complaint that dismissal under *Coleman* would "leave ratifying States unable to vindicate their . . . prerogatives to finally adopt a proposed amendment." Pls.' Mem. at 15. But this suggestion is both legally and factually incorrect. As an initial matter, "the assumption that if respondents have [not established subject matter jurisdiction over their suit], no one would [be able to], is not a reason to find [subject matter jurisdiction]." *See Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 420 (2013) (cleaned up). And *Coleman* hardly leaves States powerless to vindicate their interests in to the adoption of the ERA. Each Plaintiff State is more-than-adequately represented in Congress. Indeed, it is little accident

---

[2] Though ultimately irrelevant, Plaintiffs' suggestion that "[f]ederal courts must [always] be available to restrain" purportedly unconstitutional action, Pls. Mem. at 14, is also wrong. "There are numerous instances in which the . . . actions of Government officials are not subject to judicial scrutiny or intervention." *Trump v. Hawaii*, 138 S. Ct. 2392, 2424 (2018) (Kennedy, J., concurring).

that, at the time Article V was drafted, Article I, § 3 empowered the same state legislatures that have ratification power under Article V to choose the members of the Senate. The political nature of the instant proceeding—where three States are in a legal battle with several intervening States over whether or not the ERA should be part of the Constitution—serves to emphasize that the appropriate venue for vindicating Plaintiffs' and Intevenors' interests is not in an Article III courtroom but was in the halls of Congress when Congress finally determined the time interval for ERA ratification. As the Court explained in *Coleman*, it is "[t]he decision by the Congress, in its control of the action of the [Archivist]," of "what is a reasonable time" for ratification that must "not be subject to review by the courts." 307 U.S. at 454.

Finally, even assuming that Plaintiffs were correct and this Court is permitted to evaluate the procedure by which Congress established the deadline for ratification, Plaintiffs are silent about the justiciability of the question whether States are permitted to rescind prior votes in favor of ratification. *See Coleman*, 307 U.S. at 450; Def.'s Mem. 14–15. Because a decision on that question would be necessary to provide the relief that Plaintiffs seek in this lawsuit, this Court would still be required to dismiss Plaintiffs' Complaint.

Intervenors argue that *Coleman*'s language about rescissions was dicta, Intvs.' Mem. at 18. Even if it were dicta, "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003) (citation omitted). In any event, *Coleman's* holding about rescissions was not dicta; it was a "portion[] of the opinion necessary to [its] result." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 66-67 (1996). The *Coleman* Court concluded that the validity of one State's ratification after a prior rejection was a political question after reviewing the ratification history of the Fourteenth Amendment. *Coleman*, 307 U.S. at 448–49. The Court found, for that amendment, that

"the political departments of the Government dealt with the effect of both previous rejection and of attempted withdrawal." *Id*. at 449.[3] The Court held that "in accordance with this historic precedent the question of the efficacy of ratifications by state legislatures, in light of previous rejection or attempted withdrawal, should be regarded as a political question." *Id*. at 450. Because the Court's holding was based on the premise that rescission after ratification or ratification after rejection are two sides of the same coin, *see id*., the Court's conclusion was not dicta. *See Seminole Tribe of Florida*, 517 U.S. at 66–67.

In sum, *Coleman* requires this Court to dismiss this case. Regarding the time period for ratification, Congress long ago made a judgment regarding the time period for the ERA's ratification. Although Plaintiffs admit Congress did so, it asks this Court to undo that judgment because of its location in a resolution. *Coleman* prohibits that type of judicial meddling with Congress's judgments for how long a proposed amendment is left open for ratification. Second, *Coleman* provides that decisions about the effect of state ratification redeterminations are also left to the political branches. Because this Court would have to decide the effectiveness of several States' rescinded ratifications in order to provide Plaintiffs with their requested relief, this Court is without jurisdiction to grant that relief.

### IV.   Plaintiffs fail to satisfy the required elements to seek the extraordinary remedy of mandamus relief.

Even if this Court were permitted to reach the merits of Plaintiffs' Complaint, dismissal would still be appropriate because Plaintiffs are not entitled as a matter of law to the extraordinary mandamus relief they seek. Although Plaintiffs attempt to find a clear duty that would require the

---

[3] The Court explained that "Ohio and New Jersey first ratified and then passed resolutions withdrawing their consent." *Coleman*, 307 U.S. at 448.

Archivist to ignore Congress's ratification deadline, those arguments are directly contrary to binding Supreme Court precedent.

> A. *The Archivist must determine whether he has received "official notice" of an amendment's adoption and whether he can "certif[y]" that the proposed amendment is part of the Constitution.*

As an initial matter, Plaintiffs spend a significant amount of time in their Opposition in an attempt to cabin the Archivist's role in the ratification process to that of a rubber stamp for ratification, even if such an action would be directly contrary to Congress's command.

To be sure, "Article V of the Constitution does not prescribe any role for the Federal Executive Branch in the amendment process." Pls.' Mem. at 18; *see also* Intvs.' Mem. at 28. But Congress "carve[d] out a role in the amendment process for the Executive Branch when none exists in Article V," Pls.' Mem. at 14, by delegating promulgation authority to the Archivist. *See* 1 U.S.C. § 106b. *See Ratification of the ERA*.

Plaintiffs erroneously contend that this case "does [not] involve any exercise of judgment in an area which Congress has entrusted to [an] agency." Pls.' Mem. at 17 (citation omitted). But Congress tasked the Archivist with both publishing the amendment and certifying that it is validly part of the Constitution. Specifically, the Archivist must "cause [an] amendment to be published, *with his certificate, specifying . . . that the [proposed amendment] has become valid, to all intents and purposes as part of the Constitution of the United States*." 1 U.S.C. § 106b (emphasis added). Accordingly, Congress recognized that whether the Constitution had been amended is an issue that "lies out of the cognizance of the court, and the judges, in order to determine the question, are obliged to rely on the solemn averment or information of [the Archivist who is] in such a station as affords [him] the clearest and most competent knowledge of the truth." Henry James Holthouse, *A New Law Dictionary* 84 (2d ed. 1847) (defining "trial by certificate"). The Archivist and his predecessors, in consultation with the Office of Legal Counsel of the Department of Justice, have

long interpreted this language to require him to "certify" that the amendment is valid as part of the Constitution[4]—something he cannot do without making a good faith judgment as to compliance with the requirements of Article V. *See Congressional Pay Amendment*, U.S. Dep't of Justice, Office of Legal Counsel, 16 Op. O.L.C. at 98. As then-Professor Ruth Bader Ginsburg explained before Congress in 1978, "technically, the [Archivist] might certify [or decline to certify] and not even bring the question to the attention of Congress; 1 U.S.C. § [106b], at least if read literally, makes that possible." *Equal Rights Amendment Extension: Hearings on H.J. Res. 638 Before the Subcomm. On Civil & Constitutional Rights of the H. Comm. on the Judiciary*, 95th Cong. 137 (1978); *see also id.* at 136 (testimony of Prof. Van Alstyne) ("As a technical matter, believe it or not, [the Archivist], to whom [Congress has] delegated a seemingly ministerial chore, could resolve the question of rescission on his own.").

---

[4] *See, e.g.*, Certification by William H. Seward, Secretary of State, 13 Stat. 774 (1865) (Thirteenth Amendment); Certification of Hamilton Fish, Secretary of State, 16 Stat. 1131 (1870) (Fifteenth Amendment); Certification by Philander C. Knox, Secretary of State, Act of Feb. 25, 1913, 37 Stat. 1785 (1913) (Sixteenth Amendment); Certification by William Jennings Bryan, Secretary of State, Act of May 31, 1913, 38 Stat. 2049 (1913) (Seventeenth Amendment); Certification by Frank L. Polk, Acting Secretary of State, Act of Jan. 28, 1919, 40 Stat., "Eighteenth Amendment to the Constitution" (1919); Certification by Bainbridge Colby, Secretary of State, Act of Aug. 26, 1920, 41 Stat. 1823 (1920) (Nineteenth Amendment); Certification by Henry L. Stimson, Secretary of State, Act of Feb. 6, 1933, 47 Stat. 2569 (1933) (Twentieth Amendment); Certification by William Phillips, Acting Secretary of State, Act of Dec. 5, 1933, 48 Stat. 1749 (1933) (Twenty-First Amendment); Certification by Jess Larson, Administrator of General Services, 16 Fed. Reg. 2019 (Mar. 3, 1951) (Twenty-Second Amendment); Certification by John L. Moore, Administrator of General Services, 26 Fed. Reg. 2808 (Apr. 4, 1961) (Twenty-Third Amendment); Certification by Bernard L. Boutin, Administrator of General Services, 29 Fed. Reg. 1715 (Feb. 5, 1964) (Twenty-Fourth Amendment); Certification by Lawson B. Knott, Administrator of General Services, 32 Fed. Reg. 3287 (Feb. 24, 1967) Twenty-Fifth Amendment), Certification by Robert L. Kunzig, Administrator of General Services, 36 Fed Reg. 12,725 (July 7, 1971) (Twenty-Sixth Amendment); Certification of Amendment to the Constitution of the United States Relating to Compensation of Members of Congress, 57 Fed. Reg. 21,187 (May 18, 1992).

Congress entrusted the Archivist with certification authority for good reason. To the extent *Amici* Law Professors' congressional promulgation theory is valid, *see* Law Prof. Mem. at 11, 14–16, the fly in the ointment of that hypothetical process is that it may not always proceed so smoothly.[5]

But for § 106b, congressional failure to act "would be an impasse." *See* Senate Extension Hearings at 131 (testimony of Prof. Emerson). Anticipating these potential issues, Congress long ago delegated to the Executive Branch both the ministerial task of publication as well as the task of issuing a "certificate, specifying" that the amendment "has become valid, to all intents and purposes, as part of the Constitution of the United States." 1 U.S.C. § 106b. In light of Section 106b, it is "Congress, *in its control of the action of the [Archivist],*" that determines "whether the amendment has been adopted." *Coleman*, 307 U.S. at 454 (emphasis added). Because the Archivist's authority stems from statute—not from the Constitution—Congress may remove or amend whatever authority it once delegated to him. But "by not acting," Congress "acquiesce[s] in the [Archivist's] promulgation" or reasonable decision not to certify an amendment as a valid part of the Constitution. Senate Extension Hearings at 132 (testimony of Professor Emerson).

---

[5] Other proponents of *Amici*'s congressional promulgation theory have indicated that it is the "Congress sitting at the time" of the purported 38th ratification that "would have the obligation to decide" whether the proposed amendment had in fact become part of the Constitution. 1977 S. Hearing at 136 (testimony of Professor Ruth B. Ginsburg). But as one Senator pondered at a congressional hearing on extending the ERA deadline: "[w]hat position does a constitutional amendment get into" if, after a dispute about rescinded ratifications, a promulgating resolution "passes in the House by a significant majority," but in the Senate, "[a] filibuster ensures and it is impossible to get 60 members of the U.S. Senate to shut off the filibuster?" *Equal Rights Amendment Extension: Hearings on S.J. Res. 134 Before the Subcomm. On the Constitution of the S. Comm. on the Judiciary*, 95th Cong. 131 (1979) ("Senate Extension Hearings") (statement of Senator Bayh). In this case, the current Congress has been sitting since Virginia purported to supply the 38th state ratification of the ERA, but it may conclude without deciding whether the ERA had in fact become valid to all intents and purposes as part of the Constitution.

Plaintiffs rely on *United States ex rel. Widenmann v. Colby*, 265 F. 998, 999 (D.C. Cir. 1920). But *Colby* cannot support their request for mandamus relief because it makes clear that, to the extent the Archivist's action is ministerial, any relief "if granted . . . would avail [them] nothing" and Plaintiffs would lack standing to see it, since, according to *Colby*, the validity of the amendment "does not depend in any wise upon the proclamation." *Id*. at 1000. In any event, as Defendant has explained, the D.C. Circuit's decision in *Colby* is inapposite because it was a case where all parties agreed that the Archivist's predecessor had received the requisite number of effective ratifications. *See* 265 F. at 999. In that circumstance there is no doubt that the Archivist's role is ministerial pursuant to the authority delegated by Congress, as there is no additional action or decision required of the Archivist. *See id*. But this conclusion does not foreclose the possibility that there may exist more difficult questions presented to the Executive Branch, via the Archivist, under section 106b where the question of ratification is less clear. Indeed, the Supreme Court recognized as much in *Coleman*¸ which not only indicates that Congress acts by virtue of its control of the Archivist's limited discretion, *see* 307 U.S. at 454, but also emphasizes *no less than six times* that the validity of amendments is not for Congress *alone* but instead for the "political *departments* of the Government." *Id.* at 449–50, 454 (emphasis added).

### B.  Plaintiffs have no clear right to relief.

Plaintiffs' various attempts to impose a duty on the Archivist to certify the ERA as adopted despite the expiration of Congress's clear ratification deadline are meritless.

Plaintiffs first try to undermine the Supreme Court's recognition in *Dillon v. Gloss* that Congress can set ratification deadlines incident to its authority to control the "mode of ratification" of a proposed constitutional amendment. Plaintiffs attack *Dillon*'s "continued vitality," Pls.' Mem. 23, but fail to acknowledge that this Court cannot overturn Supreme Court precedent. *See, e.g.*, *Lawyers United Inc. v. United States*, No. 1:19-CV-3222-RCL, 2020 WL 3498693, at *6 (D.D.C.

June 29, 2020). ("[T]his District Court plainly lacks authority to overturn binding precedent, . . ."); *accord Carey v. Fed. Election Comm'n*, 791 F. Supp. 2d 121, 129 (D.D.C. 2011). The Constitution "deliberately made the grant of power to Congress in respect to the choice of the mode of ratification of amendments. Unless and until that Article be changed by amendment, Congress must function as the delegated agent of the people in the choice of the method of ratification."[6] *United States v. Sprague*, 282 U.S. 716, 733 (1931).

To the extent that they cannot convince this Court to ignore *Dillon* altogether, Plaintiffs assert that it has been materially limited by subsequent decisions. But the Supreme Court's decision in *Coleman* did not limit *Dillon* in the way Plaintiffs suggest, *see* Pls.' Mem. at 23. Rather, Justice Hughes's controlling opinion merely noted that "it does not follow" from *Dillon*'s holding "that, whenever Congress has not exercised" the power to set a ratification deadline, "the Court should take upon itself the responsibility of deciding what constitutes a reasonable time and determine accordingly the validity of ratifications." *Coleman*, 307 U.S. at 452–53. Justice Hughes's point does not undermine *Dillon*'s holding, and Defendants do not rely on *Dillon* to argue that this Court should impose a ratification deadline where none exists—Congress plainly set a deadline here.

Plaintiffs also argue that *Dillon* decided a "vastly different question than the one presented here." Pls.' Mem. at 23. But the fact that the precise question decided in *Dillon*—the validity of the Eighteenth Amendment in light of Congress's ratification deadline—may be different than the one presented here does not change the implications of the Court's reasoning for this case. The

---

[6] Contrary to Plaintiffs' suggestion, Pls.' Mem. at 21 n.18, *United States v. Sprague*, 282 U.S. 716, 729 (1931), did not overturn or limit *Dillon*—it merely decided the different question of whether "proposed amendments conferring on the United States new direct powers over individuals shall be ratified in conventions."

Supreme Court held in *Dillon* that "[w]hether a definite period for ratification shall be fixed, so that all may know what it is and speculation on what is a reasonable time may be avoided, is . . . a matter of detail which Congress may determine as an incident of its power to designate the mode of ratification." 256 U.S. at 376.  That reasoning controls the issue presented here, just as it did the question presented in *Dillon*.

Nor does the Twenty-Seventh Amendment's success diminish the force of *Dillon*'s import or of Congress's deadline here, as Plaintiffs would have it. Pls.' Mem. at 23–24. Defendant has already explained that "Congress . . . declined to impose a ratification deadline for the Twenty-Seventh Amendment, 1 Stat[.] 97 (1789)," Def.'s Mem. in Support of Mot. to Dismiss at 22 n.4. The Twenty-Seventh Amendment's lack of a ratification deadline does not detract from *Dillon*'s holding that Congress is entitled to set one if it chooses. And the Archivist does not rely on *Dillon*'s dicta speculating on what a reasonable time period for ratification might be, *see Dillon*, 256 U.S. at 375–76, given that Congress has the authority to decide what is reasonable when proposing a constitutional amendment, *id.*, and has done so here.

Any doubt about *Dillon*'s relevance, or the Supreme Court's views on the precise question presented by Plaintiffs here, is removed by the Supreme Court's later decision with respect to the ERA itself. As Defendant previously explained, at the Solicitor General's request, *see* Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, No. 81-1282 et al. (U.S. July 9, 1982), the Supreme Court previously dismissed as moot a State challenge to Congress's extension of the deadline for passage of the ERA when that extension also expired. *See NOW*, 459 U.S. at 809. That holding was necessarily predicated on the deadline's expiration, which left no live dispute to resolve. *Id.*; *see also Ratification of the ERA*  at *23. Had it been otherwise, Plaintiffs' demand that the Archivist recognize their rescissions would have remained necessary

20

to decide. Accordingly, this Court need not stop at *Dillon* to recognize that Plaintiffs' claim fails as a matter of law.

Plaintiffs also contend that "[t]he location of [the] purported 'deadline' matters under Article V," Pls.' Mem. at 20, in a further attempt to distinguish *Dillon* and minimize the effect of the Supreme Court's dismissal of the prior round of ERA litigation as moot. But they offer no language in Article V or in any case law to support this remarkable statement. Their attempts to analogize to case law regarding the substantive effect of a statutory preamble are unavailing because "the proposition, or adoption, of amendments to the constitution" is altogether different "from the ordinary cases of legislation." *See Hollingsworth v. State of Virginia*, 3 U.S. (Dall.) 378, 381 n.1 (1798). Moreover, the proposing clause of a constitutional amendment proposed by Congress is *not* a mere prefatory statement with no operative effect. Rather, it has always set out Congress's selected mode of ratification, *see Ratification of the ERA* at \*14, of which, as *Dillon* concluded, a ratification deadline is part and parcel.[7] *Dillon*, 256 U.S. at 376.

Further, there is clearly no disparate substantive effect of the deadline's placement in the proposing clause or the amendment's text; in either case, States receive ample notice of the terms by which they are to ratify a proposed amendment and can act accordingly.[8] *See also* Laurence H.

---

[7] Indeed, as OLC explains, "[t]he proposing clause for the Bill of Rights not only specified the mode of ratification but also contained a procedural instruction authorizing the state legislatures either to ratify 'all' twelve proposed articles or to ratify 'any of' them individually." *Ratification of the ERA* at \*15 (citing 1 Stat. at 97). "The proposing clause was debated by the House and the Senate and considered of a piece with the substantive proposed amendments." *Id.* (citing 4 Documentary History of the First Federal Congress of the United States of America 35–45 (Charlene Bangs Bickford & Helen E. Veit eds., 1986)).

[8] Amici's argument that "language providing that the ERA becomes valid 'when ratified' leaves open whether the ERA remains viable even if not ratified within seven years" is also unavailing. *See* Brief of *Amicus Curiae* Constitutional Law Professors at 12. A more complete excerpt of the proposing clause reveals that Congress explained that the ERA would be valid "when ratified by

Tribe, A Constitution We Are Amending: In Defense of a Restrained Judicial Role, 97 Harv. L. Rev. 433, 445 (1983) (Acknowledgment of Congress's authority under Article V "demands judicial deference to procedural provisions that Congress writes into the resolutions by which it proposes amendments for ratification no less than to procedural provisions that Congress inserts into the texts of the proposed amendments themselves.").

Plaintiffs also attempt to cast doubt on the relevance of Congress's inclusion of similar deadlines in the proposing clauses of other Constitutional amendments. *See* Pls.' Mem. at 24. But "'[l]ong settled and established practice' may have 'great weight in a proper interpretation of constitutional provisions.'" *Chiafalo v. Washington*, 140 S. Ct. 2316, 2326 (2020) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). Here, it is indeed significant that Congress has included ratification deadlines in proposed constitutional amendments for more than 100 years, *see* U.S. Const. amend. XVIII, § 3, and has included the deadline in the proposing clause since 1960, *see* 74 Stat. 1057 (1960) (23rd Amendment), largely to avoid "clutter[ing] up the Constitution with vestigial ratification deadlines, *see* 101 Cong. Rec. 6628 (1955) (Sen. Kefauver).

C. *Plaintiffs fail to satisfy the remaining requirements for mandamus jurisdiction.*

Plaintiffs fall short in meeting the next two requirement for mandamus relief. *See In re Stone*, 940 F.3d 1332, 1338 (D.C. Cir. 2019). For one, they do not demonstrate the lack of an adequate alternative remedy. *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004). Plaintiffs argue that this requirement somehow does not apply to the Administrative Procedure

---

the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress," plainly indicating that ratification was contingent on timely ratifications by the States. H.R.J. Res. 208, 92nd Cong. (1972); *see also* 117 Cong. Rec. at 35814 (statement of Representative Griffiths, ERA's lead sponsor) (noting that deadline ensured that the resolution "should not be hanging over our head forever"); Ruth Bader Ginsberg, *Ratification of the Equal Rights Amendment*, *supra*, at 921 (stating that ERA supporters "thought the stipulation innocuous, a 'customary' statute of limitations" (footnote omitted)).

Act's remedy under 5 U.S.C. § 706(1) because it is similar to mandamus relief under the All Writs Act. *See* Pls.' Mem. at 26–27. But "mandamus's invariable condition" is "the absence of an alternative remedy." *Action All. of Senior Citizens v. Leavitt*, 483 F.3d 852, 858 (D.C. Cir. 2007). The requirement, therefore, applies here as it does in all requests for mandamus relief.

Plaintiffs then attempt to evade this requirement by arguing that Defendants' position is "a distinction without a difference." Pls.' Mem. at 26. In support, they cite two district court cases that did not evaluate the question of whether mandamus relief was available in light of relief available under Section 706(1). But courts that *have* analyzed the issue hew to the principle that "[a]n adequate alternative remedy is available" where "the Administrative Procedure Act empowers district courts to 'compel agency action unlawfully withheld or unreasonably delayed.'"[9] 5 U.S.C. § 706(1). *Navajo Nation v. Azar*, 302 F. Supp. 3d 429, 436 n.4 (D.D.C. 2018); *see also Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 53 (D.D.C. 2008).

Nor do Plaintiffs show that compelling equitable grounds support mandamus jurisdiction. The test for compelling equitable grounds is not mere entitlement to relief, as Plaintiffs would have it; rather, it is a separate discretionary determination, *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 763 (D.C. Cir. 1980), and entitlement to such "drastic and extraordinary" relief is not easily shown, *Cheney*, 542 U.S. at 380. Assuming, *arguendo*, that Plaintiffs have established

---

[9] In *Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 257, 275–76 (D.D.C. 2018), *reconsideration denied*, No. CV 17-1793 (ESH), 2018 WL 7141989 (D.D.C. May 23, 2018), the district court concluded that it would be premature to dismiss a mandamus claim where the plaintiffs had also pleaded an APA claim and defendants disputed plaintiffs' entitlement to APA relief. Here, however, Plaintiffs have not even pleaded an APA claim. In any event, Defendant explained in his moving brief that "whether plaintiffs' APA claim would ultimately succeed does not bear on whether there is an adequate remedy, for the inquiry turns on whether an alternate forum, statute, or administrative process exists to adjudicate the claim." Def.'s Mem. 24 at n.5; *see also In re al-Nashiri*, 791 F.3d 71, 78 (D.C. Cir. 2015) ("Mandamus is inappropriate in the presence of an obvious *means* of review.") (emphasis added).

a clear duty for the Archivist to negate Congress's unequivocal deadline, where, as here, Plaintiffs

ask this Court to ignore Supreme Court precedent and substantial separation-of-powers concerns

to override clear Congressional intent and the process by which federal constitutional amendments

are adopted, no "compelling equitable grounds" exist for this Court to exercise its discretion over

this mandamus claim. *Lovitky v. Trump*, 949 F.3d 753, 759 (D.D.C. 2020).

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Defendant's moving brief,

Plaintiffs' Complaint should be dismissed in its entirety.[10]

Dated: August 20, 2020                           Respectfully submitted,


                                                 ETHAN P. DAVIS
                                                 Acting Assistant Attorney General

                                                 DAVID M. MORRELL
                                                 Deputy Assistant Attorney General

                                                 JOHN R. GRIFFITHS
                                                 Director

                                                 ERIC R. WOMACK
                                                 Assistant Branch Director
                                                 Civil Division

                                                 /s/ *Vinita B. Andrapalliyal*
                                                 VINITA B. ANDRAPALLIYAL
                                                 (*Admitted in New York*)
                                                 LIAM C. HOLLAND
                                                 (*Admitted in New York*)
                                                 Trial Attorneys
                                                 United States Department of Justice
                                                 Civil Division, Federal Programs Branch

---

[10] In the event that this Court wishes to substantively examine the arguments raised in Intervenor-Defendants' summary-judgment motion, ECF No. 74, and Plaintiffs' opposition thereto, without construing the motion as a motion to dismiss, *see id.* at 13 n.2, the federal Defendant requests that this Court first adjudicate the federal Defendant's motion to dismiss. If Plaintiffs' claim is allowed to proceed, the federal Defendant requests permission to address the merits of the case on summary judgment, as well.

P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-0845
Fax: (202) 616-8470
E-mail: Vinita.b.andrapalliyal@usdoj.gov

*Attorneys for Defendant*