## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VIRGINIA, ILLINOIS, and NEVADA,
<em>Plaintiffs</em>,

v.

DAVID S. FERRIERO, in his official capacity
as Archivist of the United States,
<em>Defendant</em>,

ALABAMA, LOUISIANA, NEBRASKA,
SOUTH DAKOTA, and TENNESSEE,
<em>Intervenor-Defendants</em>.

Case No. 1:20-cv-242-RC

## DECLARATION OF CAMERON T. NORRIS

1.      I am an attorney at the law firm Consovoy McCarthy PLLC and counsel for Intervenor-Defendant Alabama.

2.      I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

3.      Exhibit A is a true and accurate copy of H.R.J. Res. 208 that was downloaded on June 28, 2020.

4.      Exhibit B is a true and accurate copy of CRS Report 97-922 (Sept. 30, 1997) that was downloaded on June 28, 2020.

5.      Exhibit C is a true and accurate copy of *Equal Rights Amendment Extension: Hearings on S.J. Res. 134 Before the Subcomm. on the Const. of the S. Comm. on the Judiciary*, 95th Cong. 739-40 (1978) that was downloaded on September 22, 2020.

6.      Exhibit D is a true and accurate copy of H.R. Rep. 95-1405, at 4 (1978) that was downloaded on September 23, 2020.

7.     Exhibit E is a true and accurate copy of *Equal Rights Amendment – Proposed March 22, 1972, List of State Ratification Actions*, Nat'l Archives (Mar. 24, 2020) that was downloaded on September 22, 2020.

8.     Exhibit F is a true and accurate copy of H.R. J. Res. 638, 95th Cong., 2d Sess., 92 Stat. 3799 (1978) that was downloaded on January 18, 2020.

9.     Exhibit G is a scan of Memo. for the Admin. of Gen. Servs. Suggesting Mootness, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1281, 81-1283, 81-1312, 81-1313 (U.S. July 1982) taken on December 26, 2018.

10.    Exhibit H is a scan of Response of Idaho and Arizona, et al., in Opposition to the Administrator's Suggestion of Mootness, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1281, 81-1283, 81-1312, 81-1313 (U.S. Aug. 1982) taken on December 26, 2018.

11.    Exhibit I is a true and accurate copy of *Leaders Concede Loss on Equal Rights*, N.Y. Times (June 25, 1982) that was downloaded on June 29, 2020.

12.    Exhibit J is a true and accurate copy of June *30, 1982: The Day the ERA Dies*, UPI (June 30, 1982) that was downloaded on July 5, 2020.

13.    Exhibit K is a true and accurate copy of *U.S. Equal Rights Measure Is Re-introduced in Congress*, N.Y. Times (July 15, 1982) that was downloaded on June 29, 2020.

14.    Exhibit L is a true and accurate copy of 128 Cong. Rec. 14,913-14, 14,925, 15,149, 15,195, 15,158-60, 15,586 that was downloaded from Govinfo.gov on September 21, 2020.

15.    Exhibit M is a true and accurate copy of *Two Modes of Ratification*, Alice Paul Inst. downloaded on June 29, 2020.

16.    Exhibit N is a screenshot of *Median Age of the Resident Population of the United States from 1960 to 2018*, Statista taken on September 21, 2020.

17.    Exhibit O is a true and accurate copy of *Statement on Equal Rights Amendment Debate*, Nat'l Archives (Dec. 19, 2019) that was downloaded on September 21, 2020.

18.    Exhibit P is a true and accurate copy of *NARA Press Statement on the Equal Rights Amendment*, Nat'l Archives (Jan. 8, 2020) that was downloaded on September 21, 2020.

19.    Exhibit Q is a true and accurate copy of *Supreme Court Closes Lid on 10-Year-Old ERA Issues*, The Press-Tribune (Oct. 4, 1982) that was downloaded on July 5, 2020.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on September 23, 2020.

  /s/ Cameron T. Norris

# Exhibit A

# PROPOSED AMENDMENT

## TO THE

## CONSTITUTION OF THE UNITED STATES

### SECOND SESSION, NINETY-SECOND CONGRESS

---

### JOINT RESOLUTION

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

[H. J. Res. 208]

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein)*, That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE —

"SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"SEC. 3. This amendment shall take effect two years after the date of ratification."

CARL ALBERT

*Speaker of the House of Representatives.*

ALLEN J. ELLENDER

*President of the Senate pro Tempore.*

I certify that this Joint Resolution originated in the House of Representatives.

W. PAT JENNINGS

*Clerk.*

BY   W. RAYMOND COLLEY

1523

# Exhibit B

97-922 GOV
September 30, 1997

# CRS Report for Congress

### Received through the CRS Web

# Ratification of Amendments to the U.S. Constitution

David C. Huckabee
Specialist in American National Government
Government Division

## Summary

Article V of the U.S. Constitution provides two ways to propose amendments to the document and two ways to ratify them. Amendments may be proposed either by the Congress, by two-thirds votes of the House and the Senate (of those present and voting, provided a quorum is present), or by a convention called by Congress in response to applications from the legislatures of two-thirds (34) or more of the states.

Amendments must be ratified by three-quarters (38) or more of the states. The Congress can choose to refer proposed amendments either to state legislatures, or to special conventions called in the states to consider ratification. Only the 21st Amendment (repeal of Prohibition) has been ratified by conventions held in the states.

In the period beginning with the First Congress, through September 30, 1997 (105th Congress, 1st Session), a total of 10,980 proposals had been introduced to amend the Constitution. Thirty-three of these were proposed by Congress to the states, and 27 have been ratified. Excluding the 27th Amendment (Congressional Pay), which took more than 202 years, the longest pending proposed amendment that was successfully ratified was the 22nd Amendment (Presidential Tenure), which took three years, nine months, and four days. The 26th Amendment (18-year-old vote) was ratified in the shortest time: three months and 10 days. The average ratification time was one year, eight months, and seven days.

## Ratification Deadlines

The practice of limiting the time available to the states to ratify proposed amendments began in 1917 with the 18th Amendment (Prohibition). All amendments proposed since then, with the exception of the 19th (Women's Suffrage) and the proposed child labor amendment, have included a deadline either in the body of the amendment proposed to the states, or in the joint resolution transmitting the amendment to the states to be ratified.

CRS-2

The 20th through 22nd Amendments incorporated the ratification deadline in the body of the amendment, so these amendments' deadlines are now part of the Constitution. Beginning with the 23rd Amendment, Congress began imposing the seven-year deadline in the joint resolutions transmitting the amendments to the state legislatures in order to avoid including extraneous language in the Constitution.[1]

The ratification deadline "clock" begins running on the day final action is completed in Congress (presidential approval of proposed amendments is not necessary). The amendment may be ratified at any time after final congressional action, even though the states have not been officially notified. The Archivist of the United States officially notifies the states (by registered letters to the governors) that an amendment has been proposed. The Archivist also keeps track of state ratifications and issues a proclamation when ratification is completed.[2]

The rules governing the consideration of proposed amendments vary among the states. Many legislatures require proposed amendments to be approved by "constitutional majorities"—a majority of the membership of the legislature (rather than a quorum for doing other legislative business). Some states require amendments to be ratified by the same margin as a proposed amendment to their state constitutions; others only require a majority of the legislators present and voting (provided a quorum is present). At least seven states require a "supermajority"[3] vote in one or more "chamber, either by rule, statute, or state constitution."[4]

The unprecedented time period of the 27th Amendment's successful ratification, and the decision by the 95th Congress to extend the seven-year deadline for the proposed Equal Rights Amendment (ERA) for an additional two years, 10 months, and 16 days,[5] has prompted speculation that Congress might have the power to revive other amendments proposed without ratification deadlines (in the body of the amendment) by enacting new ratification deadlines. At this writing, this matter is unresolved, but constitutional scholars

---

[1] See: Walter Dellinger, "The Legitimacy of Constitutional Change: Rethinking the Amendment Process," *Harvard Law Review*, vol. 97, Dec. 1983, p. 408. Two exceptions to this practice were the 27th Amendment, because it was proposed in 1789, and the proposed District of Columbia voting representation amendment, where a seven-year time limit was included in the body of it.

[2] Pursuant to 1 U.S.C. 106b.

[3] A "supermajority" requires more than a simple majority (one half, plus one). A supermajority ratification requirement for proposed amendments has been recognized by a federal District Court. In *Dyer* v. *Blair*, 390 F. Supp. 1291 (N.D. Ill. 1975), a federal District Court upheld an Illinois supermajority requirement for ratification of a proposed amendment to the U.S. Constitution.

[4] The seven States requiring "supermajority" votes to ratify amendments are Alabama, Colorado, Delaware, Georgia, Idaho, Illinois, and Kansas. See Scott Mackey and Brenda Erickson, *The Balanced Budget Amendment: The Road to Ratification: A Preliminary Report*, (Washington: National Conference of State Legislatures, 1995), p. 4.

[5] The Equal Rights Amendment was proposed on March 22, 1972. The original ratification deadline of March 21, 1979 was extended until January 30, 1982, with the adoption of H.J. Res. 638 on October 11, 1978.

CRS-3

distinguish the Equal Rights Amendment extension from efforts to revive amendments whose deadlines have expired because the ERA deadline was extended before the original deadline had expired.

The following tables list information about amendments that were proposed by Congress.  Table 1 lists the dates of proposal and ratification, and the number of days each successful amendment was pending before the states before ratification.  Table 2 provides summary statistics about amendments, and Table 3 lists the amendments Congress proposed that were not ratified by the states.  Table 3 provides the date the amendment was proposed, its ratification deadline (if it had any) and the number of states that ratified it.

CRS-4

**Table 1.  Time Required to Ratify Constitutional Amendments**

| Amendment | Date Proposed | Date Ratified | No. of days |
|---|---|---|---|
| 1—Religion, speech, assembly | 25-Sep 1789 | 15-Dec-1791 | 811 |
| 2—Bear arms | " | " | 811 |
| 3—Quartering soldiers | " | " | 811 |
| 4—Searches and seizures | " | " | 811 |
| 5—Rights of persons | " | " | 811 |
| 6—Rights of accused | " | " | 811 |
| 7—Civil trials | " | " | 811 |
| 8—Punishment for crime | " | " | 811 |
| 9—Unenumerated rights | " | " | 811 |
| 10—Reserved powers | " | " | 811 |
| 11—Suits against states | 04-Mar-1794 | 07-Feb-1795 | 340 |
| 12—Election of Pres. & Vice Pres. | 09-Dec-1803 | 15-Jun-1804 | 189 |
| 13—Slavery | 31-Jan-1865 | 06-Dec-1865 | 309 |
| 14—Rights guaranteed | 13-Jun-1866 | 09-Jul-1868 | 757 |
| 15—Right to vote | 26-Feb-1869 | 03-Feb-1870 | 342 |
| 16—Income tax | 12-Jul-1909 | 03-Feb-1913 | 1,302 |
| 17—Pop. election of Senators | 13-May-1912 | 08-Apr-1913 | 330 |
| 18—Prohibition | 18-Dec-1917 | 16-Jan-1919 | 394 |
| 19—Women's suffrage | 04-Jun-1919 | 18-Aug-1920 | 441 |
| 20—Commencement of terms | 02-Mar-1932 | 23-Jan-1933 | 327 |
| 21—Repeal of prohibition | 20-Feb-1933 | 05-Dec-1933 | 288 |
| 22—Presidential tenure | 21-Mar-1947 | 27-Feb-1951 | 1,439 |
| 23—Pres. electors for D.C. | 17-Jun-1960 | 29-Mar-1961 | 285 |
| 24—Abolition of poll taxes | 27-Aug-1962 | 23-Jan-1964 | 514 |
| 25—Pres. vacancy, disability | 06-Jul-1965 | 10-Feb-1967 | 584 |
| 26—18-year-old vote | 23-Mar-1971 | 01-Jul-1971 | 100 |
| 27—Congressional salaries | 25-Sep-1789 | 07-May-1992 | 74,003 |

Source:  For dates proposed and ratified:  U.S. Congress,  House. *The Constitution of the United States of America, As Amended*,  H. Doc. 102-188,  102nd Cong., 2nd sess., (Washington: GPO, 1992).  Time to ratify calculated by CRS.

CRS-5

## Table 2.  Range, Mean, and Median Values for Ratifying
## Ratifying Constitutional Amendments
(Excluding 27th Amendment)

| | | |
|---|---|---|
| Maximum time to ratify | 22nd amend. | 1,439 days |
| Minimum time to ratify | 26th amend. | 100 days |
| Mean and median times to ratify | Median | Mean |
| 18th & 19th centuries | 811 days | 670 days |
| 20th century | 394 days | 546 days |
| 18th - 20th centuries | 670 days | 617 days |

## Table 3.  Unratified Amendments

| Subject | Date proposed | Ratification deadline | No. of states ratifying |
|---|---|---|---|
| APPORTIONMENT—Regulates the apportionment of Representatives among the states. | 25-Sep-1789 | None | 10 |
| TITLES OF NOBILITY—Revokes citizenship of people accepting titles of nobility or "any present, pension, office or emolument of any kind whatever, from any emperor, king, prince or foreign power." | 1-May-1810 | None | 12 |
| SLAVERY—Prohibits constitutional amendments that will authorize Congress to "abolish or interfere, within any State, with the domestic institutions thereof, including that of persons held to labor or service by the laws of said State." | 2-Mar-1861 | None | 2 |
| CHILD LABOR—Gives Congress the "power to limit, regulate, and prohibit the labor of persons under 18 years of age." | 2-Jun-1924 | None | 28 |
| EQUAL RIGHTS—"Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex." | 22-Mar-1972 (proposed) 11-Oct-1978 (extended) | 21-Mar-1979 (original) 30-Jan-82 (extension) | 35 |
| D.C. REPRESENTATION—Treats the District of Columbia "as a State ... for the purposes of representation in the Congress, election of the President and Vice President, and article V of this Constitution." | 22-Aug-1978 | 21-Aug-1985 | 16 |

Sources:  U.S. Congress, House, *The Constitution of the United States of America As Amended,* H. Doc. No. 102-188, 102nd Cong., 2nd sess, (Washington: GPO, 1992);  U.S. Library of Congress, Congressional Research Service, *Proposed Amendments to the Constitution of United States of America Introduced in Congress from the 91st Congress, 1st Session, Through the 98th Congress, 2nd Session, January 1969-December 1984*, by Richard A. Davis, CRS Report 85-36 GOV, (Washington: Feb . 1, 1985.)

# Exhibit C

'

## Part 4.—Government Services Administration Documents

### (To be found in the files of the subcommittee)

---

## Part 5.—Library of Congress Wording and Type of Legislative Action on State Ratification of the Proposed Equal Rights Amendment

### (By Karen R. Keesling, Analyst in American National Government, Government Division, July 14, 1978)

#### State Ratification of the Proposed Equal Rights Amendment

#### (Wording and type of legislative action)

This report presents a summary of the wording and the type of legislative action taken by the 35 States which have ratified the proposed Equal Rights Amendment to the United States Constitution. The proposed Amendment, H.J. Res. 208, was passed by the Congress on March 22, 1972 and submitted to the States for their consideration. The following is the text of H.J. Res. 208:

##### H.J. RES. 208

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein),* That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

##### "ARTICLE —

"Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"Sec. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"Sec. 3. This amendment shall take effect two years after the date of ratification."

##### WORDING OF STATE RATIFICATION RESOLUTION

*State ratifications that quoted H.J. Res. 208 in its entirety*

Twenty-five State ratifications quoted H.J. Res. 208 in its entirety, including the language referring to the seven year ratification period. These are: California, Colorado, Connecticut, Hawaii, Idaho, Indiana, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Montana, Nebraska, New Hampshire, New Mexico, North Dakota, Ohio, South Dakota, Tennessee, Texas, Washington, West Virginia, Wisconsin and Wyoming. The ratification resolutions are reproduced in the Appendix.

*State ratifications not quoting H.J. Res. 208 in its entirety, but referring to the seven year ratification period*

Five State ratifications did not quote H.J. Res. 208 in its entirety, but during the ratification process included reference to the seven year time limit for rati-

(739)

Generated on 2020-09-22 04:18 GMT / https://hdl.handle.net/2027/mdp.39015026756604
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by   .  Original from
UNIVERSITY OF MICHIGAN

fication. These States are: Delaware, Kentucky,[1] New York, Oregon, and Vermont. The ratification resolutions are reproduced in the Appendix.

*State ratifications not referring to the seven year ratification period*

Five States did not quote H.J. Res. 208 in its entirety nor did they include any mention of the seven year ratification period during their ratification process. These States are: Alaska,[2] Maryland, New Jersey, Pennsylvania, and Rhode Island. The ratification resolutions are reproduced in the Appendix.

### TYPE OF LEGISLATIVE ACTION

*Concurrent resolution*

The following nine States ratified the proposed ERA by concurrent resolution: Colorado, Delaware, Hawaii, Kansas, New Hampshire, New Jersey, New York, North Dakota, and Texas.

*Joint resolution*

The following twenty-two States ratified the proposed ERA by joint resolution: Alaska, California, Connecticut, Idaho, Indiana, Iowa, Kentucky, Maine, Maryland, Michigan, Montana, New Mexico, Ohio, Oregon, Pennsylvania, South Dakota, Tennessee, Vermont, Washington, West Virginia, Wisconsin, and Wyoming.

*Resolution*

The following four States ratified the proposed ERA by resolution: Massachusetts, Minnesota, Nebraska, and Rhode Island.

## STATE RATIFICATION DOCUMENTATION

### ALASKA STATE LEGISLATURE—1972

#### HOUSE JOINT RESOLUTION NO. 125

Relating to the ratification of the 27th Amendment to the Constitution of the United States.

*Be it resolved by the Legislature of the State of Alaska:*

Whereas the Congress of the United States has approved a proposed amendment to the United States Constitution that stipulates "Equality of rights under the law shall not be denied or abridged by the United States or by any state on account of sex"; and

Whereas this proposal has been sent to the states for ratification: be it

*Resolved,* That the Seventh Alaska Legislature hereby ratifies the proposed 27th Amendment to the Constitution of the United States prohibiting the denial or abridgment of equality of rights under the law by the United States or by any state on account of sex.

———

### CALIFORNIA

#### RESOLUTION CHAPTER —

Senate Joint Resolution No. 80—Relative to ratification of an amendment to the Constitution of the United States, proposed by the Congress of the United States, relating to equal rights for men and women.

#### LEGISLATIVE COUNSEL'S DIGEST

SJR 80. Dymally. Equal rights.

Ratifies proposed amendment to United States Constitution relating to equality of rights for men and women.

---

[1] The wording of the Kentucky resolution omitted two words and one comma in the Article. At the request of the Director of the Federal Register, Kentucky submitted a new certificate containing reference to H.J. Res. 208, which was accepted as ratification of the proposed ERA by the State of Kentucky.

[2] The State of Alaska included only Section 1 of the Article in its ratification resolution. The Director of the Federal Register requested that the certification of ratification include a reference to H.J. Res. 208, which was completed by Alaska and subsequently accepted by the Director as ratification of the proposed ERA by the State of Alaska.


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2020-09-22 04:17 GMT / https://hdl.handle.net/2027/mdp.39015026756604
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

# Exhibit D

Ervin and others adding a 7-year deadline for ratification. In proposing the deadline, Senator Ervin stated that:

> My other proposed alteration of the original purpose of the resolution would require that this resolution be ratified by three-fourths of the States within 7 years after submission by Congress to them for consideration. This is necessary because we still have floating around some unratified amendments that were submitted at the time of the original submission of the Bill of Rights. We have some other amendments that have been floating around since about 1860. There is no date for their expiration, no time limit for their ratification, and they could be ratified at any time. I do not think it is wise for Congress to submit a proposed constitutional amendment to the States without a time limit for its ratification. [116 Cong. Rec. 36302.]

However, despite the attempts to compromise, no final vote on the resolution was taken by the Senate during the 91st Congress.

In the 92d Congress, the House passed House Joint Resolution 208, containing a 7-year ratification period in the proposing clause. No discussion of the inclusion of this provision appears in the floor debates on the date of passage, October 12, 1971, 117 Congressional Record 35782–35815, but it appears that the provision was added to meet the arguments of the amendment's critics in both the House and the Senate. On March 22, 1978, the Senate passed House Joint Resolution 208 with no further discussion of the time limit. See generally 117 Congressional Record 9517–9598.

Although there was very little discussion on the addition of a deadline for ratification of the amendment on the floor of either House, apart from the few instances mentioned above, there were some references to the issue during the hearings on House Joint Resolution 208 held by the Subcommittee on Civil and Constitutional Rights of this committee in March and April of 1971. These references indicate that the amendment's sponsor, Representative Martha Griffiths, had no objection to a time limit, although she believed none was necessary.

The legislative history reveals no reason for inclusion of the deadline provision other than that such a provision had become customary and several influential Members of both Houses objected to its absence strongly enough that it was eventually added. In addition, the 7-year limitation had received a stamp of approval from the Supreme Court in *Dillon* v. *Gloss*, 256 U.S. 368 (1921). In that case the Court had held that with regard to the deadline in the 18th amendment, Congress had the authority under article V to fix a reasonable time for ratification after the proposal of an amendment. This authority was found to be incident of congressional power to designate the mode of ratification. With regard to the specific 7-year time period involved, the Court simply stated that "it is not questioned that 7 years * * * was reasonable. * * *" 256 U.S., at 376.

## AUTHORITY OF CONGRESS TO EXTEND

*Introduction*

The question whether Congress has the authority to extend the time for ratification in the manner proposed, is one of first impres-

# Exhibit E

# EQUAL RIGHTS AMENDMENT - PROPOSED MARCH 22, 1972
## LIST OF STATE RATIFICATION ACTIONS

The following dates reflect the date of the state legislature's passage, the date of filing with the Governor or Secretary of State, or the date of certification by the Governor or Secretary of State, whichever is the earliest date included in the official documents sent to the NARA, Office of the Federal Register. (Updated as of: 03/24/2020)

| STATE | RATIFICATION | STATE | RATIFICATION |
|---|---|---|---|
| Alabama | not ratified | Montana | Jan. 25, 1974 |
| Alaska | April 5, 1972 | Nebraska* | March 29, 1972 |
| Arizona | not ratified | Nevada** | March 22, 2017 |
| Arkansas | not ratified | New Hampshire | March 23, 1972 |
| California | Nov. 13, 1972 | New Jersey | April 17, 1972 |
| Colorado | April 21, 1972 | New Mexico | Feb. 28, 1973 |
| Connecticut | March 15, 1973 | New York | May 18, 1972 |
| Delaware | March 23, 1972 | North Carolina | not ratified |
| Florida | not ratified | North Dakota | Feb. 3, 1975 |
| Georgia | not ratified | Ohio | Feb. 7, 1974 |
| Hawaii | March 22, 1972 | Oklahoma | not ratified |
| Idaho* | March 24, 1972 | Oregon | Feb. 8, 1973 |
| Illinois** | May 30, 2018 | Pennsylvania | Sept. 26, 1972 |
| Indiana | Jan. 24, 1977 | Rhode Island | April 14, 1972 |
| Iowa | March 24, 1972 | South Carolina | not ratified |
| Kansas | March 28, 1972 | South Dakota* | Feb. 5, 1973 |
| Kentucky* | June 27, 1972 | Tennessee* | April 4, 1972 |
| Louisiana | not ratified | Texas | March 30, 1972 |
| Maine | Jan 18, 1974 | Utah | not ratified |
| Maryland | May 26, 1972 | Vermont | March 1, 1973 |
| Massachusetts | June 21, 1972 | Virginia** | January 27, 2020 |
| Michigan | May 22, 1972 | Washington | March 22, 1973 |
| Minnesota | Feb. 8, 1973 | West Virginia | April 22, 1972 |
| Mississippi | not ratified | Wisconsin | April 26, 1972 |
| Missouri | not ratified | Wyoming | Jan. 26, 1973 |

| * Purported Rescission | |
|---|---|
| Nebraska | March 15, 1973 |
| Tennessee | April 23, 1974 |
| Idaho | Feb. 8, 1977 |
| Kentucky | March 20, 1978 |
| South Dakota | March 5, 1979 |

** Ratification actions occurred after Congress's deadline expired. *See* U.S. Dep't of Justice, Office of Legal Counsel, *Ratification of the Equal Rights Amendment*, 44 Op. O.L.C. __, Slip Op. (Jan. 6, 2020).

# Exhibit F

# JOINT RESOLUTION

# SECOND SESSION, NINETY-FIFTH CONGRESS

## Joint Resolution

Extending the deadline for the ratification of the equal rights amendment.                    [H.J. Res. 638]

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That notwithstanding any provision of House Joint Resolution 208 of the Ninety-second Congress, second session, to the contrary, the article of amendment proposed to the States in such joint resolution shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States not later than June 30, 1982.                    86 Stat. 1523.

> THOMAS P. O'NEILL, JR.,
> *Speaker of the House of Representatives.*

> JAMES O. EASTLAND,
> *President of the Senate pro Tempore.*

JIMMY CARTER,
*October 20, 1978.*

I certify that this Joint Resolution originated in the House of Representatives.

> EDMUND L. HENSHAW, JR.,
> *Clerk.*

[Received by the Office of the Federal Register, National Archives and Records Service, General Services Administration, October 20, 1978.]

---

LEGISLATIVE HISTORY:

HOUSE REPORT No. 95–1405 (Comm. on the Judiciary).
CONGRESSIONAL RECORD, Vol. 124 (1978):
    Aug. 15, considered and passed House.
    Sept. 28, Oct. 3, 4, 6, considered and passed Senate.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 14, No. 42:
    Oct. 20, Presidential statement.

# Exhibit G

Office - Supreme Court, U.
F I L E D

JUL   9   1982

ALEXANDER L. STEV.
CLER:

Nos. 81-1282, 81-1283, 81-1312, and 81-1313

# In the Supreme Court of the United States

## OCTOBER TERM, 1982

---

NATIONAL ORGANIZATION FOR WOMEN, INC., ET AL.,
APPELLANTS AND PETITIONERS

*v.*

STATE OF IDAHO, ET AL.

---

GERALD P. CARMEN, ADMINISTRATOR OF GENERAL
SERVICES, APPELLANT AND PETITIONER

*v.*

STATE OF IDAHO, ET AL.

---

*ON APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO IN NOS. 81-1282 AND 81-1312
AND ON WRITS OF CERTIORARI BEFORE JUDGMENT TO
THE UNITED STATES COURT OF APPEALS FOR THE
NINTH CIRCUIT IN NOS. 81-1283 AND 81-1313*

---

**MEMORANDUM FOR THE ADMINISTRATOR
OF GENERAL SERVICES SUGGESTING MOOTNESS**

---

LAWRENCE G. WALLACE
*Acting Solicitor General
Department of Justice
Washington, D.C. 20530
(202) 633-2217*

Library of Congress

## TABLE OF AUTHORITIES

Page

Cases:

DeFunis v. Odegaard, 416 U.S. 312 ............ 4

Great Western Sugar Co. v. Nelson, 442
  U.S. 92 .................................. 4

North Carolina v. Rice, 404 U.S. 244 ......... 4

United States v. Alaska Steamship Co.,
  253 U.S. 113 ............................. 4

United States v. Munsingwear, Inc., 340
  U.S. 36 .................................. 4

Statute:

1 U.S.C. 106b .............................. 2

Miscellaneous:

H.R.J. Res. 208, 92d Cong., 1st Sess.
  (1972), 86 Stat. 1523  ................... 2

H.R.J. Res. 638, 95th Cong., 2d Sess.
  (1978), 92 Stat. 3799  ................... 2

# In the Supreme Court of the United States

OCTOBER TERM, 1982

---

Nos. 81-1282 and 81-1283

NATIONAL ORGANIZATION FOR WOMEN, INC., ET AL.,
APPELLANTS AND PETITIONERS

*v.*

STATE OF IDAHO, ET AL.

---

Nos. 81-1312 and 81-1313

GERALD P. CARMEN, ADMINISTRATOR OF GENERAL
SERVICES, APPELLANT AND PETITIONER

*v.*

STATE OF IDAHO, ET AL.

---

*ON APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO IN NOS. 81-1282 AND 81-1312
AND ON WRITS OF CERTIORARI BEFORE JUDGMENT TO
THE UNITED STATES COURT OF APPEALS FOR THE
NINTH CIRCUIT IN NOS. 81-1283 AND 81-1313*

---

**MEMORANDUM FOR THE ADMINISTRATOR
OF GENERAL SERVICES SUGGESTING MOOTNESS**

---

1. These cases present several questions concerning the ratification by the states of the proposed Equal Rights Amendment to the Constitution. Congress passed a resolution proposing that Amendment in March 1972. The preamble of the resolution specified that the Amendment

2

"shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress." H.R.J. Res. 208, 92d Cong., 1st Sess. (1972), 86 Stat. 1523 (81-1282 J.S. App. 154a).

During the seven years after the Amendment was proposed, 35 of the necessary 38 states ratified it and, pursuant to 1 U.S.C. 106b, transmitted official ratification documents to the Administrator of General Services (81-1282 J.S. App. 4a). Five of the ratifying states, including appellee-respondent Idaho, also passed resolutions purporting to withdraw their ratifications (id. at 4a & n.2). Idaho notified the Administrator of its rescission resolution (id. at 8a).

In August and October 1978, each House of Congress passed, by a majority (but less than two-thirds) vote, a resolution extending the expiration date of the proposed Amendment by 39 months, until June 30, 1982. H.R.J. Res. 638, 95th Cong., 2d Sess. (1978), 92 Stat. 3799 (81-1282 J.S. App. 155a). The President signed the resolution on October 20, 1978 (ibid.).

2. Appellee-respondents--Idaho and Arizona, a state that has not ratified the Amendment (81-1282 J.S. App. 8a-9a), and legislators from those two states—brought this suit in the United States District Court for the District of Idaho against the Administrator of General Services in May 1979. The National Organization for Women (NOW) intervened in the suit as a defendant.[1] Plaintiffs sought a declaration that Idaho's rescission was valid and nullified its prior ratification; an injunction requiring the

---

[1]Legislators from the State of Washington intervened as plaintiffs. 81-1282 J.S. App. 2a.

3

Administrator not to list Idaho as a ratifying state; and an injunction restraining the Administrator from taking account of any ratification that occurred after the expiration of the original seven-year period (id. at 2a).

The district court ruled in favor of plaintiffs. It held that plaintiffs had standing to sue and that their claims were ripe and did not present a political question (81-1282 J.S. App. 13a-76a). The district court then declared that the state rescissions nullified the prior ratifications, that Congress could establish the period in which ratifications would be valid only by a two-thirds vote, and that in any case Congress lacked the power to extend the ratification period for a proposed amendment once that period had been established (id. at 76a-93a).

The Administrator and NOW appealed to the United States Court of Appeals for the Ninth Circuit, filed petitions for a writ of certiorari before judgment to that court, and docketed appeals in this Court. On January 25, 1982, the Court granted the petitions for a writ of certiorari, postponed further consideration of the question of jurisdiction on appeal to the hearing of the cases on the merits, consolidated the cases, and stayed the judgment of the district court.

3. On June 30, 1982, the extended period for ratifying the Amendment expired. The Administrator informs us that no state transmitted a ratification of the Amendment during the period after the original expiration date of March 22, 1979. Congress has not passed any additional extension.

Consequently, the Amendment has failed of adoption no matter what the resolution of the legal issues presented here, and the Administrator informs us that he will not certify to Congress that the Amendment has been adopted. Even if all the ratifications remain valid, the rescissions are disregarded, and Congress is conceded the power to extend the

4

ratification period as it did here, only 35 of the necessary 38 states can be regarded as having ratified the Amendment. If appellee-respondents were to prevail on all issues, fewer than 35 states would be counted as having ratified the Amendment, and the Amendment would be regarded as having failed of adoption in March 1979. But the date on which the proposed Amendment failed of adoption, and the extent to which it fell short of the necessary three-fourths of the states, do not affect the legally cognizable interests of any party.

Because these cases accordingly present only " 'questions that cannot affect the rights of litigants in the case before' " the Court (*DeFunis* v. *Odegaard*, 416 U.S. 312, 316 (1974), quoting *North Carolina* v. *Rice*, 404 U.S. 244, 246 (1971)), they are moot. See *United States* v. *Alaska Steamship Co.*, 253 U.S. 113, 116 (1920). It is therefore respectfully submitted that the judgment of the district court should be vacated and the cases remanded with instructions to dismiss the complaint as moot. See, *e.g.*, *Great Western Sugar Co.* v. *Nelson*, 442 U.S. 92 (1979); *United States* v. *Munsingwear, Inc.*, 340 U.S. 36, 39-41 (1950).

LAWRENCE G. WALLACE
*Acting Solicitor General**

JULY 1982

*The Solicitor General is disqualified in these cases.

# Exhibit H

FILED

AUG 6 1982

ALEXANDER L. STEVAS
CLERK

Nos. 81-1282, 81-1283, 81-1312 and 81-1313

IN THE

# Supreme Court of the United States

OCTOBER TERM, 1981

NATIONAL ORGANIZATION FOR WOMEN, INC., *et al.,*
*Appellants and Petitioners,*

v.

STATE OF IDAHO, *et al,*
*Appellees and Respondents.*

GERALD P. CARMEN, ADMINISTRATOR OF
GENERAL SERVICES,
*Appellant and Petitioner,*

v.

STATE OF IDAHO, *et al,*
*Appellees and Respondents.*

ON APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO IN NOS. 81-1282 AND 81-1312
ON PETITIONS FOR WRIT OF CERTIORARI BEFORE
JUDGMENT TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT IN NOS. 81-1283 AND 81-1313

RESPONSE OF THE STATES OF IDAHO AND ARIZONA, *ET AL,*
IN OPPOSITION TO THE ADMINISTRATOR'S
SUGGESTION OF MOOTNESS

DAVID H. LEROY, Esq.
Idaho Attorney General
  (Counsel of Record)
LARRY K. HARVEY, Esq.
Chief Deputy
  Statehouse
  Boise, Idaho 83720
  (208) 334-2400

[List of Counsel continued on inside cover]

MAXWELL A. MILLER, Esq.
Mountain States Legal
Foundation
  1200 Lincoln St., Suite 600
  Denver, Colorado 80203
  (303) 861-0244

JOHN L. RUNFT, Esq.
TERRY E. COFFIN, Esq.
Runft, Stecher & Coffin, Ctd.
  420 West Bannock Street
  Boise, Idaho 83702
  (208) 345-6521

ROBERT K. CORBIN, Esq.
Arizona Attorney General
ANTHONY CHING, Esq.
Arizona Solicitor General
  1275 W. Washington Street
  Phoenix, Arizona 85007
  (602) 255-5025

DAVID WM. WEST, Esq.
West and Bliss, P.A.
  4154 North 12th Street
  Phoenix, Arizona 85104
  (602) 263-7891

Counsel for Appellees/Respondents

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| INTRODUCTION AND SUMMARY OF ARGUMENT | | 2 |
| I. | THIS APPEAL RAISES TRANSCENDENT LEGAL QUESTIONS CONCERNING THE AMENDMENT PROCESS THAT ARE NOT MOOT BECAUSE THEY ARE NOT DEPENDENT UPON THE POLITICAL FATE OF THE PROPOSED TWENTY-SEVENTH AMENDMENT | 5 |
| II. | THIS CONTROVERSY IS NOT MOOT BECAUSE THE ACTS COMPLAINED OF HAVE CONTINUING, PERVASIVE AND ADVERSE EFFECTS IN NEED OF JUDICIAL REMEDY | 7 |
| | A. The expiration of the extension period on June 30, 1982, has not eradicated the harm to the states and the amendment process caused by passage of the extension | 7 |
| | B. The expiration of the extension period on June 30, 1982, has not eradicated the harm to the amendment process as occasioned by the refusal to honor rescissions | 10 |
| III. | THE VITAL PUBLIC INTEREST ISSUES RAISED BY THIS APPEAL ARE NOT MOOT BECAUSE THEY ARE CAPABLE OF REPETITION YET EVADING REVIEW | 12 |
| | A. Congressional manipulation of the amendment process is capable of repetition, yet evading review | 12 |
| | B. The rescission issue is capable of repetition, yet evading review | 16 |
| IV. | THE PRESENT APPEAL IS STRONGLY ANALOGOUS TO THE ELECTION CASES THIS COURT HAS DECIDED DESPITE MOOTNESS CHALLENGES | 17 |
| CONCLUSION | | 19 |

# TABLE OF CITATIONS

*Cases:*                                                                Page

Baker v. Carr, 369 U.S. 186 (1962) . . . . . . . . . . . . . . . . .   9,10
Bus Employees v. Missouri, 374 U.S. 74 (1963) . . . . . . . .   8
Carroll v. Princess Anne, 393 U.S. 175 (1963) . . . . . . . . .   8
Coleman v. Miller, 307 U.S. 433 (1939) . . . . . . . . . . . . . .   8,15
County of Los Angeles v. Davis, 440 U.S. 625 (1978) . . . .   7
Dillon v. Gloss, 256 U.S. 368 (1921) . . . . . . . . . . . . . . . .   9
Dunn v. Blumstein, 405 U.S. 330 (1972) . . . . . . . . . . . . . .   19
Dyer v. Blair, 390 F.Supp. 1291 (N.D. Ill. 1975) . . . . . . . .  8-9,11,17
Gerstein v. Pugh, 420 U.S. 103 (1975) . . . . . . . . . . . . . . .   13
Goldwater v. Carter, 444 U.S. 996 (1979) . . . . . . . . . . . .   9,20
MacDougall v. Green, 335 U.S. 281 (1948) . . . . . . . . . . . .   18
Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803) . . . . .   10
Maryland Casualty Co. v. Pac. Coal & Oil Co., 312 U.S.
   270 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
Moore v. Ogilvie, 394 U.S. 814 (1969) . . . . . . . . . . . . . . .  12,17,19
Murphy v. Hunt, 50 U.S.L.W. 4264 (1982) . . . . . . . . . . . .   13
Powell v. McCormack, 395 U.S. 486 (1969) . . . . . . . . . . .   10
Preiser v. Newkirk, 422 U.S. 395 (1975) . . . . . . . . . . . . .   13
Roe v. Wade, 410 U.S. 113 (1973) . . . . . . . . . . . . . . . . . .   12
Rosario v. Rockefeller, 410 U.S. 752 (1973) . . . . . . . . . . .   19
So. Pac. Terminal Co. v. I.C.C., 219 U.S. 433 (1911) . . . .   12
So. Pac. Terminal Co. v. I.C.C., 219 U.S. 498 (1911) . . . .  12,13,19
Storer v. Brown, 415 U.S. 724 (1974) . . . . . . . . . . . . . . .   12,18
Super Tire Engineering Co. v. McCorkle, 416 U.S. 115
   (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
U.S. v. Munsingwear, Inc., 340 U.S. 36, 39-40 (1950) . . .   7
U.S. v. W.T. Grant Co., 345 U.S. 629 (1953) . . . . . . . . . . .   7,8
Weinstein v. Bradford, 423 U.S. 147, 149 (1975) . . . . . . . .   13

*Other Authorities:*

United States Constitution, Article III . . . . . . . . . . . . . . .   7
United States Constitution, Article V . . . . . . . . . . . . . . . .   *passim*
1 U.S.C. § 106(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
H.J. Res. 208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
H.J. Res. 638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

**TABLE OF CITATIONS — Continued**

S. 2307, 90th Cong., 1st Sess. (1967) . . . . . . . . . . . . . . . . .   16
S. 623, 91st Cong., 1st Sess. (1969) . . . . . . . . . . . . . . . . .   16
S. 215, 92nd Cong., 1st Sess. (1971) . . . . . . . . . . . . . . . . .   16
S. 1271, 93rd Cong., 1st Sess. (1973) . . . . . . . . . . . . . . . . .   16
Cong. Globe, 41st Cong., 2nd Sess., 28 (1869) . . . . . . . . .   16
Cong. Globe, 41st Cong., 2nd Sess., 5356 (1870) . . . . . .   16
Cong. Globe, 41st Cong., 3rd Sess., 1381 (1871) . . . . . . . .   16

*Joint Resolution Extending the Deadline for the Ratifica-
tion of the Equal Rights Amendment, 1978: Hearings on
S.J. Res. 134 Before the Subcommittee on the Constitution,*
95th Cong., 1st Sess. 105 (1978) . . . . . . . . . . . . . . . . . . . .   6

IN THE

# Supreme Court of the United States

OCTOBER TERM, 1981

———

NATIONAL ORGANIZATION FOR WOMEN, INC., *et al.,*
*Appellants and Petitioners,*

v.

STATE OF IDAHO, *et al.,*
*Appellees and Respondents.*

———

GERALD P. CARMEN, ADMINISTRATOR OF
GENERAL SERVICES,
*Appellant and Petitioner,*

v.

STATE OF IDAHO, *et al.,*
*Appellees and Respondents.*

———

ON APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO IN NOS. 81-1282 AND 81-1312
ON PETITIONS FOR WRIT OF CERTIORARI BEFORE
JUDGMENT TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT IN NOS. 81-1283 AND 81-1313

———

RESPONSE OF THE STATES OF IDAHO AND ARIZONA, *ET AL,*
IN OPPOSITION TO THE ADMINISTRATOR'S
SUGGESTION OF MOOTNESS

———

2

## INTRODUCTION AND SUMMARY OF ARGUMENT

This response is made to the suggestion by Gerald P. Carmen, Administrator of General Services (hereafter "Administrator"), that the Court vacate the district court's judgment on the ground of mootness, without further briefing or oral argument. State-appellees respectfully submit that the Administrator's advice to this Court that this case now presents only questions that cannot affect the rights of litigants as a result of the expiration of the extension resolution (H.J. Res. 638) is erroneous and misguided.

State-appellees submit that a summary vacation on the issue of mootness would not be the simple, elegant solution to the issues of this case as envisioned by the Administrator. Rather, vacation of the judgment on grounds of mootness in this case would effectively decide, without the benefit of briefing, argument and reflection, many of those very issues of fundamental constitutional significance, consideration of which the Administrator seeks to avoid. Specifically, such a ruling would effectively decide the "antecedent" issue of whether Congress has plenary power and control over the amending process under Article V and thereby determine many of the other issues and policies presented by this case.

A summary ruling as suggested by the Administrator would effectively permit unprincipled political expediency to determine the *process* for amending the Constitution. Such a result was neither intended by the framers of the Constitution nor embraced in Article V. In rejecting that result-oriented outcome, the district court ruled that the "contemporaneous consensus" required by Article V in order for an amendment to become part of the Constitution means an actual consensus reflecting a state legislature's express consent. Consensus cannot mean that Congress has power to manipulate the process to effect the end it favors. The process instead must be independent of politics, consistent with Article V's consensus requirement, and constant for every amendment Congress may propose. In this respect, the district court opinion protects the amendment process.

The Administrator and the National Organization for Women (NOW) have repeatedly claimed that the case involves

3

little more than judicial intervention in politics, and that the interests Arizona and Idaho seek to protect are somehow tied to the life or death of the proposed Twenty-Seventh Amendment (the amendment). That is an erroneous view of this case.[1]

Arizona and Idaho have consistently maintained that their interest is in protecting the integrity of the amendment process and ensuring their constitutional right to full participation in that process. These states seek to repair the damage done to their roles in the amendatory process and to clarify Article V's meaning notwithstanding the amendment's political fate.

Arizona's and Idaho's interests are similar to that of a voter who has been wrongfully denied the right to cast his ballot. If a person wanting to vote for Candidate X had been told at the polls that he could only vote for Candidate Y or that the polls would be open three hours beyond the time they were supposed to be closed to ensure Candidate Y's election, he would have a cause of action against the state official who so corrupted the election process. To sustain the claim, the person would not, in theory, have to await the election's outcome in favor of Candidate Y. In fact, he would find it difficult, if not impossible, to vindicate his right to vote before the election was over. After the election, the effects of the corrupt practice will continue and the likelihood that future elections will be similarly corrupted is real. For that reason the courts have consistently held that challenges to election procedures should not be dismissed for mootness. Likewise, the effects of the corruption of the amendment process in this case persist after June 30, 1982. Congress'

---

[1] The Court's attention is directed to the Administrator's suggestion that this Court consider vacating the judgment of the district court on ripeness grounds set forth in his jurisdictional statement in Case No. 81-1312 at p. 18, fn. 10, *and* the appellees' response.

The Administrator first argued a lack of ripeness and, by virtue of the passage of time only, now argues that the case is moot. The two suggestions share the same theoretical underpinning — the issues presented are political questions left to Congress for decision to the exclusion of this Court. The suggestion of mootness, as was the suggestion of ripeness, is so intertwined with the merits of this case that mootness should be resolved only after plenary consideration based on briefing and oral argument on all issues.

4

extension and the Administrator's rejection of rescissions are notorious precedent for future amendments unless this Court affirms the judgment of the district court. In particular, the effects of the corruption on the balance of the respective state and congressional roles in the amendment process will remain if the Court vacates for mootness.

Aside from the residual injury to the amendment process, there are compelling reasons for deciding the merits of this case. Since the Ninety-Seventh Congress convened in January, 1981, over one hundred amendments to the Constitution have been introduced.[2] Some of these deal with significant social problems, such as busing and abortion, while others attempt to regulate the nation's financial affairs. On July 14, 1982, the proposed Twenty-Seventh Amendment was reintroduced in Congress.

The obvious conclusion to be drawn from these increasing efforts to amend the Constitution is that troublesome questions concerning the amendment process will frequently recur. If, as the Administrator has consistently maintained, the Congress has plenary power to deal with these questions as they arise, the answers are as likely to be as politically motivated and lacking in principled clarity as is the congressional extension of the time period in which states could have ratified the amendment.

The appeal's present posture, without the amendment's political outcome hanging in the balance, presents the best possible setting for the Court to articulate principled rules governing the amendment process. Not only does this Court have continuing power to resolve potentially recurring challenges to the amendment process, but it can forthrightly announce enduring rules, consistent with Article V, absent any pressure to formulate rules that accomplish the politically expedient. In light of the fundamental importance the amendment process has to our constitutional system of government, this Court should give this case plenary review.

---

[2] Of the amendments introduced, forty-six concern the budget process; fifteen deal with the terms of Congress; fifteen involve the election of the President and Vice President; fourteen concern abortion; four concern the tenure of federal judges; nine involve discrimination issues; six deal with prayer in the public schools; one concerns English as the official language; and one involves the death penalty.

5

## I.

## THIS APPEAL RAISES TRANSCENDENT LEGAL QUESTIONS CONCERNING THE AMENDMENT PROCESS THAT ARE NOT MOOT BECAUSE THEY ARE NOT DEPENDENT UPON THE POLITICAL FATE OF THE PROPOSED TWENTY-SEVENTH AMENDMENT.

On March 22, 1972, the Ninety-Second Congress, by the requisite two-thirds vote, passed H.J. Res. 208 proposing "An Amendment to the Constitution of the United States Relative to Equal Rights for Men and Women." As embodied in that proposal, the amendment was to become part of the Constitution "when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by Congress." By October of 1978, only thirty-five of the thirty-eight state tally needed had approved the amendment. The thirty-five state tally was reduced to thirty since five legislatures voted to rescind their previous approvals before the seven-year period had expired. Nebraska rescinded first, on March 15, 1973. Tennessee followed in 1974, Idaho in 1977, Kentucky in 1978 and South Dakota in effect in 1979.

The seven-year time limit set in the proposal sent to the states expired on March 22, 1979. Of the thirty-five states which had approved the proposal as of that date, twenty-four states expressly included the time limitation in their ratifying resolutions, and one of five rescinding states, South Dakota, expressly stated in its rescission that its approval had been intended for seven years only and that Congress had no power to extend the approval beyond the period to which it has initially consented.

To save the proposal from political defeat, the Ninety-Fifth Congress, on October 6, 1978, took the unprecedented step of extending the deadline by which it could be ratified by three-fourths of the states to June 30, 1982. The extension resolution, H.J. Res. 638, by its terms and the statements of its sponsors, was passed upon the presumption that all thirty-five approvals remained valid, notwithstanding the five rescissions or the express expiration dates in twenty-four approvals.

Though a majority in both houses favored the extension, there was insufficient support to pass the proposal by a two-

6

thirds vote. Congress instead passed the resolution by a simple majority, the House by a vote of 253 to 189 and the Senate by a vote of 60 to 36.

In August of 1978, the Archivist of the United States, acting on behalf of the appellant-administrator, presented testimony at the Senate extension hearings.[3] The Administrator explained that his duty under 1 U.S.C. Section 106(b) was to tabulate the state approvals for the proposal and to publish the amendment once three-fourths of the states had ratified it, "along with a certificate proclaiming that the amendment has become valid as part of the Constitution of the United States and specifying the states which have ratified."[4] In deciding what states have or have not ratified, the Administrator explained that he followed "precedents and customs" and, apparently on that basis, declared that the legislatures of thirty-five states had adopted the proposal, thus ignoring all the rescissions.

In ruling on cross-motions for summary judgment, the district court on December 23, 1981, declared the extension unconstitutional and the rescissions valid. The court's ruling was premised, in part, upon a finding that:

> [B]oth the questions of the efficacy of a rescission and the proper procedure for establishing a time period for ratification are the kind of questions that must be interpreted with the kind of consistency that is characteristic of judicial rather than political decision making. Whatever the outcome of these questions as they relate to the powers vested by Article V, they must be interpreted consistently for each amendment that may be proposed.

J.S. App. 76a

---

[3] *Joint Resolution Extending the Deadline for the Ratification of the Equal Rights Amendment, 1978: Hearings on S.J. Res. 134 Before the Subcommittee on the Constitution, 95th Cong., 1st Sess. 105 (1978)* statement of James E. O'Neal, Deputy Archivist, U.S. National Archives and Records Service.

[4] *Id.* 1 U.S.C. § 106(b) is the *sole* statute which serves to guide the amendment process under Article V.

---

7

The foregoing demonstrates that at the heart of this lawsuit are questions of constitutional procedure and power. Does Congress have the power to extend the time limit of a proposed amendment? May it do so by a simple majority? May it extend the time despite incorporation of the original time limit in state approvals? Do states have the power to rescind a prior approval before ratification by three-fourths of the states? Underlying these issues is the antecedent and even more important issue, whether this Court or the Congress is the final arbiter of questions arising under Article V. The dispute over, and the need for answers to, these questions are independent of the amendment's political fate.

## II.

## THIS CONTROVERSY IS NOT MOOT BECAUSE THE ACTS COMPLAINED OF HAVE CONTINUING, PERVASIVE AND ADVERSE EFFECTS IN NEED OF JUDICIAL REMEDY.

### A. *The expiration of the extension period on June 30, 1982, has not eradicated the harm to the states and the amendment process caused by passage of the extension.*

The mootness doctrine is premised on the constitutional requirement that jurisdiction to resolve issues be limited to actual "cases or controversies." U.S. Const., Art. III. Dismissal of a case for mootness is thus warranted where the issues are no longer sufficiently "alive" to necessitate a judicial remedy. It consequently follows that dismissal of a moot case does not injure the parties' interests, *U.S.* v. *Munsingwear, Inc.*, 340 U.S. 36, 39-40 (1950).

The tests this Court has fashioned for determining mootness are explained in *County of Los Angeles* v. *Davis*, 440 U.S. 625 (1978). Emphasizing that parties claiming mootness have a "heavy" burden of proof (*U.S.* v. *W.T. Grant Co.*, 345 U.S. 629, 632-633 (1953)), the *Davis* Court then stated that a case may become moot when:

> 1. it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, *and,*

8

2. interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

440 U.S. at 631 (emphasis added).

> To apply this cumulative test, the Court directed:

> *When both conditions are satisfied*, it may be said that the case is moot because neither party has a legally cognizable interest in the underlying questions of fact and law.

*Id.* (emphasis added)

If either condition continues, the case is accordingly not moot and should be adjudicated because *both* conditions must be met before the case can be dismissed as moot. Both conditions remain unsatisfied in this case. With respect to the second condition, examples of ongoing controversies the Court has adjudicated despite mootness claims include *Bus Employees* v. *Missouri*, 374 U.S. 74 (1963); *Carroll* v. *Princess Anne*, 393 U.S. 175 (1968). In *Bus Employees*, the Court passed upon the merits of a Missouri statute authorizing the governor to seize a strike-bound transit company, even though the governor had rescinded his order. Justice Stewart, speaking for a unanimous Court, held that the merits of the case must be decided because the underlying labor dispute was unresolved. 374 U.S. at 78. The Court in *Carroll* decided the merits of a constitutional challenge to an *ex parte* restraint on free speech notwithstanding expiration of the relevant order. Eight members of the Court in *Carroll* held that the case was not moot because the Maryland Court of Appeals "continues to play a substantial role in the response of officials to their activities." 393 U.S. at 178.

The primary residual, on-going and adverse effect of the extension resolution is the unconstitutional enlargement of congressional power. To bolster the rationale for the extension, the government has adopted the view of the dissenting justices in *Coleman* v. *Miller*, 307 U.S. 433 (1939), that Congress has "plenary authority over the process of amending the Constitution." This dissenting view of congressional power has never been the law and in fact was expressly rejected not only by *Coleman*'s majority but by Judge (now Justice) Stevens in *Dyer* v.

9

*Blair*, 390 F. Supp. 1291, 1300 (N.D. Ill. 1975). When passing the extension, Congress thus usurped unto itself powers it does not have. It effectively embraced the rejected view of the dissenting justices in *Coleman*.

Congress has also enlarged its powers by fabricating authority to extend the time period for ratification where no such power exists. The very rationale in *Dillon* v. *Gloss*, 256 U.S. 368 (1921), upon which Congress' power to set a time period initially is based — i.e., *providing certainty* — is thwarted by an extension.

One of the continuing effects of Congress' unconstitutional expansion of its Article V role is the erosion of the states' role in the amendment process. Under Article V, it is Congress' function to propose amendments and set the conditions for their ratification. The states, through their legislatures, decide whether they will agree with any such proposal. The states' constitutional function in the process of determining a sufficiently "contemporaneous consensus" of the people (*Dillon* v. *Gloss, supra*) is severely hampered if the precedent of the extension resolution is allowed to stand. Not only is the certainty of the process of ratification by the states destroyed by the continuing possibility of congressional extension, but also the states find their authority diminished by the prospect of extension. The possibility of a state's consent to a proposed amendment being extended by Congress might cause such legislatures to be even more guarded in giving such consent. There can be no question that the uncertainty of the contemporaneousness of any such consensus caused by the continued existence of an extension doctrine or precedent will have a deleterious effect on the amendatory process.

Another continuing, adverse effect of extension is unconstitutionally replacing this Court with Congress as the final arbiter of the Constitution. In *Goldwater* v. *Carter*, 444 U.S. 996 (1979), Justice Brennan wrote that the "political question" doctrine restrains courts from reviewing an exercise of decisionmaking by a:

> coordinate political branch to which authority to do make that judgment has been "constitutional[ly] commit[ted]." *Baker* v. *Carr*, 369 U.S.

10

186, 211-213, 217 (1962). But that doctrine does not pertain when a court is faced with the *antecedent* question whether a particular branch has been constitutionally designated as the repository of political decision-making power. C.F. *Powell* v. *McCormack*, 395 U.S. 486, 519-521 (1969). The issue of decision-making authority must be resolved as a matter of constitutional law, not political discretion; accordingly it falls within the competence of the Courts.

440 U.S. at 1006-1007. Justice Brennan made the same observation in *Baker* v. *Carr*: "[D]eciding whether a matter has in any measure been committed by the Constitution to another branch of government . . . is itself a delicate exercise in constitutional interpretation and the responsibility of the Court as ultimate interpreter of the Constitution." 369 U.S. at 211. The "antecedent question" principle is ultimately grounded upon a correct understanding of the separation of powers doctrine and Chief Justice Marshall's famous recognition that "[I]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). As in *Powell* v. *McCormack*, this appeal squarely raises the antecedent question. If this Court dismisses the case as moot, it will be making, *sub silentio*, a decision that the passage of an extension period for ratification of a constitutional amendment by less than the majority required for proposing the amendment is not subject to review because Congress has constitutionally been given that decision-making power. The rules for the amendment process in the future will be set by political whim rather than reasoned application of principle. Protection of the states' Article V role similarly will be dependent upon congressional whim. This antecedent question remains "live" and "legally cognizable" despite the expiration of the June 30, 1982, deadline.

   B. *The expiration of the extension period on June 30, 1982, has not eradicated the harm to the amendment process as occasioned by the refusal to honor rescissions.*

11

By refusing to recognize Idaho's rescission resolution and by refusing to make any official announcement honoring the rescinding resolutions of other states, the Administrator has damaged the sovereign power and authority of the states well beyond the expiration of the extension. As alleged in the complaint and recognized by the district court, the states have a right, inherent in the amendment process, to rescind their previous approval of a proposed amendment prior to its final ratification by a contemporaneous consensus of the states. The Administrator violated the inherent power of the Legislature of the State of Idaho to decide its own will, and procedure for expressing consensus, with respect to constitutional amendments. The Administrator's acts also deprived members of the Idaho Legislature of the effectiveness of their votes and interfered with the rightful prosecution of their legislative duties on behalf of their constituents.

This injury to Idaho has relegated all states to a second-class role in the amendment process without redress for all future constitutional amendment proposals in the event this Court accepts the Administrator's suggestion of mootness. To argue that the "effect" of the refusal to recognize a sovereign state's valid rescission under Article V is "completely and irrevocably eradicated" by the expiration of the extension on June 30th is a fantasy. Unless this Court affirms the judgment of the district court, the state's role in the amendment process will have been irrevocably altered.

This Court's decision in *Super Tire Engineering Co.* v. *McCorkle*, 416 U.S. 115 (1974), supports a conclusion that the case is not moot. In *McCorkle*, this Court held that the case before it was not moot because the policy there challenged "has not ceased" and that it was "fixed and definite." 416 U.S. at 123. Similar to *McCorkle*, the policy challenged here is "fixed and definite." The government's policy on rescissions should not be anything but constant. As noted by Justice (then Judge) Stevens in *Dyer* v. *Blair*, the interpretation of the word "ratification" "must be constant for each amendment that a Congress may propose." 390 F. Supp. at 1303. Consequently, the Administrator's position on what constitutes a binding "ratification" (and the effect of the state's vote to rescind its approval) has continued without modification after the subject expiration

of the extension period and will continue regardless of the substantive content of any particular amendment being considered or the political philosophy of the particular administration then in power. This policy of refusing to recognize a state's rescission during the period allowed for ratification of a constitutional amendment thus raises an on-going case or controversy and is not moot.

The rescission issue also raises the "antecedent question" of who is to be the final arbiter of Article V. For rescission, the question in this case principally is whether the decision on the effect of a state's rescission has been committed to the Administrator's discretion. Though administrative officials are ordinarily entitled to judicial deference in interpreting their duties, in this instance the Court must act as the "ultimate interpreter of the Constitution" if an administrative official is not to have powers no one intended him to have. Ruling the present appeal moot is tantamount to saying that a state's role in, and procedures for, reflecting the "contemporaneous consensus" for an amendment is not committed to elected state legislatures, but is rather in the hands of the Administrator.

### III.

### THE VITAL PUBLIC INTEREST ISSUES RAISED BY THIS APPEAL ARE NOT MOOT BECAUSE THEY ARE CAPABLE OF REPETITION YET EVADING REVIEW.

A. *Congressional manipulation of the amendment process is capable of repetition, yet evading review.*

As an independent test for mootness, this Court has consistently maintained that an action will not be dismissed if the issue is "capable of repetition, yet evading review." Under this prudential doctrine, a case or an issue complained of is "capable of repetition, yet evading review." *So. Pac. Terminal Co.* v. *I.C.C.*, 219 U.S. 433 (1911); *So. Pac. Terminal Co.* v. *I.C.C.*, 219 U.S. 498 (1911); *Moore* v. *Ogilvie*, 394 U.S. 814 (1969); *Roe* v. *Wade*, 410 U.S. 113 (1973); *Storer* v. *Brown*, 415 U.S. 724 (1974); *Super*

*Tire Engineering Co.* v. *McCorkle, 416 U.S. 115 (1974); Gerstein* v. *Pugh*, 420 U.S. 103 (1975); and *Murphy* v. *Hunt*, 50 U.S.L.W. 4264 (March 2, 1982).

This Court's most recent pronouncement on mootness, *Murphy* v. *Hunt*, explained that the "capable of repetition, yet evading review" doctrine was limited to cases where two elements are present: (1) the challenged action was too short in its duration to be fully litigated prior to its succession or expiration; and (2) there is reasonable expectation that the same complaining party would be subject to the same action again. In expanding upon the second element of this test, *Murphy* emphasized that the reasonable expectation must be a "' demonstrated probability' that the same controversy will recur involving the same complaining party." *Id.*, at 4265, quoting *Weinstein* v. *Bradford*, 423 U.S. 147, 149, (1975).

Two additional cases clarify the "capable of repetition, yet evading review" doctrine in declaratory judgment cases: *Maryland Casualty Co.* v. *Pac. Coal & Oil Co.*, 312 U.S. 270 (1941), as explained by *Preiser* v. *Newkirk*, 422 U.S. 395 (1975), and *Super Tire Engineering Co.* v. *McCorkle*. The *Preiser* Court, relying on *Maryland Casualty* language, held that the basic question in determining mootness in a declaratory judgment action is whether the facts alleged under all the circumstances show that there is a substantial controversy between parties having an adverse legal interest of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

In *McCorkle*, after citing with approval the *Maryland Casualty* test, the Court added:

> [A]nd since this case *involves governmental action*, we must ponder the broader consideration whether the short term nature of that action makes the issues here "capable of repetition, yet evading review," so that petitioners are adversely affected by government "without a chance of redress." *So. Pac. Terminal Co.* v. *I.C.C.*, 219 U.S. 498, 515 (1911).

416 U.S. at 122 (emphasis added). *McCorkle* further emphasized that "the challenged government action has not ceased" and the policy challenged is "fixed and definite" and not "con-

14

tingent upon executive discretion," 416 U.S. at 123. In conclusion, the Court stated:

> It is sufficient, therefore, that the litigant show the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest.

416 U.S. at 125-126.

Notwithstanding the expiration of the extension, the issues raised in the present appeal meet the foregoing tests of "capable of repetition, yet evading review." First, the very nature of the extension period granted by Congress is one of relatively short duration, only three years. This action was filed in the district court on May 9, 1979, within two months of the extension's passage. Thereafter, the Justice Department, followed by the National Organization for Women, sought to disqualify Judge Callister on religious grounds. This "case within a case" took years to resolve and was ultimately decided in Judge Callister's favor by the United States Court of Appeals for the Ninth Circuit.

The merits of the case also took years to resolve. Because of the significance and complexity of the issues involved, both sides did extensive briefing on the merits after having taken many months to agree upon a stipulation of facts. After argument in May of 1981, Judge Callister took fully six months to render his thorough decision. The case was promptly before this Court on a petition for certiorari *before* judgment to the Ninth Circuit. NOW filed its motion to expedite this matter on January 8 and 9, 1982. On January 25, 1982, the motion to expedite consideration of the jurisdictional statement was granted, but expedition of plenary consideration was denied. Further consideration of the question of jurisdiction was postponed to the hearing of the case on the merits. Since the Court called for hearing the case on the merits, repeated extensions of time for filing of the joint appendix and briefs have been granted to the Administrator. As of this writing no joint appendix or briefs on the merits have yet been filed. The Administrator has failed to proceed to argument on the merits of the case but rather continues to argue issues piecemeal before this Court. It has been pending for over six months without a decision.

15

Obviously, the three-year extension was too short in its duration to be fully litigated prior to its expiration. The first component of the "capable of repetition, yet evading review" doctrine is thus satisfied.

Second, the state-appellees can reasonably expect to be subjected to the same illegal action by Congress again. Idaho and Arizona now seek to protect the integrity of their role in the federalist scheme embodied in Article V. It is probable that Congress will again propose a constitutional amendment and likewise probable that these states will be again subjected to unlawful manipulation of the amendment process. Since the Administrator and congressional leaders have themselves defended the extension under a theory of plenary power, it is reasonable to assume that having established the precedent, Congress will again assume the power.

Even if Congress does not have plenary power, the legal extent of its powers remains unclear. In *Coleman* v. *Miller*, 307 U.S. 433 (1939), the majority, explaining what is a reasonable time after a proposal of an amendment for ratification by a state, declared:

> The question of reasonable time in many cases would involve . . . an appraisal of a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in courts of justice . . . On the other hand, these conditions are appropriate for the consideration of the political departments of government.

307 U.S. at 453-54. Because *the initial setting* of a reasonable time has been deemed a "political question" committed to the Congress, the argument has been made that Congress can reset or alter the time and impose any condition it wishes. Accepting that rationale leaves nothing to prevent Congress from extending the time limit of future amendments, passing an extension retroactively to revive the amendment, shortening the time period for other proposed amendments, or ignoring state approvals as untimely. Multiple variations of this nightmare are possible. But it is clear that states can reasonably expect that the extension resolution will become a prece-

16

dent in determining the scope of congressional powers in the amendment process.

### B. *The rescission issue is capable of repetition, yet evading review.*

As with the extension, it is reasonable to expect that the rescission issue will recur. The rescission problem has repeatedly frustrated a consistent and principled operation of the amendment process beginning with the Fourteenth and recurring with the Fifteenth and proposed Twenty-Seventh Amendments. Relating to the Fourteenth and Fifteenth Amendments, Congress avoided making a decision on the rescission issue because the amendments had been ratified by a sufficient number of the states without counting the rescissions. In both instances, the Secretary of State (predecessor to the Administrator in the amendatory process) did not issue a proclamation unconditionally promulgating the amendments until the necessary number of states excluding rescinding states had ratified.

Contrary to the assumption and action of the Administrator, congressional precedent concerning rescission remains inconsistent or at least ambiguous. This is further demonstrated by Congress' legislative actions subsequent to ratification of the Fourteenth Amendment. Following ratification, a bill was introduced that would have made rescissions null and void. Cong. Globe, 41st Cong., 2nd Sess., 28 (1869). The measure passed the House but not the Senate. Cong. Globe, 41st Cong., 2nd Sess., 5356 (1870); Cong. Globe, 41st Cong., 3d Sess., 1360 (1871). More recently, the following bills have been initiated in Congress: S. 2307, 90th Cong., 1st Sess. (1967); S. 623, 91st Cong., 1st Sess. (1969); S. 215, 92nd Cong., 1st Sess. (1971); S. 1271, 93rd Cong., 1st Sess. (1973). Most of the recent bills would have confirmed the states' right to rescind. None passed both Houses but the 1973 Senate version confirming the power to rescind passed 84-0.

There are two relevant conclusions to be emphasized from this brief sketch of rescission history and a survey of related legal literature. One is the obvious point that rescission questions concerning their validity have frequently occurred and can be expected to recur. The second and less obvious point is that there is no principled guidance on the rescission issue.

17

tion. Thus, the need for a judicial determination is compelling. Since the question of the validity of rescissions is inextricably intertwined with the Article V "ratification" process and since the validity of rescissions "must be constant for each amendment that Congress may propose," *Dyer* v. *Blair*, 390 F. Supp. at 1303, such questions must be determined by the Court, not by Congress or the Administrator on a case-by-case basis.

Article V embodies a careful balancing of Congress' power to propose, and the states' power both to initiate (by convention) and ratify, changes to the Constitution. The Administrator's determination that a state may not withdraw its earlier approval prior to ratification upsets this constitutional balance by divesting states, including Arizona and Idaho, of their exclusive right ultimately to determine the fate of each proposed amendment. Not only do the effects of this deprivation continue, but there is strong likelihood that, given the ambiguity of congressional precedent, states will attempt rescissions in the future only to find such actions questioned by the Administrator or Congress.

### IV.

## THE PRESENT APPEAL IS STRONGLY ANALOGOUS TO THE ELECTION CASES THIS COURT HAS DECIDED DESPITE MOOTNESS CHALLENGES.

Although this Court has not set up a separate test to evaluate mootness problems in cases challenging election procedures, it has recognized the impossibility of resolving legal challenges to election procedures before the election is held. For that reason, the Court has consistently adjudicated such challenges after the conclusion of the relevant election, recognizing a need to resolve cases involving "a continuing controversy in the federal state area." *Moore* v. *Ogilvie*, 394 U.S. 814 (1969). Since the amendment process is strongly analogous to an election, the rationale of the election cases merits serious consideration in the determination of the issue of mootness in the present appeal.

*Moore* v. *Ogilvie* was a suit for declaratory and injunctive relief brought by individuals who were independent candidates

18

for the offices of electors of the President and Vice President of the United States from Illinois. The defendants were members of the Illinois Electoral Board that had refused to certify the plaintiffs on the November, 1968, election ballot. A three-judge district court dismissed the plaintiff's complaint for failure to state a cause of action, and the case was appealed directly to the United States Supreme Court. On appeal, the appellants filed a motion to expedite the hearing and disposition of the cause (similar to this case) before the election, which the Court denied. After the election, the Illinois Electoral Board urged the Court to dismiss the action as moot since, it was claimed, there was no possibility of granting any relief to appellants. The *Moore* Court, however, declared that the problem posed was one "capable of repetition, yet evading review" even though the election was over. Citing *So. Pac. Terminal Co.*, the Court held that because its decision in *MacDougall* v. *Green*, 335 U.S. 281 (1948), mandated the election procedure used, the case was not moot. The Court expressly recognized that the need for resolution of the case reflected "a continuing controversy in the federal state area." 394 U.S. at 816.

*Storer* v. *Brown*, 415 U.S 724 (1974), involved a similar conclusion and reasoning. As Justice White, speaking for the six members of the Court, explained:

> The 1972 election is long over, and no effective relief can be provided to the candidates or voters, but this case is not moot since the issues properly presented, and their effects on independent candidacies, will persist as California statutes are applied in future elections. This is, therefore, a case where the controversy is "capable of repetition, yet evading review." [Citations omitted] The "capable of repetition, yet evading review" doctrine *in the context of election cases*, is appropriate where there are "as applied" challenges as well as in the more typical case involving only facial attacks. The construction of the statute, and understanding of its operation, and possible constitutional limits on its application will have the effect of simplifying future challenges, *thus increasing the likelihood*

19

> *that timely filed cases can be adjudicated before an election.*

415 U.S. at 737, n. 8 (emphasis added).

Similarly, in *Dunn* v. *Blumstein*, 405 U.S. 330 (1972), this Court stated:

> Although appellee can now vote, the problem to voters posed by the Tennessee residency requirement is "capable of repetition, yet evading review," *Moore* v. *Ogilvie . . . So. Pac. Terminal Co.* v. *I.C.C. . . .* In this case, . . . the laws in question remain on the books, and Blumstein has standing to challenge them as a member of the class of people affected by the present written statute.

405 U.S. at 333, n. 2.

The Court followed the *Dunn* result in *Rosario* v. *Rockefeller*, 410 U.S. 752 (1973), and stated:

> Although the June primary election has been completed and the petitioners will be eligible to vote in the next scheduled New York primary, this case is not moot, since the question petitioners raise is "capable of repetition, yet evading review."

410 U.S. at 756, n. 5.

These cases are strongly analogous to the present appeal. The Administrator has declared a policy of dishonoring rescissions and recognizing Congress' alleged plenary power over the amendment process. Neither of these policies will evaporate simply because the amendment has not been ratified. Instead, they will be the standard by which the process will be guided in the future. Appellees, as participants in that process, thus remain affected by such policies and the controversy is truly one "capable of repetition, yet evading review."

## CONCLUSION

The issues of this appeal have enormous significance and transcend the immediate controversy that brings them to this

20

Court's attention. The parties continue to maintain interests adverse to one another. None of the parties, notwithstanding the passage of the June 30, 1982, deadline for ratification of the amendment, has changed its position on the substantive issues which were raised below and are now squarely before this Court. The requisite "constitutional impasse" (*Goldwater* v. *Carter*, *supra*, at 997-98) has occurred and maintains.

The Administrator's position on mootness is inherently based on the concept that the amendatory process under Article V is wholly political and entirely within the control of Congress. Therefore, according to the Administrator, when the political process ends with the failure of a proposed amendment to achieve ratification, there remain no justiciable issues for review by the Court. However, the Administrator's casting of the issues is erroneous. This case remains justiciable, *inter alia*, for the very reason that state-appellees challenge the congressional plenary power premise upon which the Administrator's theory of mootness is founded. The merits of rescission and extension are thus sub-issues to what Justice Brennan might term "the antecedent question." *Goldwater* v. *Carter*, *supra*, at 1006-07. State-appellees submit that their challenge to the theory of Congress' plenary power over the amendatory process and, hence, the ensuing issues of this case, are properly joined and are not affected by the failure of the proposed Twenty-Seventh Amendment to achieve ratification.

Whatever the outcome, the core meaning of the amendatory procedures under Article V of the Constitution is at stake. Interwoven as a common feature to both the rescission and extension issues is the concept that the "united desire" necessary for constitutional change should reflect the actual "contemporaneous consensus" of the state legislatures rather than a contrivance to ensure the amendment's passage. Further refinement of these concepts will not only determine the difficulty or ease in passing an amendment, but also fundamental matters of allocation of power between the states and the federal government as well as issues concerning the proper role of the judiciary in interpreting the Constitution.

This Court should decide these issues by its traditional deliberative process. To short-circuit that process by a vacation of

21

the judgment below on mootness grounds would be to decide these important questions by default to the concept that Congress has plenary control of the amendatory process and to the continuing injury of the state-appellees' interests. For these reasons, it is respectfully suggested that this Court should proceed to a briefing and hearing of the case on its merits.

Respectfully submitted.
DATED: August 5, 1982.

APPELLEES-RESPONDENTS:

DAVID H. LEROY
Attorney General of Idaho
Counsel of Record

Larry K. Harvey
Chief Deputy
IDAHO ATTORNEY GENERAL

Maxwell A. Miller
MOUNTAIN STATES LEGAL FOUNDATION

Terry E. Coffin
John. L. Runft
RUNFT, STECHER & COFFIN, CTD.

Attorneys for Idaho
Appellees-Respondents

Robert K. Corbin
ATTORNEY GENERAL OF THE
STATE OF ARIZONA
By Anthony B. Ching
SOLICITOR GENERAL OF THE
STATE OF ARIZONA

David Wm. West
WEST AND BLISS, P.A.

Attorneys for Arizona
Appellees-Respondents

# Exhibit I

The New York Times | https://nyti.ms/29QlyMN

# LEADERS CONCEDE LOSS ON EQUAL RIGHTS

**By Marjorie Hunter, Special To the New York Times**

June 25, 1982



See the article in its original context from
June 25, 1982, Section A, Page 1    Buy Reprints

New York Times subscribers* enjoy full access to
TimesMachine—view over 150 years of New
York Times journalism, as it originally appeared.

SUBSCRIBE

*Does not include Crossword-only or
Cooking-only subscribers.

*About the Archive*
*This is a digitized version of an article from The Times's print archive, before the start of online publication in 1996. To preserve these articles as they originally appeared, The Times does not alter, edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems; we are continuing to work to improve these archived versions.*

---

Leaders of the fight for an equal rights amendment officially conceded defeat today. But they vowed to continue the struggle for equality of women by electing their backers to state legislatures and by suing corporations that practice sexual discrimination.

''We've just begun to fight,'' said Eleanor Smeal, the president of the National Organization for Women, the group that spearheaded the Equal Rights Amendment Countdown Campaign, which has now ended in defeat.

In the 10 years since Congress passed the proposed constitutional amendment to forbid discrimination on the basis of sex, it has been ratified by 35 states, three short of the three-fourths it needed to become part of the Constitution.

Hopes for ratification before the deadline next Wednesday were dashed this week when the amendment was rejected by the Illinois House and the Florida Senate, two states in which supporters felt they had a fighting chance. Hope for One of Two Others

Had Illinois and Florida ratified the amendment, there was at least some chance that either Oklahoma or North Carolina would have provided the final needed vote.

Prospects were far slimmer in the other nonratifying states: Alabama, Arizona, Arkansas, Georgia, Louisiana, Mississippi, Missouri, Nevada, South Carolina, Utah and Virginia.

Phyllis Schlafly, a leader of a group called Stop-ERA, hailed the defeat of the amendment tonight, saying: ''They realized E.R.A. is dead and I think that that is an admission they have lost the battle. My feeling is that E.R.A. will take its place with the prohibition and the child labor amendments as ones which did not have enough support of the American people to be in the Constitution.''

A bipartisan group of at least 38 senators, led by Bob Packwood of Oregon, a Republican, and Paul E. Tsongas of Massachusetts, a Democrat, will introduce new legislation in Congress on July 14, calling again for a constitutional amendment that would have to be ratified by three-fourths of the state legislatures.

But at her crowded news conference today in the organization's storefront headquarters on Pennsylvania Avenue, between the Capitol and the White House, Mrs. Smeal said her organization would ''not again seriously pursue the E.R.A. until we've made a major dent'' in the memberships of Congress and state legislatures by electing more women and ''men who are genuinely feminists.''

She said that NOW, with a membership of 200,000 and a goal of at least a million members, intended to create ''an independent political force'' to unseat legislators who opposed equal rights and recruit and elect those pledged to support the amendment. Says G.O.P. 'Led the Attack'

While she said the new movement would work in both major political parties, she was critical of the Republican Party, saying that it ''actually led the attack'' against the amendment. Although she was less critical of the Democrats, she said that ''women's rights were not high on their agenda and there was significant defection in their ranks.''

To carry on the fight ahead, Mrs. Smeal said, the organizations have a large war chest. She said that donations had averaged $1 million a month in recent months and were still pouring in.

''We're now raising more money than the Democratic Party,'' she said. ''If our opponents think it's all over, someone should tell them we've just begun to fight.''

While critical of state legislators who voted against the proposed amendment, Mrs. Smeal said: ''The real opposition, behind the visible political opposition, has been the special corporate interests that profit from sex discrimination.'' She Accuses Corporaations

Major corporate interests, she said, made heavy contributions to the opposition to the equal rights amendment. In the months and years to come, she said, she expects to see big corporations and other special interests ''fighting us as we work to ban discrimination in insurance or to win better wages for women.'' She said that the National Organization for Women would spearhead efforts to boycott, and in some cases to sue, businesses that practiced sex discrimination. She did not cite any specific corporations.

While the battle over the equal rights amendment has been waged more intensely in the last few years, the effort to achieve such an amendment dates from 1923, when legislation was first introduced in Congress. It Passed in 1972

In 1972, the proposed amendment passed the House by the wide margin of 354 to 24, and the Senate by an equally top-heavy vote, 84 to 8. It was a one-sentence amendment: ''Equality of rights under the law shall not be abridged or denied by the United States or any state on account of sex.''

In two hours after it cleared Congress, the amendment had been ratified by Hawaii. And in the months that followed, it handily won approval in a number of other state legislatures.

But by the spring of 1973, opponents had mounted a strong campaign, arguing that it would result in forced military service for women; a dilution of existing laws protecting women in the workplace; homosexual marriages, and unisex public toilets. Furthermore, they argued

that existing laws provided equality for women. Proponents of the measure rebutted or minimized allegations of such consequences.

The bill had stipulated that the states had five years in which to ratify. As the deadline in the spring 1979 approached, the amendment was still three states short. Over the objections of forces opposed to it, Congress in the fall of 1978 granted a 36-month extension, which ends next Wednesday.

A version of this article appears in print on June 25, 1982, Section A, Page 1 of the National edition with the headline: LEADERS CONCEDE LOSS ON EQUAL RIGHTS

# Exhibit J

  

UPI ARCHIVES        JUNE 30, 1982

# June 30, 1982: The Day the ERA Dies

By PATRICIA McCORMMCK, United Press International

Celebration and mourning both mark June 30, 1982, the day the Equal Rights
Amendment dies.

In both cases, the sentiment is heartfelt. The mourning losers are those who campaigned
nearly 10 years for ratification of the proposed amendment to the Constitution. The
winners are those who fought to keep the proposal from being approved by the required
38 states.

ADVERTISEMENT

Autopsies of the ERA -- and there will be many -- undoubtedly will show no one thing or person killed it.

The actual agents who killed it were the deeply divided state legislators in states that did not ratify the amendment, even though polls in some of those states -- whose accuracy themselves was controversial -- showed more than half the voters favored ERA.

Both celebrations and wakes are planned in the nation's capital.

In a Washington hotel Phyllis Schlafly, the Rev. Jerry Falwell and others who fought ERA for a decade will join in an 'Over the Rainbow' celebration. Mrs. Schlafly said the victors will cheer the beginning of a new era of harmony between women and men.

In Lafayette Park, across from the White House, the losers, led by Eleanor Smeal, president of the National Organization for Women, will rally in mourning. Ms. Smeal said the rally also will mark the start of a new campaign called 'Until Justice is Ours' which she said is shaping up as Round Two of the ERA battle.

Smeal discounts the suggestion fear of unisex toilets and a draft for women beat ERA. She blames big business and said the new campaign will include boycotts of firms that discriminate against women -- plus court action, against discrimination.

A D V E R T I S E M E N T



Charging women earn 59 cents on the dollar to what men are paid for similar work, Smeal says boycotts would supply incentive for equality by making discriminating firms feel it in the cash register.

Birth of the new ERA 'crusade' is expected soon after Congress returns from its Fourth of July holiday and certain congressmen re-introduce an ERA amendment to start the ratification process back at square one.

No one knows as yet if the language will be the same as that of the ERA that died.

That language:

Section 1: 'Equality of Rights under the law shall not be denied or abridged by the United States or by any state on account of sex.'

Section 2: 'The Congress shall have the power to enforce by appropriate legislation the provisions of this article.'

Section 3: 'This amendment shall take effect two years after the date of ratification.'

The ERA officially dies at midnight, June 30, when it falls three states shorts of the required 38 for ratification. Death was sealed last week when Florida and then Illinois legislatures rejected ratification.

The death of ERA has been called a tragedy, a great accomplishment, a disgrace, a vindication for right, depending, of course, on which side of the ERA fence one stood.

'I think it is a disgrace, an outrage against the will of men and women,' said Betty Friedan, founder of the National Organization for Women and author of 'The Feminine Mystique,' the book that started the women's liberation movement, a crusade that helped make the ERA sprout in Congress.

ADVERTISEMENT

'We will get it before his century is over, maybe in the '80s.

'We will get it because women are outraged and will turn the country around.'

'The basic thrust of the women's movement cannot be reversed,' Ms. Friedan said from her summer home in Sag Harbor, N.Y.

In Salt Lake City, Utah, Barbara Smith, president of the Relief Society of the Church of Jesus Christ of the Latter-day Saints, the 1.6 million member Mormon women's organization, said:

'We hope the divisive struggle that has encompassed the ERA will end and that some very positive things might begin to emerge -- such as we hope both men and women will use their energies cooperatively to create a finer society than we have yet known.

'And we hope efforts of individuals will be expended in sharing a loving concern for the well being of each individual to unite our nation under God.'

In New York City, Muriel Fox, president of the National Organization for Women Legal Defense and Education Fund, said:

'I think the death of the ERA is a tragedy.

'Even though time is not on our side for the deadline time will be on our side for the ultimate passage of an ERA. I see more and more women and men understanding our goals more fully, especially as their daughters enter the job market and as more wives turn to work outside the home to make ends meet.'

In Las Vegas, Nev., Jacqui Davison, founder of Happiness of Womanhood, an anti-ERA organization dating from 1973, said:

ADVERTISEMENT



'The defeat of the ERA is just wonderful. It is good newsfor the family and for the happiness of womanhood.'

In Alton, Ill., Mrs. Schlafly echoed the sentiments.

'I think the defeat of the ERA is a tremendous victory for women and for families.'

Where did the ERA crusaders go wrong?

'They didn't have a product to sell,' Mrs. Schlaflyy said. 'And I think a grievous tactical error was made when they got President Carter to come out in favor of drafting women.'

What will happen to Mrs. Schlafly's 'STOP ERA' organization, now that the ERA has been stopped?

'It will fold into the Eagle Forum,' she said. That Forum, 50,000 members, was set up to help crusades for strong families -- a type Mrs. Schlafly describes as the husband out earning the living, the mother home keeping the homefront and taking care of the children.

Sarah Alice Wright, executive director of the National Board of the YWCA, said members at the annual meeting in Washington mourned ERA June 6 at a prayer vigil on the steps of the National Cathedral.

It was led by YMCA President Mrs. Jewel Graham, Antioch College, Yellow Springs, Ohio.

'The spirit of that vigil,' said Mrs. Wright, 'was that we are not going to view what happened to the ERA as defeat. We will continue the crusade.'

Mrs. Wright said many women apparently did not understand what the language of the amendment meant.

'Many women did not recognize that there are gaps in the laws, gaps that would have been bridged by the ERA.'

A D V E R T I S E M E N T

At headquarters of the National Council of Churches, New York City, Dr. Claire Randall, general secretary of the Council which includes 30 Protestant, Orthodox and Anglican Communions, said:

'One can only be sad that the fear of a minority has tarnished our national proclamation that freedom and equality are the right of all people because we are all made in God's image. Until women are included in the constitution -- and they will be one day -- that promise cannot be fulfilled.'

In Washington, D.C., Sister Lora Ann Quinonez, executive director of the Leadership Conference on Women Religious, which comprises heads of 370 women's Catholic religious communities in America, said the LCWR has been participating in the Religious Committee for the ERA, a coalition of different denominations trying to explain 'the religious and moral values that undergird the ERA, to state to religious people that there can and should be justice for women before the law.'

'We have for years made systematic efforts to educate members of the church (on the ERA),' she said. 'It's a justice question, a moral question.'

What does the defeat mean for women religious -- nuns?

'I think it means the same as to other women who are concerned about justice for women,' Sister Quinonez sais. 'One thing it shouldn't mean is that we should examine 'everything that went wrong.' I feel the burden for someone who didn't act justly is on that someone, not the person who has suffered the injustice.

'We should also continue a serious discussion that, from a religious point of view, there's an absolute mandate for justice and justice should not exclude any one or any group.

A D V E R T I S E M E N T

'...we need to keep asking persistently why there has been such a deafening silence of the official Catholic Church of the United States. Some individual bishops have spoken out, but the official structure of the U.S. Catholic Church has been very loudly silent (on the ERA).

'And since the church has various statements about justice and rights for women, I think we have to keep raising persistently the question, 'Why?''

The National Conference of Catholic Bishops, also based in Washington, D.C., didn't support or didn't fight the ERA. Bill Ryan, spokesman, said there would be no comment on the death of the ERA.

Dorothy Ridings, president of the League of Women Voters, said:

'We have learned so much in 10 years that simply is never going to be lost, which is going to be translated into a lot of other issues as well as ERA. It has taught women how to play political hardball.'

Bella Abzug, former congresswoman who was among those introducing the ERA in the House of Representatives, said:

'There is anger over the death of the ERA. But out of anger comes energy. What we need is non-stop action to take out all the obstructionists, from Reagan on down.'

Patricia Carbine, publisher of Ms. Magazine, the publication that sprouted from the women's movement, said, 'Remember it took 72 years for women to get the vote in this country.'

She was confident that the ERA will be ratified eventually.

The same sentiments came from Gloria Steinem, editor of Ms. and a leading women's movement figure. Steinem interprets the defeat of the ERA movement at the hands of male legislators at the state legislature level as a mandate to elect more women to those assemblies.

ADVERTISEMENT

The National Organization for Women claimed the life insurance industry benefits from the death of the ERA.

In a statement, the American Council of Life Insurance reacted to that charge.

'The American Council of Life Insurance, which represents insurance companies accounting for 95 percent of life insurance in force, does not oppose the Equal Rights Amendment,' the statement said.

'NOW's claim that the life insurance business somehow profits by using sex-distinct rates is totally false. Sex-distinct pricing allows companies to set fair prices for groups of people.

'If the rates were merged, so that men and women paid equal rates regardless of their risk of death or sickness at different ages, some people would pay more for insurance than they do now, and some would pay less.

'The extra cost of converting to that system would be paid by everyone.'

'It is unfortunate that NOW has distorted the facts...'

**(0) Leave a comment**

# Exhibit K

The New York Times

https://nyti.ms/29KwREb

# U.S. EQUAL RIGHTS MEASURE IS RE-INTRODUCED IN CONGRESS

**By Lynn Rosellini, Special To the New York Times**

July 15, 1982



See the article in its original context from
July 15, 1982, Section B, Page 13    Buy Reprints

New York Times subscribers* enjoy full access to
TimesMachine—view over 150 years of New
York Times journalism, as it originally appeared.

SUBSCRIBE

*Does not include Crossword-only or
Cooking-only subscribers.

## About the Archive

*This is a digitized version of an article from The Times's print archive, before the start of online*
*publication in 1996. To preserve these articles as they originally appeared, The Times does not alter,*

*edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems; we are continuing to work to improve these archived versions.*

---

With a flurry of press releases, more than 200 senators and representatives re-introduced the proposed equal rights amendment to the Constitution today and then posed for pictures behind a green-and-white banner on the Capitol steps.

Some of the stars of the Democratic Party, and a sizable contingent of Republicans, took turns addressing a crowd of several hundred people at the Capitol's West Front. If anyone was skeptical about the task of starting work on the amendment all over again, 14 days after expiration of the ratification deadline and 10 years after the ratification task began, nobody let on.

''I know that success is out there,'' said the Speaker of the House, Thomas P. O'Neill Jr., Democrat of Massachusetts. ''The temporary defeat of E.R.A. is a national disgrace,'' said Senator Edward M. Kennedy, Democrat of Massachussetts. Packwood Predicts Success

''If you look at the history of the advocacy of civil liberties,'' said Senator Bob Packwood, Republican of Oregon, ''it is never fast, but it is always sure.''

A bipartisan group of 51 senators and 201 representatives cosponsored the measure. Many showed up for the rally wearing greenand-white ''E.R.A. Now'' buttons.

National opinion polls have shown that a majority of Americans continue to support the amendment, which has long been pushed by the Democratic Party but was rejected by the Republicans in their 1980 convention.

At the same time, President Reagan, an opponent of the proposal, has slipped dramatically in his poll ratings among women. Some Republicans fear this reaction will also affect Republican congressional candidates in November. A Warning by Packwood

''If we are going to write off 90 percent of minorities and 50 percent of women, our party is going to go out of existence,'' Senator Packwood, head of the Senate Republican Campaign Committee, said in an interview. ''It's the worst mistake the party has made morally and politically since its founding.''

He predicted that women's issues would be felt less in statewide Senate races than in the more limited House races, where women's political groups can mobilize more effectively. ''We will lose five or six more seats than we thought we would, just on those issues,'' Mr. Packwood said.

Announcements about the rally went out weeks ago. Reporters arriving today found dozens of stacks of news releases covering three conference tables. The releases had such headlines as ''Moffett Aids Resumption of Fight for E.R.A'' (Representative Toby Moffett, Democrat of Connecticut) and ''McHugh Cosponsors E.R.A. Reintroduction in Capitol Ceremony'' (Representative Matthew F. McHugh, Democrat of upstate New York).

Members of Congress met on the Capitol steps with representatives of women's groups. Some made pointed comments about Phyllis Schlafly, a principal architect of the defeat of the earlier rights amendment.

A version of this article appears in print on July 15, 1982, Section B, Page 13 of the National edition with the headline: U.S. EQUAL RIGHTS MEASURE IS RE-INTRODUCED IN CONGRESS

# Exhibit L

have worked a full basic workweek, and for other purposes.

The message also announced that the Senate had passed a bill of the following title, in which the concurrence of the House is requested:

S. 2457. An act to amend the District of Columbia Self-Government and Governmental Reorganization Act to increase the amount authorized to be appropriated as the annual Federal payment to the District of Columbia.

---

## PERMISSION FOR COMMITEE ON BANKING, FINANCE AND URBAN AFFAIRS TO HAVE UNTIL 5 P.M., JULY 1, 1982, TO FILE REPORT ON H.R. 6016, BANK EXPORT SERVICES ACT

Mr. ST GERMAIN. Mr. Speaker, I ask unanimous consent that the Committee on Banking, Finance and Urban Affairs may have until 5 p.m. on July 1, 1982, to file its report on the bill, H.R. 6016, the Bank Export Services Act.

The SPEAKER. Is there objection to the request of the gentleman from Rhode Island?

There was no objection.

---

## PERMISSION FOR SUBCOMMITTEE ON MERCHANT MARINE OF COMMITTEE ON MERCHANT MARINE AND FISHERIES TO SIT DURING 5-MINUTE RULE TOMORROW, THURSDAY, JUNE 24, 1982

Mr. BIAGGI. Mr. Speaker, I ask unanimous consent that the Subcommittee on Merchant Marine of the Committee on Merchant Marine and Fisheries be permitted to sit on tomorrow, Thursday, June 24, 1982, during the 5-minute rule for the purpose of marking up four bills.

The SPEAKER. Is there objection to the request of the gentleman from New York?

Mr. DUNN. Mr. Speaker, reserving the right to object, could the gentleman tell me whether this has been cleared with the ranking minority member?

Mr. BIAGGI. Mr. Speaker, if the gentleman will yield, yes, it has. The gentleman from California (Mr. McCLOSKEY) has been apprised of it.

The SPEAKER. All Members will be seated.

Mr. DUNN. Mr. Speaker, I object.

The SPEAKER. The Chair hears an objection. The required 10 Members not having stood, the Chair hears no objection.

---

## THE WOMEN OF AMERICA WILL NOT LET ERA DIE

(Mrs. SCHROEDER asked and was given permission to address the House for 1 minute and to revise and extend her remarks.)

Mrs. SCHROEDER. Mr. Speaker, this week is a grim one for ERA supporters. The Florida State Legislature voted on Monday against ratifying the equal rights amendment. Polls have shown that the majority of Floridians support the ERA. This defeat brings home the jolting reality that the democratic process is not working.

That the debate on the ERA has been so lively down to the wire proves that the amendment and the issue are far from its deathbed.

Millions of women and men have worked for the ERA since Alice Paul first introduced it in 1923. It is an issue that touches men and women in all walks of life and in every State of the Union. The amendment guarantees equal rights for men and women.

It has been argued that ratification of the ERA would loosen the moral fabric of America. That it would change lifestyles overnight.

It is 10 years later. Lifestyles have changed and we do not even have an ERA.

Lifestyles change because the country changes. It is precisely because our lifestyles are constantly in flux that we need a constant that will withstand these changes. That is what the ERA is. It is an immovable constant around which our laws must revolve. Unless women are specifically in the Constitution, our status is as stable as the 1929 stock market.

The ERA is an issue that will not die. The women of America will not let it.

---

## ERA MUST BE REINTRODUCED

(Mr. FRANK asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. FRANK. Mr. Speaker, I want to join the gentlewoman from Colorado (Mrs. SCHROEDER) in her expression of anger and dismay that the ERA has run into political obstacles that have apparently stopped its ratification temporarily. I join her in expressing our determination to reintroduce the equal rights amendment and to continue the fight until we put the principle of equality for women into the Constitution. This is a fight supported by the large majority of the American people who want the ERA passed.

Mr. Speaker, in the State of Massachusetts we have operated under an equal rights amendment since 1977. None of the horror stories conjured up by the opponents have come true. There has been none of the erosion of family life or moral standards that have been inaccurately imputed to ERA, and, in fact, it has had positive effects. For example, it has led to significant changes in our State's property laws which give greater protections to women.

The principle of equality between men and women is one that we still

must go a long way to reach. It is essential that we put that principle into our Constitution, and I want to join with the gentlewoman from Colorado, and I hope a large majority of this House, in reintroducing the equal rights amendment. We can and we must continue the fight for equality in the American Constitution and my determination to see that principle established has not diminished.

The ERA has, to be sure, important symbolic value but it really means much more than that. Individual laws deal with specific and often narrow situations. No one statue can deal effectively with the widespread discrimination which still persists against women. Even a bill as comprehensive as the Economic Equity Act, of which I am a cosponsor, cannot serve as a replacement for passage of an amendment to the Constitution.

Mr. Speaker, despite this temporary setback, I am confident that the march for equal rights will continue and will succeed. Should the Congress approve the reintroduced ERA, we will have 7 years to win ratification. We will have time to expose the myths and scare tactics employed by some opponents of the ERA and persuade State legislators that equality for women is a fundamental right which must be recognized in our Constitution.

Progress in equal rights for women has been made. But as long as women earn, on the average, only 59 percent of men's earnings, we cannot say that the progress has been complete. As long as equality for women is not part of the Constitution, we cannot say "equal justice under law," the phrase that appears over the entrance to the Supreme Court, is really true when it comes to women's rights.

---

## ERA IS NOT DEAD

(Ms. FERRARO asked and was given permission to address the House for 1 minute and to revise and extend her remarks.)

Ms. FERRARO. Mr. Speaker, here we stand, a week left from the end of the ratification period for the equal rights amendment, still battling the forces of reaction against women. It is a fight that our grandmothers thought they had won when women in America got the right to vote 62 years ago, after a 72-year struggle.

Why are we fighting now? Women are the majority of our people, yet we are treated like a minority. We are, on the average, paid 59 cents for each $1 earned by a man—a gap that has actually widened in the last 20 years.

Women are discriminated against in insurance, pensions, and social security; victimized by sexual harassment and spousal violence. Those of us who choose the life of a homemaker re-

ceive hollow praise but inadequate financial protection from our society.

□ 1230

Every poll ever taken affirms support for the ERA by the vast majority of Americans. The foes of ERA are a minority. If they think that ERA will soon be dead, they are dead wrong.

Mr. Speaker, July 14 marks the day of the beginning of a new battle for equal rights. I ask my colleagues to join me in cosponsoring the reintroduction of that amendment.

## DISCHARGE PETITION FILED ON ADMINISTRATIVE RULEMAKING REFORM ACT

(Mr. LEVITAS asked and was given permission to address the House for 1 minute, and to revise and extend his remarks.)

Mr. LEVITAS. Mr. Speaker, it is with a sense of regret but out of great frustration that I announce this morning that I have filed at the Clerk's desk discharge petition No. 17 for the discharge of H.R. 1776, the Administrative Rulemaking Reform Act, which will provide among other things, for a legislative veto over rules and regulations issued by government agencies.

This bill has over 250 bipartisan cosponsors. More than a majority of the Members of this House had cosponsored this bill by May 27, 1981, over a year ago. The time has come for this House to deal with the entire question of regulatory reform, and it would by my purpose, if we discharge H.R. 1776, to provide that the substance of the comprehensive regulatory reform legislation, H.R. 746, be offered as amendments to H.R. 1776.

Mr. Speaker, the time to act is now. I urge my colleagues to join with me in signing this discharge petition, discharge petition No. 17. It is at the Clerk's desk for Members to sign. The American people will be watching to see who is really interested in controlling the bureaucrats, cutting redtape and reforming the regulatory process.

## URGENT SUPPLEMENTAL CONTAINS FUNDS FOR GUARANTEED STUDENT LOANS

(Mr. PEYSER asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. PEYSER. Mr. Speaker, today we are going to be taking up the urgent supplemental. One of the major items in the urgent supplemental that will continue beyond the July 20 date is the guranteed student loan moneys.

Mr. Speaker, we have students all over the country today who are waiting to get forms so they can actually go ahead and apply for these loans. If we do not act in a positive sense today,

we will just about have run out of time for these young people who are planning to go to college in September. So I urge the support of this bill and moving ahead with it.

The guaranteed student loan provision will continue throughout the year, and at least we will have launched thousands and thousands of our students on the road to a college education that they are entitled to have and that we in Congress intend for them to have.

Mr. Speaker, I urge the Members to vote "yes" on this urgent supplemental today.

## SHARP CRITICISM OF ISRAEL'S INVASION OF LEBANON

(Mr. RAHALL asked and was given permission to address the House for 1 minute, and to revise and extend his remarks.)

Mr. RAHALL. Mr. Speaker, with each day the death toll mounts. The threat of serious disease and the stench of dead bodies have reached epidemic proportions. In the Middle East the question of Israel's invasion of Lebanon can no longer be shunned by this country's policymakers.

Mr. Begin has just visited the President, and we are told that there were no serious reprimands taken by our President to oppose Prime Minister Begin's policies in the Middle East.

Mr. Speaker, there is no question that the Israeli invasion of Lebanon is just that—an invasion. This country's policymakers and those of us throughout this country and in this Congress should begin questioning whether the policies of Menachem Begin are indeed leading to peace in the Middle East and whether they are in the best interests of America's foreign policy concerns.

Mr. Speaker, none of us question the right of every country to defend its territorial boundaries and its sovereignty. Each country has that right, but it is time that we question what is in the best interests of American foreign policy, if we are to continue to send massive amounts of arms to that country.

## LEBANON DEVASTATED, WHITE HOUSE DOES NOTHING

(Ms. OAKAR asked and was given permission to address the House for 1 minute.)

Ms. OAKAR. Mr. Speaker, there is a dramatic void of leadership on the part of the President of the United States. The world is witnessing the destruction of a country and its people, the devastation of Lebanon, and the President does nothing. American taxpayers have paid for the equipment used to destroy this country and the President expresses no remorse—no leadership. One expects Secretary

Haig to act in the manner he does. He looks for military solutions, not diplomatic solutions.

But, Mr. Speaker, are we not a civilized country which values life? One Israeli life lost, one Palestinian life lost, one Lebanese life lost is one loss too many. But more than 10,000 have died and thousands left homeless. And the President does nothing.

## INDUSTRIAL ESPIONAGE IS NOT FAIR TRADE

(Mr. SCHULZE asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. SCHULZE. Mr. Speaker, the FBI is to be commended for uncovering what is reported to be the biggest industrial espionage case ever. Yesterday, the Bureau charged 18 men, including a number of high-ranking executives of Hitachi, Ltd. with paying an undercover agent $648,000 to steal technical data on new generation American computers.

The Japanese are fierce competitors and we do not fear competition if it is fair. But industrial espionage is never fair. It belies the Japanese statements in recent months that they are doing all that they can to engage in "fair trade."

Since when is it fair to steal the work product of the American people? Since when is it fair to profit from criminal acts?

I think there is a message here, Mr. Speaker. When it comes to innovation, our honorable trading partners in the Far East will steal everything we have that is not nailed down.

## ANNOUNCEMENT OF SPECIAL ORDERS ON ABC'S REPORT ON JOHN EDGAR HOOVER AND THE FBI

(Mr. RUDD asked and was given permission to address the House for 1 minute, and to revise and extend his remarks.)

Mr. RUDD. Mr. Speaker, on June 3 last, the American Broadcasting Co. provided an hour-long program purporting to report on the life and times of John Edgar Hoover and the FBI. This afternoon, after legislative business, the gentleman from Virginia (Mr. DAN DANIEL) and I will address the House on special orders we have taken to clarify the distortions, half-truths, and other inaccuracies in that report.

## HINCKLEY VERDICT POINTS UP DEFICIENCIES IN INSANITY DEFENSE STATUTES

(Mr. PARRIS asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

The SPEAKER pro tempore. Pursuant to the order of the House of June 22, 1982, the previous question is considered as having been ordered without intervening motion to final passage.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

□ 1130

## A NEW EQUAL RIGHTS AMENDMENT

(Mr. CONTE asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. CONTE. Mr. Speaker, may I have the attention of the gentlewoman from Colorado (Mrs. SCHROEDER).

The gentlewoman is going to file the extension of the equal rights amendment on July 15, is that right?

Mrs. SCHROEDER. If the gentleman will yield, the equal rights amendment will be reintroduced July 14, 1982.

Mr. CONTE. July 14?

Mrs. SCHROEDER. That is right.

Mr. CONTE. I would like to be included in that.

The gentlewoman knows that I have been with her right from the beginning on this crusade.

Mrs. SCHROEDER. I thank the gentleman from Massachusetts. I know the gentleman has. He has been valiant in the effort to grant women equal rights.

My hope is that we finally get the ERA passed. I keep having a nightmare I am in a nursing home still writing letters to my Congressman about passing the ERA, but I am hoping that this time we really finally get the amendment ratified. It has been a long and hard road and we really appreciate good supporters, such as the gentleman from Massachusetts, who has been so helpful. I am delighted he is not a quitter.

Mr. CONTE. Is this a simple extension? Can the gentlewomen tell us something about it?

Mrs. SCHROEDER. If the gentleman will yield further, what we are going to do is totally reintroduce the ERA. We have decided that it is improper to do another extension at this point. We will have to reintroduce it fresh and begin from square 1. It will then have to go through the different legislatures all over again; but we anticipate States, such as mine which passed it before, will reratify it very rapidly, so we will have a full 7 years to focus on the few States that in prior years did not approve the ERA.

I think that those holdout legislatures are going to change very radically and, hopefully, they will be joining us.

Mr. CONTE. So the gentlewoman will introduce it on July 14, 1982, and then there will be 7 years from that date to accomplish it.

Mrs. SCHROEDER. That is exactly right. It will be 7 years from the date that the ERA passes out of the House and the Senate, so we are encouraging Members of the House and the Senate to cosponsor, so we have as many cosponsors as possible.

The gentleman knows that we need two-thirds on both sides to get the ERA passed, but our hope is that we can get that as rapidly as possible and then begin the ratification process once again.

Mr. CONTE. That is two-thirds of the legislatures?

Mrs. SCHROEDER. That is two-thirds House and Senate and then two-thirds of the State legislatures; so I am very pleased that the gentleman from Massachusetts brought this up. We are looking for cosponsors and I know the gentleman has been so good on this. We hope the gentleman can help us on that side of the aisle in getting cosponsors for the reintroduction of the ERA.

We want to do a massive press conference with both the Senate and the House Members reintroducing it on July 14.

Mr. CONTE. Well, if I am invited, certainly I will be there to join with the gentlewomen, if they will have me.

Mrs. SCHROEDER. If the gentleman will yield further, I am sure his mother will be very proud. She raised him properly.

Mr. CONTE. Well, I thank the gentlewoman very much.

Mr. ROSTENKOWSKI. Mr. Speaker, will the gentleman yield?

Mr. CONTE. I yield to my friend, the gentleman from Illinois (Mr. ROSTENKOWSKI).

Mr. ROSTENKOWSKI. Mr. Speaker, I want to commend the gentleman on his courageous commitment. The gentleman is always in the forefront of these very difficult decisions.

Mr. CONTE. Mr. Speaker, on that note, I yield back the balance of my time.

## SMALL BUSINESS INNOVATION DEVELOPMENT ACT OF 1981

Mr. LaFALCE. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill (H.R. 4326) to amend the Small Business Act to strengthen the role of the small, innovative firms in federally funded research and development, and to utilize Federal research and development as a base for technological innovation to meet agency needs and to contribute to the growth and strength of the Nation's economy.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from New York (Mr. LaFALCE).

The question was taken; and the Speaker pro tempore announced that the ayes appeared to have it.

Mr. WALKER. Mr. Speaker, I object to the vote on the ground that a quorum is not present and make the point of order that a quorum is not present.

The SPEAKER pro tempore. Evidently a quorum is not present.

The Sergeant at Arms will notify absent Members.

The vote was taken by electronic device, and there were—yeas 389, nays 2, answered "present" 1, not voting 40, as follows:

[Roll No. 166]

YEAS—389

| | | |
|---|---|---|
| Addabbo | Crane, Daniel | Gonzalez |
| Akaka | Crane, Philip | Goodling |
| Albosta | Crockett | Gore |
| Alexander | D'Amours | Gradison |
| Anderson | Daniel, R. W. | Gramm |
| Andrews | Dannemeyer | Gray |
| Annunzio | Daschle | Green |
| Applegate | Daub | Gregg |
| Archer | Davis | Grisham |
| Aspin | de la Garza | Guarini |
| Atkinson | Deckard | Gunderson |
| AuCoin | Dellums | Hagedorn |
| Badham | Derrick | Hall (OH) |
| Bailey (MO) | Derwinski | Hall, Ralph |
| Bailey (PA) | Dickinson | Hall, Sam |
| Barnard | Dicks | Hamilton |
| Barnes | Dixon | Hammerschmidt |
| Beard | Donnelly | Hance |
| Bedell | Dorgan | Hansen (ID) |
| Beilenson | Dorman | Hansen (UT) |
| Benedict | Dougherty | Harkin |
| Benjamin | Dowdy | Hatcher |
| Bennett | Downey | Hawkins |
| Bereuter | Dreier | Heckler |
| Bethune | Duncan | Hefner |
| Bevill | Dunn | Heftel |
| Biaggi | Dwyer | Hendon |
| Bingham | Dymally | Hertel |
| Bliley | Early | Hightower |
| Boggs | Eckart | Hiler |
| Boner | Edgar | Hillis |
| Bonior | Edwards (AL) | Hollenbeck |
| Bonker | Edwards (CA) | Holt |
| Bouquard | Edwards (OK) | Hopkins |
| Bowen | Emerson | Horton |
| Breaux | Emery | Howard |
| Brinkley | English | Hoyer |
| Brodhead | Erdahl | Hubbard |
| Brooks | Erlenborn | Huckaby |
| Broomfield | Evans (DE) | Hughes |
| Brown (CA) | Evans (GA) | Hunter |
| Brown (CO) | Evans (IA) | Hutto |
| Broyhill | Evans (IN) | Hyde |
| Burton, John | Fary | Ireland |
| Burton, Phillip | Fascell | Jacobs |
| Butler | Fazio | Jeffords |
| Byron | Fenwick | Jeffries |
| Campbell | Ferraro | Jenkins |
| Carman | Fiedler | Johnston |
| Carney | Fields | Jones (NC) |
| Chappell | Findley | Jones (OK) |
| Chappie | Fish | Jones (TN) |
| Cheney | Flippo | Kastenmeier |
| Clausen | Foglietta | Kazen |
| Clinger | Foley | Kemp |
| Coats | Ford (TN) | Kennelly |
| Coelho | Forsythe | Kildee |
| Coleman | Fountain | Kindness |
| Collins (IL) | Fowler | Kogovsek |
| Collins (TX) | Frank | Kramer |
| Conable | Frost | LaFalce |
| Conte | Fuqua | Lagomarsino |
| Conyers | Gaydos | Lantos |
| Corcoran | Gejdenson | Latta |
| Coughlin | Gephardt | Leach |
| Courter | Gilman | Leath |
| Coyne, James | Gingrich | LeBoutillier |
| Coyne, William | Glickman | Lee |
| Craig | Goldwater | Lehman |

S. 2494. An act to authorize support for an ongoing program of water resources research; and

S Con. Res. 100. Concurrent resolution expressing the sense of the Congress that pending steel unfair trade practice cases be vigorously pursued and promptly concluded.

## ANNOUNCEMENT BY THE SPEAKER

The SPEAKER. The Chair desires to announce that pursuant to clause 4 of rule I, the Speaker signed the following enrolled bill earlier today:

H.R. 5922. Making urgent supplemental appropriations for the fiscal year ending September 30, 1982, and for other purposes.

## RABBI EUGENE LEVY

(Mr. FROST asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

The SPEAKER. The Chair wishes to inform the Members that our visiting Chaplain this morning is the cousin of the distinguished gentleman from Texas (Mr. FROST).

The Chair recognizes the gentleman from Texas.

Mr. FROST. Mr. Speaker, it is an honor to introduce my cousin and good friend, Rabbi Eugene Levy, who served as our guest chaplain today.

Rabbi Levy is with the Temple Beth-El in Tyler, Tex., and was formerly the director of the Hillel Foundation at the University of Oklahoma at Norman. He is a graduate of the University of Texas and of the Hebrew Union College of Cincinnati where he received his rabbinical degree.

Rabbi Levy grew up in San Antonio, Tex., where as a young man, he served as the president of the Texas-Oklahoma Federation of Temple Youth. Now living in Tyler with his wife, Bobbi, and their two children, Rabbi Levy has continued his active involvement in Tyler's civic affairs.

Because he has been my close friend for so many years, I take extra pride in introducing him to my friends and colleagues in the House.

## RABBI EUGENE LEVY

(Mr. GONZALEZ asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. GONZALEZ. Mr. Speaker, I follow my distinguished associate and colleague from the Dallas area, Congressman FROST, in welcoming Rabbi Levy, who gave us and offered the prayer as the guest chaplain.

Because of the fact that this distinguished family, both the Frost family as well the Levy family and their immediate forebears, have played a very important role in the development of the district I have the honor of representing, the city of San Antonio, cul-

turally, socially, economically, the names Frost, Cohen, and Levy are outstanding.

In my own family, when my parents came from Mexico in the category of refugees, actually, and in the early dim years of my childhood, the earliest memory I have is accompanying my mother and my aunt to English and citizenship class intruction offered by the Jewish Federation of Women, the only organization anywhere that took any interest in trying to help the immigrant group. At that time the U.S. Immigration officials did everything they could to prevent people like my relatives from becoming citizens. The Frost family was in the forefront of the efforts of the San Antonio Federation of Jewish Women, who had their headquarters on Poplar Street and where English and citizenship instructions were imparted.

## VETO OVERRIDE NECESSARY TO SAVE FOREST PRODUCTS INDUSTRY

(Mr. DICKS asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. DICKS. Mr. Speaker, our Nation's economy is in very serious trouble. In the Pacific Northwest, unemployment has reached 13 percent, and in some counties in the State of Washington unemployment today is at 30 percent. The forest products industry is devastated, and yet we hear today that David Stockman is drafting a veto message for the President for the housing initiative that was passed by this Congress by a vote of 349-55.

The President says the housing bill will increase the deficit. This bill, by the way, pays for itself, and I will tell the Members why we have large deficits today. It is because unemployment has gone from 7 to 9.5 percent in the last 9 months, and every time unemployment goes up 1 percent, the Federal Government loses $25 billion in revenues, and we must pay $5 billion to take care of the unemployed.

That 2.5-percent increase in unemployment means that the deficit is increased by $75 billion. The best way to reduce the deficit is to get people back to work, and that is what this housing bill will do.

## CONGRESS URGED TO LEAD FIGHT FOR EQUAL RIGHTS FOR WOMEN

(Mr. LEHMAN asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. LEHMAN. Mr. Speaker, as a Floridian, I was particularly disappointed by the failure of the Florida Legislature earlier this week to ratify the equal rights amendment. I had

hoped, that if our State had ratified the amendment, it would have encouraged at least two other States to do likewise before the amendment expires on June 30.

Those of us who believe strongly in equal rights for women cannot let this setback dissuade us from our purpose. Next month, I will join with other members of the Congressional Caucus for Women's Issues in reintroducing the equal rights amendment. I will work for its passage by the Congress and for its ratification by the States.

Equal rights for women is too important to be put on the back burner. I urge all my colleagues to show the country that the Congress will lead the fight for equal rights. I urge you to support the equal rights amendment when it is reintroduced on July 14.

## REPUBLICANS URGED TO VOTE TO OVERRIDE VETO

(Mr. PATTERSON asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. PATTERSON. Mr. Speaker, yesterday this House sent to the President of the United States the urgent supplemental appropriation, including the housing stimulus program. Strong rumor has it this morning that David Stockman has already drafted a veto message, and when the President arises, if he signs that veto message, then we will vote to either override, or sustain the veto.

Let me remind my colleagues in the House that 349 of them voted for the housing stimulus and only 55 against it, a 7 to 1 vote. As recently as yesterday 74 Members of the Senate voted for the housing stimulus—a 3 to 1 vote.

If the President vetoes the housing stimulus bill, our President is asking Republican Members to fall on your swords. He is not asking you to fight a good battle. Let me tell you, if you fall on that sword, then November will be a lot easier for my side of the aisle. But in the interest of the health of the American economy and the bipartisan nature of this housing economic stimulus and the desperate need for recovery of the housing industry, I urge you to stand up and vote as you did previously, 349 strong, to override the veto.

□ 1030

## OUR FIRST RESPONSIBILITIES BEGIN AT HOME

(Mr. BONER of Tennessee asked and was given permission to address the House for 1 minute.)

Mr. BONER of Tennessee. Mr. Speaker, yesterday the House of Representatives passed a bill authorizing

assuring continued development in the future.

This resolution will send a clear message to to REA and other agencies. I urge my colleagues in the House to join with Mr. JONES and me in securing the rapid passage of this resolution.

The text of the resolution follows:

H. RES. 516

Resolution expressing the sense of the House of Representatives that the role of the Rural Electrification Administration should be enhanced to assure that Federal agencies consider the needs of rural America in establishing policies which affect telephone service in rural America

Whereas the Congress, in enacting the rural telephone loan program in the Rural Electrification Act of 1936, established a policy of special concern and attention for the needs of rural America regarding telephone service;

Whereas there are unique capitalization and service requirements applicable to the provision of rural telephone service which are reflected in the provisions of the Rural Electrification Act of 1936 and the policies and programs of the Rural Electrification Administration; and

Whereas there is a continuing need for the Federal Government to give special attention to the capitalization and financing needs of telephone service in rural areas and provide the greatest practicable support to the rural telephone financing programs administered by the Rural Electrification Administration: Now, therefore, be it

*Resolved,* That it is the sense of the House of Representatives that—

(1) the Administrator of the Rural Electrification Administration should establish policies and guidelines which will assure that Federal agencies consider the needs of rural America in connection with granting loans, prescribing rules, and establishing policies which affect the capitalization and other financial requirements of telephone service in rural America as established under the Rural Electrification Act of 1936; and,

(2) such Federal agencies should act consistent with all policies and guidelines established pursuant to paragraph (1) and should consult on a routine basis with the Administrator of the Rural Electrification Administration and with State agencies which administer rural development and rural telephone service programs when such Federal agencies are granting loans, prescribing rules, and establishing policies which affect the capitalization and other financial requirements of telephone service in rural America.●

● Mr. JONES of Tennessee. Mr. Speaker, today I join with Congressman GLENN ENGLISH in introducing a resolution which expresses the sense of this House that Federal agencies when taking actions which affect the development and financing of rural telephone service.

I believe that this resolution is vital. In this time of change for the U.S. communications industry, the needs of the millions of Americans who live scattered across the countryside could be ignored. It is all too easy to lose the small voices in the whirlwind of

change sweeping through the world of telecommunications.

Even when the world was slower paced, the needs of rural America were ignored—in the 1930's and 1940's. The modern communications services which are critical in drawing this Nation together were not shared with the small towns and the countryside. America was poorer for that.

As chairman of the subcommittee of the Agriculture Committee which oversees rural telephone financing, I am pleased to say that amendments to the Rural Electrification Act in 1949 remedied that problem. The 1949 legislation authorized Federal financing of rural telecommunications through the Rural Electrification Administration.

The reasons that that legislation was enacted in 1949 remain valid today. First, large telephone companies serving cities and suburban areas consider high-cost; low-density rural areas unattractive investments. Second, small rural companies are simply unable to raise the capital for necessary development and expansion in the ordinary commercial markets.

Without the Federal assistance provided through the REA, the congressional policy of universal telephone service enunciated in other laws would never have been realized.

REA provides financing through three related programs: The Rural Telephone Bank, The insured telephone loan program, and the guaranteed loan program. Administration of these has given the REA a unique understanding of the needs and problems of rural telephone service. As it has assured the development of rural telephone service in the past, REA must redouble its efforts to assure the preservation and expansion of them in the future.

The resolution Mr. ENGLISH and I have introduced makes sure that the needs of rural America will get the attention they deserve. The Administrator of REA is charged with employing that agency's experience to develop policies and guidelines which will make sure that special attention is paid to the needs of rural America by the agencies of the Federal Government as they sort out the regulatory and policy changes demanded by the communications revolution.

I ask all of the Members of the House to join with Mr. ENGLISH and me in securing the speedy passage of this resolution.●

## THE ERA WILL PREVAIL

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from Wisconsin (Mr. KASTENMEIER) is recognized for 5 minutes.

● Mr. KASTENMEIER. Mr. Speaker, on June 30, the first stage of the fight to enact the equal rights amendment will come to a close. I say the first

stage because those of us committed to equality of rights under the law regardless of sex will not abandon the fight.

There are scores of us in the Congress prepared to reintroduce the equal rights amendment and work for what can only be described as a totally just and long overdue amendment to our Constitution.

The fact is that the Nation overwhelmingly supports the equal rights amendment. Over 75 percent of the American people support equality of rights under the law for women. These people will not be quieted.

At some point in our history I am certain we will look back and find it almost beyond comprehension that in 1982 we were still debating whether the women of this country—more than one-half of our population—should be treated equally under the law. Those future generations will surely wonder at the narrowmindedness of a few in power in States across the country who managed to keep women as second-class citizens. They will surely question how this could happen in a country that has touted to the world its history of freedom, equality, and virtually unlimited opportunity.

Mr. Speaker, we will make certain that that will not be the final note in the history books. We will win this fight. We will ultimately prevail. We will finally give truth to the statement that helped found our Nation—that all people in this country are created equal. History has shown time and again that with patience and perseverence justice finally wins the day. So, too, will the ERA.●

## CLEAN AIR WORKING GROUP

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from Alabama (Mr. SHELBY) is recognized for 5 minutes.

● Mr. SHELBY. Mr. Speaker, as a member of both the full Energy and Commerce Committee and the Subcommittee on Health and the Environment, I know how difficult it is to evaluate and vote on amendments to the Clean Air Act. The issues are important and complex. It is equally important that we identify and discount passionate but unfounded rhetoric.

The Clean Air Working Group sent all Members of Congress a letter dated June 22, 1982, addressing this issue. I commend this letter to the attention of all Members and include it for printing in the RECORD:

THE CLEAN AIR WORKING GROUP,
*Washington, D.C., June 22, 1982.*

*To Members of Congress:* The Clean Air Working Group is a broad-based coalition of over 100 business and trade organizations supporting reform of the Clean Air Act this year. We support amendments to the Act that are a matter of public record complete with justification and documentation. The

cated to the Senator from Massachusetts.

Mr. PACKWOOD. Mr. President, could I just for a moment suggest the absence of a quorum without being charged with the time?

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The clerk will call the roll.

The Assistant Secretary proceeded to call the roll.

Mr. PACKWOOD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The Senator from Oregon is recognized.

THE EQUAL RIGHTS
AMENDMENT

Mr. PACKWOOD. Mr. President, June 30, 1982, marked another milestone along the rough road toward equality for women in this country. Yesterday, the ratification deadline for the equal rights amendment expired. It is unfortunate, indeed tragic, that the deadline passed with us still three States short of the 38 needed to put the equal rights amendment into our Constitution. Today, however, is the beginning of a new era. Today we rededicate our efforts and reaffirm our commitment to equal rights for all Americans.

On July 14, Senator TSONGAS and I will reintroduce the equal rights amendment in the Senate. To date, 45 Senators have indicated they will be cosponsors. Over 150 of our colleagues in the House will also reintroduce ERA in the House the same day.

Opponents of ERA say it is not needed. They say times have changed, laws have changed and equality has been achieved.

But the need for ERA is no less today than it was 10 years ago.

We have made progress in some areas: Title IX for equality in education, the Equal Pay and Credit Acts are notable examples. But these and other equal opportunity laws do not have the force of a constitutional amendment. What Congress gives it, can also take away.

The American Bar Association explained the need for ERA this way:

No ordinary statute can provide the bedrock protection assured by a Constitutional Amendment. No Court decision can provide that protection, for the courts can interpret, but they may not amend the Constitution.

Women should not have to fight for equality every 2 or 4 years with changing political winds. Equal protection and opportunity for women should not be subject to the capriciousness of politics. Equality is a basic constitutional right which must be guaranteed all Americans. A constitutional amend-

ment is the only permanent insurance women will have of equal opportunities in education, employment, credit, retirement plans, and numerous other areas.

There is no doubt the character of women's place in our society has changed. More than 44 million women are in the work force. Women account for over 60 percent of the net growth in our labor force in the last 10 years. Our typical American family structure is changing. The stereotypical image of an employed husband, full-time housewife, and two school age children applies to less than 10 percent of American families today. The most prevalent type of family is now the two-parent, two-wage earner family. The facts tell the story:

More than half the children under 18 have working mothers, and the mothers of 43 percent of the children under six work outside the home.

The number of employed wives has tripled since 1950, with 52 percent of all wives holding jobs outside the home.

One of every seven families is headed by a woman and one of every nine women in the labor force is the sole support of her family.

The average married woman is employed for 25 years; the average single woman for 45 years.

ERA is the most powerful tool to insure women equal pay and equal opportunity in jobs. ERA is necessary to permanently end discrimination in the workplace.

As significant as the equal rights amendment is for women in the work force, the amendment will aid homemakers more than any other group of women. The ERA will secure the legal and economic rights of homemakers and guarantee that marriage be viewed as a legal partnership between husband and wife. Homemakers will no longer be second-class citizens with little economic or legal clout. The full-time homemaker who provides valuable services to the community as well as to her family will be recognized as an individual in her own right—not as the property of her husband.

The equal rights amendment is for all Americans. It is not just for the 51.4 percent of Americans who are female. ERA will insure women and men equal protection under the law. To deny that protection or to discriminate against one group, is to discriminate against all. In the final analysis, the rights of the least of us are the rights of all of us. Deny them to a few and you will deny them to all. There is no substitute for ERA. And there is no excuse for its failure. We will redouble our efforts for passage of this amendment, and will not rest until equal rights for women is part of our Constitution.

Mr. President, as we are all aware, at midnight last night, time expired for

the ratification of the equal rights amendment. Because of the efforts of a handful of State legislators and a very small handful of States, the equal rights amendment was not passed.

Last night, Phyllis Schlafly, the self-acknowledged leader of the anti-ERA movement, hosted a party at one of the Washington hotels, calling it an Over-the-Rainbow Party, to celebrate the demise of the equal rights amendment.

Mr. President, I know during the fight on the equal rights amendment, each side engaged in what the other side probably thought were excesses. That is not unknown in combat, be it political or military.

In all battles we have our Mylais and our Malvinas which, when the war is over, we are ashamed of. And all of us have been involved in political battles where we may have said or done something untoward and in retrospect wish we had not done.

I am not now going to get into an argument over those who supported or those who opposed the equal rights amendment who, on occasion, made statements or did things that, in retrospect, they wish they had not done. The genuine test of a person's character is not whether they can stand adversity. It is whether they stand power.

The gala celebration, I think, reveals the attitude of those who are in opposition to the equal rights amendment. It was a victory celebration in which they played "Ding, Dong, the Witch Is Dead." John Lofton, the editor of the Conservative Digest, said, "We're here to celebrate a death, to dance on a grave."

Richard Viguerie said, "We've just witnessed a classic confrontation between the power elite and the people—and the people have won."

I might pause here to say to Mr. Viguerie that to the best of my knowledge most of the polls that exist in this country still show about two-thirds of the people supporting the equal rights amendment. I have not seen any polls on the power elite. Nor am I going to use the argument that because two-thirds of the people support this constitutional amendment it should pass. That is a bad argument to use.

It is an argument, it is a fair one, but to rest your sole defense or offense on that argument is a bad one because we are going to face a number of constitutional amendments in this Congress before the session is out. Some of those I will support; some of those I will oppose. Some of those that I oppose will have the support of a majority of the people who are polled, and vice versa.

When you are dealing with fundamental liberties, a retreat solely to the majority and to the polls in a danger-

ous approach. But as far as Mr. Viguerie is concerned, if he wonders who won and who lost, the people lost.

M. Stanton Evans, a conservative columnist, said, "When you hear the phrase 'gross national product'—that is not a reference to Bella Abzug." A very tasteful statement.

Then the group last night, to the music from "Kiss Me Kate," said, and I am paraphrasing their words quoting from the paper:

Where are you Ellie?
I'm sorry to tell you that your arguments were smelly.
Where are you Gloria?
Still pedaling your life style to housewives in Peoria.

Let me say to Ms. Schlafly, she has won a victory and I congratulate her. But she is the General Cornwallis of her movement. As the British had success at Bunker Hill and Fort Washington, and Brandywine and Germantown, so Ms. Schlafly one day will be at Yorktown. And at Yorktown when we win—and we will win—I hope that when we celebrate our victory we will celebrate it with grace and dignity and forgiveness. Because in victory, not in defeat, is measured the true magnanimity of all people.

The ACTING PRESIDENT pro tempore. Under the previous order, the Senator from Massachusetts (Mr. TSONGAS) is recognized for not to exceed 15 minutes.

Mr. TSONGAS. Mr. President, I would like to begin by commending the very thoughtful statement of the Senator from Oregon. I might say that my own view is that the victory of the Schlafly forces, if you will, is a Pyrrhic victory. Indeed, I think if viewed historically 10, 15, or 20 years from now, it will be understood that frustrating a fundamentally mainstream idea—the equal rights amendment—only results in greater momentum being built up as more and more women become politicized.

I think we will find they will not be involved in just the ERA issue, but in issues such as arms control and many others.

So I think in many respects the defeat of ERA yesterday, which was celebrated by the opponents, will, in the long term, have proven to be just the opposite. The fact that they had a gala event last night suggests that they have a rather short-term view of history.

Mr. President, yesterday, as the Senator from Oregon pointed out, marked the final deadline in the drive for ratification of the proposed equal rights amendment. The amendment was ratified by 35 States, just 3 States short of the number required to make the ERA the 27th amendment to the Constitution. It is now apparent that the march toward equal rights for women and men in this country must pause before it reaches its destination.

But the fight for equal rights will continue. As Sonia Johnson, one of seven women recently fasting in Illinois, said "the ERA is very much alive and compelling." In time, I am confident that this Nation will embrace the ERA, for it is a cause that is just.

Toward this end. I intend to reintroduce the ERA in the Senate on July 14, along with Senator BOB PACKWOOD and 44 colleagues. I expect to have more cosponsors by July 14. Indeed, I would like it to be at the 50-colleague level at that point. We hope that at least four more of our colleagues will see fit to join us by July 14.

In the House, a similar measure will be introduced the same day by Representative PAT SCHROEDER, Representative MARGARET HECKLER, and Representative DON EDWARDS.

Today my colleagues and I would like to discuss why the ERA should be made part of our Constitution.

The amendment seeks to eliminate sex as a factor in determining the legal rights of women or men. It requires that governments treat each person, female or male, as a citizen under the law without regard to gender. The amendment thus recognizes the fundamental dignity and individuality of each human being.

Since its first introduction, controversy over ERA has centered on essentially the same questions: Whether there should be room in the law for "reasonable" distinctions in the treatment of men and women; whether a constitutional amendment is the proper vehicle for improving the legal status of women; and how ERA might affect such areas as privacy, military service, domestic relations, criminal law, employment, education, and others. My colleagues and I would like to address these issues and discuss how each will be affected by the ERA.

The text of the amendment we plan to introduce on July 14 is the same amendment that was passed by the Congress in 1972. It reads:

SEC. 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of the article.

SEC. 3. This Amendment shall take effect two years after the date of ratification.

It is very simple, very straightforward, very compelling, which is why the polls show most Americans support it.

I believe the ERA is essential because it would, for the first time, grant women full status as equal citizens under the Constitution and establish a standard for eliminating discrimination based on sex. Only a constitutional amendment can adequately assure equal rights to the women and men of this country. It is the only insurance that women will have fair and equal opportunities in employment, educa-

tion, benefit and retirement plans, marriage, and divorce.

A statute-by-statute, piecemeal approach to ending sex discrimination, whether at the Federal or State level, has not worked. Title VII of the Civil Rights Act, title IX of the education amendments and the Equal Pay Act are the laws most often cited as providing equal opportunities for women. The experience in the past 21 years have shown, unfortunately, that these statutes have not provided adequate enforcement and have not resulted in desired changes in the patterns and practices of discrimination. The current laws are simply not enough. Moreover, equal employment laws can be repealed at any time.

In Federal statutes alone, more than 800 sections of the United States Code contain sexually biased terminology inconsistent with the Nation's purported commitment to equal rights. State laws are also replete with provisions that assign women, on the basis of their sex, to an inferior role.

It is also clear that existing constitutional guarantees will not mandate the changes that are needed. Judicial interpretation has allowed sex bias to survive. For example, those challenging sex discrimination in the courts have found the 5th and 14th amendments unreliable and inadequate as a remedy for sex discrimination. Further, the U.S. Supreme Court has failed to apply the same strict standard in sex discrimination cases that it has mandated for weighing racial discrimination.

ERA is needed more today than ever if women are to achieve permanent economic equity. As workers, women are paid only 64 cents to every dollar paid to men. This is the same ratio that was paid to women a quarter century ago. As wives, women are still subject to laws that deny them equal partnership in marriage. As students, they are often steered away from the education that could pierce the barrier to better paying jobs. Further, women endure a criminal justice system that too often judges them by their sex and not be the acts they commit or by which they are victimized. The reality today is all too obvious: Women have not achieved equality under the law.

Current administration proposals are actually moving women backward in equal employment, education, credit, and other economic and social issues. For example, the administration—through the Office of Federal Contract Compliance Programs (OFCCP) in the Department of Labor—has proposed regulations reducing affirmative action requirements for women by Federal contractors and has proposed significant changes in title IX of the Education amendments.

So much for the President's remarks last night.

Public opinion polls show unmistakably that the vast majority of the American people favor passage of the equal rights amendment. In April, a Harris survey showed that ERA is supported by over 60 percent of the American public. I concur with Senator PACKWOOD that that is only an argument and certainly not the basis on which one would argue ratification on such an important issue.

Organizational support for ERA is also strong. Over 500 organizations representing more than 50 million Americans have endorsed the ERA. These include major labor unions, church and civil rights groups, legal, educational and medical associations and all major women's groups. Indeed, the ERA was supported in the platforms of both major parties for four decades, until the Republican party reneged in 1980.

The need for ERA was great in 1923, when it was first introduced in Congress. The need was great in 1972, when Congress first approved it. The need is still as great.

Mr. President, I think the time will come when Americans will look back on this period and wonder what all the fuss was about, why something that made such eminent good sense, that seemed so normal, would have been the subject of such controversy that, in many respects, it would have been a kind of barometer of our time. It is my hope that the amendment will be cosponsored by two-thirds of the Senate. We are well on our way there. It is my hope that the States will ratify it, that we can put this issue behind us; that when my three daughters are adults, they will look on this as an issue of ancient history.

Mr. President, let me read off the names of the cosponsors of the amendment:

Mark Andrews, Max Baucus, Joseph Biden, Jr., Rudy Boschwitz, Bill Bradley, Quentin Burdick, John Chafee, William Cohen, Alan Cranston, John Danforth, Dennis DeConcini, Alan Dixon, Christopher Dodd, David Durenberger, Thomas Eagleton, John Glenn, Slade Gorton, Gary Hart, Mark Hatfield, John Heinz, Ernest Hollings, Daniel Inouye, Henry Jackson, Nancy Kassebaum, Edward Kennedy, Patrick Leahy, Carl Levin, Charles Mathias, Jr., Spark Matsunaga, John Melcher, Howard Metzenbaum, George Mitchell, Daniel Patrick Moynihan, Bob Packwood, Claiborne Pell, Charles Percy, William Proxmire, Jennings Randolph, Donald Riegle, Paul Sarbanes, Harrison Schmitt, Arlen Specter, Robert Stafford, Ted Stevens, Paul Tsongas, and Lowell Weicker.

I ask you, Mr. President, can all these people be wrong?

Mr. President, I ask unanimous consent that the statement of Senator CRANSTON, who is unable to be with us this morning, be placed in the RECORD as if read.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

● Mr. CRANSTON. Mr. President, I join today, not in a ceremony of mourning for the equal rights amendment, but in a public reaffirmation of our commitment to the goal of placing within the Constitution of the United States a guarantee of full, equal rights of women—and men—in our country.

Let me first say that the equal rights amendment is not dead. On July 14, 1982, I will join with my colleagues in the Senate and the House of Representatives in reintroducing the equal rights amendment. We will not delude ourselves in believing that ratification of ERA will come easily, particularly under the hostility of the Reagan administration and its allies in the Congress toward women's rights. But neither should we feel that we will be starting from scratch.

The efforts of the past decade have not been in vain. The vast majority of Americans now strongly support the ERA. Every poll, every survey—even in the unratified States—show overwhelming support for the ERA. Ratification was blocked by a handful of individuals in key positions in the unratified States. They believed—mistakenly—that if the ratification period ran out, ERA would be dead. They were wrong. There can be no time limit placed on the pursuit of equality and justice.

Mr. President, ERA is needed today, as much as ever. Measured by any standard, sex discrimination has not been erased in our society. Women have made tremendous strides and hold important policymaking positions in every level of government, in every sector of our society. But discrimination and denial of equal opportunities because of gender continues. Women today earn on the average only 59 cents for every comparable dollar earned by men. Women continue to be concentrated in the lowest paying, least-valued jobs. The consequences of a lifetime of inequality is particularly devastating for older women. Because their lifetime earnings are lower, and many spend years out of the work force raising children, older women often have fewer resources to draw on. Poverty rates are much higher for older women, particularly those who outlive their husbands or who are unmarried. Women of all ages continue to face a patchwork of State laws and practices depriving them of equal ownership of property and continuing to stand as obstacles to equal opportunities and employment.

Although many barriers have been broken down and much progress has been made, without a constitutional amendment, much of the discrimination that still exists will continue. Without a constitutional amendment, much of the progress that has been made can be eroded. We have only to look at the recent proposals within the Reagan administration to repeal or weaken women's educational rights and to limit enforcement of equal employment opportunity laws, to see how quickly this progress can be curtailed.

Equality of rights without regard to sex must, like other basic civil rights, be a constitutional right. The women of this country deserve no less than a secure, constitutional guarantee of full citizenship and equality under the law.

Mr. President, I was an original cosponsor of the ERA when it was approved in 1972. I will be an original cosponsor when it is reintroduced on July 14, 1982. We must and will continue the ERA effort until it is successful, however long it takes. I believe that in the not too distant future, we will look back at 1982, not as the year ERA died, but as the year the final stages of ratification of ERA began.●

Mr. DeCONCINI addressed the Chair.

The ACTING PRESIDENT pro tempore. Under the previous order, the Senator from Florida (Mr. CHILES) is to be recognized for not to exceed 15 minutes.

Mr. TSONGAS addressed the Chair.

The ACTING PRESIDENT pro tempore. The Senator from Massachusetts.

Mr. TSONGAS. Mr. President, my understanding is that the Senator from Oregon and I have a combined total of 65 minutes. Has that time tolled?

The ACTING PRESIDENT pro tempore. The Senator is correct. The Senator may yield.

Mr. DeCONCINI. Mr. President, will the Senator from Massachusetts yield?

Mr. TSONGAS. I yield to the Senator.

The ACTING PRESIDENT pro tempore. The Senator from Arizona.

Mr. DeCONCINI. I thank the Senator.

The ACTING PRESIDENT pro tempore. The Senator may proceed.

Mr. DeCONCINI. Mr. President, a constitutional amendment which guarantees equal rights under the law to all persons regardless of sex is long overdue. I personally find it difficult to understand the controversy that has swirled around this issue. It is a simple matter: In a society of laws, which the United States is, all citizens must have equal standing. Anything less is simply unacceptable. I fear that too many well-meaning individuals have lost sight of the simple and profound elegance of the proposition, and have gone looking for demons and dragons. There are none. The equal rights amendment is what it says—nothing more, nothing less. We are all equal, that is all.

No one would disagree with the notion that the United States has long

become a part of the U.S. Constitution. A statement of principle so simple and so straightforward that many ERA supporters, men and women, were hardpressed to understand a basis for opposition.

Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

An eminently reasonable statement—who could disagree? In fact the principle appeared to be so obvious that some even questioned its necessity.

Well, we have come a long way since that naive beginning. As the disparity between male and female salaries became even greater—women earn 59 cents for every $1 earned by men—as it became obvious that the Supreme Court was not going to find the same protection for women in the Constitution that it held existed for other citizens, as the backlash against those who pioneered new avenues for women became stronger, we soon learned why the ERA was necessary.

And as the bitter, hardcore opponents of the ERA screamed for media attention, we began to realize how the ERA was going to be opposed. The ERA battle would not be fought on the high ground of reason; instead, it would descend to the hysterical level of accusation, exaggeration, and even outright fabrication. Men and women required to share public toilets, women forced onto the battlefield against their will, the family structure ripped asunder—this is the litany of horrors that would supposedly follow passage of the ERA. What happened to that simple, straightforward statement of equal rights?

Yet, ERA supporters continued to supply their Representatives with the undeniable facts and figures regarding inequality in America. We continued to believe that reason would prevail over hysteria. But as time passed, to our horror and disbelief, it became increasingly apparent that a vocal minority and a handful of powerful men might successfully block passage of this declaration of women's equality.

This is a shameful situation. It is shameful that the most rich and powerful Nation in the world will continue to deny equal rights under the law to 51 percent of its citizens.

But this situation will not continue. The history of the movement to achieve voting rights for women indicates the tenacity with which supporters of equal rights will continue this battle until it is won.

While the late 1960's and early 1970's saw the advent of the women's movement, the 1980's will be known as the decade that women became a powerful political force in this Nation. Recent polls reveal that women are voting in ever-increasing numbers and that they are beginning to vote their own interests rather than reflecting

the views of their fathers, husbands, or other men in their lives. No longer can the women's vote be ignored or taken for granted.

In the next decade, I predict that if that same small handful of men continue to use their key political positions to bar equal rights for women, they will be swept out of office and replaced by Representatives committed to true equality for women.

While it sometimes appears that the wheels of justice grind exceedingly slowly, the ERA cannot and will not be stopped.

Mr. President, I think it is appropriate that we give a moment's attention to that which occurred here in Washington last night. A group met here—they called themselves Somewhere Over the Rainbow—to celebrate the demise of ERA. That group probably should more appropriately have been called Somewhere Over the Hill, because those who were there, those who were the honorees, those who put the program together, are those who indeed are over the hill so far as America is concerned.

They would like to turn the clock back. They would like to turn the clock back on programs we have moved forward with over the years, such as programs for women, infants, and children, nutrition programs for young and old. They would like to cut social security. They would like to go backward with respect to minimum wage laws. They would like to go backward with respect to job programs.

Those who met and those who were excited last evening about Over the Rainbow were indeed those who are the forces of reaction in America. They are the forces of negativism. They are the negative thinkers of America.

They want to go backward, and the real question with respect to this constitutional amendment is whether or not this Nation will move forward, as it should, to that point in our history where we recognize the full equality of all of our people, particularly those who have been sexually discriminated against over a period of years.

Mr. President, I think it is high time for our Nation to move forward and not permit those who would turn the clock back to press upon the rest of us their negative thinking. I think it is time for a future America and not for a backward movement.

Those who foolishly celebrated a supposed victory yesterday will wake up tomorrow to discover that real victory lies with the vast majority of citizens in this country who will not be satisfied until equal justice for women has been achieved, not just as a constitutional principle, but as a practical reality.

The ACTING PRESIDENT pro tempore. The Senator from Massachusetts.

Mr. KENNEDY. Thank you very much, Mr. President.

First of all, I want to commend my colleague, Senator TSONGAS, and my friend Senator PACKWOOD for introducing this legislation, and I welcome the opportunity to cosponsor it.

This morning, Mr. President, I welcome this opportunity to reaffirm my strong commitment in making the equal rights amendment part of the Constitution of the United States.

The temporary defeat of ERA is a national disgrace. But the deadline which passed today will be only the starting line of a new crusade to pass and to ratify equal rights. Mr. President, I remember the time in the Senate Judiciary Committee when we had the distinguished Senator from Indiana, Senator Bayh, who was so extraordinarily effective and provided such leadership on this issue both in the passing of the initial proposal and then the extension of time, and I welcomed the opportunity to stand shoulder-to-shoulder with Senator Bayh in the Judiciary Committee during the consideration of the amendment and the extension, and I looked forward to working with my colleagues in the Judiciary Committee for another successful effort over the period of these following weeks and months. I led the successful fight in the Judiciary Committee to extend the period for ratification of ERA. I will join my colleagues in the reintroduction of the equal rights amendment in the Senate and the House of Representatives later this month. And I will be proud to lead the fight again in the Judiciary Committee to pass ERA.

For too long, women have been relegated to the position of second-class citizens. For too long, the minority whose skin is not white and the majority who are women have been denied equality—which is the right of all Americans. I will not rest or retreat until our Nation at long last holds this truth to be self-evident—that not only all men, but all people, are created equal.

The ERA is more than a symbol; it can become the mandate for the Federal Government and for every State to insure equality in both the law and the life of this land. The need for ERA is as compelling today as when it was introduced in this Chamber 10 years ago. The facts of sex discrimination, especially in employment and health care, are no less stark now than they were in 1972.

More women are working today than ever before. In 1965, only 39 percent of women were in the job force according to the Labor Department, but the rate is 52 percent today and is expected to rise as high as 65 percent by 1995. However, women, on the average earn only 59 percent for every dollar earned

The ACTING PRESIDENT pro tempore. On whose time?

Mr. PACKWOOD. On my time.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. BIDEN. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mrs. KASSEBAUM). Without objection, it is so ordered.

Mr. TSONGAS. Will the Senator yield?

Mr. BIDEN. Yes.

Mr. TSONGAS. I request, after the Senator has completed his remarks, that the time remaining be yielded back.

The PRESIDING OFFICER. There are 5 minutes remaining.

Mr. TSONGAS. The Senator from Delaware is the last speaker, and he may not use all the time but I suspect he will.

ERA AND THE CRIMINAL JUSTICE SYSTEM

Mr. BIDEN. Madam President, throughout the past 10 years opponents of the equal rights amendment have managed to wage an intimidating campaign as to why we should not ratify ERA prior to last night's deadline. Visions of unisex toilets, young girls in foxholes dodging bullets, not to mention lecherous male soldiers following them through those foxholes, and homosexual marriages have danced through many heads.

That is what we have been told would happen by those who have been most strident in their opposition to the equal rights amendment.

Those were the arguments of those who now celebrate what they see as a death of ERA.

Obviously, all of us here on the floor are announcing the rebirth of ERA, not the death of ERA.

Madam President, you and my colleagues have heard from a number of distinguished speakers this morning discussing various aspects of why the ERA is so important. I associate myself with the remarks of my colleagues this morning. But I am going to be very specific, if I may. I would like to address my comments to ERA and the criminal justice system.

Madam President, as I said earlier, I do not believe the ERA is dead. I believe it is very much alive. A number of us from both parties in both Houses will be reintroducing the amendment on July 14. Having learned our lesson from the experience of the past 10 years, those of us who believe that women should be afforded equal constitutional protection will be better able to focus the ERA debate on the real issues of equal treatment of our citizens by our laws and not have to spend as much time talking about coed bathrooms.

And what better place to start than with an examination of the way in which the equal rights amendment would impact upon our Nation's criminal justice system.

Did you know, Madam President, that in some States a man finding his wife in the act of adultery may kill her on the spot and face a reduced charge of manslaughter? If the situation were reversed, however, and the wife found him in the midst of such an act, she would not have the passion killing defense available to her and would have to face trial on the charge of murder.

Did you know, Madam President, that several States punish prostitutes but do not punish those who seek to pay for their services?

Did you know, Madam President, that the Mann Act prohibits transporting females across State lines for "any immoral purpose" but does not protect males in the same manner?

Did you know, Madam President, that 25 States have no statutory rape laws protecting young boys?

Were you aware, Madam President, that many States have no laws recognizing the possibility that forcible rape can be committed by a husband against his wife regardless of the circumstances and the degree of coercion involved?

Are you further aware, Madam President, that many States still mandate intermediate sentences for women, while providing for minimum and maximum sentences for men?

This is done in the enlightened belief that women are more amenable to rehabilitation than men, but what this leads to, Madam President, are situations in which women must serve either much longer or much shorter sentences than men serve for precisely the same offense.

Finally, Madam President, did you know that the U.S. Civil Rights Commission, in a report issued in December 1978, concluded that women in prison generally receive far less vocational training or job placement assistance than men, and that training offered in women's prisons tends to be sex stereotyped, tracking women into lower paying and more traditional jobs?

In each of these cases, Madam President, Federal and State laws have the effect of discriminating against one or the other of the sexes. In each of these cases, Madam President, the equal rights amendment would result in the elimination of this discrimination, sometimes merely by changing one or two words in the law in order to make it sex neutral. Let me cite just two examples.

The Mann Act could be made to protect both sexes against interstate transportation for immoral purposes simply by changing the word "female" to "person." Prostitution laws can be made to hold members of both sexes

accountable for their actions by treating both prostitute and patron in a sex-neutral manner.

I point out at this time, Madam President, that no State operating with its own ERA has acted to legalize prostitution and that all these States, with the exception of Alaska, now operate under a sex-neutral law. Hardly the stuff of coed bathrooms; hardly the stuff of women in foxholes.

Madam President, it is simply not enough to claim that existing laws already give sufficient protection against sex discrimination. As we have seen, many existing laws actually embody such discrimination.

I might also add, Madam President, that Federal and State laws may be repealed at any time. Equal treatment under the law is an ideal that must not be subject to the time and caprice of 50-percent-plus-1 of any legislative body acting to satisfy some temporary popular sentiment.

It is not enough to claim, Madam President, that the Constitution already provides adequate protection against sex discrimination. In a recent Supreme Court opinion, Mr. Justice Lewis Powell wrote:

The court has never viewed sex as inherently suspect or as comparable to racial or ethnic classification for the purposes of equal protection statutes.

Let us further remember that it took half a century following the passage of the 14th amendment to grant women one of the most basic American rights of all, the right to vote—one, I suspect, they will not forget in the next election, in the light of what has happened to ERA.

Remember, too, Madam President, that for several years after the ratification of the 14th amendment, many States still had laws preventing women from owning property and holding certain jobs. The history of equal protection for women under the 14th amendment, therefore, is at best uneven and uncertain.

Madam President, I look forward with great anticipation to the committee and floor debate on the equal rights amendment following its reintroduction on July 14. The American people, by an overwhelming majority, want their Representatives in Congress to take positive action on this great commitment to equal justice. Let us listen to them, Madam President, and let us keep in mind what I said yesterday with regard to a totally different issue, the nuclear freeze, nuclear disarmament, mutually balanced and verifiable treaties. I said then that the freeze is an example, once again, of the American people leading their leaders.

So it is on the question of equal protection for women; once again, according to the public opinion polls, the outpouring of support from women

# Exhibit M

 

# TWO MODES OF RATIFICATION

While women enjoy more rights today than they did when the ERA was first introduced in 1923 or when it passed out of Congress in 1972, hard-won laws against sex discrimination do not rest on any unequivocal constitutional foundation. They can be inconsistently enforced or even repealed by a simple majority vote. Elements of sex discrimination remain in statutory and case law, and courts have had difficulty applying a consistent standard to gender-based classifications, which are not inherently suspect or comparable to racial or ethnic classifications under equal-protection analysis.

The need for a federal Equal Rights Amendment remains as compelling as it was in 1978, when now Supreme Court Justice Ruth Bader Ginsburg wrote in the *Harvard Women's Law Journal*: "With the Equal Rights Amendment, we may expect Congress and the state legislatures to undertake in earnest, systematically and pervasively, the law revision so long deferred. And in the event of legislative default, the courts will have an unassailable basis for applying the bedrock principle: All men and all women are created equal."

## Mode 1:  Constitutional Ratification Process (Article V)

The traditional constitutional amendment process is described in Article V of the Constitution. Congress must pass a proposed

CART (0)





used for ratification of every amendment to the Constitution thus far.

Article V also provides for an alternative process, which has never been utilized. If requested by two-thirds of the state legislatures, Congress shall call a constitutional convention for proposing amendments. To become part of the Constitution, any amendment proposed by that convention must be ratified by three-fourths of the states through a vote of either the state legislature or a state convention convened for that purpose.

The mode of ratification is determined by Congress, and in neither of these two processes is a vote by the electorate applicable to the ratification of a constitutional amendment.

Article V makes no mention of a time limit for the ratification of a constitutional amendment, and no amendment before the 20th century had a time limit attached to it. The first amendment with a time limit was the 18th Amendment (Prohibition), proposed in 1917. For political reasons, Congress included an arbitrarily chosen seven-year deadline in Section 3. The amendment was also the first to include a time delay before it would take effect, in that case one year after the date of ratification.

The next two proposed amendments, the 19th Amendment (Woman Suffrage) and the never-ratified Child Labor Amendment, had no time limit attached. However, beginning with the 20th Amendment, Congress has attached a time limit to the ratification of all proposed amendments. Some of these deadlines were in the language of the amendment itself, thus ratified by the states and not able to be changed. However, some of these deadlines, including the time limit for ratification of the Equal Rights Amendment, were in the proposing clause of the amendment, not in the language ratified by the state legislatures. In 1978, Congress acted on the premise that it could change a deadline in a proposing clause and passed by majority vote a bill to extend the ERA's ratification deadline from March 22, 1979 to June 30, 1982.

## Mode 2:  Three-State Strategy

*The "three-state strategy" for ERA ratification was originally developed through the work of the ERA Summit, a volunteer coalition organized in Washington, DC in 1992. U.S. Representative Robert Andrews (D-N.J.)*

CART (0)



*in the early implementation of this strategy.*

The three-state strategy for ERA ratification was developed following the 1992 ratification of the "Madison Amendment" as the 27th Amendment to the Constitution after a ratification period of 203 years. Given that acceptance, some ERA advocates contended that the ERA's ratification period of just over two decades would surely meet the "reasonable" and "sufficiently contemporaneous" standards required by Supreme Court decisions in 1921 and 1939. Time limits were not attached to proposed amendments until 1917, and  Congress demonstrated its belief that it may alter a time limit in a proposing clause by extending the original ERA deadline. Precedent regarding a state's ability to withdraw its ratification by a rescission vote shows that such actions have not been accepted as valid. Thus, supporters argued, the 35 existing ratifications should still be legally viable, and Congress likely has the power to adjust or repeal the previous time limit on the ERA, determine whether state ratifications subsequent to 1982 are valid, and recognize the ERA as part of the Constitution after three more states ratify.

The legal rationale for the three-state strategy is explained in "The Equal Rights Amendment: Why the ERA Remains Legally Viable and Properly Before the States," by Allison Held, Sheryl Herndon, and Danielle Stager, published in the Spring 1997 issue of *William & Mary Journal of Women and the Law.*

This mode of ratification is getting closer to potential realization. With the ratification of the Equal Rights Amendment by the state of Nevada in 2017 and by the state of Illinois in 2018, one more state is needed to ratify the ERA to achieve the initial 38 states for federal ratification as determined in 1982. If one more state ratifies the ERA, the ratification process will move into the courts for determination regarding the constitutionality of the original deadline that was applied to the Equal Rights Amendment.

Currently efforts to ratify the ERA are active in North Carolina, Tennessee, and Florida.

## Time Limits

As the legal article explains, Article V of the U.S. Constitution gives Congress the power to propose an amendment and to determine the mode of ratification, but it is silent as to the power of Congress to impose time limits or its role after ratification by three-fourths of

CART (0)

 

Constitution once ratified by the final state constituting a three-fourths majority of the states. The *Dillon* Court said that an amendment should be ratified within a "reasonable" and "sufficiently contemporaneous" time frame "to reflect the will of the people in all sections at relatively the same period," because the amendment process is presumably triggered by a perception of "necessity" with respect to the subject of the amendment.

A 1939 Supreme Court decision (*Coleman* v. *Miller*) reaffirmed the power of Congress to fix a reasonable time period for ratification but also determined that Congress has the power to promulgate an amendment after the final state constituting a three-fourths majority ratifies. In *Coleman*, the Court held that Congress, upon receiving notification of ratification by three-fourths of the states, may determine whether the amendment is valid because it has been ratified in a reasonable period of time, or whether "the amendment has lost its vitality through lapse of time." The Court called the timeliness decision a "political question" and said that Congress is uniquely equipped to make that decision because of its "full knowledge ... of the political, social and economic conditions which have prevailed during the period since the submission of the amendment."

It is important to note that Congressional promulgation is not a necessary feature of ratification under Article V. In the history of the amendment process Congress has promulgated only two amendments, the 14th and the 27th, following the final state ratification. In addition, the requirement for ratification within a "sufficiently contemporaneous" time frame and the chronological definition of "contemporaneous" are now open to question in light of acceptance of the Madison Amendment.

The first time limit ever imposed on the ratification period of a constitutional amendment was in the text of the 18th Amendment (Prohibition) in 1917, and the limit of seven years was chosen by Congress without extensive discussion. The 19th Amendment (Woman Suffrage) was sent to the states in 1919 with no time limit, as was a proposed Child Labor Amendment in 1924. Seven-year time limits were placed in the text of the 20th, 21st, and 22nd Amendments, but Congress shifted the seven-year limit out of the text and into the proposing clause of the 23rd, 24th, 25th, and 26th Amendments.

The most recent amendment to the Constitution, the 27th Amendment, had no deadline attached because it was passed

CART (0)





Despite arguments by proponents that the Equal Rights Amendment should go to the states without a time limit in the tradition of the 19th Amendment, the ERA passed Congress in 1972 with a seven-year time limit in its proposing clause. If the time limit had been placed in the text of the amendment itself, that restriction would not be subject to alteration by Congress after any state legislature had ratified. However, the ERA language ratified by 35 states between 1972 and 1982 did not contain a time limit for ratification.

By transferring time limits from the text of an amendment to the proposing clause, Congress retained for itself the authority to review the time limit and to amend its own previous legislative action regarding it. In 1978, Congress clearly demonstrated its belief that it may alter a time limit in the proposing clause when it passed a bill moving the deadline from March 22, 1979, to June 30, 1982. A challenge to the constitutionality of the extension was dismissed by the Supreme Court as moot after the deadline expired, and no lower-court precedent stands regarding that point.

The *Coleman* decision asserted that Congress may determine whether the states have ratified in a "reasonable" time or whether the amendment is "no longer responsive to the conception which inspired it." Congress therefore could determine that the time period since the ERA went to the states for ratification in 1972 is "reasonable" and "contemporaneous" (particularly in light of the fact that it deemed the Madison Amendment's 203 years to be so), and it could decide that the ERA remains "responsive to the conception which inspired it" (indisputably so, since the fact that women's equal rights are not constitutionally affirmed will remain unchanged until the Constitution is amended or interpreted to establish unequivocally that women and men have equal rights).

Therefore, under the principles of *Dillon* and *Coleman*, and based on the fact that Congress voted to extend the ERA time limit and to accept the 203-year-long ratification period of the Madison Amendment as sufficiently "contemporaneous," it is likely that Congress has the power to legislatively adjust or remove the time limit constraint on the ERA if it chooses, to determine whether or not state ratifications which occur after the expiration of a time limit in a proposing clause are valid, and to promulgate the ERA after the 38th state ratifies.

CART (0)



questioning; questionable. Article V of the Constitution speaks only to the states' power to ratify an amendment but not to the power to rescind a ratification. All precedents concerning state rescissions of ratifications indicate that such actions are not valid and that the constitutional amendment process as described in Article V allows only for ratification. For example, the official tally of ratifying states for the 14th Amendment in 1868 by both the Secretary of State and Congress included New Jersey and Ohio, states which had passed resolutions to rescind their ratifications. Also included in the tally were North Carolina and South Carolina, states which had originally rejected and later ratified the amendment. In the course of promulgating the 14th Amendment, therefore, Congress determined that both attempted withdrawals of ratifications and previous rejections prior to ratification had no legal validity.

Therefore, it is most likely that the actions of the five states that voted to rescind their ratification of the ERA between 1972 and 1982 are a legal nullity.

**BY STATE**

**IN CONGRESS**

*© 2018 Alice Paul Institute • Site Design by Kathryn Elizabeth Colohan, Jill S. and Krista Joy Niles*

  

CART (0)

# Exhibit N

TRY OUR CORPORATE SOLUTION FOR FREE! 📞 +1 (212) 419-5770 ✉ support@statista.com

Source: https://www.statista.com/statistics/241494/median-age-of-the-us-population/

## Median age of the U.S. population 1960-2019

Published by Erin Duffin, Jul 20, 2020

In 2018, the median age of the population of the United States was 38.4 years. While this may seem quite young, the median age in 1960 was even younger, at 29.5 years.

### The aging population

The year 2035 is expected to be a turning point for the population of the United States. This is the year that demographers expect there to be more adults over the age of 65 than children. Additionally, in the year 2060, there are expected to be about 604,000 people aged 100 and

**Median age of the resident population of the United States from 1960 to 2019**



ⓘ Additional Information

© Statista 2020 🏳

Show source ⓘ

**Source**
➞ Show sources information
➞ Show publisher information

**Release date**
June 2020

**Region**
United States

**Survey time period**
1960 to 2019

**Supplementary notes**
Data prior to 2010 can be found here.
Values have been rounded, and are estimates as of
July 31 each year.

# Exhibit O



# Statement on Equal Rights Amendment Debate

Press Release ·
Thursday, December 19, 2019

**Washington, DC**

In light of the public interest and ongoing debate about the Equal Rights Amendment (ERA), the National Archives and Records Administration (NARA) requested guidance from the Department of Justice's Office of Legal Counsel on legal issues regarding ratification of the ERA. These issues are currently presented in a lawsuit filed by the states of Alabama, Louisiana, and South Dakota against the Archivist of the United States. NARA does not intend to take any action regarding the ERA until, at a minimum, it receives the guidance it previously requested and in no event before February 15, 2020.

**The U.S. National Archives and Records Administration**
1-86-NARA-NARA or 1-866-272-6272

# Exhibit P

Top



# NARA Press Statement on the Equal Rights Amendment

Press Release ·
Wednesday, January 8, 2020

**Washington, DC**

At the request of the National Archives and Records Administration    (NARA), the Department of Justice (DOJ) has issued an opinion on the Ratification of the Equal Rights Amendment (ERA) and the statutory role of the Archivist of the United States.

Under 1 U.S.C. § 106b, the Archivist performs a ministerial role with respect to certifying the ratification of amendments to the U.S. Constitution, as follows:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

In its January 6, 2020, opinion, the Office of Legal Counsel (OLC) has concluded "that Congress had the constitutional authority to impose a deadline on the ratification of the ERA and, because that deadline has expired, the ERA Resolution is no longer pending before the States." (OLC Opinion, at p.2.) Accordingly, the OLC opinion goes on to state that "the ERA's adoption could not be certified under 1 U.S.C. § 106b." (OLC Opinion, at p.37.)

These issues are currently presented in two federal lawsuits against the Archivist of the United States, one filed in the U.S. District Court for the Northern District of Alabama    by the states of Alabama, Louisiana, and South Dakota and the other filed in the U.S. District Court for the District of Massachusetts    by Equal Means Equal, The Yellow Roses, and Katherine Weitbrecht.

Case 1:20-cv-00242-RC Document 113 Filed 09/23/20 Page 87 of 89

NARA defers to DOJ on this issue and will abide by the OLC opinion, unless otherwise directed by a final court order.

### # # #

For press information contact the National Archives Public and Media Communications Staff at 202-357-5300.

*Connect with the National Archives on:*
**Twitter:** @USNatArchives
**Facebook:** USNationalArchives
**Tumblr:** usnatarchives
**Instagram:** usnatarchives

**The U.S. National Archives and Records Administration**
1-86-NARA-NARA or 1-866-272-6272

Top

# Exhibit Q

Newspapers by ancestry

The Press-Tribune (Roseville, California) · Mon, Oct 4, 1982 · Page 3

https://www.newspapers.com/image/475336066

Printed on Jul 5, 2020



Copyright © 2020 Newspapers.com. All Rights Reserved.

