**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| COMMONWEALTH OF VIRGINIA, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 20-242 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 29, 74, 100 |
| | : | | |
| DAVID S. FERRIERO, | : | | |
| | : | | |
| Defendant, | : | | |
| | : | | |
| v. | : | | |
| | : | | |
| ALABAMA, *et al.*, | : | | |
| | : | | |
| Intervenor-Defendants. | : | | |

**<u>MEMORANDUM OPINION</u>**

GRANTING DEFENDANT'S MOTION TO DISMISS;
GRANTING INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Hoping to secure a place in the Constitution for sex equality, Plaintiffs Nevada, Illinois, and Virginia ratified the Equal Rights Amendment ("ERA") years after many presumed it was dead. They now challenge the refusal of the Archivist of the United States to publish and certify the amendment as part of the Constitution. Laudable as their motives may be, Plaintiffs run into two roadblocks that forbid the Court from awarding the relief they seek. First, the Archivist's publication and certification of an amendment are formalities with no legal effect. His failure to perform those formalities does not cause Plaintiffs any concrete injury, so they lack standing to sue. Second, even if Plaintiffs had standing, Congress set deadlines for ratifying the ERA that

expired long ago.  Plaintiffs' ratifications came too late to count.  For those two reasons, the

Court dismisses Plaintiffs' suit.

## II.  BACKGROUND

### A.  The Amendment Process

Article V lays out procedures for amending the Constitution.  It says:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall
> propose Amendments to this Constitution, or on the Application of the
> Legislatures of two thirds of the several States, shall call a Convention for
> proposing Amendments, which, in either Case, shall be valid to all Intents and
> Purposes, as Part of this Constitution, when ratified by the Legislatures of three
> fourths of the several States, or by Conventions in three fourths thereof, as the one
> or the other Mode of Ratification may be proposed by the Congress . . . .

U.S. Const. art. V.  The Article V framework thus consists of three steps: proposal, selection of a

"Mode of Ratification," and ratification.  A proposal can originate with either two-thirds of both

houses of Congress or a convention called by two-thirds of state legislatures.  Congress then

chooses whether states will have to ratify the proposal by legislature or convention.  And finally,

the proposal becomes part of the Constitution when three-fourths of the states ratify it.

Independent of the Article V process, Congress has charged the Executive with

publishing and certifying the validity of constitutional amendments since 1818.  Congress

initially gave the duty to the Secretary of State, then transferred it to the Administrator of

General Services, and most recently assigned it to the Archivist of the United States (the head of

the National Archives and Records Administration).  *See* Congressional Pay Amendment, 16 Op.

O.L.C. 85, 98 (1992), https://www.justice.gov/sites/default/files/olc/opinions/1992/05/31/op-olc-

v016-p0085_0.pdf.  Today, 1 U.S.C. § 106b codifies the Archivist's duties as follows:

> Whenever official notice is received at the National Archives and Records
> Administration that any amendment proposed to the Constitution of the United

States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

### B.  History of the Equal Rights Amendment

Congress first considered a constitutional amendment guaranteeing sex equality almost one hundred years ago.  The original 1923 proposal did not get off the ground, but it heralded a series of successive proposals introduced in every session of Congress from then until 1971.  *See* Jean Witter, *Extending Ratification Time for the Equal Rights Amendment: Constitutionality of Time Limitations in the Federal Amending Process*, 4 Women's Rts. L. Rep. 209, 209, 216–17 (1978).  Over nearly fifty years, support for the idea ebbed and flowed before reaching its zenith in the 1960s and 1970s.  *See id.*  Then, in 1972, supermajorities in both houses of Congress adopted the following joint resolution proposing the ERA:

JOINT RESOLUTION

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein)*, That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE —

"SECTION 1.  Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
"SEC. 2.  The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"SEC. 3.  This amendment shall take effect two years after the date of ratification."

H.R.J. Res. 208, 92nd Cong., 86 Stat. 1523 (1972).

The clause central to this dispute is the ratification deadline, which requires state legislatures to ratify the ERA "within seven years from the date of its submission by the Congress."  Prior editions of the ERA had never contained a deadline, and the change was the result of a compromise.  *See* Witter, *supra*, at 215–16.  While debating the previous version of the ERA in 1970, opponents in the House and Senate called for a deadline.  Representative Celler lamented: "This amendment could roam around State legislatures for 50 years.  Customarily we provide that ratification must occur within 7 years of its submission to the States.  But there is no provision of that sort in this resolution."  116 Cong. Rec. 28,012 (1970).  Senator Ervin echoed the sentiment: "[E]very amendment which has been submitted by Congress to the States since 1939 . . . has carried a 7-year period as the time in which the amendment must be ratified or lapse in legal efficacy."  *Id.* at 36,302.  Proponents eventually relented and inserted a seven-year time limit.  Representative Griffiths, the ERA joint resolution's lead sponsor in the House, explained that the deadline was a "customary" and "perfectly proper" way to respond to "some of the objections" raised against the ERA and ensure that "it should not be hanging over our head forever."  117 Cong. Rec. 35,814–15 (1971); *see also* Ruth Bader Ginsburg, Observation, *Ratification of the Equal Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919, 921 (1979) ("[P]rincipal congressional proponents of the ERA . . . . thought the stipulation innocuous, a 'customary' statute of limitations, not a matter of substance worth opposing." (footnotes omitted)).

State ratifications followed quickly at first.  By the end of 1972, twenty-two states had approved the ERA.  Ratification of the Equal Rights Amendment ("2020 OLC ERA Opinion"),

44 Op. O.L.C. __, slip op. at 6 n.6 (2020), https://www.justice.gov/olc/file/1232501/download (collecting state resolutions).  Over the next five years, however, the proposed amendment's momentum stalled.  Only thirteen more states ratified the ERA, *id.* at 7 n.7 (same), and four states even voted to rescind earlier ratifications, *id.* at 7 n.8 (same).  South Dakota passed a resolution stating that its ratification would be withdrawn if the ERA was not adopted by the time the seven-year period elapsed.  *Id.* at 7.  Excluding the purported rescissions, thirty-five states had ratified the ERA as its deadline approached—three short of Article V's three-fourths threshold.  So, with the deadline around the corner, Congress decided to give states more time.  In the fall of 1978, simple majorities in each house passed a joint resolution to extend the ratification deadline to June 30, 1982.  *See* H.R.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978); *see also* 124 Cong. Rec. 26,264, 34,314 (1978).

When a few states and individual state legislators challenged the move, a district court sided with the challengers.  *See Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1981), *vacated as moot*, 459 U.S. 809 (1982).  It held that Article V did not permit Congress to extend a ratification deadline.  *Id.* at 1153–54.  Because the extended deadline was drawing near, the Supreme Court agreed to hear the case on an expedited basis.  It granted certiorari before judgment in the court of appeals and stayed the district court's decision.  *Nat'l Org. for Women v. Idaho*, 455 U.S. 918 (1982).  But before the Court heard argument in the case, the extended deadline passed without any additional states having ratified the amendment.  The Court vacated the district court's judgment and ordered dismissal of the complaints as moot.  *Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982).

Most supporters and commentators assumed that was it for the ERA.  *See, e.g.*, Mary Frances Berry, *Why ERA Failed* 1 (1986) ("The failure of the Equal Rights Amendment

ratification effort had many causes."); Marjorie Hunter, *Leaders Concede Loss on Equal Rights*, N.Y. Times, June 25, 1982, at A1 ("Leaders of the fight for an equal rights amendment officially conceded defeat today.").  Since then, federal legislators have repeatedly tried to start over from scratch, but Congress has never adopted one of their resolutions.  *See* 2020 OLC ERA Opinion at 10 (collecting proposed resolutions).  More recently, however, some ERA supporters have asserted that the 1972 proposal is still on the table.  They claim that its deadlines are unenforceable, either because a deadline must be in an amendment's text to be effective or because Congress can decide an amendment's timeliness after the final state ratification.  *See, e.g.*, Allison L. Held et. al., *The Equal Rights Amendment: Why the ERA Remains Legally Viable and Properly Before the States*, 3 Wm. & Mary J. Women & L. 113, 115 (1997).

Over the past four years, each of Plaintiffs' legislatures enacted joint resolutions ratifying the ERA.  *See* S.J. Res. 2, 79th Leg., Reg. Sess. (Nev. 2017); S.J. Res. Const. Amend. 0004, 100th Gen. Assemb., Reg. Sess. (Ill. 2018); S.J. Res. 1, Gen. Assemb., Reg. Sess. (Va. 2020). With Virginia's ratification last year, Plaintiffs say that the ERA reached the three-fourths threshold and is now part of the Constitution.  Compl. ¶ 57, ECF No. 1.  The Archivist disagrees. After consulting with the Department of Justice's Office of Legal Counsel, *see* 2020 OLC ERA Opinion, he refuses to publish and certify the ERA "unless otherwise directed by a final court order," Compl. ¶ 62.  Plaintiffs brought this suit to require him to do so.

### C.  Procedural History

Plaintiffs filed a complaint seeking mandamus relief that would order the Archivist to publish and certify the ERA.  Compl. at 16–17.  In response, five other states intervened as defendants: Alabama, Louisiana, Nebraska, South Dakota, and Tennessee ("Intervenors").  *See* Order Granting Movants' Mot. to Intervene, ECF No. 33.  Intervenors—two of which voted

down the ERA resolution and three of which purported to rescind their prior ratifications—argue

that they should not have to spend resources defending their laws against an invalidly enacted

ERA.  *See* Intervenors' Mot. to Intervene, ECF No. 10.

The Archivist asked the Court to dismiss Plaintiffs' complaint for lack of jurisdiction.

*See* Mem. Supp. Def.'s Mot. Dismiss ("Def.'s Mot."), ECF No. 29-1; *see also* Pls.' Mem. Opp'n

Def.'s Mot. Dismiss ("Pls.' Opp'n"), ECF No. 37; Def.'s Reply Supp. Mot. Dismiss ("Def.'s

Reply"), ECF No. 101.  Intervenors then piled on with what the Court construes as another

motion to dismiss.  *See* Intervenors' Mot. Summ. J. & Supp. Mem. ("Intervenors' Mot."), ECF

No. 74; *see also* Pls.' Mem. Opp'n Intervenors' Mot. Summ. J., ECF No. 99; Intervenors' Reply

Supp. Mot. Summ. J., ECF No. 112.[1]  In response, Plaintiffs moved for summary judgment.  *See*

Pls.' Mot. Summ. J. & Mem. Supp., ECF No. 100.[2]

---

[1] Intervenors styled their motion as one for summary judgment but asked that it be treated as a motion to dismiss.  *See* Intervenors' Mot. at 13 n.2.  They explained that the Federal Rules of Civil Procedure gave them no choice but to file a summary judgment motion.  *Id.*  Rule 24(c) required them to file an answer with their motion to intervene, so they could not file a Rule 12(b) motion to dismiss.  And because the Archivist has not filed an answer yet, they could not move for a Rule 12(c) judgment on the pleadings either.  Plaintiffs do not object to Intervenors' request that the motion be considered a motion to dismiss.  *See* Pls. Opp'n Intervenors' Mot. Summ. J. at 1–3 (merely explaining the difference between the two motions).  Accordingly, the Court grants the request.  *Cf. Prade v. City of Akron*, 14-cv-188, 2015 WL 2169975, at *1–2 (N.D. Ohio May 8, 2015) (treating a Rule 12(c) motion as a Rule 12(b)(6) motion even though the movant had already filed an answer because other defendants had not yet filed their answers).

[2] In addition, numerous amici have asked the Court to consider their perspectives on the important issues at stake in this case.  The Court grants their motions to file amicus briefs and appreciates their input.  *See* Br. Amicus Curiae of Eagle Forum et al. in Supp. of Def.'s Mot., ECF No. 31-1; Br. of Business and Corporate Entities as Amicus Curiae in Supp. of Pls., ECF Nos. 40-1, 96-1; Br. for Generation Ratify et al. as Amicus Curiae in Supp. of Pls., ECF No. 44-1; Br. of Amici Curiae Constitutional Law Professors Erwin Chemerinsky et al. in Supp. of Neither Party, ECF No. 48-1; Amicus Curiae Br. in Supp. of Pls. for the U.S. Conference of Mayors et al., ECF No. 51-1; Br. for Equality Now et al. as Amicus Curiae in Supp. of Pls., ECF No. 61-1; Amicus Br. by Organizations that Advocated ERA Ratification in Virginia, Illinois, and Nevada in Opp'n to Def.'s Mot., ECF No. 66-1; Br. Amici Curiae of the ERA Coalition and Advocates in the Women's Movement in Supp. of Pls.' Opp'n to Def.'s Mot., ECF No. 68-1; Amicus Br. of Michigan Supp. Pls. in Requesting a Declaration that the Equal Rights

The Court grants the motions to dismiss.  It therefore denies Plaintiffs' motion for summary judgment and the Archivist's motion to stay summary judgment briefing.  *See* Def.'s Mot. Stay Summ.-J. Briefing, ECF No. 104.  Furthermore, the Court can address the motions to dismiss without oral argument, so it denies Intervenors' motion to consolidate hearings on their and the Archivist's motions.  *See* Intervenors' Unopposed Mot. Consolidate Hr'gs, ECF No. 88.  With that housekeeping out of the way, the Court turns to the parties' dispute.

## III.  LEGAL STANDARD

In one way or another, the Archivist's and Intervenors' attacks on the complaint are all jurisdictional.  Intervenors focus on the merits.  They argue that the ERA has not become part of the Constitution, so the Archivist has no obligation to publish and certify it.  *E.g.*, Intervenors' Mot. at 13–14.  But Plaintiffs seek relief under the Mandamus Act, which withholds subject-matter jurisdiction when mandamus is not warranted.  *See Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020).  It thus makes the merits question a jurisdictional one.  *See id.*  The Archivist advances merits arguments too, but he also adds more traditional justiciability arguments regarding standing, ripeness, and the political question doctrine.  *E.g.*, Def.'s Mot. at 1–2.  Because all these contentions go to the Court's jurisdiction, Federal Rule of Civil Procedure 12(b)(1) governs.  It allows a defendant to seek dismissal of a claim for lack of jurisdiction.

---

Amendment Has Become the 28th Amendment to the U.S. Constitution, ECF No. 71; Br. Amicus Curiae of VoteERA.org and Leanne Littrell DiLorenzo in Supp. of Pls., ECF No. 73-1; Br. of Amicus Curiae Montana Governor Steve Bullock, ECF No. 76; Br. of Amicus Curiae Independent Women's Law Center Supp. Intervenors' Mot., ECF No. 90-1; Br. of Concerned Women for America and Susan B. Anthony List as Amici Curiae in Supp. of Intervenors, ECF No. 94-1; Br. on Behalf of Amici Curiae Kentucky-Based Women's-Rights Advocates in Supp. of Pls.' Mot. for Sum. J. and in Opp'n to Intervenors' Mot., ECF No. 108-1.

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Accordingly, a federal court is presumed to lack jurisdiction unless the plaintiff proves otherwise. *Id.* "When ruling on a Rule 12(b)(1) motion, the court must 'treat the complaint's factual allegations as true' and afford the plaintiff 'the benefit of all inferences that can be derived from the facts alleged . . . .'" *Cause of Action Inst. v. IRS*, 390 F. Supp. 3d 84, 91 (D.D.C. 2019) (citation omitted). Because a court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," however, it scrutinizes a plaintiff's factual allegations more closely than it would in resolving a Rule 12(b)(6) motion for failure to state a claim. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001). If need be, it "may consider . . . materials outside the pleadings . . . to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), *aff'd*, No. 00-7176, 2001 WL 135857 (D.C. Cir. Jan. 18, 2001).

## IV.  ANALYSIS

The Archivist and Intervenors point to several barriers in the way of Plaintiffs' claim. For starters, Plaintiffs must show that their suit is justiciable. The Archivist asserts that Plaintiffs cannot make that showing for three reasons: they lack standing, their suit is not ripe, and their claim requires resolution of political questions that are outside the province of the Judiciary. Then, even if Plaintiffs can overcome those hurdles, they need to demonstrate that the Archivist has a duty to publish and certify the ERA as part of the Constitution. That requires two things to be true. First, the Archivist must be obliged to accept Plaintiffs' three ratifications regardless of the ERA's deadlines. And second, the five states' purported rescissions must be invalid. Only if

both propositions are true would thirty-eight (or three-fourths) of the states have ratified the amendment and triggered the Archivist's duty to publish it under section 106b.

Plaintiffs' claim collapses against at least two of these barriers.  They lack standing because, by their own account, the certification they demand from the Archivist has no legal effect.  His refusal to publish and certify the ERA thus does not cause them a concrete injury that could be remedied by ordering him to act.  Plaintiffs are also wrong that the Archivist is bound to accept their ratifications as valid.  Section 106b permits the Archivist to determine whether a ratification meets a deadline that Congress set when it proposed the amendment.  And the ERA's ratification deadline is effective despite its location in the introductory clause of the amendment's proposing resolution.

Although the Court could end its analysis after concluding that Plaintiffs lack standing, it decides the deadline issue as an alternative holding to streamline appellate review.  To reach the deadline issue, the Court first determines that it does not present a political question.  As mentioned, all three questions—standing, the political question doctrine, and whether Plaintiffs deserve relief under the Mandamus Act—are jurisdictional.  *Cf. Lovitky*, 949 F.3d at 758 ("Where . . . 'both standing and subject matter jurisdiction are at issue . . . [,] a court may inquire into either and, finding it lacking, dismiss the matter without reaching the other.'" (second omission in original) (citation omitted)).  Having identified two independent grounds to dismiss the case for lack of jurisdiction, the Court does not discuss the rescission issue.

### A.  Plaintiffs Lack Standing

Article III of the Constitution gives federal courts the power to decide "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  That limited grant of jurisdiction gives rise to the standing doctrine.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Standing ensures

that a court will exercise its jurisdiction "only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.'"  *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)).  It requires the plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547.  "[T]he party invoking federal jurisdiction[] bears the burden of establishing these elements."  *Id.*  "[A]t the pleading stage," that means "the plaintiff must 'clearly . . . allege facts demonstrating' each element."  *Id.* (quoting *Warth*, 422 U.S. at 518).  For purposes of assessing standing, courts assume that plaintiffs will succeed on the merits of their claims.  *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012).

"A State's standing depends on the capacity in which it initiates a lawsuit."  *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019).  Most straightforwardly, it can sue to "redress its own injury" in what is called a "direct injury lawsuit."  *Id.*  A state pressing a direct injury lawsuit must "meet only the ordinary demands of Article III."  *Id.*  Alternatively, a State can sometimes "sue in a representative capacity to vindicate its citizens' interests" in what is called a "*parens patriae* lawsuit."  *Id.*  That kind of suit requires the plaintiff state to satisfy Article III's standing requirements and "assert a quasi-sovereign interest 'apart from the interests of particular private parties.'"  *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)).  Because states cannot bring a *parens patriae* lawsuit against the Federal Government, *id.* at 179–80, 183, Plaintiffs must show a direct injury.[3]

---

[3] Plaintiffs concede that current D.C. Circuit caselaw precludes a claim of *parens patriae* standing but preserve the issue for appeal.  *See* Pls.' Opp'n at 11 n.8.

Plaintiffs' theory of standing rests on an injury to one of their sovereign interests.  They argue that, as sovereign states in the Constitution's federal system, they have "an interest in securing observance of the terms under which [they] participate[] in" that system.  Pls.' Opp'n at 9 (alterations in original) (quoting *Snapp*, 458 U.S. at 607–08).  One of those terms is the role that Article V gives states in amending the Constitution.  *Id.* at 7–8.  It promises that, "once a proposed amendment has been 'ratified by the Legislatures of three fourths of the several States,' it '*shall be* valid to all Intents and Purposes, as Part of th[e] Constitution.'"  *Id.* at 8 (alteration in original) (quoting U.S. Const. art. V).  According to Plaintiffs, however, the Archivist has "improperly interfere[d] with [their] constitutional authority to amend the Federal Constitution."  *Id.* at 10–11.  "By refusing to honor [their] ratification[s] of the Equal Rights Amendment," Plaintiffs assert, the Archivist has "intrude[d]" on their sovereignty and "disregard[ed] an exercise of their sovereign power."  *Id.* at 9.

The problem with Plaintiffs' theory is that it assigns the Archivist's actions too much weight.  Plaintiffs "seek mandamus relief to compel the Archivist to 'publish' and 'certif[y]'" the ERA as part of the Constitution, *id.* at 5 (alteration in original), supposedly because his "refusal to do so deprives . . . [them] of their sovereign prerogatives under Article V," *id.* at 27–28.  But the Archivist's proclamation has no legal effect.  Article V "makes no mention" of the Archivist or publication of an amendment.  Lester Bernhardt Orfield, *The Amending of the Federal Constitution* 77 (1942); *see also* Congressional Pay Amendment, 16 Op. O.L.C. at 99 n.19.  And, for that reason, both the Supreme Court and the D.C. Circuit have held that an amendment becomes law when it secures ratifications from three-fourths of the states—not when the Archivist publishes and certifies it.  *See Dillon v. Gloss*, 256 U.S. 368, 376 (1921) (explaining that the Eighteenth Amendment became valid when it received its final ratification, so the date of

12

the Secretary of State's proclamation was "not material"); *U.S. ex rel. Widenmann v. Colby*, 265

F. 998, 1000 (D.C. Cir. 1920) ("It is the approval of the requisite number of states, not the

proclamation, that gives vitality to the amendment and makes it a part of the supreme law of the

land."), *aff'd*, 257 U.S. 619 (1921); *see also United States v. Sitka*, 845 F.2d 43, 47 (2d Cir.

1988) ("The authority created in the Secretary of State . . . was purely ministerial; it could not

and did not affect the process of ratification itself, which is self-executing upon completion.").

Nowhere do Plaintiffs assert that the Archivist's publication of an amendment does

anything legally significant.  Far from it.  They emphasize time and time again that publication is

a formality and that the ERA is in fact already part of the Constitution.  *See, e.g.*, Compl. ¶ 57

("[T]he Equal Rights Amendment became part of the U.S. Constitution immediately upon

Virginia's ratification."); *id.* ¶ 79 ("Under Article V, the Equal Rights Amendment has been

added to the U.S. Constitution."); Pls.' Opp'n at 4 ("With Virginia's ratification earlier this year,

the Article V requirements were satisfied and the Equal Rights Amendment became 'valid to all

Intents and Purposes, as Part of th[e] Constitution." (citations omitted)); *cf. id.* at 13–14 (arguing

that there is no need for Congress to approve an amendment for it to become effective).

Plaintiffs' pronouncements undermine their claim to standing.  *See NB*, 682 F.3d at 82

(explaining that a court assessing standing assumes that the plaintiff is right on the merits).

Because the Archivist's publication of an amendment does not affect the amendment's

validity, Plaintiffs cannot show that his refusal to publish the ERA caused the injury that they

claim: "interfere[nce] with [their] constitutional authority to amend the Federal Constitution."

Pls. Opp'n at 10–11.  By the same token, forcing the Archivist to publish the amendment "would

avail [them] nothing."  *Cf. Colby*, 265 F. at 1000 (explaining that a plaintiff who asked for the

cancellation of a Secretary of State's proclamation "ha[d] no interest in the prayer of his

petition" because cancellation "would not affect the validity of the amendment").  Plaintiffs'
intrusion-on-sovereignty theory thus cannot establish injury, causation, or redressability.

Plaintiffs also gesture nonspecifically toward "widespread confusion" as another possible
source of injury.  *See* Compl. ¶ 80; Pls.' Opp'n at 10.  They acknowledge that "confusion alone
would be insufficient to confer Article III standing" because it is a generalized grievance.  Pls.'
Opp'n at 10; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 575 (1992) (explaining that suits
based on a "generalized grievance"—in which "the impact on plaintiff is plainly undifferentiated
and common to all members of the public"—are "inconsistent with the framework of Article III"
(cleaned up) (citation omitted)).  But Plaintiffs say they have "much more at stake" because their
allegation of confusion is "made in connection with [their] sovereign interests."  Pls.' Opp'n at
10.  They do not elaborate much beyond that.  *See id.*  And it is not the Court's job to flesh their
argument out for them.  *See Spokeo*, 136 S. Ct. at 1547 ("The plaintiff . . . bears the burden of
establishing [standing].").

Nevertheless, Plaintiffs' earlier citation to *Massachusetts v. EPA*, 549 U.S. 497 (2007),
suggests they believe that states may be able to rely on a confusion-based injury that would be
insufficient for ordinary litigants.  *See* Pls.' Opp'n at 7.  Not so.  Although *Massachusetts*
recognized that "States are not normal litigants for the purposes of invoking federal jurisdiction,"
549 U.S. at 518, and may sometimes be "entitled to special solicitude in [a] standing analysis,"
*id.* at 520, the D.C. Circuit has said that the case's holding is quite narrow.  The case examined
Massachusetts's standing to seek review of the EPA's denial of a petition to regulate greenhouse
gases.  *Id.* at 516–26.  Massachusetts alleged injuries resulting from global warming, including
rising sea levels that had begun to consume its coastal property.  *Id.* at 521–23.  The EPA
retorted that global warming "inflict[ed] widespread harm," so it should not give rise to standing.

*Id.* at 517.  The Supreme Court disagreed.  It emphasized that Massachusetts sued under a statute creating a procedural right to challenge the petition's denial and that Massachusetts was trying to vindicate its own interests in preserving its sovereign territory.  *Id.* at 519–20.  Even though the "climate-change risks [we]re 'widely shared,'" Massachusetts had "alleged a particularized injury in its capacity as a landowner"—namely, loss of its coastal land.  *Id.* at 522–23.

Properly understood, *Massachusetts* is of no help to Plaintiffs.  The D.C. Circuit has summarized the case in this way: "*Massachusetts* stands only for the limited proposition that, where a harm is widely shared, a sovereign, suing in its individual interest, has standing to sue where that sovereign's individual interests are harmed, wholly apart from the alleged general harm."  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476–77 (D.C. Cir. 2009).  To be sure, states—as sovereigns—have "unique and sweeping interests" that ordinary litigants lack.  *California v. Trump*, No. 19-cv-960, 2020 WL 1643858, at *6 (D.D.C. Apr. 2, 2020); *see also Snapp*, 458 U.S. at 601–08 (providing an overview of states' nonsovereign, sovereign, and quasi-sovereign interests).  But they must still "establish a particularized harm" to one of those interests to prove standing.  *California*, 2020 WL 1643858, at *6.  Plaintiffs have not done that.  They merely assert that "[t]he Archivist's failure to carry out his ministerial duties to acknowledge the adoption of the amendment harms the Plaintiff States by creating widespread confusion regarding the effect of their ratifications."  Compl. ¶ 80.  That meager "allegation[] of confusion [is] simply too abstract to be judicially cognizable."  *Cf. Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 668 (D.C. Cir. 1987) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)).[4]

---

[4] To the extent the Archivist's alleged noncompliance with section 106b may cause a procedural injury, Plaintiffs do not assert one.  And even then, Plaintiffs would still have to show some concrete, individualized harm associated with the procedural injury.  *See Equal Means*

Plaintiffs have failed to allege an injury specific to them that was caused by the Archivist's refusal to publish the ERA and would be remedied by ordering him to publish it. Consequently, they have not established standing.  While that deficiency alone is enough reason to dismiss this case for lack of jurisdiction, the Court moves on to reach an alternative holding on the ratification deadline issue.[5]

### B.  The Ratification Deadline Issue Does Not Present a Political Question

According to the Archivist, whether an amendment's deadline blocks its ratification is a nonjusticiable political question.  The political question doctrine is a "narrow exception" to the general rule that "the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'"  *Zivotofsky ex rel. Zivotofsky v. Clinton (Zivotofsky I)*, 566 U.S. 189, 194–95 (2012) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).  It "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986).  The doctrine is therefore grounded in respect for "the constitutional principle of separation of powers."  *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019).

---

*Equal v. Ferriero*, 478 F. Supp. 3d 105, 125 (D. Mass. 2020) (rejecting organizational plaintiffs' claim of standing because, "[e]ven assuming there was some procedural violation," they "ha[d] not alleged any concrete interest in tandem with the Archivist's failure"); *see also New Hampshire v. Holder*, 293 F.R.D. 1, 6 (D.D.C. 2013) ("[T]he procedural standing doctrine 'does not—and cannot—eliminate any of the irreducible elements of standing[.]"  (second alteration in original) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996))).

   [5] Because the Court does not decide whether states can rescind their ratifications, it will not address the Archivist's ripeness argument, which pertains to only the rescission issue.  *See* Def.'s Mot. at 11–12; Def.'s Reply at 4–6.

Assessing whether an issue presents a political question typically requires analysis of the six factors the Supreme Court laid out in *Baker v. Carr*, 369 U.S. 186 (1962). A political question may exist if there is:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. Supreme Court precedent indicates that the first two factors are preeminent in the political question analysis. *See Al-Tamimi*, 916 F.3d at 12 ("At the very least, *Zivotofsky I* suggests that, if the first two *Baker* factors are not present, more is required to create a political question than apparent inconsistency between a judicial decision and the position of another branch." (citing *Zivotofsky I*, 566 U.S. at 194–201)).

Rather than argue in terms of the *Baker* factors, however, the Archivist says that the Supreme Court has already determined that questions around ratification deadlines are for the political branches to decide. *See* Def.'s Mot. at 12–14; Def.'s Reply at 6–13. His argument is based on the Court's decision in *Coleman v. Miller*, 307 U.S. 433 (1939). *Coleman* involved a suit by Kansas legislators to prevent state officials from recognizing the legislature's ratification of the proposed Child Labor Amendment. *Id.* at 436. The Court considered two issues similar to the questions presented in this case: (1) whether Kansas's previous rejection of the amendment precluded the state's later ratification; and (2) whether the state's ratification of the amendment thirteen years after its proposal came too late to be effective. *Id.* at 447. The Court held that both questions were nonjusticiable. *Id.* at 450, 456.

But *Coleman* does not apply here.  As an initial matter, *Coleman* does not establish that *all* questions related to the amendment process are political ones.  Even though four concurring members of the *Coleman* Court took that broad view, they failed to convince a majority.  *See id.* at 459 (Black, J., concurring) ("Undivided control of [the amendment] process has been given by the Article exclusively and completely to Congress."); *see also Dyer v. Blair*, 390 F. Supp. 1291, 1299–300 (N.D. Ill. 1975) (three-judge court) (Stevens, J.) (rejecting the argument that all amendment process questions are political ones in part because a majority of the *Coleman* Court "refused to accept that position").[6]  And elsewhere, the Supreme Court has repeatedly decided questions about the Article V process—even when faced with political question arguments.  *See Dyer*, 390 F. Supp. at 1300 & n.21 (collecting cases); 2020 OLC ERA Opinion at 30 n.24 (same); Walter Dellinger, *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 Harv. L. Rev. 386, 403–05 (1983) (same).[7]  A court's task, then, is to determine

---

[6] Chief Justice Hughes's opinion in *Coleman* is styled as the "Opinion of the Court" but had the approval of only three Justices.  *See* 307 U.S. at 435.  The opinion is nevertheless "the holding of the Court" because it articulated the "position taken by those Members who concurred in the judgments on the narrowest grounds."  *See Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted).  The four concurring Justices believed that all amendment-related questions were nonjusticiable while the three Justices who signed onto Chief Justice Hughes's opinion went only so far as to hold that the two questions before them were nonjusticiable.  *See Baker*, 369 U.S. at 214 (recognizing the *Coleman* plurality opinion as controlling); *Goldwater v. Carter*, 444 U.S. 996, 1002–03 (1979) (opinion of Rehnquist, J.) (same); *Dyer*, 390 F. Supp. at 1300 (same); *see also* 2020 OLC ERA Opinion at 29–30; 13C Charles Alan Wright et al., *Federal Practice and Procedure* § 3534.1 (3d ed. 2020).

[7] *See also, e.g.*, *Dillon*, 256 U.S. 368 (holding that Congress can set a reasonable time limit on the ratification of an amendment); *Nat'l Prohibition Cases*, 253 U.S. 350 (1920) (holding, *inter alia*, that Congress did not need to deem an amendment "necessary" to propose it and that the two-thirds vote of a quorum of each house was enough to propose an amendment); *Hollingsworth v. Virginia*, 3 U.S. (3 Dall.) 378, 381 n.* (1798) (holding that a President's veto power "applies only to the ordinary cases of legislation: He has nothing to do with the proposition, or adoption, of amendments to the Constitution").

whether the specific amendment-related questions before it are political ones. *See Dyer*, 390 F. Supp. at 1300.

*Coleman* does not control that narrower inquiry into the political nature of a ratification deadline either. Congress attached no deadline to the amendment under review in *Coleman*. 307 U.S. at 452. Embracing dicta in a previous case indicating that Article V implicitly required amendments to be ratified within a "reasonable" time after proposal, the *Coleman* Court declared that courts were unable to decide whether that nebulous requirement was met. *Id.* at 452–56 (citing *Dillon*, 256 U.S. 368). It explained that the host of "political, social and economic" considerations that inhere in such a reasonableness assessment were best left to the political branches. *Id.* at 453–54. But that reasoning has no force here. Congress set deadlines for the ERA and presumably considered those "political, social and economic" factors when it did so. *See id.* at 454 ("Our decision that the Congress has the power under Article V to fix a reasonable limit of time for ratification in proposing an amendment proceeds upon the assumption that the question, what is a reasonable time, lies within the congressional province."). Put simply, there is a difference between deciding whether a proposed amendment with no deadline has expired naturally and judging the effect of a clear deadline that Congress has already set.[8]

---

[8] The *Coleman* decision also depended on a promulgation theory of the amendment process under which Congress has the power, after receiving ratifications from three-fourths of the states on a proposed amendment, to adopt or reject the amendment. *See* 307 U.S. at 454–56. Commentators have widely panned the theory as out of sync with the text of Article V, prior precedent, and historical practice. *See, e.g.*, 2020 OLC ERA Opinion at 29–32; Congressional Pay Amendment, 16 Op. O.L.C. at 99–105; Dellinger, *supra*, at 398–405; Michael Stokes Paulsen, *A General Theory of Article v: The Constitutional Lessons of the Twenty-Seventh Amendment*, 103 Yale L.J. 677, 706–21 (1993); 3 William J. Rich, *Modern Constitutional Law* § 37:25 (3rd ed. 2020). Indeed, Plaintiffs and the Archivist both denounce the theory. *See* Pls.' Opp'n at 12–14; Def.'s Reply at 8. In any case, the *Coleman* opinion indicates that congressional promulgation—insofar as it is consistent with Article V and was actually part of the Court's holding—comes into play only when a proposed amendment has no deadline. *See* 307 U.S. at 454 ("If it be deemed that [the reasonableness] question is an open one when the

Having distinguished *Coleman*, the Court turns to the *Baker* factors to assess whether the effectiveness of the ERA's ratification deadline is a nonjusticiable political question. To begin, there is no "textually demonstrable constitutional commitment of the issue to a coordinate political department." *See Baker*, 369 U.S. at 217. Although Article V articulates a central role for Congress in the amendment process, nowhere does it discuss ratification deadlines or say that Congress should determine the validity of states' ratifications. *See Dyer*, 390 F. Supp. at 1300 ("The text of the Constitution does not expressly direct Congress, rather than the judiciary, to interpret the word 'ratified' as it is used in article V, or to decide whether a particular state has taken action which constitutes ratification of a proposed amendment."); Orfield, *supra*, at 13 (reasoning that Article V's "silen[ce]" on who should determine the procedural validity of amendments suggests that the issue, "like so many other controversies which may arise over the interpretation of the Constitution, is a legal question"). It certainly does not include the kind of specific delegation of authority usually associated with textual commitments that push questions beyond the reach of the judiciary. *Cf. Nixon v. United States*, 506 U.S. 224 (1993) (holding that the question of how to conduct an impeachment trial was nonjusticiable because Article I gave the Senate "sole Power to try all Impeachments"); *cf. also Al-Tamimi*, 916 F.3d at 10 (recognizing, despite numerous constitutional provisions "expressly commit[ting] certain foreign affairs questions to the Executive or the Legislature," that "not every case that involves foreign affairs is a political question"). Furthermore, Article V's careful division of the amendment

---

limit has not been fixed in advance, we think that it should also be regarded as an open one for the consideration of the Congress when, in the presence of certified ratifications by three-fourths of the States, the time arrives for the promulgation of the adoption of the amendment."); *see also* 2020 OLC ERA Opinion at 33 ("The opinion . . . repeatedly made clear that the Court was addressing the case where Congress did not include a deadline when proposing the amendment.").

power between Congress and the states suggests that the Framers did not intend for "either of those two parties to be the final arbiter of the process." *Freeman*, 529 F. Supp. at 1135. "It seems more logical that the courts, as a neutral third party, . . . decide . . . questions raised under article V." *Id.* After all, "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'" *Baker*, 369 U.S. at 210.

The deadline question also does not suffer from a "lack of judicially discoverable and manageable standards." *See id.* at 217. "It is primarily the character of the standards, not merely the difficulty of their application, that differentiates between those which are political and those which are judicial." *Dyer*, 390 F. Supp. at 1302. Political questions revolve around "political, social and economic" judgments. *See Coleman*, 307 U.S. at 453–54; *cf. Rucho v. Common Cause*, 139 S. Ct. 2484, 2500 (2019) (explaining how evaluating "fairness" in the partisan gerrymandering context "poses basic questions that are political, not legal"). Accordingly, the answer to a political question may change if the surrounding circumstances change. *See Dyer*, 390 F. Supp. at 1302 ("A question that might be answered in different ways for different amendments must surely be controlled by political standards rather than standards easily characterized as judicially manageable."); *accord Goldwater v. Carter*, 444 U.S. 996, 1003 (1979) (opinion of Rehnquist, J.).

Interpreting Article V's use of the terms "propose" and "ratification" to determine the effect of a proposed amendment's deadline requires nothing more than applying "familiar principles of constitutional interpretation" to "textual, structural, and historical evidence." *See Zivotofsky I*, 566 U.S. at 201. Though the task may be difficult on account of scarce or even competing evidence, "[t]his is what courts do." *Id.* In fact, the Supreme Court did not shrink

from addressing a closely related issue in *Dillon v. Gloss*, 256 U.S. 368 (1921). There, a habeas petitioner convicted under a statute passed pursuant to the Eighteenth Amendment argued that the amendment was invalid because it contained a ratification deadline. *Id.* at 370–71. The Court held that Article V permitted Congress to affix ratification deadlines to proposed amendments. *See id.* at 375–76. Recognizing "[t]hat the Constitution contains no express provision on the subject" but "what is reasonably implied is as much a part of [the Constitution] as what is expressed," *id.* at 373, the Court looked to textual, structural, and historical evidence to determine that Congress's power to set a ratification deadline was "incident of its power to designate the mode of ratification," *id.* at 376. There is no reason the deadline question presented here would be any less susceptible to the same modes of analysis. If a court can consider whether Article V permits Congress to set a ratification deadline, it should also be able to consider whether that deadline affects late-coming ratifications.

In addition, the effect of a ratification deadline is not the kind of question that ought to vary from political moment to political moment. The political question doctrine is "a tool for maintenance of governmental order" and "will not be so applied as to promote only disorder." *Baker*, 369 U.S. at 215. Yet leaving the efficacy of ratification deadlines up to the political branches would do just that. "[I]nconsistent interpretations or approaches would create an incurable uncertainty regarding the validity of the acts of the participants, severely crippling the amendment process." *Freeman*, 529 F. Supp. at 1139; *see also* Orfield, *supra*, at 21 ("From the point of view of orderly amending procedure it is doubtful that the doctrine of political question should be extended to other procedural steps. If orderly procedure is essential in the enactment of ordinary statutes, should it not be even more so as to the adoption of important and permanent constitutional amendments?"). Because determining the effect of the ERA's ratification deadline

will not require resort to policy judgments, there is no need to allow such uncertainty. The terms "propose" and "ratification" "must be interpreted with the kind of consistency that is characteristic of judicial, as opposed to political, decision making." *See Dyer*, 390 F. Supp. at 1303; *accord Freeman*, 529 F. Supp. at 1139; *see also* 13C Charles Alan Wright et al., *Federal Practice and Procedure* § 3534.1 (3d ed. 2020) (declaring that *Dyer* and *Freeman* "provide convincing support for the conclusion that many of the issues growing out of the amendment process are justiciable").[9]

Finally, none of *Baker*'s four prudential factors demand that the deadline issue be kept from the Court. Addressing the effect of the ERA's deadline would not entail making a policy determination, so all the Court has to do is interpret the Constitution. Constitutional

---

[9] Critics of judicial review in the Article V context worry about courts "oversee[ing] the very constitutional process used to reverse [their] decisions." Laurence H. Tribe, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role*, 97 Harv. L. Rev. 433, 435 (1983) (quoting *Goldwater*, 444 U.S. at 1001 n.2 (Powell, J., concurring)); *see also, e.g.*, Fritz W. Scharp, *Judicial Review and the Political Question: A Functional Analysis*, 75 Yale L.J. 517, 589 (1966). While that concern is valid, it is not enough to justify a ban on review of procedural questions like the effectiveness of an amendment's deadline. For one thing, the Judiciary is trusted with reviewing statutes that are sometimes meant to overturn court decisions—that is part of its constitutional duty "to say what the law is." *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Why should the constitutional amendment process be any different? *See* Paulsen, *supra*, at 717 ("[T]here is no more justification for judicial abdication in [the constitutional] context than in interpreting statutes 'overruling' the Court's prior statutory interpretation cases."). For another thing, "the adoption of amendments has only rarely been 'the . . . constitutional process used to reverse Supreme Court decisions.'" Dellinger, *supra*, at 415 (omission in original). Indeed, "[v]iewed historically, amendments to the Constitution are at least as likely to involve checks upon the power of Congress (as in the Bill of Rights and the 27th Amendment) as to represent efforts to overturn decisions of the Supreme Court (as in the case of the Eleventh Amendment)." 3 Rich, *supra*, § 37:25; *see also* Dellinger, *supra*, at 414–16. If amendments may affect both institutions' interests and powers, why should just one branch be cut out from the amendment process? *See* Paulsen, *supra*, at 717 ("If anything, such concerns cut in the opposite direction when an amendment limits Congress' power—suggesting that such issues should be found not to be 'congressional.'"). "In the end, . . . there is simply no escape from the fact that *any* institution entrusted with the responsibility of passing judgment upon amendment procedures might in some instance be perceived to have an institutional interest in the outcome of the process." Dellinger, *supra*, at 416.

interpretation does not disrespect a coordinate branch of government, even when a court's interpretation does not accord with a political branch's view. *Powell v. McCormack*, 395 U.S. 486, 548–49 (1969); *see also Dyer*, 390 F. Supp. at 1301. Nor does it risk the embarrassment of "multifarious pronouncements by various departments on one question," because "it is the responsibility of [the Judiciary] to act as the ultimate interpreter of the Constitution." *Powell*, 395 U.S. at 549 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)). The Court sees only the potential for "apparent inconsistency between a judicial decision and the position of another branch." *Al-Tamimi*, 916 F.3d at 12. But when "the first two *Baker* factors are not present," something "more is required to create a political question." *Id.*; *see also Zivotofsky I*, 566 U.S. at 207 (Sotomayor, J., concurring in part and concurring in the judgment) (describing how it is the "rare" and "exceptional" case when *Baker*'s final three factors "alone render a case nonjusticiable"). The Court will therefore proceed to examine whether the Archivist has a duty to ignore the ERA's deadline and publish the ERA.

### C. Plaintiffs Are Not Entitled to Mandamus Relief

Plaintiffs request mandamus relief to require the Archivist to certify and publish the ERA. Compl. ¶¶ 76–80; Pls.' Opp'n at 5.[10] The Mandamus Act provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "A court may grant mandamus relief only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy

---

[10] Plaintiffs also ask for a declaration that the ERA is "'valid' and 'part of th[e] Constitution.'" Compl. at 17 (alteration in original). Their right to that relief turns on their right to mandamus relief. *See Lovitky*, 949 F.3d at 758 (explaining that "the declaratory judgment statute 'is not an independent source of federal jurisdiction'" and that "the availability of declaratory relief presupposes the existence of a judicially remediable right" (citations omitted)).

available to plaintiff." *Lovitky*, 949 F.3d at 759 (quoting *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010)).  The party seeking this "drastic" remedy bears the burden of establishing that the defendant's duty to act "is clear and indisputable." *Id.* at 759–60 (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).  That "does not mean that mandamus actions are ruled out whenever the statute allegedly creating the duty is ambiguous." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc).  Instead, a court "must interpret the underlying statute" to determine if it imposes the duty the plaintiff says it does. *Id.*  The inquiry thus looks like an analysis of the merits, even though the Mandamus Act is jurisdictional. *Lovitky*, 949 F.3d at 759 ("[M]andamus jurisdiction under § 1361 merges with the merits." (quoting *In re Cheney*, 406 F.3d at 729)).  Here, the Court needs to discuss only the first two elements of mandamus relief, which it does "concurrently" as courts "often do[]." *See id.* at 760.

According to Plaintiffs, the Archivist has a duty to publish and certify the ERA under 1 U.S.C. § 106b.  Recall that the statute requires the Archivist to "cause [an] amendment to be published, with his certificate, specifying . . . that the same has become valid . . . as a part of the Constitution" when "official notice is received . . . that [the] amendment proposed . . . has been adopted[] according to the provisions of the Constitution." *Id.*  The ERA will have been "adopted" if it secured proper ratifications from thirty-eight states.  To prevail, then, Plaintiffs must show: (1) that their three ratifications count; and (2) that the rescissions of five other states do not.  They cannot make the first showing because their ratifications postdate a deadline that Article V authorized Congress to impose. *See Dillon*, 256 U.S. at 375–76 ("Of the power of Congress . . . to fix a definite period for the ratification we entertain no doubt.").  The Court focuses on the ERA's original seven-year deadline because if that deadline is effective, then it does not matter whether the extension was too—both deadlines have expired.

Plaintiffs offer two independent reasons why the Archivist must accept their ratifications as valid notwithstanding the seven-year deadline.  First, they say that section 106b does not permit the Archivist to inquire into the validity of a state's ratification, so he must certify and publish an amendment whenever three-quarters of the states have claimed to ratify it.  *See* Pls.' Opp'n at 18–19.  Their position relies heavily on *United States ex rel. Widenmann v. Colby*, 265 F. 998 (D.C. Cir. 1920), which discussed the certification and publication duties.  There, the plaintiff sought mandamus requiring the Acting Secretary of State to cancel his certification of the Eighteenth Amendment because the amendment was not validly adopted.  *Id.* at 999.  The court rejected his request.  It looked to section 106b's predecessor statute and explained:

> It will be observed that by this section i[t] was the duty of the Acting Secretary of State, upon receiving official notice from three-fourths of the several states that the proposed amendment had been adopted, to issue his proclamation. He was not required, or authorized, to investigate and determine whether or not the notices stated the truth.  To accept them as doing so, if in due form, was his duty.  As soon as he had received the notices from 36 of the states that the amendment had been adopted, he was obliged, under the statute, to put forth his proclamation.  No discretion was lodged in him.  The act required was purely ministerial.

*Id.* (citation omitted).  Holding that the Acting Secretary had fulfilled his statutory duties by issuing a certification, the court denied mandamus.  *Id.* at 1000.

While at first glance *Colby* seems to support Plaintiffs' position, it is inapplicable.  The *Colby* court suggested that the plaintiff there took issue with state ratification proceedings.  It observed that there was no dispute the Acting Secretary had "receive[d] official notice from the requisite number of states" and then summarized the plaintiff's challenge as asserting "that the officials of the several states should not have issued the notices."  *Id.* at 999.  Faced with that contention, the *Colby* court declared that "the Acting Secretary had no authority to examine into that matter, to look behind the notices."  *Id.* at 1000.  This case presents a different issue.  Here,

the Archivist did not "look behind" Plaintiffs' ratification notices to second-guess the proceedings that generated them.  He instead determined that the notices—on their face— revealed an obvious and direct contradiction between Plaintiffs' claimed ratifications and a deadline that Congress had imposed pursuant to its Article V "power to designate the mode of ratification."  *See Dillon*, 256 U.S. at 376.[11]

Before publishing an amendment, the Archivist may ensure that it complies with Article V's requirements and, consequently, any time limit that Congress put on the ratification process. Section 106b provides that the Archivist "shall" publish and certify an amendment only when the amendment "has been adopted[] *according to the provisions of the Constitution*."  1 U.S.C. § 106b (emphasis added).  Surely implied in that language is the Archivist's authority to determine whether a proposed amendment has in fact been adopted according to Article V's procedures before he publishes it.  *See* Congressional Pay Amendment, 16 Op. O.L.C. at 98–99. The ministerial nature of the Archivist's obligations does not mean that he must rubberstamp any ratification he receives but rather that, once he has determined that a proposed amendment has met Article V's requirements, he must publish it.  *See id.* at 98 ("The Archivist may not refuse to certify a *valid* amendment." (emphasis added)); *cf. Dahl v. Dickson*, No. 19-cv-3267, 2020 WL 6887925, at *5 (D.D.C. Nov. 24, 2020) (explaining that a duty may be ministerial "if it involves enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required" (quoting *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988))).  A contrary result would be absurd.  On Plaintiffs' reading, for

---

[11] For the same reason, *Leser v. Garnett*, 258 U.S. 130 (1922), does not apply.  *Leser* held that a state's notice of ratification can sometimes be "conclusive" on the Archivist.  *See id.* at 137.  But the claim at issue there was that two states' ratifications were invalid because they violated state legislative procedure rules—not Article V's requirements.  *Id.*

example, the Archivist would have to accept a state's ratification by convention even if Congress had called for ratification by legislature. Section 106b cannot possibly require the Archivist to publish and certify a proposed amendment that so clearly violates a condition of Article V.

A congressionally imposed ratification deadline is no different. As mentioned earlier, the Supreme Court held in *Dillon* that Congress can attach a deadline to a proposed amendment "as an incident of its power to designate the mode of ratification." 256 U.S. at 376. That means that Congress's power to set a ratification deadline comes directly from Article V. *See* U.S. Const. art. V (providing for ratification by state legislatures or conventions "as the one or the other Mode of Ratification may be proposed by the Congress"); *see also United States v. Sprague*, 282 U.S. 716, 730 (1931) ("The choice . . . of the mode of ratification, lies in the sole discretion of Congress."). The Archivist's assessment of whether a proposed amendment "has been adopted[] according to the provisions of the Constitution," 1 U.S.C. § 106b, should therefore include confirmation that the states ratified the amendment in accordance with any properly imposed ratification deadline. Because Congress derives its power to set a ratification deadline from Article V, it would be just as absurd for the Archivist to ignore such a deadline as it would be for him to ignore a violation of one of the conditions stated expressly in Article V. Contrary to Plaintiffs' contention, the Archivist does not have to accept their ratifications as valid merely because they told him to.

Plaintiffs' second reason for requiring the Archivist to publish the ERA despite its ratification deadline is that the deadline is not actually part of the proposed amendment. *See* Pls.' Opp'n at 19–26. The argument rests on a distinction between the preamble to the joint resolution proposing the ERA and the text of the proposed amendment itself. The ERA's original deadline is in the former, not the latter. *See* H.R.J. Res. 208, 86 Stat. 1523. Whether the

distinction matters is a question of first impression.  Given that the deadline-setting power is implied in Article V to begin with, *see Dillon*, 256 U.S. at 375–76, the Constitution's text provides no guidance.  The Supreme Court has not spoken directly on the issue either.  Mindful that "the longstanding 'practice of the government' can inform our determination of 'what the law is,'" the Court looks to history.  *See NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (first quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819); and then quoting *Marbury*, 5 U.S. (1 Cranch) at 177).  It finds that Congress has routinely put ratification conditions in the preambles of proposing resolutions since the Founding.  And that practice is consistent with what few hints the Supreme Court has provided on the subject as well as the common understanding that Congress's ratification conditions have had meaning even when placed in introductory language.  Consequently, the Court holds that the ERA's ratification deadline is effective despite its location outside the text of the proposed amendment.

There is a long history of Congress placing ratification conditions in its proposing resolutions' prefatory language.  In the introduction to the joint resolution proposing the first constitutional amendments (ten of which became the Bill of Rights and another of which later became the Twenty-Seventh Amendment), the First Congress declared:

> the following articles be proposed to the legislatures of the several states, as amendments to the constitution of the United States, all or any of which articles, *when ratified by three fourths of the said legislatures*, to be valid to all intents and purposes, as part of the said Constitution . . . .

J. Res., 1st Cong., 1 Stat. 97 (1789) (emphasis added).  With that, Congress began the practice of dictating an amendment's "Mode of Ratification" through language in the proposing resolution's prefatory clause.  It has maintained that practice for every amendment proposed since.  *See* 2020 OLC ERA Opinion at 15 n.15 (collecting proposing resolutions).  And states have always followed Congress's direction without question—even the one time Congress called for

ratification by convention.  *See generally* Everett S. Brown, *The Ratification of the Twenty-First Amendment*, 29 Am. Pol. Sci. Rev. 1005 (1935) (providing a detailed overview of the states' approaches to ratification conventions for the Twenty-First Amendment).  This longstanding practice is significant because, as stated, Congress's power to fix a ratification deadline is "incident of its power to designate the mode of ratification."  *Dillon*, 256 U.S. at 376.  If Congress can dictate the mode of ratification in the prefatory language accompanying a proposed amendment, then it should be able to dictate a ratification deadline in the same fashion.

Congress has shown it believes that it can do just that.  Congress began to set ratification deadlines with the Eighteenth Amendment in 1917 and, with the exception of the Nineteenth Amendment, has included a deadline in every proposed amendment since.  2020 OLC ERA Opinion at 15 (collecting proposing resolutions).  It put the deadline for the Eighteenth, Twentieth, Twenty-First, and Twenty-Second Amendments in the texts of the proposed amendments.  *See* U.S. Const. amends. XVIII, § 3; XX, § 6; XXI, § 3; XXII, § 2.  But beginning in 1960 with the proposal of the Twenty-Third Amendment, Congress started to put deadlines in proposing resolutions' introductory clauses.[12]  The reason was simple: Congress wanted to stop "cluttering up" the Constitution with provisions that were useless immediately upon ratification.

---

[12] *See* S.J. Res. 39, 86th Cong., 74 Stat. 1057 (1960) (Twenty-Third Amendment); S.J. Res. 29, 87th Cong., 76 Stat. 1259 (1962) (Twenty-Fourth Amendment); S.J. Res. 1, 89th Cong., 79 Stat. 1327 (1965) (Twenty-Fifth Amendment); S.J. Res. 7, 92d Cong., 85 Stat. 825 (1971) (Twenty-Sixth Amendment); H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972) (ERA); H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment).  Notably, the proposing resolution for the D.C. Congressional Representation Amendment included a deadline in both the preamble and the text of the proposed amendment. *See* H.R.J. Res. 554, 92 Stat. 3795.  Though debates on that amendment "did not show any significant acknowledgement of the fact" that the limit was in both places, the House Report stated: "The effect of placing this time limit in the text of the amendment prohibits subsequent Congresses from deciding to extend the period of time allowed for ratification."  Witter, *supra*, at 214–15 (quoting H.R. Rep. No. 95-886, at 7 (1978)).

*E.g.*, 2020 OLC ERA Opinion at 20–21; Dellinger, *supra*, at 408; Ginsburg, *supra*, at 923.  It did

not expect that changing the location of a deadline would affect the deadline's effectiveness.  *See*

2020 OLC ERA Opinion at 21 ("[W]e have found no indication that Members of Congress (or

any court) seriously questioned the binding nature of a deadline stated in a resolution's proposing

clause rather than the text of its proposed amendment."); *see also* Grover Rees III, *Throwing*

*Away the Key: The Unconstitutionality of the Equal Rights Amendment Extension*, 58 Texas L.

Rev. 875, 917–19 (1980) (describing the legislative history behind Congress's decision to

transfer the deadline for the Twenty-Third Amendment from its text to prefatory language in the

proposing resolution).  While Congress has not included deadlines in proposed amendments'

introductions for as long as it has put the mode of ratification there, the practice has still persisted

for over sixty years.  The Court affords that practice due weight.  *See Noel Canning*, 573 U.S. at

525 ("[T]his Court has treated practice as an important interpretive factor even when the nature

or longevity of that practice is subject to dispute, and even when that practice began after the

founding era."); *cf. Dames & Moore v. Regan*, 453 U.S. 654, 684 (1981) ("[E]ven if the pre-1952

cases should be disregarded, congressional acquiescence in settlement agreements since that time

supports the President's power to act here.").

Two clues from the Supreme Court corroborate the idea that ratification deadlines located

in proposing resolutions' preambles are as effective as those found in the proposed amendments

themselves.  First, the *Coleman* Court suggested that it did not matter where Congress put a

ratification deadline when, in distinguishing the amendment at issue there from the amendment

at issue in *Dillon*, it observed: "No limitation of time for ratification is provided in the instant

case either in the proposed amendment *or in the resolution of submission*."  307 U.S. at 452

(emphasis added); *see also* 2020 OLC ERA Opinion at 12, 19.

Second, the Supreme Court's vacatur of the decision in *Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1981), appeared to tacitly acknowledge that the ERA's ratification deadline was effective.  The *Freeman* court held, among other things, that a state could withdraw a prior ratification before an amendment reached the three-fourths threshold, *id.* at 1150, and that Congress could not extend the ERA's ratification deadline, *id.* at 1153.  After the Supreme Court granted review but before it heard argument, the ERA's extended deadline elapsed.  2020 OLC Opinion at 23.  "At that point, the Acting Solicitor General urged the Court to dismiss the case as moot because 'the Amendment has failed of adoption no matter what the resolution of the legal issues presented.'"  *Id.* (quoting Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (U.S. July 9, 1982)).  The Court agreed to dismiss the case.  Citing the Acting Solicitor General's filing, it held that the case was moot and vacated the lower court's decision.  *Nat'l Org. for Women*, 459 U.S. 809.  To reach that conclusion, the Court must have assumed that the ERA's deadline barred further ratifications— as the respondents warned a mootness ruling would imply.  *See* 2020 OLC Opinion at 24 ("Even an unexplained ruling that this case is moot would necessarily signal implicit acceptance of [the Acting Solicitor General's] position . . . ." (alteration in original) (quoting Resp. of Nat'l Org. for Women, Inc., et al., to Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (July 23, 1982))).  If the deadline was ineffective, a live controversy would have remained because additional states' ratifications could have still pushed the ERA past the three-fourths threshold.

The point of recounting these clues is not to say that the Supreme Court has weighed in on the validity of ratification deadlines in a proposing resolution's preamble.  Of course not.  To call the first one "dictum" would be generous.  And the second one is based on a summary

disposition that employed a doctrine "specifically aimed at preventing a decision subsequently mooted 'from spawning any legal consequences.'" *See Am. Fed'n of Gov't Emps. Nat'l Council, 118-ICE v. Fed. Labor Rels. Auth.*, 926 F.3d 814, 819 n.3 (D.C. Cir. 2019) (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 41 (1950)). Nevertheless, both clues are helpful because what they suggest accords with longstanding congressional practice: it makes no difference if a ratification deadline is in the prefatory text of a resolution proposing an amendment or in the amendment itself—either way, the deadline is valid.

Accepting that the location of a deadline is immaterial does not evade Article V's procedural requirements in any meaningful way. Congress considers the full proposing resolution alongside the proposed amendment's text, so the resolution's prefatory language still receives the assent of two-thirds of both houses of Congress. *See* 2020 OLC ERA Opinion at 14–15. In fact, Congress has debated proposing resolutions' preambles just as it has debated the text of proposed amendments since the Founding. *See id.* (discussing debate over a clause preceding the first twelve proposed amendments, which permitted the states to ratify "all or any" of those proposals, J. Res. 1, 1 Stat. at 97 (citing 4 *Documentary History of the First Federal Congress of the United States of America* 35–45 (Charlene Bangs Bickford & Helen E. Veit eds., 1986))). The Congress that proposed the ERA continued that tradition. Inclusion of a deadline was a compromise that helped Congress successfully propose the ERA where previous attempts to pass a proposal had failed. *See* 2020 OLC ERA Opinion at 4–6; Rees, *supra*, at 915–19; Witter, *supra*, at 215–17. There is likewise little doubt that the states were aware of the ERA's deadline. Twenty-five of the thirty-five states that ratified the ERA by 1977 voted on an instrument of ratification that quoted Congress's joint resolution in its entirety. *Equal Rights Amendment Extension: Hearings on S.J. Res. 134 Before the Subcomm. on the Constitution of*

*the S. Comm. on the Judiciary*, 95th Cong. 739 (1979).  Five other states voted on instruments that did not quote the entire resolution but nonetheless referenced its seven-year deadline.  *Id.* at 739–40.  And two of the remaining five states that did not mention the ERA's deadline in their instruments of ratification cited to Congress's joint resolution.  *See id.* at 748, 751.  Given the debate over the deadline in Congress, the presence of the deadline in the proposing resolution, and the extensive media coverage of the ERA at the time,[13] the Court cannot believe that the deadline took anyone by surprise.  *See* 2020 OLC ERA Opinion at 23; Rees, *supra*, at 914–15.

Finally, Plaintiffs cite three cases for the general principle that prefatory language cannot affect the scope of operative language.  *See* Pls.' Opp'n at 25 n.22.  *Yazoo & M.V.R. Co. v. Thomas*, 132 U.S. 174 (1889), applied the principle to a statute's preamble.  *Id.* at 188.  *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), applied the principle to the Constitution's preamble.  *Id.* at 22.  And *District of Columbia v. Heller*, 554 U.S. 570 (2008), applied the principle to the prefatory clause in the Second Amendment.  *Id.* at 578–79 & n.3; *see also* U.S. Const. amend. II ("*A well regulated Militia, being necessary to the security of a free State*, the right of the people to keep and bear Arms, shall not be infringed." (emphasis added to prefatory clause)).

True as it generally is, the principle does not control here.  The process governing "the proposition, or adoption, of amendments to the Constitution" is different from that governing "ordinary cases of legislation."  *Hollingsworth*, 3 U.S. (3 Dall.) at 381 n.*.  And even though

---

[13] *See, e.g.*, Eileen Shanahan, *Equal Rights Amendment Is Approved by Congress*, N.Y. Times, Mar. 23, 1972, at 1 ("The amendment itself permits seven years to elapse before it dies, if unratified."); Judy Rollins, *Equal Rights Amendment—Pass or Not to Pass*, Salt Lake Trib., Jan. 14, 1973, at 77 ("The ERA will become law when passed by three-fourths of the state legislatures . . . within seven years of March, 1972."); Paul G. Edwards, *Senate Gives ERA Chance In Virginia*, Wash. Post, Jan. 25, 1977, at C1 ("Only three more states must ratify the amendment, which would ban discrimination based on sex, before March 22, 1979, to make it a part of the U.S. Constitution.").

*Jacobson* and *Heller* both dealt with text in the Constitution, the prefatory language at issue in those cases differs markedly from the ratification conditions that Congress puts in the introductions of proposing resolutions.  As the Supreme Court explained, the preamble to the Constitution and the prefatory clause in the Second Amendment are statements of general purpose.  *See Jacobson*, 197 U.S. at 22 ("Although that preamble indicates the general purposes for which the people ordained and established the Constitution, it has never been regarded as the source of any substantive power conferred on the government of the United States . . . ."); *Heller*, 554 U.S. at 577 (explaining that the Second Amendment's prefatory clause "announces a purpose").  They do not lay out discernable rules or standards that one would expect to have substantive effect.  By contrast, the ratification conditions that Congress has included in proposing resolutions' introductions—determining the "Mode of Ratification" or setting a deadline—draw unmistakable lines for states to follow and for the public to rely on.  There is no doubt that Congress intended them to be binding.  And few have questioned that they are.  The Court will not pull the rug out from under Congress's long-accepted practice of declaring ratification conditions in a proposing resolution's preamble based on a technicality.  *Cf. Sprague*, 282 U.S. at 731 ("The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning; where the intention is clear there is no room for construction and no excuse for interpolation or addition."); *McCulloch*, 17 U.S. (4 Wheat.) at 407 ("[W]e must never forget that it is a *constitution* we are expounding.").  It holds that the ERA's deadline barred Plaintiffs' late-coming ratifications.

*     *     *

To summarize, the Archivist has no duty to publish and certify the ERA.  Section 106b permits him to consider whether a state's ratification complies with a congressionally imposed ratification deadline.  And a ratification deadline in a proposing resolution's introduction is just as effective as one in the text of a proposed amendment.  Plaintiffs' ratifications came after both the original and extended deadlines that Congress attached to the ERA, so the Archivist is not bound to record them as valid.  Accordingly, Plaintiffs' request for mandamus is denied.

Equally significant as the Court's holding is what it does not hold.  In light of its decision on the deadline issue, the Court does not reach the question of whether states can validly rescind prior ratifications.  Nor does the Court make any statement on whether Congress's extension of the ERA deadline was constitutional.  It does not need to.  If the extension was unconstitutional, then the original deadline bars ratification; if the extension was constitutional, then the extended deadline has passed too.  Congress has not tried to revive the ERA despite both deadlines' expirations, so the Court is not confronted with that difficult issue either.  And because the Court holds that the ERA's deadline is effective, it does not need to discuss Intervenors' argument that the Constitution imposes an implicit reasonableness-based time limit on proposed amendments that would apply absent a deadline.  *See* Intervenors' Mot. at 16–23; Intervenors' Reply at 5–9. Lastly, the Court does not express an opinion on the merits of the ERA as a matter of policy.  It merely enforces a procedural time limit that Congress set when proposing the amendment.

## V.  CONCLUSION

For the foregoing reasons, the Archivist's motion to dismiss (ECF No. 29) is **GRANTED**; Intervenors' motion for summary judgment construed as a motion to dismiss (ECF No. 74) is **GRANTED**; and Plaintiffs' motion for summary judgment (ECF No. 100) is **DENIED**.  In addition, Intervenors' unopposed motion to consolidate hearings (ECF No. 88) is

**DENIED**; the Archivist's motion to stay summary-judgment briefing (ECF No. 104) is

**DENIED**; and amici's motions for leave to file amicus briefs (ECF Nos. 31, 40, 44, 48, 51, 61,

66, 68, 73, 90, 91, 94, 96, 108) are **GRANTED**.  An order consistent with this Memorandum

Opinion is separately and contemporaneously issued.

Dated: March 5, 2021                                    RUDOLPH CONTRERAS
                                                       United States District Judge